**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

**Docket Number(s):** 26-1835

**Caption [use short title]**

**Motion for:** emergency motion pursuant to Circuit Rule 27.1(d)

for injunction pending appeal pursuant to Fed. R. App. P. 8(a)

KalshiEX LLC v. Williams

Set forth below precise, complete statement of relief sought:

Plaintiff KalshiEX LLC seeks "an order ... granting an injunction

while an appeal is pending." Fed. R. App. P. 8(a)(1)(C).

Plaintiff seeks an injunction enjoining Defendants from

enforcing New York gambling laws against Kalshi.

Plaintiff requests emergency relief by July 30, 2026.

**MOVING PARTY:** KalshiEX LLC          **OPPOSING PARTY:** Williams

☑ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner          ☐ Appellee/Respondent

**MOVING ATTORNEY:** Neal Kumar Katyal          **OPPOSING ATTORNEY:** Grace Zhou

[name of attorney, with firm, address, phone number and e-mail]

| | |
|---|---|
| Milbank LLP | New York Office of the Attorney General |
| 1101 New York Ave. NW, Washington DC 20005 | 28 Liberty Street, 23rd Fl., New York, NY 10005 |
| 202.835.7505 / nkatyal@milbank.com | 212.416.6160 / grace.zhou@ag.ny.gov |

Court- Judge/ Agency appealed from: S.D.N.Y. (No. 1:25-cv-8846), Hon. Analisa Torres

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):

Opposing counsel's position on motion:
☐ Unopposed   ☑ Opposed   ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes   ☐ No   ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☑ Yes  ☐ No
Has this relief been previously sought in this court?   ☐ Yes  ☑ No

Requested return date and explanation of emergency: July 30, 2026.

Kalshi is potentially subject to civil or criminal enforcement under the New York
laws challenged in this appeal. Defendants have agreed to withhold enforcement
of those laws through July 30, 2026, but refused to withhold enforcement
through the duration of the appeal.

Is the oral argument on motion requested?   ☑ Yes   ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?   ☐ Yes   ☑ No  If yes, enter date:

**Signature of Moving Attorney:**
s/Neal Kumar Katyal          **Date:** 07/23/2026          Service : ☑ Electronic   ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# 26-1835

IN THE

# United States Court of Appeals
## for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

ROBERT WILLIAMS, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York
No. 1:25-cv-8846 (Torres, J.)

**KALSHIEX LLC'S EMERGENCY MOTION FOR AN
INJUNCTION PENDING APPEAL
[RELIEF NEEDED BY JULY 30, 2026]**

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
  *Counsel of Record*
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

July 23, 2026

*Counsel for Plaintiff-Appellant
KalshiEX LLC*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant KalshiEX LLC discloses Kalshi Inc. as its parent company. No publicly held corporation owns 10% or more of KalshiEX LLC's stock.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BACKGROUND ..................................................................................... 4

I.    LEGAL BACKGROUND ........................................................... 4

II.   FACTUAL AND PROCEDURAL BACKGROUND................................7

LEGAL STANDARD .................................................................................10

ARGUMENT............................................................................................10

I.    KALSHI IS LIKELY TO PREVAIL ON APPEAL ............................... 11

    A.    The CFTC's Exclusive Jurisdiction Over Kalshi's Contracts Preempts State Law.................................................................. 11

    B.    The District Court Erred In Rejecting Preemption...................16

II.   KALSHI WILL SUFFER IRREPARABLE HARM ABSENT A STAY ................... 22

III.  THE EQUITIES STRONGLY FAVOR AN INJUNCTION................................. 24

CONCLUSION ....................................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

INDEX OF EXHIBITS

# TABLE OF AUTHORITIES

**CASES:**                                                                  Page(s)

*Agudath Israel of Am. v. Cuomo,*
  980 F.3d 222 (2d Cir. 2020) ...............................................................10

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
  977 F.2d 1147 (7th Cir. 1992) ..........................................................2, 15

*Buono v. Tyco Fire Prods., LP,*
  78 F.4th 490 (2d Cir. 2023)................................................................16

*Chi. Mercantile Exch. v. SEC,*
  883 F.2d 537 (7th Cir. 1989) ........................................................ 13, 14

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
  162 F.4th 631 (6th Cir. 2025) ...................................................... 16, 17, 25

*Cothran v. Ellis,*
  16 N.E. 646 (Ill. 1888) ......................................................................... 4

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ........................................................................... 11

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  622 F.2d 216 (6th Cir. 1980) ...........................................................6, 12

*Dickson v. Uhlmann Grain Co.,*
  288 U.S. 188 (1933) .........................................................................4, 21

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001)............................................................12

*KalshiEX LLC v. CFTC,*
  2024 WL 4164694 (D.D.C. Sep. 12, 2024) ..........................................7

*KalshiEX LLC v. Flaherty,*
  172 F.4th 220 (3d Cir. 2026) ........................................... 2, 3, 12, 17, 24

*KalshiEX LLC v. Orgel,*
  2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) .......................................7

# TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

*Leist v. Simplot,*
    638 F.2d 283 (2d Cir. 1981) ................................................1, 2, 4, 13, 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
    456 U.S. 353 (1982) ...........................................................................6, 12

*Mississippi v. Louisiana,*
    506 U.S. 73 (1992) ................................................................................ 11

*Monsanto Co. v. Durnell,*
    609 U.S. ----, 2026 WL 1825691 (2026) ...................................... 11, 12, 15

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) .............................................................................. 22

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ............................................................. 24, 25

*Oklahoma v. Castro-Huerta,*
    597 U.S. 629 (2022) ........................................................................... 2, 22

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
    579 U.S. 115 (2016) .............................................................................. 16

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,*
    608 F.2d 175 (5th Cir. 1979) ............................................................. 13, 14

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ................................................................. 24

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ...........................................................................11, 12

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.,*
    108 F.4th 144 (3d Cir. 2024) ................................................................. 12

*United States v. Arizona,*
    567 U.S. 387 (2012) .........................................................................15, 20

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Locke,*
529 U.S. 89 (2000) ...............................................................16

*United States v. Texas,*
144 S. Ct. 797 (2024).......................................................... 3

**STATUTES:**

7 U.S.C. §§

1a(19)(iv) ...................................................................... 5

1a(47)(A) ...................................................................... 5

1a(47)(A)(ii) ................................................................17

2(a)(1)(A) .....................................................1, 4, 5, 11, 17, 18

6c (1936) ......................................................................13

7(d) .......................................................................... 6

7a-2(c)(1).................................................................... 6

7a-2(c)(5)(C)(i) ........................................................ 5, 15, 19, 20

16(e)(1)(B)...................................................................18

16(e)(2)......................................................................19

16(h) ........................................................................ 20

31 U.S.C. § 5362(1)(A) ...................................................... 20

31 U.S.C. § 5362(1)(E)(ii) .............................................. 20, 21

N.Y. Penal Law § 225.10 .....................................................7

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 104(9) ..........................7

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367-a(4)(a)(ii) .........................14

## TABLE OF AUTHORITIES—Continued

Page(s)

**REGULATIONS & RULES:**

17 C.F.R. §§

38.4(b) ............................................................................................ 6

38.5(b) ............................................................................................ 6

38.151(b) .......................................................................... 6, 14, 15, 23

38.251(a) ........................................................................................ 6

40.2(a) ............................................................................................ 6

40.11(c) .......................................................................................... 6

40.11(c)(2) ...................................................................................... 6

Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents*, CFTC (July 14, 2026), https://perma.cc/82PB-J6QM ........................................................................................ 23, 24

Fed. R. App. P. 8(a) ....................................................................... 10

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) .............................................. 8, 9, 12, 14, 15, 16

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30,464 (1974) ....................................................... 13

156 Cong. Rec. S5906 (daily ed. July 15, 2010) .......................... 22

Hearings Before the S. Comm. on Agric. & Forestry, 93d Cong. (1974) ................................................................. 12, 13

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ............................. 1, 4, 13, 18, 19

H.R. Rep. No. 106-711, pt. 2 (2000) ....................................... 19, 20

vi

# TABLE OF AUTHORITIES—Continued

Page(s)

**OTHER AUTHORITIES:**

Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-integrity/kyc-surveillance (last visited July 23, 2026) ........................... 25

Kalshi, *Responsible Trading*, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited July 23, 2026) .......... 25

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ........................................................... 13, 14

## INTRODUCTION

Defendants have threatened to prosecute KalshiEX LLC ("Kalshi") under New York gambling laws for offering contracts subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Although Defendants' efforts are preempted under the plain text of the Commodity Exchange Act ("CEA"), the district court denied Kalshi a preliminary injunction, splitting from the only court of appeals to resolve the question and from the CFTC's own position. Kalshi thus faces an imminent risk of civil or *even criminal* enforcement under preempted state laws.

Kalshi is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Federal law accordingly preempts state regulation of trading on Kalshi, as confirmed by every marker of legislative intent. The CEA's text grants the CFTC "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Congress deleted the CEA provision that previously preserved concurrent state jurisdiction, noting its intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And Congress reinforced the CEA's exclusive jurisdiction after courts—including this Court—uniformly concluded that it "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1981)

1

(Friendly, J.). Federal law therefore bars states from regulating Kalshi's contracts under straightforward preemption principles. If New York could enforce its gambling laws against Kalshi, so could 49 other states, subjecting Kalshi to a patchwork of contradictory regulation, interfering with the CFTC's uniform oversight, conflicting with Kalshi's federal obligation to provide impartial access to its exchange, and resulting in "total chaos." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (citation omitted).

Nonetheless, to avoid what it viewed as undesirable consequences of preemption, the district court allowed New York to ban Kalshi's contracts. The court carved out an extratextual "gambling" exception to the CFTC's exclusive jurisdiction. Its decision rests on "purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). And it gets Congress's intent flat wrong. For as long as derivatives trading has existed, states have sought to ban it as a form of gambling. Congress was aware of these efforts and answered them by drawing a clear line: States may regulate off-exchange trading, but the CFTC alone may regulate on-DCM trading.

The decision below breaks from the only merits decision from any court of appeals on these issues. *See KalshiEX LLC v. Flaherty*, 172 F.4th

2

220, 224 (3d Cir. 2026). It is also inconsistent with the CFTC's position that "[s]tates cannot invade the CFTC's exclusive jurisdiction" "by re-characterizing swaps trading on DCMs as illegal gambling," which would present "a fundamental threat to Congress's statutory design." CFTC Br. 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br."). The CFTC's position, which the district court ignored, itself warrants relief.

Kalshi will face extensive irreparable harms absent injunctive relief. If Kalshi declines to comply with preempted state laws, it risks criminal prosecution. If it complies, it will violate its federal obligation to provide impartial access to its exchange nationwide and incur substantial financial harms that it could not recoup if it ultimately prevails on appeal. Defendants, by contrast, suffer no harm from complying with the Supremacy Clause.

Kalshi therefore respectfully requests that the Court grant an injunction pending appeal. Defendants have agreed to withhold enforcement against Kalshi through July 30, 2026, and Kalshi therefore respectfully requests a ruling by that date. If more time is needed to consider this motion, Kalshi respectfully requests that the Court grant administrative relief while this motion is pending. *See United States v. Texas*, 144 S. Ct. 797, 798-799 (2024) (Barrett, J., concurring).

3

## BACKGROUND

### I.   LEGAL BACKGROUND

Before Congress regulated derivatives, many states prohibited futures trading as "gambling." *E.g.*, *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). Congress began regulating derivatives trading with the Grain Futures Act of 1922. In 1936, Congress passed the CEA, extending the regulatory framework for grain futures to other commodities. These early statutes did not preempt state law. States remained free to regulate derivatives transactions, including by prohibiting "gambling in grain futures." *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

That changed in 1974, when Congress passed sweeping amendments to the CEA. Congress created the CFTC and granted it "exclusive jurisdiction" over on-DCM trading, thus "supersed[ing]" state laws. 7 U.S.C. § 2(a)(1)(A). Congress's purpose was to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35. This Court and others immediately recognized the amendments' preemptive effect. *E.g.*, *Leist*, 638 F.2d at 322.

The 1974 amendments swept broadly but did not preempt *all* state derivatives regulation. Section 2(a) made clear that, beyond the CFTC's "exclusive jurisdiction" over DCMs, the CEA did not "supersede or limit the

4

jurisdiction" of "regulatory authorities under the laws ... of any State." 7 U.S.C. § 2(a)(1)(A).

The CEA now gives the CFTC exclusive jurisdiction over "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on" DCMs. 7 U.S.C. § 2(a)(1)(A). The CEA broadly defines "swap" to include a contract tied to "the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," an agreement that "is" or "becomes[ ] commonly known to the trade as a swap," or any combination thereof. *Id.* § 1a(47)(A).

This appeal concerns event contracts, a type of derivative under the CFTC's exclusive jurisdiction. The CEA refers to event contracts as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon [an] occurrence." 7 U.S.C. § 7a-2(c)(5)(C)(i); *see id.* § 1a(19)(iv) (defining "excluded commodity" to include certain "occurrence[s]"). In 2010, Congress amended the CEA to add a "Special [R]ule" allowing the CFTC to review and prohibit event contracts within six categories—including contracts involving "gaming" or "activity that is unlawful under any Federal or State law"—if the CFTC concludes the contracts are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i). Absent

5

an adverse public-interest determination, however, DCMs may list such contracts for trading.

The CEA sets out a "comprehensive regulatory structure" for entities seeking to offer derivatives. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). Derivatives exchanges must become DCMs and comply with 23 "core principles" identified in the CEA and CFTC regulations. 7 U.S.C. § 7(d); 17 C.F.R. § 38.5(b). Among many requirements, DCMs must offer "impartial access" to their platforms, 17 C.F.R. § 38.151(b), and monitor for "manipulation," *id.* § 38.251(a).

The CEA also prescribes a detailed system for the approval and listing of contracts on DCMs. DCMs may list new contracts by self-certifying compliance with applicable requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a). If the CFTC concludes an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest review. 17 C.F.R. § 40.11(c). Following review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

In 2020, the CFTC certified Kalshi as a DCM.  *See KalshiEX LLC v. CFTC*, 2024 WL 4164694, at \*4 (D.D.C. Sep. 12, 2024).  Kalshi offers event contracts related to climate, health, popular culture, economics, and more.

In January 2025, Kalshi began offering contracts on sports events.  When Kalshi self-certified its sports contracts, the CFTC requested that Kalshi submit a written "[d]emonstration of [c]ompliance" with the CEA.  *KalshiEX LLC v. Orgel*, 2026 WL 474869, at \*5 (M.D. Tenn. Feb. 19, 2026).  Kalshi responded with detailed filings describing the contracts' compliance with applicable law.  *Id.*  The CFTC took no further action with respect to Kalshi's sports contracts, allowing Kalshi to list them.  *Id.*

In October 2025, the New York State Gaming Commission sent Kalshi a cease-and-desist letter asserting that Kalshi's sports contracts are prohibited by New York gambling law and demanding that Kalshi immediately cease offering them in New York.  The Commission threatened "civil penalties and fines" pursuant to New York gambling laws and accused Kalshi of violating state criminal laws that could subject Kalshi or its officers to imprisonment.  Ex. A at 2, 5; *see also* N.Y. Penal Law § 225.10; N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 104(9).  Kalshi filed this suit, asserting that the CEA preempts state regulation of Kalshi.

7

After preliminary-injunction briefing was complete, the CFTC supported Kalshi's position in related litigation. The CFTC explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction ... by re-characterizing swaps trading on DCMs as illegal gambling"; allowing states to regulate event contracts "is inconsistent with the text, structure, and history of the CEA"; and the states' theory presents "a fundamental threat to Congress's statutory design" that would create "a seismic shift in the longstanding status quo between CFTC and state authority." CFTC Br. 2. The CFTC has since sued numerous states, including New York, to enjoin unlawful enforcement actions against DCMs like Kalshi.[1]

The CFTC has also published a Notice of Proposed Rulemaking ("NPRM") concerning event contracts. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The NPRM recognizes the CEA "expressly preempts state laws"; confirms sports-event contracts are derivatives under CFTC jurisdiction; and concludes many (but not all)

---

[1] *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz.); *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn.); *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill.); *United States v. Kentucky*, No. 3:26-cv-49 (E.D. Ky.); *United States v. Minnesota*, No. 0:26-cv-2661 (D. Minn.); *United States v. New Mexico*, No. 1:26-cv-1912 (D.N.M.); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y.); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis.).

sports-event contracts "can be operated consistent with the public interest." *Id.* at 35,808, 35,813-15, 35,836.

The district court denied Kalshi a preliminary injunction without oral argument. It began by "assum[ing]" Kalshi's contracts are "swaps" subject to the CFTC's exclusive jurisdiction. Ex. B at 11 ("Op."). It also recognized that "it is clear from the CEA's text that Congress intended for the CFTC to have exclusive jurisdiction over swap transactions on DCMs." Op.11. But it nevertheless concluded that letting New York apply its gambling laws to DCM-traded swaps would not "sufficiently interfere[] with federal regulation" to be preempted. Op.11 (citation omitted).

Kalshi appealed. Defendants agreed to withhold any enforcement through July 30 to allow the parties to submit briefing on Kalshi's request for an injunction pending appeal, but declined to withhold enforcement through the duration of the appeal. Kalshi sought an injunction pending appeal in the district court on July 15, and informed the district court that, absent relief, Kalshi would seek relief in this Court on July 23. D. Ct. Dkt. No. 110 at 1. The district court has yet to rule on Kalshi's request. Kalshi respectfully moves for relief from this Court now to ensure the Court has sufficient time to consider the motion before July 30.

9

## LEGAL STANDARD

This Court may grant an injunction pending appeal to prevent irreparable harm. *See* Fed. R. App. P. 8(a). In determining whether to grant a stay of a lower-court order or injunction pending appeal, the Court considers the same factors a district court considers in deciding whether to grant a preliminary injunction: "movants generally bear the burden of showing that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 225-226 (2d Cir. 2020) (per curiam). While the factors courts consider are the same, a stronger showing is needed to obtain an injunction pending appeal than a stay. *Id.* at 226.

## ARGUMENT

This case cries out for relief pending appeal. The decision below privileges extratextual policy considerations over the statutory text, breaks from the Third Circuit, and ignores the CFTC's emphatic confirmation of its exclusive jurisdiction to regulate Kalshi. Without relief, Kalshi will suffer irreparable harm from being forced to choose between criminal liability under preempted state law and violation of its federal obligations, even as

10

the CFTC seeks to enjoin New York from applying its gambling laws in a separate case.

**I.  KALSHI IS LIKELY TO PREVAIL ON APPEAL.**

### A.  The CFTC's Exclusive Jurisdiction Over Kalshi's Contracts Preempts State Law.

The Supremacy Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Congress can preempt state law expressly in a statute; it can preempt an entire field of regulation; and it can preempt state law where compliance with both federal and state law is "impossible" or where state law stands as an "obstacle" to Congress's objectives.  *Id.* at 372-373 (citation modified).  These categories are not "rigidly distinct."  *Id.* at 372 n.6 (citation omitted).  The CEA preempts state regulation of trading on DCMs in each of these respects.

Express preemption: The CEA's plain text gives the CFTC "exclusive jurisdiction" over transactions on DCMs.  7 U.S.C. § 2(a)(1)(A).  The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992).  Thus, the Supreme Court has held that a statute granting "exclusive" "jurisdiction" preempts state law by specifying that "matters regulated by the Federal Act cannot be regulated by the States."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233-

234 (1947) (citation modified); *accord Monsanto Co. v. Durnell*, 609 U.S. ----, 2026 WL 1825691, at *5 (2026) (state law preempted where Congress gave agency "comprehensive and exclusive authority"). An "explicit statutory conferral of exclusive jurisdiction … over a particular subject matter is a form of express preemption." *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024).

The Third Circuit has accordingly held that the CEA's "text … preempts otherwise applicable state laws that purport to regulate sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 228. And the CFTC agrees that the CEA "expressly preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-registered exchanges." 91 Fed. Reg. at 35,808.

Field preemption: The CEA's express text resolves this case, but every other indicator of Congressional intent confirms preemption applies. The CEA is "a comprehensive regulatory structure" to oversee the "futures trading complex." *Curran*, 456 U.S. at 356 (citation omitted). That scheme leaves no room for parallel state regulation of trading on DCMs. The 1974 CEA amendments sought to "avoid unnecessary, overlapping and duplicative regulation" of DCMs. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citation omitted). Congress sought to bring "the futures markets"

12

"under Federal regulation" because "different State laws would just lead to total chaos." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 249, 685 (1974) (statements of Sen. Clark). And the conference report emphasized Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35.

When Congress considered the 1974 amendments, moreover, a provision of the CEA preserved any State law "applicable to any transaction" regulated by the CEA. 7 U.S.C. §6c (1936). Senate drafters "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis). This and other changes "wholly and unequivocally eliminated" each ground on which the CEA had previously been found to lack preemptive force. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-693 (1982). The changes would be incomprehensible if Congress intended to preserve state authority to regulate on-DCM trading.

This Court has therefore long recognized that "the CEA preempts the application of state law." *Leist*, 638 F.2d at 322. Other courts agree. *E.g.*, *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980) (CFTC's exclusive jurisdiction "ensure[d] that regulatory bodies other than the CFTC would not interfere with the orderly

development and enforcement of commodities regulation"); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (state-law "commercial gambling" claim barred because the CEA "preempts all state laws inconsistent with its provisions"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive").

The CFTC agrees—and always has. *See* Van Wart, *supra*, at 694-695. "Subjecting" event contracts "to a patchwork of 50 state regulations is precisely what Congress sought to avoid with the CEA." 91 Fed. Reg. at 35,808. "States cannot invade the CFTC's exclusive jurisdiction over" DCMs "by re-characterizing swaps trading on DCMs as illegal gambling"; a contrary conclusion would represent "a seismic shift in the longstanding status quo between CFTC and state authority." CFTC Br. 2.

Conflict preemption: Conflict-preemption principles also bar state regulation in at least three respects.

*First*, New York requires any entity offering sports wagering to ensure "that authorized sports bettors are physically located within the state." N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367-a(4)(a)(ii). Kalshi cannot run a nationwide exchange while requiring all transactions to come from within New York—to say nothing of compliance with 49 other states' laws. As the

14

CFTC has confirmed, compliance with such restrictions is an "impossibility" for DCMs, which are "required by federal law to provide 'impartial access' to all eligible participants nationwide," and "cannot fulfill [that] federal mandate" if subject to state-by-state regulation. CFTC Br. 26-27 (quoting 17 C.F.R. § 38.151(b)).

*Second*, "[a]pplying state-by-state local requirements to national commodity exchanges would" pose an "obstacle" to the CEA by creating "the very 'patchwork'" Congress sought to prevent. CFTC Br. 27; *see Monsanto*, 2026 WL 1825691, at *6 (state law preempted where Congress's goal of "[u]niformity" "would otherwise be impossible to achieve" (citation modified)); *Am. Agric.*, 977 F.2d at 1156-57 (state law "is preempted" where it "would directly affect trading on" a DCM).

*Third*, letting New York ban Kalshi's contracts would conflict with the "method" Congress prescribed to regulate event contracts. *United States v. Arizona*, 567 U.S. 387, 406 (2012). The Special Rule provides that the CFTC *alone* "may" prohibit contracts involving "gaming" if it determines they are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). Exercising that authority, the CFTC has made clear that many sports-event contracts "can be operated consistent with the public interest," 91 Fed. Reg. at 35,836, while proposing to prohibit sports-event contracts "present[ing] a particular risk

of manipulation or market disruption," *id.* at 35,829. Letting states second-guess the CFTC's determination creates an obvious conflict.

## B. The District Court Erred In Rejecting Preemption.

The district court created an extratextual exception to the CFTC's exclusive jurisdiction to let states ban DCM-traded contracts under state gambling laws. In doing so, the district court committed multiple clear errors.

*First*, the court erred in applying "a presumption against preemption." Op.10 (citation omitted). Courts "do not invoke any presumption against pre-emption" where, as here, a statute "contains an express pre-emption clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified); *accord Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023).

In addition, no presumption applies "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). As this Court observed decades ago, "[t]he federal government has been vitally concerned with trading in futures since 1922." *Leist*, 638 F.2d at 322. While the district court believed Kalshi's contracts are "gambling," Op.10, that still does not warrant a presumption, because "regulation of *interstate* gambling isn't a traditional

16

area of state regulation," *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025). The district court accordingly erred in applying a presumption to disregard Congress's textual grant of exclusive jurisdiction to the CFTC.

*Second,* the district court's express-preemption analysis was severely flawed. The court "assume[d]" Kalshi's sports-event contracts "are swaps under the CEA."[2] Op.11. The court also noted that "it is clear from the CEA's text that Congress intended for the CFTC to have exclusive jurisdiction over swap transactions on DCMs." *Id.* That should have been dispositive: If Kalshi's contracts are DCM-traded swaps, and if Congress gave the CFTC "exclusive jurisdiction" over DCM-traded swaps, then states have no jurisdiction over those contracts. But the court elided the text's plain meaning, declaring that the "scope of Congress' intent to displace state law ... can be determined by considering" "implied preemption." Op.12 (citation modified). That reasoning is untenable. The scope of express preemption

---

[2] The CEA grants the CFTC "exclusive jurisdiction ... with respect to accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). The court's assumption that Kalshi's contracts fall within this provision is correct, both because Kalshi's contracts are DCM-traded agreements and because they are DCM-traded swaps. *See id.* § 1a(47)(A)(ii); *Flaherty*, 172 F.4th at 227 (holding Kalshi's sports-event contracts "fit comfortably within the statutory definition" of swap (citation omitted)).

follows from the CEA's text, not "implied preemption." The court left the task of interpreting the CEA's express-preemption clause unfinished, simply moving on to address implied preemption.

*Third*, the district court relied on Section 2(a)'s savings clause but omitted the relevant portion. The court quoted the savings clause as providing that Section 2 does not "supersede" or "limit" the jurisdiction of "other regulatory authorities" under the laws "of any State." Op.13 (citation omitted). But that skips the critical proviso making clear the savings clause applies "*[e]xcept as hereinabove provided*" by the grant of "exclusive jurisdiction" to the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Congress added the proviso specifically to "clarify[ ]" that "where applicable," the CFTC's jurisdiction "supersedes State as well as Federal agencies." H.R. Rep. No. 93-1383, at 35. Thus, rather than undermine preemption, the savings clause reinforces that the CFTC's exclusive jurisdiction *does* "supersede" states from regulating on-DCM transactions. 7 U.S.C. § 2(a)(1)(A).

*Fourth*, the district court noted that the CEA leaves "room for supplementary state legislation." Op.14 (citation omitted); *see* 7 U.S.C. §§ 2(a)(1)(A), 16(e)(1)(B). But the CEA *only* allows states to regulate *off-DCM* transactions. *See* H.R. Rep. No. 93-1383, at 36 (Congress did "not contemplate that there will be a need for any supplementary regulation by

18

the States"). The court interpreted the Special Rule to "demonstrate[ ]" some state law can "operate in tandem with the CEA." Op.13. But nothing about the Special Rule grants states concurrent jurisdiction to regulate DCM-traded instruments. Instead, it grants the *CFTC*—not 50 states—authority to prohibit as "contrary to the public interest" event contracts that "involve" "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule is a grant of authority to the CFTC, not states.

*Fifth,* the court pointed to express-preemption clauses in Section 16 and maintained "Congress' intended scope of preemption" is limited to those clauses. Op.14. But these clauses support Kalshi; they preempt state law as to transactions that *need not occur on DCMs.* Section 16(e)(2) preempts application of state gaming laws to agreements "excluded or exempted from the CEA," which need not be traded on-DCM. Op.14; *see* 7 U.S.C. § 16(e)(2). Congress's decision in 2000 to preempt state gaming law as to these excluded transactions turned critically on its recognition that "*the current*" CEA already "supersedes and preempts" state laws "in the case of transactions conducted *on a registered entity*," and the new provision clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to excluded transactions as well. H.R. Rep. No. 106-711, pt. 2,

19

at 71 (2000) (emphasis added). Section 16(h) similarly prevents states from regulating swaps—whether DCM-traded or over-the-counter—as insurance. 7 U.S.C. § 16(h). Neither of these provisions undermines the conclusion that the CEA's exclusive-jurisdiction provision preempts state regulation of on-DCM trading. "[T]he existence of an express preemption provision does *not* ... impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause." *Arizona*, 567 U.S. at 406 (citation modified).

*Sixth*, the court overlooked overwhelming evidence that Congress intended derivatives to be subject to CFTC regulation rather than state gambling laws. The Special Rule's reference to "[e]vent contracts" involving "gaming" as one type of "swap" is irrefutable textual proof Congress understood that sports contracts would fall under the CFTC's jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA") underscores that Congress intended the CFTC to regulate transactions on DCMs rather than state gambling laws. UIGEA, which regulates interstate "bets or wagers" over the Internet, acknowledges that a "bet or wager" can pertain to "a sporting event," 31 U.S.C. § 5362(1)(A), but specifically provides that "any transaction conducted on or subject to the

20

rules of a registered entity or exempt board of trade under the Commodity Exchange Act" is *not* a "bet or wager," *id.* § 5362(1)(E)(ii).

Indeed, if the district court were correct, nothing would stop states from prohibiting *all event contracts* or *all futures trading* as gambling—as dozens of states did a century ago. *Dickson*, 288 U.S. at 198. The theory that state gambling laws are not preempted lacks "any limiting principle," and "upend[s] decades of well-settled and Congressionally-mandated exclusive jurisdiction." CFTC Br. 3.

*Finally*, the court erred in rejecting conflict preemption. It maintained that the impartial-access requirement "does not require DCMs to offer contracts nationwide." Op.16. The CFTC has said the opposite, explaining that compliance with state laws like New York's is an "impossibility" because a DCM "cannot fulfill its federal mandate" if it imposes geographical state-by-state restrictions. CFTC Br. 26-27. The district court's contrary reasoning would mean that DCMs *must offer up to 50 different markets for the same contracts*, a "seismic shift." *Id.* at 2. The court acknowledged the "CFTC holds the authority to determine whether a contract is legal," Op.18, but it simply ignored that the CFTC *has* determined Kalshi's contracts are legal. The CFTC's position is a materially new development since this case was briefed, and it strongly favors relief pending appeal.

21

The district court asserted the CEA allows states "to regulate tangential issues that may arise from trading" on DCMs. Op.17. But New York's assertion of power to ban transactions on DCMs is not a tangential issue. The court relied on floor statements from one legislator to suggest that "Congress sought to prohibit the exact types of event contracts that Kalshi seeks to offer." Op.18. But the Supreme Court has "repeatedly stated" that "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Castro-Huerta*, 597 U.S. at 642. And the cited statements support Kalshi by confirming Congress sought to "restore *CFTC's authority* to prevent" gaming contracts—not to let states exercise concurrent jurisdiction. 156 Cong. Rec. S5906 (daily ed. July 15, 2010) (emphasis added).

## II. KALSHI WILL SUFFER IRREPARABLE HARM ABSENT A STAY.

The district court concluded Kalshi would not suffer irreparable harm absent relief. Op.19-20. Not so. Unless the Court enjoins the application of New York gaming law as to Kalshi, Kalshi will face a "Hobson's choice" of "violat[ing]" state law and exposing itself to "huge liability," or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Kalshi faces irreparable harm along several dimensions.

*First*, if Kalshi does not comply with Defendants' demands pending appeal, it faces potential civil or even criminal liability under New York's laws. Even the district court recognized that "the prospect of being subject to criminal prosecution could demonstrate a showing of irreparable injury." Op.19. Defendants should not be permitted to inflict such injury on Kalshi under New York's laws while this Court considers whether those very same laws are preempted. Moreover, if New York were to secure a state-court liability judgment in the meantime, that judgment could raise nettlesome jurisdictional complications if Kalshi later prevails before this Court, further underscoring the need to maintain the status quo.

*Second*, Kalshi would face other irreparable harms if it attempted to comply with Defendants' demands. "[I]immediate[ ]" compliance with New York law, as Defendants have demanded, *see* Ex. A at 5, would require terminating trading for hundreds of thousands of users in New York, many of whom have open investments on the platform, Ex. C ¶¶ 24-25. That would violate Kalshi's federal obligations. As the CFTC has emphasized, blocking users from certain states would prevent a DCM from "fulfill[ing] its federal mandate." CFTC Br. 26-27; *see* 17 C.F.R. § 38.151(b) (requiring DCMs to offer "impartial access"). And when Kalshi sought to unwind trades involving Michigan residents to comply with a state-court order, the CFTC

23

ordered Kalshi "to fulfill the trades in question in accordance with its normal practices." Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents* 1, CFTC (July 14, 2026), https://perma.cc/82PB-J6QM. Absent an injunction pending appeal, Defendants could put Kalshi in the extraordinary and untenable position of having to choose between compliance with state law and a direct order from Kalshi's federal regulator not to comply with state law.

*Third*, compliance with New York's demands would subject Kalshi to "economic and reputational harm, including loss of business and goodwill." *Flaherty*, 172 F.4th at 231; *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (holding "loss of reputation, good will, and business opportunities" constitutes irreparable harm). Blocking New York users and unwinding trades would cause an immediate loss of business for Kalshi. And those users may not immediately (or ever) return to Kalshi even if Kalshi prevails on appeal.

## III. THE EQUITIES STRONGLY FAVOR AN INJUNCTION.

The irreparable harms Kalshi will suffer absent relief easily outweigh any harms Defendants or the public would suffer if relief is granted. "The Government does not have an interest in the enforcement of an

24

unconstitutional law," so an injunction "is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation modified).

In denying a preliminary injunction, the district court invoked New York's interest in "regulating gaming in New York and ensuring" its "ability to effectuate [state] statutes." Op.21. But New York has not "los[t] its ability to regulate gambling other than" what is preempted by the CEA's grant of exclusive jurisdiction to the CFTC. *Churchill Downs*, 162 F.4th at 643. New York thus retains authority to apply its gambling laws to off-DCM conduct while this appeal is pending.

Kalshi, moreover, is subject to rigorous regulations and oversight—just from the CFTC, not New York. Kalshi also employs Know-Your-Customer procedures and lets users self-exclude from trading, take trading breaks, and set personal funding caps limiting deposits to Kalshi.[3] Defendants have proffered no evidence that Kalshi users in New York have suffered harm from trading on Kalshi. The question is not whether Kalshi should be regulated, but rather by whom. Congress's clear answer is the CFTC.

---

[3] Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-integrity/kyc-surveillance (last visited July 23, 2026); Kalshi, *Responsible Trading*, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited July 23, 2026).

## CONCLUSION

The Court should grant an injunction pending appeal, as well as emergency administrative relief to maintain the status quo while this motion is pending.

Date: July 23, 2026

Respectfully submitted,

*/s/ Neal Kumar Katyal*

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant
KalshiEX LLC*

26

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,195 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point type face.

Date: July 23, 2026          */s/ Neal Kumar Katyal*
                                    Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on July 23, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Second Circuit by using the ACMS.

Date: July 23, 2026                    */s/ Neal Kumar Katyal*
                                        Neal Kumar Katyal

## INDEX OF EXHIBITS

| Exhibit | Date | Document |
|---|---|---|
| A | 10/24/2025 (filed 10/28/2025) | Cease & Desist Letter from Robert Williams to Xavier Sottile, D. Ct. Dkt. No. 35-2 |
| B | 07/07/2026 | Opinion & Order, D. Ct. Dkt. No. 106 |
| C | 10/27/2025 | Decl. of Xavier Sottile in Support of Mot. For Prelim. Inj., D. Ct. Dkt. No. 18 |

# EXHIBIT A

# Exhibit 2



**KATHY HOCHUL**
Governor

October 24, 2025

**By Electronic Mail (*xsottile@kalshi.com*)**

Xavier Sottile
Head of Markets
KalshiEX LLC
594 Broadway, #407
New York, NY 10012

Re: Unlicensed sports wagering in New York State

Dear Xavier Sottile:

The New York State Gaming Commission ("Commission") has general jurisdiction over all gaming activities within New York State and over the corporations, associations and persons engaged therein, including, specifically, the regulation of sports wagering. Racing Law §§ 104(1) and (24). The Commission is empowered to levy and collect civil penalties and fines for any violation of the Racing Law. Racing Law § 104(9).

This letter constitutes a demand by the Commission that KalshiEX LLC ("Kalshi") cease and desist from illegally operating, advertising, promoting, administering, managing, or otherwise making available an unlicensed mobile sports wagering platform in New York State in connection with any sports event, whether through any of the contracts as described in the filings with the Secretary of the United States Commodity Futures Trading Commission ("CFTC") identified below (collectively, the "CFTC Filings"), or otherwise, including, without limitation, any other contract or product that provides an opportunity to risk something of value based upon an agreement or understanding that a person will receive something of value in the event of a certain outcome in connection with any sports event within the meaning of Racing Law section 1367(1)(t):

- "Will <team> win <event>?" contracts (February 7, 2005 CFTC filing);

- "Will <person> win the golf grand slam before <date>?" contracts (May 23, 2025 CFTC filing);

- "Will the next iteration of <golf tournament> have a first time winner?" contracts (May 23, 2025 CFTC filing);

- "Will <tennis player> win a major before <date>?" contracts (May 23, 2025 CFTC filing);

- "Will a Canadian hockey team win the Stanley Cup before <date>?" contracts (June 11, 2025);

354 Broadway, Schenectady, NY 12305 | gaming.ny.gov | info@gaming.ny.gov | 518-388-3300

Xavier Sottile
October 24, 2025
Page 2

- "Will <team> have the <best rank/worst rank> record in <league/division> in <season>?" contracts (June 13, 2025);

- "Will <person> win a Grand Slam in <year>?" contracts (July 22, 2025 CFTC filing);

- "How many games will <player> start in the <year> <season_type> <league> season?" contracts (July 25, 2025 CFTC filing);

- "Will <event 1> or <event 2> happen first?" contracts (August 12, 2025 CFTC filing;

- "Will <player/team> score <first/last/any/count> touchdown(s) in <time_period> of <game>?" contracts (August 18, 2025 CFTC filing);

- "Will <game> have <over/under> <count> points in <time period> of <game>?" contracts (August 18, 2025 CFTC filing);

- "Will <player> win another major championship before <date>?" contracts (August 26, 2025 CFTC filing);

- "Will <outcomes> occur in <events>?" contracts (August 30, 2025 CFTC filing);

- "Will <outcomes> occur in <events>?" contracts (September 2, 2025 CFTC filing);

- "Will <player> have <above/below/between/exactly/at least> <count> <statistic> in <time period> of <game>?" contracts (September 15, 2025 CFTC filing);

- "Will <team/person> play in <game>?" contracts (September 17, 2025 CFTC filing);

- "Will <participant> win <competition>?" contracts (September 24, 2025 CFTC filing);

- "Will <participant> be eliminated from <competition> before <date>?" contracts (September 24, 2025 CFTC filing);

- "Will <participant> reach <milestone> in <competition> before <date>?" contracts (September 26, 2025 CFTC filing);

- "Will <participant> be the last <with/without> <outcome> in <competition/season>?" contracts (September 26, 2025 CFTC filing).

The activity described on the Kalshi website and in its CFTC Filings is offering sports wagering gambling opportunities to Kalshi customers within the meaning of Penal Law § 225.00(2), in that the customer, in consummating a transaction through the Kalshi platform, is staking or risking "something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome" with respect to a sports event within the meaning of Racing Law section 1367(1)(t).

Xavier Sottile
October 24, 2025
Page 3

In New York, "sports wagering"

means wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets[.]

Racing Law § 1367(1)(x).

The purported event contracts described generally in Kalshi's CFTC Filings and as offered specifically through its public website (https://kalshi.com/sports/all-sports) are sports wagering within the meaning of New York law when they concern sports events within the meaning of Racing Law section 1367(1)(t).

Sports wagering may be conducted, advertised or promoted in New York only by entities licensed by the Commission. New York law provides:

No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York.

Racing Law § 1367-a(4)(b).

In-person sports wagering may be conducted in New York only at licensed casinos by entities that also hold gaming facility licenses from the Commission. Racing Law § 1367(2)(a). Mobile sports wagering conducted through servers at licensed casinos may be operated only by entities the Commission licenses pursuant to Racing Law 1367-a:

No entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission pursuant to this section.

Racing Law § 1367-a(2)(a).

"Mobile sports wagering platform"

means the combination of hardware, software, and data networks used to manage, administer, or control sports wagering and any associated wagers accessible by any electronic means including mobile applications and internet websites accessed via a mobile device or computer[.]

Xavier Sottile
October 24, 2025
Page 4


Racing Law § 1367(1)(k).

Kalshi is not licensed by the Commission to offer a platform for sports wagering in New York, either at a casino or as a mobile sports wagering operator. Accordingly, the Commission demands that Kalshi cease and desist immediately from illegally operating, advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform in New York, and confirm with the Commission through the undersigned that all such activity has ended.

The Commission reserves all rights to investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York.


Sincerely,


Robert Williams
Executive Director


cc:  Thomas Fattorusso
     Edmund Burns, Esq.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KALSHIEX LLC,

                                        Plaintiff,

        -against-

ROBERT WILLIAMS, in his official capacity as
Executive Director of the New York State
Gaming Commission; BRIAN O'DWYER, in his
official capacity as Chair and Commissioner of
the New York State Gaming Commission; JOHN
A. CROTTY, in his official capacity as
Commissioner of the New York State Gaming
Commission; SYLVIA B. HAMER, in her
official capacity as Commissioner of the New
York State Gaming Commission; MARTIN J.
MACK, in his official capacity as Commissioner
of the New York State Gaming Commission;
PETER J. MOSCHETTI, JR., in his official
capacity as Vice Chair and Commissioner of the
New York State Gaming Commission;
MARISSA SHORENSTEIN, in her official
capacity as Commissioner of the New York State
Gaming Commission; JERRY SKURNIK, in his
official capacity as Commissioner of the New
York State Gaming Commission; and the NEW
YORK STATE GAMING COMMISSION,

                                        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/7/2026

25 Civ. 8846 (AT)

**OPINION**
**AND**
**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, KalshiEX LLC ("Kalshi"), moves for a temporary restraining order and

preliminary injunction against the New York State Gaming Commission (the "Gaming

Commission") and the following Gaming Commission officials: Robert Williams, Executive

Director and Commissioner, Brian O'Dwyer, Chair and Commissioner, Peter J. Moschetti, Jr.,

Vice Chair and Commissioner, and Commissioners Jerry Skurnik, John A. Crotty, Marissa

Shorenstein, Martin J. Mack, and Sylvia B. Hamer (collectively, "Defendants"). *See* Proposed

Order to Show Cause ("POTSC"), ECF No. 15. Kalshi seeks an order enjoining Defendants

from enforcing New York state gambling laws against its offering of sports-related event contracts in New York during the pendency of this action. *See id.*; *see also* Mem., ECF No. 16; Wong Decl. I, ECF No. 17; Sottile Decl. I, ECF No. 18; Opp., ECF No. 52; Janofsky Decl., ECF No. 53; Reply, ECF No. 76; Sottile Decl. II, ECF No. 75; Wong Decl. II, ECF No. 79; Sur-reply, ECF No. 86. For the reasons stated below, Kalshi's motion is denied.

## BACKGROUND[1]

### I. Event Contracts

The Commodity Exchange Act ("CEA") provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356, 360–67 (1982). Under the CEA, the Commodity Futures Trading Commission ("CFTC") regulates the trade of financial derivatives. "A derivative is a financial instrument or contract whose price is directly dependent upon (i.e.[,] derived from) the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Commodity Futures Trading Comm'n ("KalshiEX D.D.C.")*, No. Civ. 23-3257, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024) (internal quotation marks and citations omitted), *appeal dismissed*, No. Civ. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025).

Subject to certain exceptions, the CFTC has "exclusive jurisdiction" to regulate various types of derivatives. Section 2(a)(1)(A) of the CEA states that the CFTC:

> shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution

---

[1] Having reviewed the parties' briefing, the Court finds that the material facts are not in dispute and, therefore, decides Plaintiffs' motion for a preliminary injunction without a hearing. *See* ECF No. 67 at 2 ("The parties have conferred and agree that there are no relevant facts in dispute that necessitate an evidentiary hearing and disputed facts are amenable to complete resolution on a paper record.").

2

> facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the [CFTC] pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A).

This lawsuit concerns a specific type of derivative called an "event contract." *See* Am. Compl. ¶ 2, ECF No. 35 ("Kalshi . . . offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts."). An event contract is a type of derivative contract "whose payoff is based on a specified event, occurrence, or value." *KalshiEX D.D.C.*, 2024 WL 4164694, at *2. Buyers of event contracts may trade "several possible outcomes" on any future event, and most commonly, they will trade either a "yes" or "no" position. Am. Compl. ¶ 27. The seller of an event contract implicitly takes the opposite position regarding the outcome of the event. If the buyer takes a position on a possible outcome of a future event and then that outcome actually occurs, they will receive a payment from the seller. *Id*.

> For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the 'yes' or the 'no' position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

*Id*. Traders can buy or sell event contracts for a specific value any time before they expire.

An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Under the CEA, DCMs are permitted to list contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2 (a)(2) (requiring DCMs to wait one business day before publicly trading self-certified contracts). In 2010, when Congress amended the CEA under the Dodd-Frank Wall Street Reform and Consumer Protection Act, it created a "[s]pecial rule for review and approval of event contracts and swaps contracts"

3

(the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C)(i). Under the Special Rule, the CFTC can review and prohibit certain types of contracts when those contracts are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," assassination," "war," "gaming," or "other similar activity determined by the [CFTC] by rule or regulation to be contrary to public interest." *Id.* § 7a-2(c)(5)(C)(i). Agreements, contracts, or transactions that the CFTC determines are contrary to public interest "may [not] be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii).[2]

## II.   Kalshi's Sports-Event Contracts

Kalshi, a financial services company, operates a prediction market that allows users to buy and sell event contracts on its platform. Am. Compl. ¶ 16. The CFTC has certified Kalshi as a DCM. *See id.* ¶¶ 2, 4, 16; Mem. at 6.

On January 22, 2025, Kalshi self-certified several contracts relating to sporting events ("sports-event contracts") and began to list them on its exchange. Am. Compl. ¶ 47. Kalshi's sports-event contracts allow users to place positions on the "outcomes of sports events," for example, "which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." *Id.* ¶¶ 32, 47.

Under New York law, any gambling enterprise that offers sports gaming, including wagering, must obtain a license from the Gaming Commission, the state agency that regulates gambling in New York. *See* N.Y. Rac. Pari-Mut. Wag. & Breed. Law ("Racing Law") §§ 1367(2)(a), 1367-a(4)(b); *see also id.* § 1367(1)(x) ("'Sports wagering' means wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes

---

[2] On June 10, 2026, the CFTC issued a notice of proposed rulemaking regarding the Special Rule for prediction market event contracts. *See* Press Release, CFTC, CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Event Contracts Involving Enumerated Activities, Release No. 9249-26 (June 10, 2026), available at https://www.cftc.gov/PressRoom/PressReleases/9249-26.

participating in a sporting event, or combination of sporting events . . . .”); Am. Compl. ¶ 25.

The offer of sports gaming in New York in violation of its gambling laws may risk civil and

criminal penalties.  *See* Racing Law §§ 104(9), 116; N.Y. Penal Law § 225.00 *et seq.*  Kalshi is

not licensed with the Gaming Commission to offer sports wagering.  Am. Compl. ¶ 48; *see* Opp.

at 1–2.

By letter dated October 24, 2025, the Gaming Commission directed Kalshi to "cease and

desist from illegally operating, advertising, promoting, administering, managing, or otherwise

making available an unlicensed mobile sports wagering platform in New York State in

connection with any sports event."  Ex. 2 at 4, ECF No. 35-2.[3]  The Gaming Commission

advised Kalshi that "[s]ports wagering may be conducted, advertised or promoted in New York

only by entities licensed by the [Gaming] Commission."  *Id.* at 3.

On October 27, 2025, Kalshi initiated this action against the Gaming Commission and its

members in their official capacities, seeking declaratory and injunctive relief and arguing that the

CFTC has exclusive jurisdiction over the sports-event contracts traded on Kalshi's exchange,

such that the Gaming Commission lacks the authority to enforce New York gambling laws

against Kalshi.  *See generally* Compl., ECF No. 1; *see also* Am. Compl.; POTSC; Mem.

Defendants contend that the Gaming Commission's regulation of Kalshi's sports-related event

contracts is not preempted by the CEA.  *See generally* Opp.

Various amici jointly filed a brief in support of Defendants, arguing that Kalshi has

"unlawfully and unfairly entered into the gaming market," and that "[b]y offering sports-event

contracts to people on Indian lands under the guise of commodity trading pursuant to [the CEA,]

Kalshi impedes tribes' inherent sovereign right to regulate gaming activity on those lands."

---

[3] Citations to "Ex." Refer to the exhibits filed with the amended complaint at ECF No. 35.

Tribal Amici Br. at 11, ECF No. 66.

III.     Nationwide Litigation

Courts in other jurisdictions have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.  Courts have found both in Kalshi's favor, granting its preliminary injunction motion, *see, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26 Civ. 34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026), and against it, denying its motion, *see, e.g.*, *Kalshiex LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Johnson*, No. 26 Civ. 1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025).

**DISCUSSION**

I.     Eleventh Amendment Immunity

As a preliminary matter, the Court addresses the issue of Eleventh Amendment immunity as to the Gaming Commission.  Defendants argue that Kalshi's claims against the Gaming Commission should be dismissed because it is a state agency covered by the Eleventh Amendment's immunity, which bars suit against the states, including "state agents and state instrumentalities that are, effectively, arms of a state."  *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (citation omitted); *see also* Opp. at 21–22.  The *Ex parte Young* doctrine allows suits like Kalshi's for prospective injunctive relief against New York state officers in their official capacities, notwithstanding Eleventh Amendment immunity.  *Reed v. Goertz*, 598 U.S. 230, 234 (2023) (citing *Ex parte Young*, 209 U.S. 123, 159–161

6

(1908)); *see also Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020).[4]  Defendants contend, however, that the *Ex parte Young* doctrine does not extend to Kalshi's claims against the Gaming Commission because it has not waived its Eleventh Amendment immunity and Congress did not abrogate states' immunity in enacting the CEA.  Opp. at 21–22.  Kalshi has not responded to the Gaming Commission's Eleventh Amendment defense in its briefing.  *See generally* Mem.; Reply.  The Court agrees with Defendants.  *See Walker v. New York State Dep't of Health*, 788 F. Supp. 3d 427, 490–91 (E.D.N.Y. 2025) (holding that the *Ex parte Young* exception "does not extend to suits against state agencies"); *Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 663 (N.D.N.Y. 2025) (dismissing the Gaming Commission from the action because none of the cases cited by the plaintiff "with respect to [the issue of the Gaming Commission's immunity] support the proposition that a state agency may be made a proper party to the suit because its constituent members are simultaneously sued pursuant to *Ex parte Young*").  Accordingly, the Gaming Commission is dismissed from the action because it is immune from suit under the Eleventh Amendment.

II.      Preliminary Injunction

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public

---

[4] The Court's conclusion that Kalshi's claims may proceed against the individual Gaming Commission members in their official capacities for the purposes of determining Kalshi's motion is without prejudice to Defendants' raising an Eleventh Amendment defense in a motion to dismiss.

interest." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 20).

"[W]hen, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (quoting *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014)); *see also Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). Kalshi must, therefore, "establish a clear or substantial likelihood of success on the merits." *New York State Firearms Ass'n*, 157 F.4th at 242 (quoting *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (per curiam)).

## A.  Likelihood of Success on the Merits

The merits of this case center on whether New York gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi argues that it has demonstrated a likelihood of success on the preemption issue that its sports-event contracts are exclusively regulated by the CFTC. *See* Mem. at 10. Defendants contend that Kalshi cannot show a likelihood of success on the merits because sports-event contracts do not fall within CFTC regulation and, therefore, may be regulated by New York law. *See* Opp. at 9. For the reasons explained below, the Court finds that New York gambling laws as applied to Kalshi's sports-event contracts are not preempted by the CEA and Kalshi has not, therefore, made a clear or substantial showing that it is likely to succeed on the merits.

8

1. Preemption Legal Standard

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Arizona v. United States*, 567 U.S. 387, 398–99 (2012). "In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (citations and internal quotation marks omitted).

"The key to the preemption inquiry is the intent of Congress." *Id.* at 104. "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress' preemptive intent may be inferred from the scope of the statute such that "Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* at 76–77 (citations omitted). "[T]he party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

9

2.    Express Preemption

Kalshi argues that the CEA expressly preempts New York gambling laws as applied to its sports-event contracts because the CFTC has "exclusive jurisdiction" over "transactions involving swaps," including Kalshi's sports-event contracts, that are "traded or executed" on DCMs like Kalshi.  Mem. at 8, 11–13; (citing 7 U.S.C. § 2(a)(1)(A)); *see* Reply at 1–4. Defendants contend that Kalshi's sports-event contracts are not "swaps" within the meaning of the CEA and are, therefore, not explicitly preempted.  *See* Opp. at 9–15.

Courts apply "a presumption against preemption with respect to areas where states have historically exercised their police powers." *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104; *see Altria Grp.*, 555 U.S. at 77 ("When addressing questions of express or implied pre-emption, we begin our analysis with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. . . . That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." (citations and internal quotation marks omitted).  "The scope of laws regulating gambling and lotteries is clearly a matter of predominantly state concern." *Chun v. State of N.Y.*, 807 F. Supp. 288, 292 (S.D.N.Y. 1992); *see KalshiEX, LLC v. Schuler* ("*Schuler I*"), No. 25 Civ. 1165, 2026 WL 657004, at *8 (S.D. Ohio Mar. 9, 2026) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare." (citations and internal quotation marks omitted)); *Martin*, 793 F. Supp. 3d at 677 ("It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." (quotation omitted)); *Flaherty*, 172 F.4th at 234 (Roth J., dissenting) ("Throughout U.S. history, gambling regulation has been largely left to the state legislatures.").

10

The presumption against preemption, therefore, applies to this case, and the Court must analyze whether Kalshi has demonstrated that in enacting the CEA, it was the "clear and manifest purpose of Congress" to preempt New York's authority to regulate gambling where a DCM, like Kalshi, offers sports-event contracts on its platform. *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 96 (citation omitted).

To discern Congress' intent, the Court begins with the CEA's text. It is clear that Congress intended the CEA to preempt certain areas of derivative trading—specifically, as relevant to this action, the CEA grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). For the purposes of resolving Kalshi's motion, consistent with the approach of other courts, the Court assumes without deciding that Kalshi's sports-event contracts are swaps under the CEA. *See Schuler II*, 2026 WL 1295806, at *3; *see also Commonwealth v. Kalshiex, LLC*, No. 2584 Civ. 2525, 2026 LX 33147, at *13 (Mass. Super. Ct. Jan. 20, 2026); *Martin*, 793 F. Supp. 3d at 675.[5]

The Court does not, however, end its inquiry there. Although it is clear from the CEA's text that Congress intended for the CFTC to have exclusive jurisdiction over swap transactions on DCMs, the Court must also determine the scope of that preemption—that is, "at what point the state regulation sufficiently interferes with federal regulation that it should be deemed [preempted]." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505

---

[5] The Court notes that some courts considering this issue in other jurisdictions have found that Kalshi's sports-event contracts are swaps within the meaning of the CEA, *see, e.g.*, *KalshiEX LLC v. Johnson*, No. 26 Civ. 1715, 2026 WL 1223373, at *4–5 (D. Ariz. May 5, 2026), and other courts have not, *see, e.g.*, *Schuler*, 2026 WL 657004, at *4–7.; *see also QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1166362, at *2–3 (W.D. Mich. Mar. 10, 2026) (finding that a different prediction contract market's sport-related products do not fall within the CEA's definition of a swap).

U.S. 88, 107, 112 (1992)); *see also Altria Grp.*, 555 U.S. at 76. The scope of Congress' intent to displace state law with its grant of exclusive jurisdiction to the CFTC can be determined by considering both field and conflict preemption as applied to Kalshi's sports-event contracts. *See N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104 ("Even where a federal law contains an express preemption clause, the court still may be required to consider implied preemption as it considers 'the question of the substance and scope of Congress' displacement of state law.'" (quoting *Altria Grp.*, 555 U.S. at 543)); *see also id.* ("By their nature, field preemption and conflict preemption are usually found based on implied manifestations of congressional intent.").

### 3. Implied Preemption

#### a. Field Preemption

The Court first considers the issue of field preemption, which is implicated where congressional action reflects a "decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401. The basic premise of field preemption is that "[s]tates may not enter, in any respect, an area the [f]ederal Government has reserved for itself." *Id.* at 402. Accordingly, "[i]n rare cases, the Court has found that Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation and quotation marks omitted).

Kalshi argues that Congress has "preempted the field of regulating trading on DCMs . . . implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation." Mem. at 11. Defendants contend that New York law is not field preempted as to Kalshi's sports-event contracts because Congress did not intend to regulate so broadly as to exclude all state law. *See* Opp. at 16–17.

12

Kalshi's field preemption argument, "like all preemption arguments, must be grounded in the text and structure of the statute at issue." *Garcia*, 589 U.S. at 208 (citation and quotation marks omitted). Although § 2 of the CEA grants the CFTC "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM, this grant is not without limits. Section 2 specifies that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA. *See Schuler II*, 2026 WL 1295806, at *5 ("[T]he presence of a savings clause [like in § 2] usually signals that Congress does not mean to preempt the field." (emphasis removed)); *Martin*, 793 F. Supp. 3d at 679 ("[T]he fact that the CEA has some field-preemptive effect does not mean that the 'field' Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws."); *id.* (holding that the clause in § 2 "on balance [] cuts against a finding of field preemption").

The scope of the CEA's preemption is further clarified by looking at the CEA's structure as a whole. Congress' enactment of the Special Rule in 7 U.S.C. § 7a-2(c) demonstrates its intent that some state law and regulation should operate in tandem with the CEA. Under the Special Rule, the CFTC has authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . [, *inter alia*,] activity that is unlawful under any Federal or State law" or "gaming." 7 U.S.C. §7a-2(c)(5)(C)(i). That is, the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Further, because Congress "expressly authorized the [CFTC] to prohibit particular categories of transactions as

13

contrary to the public interest *based on the fact that the conduct at issue would violate state law*[,]" this provision "severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA." *Id.* at 680 (emphasis in original). Moreover, given that the power to regulate gambling is a traditional police power exercised by New York, the Court also declines to interpret the CEA's grant of exclusive jurisdiction as leaving "no room for supplementary state legislation." *Garcia*, 289 U.S. at 208; *Schuler II*, 2026 WL 1295806, at *4–5; *Dep't of Revenue of Oregon v. ACF Indus.*, Inc., 510 U.S. 332, 345 (1994) ("When determining the breadth of a federal statute that impinges upon or pre-empts the States' traditional powers, we are hesitant to extend the statute beyond its evident scope.").

Finally, Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts. For example, § 16 prohibits the regulation of transactions involving swaps by state gambling laws in certain limited circumstances. *See* 7 U.S.C. § 16(e) (superseding and preempting "any State or local law that prohibits or regulates gaming or the operation of bucket shops" as it relates to certain electronic trading facilities or certain agreements that are excluded or exempted from the CEA). Neither of these circumstances is presented in this action, and Kalshi does not argue that the Court should find otherwise. *See generally* Mem.; Reply. Section 16 also prohibits state regulation of transactions involving swaps in other contexts like insurance contracts. *See, e.g.*, *id.* § 16(h) ("A swap . . . may not be regulated as an insurance contract under the law of any State."). These provisions provide "strong evidence" that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps. *See Martin*, 793 F. Supp.

14

at 681.  Therefore, Kalshi has not demonstrated a likelihood of success on the merits that New York's gambling laws are field preempted as applied to its sports-event contracts.

> b.  Conflict preemption

Next, the Court considers the issue of conflict preemption.  Kalshi argues that New York's gambling laws are conflict-preempted as applied to Kalshi's sports-event contracts because it would be impossible for Kalshi to comply with both state and federal law and because New York's laws are an obstacle to the accomplishment and execution of the full objectives of the CEA.  *See* Mem. at 16.  Defendants contend that Kalshi has failed to provide evidence demonstrating how New York gambling laws would conflict with or stand as an obstacle to achieving the purposes of the CEA.  *See* Opp at 20.  The Court agrees and holds that Kalshi has not shown that conflict preemption likely applies.

Conflict preemption of state law occurs where "'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Genna v. Sallie Mae, Inc.*, No. 11 Civ. 7371, 2012 WL 1339482, at *8 (S.D.N.Y. Apr. 17, 2012) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)).  Under the "purposes and objectives" inquiry, courts consider "whether the state law interferes with a method the federal law uses to promote its goal."  *Id.* (quoting *United States Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 703 F. Supp. 2d 329, 334 (S.D.N.Y. 2010)).  The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting

15

preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (quotation marks omitted).

First, Kalshi has not shown that it is impossible to comply with both New York gambling laws and the CEA. Kalshi contends that if it were required to comply with New York law, it would violate the CFTC's requirement that a DCM provide "impartial access to its markets and services" because Kalshi would be required to limit access to its exchange to persons living only in New York, which would be impossible for a nationwide platform such as Kalshi. *See* Mem. at 18–19. Not so. The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide. *See* 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants."). There is nothing preventing Kalshi from obtaining a license pursuant to New York law and establishing a category of New York market participants that does not discriminate within that New York-resident category. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that

16

Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access. . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *Schuler I*, 2026 WL 657004, at \*9 ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'").  Although complying with New York gambling laws imposes an additional regulatory requirement on Kalshi, that requirement is not squarely contrary to federal law.  Kalshi's attempt, therefore, to avoid that requirement is unavailing.

Second, New York's gambling laws as applied to Kalshi's sports-event contracts do not frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme.  Kalshi argues that "once [it] was approved as a CFTC-designated contract market, Kalshi was authorized to list its [sports-]event contracts by self-certifying that the contracts comported with federal law." Mem. at 18.  Kalshi contends that New York's attempt to regulate its sports-event contracts "would substantially interfere with the CFTC's discretion" to review Kalshi's self-certification on the ground that it was "contrary to the public interest" because the CFTC ultimately "chose not to do so."  *Id.* (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)).

This argument lacks merit and misinterprets the authority of Kalshi's self-certification of its sports-event contracts.  As stated above, the CEA's text and structure, as well as the historical context of New York's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs.  Instead, the CEA leaves room for states to regulate tangential issues that may arise from trading swaps and other financial products on DCMs.  As other courts have noted, the congressional record for the CEA

17

supports the view that when enacting the Special Rule, Congress sought to prohibit the exact types of event contracts that Kalshi seeks to offer. *See Flaherty*, 172 F.4th at 240 (Roth J., dissenting). For example, when discussing the Dodd-Frank Act, Senator Blanche Lincoln of Arkansas stated that the purpose of the Special Rule is to "prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events." 156 Cong. Rec. S5906 (2010). Senator Lincoln further explained that "it would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and [the] Masters Golf Tournament," which would be contracts that "would not serve any real commercial purpose" but "[r]ather, . . . would be used solely for gambling." *Id.* at S5906–07. Kalshi states that its contracts not only allow users to take positions and profit from devastating events, *e.g.*, "whether an earthquake will take place in Los Angeles County before December 31, 2025," Am. Compl. ¶ 27, but also sporting events, *e.g.*, "which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship," *id.* at ¶ 47. Further, although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful. The CFTC holds the authority to determine whether a contract is legal. *See* 7 U.S.C. § a-2(c)(5)(C)(i) ("The [Gaming] Commission may determine that . . . [event] contracts . . . are contrary to the public interest" if they involve "gaming"); 17 C.F.R. § 40.11(a)(1) ("A registered [DCM] shall not list for trading or accept for clearing on or through the registered entity any . . . agreement, contract, transaction, or swap . . . that involves, relates to, or references . . . gaming"). The Court declines to comment on CFTC's decision not to exercise its authority under the Special Rule or 17 C.F.R. § 40.11 with respect to Kalshi's sports-event contracts. However, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has

18

concluded they are not." *Schuler I*, 2026 WL 657004, at \*9. Therefore, New York's gambling

laws, which seek to regulate gaming in the state, complement rather than conflict with federal

law. Because Kalshi has failed to show likelihood of success on the merits as it relates to the

issue of preemption, this factor weighs against the issuance of a preliminary injunction.

        B.  Irreparable Harm

To satisfy the irreparable harm requirement, Kalshi "must demonstrate that absent a

preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual

and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve

the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)

(quoting *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007)).

Irreparable harm must be an injury that "cannot be remedied by an award of monetary damages."

*Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 690 (S.D.N.Y. 2025) (quoting *New York ex*

*rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)).

Kalshi argues that without an injunction, it will face the threat of civil and criminal

enforcement by the Gaming Commission, disruption to its business in New York and

nationwide, including the cost of "comprehensively geolocat[ing] its users on a state-by-state

basis," and harm to its reputation, including the possibility that the CFTC could revoke Kalshi's

designation as a DCM. Mem. at 20–22. Although the prospect of being subject to criminal

prosecution could demonstrate a showing of irreparable injury, *see Black v. Cakor Rest., Inc.*,

No. 22 Civ. 1447, 2022 WL 17689840, at \*6 (S.D.N.Y. Dec. 15, 2022), Kalshi's harms "are

largely monetary." *Hendrick*, 817 F. Supp. 3d at 1035. As Defendants contend, any civil fines

that may be levied against Kalshi can be challenged and vacated if Kalshi ultimately prevails on

the merits, which, as stated above, is unlikely. *See* Opp. at 22. Kalshi's argument that

geolocating its users on a state-by-state basis would constitute irreparable injury is unpersuasive because the ordinary burdens and costs of complying with government regulation are typically insufficient to constitute irreparable harm.  *See Wheely USA, Inc. v. City of New York*, No. 26 Civ. 1057, 2026 WL 972924, at *7 (S.D.N.Y. Apr. 10, 2026) (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)).  Kalshi has not presented any evidence that the possibility of the CFTC's revocation of its designation as a DCM is more than mere speculation.  Over the past year, Kalshi has litigated this issue in various jurisdictions across the country and has been denied injunctive relief in certain of those jurisdictions, but the CFTC has not altered Kalshi's DCM status.  Therefore, on balance, the irreparable injury factor weighs against the granting of a preliminary injunction.

C.  Balance of the Equities

The Court considers the balance of the equities between the parties and the public's interest together.  *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("[W]ith respect to the factors of the public interest and the balance of the equities, '[i]n a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest.'" (quoting *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021))).  Kalshi argues that the public has an interest in "ensuring that preempted New York laws are not enforced against federally regulated entities" and that Kalshi users will experience harm if New York laws are enforced against Kalshi by experiencing "intractable technological difficulties on a very short timeframe."  Mem. at 23.  Defendants contend that the equities weigh in their favor because "New Yorkers are harmed if Kalshi continues to engage in unsupervised sports gambling," especially individuals between the ages of 18 and 24 who are a "'high-risk population' for gambling addictions"; that Kalshi's expansion of "proposition betting" which

20

usually involves "wagers on an individual player's performance" often is "hazardous to the integrity of college sports"; that gambling on college sports involving any New York-based college team is unlawful under state law; and that if Kalshi continues to operate, other potential DCMs listing sports contracts will proliferate. Opp. at 25–28. Defendants' interests in regulating gaming in New York and ensuring that the Gaming Commission has the ability to effectuate statutes enacted by its state representatives heavily outweigh the interests articulated by Kalshi. It is well established that "[a] prohibition on a state from 'effectuating statutes enacted by representatives of its people' itself inflicts 'a form of irreparable injury.'" *Duffy*, 784 F. Supp. 3d at 690 (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)); *see also id.* (collecting cases). Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

Because all four *Winter* factors weigh against the issuance of a preliminary injunction, Kalshi's motion is denied.

III.    Motion to Seal

Kalshi seeks an order sealing two exhibits filed in connection with its reply brief. *See* ECF No. 74. Defendants do not object. *See generally* Opp.; Sur-reply. The exhibits are judicial documents to which the presumption of the common law right of access attaches. *See Coach IP Holdings, LLC v. ACS Grp. Acquisitions LLC*, No. 23 Civ. 10612, 2024 WL 3965936, at *1 (S.D.N.Y. Aug. 27, 2024); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). However, because the exhibits contain confidential information that Kalshi submitted to the CFTC, including certain proprietary business information, competing privacy interests outweigh the presumption of access. *See SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 329211, at *3 (S.D.N.Y. Feb. 3, 2022). Moreover, the proposed redactions at ECF Nos. 79-1

21

through 2 are narrowly tailored to protect that privacy interest.  Therefore, Kalshi's motion to seal is granted.

## CONCLUSION

For the foregoing reasons, Kalshi's motion for a preliminary injunction is DENIED.

Kalshi's motion to seal is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion at ECF Nos. 74 and terminate the New York State Gaming Commission from the docket.

SO ORDERED.

Dated: July 7, 2026
      New York, New York

_____
ANALISA TORRES
United States District Judge

22

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

KALSHIEX LLC,

      *Plaintiff*,

      vs.

ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and NEW YORK STATE GAMING COMMISSION,

      *Defendant*s.

Case No.: 1:25-cv-08846

---

**DECLARATION OF XAVIER SOTTILE**

1. I am the Head of Markets at KalshiEX LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2. My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the

1

regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC"). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4. I offer this Declaration to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the New York State Gaming Commission (the "Gaming Commission") from enforcing its demand that Kalshi immediately cease and desist from offering sporting event-based contracts in New York. Ex. 1 at 1. Without an injunction, Kalshi will be forced into an impossible choice. It must either decline to comply with the letter, subjecting itself and its representatives to the risk of criminal and civil liability. *Id.* at 1-4. Or it must attempt to comply with the letter, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case. This Declaration reflects my preliminary analysis of Kalshi's harms. Other unanticipated harms are possible, and even likely, given the nature of the Gaming Commission's letter and the uncharted territory into which it would lead.

## I.   Harms Resulting from Noncompliance

5. If Kalshi declines to comply with the letter and continues to offer sports event contracts in the state of New York, the company and its representatives risk criminal and civil jeopardy in New York.

6. New York authorities have threatened Kalshi and its representatives with civil and criminal penalties. Ex. 1 at 1-4. The Gaming Commission has expressed that it believes that Kalshi's operations in New York are in violation of several New York statutes. *Id.* The Gaming

2

Commission stated that Kalshi's conduct violates New York State Penal Law § 225.00(2), which can give rise to potential criminal felony charges. *Id.* at 2; Penal Law § 225.10.

7. The Gaming Commission's October 24, 2025 cease & desist letter stated that it "reserves all rights to investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York." Ex. 1 at 4.

8. Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide. As Head of Markets, I have assiduously complied with federal regulations with regard to all our contracts, including the sports-related contracts that New York authorities have highlighted in their letter. *See* Ex. 1 at 1-2. We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for almost five years.

9. Since receiving the cease-and-desist letter, Kalshi's operations—which are lawful under federal law—risk exposing the company and representatives to criminal and civil liability. It is terrifying and stressful to attempt to operate the company while the risk of criminal and civil jeopardy looms. I am deeply concerned that New York will make good on its threat to file criminal and civil charges against Kalshi, its representatives, and possibly even its contractual counterparties. That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with the cease-and-desist letter, which would bring about a whole host of other harms to Kalshi and its users as I describe below.

## II.    Harms Resulting from Attempted Compliance

10. Choosing to comply with the cease-and-desist letter would introduce a new set of barriers and challenges that themselves would subject Kalshi and its users to irreparable harm. Technical compliance with the cease-and-desist letter in short order would be exceedingly difficult. But even if Kalshi could implement a technical solution to comply with the letter, halting access to event contracts in New York would cause severe harm to Kalshi's existing user base. Compliance would also risk Kalshi's status as a designated contract market under the

3

CFTC, throwing away years of efforts to earn and maintain its federal designation. All of these harms would be avoided by this Court's entry of immediate injunctive relief.

11. Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in New York, (c) risk that complying with New York law would jeopardize Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in New York. I describe each of these categories in more detail below.

### a. Harms Resulting from Technical Barriers to Compliance

12. The cease-and-desist letter requires Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement immediately, under the threat of imminent litigation. Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

13. The Gaming Commission's letter requires Kalshi to cease all of its event contracts in New York under threat of imminent enforcement. Ex. 1 at 1-4. If Kalshi attempted to comply with this demand, it would be required to, first, undertake efforts to geolocate which of its users are in New York, and, second, cease all event contracts for those users. I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance at both of these steps. Compliance would be difficult to implement even under a relaxed timeline and could not be done immediately.

### i. Step One – Identifying New York Users

14. Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

15. Traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected

device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

16. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking real-time movement of devices.

17. The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. The precision of geolocation allows sports pools to make refined geographic determinations at the transaction level rather than the user level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than bluntly denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

18. Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

19. Kalshi keeps Know Your Customer (KYC) data on the traders that place positions on its platform. Kalshi knows the permanent residence and IP address of its users but does not geolocate its users and therefore does not know where a user's device is located at any point in time. Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request.

20. Kalshi has no evident way to comply immediately with the cease-and-desist letter. If Kalshi sought to use its existing KYC data to identify New York-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as New York even if they place positions when they are located outside of New York. Conversely, the KYC data could fail to capture users whose permanent residence is outside of New York but who travel to the state and place a position while there.

21. If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform. I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually. Thus, if it attempted compliance with the Gaming Commission's letter, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that New York law does not apply to Kalshi.

22. Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months. Implementing and integrating the geolocation services into our existing platform would take longer still. Thus, attempting to comply with the Gaming Commission's letter could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

ii.  Step Two - Geographical Cessation

23. Only after identifying Kalshi users who are physically present in New York could Kalshi cease offering its event contracts to users in New York. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around the state of New York. Again, this process would be technically challenging, time-consuming, and expensive.

24. While geofencing might block *newcomers* from trading on the platform from New York, geographical cessation presents a host of additional difficulties for *existing* Kalshi users. As of today, there are 176,728 accounts on Kalshi that have registered with an New York address; 174,278 of those accounts have passed KYC protocols and become full-fledged Kalshi members. While the precise numbers are not public, these accounts have tens of millions of dollars in open interest on the Kalshi platform, meaning New York users have tens of millions of dollars' worth of open positions on Kalshi markets that have not yet been settled.

25. The Gaming Commission's letter could be understood to require Kalshi to cease its contracts even with respect to these existing positions. But doing so would present intractable technical difficulties.

26. If the Gaming Commission's letter is understood to require Kalshi to unilaterally liquidate all trades that originated in New York, compliance would either be impossible or irreparably harmful. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

27. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally-regulated contract market. In contrast to a casino, an exchange facilitates trades between different users on the platform. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange. To ensure compliance with the CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi does not have access to immediate liquidity like a sports pool or casino that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not now have.

7

28. Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose.  But the immediate threat of criminal and civil liability from New York state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

### b. Irreparable Harms to Kalshi's Users

29. Ceasing operations in New York would impose irreparable harm on Kalshi's existing user base.  Ceasing operations could be understood to require either pausing current trades pending the outcome of the event that is the subject of the contract, or else liquidating user positions.  Either option would impose severe harms on users.

### i. Pausing Positions

30. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

31. Pausing positions pending the outcome of the event would deny New York users access to their property.  Users' capital would be locked on the Kalshi platform and users with significant investments on the platform would be unable to retrieve it.  If the event at issue is months or years in the future, users' assets would be locked up for the duration.  Given current market conditions and uncertainty, this lack of access funds could result in substantial losses.

32. Pausing positions would also cause a massive disruption to users' investment-backed expectations.  Financial traders on Kalshi, like investors in other markets, expect to be able to alter their investments as facts on the ground change.  Due to the unique market sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract.  Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies.  Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound.  And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term.  For example, one of Kalshi's event contracts allows traders to place

8

positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes, so does the price of the event contract. A trader may make an investment at 45 cents on the electric vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

33. Traders are constantly engaged in the practice of ascertaining risk. As facts on the ground change, so do traders' strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

34. Hitting pause on all New York-based trades would completely upend this investment strategy and destroy traders' expectations. If Kalshi were to pause all trades in New York, traders would no longer be able to take action on their existing contracts in accordance with their investment models. The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be lost. A Kalshi user that entered into a contract on whether President Trump would place tariffs on copper imports to the United States before January 1, 2026, for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.[1] Traders would be forced either to leave the state to change positions or suffer whatever losses they may endure as a result of being locked out.

35. Pausing all New York-based trades would not solely affect New York-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem. Again, exchanges

---

[1] This is a politics-based event contract that is currently offered through the Kalshi exchange. KalshiEX, *Will Trump launch tariffs on copper?*, https://kalshi.com/markets/kxtariffscopper/copper-tariffs.

do not operate like casinos where gamblers bet against the house. Instead, exchanges facilitate contracts between individual traders on the market. Traders on either side of a contract are often from different states, given that Kalshi does not distinguish between the geographic location of traders. If traders in New York are locked out of their positions, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. Traders in California, for example, may expect to rely on traders in New York on contracts related to water availability in the American Southwest. But if the New York-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states. Pausing transactions in New York would thus disrupt users' positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.

ii.     Liquidating Positions

36. Liquidating New York-based positions on Kalshi would similarly subject users to irreparable harm. This would require Kalshi to refund either the current value of users' existing positions or the original cost of their existing positions on their respective open contracts. Unilaterally settling traders' positions based on current market conditions or the original cost of the positions could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, refunding users based either on the cost of their positions or the position's current value would be prohibitively expensive for Kalshi to execute.

37. By the same token, immediately liquidating New York-based users' positions would disrupt the market for out-of-state users by causing a false signal in the market. Event contract

markets respond to market fluctuations.  The immediate exit of a large portion of investors on a particular contract would have a distorting effect on the value of the contract, impairing other investors' ability to predict market changes and act accordingly.  If, for example, New York traders make up a plurality of the trades on a particular contract, the immediate liquidation of all New York positions would indicate to the market that the contract's value has changed, causing a price change in response.  Remaining traders would suffer from the market distortion, resulting in substantial financial losses even for Kalshi's non-New York users.  Alternatively, Kalshi could liquidate the entire market for both New York and non-New York users by settling prices at either the current market price or the original contract price, but this would, again, be prohibitively expensive and likely occasion the end of our federally-regulated company simply to stave off potential criminal or civil liability.

### c.  Harms to Kalshi Resulting from the Risk of CFTC Decertification

38.  Compliance with New York state law would jeopardize Kalshi's status as a CFTC-designated contract market.  It is difficult to overstate how harmful this would be to Kalshi.

39.  As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets.  In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges.  Complying with New York state law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

40.  CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process."  17 C.F.R. § 38.250.  Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against.  Pausing trades could cause "disruption[] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

11

41. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "[a]ccess criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would conflict with this requirement, but that is exactly what Kalshi would have to do to comply with New York's cease-and-desist letter. Traders who execute positions in New York would be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts, whereas traders in any other state would have unlimited access to the platform.

42. Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

43. Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long-term.

44. CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of state residence could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions. Yet that is what compliance with the Gaming Commission's letter would require Kalshi to do.

12

45.  Compliance with New York law thus places Kalshi in a regulatory Catch-22:  Either it complies with New York law and risks CFTC sanctions, or it continues operations in New York and subjects itself to state criminal and civil liability.

> d.  *Economic and Reputational Harms to Kalshi*

46.  Compliance with the cease-and-desist letter would also cause economic and reputational harm to Kalshi.  Losses on both fronts would be irreparable even if Kalshi ultimately wins this case.

47.  Kalshi has nearly 175,000 verified users in New York with tens of millions of dollars invested on the exchange.  The market uncertainty created by abruptly closing its contracts in New York could lead many users to leave the platform—even users outside of New York.  Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with the Gaming Commission's order and the prospect that other states may to follow New York's lead.  Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult.  Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business.  Losing those traders would mean that many of those efforts were for naught.  Thus, compliance would impose significant and irrevocable economic harm on the company.

48.  The threat of state litigation also endangers Kalshi's established partnerships and relationships.  One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states because of state cease-and-desist letters.  This is a massive disruption for Kalshi given Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to a cease-and-desist letter similar to the one New York issued here.  Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

49.  The effects of New York's cease-and-desist letter are not limited to the state but instead threaten to open a Pandora's box of regulation for the 49 other states that may wish to impose their local laws on Kalshi's exchange.  In the absence of a temporary restraining order and preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

\* \* \*

50. The Gaming Commission's cease-and-desist letter imposes irreparable harms that Kalshi cannot avoid no matter how it responds.  If Kalshi did not comply with the Gaming Commission's demands, the company faces civil and criminal liability and its representatives face nothing short of imprisonment.  But if Kalshi attempted to comply with the Gaming Commission's demands, it would incur massive costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken.  All of these harms are compounded by the real risk that other states will be emboldened by the Gaming Commission's demands to follow New York's lead.  And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline.  Kalshi has spent years cultivating its reputation and developing its user base.  Compliance with the Gaming Commission's demands to ward off New York criminal and civil liability would lead to economic and reputational harm that will be difficult to regain.

51.  I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 27th day of October, 2025.

Xavier Sottile

14