# 26-1835

# United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Southern District of New York

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR AN INJUNCTION PENDING APPEAL

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
GRACE X. ZHOU
  *Senior Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appelles
28 Liberty Street
New York, New York 10005
(212) 416-6160

Dated: July 28, 2026

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF THE CASE ............................................................................ 3

    A.   New York's Regulation of Gambling ......................................... 3

    B.   Federal Regulation of Derivatives Markets ........................... 4

    C.   This Lawsuit ...................................................................... 6

ARGUMENT

THE COURT SHOULD DENY KALSHI'S EXTRAORDINARY REQUEST
FOR AN INJUNCTION PENDING APPEAL ....................................................... 8

    A.   Kalshi Cannot Establish a Clear or Substantial
        Likelihood of Success on the Merits. ....................................... 9

        1.   Sports bets do not qualify as "swaps" under the
            Commodity Exchange Act (CEA) ..................................... 9

        2.   The CEA does not preempt New York gaming law. ....... 13

        3.   The CFTC's regulatory about-face does not give rise
            to conflict preemption. ................................................... 21

    B.   The Equities Weigh Decisively Against Granting an
        Injunction Pending Appeal. ................................................... 22

        1.   Kalshi identifies no irreparable injury ........................... 22

        2.   The balance of equities and public interest favor the
            State. .............................................................................. 25

CONCLUSION .............................................................................................. 28

i

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott v. Perez,*
585 U.S. 579 (2018)......................................................................27

*Agudath Israel of Am. v. Cuomo,*
979 F.3d 177 (2d Cir. 2020) ......................................................8-9

*Ah Sin v. Wittman,*
198 U.S. 500 (1905)......................................................................11

*Alabama Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021)......................................................................14

*American Agric. Movement, Inc. v. Board of Trade,*
977 F.2d 1147 (7th Cir. 1992)......................................................19

*Bond v. United States,*
572 U.S. 844 (2014)......................................................................11

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992)......................................................................17

*Council for Responsible Nutrition v. James,*
159 F.4th 155 (2d Cir. 2025)................................................. 14, 23

*Fellner v. Tri-Union Seafoods, L.L.C.,*
539 F.3d 237 (3d Cir. 2008) ........................................................21

*Figuerora v. Foster,*
864 F.3d 222 (2d Cir. 2017) ........................................................19

*Hirschfeld v. Board of Elections,*
984 F.2d 35 (2d Cir. 1993) ..........................................................24

*INS v. Cardoza-Fonseca,*
480 U.S. 421 (1987)......................................................................22

ii

| **Cases** | **Page(s)** |
|---|---|

*International Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ................................................................. 16

*Investment Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013) ................................................. 4

*KalshiEX LLC v. Martin,*
    793 F. Supp. 3d 667 (D. Md. 2025) ................................... 17-20

*KalshiEX, LLC v. Flaherty,*
    172 F.4th 220 (3d Cir. 2026) ............................................ 10-11

*KalshiEX, LLC v. Hendrick,*
    817 F. Supp. 3d 1014 (D. Nev. 2025) ................................ 9, 11, 13, 20

*KalshiEX, LLC v. Schuler* (*Schuler I*),
    No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026)... 12-13, 20

*KalshiEX LLC v. Schuler* (*Schuler II*),
    No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) ............... 2, 16

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ................................................................. 16

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ............................................................. 14, 22

*Massachusetts v. KalshiEX LLC,*
    No. 2584CV02525, 2026 WL 188019
    (Mass. Super. Ct. Jan. 20, 2026) ....................................... 20

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ................................................................. 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
    456 U.S. 353 (1982) ............................................................... 4-5

*Monsanto Co. v. Durnell,*
    146 S. Ct. 2001 (2026) ............................................................ 15

| **Cases** | **Page(s)** |
|---|---|

*Murphy v. NCAA,*
  584 U.S. 453 (2018) ....................................................................... 3, 12

*New York State Firearms Ass'n v. James,*
  157 F.4th 232 (2d Cir. 2025) ................................................................. 9

*North Am. Derivatives Exch., Inc. v. Nevada,*
  815 F. Supp. 3d 1169 (D. Nev. 2025) .............................................. 13, 20

*Norton v. Sam's Club,*
  145 F.3d 114 (2d Cir. 1998) ................................................................ 15

*Ohio Citizens for Responsible Energy, Inc. v. NRC,*
  479 U.S. 1312 (1986) ........................................................................... 8

*QCX LLC v. Nessel,*
  No. 1:26-cv-710, 2026 WL 1895958
  (W.D. Mich. June 17, 2026) .......................................... 10, 13, 16, 20

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ........................................................................... 15

*Saratoga Cnty. Chamber of Comm. v. Pataki,*
  10 N.Y.2d 801 (2003) ........................................................................... 3

*St. Joseph's Hosp. Health Ctr. v. American Anesthesiology*
  *of Syracuse, P.C.,*
  131 F.4th 102 (2d Cir. 2025) .............................................................. 22

*Tom Doherty Assocs. v. Saban Ent., Inc.,*
  60 F.3d 27 (2d Cir. 1995) ................................................................... 23

*Transcontinental Gas Pipe Line Co. v. Pennsylvania Env't*
  *Hearing Bd.,*
  108 F.4th 144 ..................................................................................... 15

*Whitman v. American Trucking Ass'ns,*
  531 U.S. 457 (2001) ........................................................................... 12

**Cases**                                                                        **Page(s)**

*Wyeth v. Levine,*
   555 U.S. 555 (2009) .................................................................... 14

*Yates v. United States,*
   574 U.S. 528 (2015) .................................................................... 11

**Constitution**

N.Y. Const., art. I, § 9 .................................................................. 3

**Federal Statutes**

Commodity Exchange Act, 7 U.S.C.
   § 1 et seq. .................................................................................. 4
   § 1a(47)(A) .......................................................................... 5, 9-11
   § 2(a)(1)(A) ....................................................................... 4-5, 15-16
   § 2(e) ..................................................................................... 5, 12
   § 5 ............................................................................................ 12
   § 7a-2(c)(5)(C)(i) .............................................................. 5, 17-18
   § 13a-2 ..................................................................................... 17
   § 16(e)(2) ............................................................................ 15, 17

18 U.S.C. § 1084(a) ..................................................................... 13

31 U.S.C. § 5361(b) ..................................................................... 13

**State Statutes**

N.Y. C.P.L.R. 7803(2) ................................................................. 23

N.Y. Racing Pari-Mutuel Wagering & Breeding Law
   § 104 ......................................................................................... 3
   § 116 ........................................................................................ 23
   § 1367 ................................................................................. 3, 25-26
   § 1367-a ................................................................................. 3, 26

**Federal Regulations**                                    **Page(s)**

17 C.F.R.
   § 38.151(b)......................................................................................19
   § 40.11(a)........................................................................................5

75 Fed. Reg. 80572 (Dec. 22, 2010).........................................................20

89 Fed. Reg. 48968 (June 10, 2024)..........................................................5

91 Fed. Reg. 5386 (Feb. 6, 2026)..............................................................6

91 Fed. Reg. 35806 (June 12, 2026)..........................................................6

**State Regulations**

9 N.Y.C.R.R. § 5330.8(c)(4).....................................................................25

**Miscellaneous Authorities**

156 Cong. Rec. 13173 (2010)..................................................................18

*The New Oxford American Dictionary* (2d ed. 2005)..............................10

Ohio et al., Comment Letter (July 27, 2026),
   https://www.regulations.gov/comment/CFTC-2026-1189-0174...........6

Order, *In re KalshiEX LLC's Notice Regarding Market Emergency
   Declaration*, Commodity Futures Trading Comm'n (July 14,
   2026), https://www.cftc.gov/filings/documents/2026/
   orgcftcorderstayingkalem61407.pdf.................................................21

Stipulation, *Nevada ex rel. Nev. Gaming Control Bd. v. KalshiEX,
   LLC*, No. 26 OC 00050 1B (Nev. Dist. Ct. July 24, 2026),
   https://www.gaming.nv.gov/siteassets/content/about/press-
   release/2026.07.24-joint-stipulation.order-signed.pdf.......................24

## PRELIMINARY STATEMENT

Plaintiff-appellant KalshiEX LLC operates a multi-billion-dollar online prediction market. In January 2025, Kalshi began offering sports wagers—styled as "sports-event contracts"—in violation of New York law. After the New York State Gaming Commission issued Kalshi a cease-and-desist letter in October 2025, Kalshi sued defendants-appellees (various Gaming Commission officials), asserting that the Gaming Commission lacks authority to regulate Kalshi's sports wagers because they are supposedly "swaps" governed exclusively by the federal Commodity Futures Trading Commission (CFTC).

On July 7, 2026, the U.S. District Court for the Southern District of New York (Torres, J.) issued a decision and order denying Kalshi's motion for a preliminary injunction barring enforcement of New York's gaming law. The district court concluded that Kalshi is unlikely to succeed on the merits of its novel preemption theory and that the equities tip decidedly toward allowing the Gaming Commission to enforce state gambling laws during the pendency of this lawsuit. On July 27, the district court denied Kalshi's request for emergency relief pending appeal of the order.

This Court should likewise deny Kalshi's extraordinary request for an injunction pending appeal. *First*, Kalshi cannot show that it is likely to succeed on the merits of its appeal. Sports wagers are not "swaps" governed by the federal Commodity Exchange Act, and even if they were, the Act does not preempt application of *state gaming law* to sports-wagering that is conducted on a federal contract market. A contrary conclusion would eviscerate the States' historic role in regulating gambling and make the CFTC the Nation's sole regulator of sports-betting, a result Congress neither commanded nor intended.

*Second*, the equities weigh overwhelmingly in the Gaming Commission's favor. While Kalshi complains of potential monetary harms and its speculative fear of being subject to dueling federal and state regulators, the State and public are irreparably harmed by Kalshi's continued circumvention of New York's carefully calibrated safeguards to ensure responsible gaming. The Sixth Circuit recently denied Kalshi's motion for an injunction pending appeal in its lawsuit against Ohio precisely because it found the "equities and public interest" to favor the State. *See KalshiEX LLC v. Schuler ("Schuler II")*, No. 26-3196, 2026 WL 1295806, at *7 (6th Cir. Apr. 24, 2026). This Court should do the same.

## STATEMENT OF THE CASE

### A.   New York's Regulation of Gambling

New York has regulated gaming within its borders for more than two centuries. *See Saratoga Cnty. Chamber of Comm. v. Pataki*, 10 N.Y.2d 801, 826-28 (2003) (Smith, J., concurring in part). Gambling is specifically restricted in the State Constitution, *see* N.Y. Const., art. I, § 9, and state law confers the Gaming Commission jurisdiction to enforce the State's civil gambling laws, N.Y. Racing Pari-Mutuel Wagering & Breeding Law ("Racing Law") § 104(1), (6) & (9).

After the U.S. Supreme Court struck down the federal prohibition against state-authorized sports-betting in 2018, *see Murphy v. NCAA*, 584 U.S. 453 (2018), New York legalized in-person and mobile sports wagering within the State, *see* Racing Law §§ 1367, 1367-a. Any entity that offers online sports-betting to customers in New York must be licensed by the Gaming Commission and comply with all applicable laws and regulations. *See id.* § 1367-a(2)(a), (4)(a)-(b). Licensed operators pay substantial state taxes on gross gaming revenue, and were selected through a competitive bidding process. *See id.* § 1367-a(7)(d).

3

## B.   Federal Regulation of Derivatives Markets

Since 2020, Kalshi has claimed to offer derivatives trading on a designated contract market (DCM) regulated by federal law. (ECF 35, at 14 (¶ 44).[1]) Derivatives are "contracts deriving their value from underlying assets," *Investment Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013), which are commonly used to hedge against risk. In 1936, Congress enacted the Commodity Exchange Act (CEA), 7 U.S.C. § 1 et seq., to regulate trading in derivatives (specifically, futures) for agricultural commodities, such as grain and cotton. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 & n.17 (1982).

In 1974, Congress created the Commodity Futures Trading Commission to oversee derivatives trading. *Id.* at 365; *see* 7 U.S.C. § 2(a)(1)(A). The CEA confers the CFTC with "exclusive jurisdiction" over certain derivatives trading on DCMs (subject to important limitations, *infra* at 15-16), *see* 7 U.S.C. § 2(a)(1)(A), in order to "consolidate federal regulation of commodity futures trading in the Commission," *Merrill Lynch*, 456 U.S. at 387, and to "separate [its] functions" from "those of

---

[1] "ECF" citations refer to entries on the district court's docket and the ECF-imprinted pagination.

the Securities and Exchange Commission and other regulatory agencies," *id.* at 386.

Following the 2008 financial crisis, Congress added the regulation of a particular type of derivative called a "swap" to the CFTC's jurisdiction as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. *See* 7 U.S.C. § 2(a)(1)(A). Congress provided a carefully reticulated six-part definition of "swap," *id.* § 1a(47)(A), and made it generally unlawful for a retail customer to enter into a swap outside of a DCM, *see id.* § 2(e).

In 2011, the CFTC promulgated a regulation barring DCMs from listing any event contract "that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law" or any "similar" activity that the CFTC deems to be "contrary to the public interest." *See* 17 C.F.R. § 40.11(a); *see also* 7 U.S.C. § 7a-2(c)(5)(C)(i). In 2024, the CFTC issued a notice of proposed rulemaking intended to clarify that DCMs cannot offer events contracts involving gaming, explaining that "gambling is overseen by state regulators with particular expertise." 89 Fed. Reg. 48968, 48982-83 (June 10, 2024).

5

In February 2026, following a change in the presidential administration, the CFTC withdrew the proposed rule, asserting a need for reconsideration "in light of various forms of state regulatory actions and litigation concerning the Commission's exclusive jurisdiction over event contract derivatives." 91 Fed. Reg. 5386, 5387 (Feb. 6, 2026). Several months later, the CFTC issued a notice of proposed rulemaking seeking, for the first time, to preempt application of state gaming law to DCMs like Kalshi. *See* 91 Fed. Reg. 35806, 35808, 35822 (June 12, 2026). A bipartisan coalition of forty-four States submitted a comment explaining why the CFTC lacks statutory authority to promulgate the proposed rule and identifying numerous additional flaws. *See* Ohio et al., Comment Letter (July 27, 2026).

## C.    **This Lawsuit**

In January 2025, Kalshi began listing "sports event-contracts" on its platform. (ECF 35, at 14-15 (¶ 47).) These contracts are functionally identical to sports wagers and are advertised as such: Customers can bet on everything ranging from which NFL team will win a particular game, to how many passing yards a team's quarterback will have in a given game. (*See* ECF 53-2, at 3; ECF 53-3, at 8.) The addition of sports-event

contracts has been remarkably lucrative for Kalshi, which has reached an estimated, annualized trading volume of $50 billion. (ECF 53-4, at 3.)

On October 24, 2025, the Gaming Commission issued a cease-and-desist letter demanding that Kalshi stop offering sports-wagering in New York without a license. (ECF 35-2.) In response, Kalshi filed this lawsuit, asserting that the CEA preempts the Gaming Commission from regulating Kalshi's sports contracts because they are supposedly "swaps" subject to the CFTC's exclusive jurisdiction. (ECF 35; *see* ECF 1.) Kalshi moved for a preliminary injunction barring defendants from enforcing state gaming law (ECF 15), and defendants agreed to stay enforcement actions by them against Kalshi pending resolution of the motion (ECF 34).

On July 7, 2026, the district court (Torres, J.) denied Kalshi's motion. (ECF 106; *see* ECF 109 (July 13 amended decision).) The court held that Kalshi failed to establish a clear or substantial likelihood of success in demonstrating that the CEA preempts New York from applying its gaming laws, even if one assumed that sports event-contracts were swaps under federal law. (ECF 109, at 12-21.) The district court further found that Kalshi's "largely monetary" harms are not irreparable (*id.* at

7

21), whereas the State's substantial interests "in regulating gaming in New York" favored denying preliminary relief (*id.* at 22-23).

Defendants agreed to stay enforcement through July 30, 2026. On July 15, Kalshi moved in the district court for an injunction pending appeal (ECF 110), which the district court denied (ECF 113).

## ARGUMENT

### THE COURT SHOULD DENY KALSHI'S EXTRAORDINARY REQUEST FOR AN INJUNCTION PENDING APPEAL

Unlike a stay pending appeal, which "simply suspend[s] judicial alteration of the status quo," an injunction pending appeal "grants judicial intervention" withheld by the lower court, and thus "demands a significantly higher justification." *Agudath Israel of Am. v. Cuomo*, 979 F.3d 177, 180 (2d Cir. 2020) (quotation marks omitted); *accord Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers).

Where, as here, an injunction would "affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party must—at a minimum—establish "a clear or substantial likelihood of success on the merits"; that it is "likely to suffer irreparable

harm" absent the Court's intervention; and that "the balance of equities" and "public interest" favor an immediate injunction. *New York State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (quotation marks omitted); *see Agudath Israel*, 979 F.3d at 180. Kalshi's arguments fall short of these stringent requirements.

## A.  Kalshi Cannot Establish a Clear or Substantial Likelihood of Success on the Merits.

### 1.  Sports bets do not qualify as "swaps" under the Commodity Exchange Act (CEA).

As a threshold matter, Kalshi cannot establish that its "sports-event contracts" are swaps governed by the CEA.[2] Under the CEA, a swap may include a contract "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). A "swap" thus refers to an event that is "inherently joined or connected" to a potential economic consequence. *KalshiEX, LLC v.*

---

[2] Kalshi's contention that its contracts also may qualify as unspecified "agreements" (Mot. 17 n.2) was not raised below and contradicts Kalshi's own representations to the CFTC that its contracts are "swaps" (*see* ECF 81-1; ECF 81-2, at 2).

*Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025), *appeal docketed*, No. 25-7516 (9th Cir. Nov. 28, 2025); *see QCX LLC v. Nessel*, No. 1:26-cv-710, 2026 WL 1895958, at *3 (W.D. Mich. June 17, 2026), *appeal docketed*, No. 26-1552 (6th Cir. June 25, 2026).

The outcome of a sporting event is not inherently "associated with" any "potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii). To "associate" means to "connect" things "in one's mind." *The New Oxford American Dictionary* 95 (2d ed. 2005). Natural disasters, for example, are "associated with" financial consequences that traders may wish to hedge against. The margin of victory of a particular college basketball game has no conceivable economic consequences for any of the participants or the financial markets.

Kalshi insists otherwise (in a footnote) by citing to the Third Circuit's split decision in *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026). *See* Mot. 17 n.2. There, the majority concluded that Kalshi's sports contracts are "swaps" because it read the phrase "associated with" to encompass even attenuated or downstream economic consequences, such as potential impacts on "sponsors, advertisers, [and] television net-

10

works." *See Flaherty*, 172 F.4th at 227-28. Several considerations counsel against adopting this limitless interpretation here.

*First,* "Congress does not normally intrude upon the police power of the States." *Bond v. United States*, 572 U.S. 844, 863 (2014). State gaming laws are a core exercise of the States' police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905). This Court must therefore refrain from adopting a reading of "swap" that would "convert an astonishing amount of" state-regulated gambling into "a matter for federal enforcement," *Bond*, 572 U.S. at 863 (quotation marks omitted).

*Second*, the surrounding statutory text forecloses a maximalist reading. The other definitions of "swap" found in § 1a(47)(A)(i)-(iv) "refer almost exclusively to financial measures, indices, or instruments," *Hendrick*, 817 F. Supp. 3d at 1027—i.e., bona fide instruments for hedging against financial risk. The definition that Kalshi relies on must therefore be interpreted concordantly. *See Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.) (applying noscitur a sociis canon).

*Third*, Kalshi's interpretation of "swap" has no grounding in the history or purposes of the CEA. The goal of the statute was to serve "the national public interest" of "managing and assuming price risks, discover-

11

ing prices, or disseminating pricing information." 7 U.S.C. § 5. For that reason, the CFTC's exclusive jurisdiction covers "transaction[s] involving financial instruments and measures that traditionally and directly *affect commodity prices." KalshiEX, LLC v. Schuler ("Schuler I")*, No. 2:25-cv-1165, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026). It is implausible that Congress's addition of "swaps" to the CFTC's jurisdiction as part of the Dodd-Frank Act was to facilitate federal regulation of sports wagers. *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

*Finally*, Kalshi's interpretation of the CEA would lead to absurd consequences. The statute makes it generally *unlawful* for any retail customer to enter into a "swap" outside of a DCM. 7 U.S.C. § 2(e). Thus, if sports wagers are considered swaps, then virtually *all* licensed gaming *must* take place on federally regulated DCMs. But there is no indication that Congress intended to legalize sports-betting nationwide and to consolidate its regulation in the CFTC to the exclusion of the States. Indeed, the Supreme Court expressly reaffirmed in 2018—after the CFTC assumed jurisdiction over swaps—that sports-betting falls within the States' historic power to regulate gambling. *See Murphy*, 584 U.S. at

12

480. And it is doubtful that Congress intended to legalize sports-betting when the Wire Act generally criminalizes the interstate transmission of bets or wagers on sporting events. *See* 18 U.S.C. § 1084(a).[3]

For these reasons, courts across the country have correctly rejected arguments made by Kalshi and other DCMs that sports bets qualify as "swaps."[4] This Court is likely to do the same on appeal.

### 2. The CEA does not preempt New York gaming law.

Even if Kalshi's statutory argument were adopted, its preemption theories would fail. The "purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) (quotation marks omitted). Although the CFTC has recently asserted in a proposed rule and various lawsuits against state gaming regulators that the agency possesses exclusive jurisdiction over all

---

[3] The Unlawful Internet Gambling Enforcement Act of 2006 does not suggest otherwise. *See* Mot. 20. Congress made clear that nothing in that law "alter[s]" or "limit[s]" other federal or state laws "regulating gambling within the United States." *See* 31 U.S.C. § 5361(b).

[4] *See, e.g., Schuler I*, 2026 WL 657004, at *5-6; *Nessel*, 2026 WL 1895958, at *2-8; *North Am. Derivatives Exch., Inc. v. Nevada*, 815 F. Supp. 3d 1169, 1180-86 (D. Nev. 2025), *appeal docketed*, No. 25-7187 (9th Cir. Nov. 14, 2025); *Hendrick*, 817 F. Supp. 3d at 1026-31.

trading on DCMs (*see* Mot. 8), this Court owes no deference to the agency's interpretation of the CEA. *See Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 400-01 (2024). Instead, where, as here, Kalshi claims that federal law preempts a traditional area of state regulation (gaming), this Court must "start with the assumption" that state law is not superseded unless "that was the clear and manifest purpose of Congress."[5] *See Wyeth v. Levine,* 555 U.S. 555, 565 (2009) (quotation marks omitted); *see also Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (expecting "Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance" (quotation marks omitted)). The CEA evinces no clear intent to preempt state gaming law.

---

[5] Kalshi's attempts to avoid the presumption against preemption are wholly unavailing. *See* Mot. 16-17. Even assuming that § 2(a)(1)(A) is an express preemption clause, the presumption nevertheless applies because "the preemptive force of the text is ambiguous," *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025), *petition for cert. filed*, No. 25-1145 (U.S. Apr. 2, 2026). The federal government's longstanding regulation of derivatives trading also makes no difference. The presumption against preemption "accounts for the historic presence of *state law*" and "does not rely on the absence of federal regulation." *Wyeth*, 555 U.S. at 565 n.3 (emphasis added).

***Express preemption.*** Kalshi is wrong in contending that the CEA's exclusive-jurisdiction provision, § 2(a)(1)(A), gives rise to express preemption. *See* Mot. 11-12. This argument—which Kalshi raised for the first time below in reply—is waived, *see Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir. 1998), and meritless. Indeed, § 2(a)(1)(A) bears no resemblance to a typical express preemption clause, including one in the CEA itself. *Cf., e.g.*, 7 U.S.C. § 16(e)(2) (explicitly stating "[t]his chapter shall supersede and preempt the application of any State or local law").[6] The provision instead states that the CFTC "shall have exclusive jurisdiction" over "transactions involving swaps . . . traded or executed on" a DCM, while expressly preserving state-law enforcement and state-court jurisdiction in two savings clauses. *See id.* § 2(a)(1)(A). Courts have therefore soundly rejected the suggestion that this provision expressly preempts application of state gaming law to so-called "sports-event

---

[6] None of Kalshi's cited cases (Mot. 11-12) stands for the proposition that the words "exclusive jurisdiction" have talismanic power to expressly preempt state law. *See, e.g.*, *Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2008 (2026) (analyzing different statutory language); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230-36 (1947) (analyzing field preemption); *Transcontinental Gas Pipe Line Co. v. Pennsylvania Env't Hearing Bd.*, 108 F.4th 144, 151-52 (analyzing conferral of exclusive jurisdiction to "a federal court"), *as amended*, 110 F.4th 612 (3d Cir. 2024).

15

contracts." *See Schuler II*, 2026 WL 1295806, at *4; *see also Nessel*, 2026 WL 1895958, at *9-10.

***Field preemption.*** Kalshi likewise errs in invoking field preemption. *See* Mot. 12-14. That doctrine applies in "rare" circumstances when "Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quotation marks omitted). Here, several features of the CEA's text and structure demonstrate that Congress did not intend to occupy the entire field of trading on DCMs so as to foreclose any application of state gaming law.

*First*, the CEA's exclusive-jurisdiction provision itself contains two savings clauses, *see* 7 U.S.C. § 2(a)(1)(A), which counsel strongly against a finding of field preemption. Although Kalshi quibbles with the exact scope of state law that these clauses preserve (Mot. 18), those arguments miss the point. Regardless of scope, the very presence of savings clauses clearly "negates the inference that Congress left no room for state causes of action," *International Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (quotation marks omitted). *See Schuler II*, 2026 WL 1295806, at *5.

16

*Second*, other provisions of the CEA further contravene Kalshi's field-preemption argument. For example, the CEA expressly authorizes state regulators to bring enforcement actions for certain violations of the statute. *See* 7 U.S.C. § 13a-2. And the CEA's other express preemption provisions reflect Congress's intent to preempt state law only in specific areas. *See, e.g.*, *id.* § 16(e)(2) (preempting state laws regulating "gaming or the operation of bucket shops" as to a discrete set of transactions); *id.* § 16(h) (preempting application of state insurance laws to swaps). Such provisions evince Congress's intent to preempt surgically, *not* to occupy the field. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

*Third*, the CEA expressly incorporates state law, rendering field preemption particularly inappropriate. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025). Specifically, the CEA directs the CFTC to disallow events contracts that "involve . . . activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). The plain text thus "clearly reflects an

17

affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful."[7] *Martin*, 793 F. Supp. 3d at 680.

*Finally*, to the extent the CEA's text and structure leave any doubt, the relevant history strongly suggests that Congress did not intend to preempt application of state gambling laws that touch on federal markets. Indeed, the history of the Dodd-Frank Act, which added "swaps" to the CFTC's jurisdiction in 2010, indicates that Congress did not view sports bets as legitimate event contracts that should be traded on derivatives markets. *See, e.g.*, 156 Cong. Rec. 13173 (2010) (statement of Senator Lincoln observing that CFTC should "prevent derivatives contracts" that "exist predominantly to enable gambling," such as those "around sporting events").

All of Kalshi's cited history (*see* Mot. 13), by contrast, predates Dodd-Frank by decades, and offers no insight into what Congress specifically intended when it added "swaps" to the CFTC's jurisdiction. In any event,

---

[7] Kalshi wrongly claims that § 7a-2(c)(5)(C)(i) is "irrefutable textual proof" that "gaming" contracts are "swaps." *See* Mot. 20. The provision applies to the "listing of agreements, contracts, transactions, or swaps," § 7a-2(c)(5)(C)(i) (emphasis added), and is silent about the definition of "swap" or the CFTC's jurisdiction

18

while that history may reflect Congress's intent to preempt *some* state regulation, at least one other circuit has squarely concluded that "Congress did not intend to preempt *the field* of futures trading." *See American Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (emphasis added); *see also Martin*, 793 F. Supp. 3d at 684 n.5 (rejecting Kalshi's reliance on same history).

*Conflict preemption.* Kalshi is also incorrect that New York gaming law conflicts with the CEA. *See* Mot. 14-16. Conflict preemption exists where "it is impossible for a party to comply with both" federal and state law, or where the state law is "an obstacle to achievement of federal objectives." *Figuerora v. Foster*, 864 F.3d 222, 228 (2d Cir. 2017) (quotation marks omitted). Kalshi cannot establish either basis.

As for impossibility, Kalshi contends that complying with New York's requirement that licensed operators accept only in-state wagers would force it to violate its federal duty to provide "impartial access to its markets and services," 17 C.F.R. § 38.151(b). *See* Mot. 14-15. But the federal impartial-access requirement was intended to ensure that exchanges do not use "discriminatory access requirements as a competitive tool against certain participants"—e.g., to discriminate against participants

19

based on *economic means. See* 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010). Kalshi cites no authority—aside from the CFTC's argument in an amicus brief—to suggest that it must operate in all fifty States or that any *geographical* restrictions are discriminatory. *See* Mot. 15. Indeed, the CFTC has taken no action to date against Kalshi, even though Kalshi has been ordered to withdraw from other States. See *infra* at 23-24.

Kalshi also cannot identify any obstacle to federal objectives. Kalshi claims that allowing New York to regulate sports bets on Kalshi's platform would frustrate Congress's goal of consolidating all regulation of DCMs under the CFTC. *See* Mot. 15. But that argument improperly presumes that Congress intended to displace even the application of *state gambling laws* to these platforms. The majority of courts has concluded—contrary to the Third Circuit's decision in *Flaherty*—that it is *unlikely* Congress intended to displace state gaming laws when it gave the agency jurisdiction to regulate "swaps" in the aftermath of the 2008 financial crisis.[8]

---

[8] *See , e.g., Nessel*, 2026 WL 1895958, at \*9-13; *Schuler I*, 2026 WL 657004, at \*6, \*8-10; *North Am. Derivatives*, 815 F. Supp. 3d at 1184-87; *Hendrick*, 817 F. Supp. 3d at 1023; *Martin*, 793 F. Supp. 3d at 676-86; *Massachusetts v. KalshiEX LLC*, No. 2584CV02525, 2026 WL 188019, at \*4-8 (Mass. Super. Ct. Jan. 20, 2026), *appeal argued*, No. SJC-13906 (Mass. May 4, 2026).

### 3. The CFTC's regulatory about-face does not give rise to conflict preemption.

Finally, Kalshi is wrong to point to the CFTC's recent regulatory actions respecting DCMs as evidence supporting an injunction pending appeal. *See* Mot. 8, 21-24. As an initial matter, the mere fact that the CFTC has not taken enforcement action against Kalshi and has instead proposed rulemaking that favors Kalshi's interests does not, in and of itself, have preemptive force. *Cf. Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 247, 250 (3d Cir. 2008) ("deliberate agency inaction" and "agency's informal interpretations" lack preemptive force). Likewise, the CFTC's recent order concerning Kalshi's contracts in Michigan similarly does not warrant relief in this Court. There, the CFTC invoked purported emergency authority to order Kalshi to fulfill all executed trades in Michigan, despite a Michigan state-court order to liquidate such trades for violating state gaming laws.[9]

Contrary to Kalshi's suggestion (Mot. 21), preemption cannot turn on the CFTC's own actions in manufacturing a conflict based on the

---

[9] *See* Order at 5, 7-9, *In re KalshiEX LLC's Notice Regarding Market Emergency Declaration*, CFTC (July 14, 2026).

agency's view of its authority under the CEA and what the statute requires. This Court owes no deference to the agency's interpretation, *see Loper Bright*, 603 U.S. at 400-01, and should be particularly skeptical given the agency's sharp departure from its longstanding positions, *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987). Moreover, as explained in the bipartisan comment letter submitted by the States (see *supra* at 6), the CFTC's recent position that "sports-event contracts" are lawful and subject the CFTC's exclusive jurisdiction suffers from a litany of legal and factual flaws, and, if the proposed rule is enacted, it is almost certain to face immediate legal challenge.

### B. The Equities Weigh Decisively Against Granting an Injunction Pending Appeal.

#### 1. Kalshi identifies no irreparable injury.

"To establish irreparable harm, the moving party must show an injury that is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr. v. American Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quotation marks omitted). None of Kalshi's asserted monetary injuries or reputational harms suffice.

22

*First*, Kalshi misses the mark in asserting that it faces either irreparable penalties for continued noncompliance with New York law or irreparable compliance costs and lost revenue. *See* Mot. 22. Contrary to Kalshi's repeated assertion, the Gaming Commission possesses no criminal jurisdiction to prosecute Kalshi. (*See* ECF 35-2, at 2.) And any civil penalties that the Gaming Commission may assess can be challenged (and refunded). *See* Racing Law § 116 (providing for administrative hearing or opportunity to be heard); N.Y. C.P.L.R. 7803(2) (providing for judicial review).

Moreover, ordinary compliance costs—even if substantial—are *not* irreparable. *See Council for Responsible Nutrition*, 159 F.4th at 171-72. At bottom, Kalshi has pointed to no evidence suggesting that its claimed losses will threaten the "very viability of [its] business." *See Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). Indeed, Kalshi continues to successfully operate despite being currently enjoined from

23

offering its "sports-event contracts" in multiple States,[10] and agreeing to implement geofencing technology.[11]

*Second*, Kalshi's asserted reputational harms are even further afield. Kalshi complains that being forced to withdraw from New York would undermine its goodwill with users and partners. *See* Mot. 24. But any such harm has largely *already* accrued given that Kalshi was ordered to exit from other States. Moreover, Kalshi has had months to prepare itself, its partners, and its customers for this potential occurrence. Any reputational fallout from Kalshi's refusal to do so is plainly "self-inflicted" harm that is not cognizable. *See Hirschfeld v. Board of Elections*, 984 F.2d 35, 40 (2d Cir. 1993).

*Third*, Kalshi's fears about being subject to competing demands from the Gaming Commission and the CFTC are premature and baseless. *See* Mot. 23-24. Notwithstanding the CFTC's recent order requiring Kalshi to fulfill *executed* trades in Michigan, the agency has not issued any order to do date concerning Kalshi's trades *in New York*. Nor did the

---

[10] *See* ECF 98-1 (Nevada); ECF 112-1 (Michigan); ECF 112-2 (Washington).

[11] *See* Stipulation, *Nevada ex rel. Nev. Gaming Control Bd. v. KalshiEX, LLC*, No. 26 OC 00050 1B (Nev. Dist. Ct. July 24, 2026).

Gaming Commission's cease-and-desist letter require Kalshi to immediately unwind any executed trades. (*See* ECF 35-2, at 5.)

### 2. The balance of equities and public interest favor the State.

By contrast, the district court correctly concluded that an injunction pending appeal would result in "significant harms" to the State and its residents. (*See* ECF 113, at 3.)

*First*, an injunction would be particularly harmful to young New Yorkers, who are at high risk for gambling addiction. (*See* ECF 53-14, at 4.) With an injunction in place, Kalshi could continue offering sports-betting illegally to eighteen-to-twenty-year-olds. *See* Racing Law § 1367(2)(d) (setting minimum age for sports-gambling at twenty-one). Kalshi also would be free to operate without complying with any of the State's myriad requirements on gambling operators, including age-verification controls, 9 N.Y.C.R.R. § 5330.8(c)(4); advertising restrictions,

Racing Law § 1367-a(4)(e); and resources for problem-gambling, *id.* § 1367-a(4)(a)(xiv).[12]

*Second*, Kalshi's continued expansion of proposition-betting (often wagers on an individual player's performance) threatens tremendous harm on the integrity of sports. (*See* ECF 53-16 to 53-18 (reporting recent player scandals and widespread industry concern).) These harms are particularly salient for college sports. Despite the fact that New York strictly prohibits gambling on any New York–based college sports teams, *see* Racing Law §§ 1367(1)(s), 1367-a(4)(a)(xi), and the Gaming Commission does not allow proposition-betting on college players, Kalshi has made no commitment to stop offering such bets.

*Third*, allowing Kalshi to operate outside the confines of New York law for the duration of this appeal will embolden others to copy its unlawful playbook. Since Kalshi began listing sports contracts, several new DCMs have been designated and others are pending. (*See* ECF 53-22.) An injunction precluding the Gaming Commission's enforcement of state

---

[12] Kalshi's alleged consumer-protection features (Mot. 25) have no basis in the record and are an inadequate substitute for complying with New York's robust regulations.

26

law would set a negative precedent of allowing DCMs to flood the State with unlicensed and unregulated sports-betting while they tie-up in court the State's lawful attempts to regulate. And the injunction may also incentivize *licensed operators* to switch to Kalshi's model, thus depriving the State of millions of dollars of revenue used to fund public education and gambling-addiction treatment. (*See* ECF 53-1, at 15.) These harms far outweigh Kalshi's monetary injuries and counsel decisively against an injunction barring enforcement.

*Finally*, the State's inability to enforce its duly-enacted laws "clearly inflicts irreparable harm" on its sovereign interests. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

## CONCLUSION

The Court should deny Kalshi's motion for an injunction pending appeal.

If the Court grants the injunction, defendants respectively request that the Court enter an expedited schedule for briefing and oral argument, with each side receiving thirty days for its principal briefs, appellant receiving fourteen days for its reply brief, and oral argument to be scheduled as soon as practicable.

Dated:  New York, New York
   July 28, 2026

Respectfully submitted,

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellees

By:   */s/ Grace X. Zhou*
    GRACE X. ZHOU
    Senior Assistant Solicitor General

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
GRACE X. ZHOU
 *Senior Assistant Solicitor General*
  *of Counsel*

    28 Liberty Street
    New York, New York 10005
    (212) 416-6160

28

# CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this document, the document contains 5,175 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).

*/s/ Oren L. Zeve*
Oren L. Zeve

# ADDENDUM

# TABLE OF CONTENTS

**Page**

ECF No. 109:
District Court Amended Opinion, dated July 13, 2026....................ADD1

ECF No. 113:
District Court Order Denying Stay, dated July 27, 2026...............ADD25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KALSHIEX LLC,

                    Plaintiff,

          -against-

ROBERT WILLIAMS, in his official capacity as
Executive Director of the New York State
Gaming Commission; BRIAN O'DWYER, in his
official capacity as Chair and Commissioner of
the New York State Gaming Commission; JOHN
A. CROTTY, in his official capacity as
Commissioner of the New York State Gaming
Commission; SYLVIA B. HAMER, in her
official capacity as Commissioner of the New
York State Gaming Commission; MARTIN J.
MACK, in his official capacity as Commissioner
of the New York State Gaming Commission;
PETER J. MOSCHETTI, JR., in his official
capacity as Vice Chair and Commissioner of the
New York State Gaming Commission;
MARISSA SHORENSTEIN, in her official
capacity as Commissioner of the New York State
Gaming Commission; JERRY SKURNIK, in his
official capacity as Commissioner of the New
York State Gaming Commission; and the NEW
YORK STATE GAMING COMMISSION,

                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/13/2026____

25 Civ. 8846 (AT)

**ORDER**

On July 7, 2026, the Court filed an Opinion and Order in this action, which denied Plaintiff's motion for a temporary restraining order and preliminary injunction. *See* ECF No. 106. Page 18 of the Opinion and Order contained a scrivener's error. The original text, in relevant part, read as follows:

> The CFTC holds the authority to determine whether a contract is legal. *See* 7 U.S.C. § a-2(c)(5)(C)(i) ("The [Gaming] Commission may determine that . . . [event] contracts . . . are contrary to the public interest" if they involve "gaming"). . . .

Because 7 U.S.C. § 7a-2(c)(5)(i) references the Commodity and Futures Trading Commission ("CFTC"), instead of the New York State Gaming Commission (the "Gaming Commission"), the Court corrects the scrivener's error in an amended Opinion and Order, which is annexed below. *See* Fed. R. Civ. P. 60(a). The amended text reads as follows:

**ADD1**

The CFTC holds the authority to determine whether a contract is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i) ("The [CFTC] may determine that . . . [event] contracts . . . are contrary to the public interest" if they involve "gaming"). . . .

SO ORDERED.

Dated: July 13, 2026
      New York, New York

**ADD2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KALSHIEX LLC,

                            Plaintiff,

      -against-

ROBERT WILLIAMS, in his official capacity as
Executive Director of the New York State
Gaming Commission; BRIAN O'DWYER, in his
official capacity as Chair and Commissioner of
the New York State Gaming Commission; JOHN
A. CROTTY, in his official capacity as
Commissioner of the New York State Gaming
Commission; SYLVIA B. HAMER, in her
official capacity as Commissioner of the New
York State Gaming Commission; MARTIN J.
MACK, in his official capacity as Commissioner
of the New York State Gaming Commission;
PETER J. MOSCHETTI, JR., in his official
capacity as Vice Chair and Commissioner of the
New York State Gaming Commission;
MARISSA SHORENSTEIN, in her official
capacity as Commissioner of the New York State
Gaming Commission; JERRY SKURNIK, in his
official capacity as Commissioner of the New
York State Gaming Commission; and the NEW
YORK STATE GAMING COMMISSION,

                           Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/10/2026_

25 Civ. 8846 (AT)

**OPINION**
**AND**
**ORDER**

ANALISA TORRES, District Judge:

      Plaintiff, KalshiEX LLC ("Kalshi"), moves for a temporary restraining order and

preliminary injunction against the New York State Gaming Commission (the "Gaming

Commission") and the following Gaming Commission officials: Robert Williams, Executive

Director and Commissioner, Brian O'Dwyer, Chair and Commissioner, Peter J. Moschetti, Jr.,

Vice Chair and Commissioner, and Commissioners Jerry Skurnik, John A. Crotty, Marissa

Shorenstein, Martin J. Mack, and Sylvia B. Hamer (collectively, "Defendants"). *See* Proposed

Order to Show Cause ("POTSC"), ECF No. 15. Kalshi seeks an order enjoining Defendants

**ADD3**

from enforcing New York state gambling laws against its offering of sports-related event contracts in New York during the pendency of this action. *See id.*; *see also* Mem., ECF No. 16; Wong Decl. I, ECF No. 17; Sottile Decl. I, ECF No. 18; Opp., ECF No. 52; Janofsky Decl., ECF No. 53; Reply, ECF No. 76; Sottile Decl. II, ECF No. 75; Wong Decl. II, ECF No. 79; Sur-reply, ECF No. 86. For the reasons stated below, Kalshi's motion is denied.

## BACKGROUND[1]

### I.     Event Contracts

The Commodity Exchange Act ("CEA") provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356, 360–67 (1982). Under the CEA, the Commodity Futures Trading Commission ("CFTC") regulates the trade of financial derivatives. "A derivative is a financial instrument or contract whose price is directly dependent upon (i.e.[,] derived from) the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Commodity Futures Trading Comm'n ("KalshiEX D.D.C.")*, No. Civ. 23-3257, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024) (internal quotation marks and citations omitted), *appeal dismissed*, No. Civ. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025).

Subject to certain exceptions, the CFTC has "exclusive jurisdiction" to regulate various types of derivatives. Section 2(a)(1)(A) of the CEA states that the CFTC:

> shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution

---

[1] Having reviewed the parties' briefing, the Court finds that the material facts are not in dispute and, therefore, decides Plaintiffs' motion for a preliminary injunction without a hearing. *See* ECF No. 67 at 2 ("The parties have conferred and agree that there are no relevant facts in dispute that necessitate an evidentiary hearing and disputed facts are amenable to complete resolution on a paper record.").

2
**ADD4**

facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the [CFTC] pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A).

This lawsuit concerns a specific type of derivative called an "event contract." *See* Am. Compl. ¶ 2, ECF No. 35 ("Kalshi . . . offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts."). An event contract is a type of derivative contract "whose payoff is based on a specified event, occurrence, or value." *KalshiEX D.D.C.*, 2024 WL 4164694, at *2. Buyers of event contracts may trade "several possible outcomes" on any future event, and most commonly, they will trade either a "yes" or "no" position. Am. Compl. ¶ 27. The seller of an event contract implicitly takes the opposite position regarding the outcome of the event. If the buyer takes a position on a possible outcome of a future event and then that outcome actually occurs, they will receive a payment from the seller. *Id*.

> For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the 'yes' or the 'no' position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

*Id.* Traders can buy or sell event contracts for a specific value any time before they expire.

An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Under the CEA, DCMs are permitted to list contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2 (a)(2) (requiring DCMs to wait one business day before publicly trading self-certified contracts). In 2010, when Congress amended the CEA under the Dodd-Frank Wall Street Reform and Consumer Protection Act, it created a "[s]pecial rule for review and approval of event contracts and swaps contracts"

(the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C)(i). Under the Special Rule, the CFTC can review and prohibit certain types of contracts when those contracts are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the [CFTC] by rule or regulation to be contrary to public interest." *Id.* § 7a-2(c)(5)(C)(i). Agreements, contracts, or transactions that the CFTC determines are contrary to public interest "may [not] be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii).[2]

II.      Kalshi's Sports-Event Contracts

Kalshi, a financial services company, operates a prediction market that allows users to buy and sell event contracts on its platform. Am. Compl. ¶ 16. The CFTC has certified Kalshi as a DCM. *See id.* ¶¶ 2, 4, 16; Mem. at 6.

On January 22, 2025, Kalshi self-certified several contracts relating to sporting events ("sports-event contracts") and began to list them on its exchange. Am. Compl. ¶ 47. Kalshi's sports-event contracts allow users to place positions on the "outcomes of sports events," for example, "which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." *Id.* ¶¶ 32, 47.

Under New York law, any gambling enterprise that offers sports gaming, including wagering, must obtain a license from the Gaming Commission, the state agency that regulates gambling in New York. *See* N.Y. Rac. Pari-Mut. Wag. & Breed. Law ("Racing Law") §§ 1367(2)(a), 1367-a(4)(b); *see also id.* § 1367(1)(x) ("'Sports wagering' means wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes

---

[2] On June 10, 2026, the CFTC issued a notice of proposed rulemaking regarding the Special Rule for prediction market event contracts. *See* Press Release, CFTC, CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Event Contracts Involving Enumerated Activities, Release No. 9249-26 (June 10, 2026), available at https://www.cftc.gov/PressRoom/PressReleases/9249-26.

participating in a sporting event, or combination of sporting events . . . ."); Am. Compl. ¶ 25. The offer of sports gaming in New York in violation of its gambling laws may risk civil and criminal penalties. *See* Racing Law §§ 104(9), 116; N.Y. Penal Law § 225.00 *et seq.* Kalshi is not licensed with the Gaming Commission to offer sports wagering. Am. Compl. ¶ 48; *see* Opp. at 1–2.

By letter dated October 24, 2025, the Gaming Commission directed Kalshi to "cease and desist from illegally operating, advertising, promoting, administering, managing, or otherwise making available an unlicensed mobile sports wagering platform in New York State in connection with any sports event." Ex. 2 at 4, ECF No. 35-2.[3] The Gaming Commission advised Kalshi that "[s]ports wagering may be conducted, advertised or promoted in New York only by entities licensed by the [Gaming] Commission." *Id.* at 3.

On October 27, 2025, Kalshi initiated this action against the Gaming Commission and its members in their official capacities, seeking declaratory and injunctive relief and arguing that the CFTC has exclusive jurisdiction over the sports-event contracts traded on Kalshi's exchange, such that the Gaming Commission lacks the authority to enforce New York gambling laws against Kalshi. *See generally* Compl., ECF No. 1; *see also* Am. Compl.; POTSC; Mem. Defendants contend that the Gaming Commission's regulation of Kalshi's sports-related event contracts is not preempted by the CEA. *See generally* Opp.

Various amici jointly filed a brief in support of Defendants, arguing that Kalshi has "unlawfully and unfairly entered into the gaming market," and that "[b]y offering sports-event contracts to people on Indian lands under the guise of commodity trading pursuant to [the CEA,] Kalshi impedes tribes' inherent sovereign right to regulate gaming activity on those lands."

---

[3] Citations to "Ex." refer to the exhibits filed with the amended complaint at ECF No. 35.

Tribal Amici Br. at 11, ECF No. 66.

### III. Nationwide Litigation

Courts in other jurisdictions have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it. Courts have found both in Kalshi's favor, granting its preliminary injunction motion, *see, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26 Civ. 34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026), and against it, denying its motion, *see, e.g.*, *Kalshiex LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Johnson*, No. 26 Civ. 1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025).

## DISCUSSION

### I. Eleventh Amendment Immunity

As a preliminary matter, the Court addresses the issue of Eleventh Amendment immunity as to the Gaming Commission. Defendants argue that Kalshi's claims against the Gaming Commission should be dismissed because it is a state agency covered by the Eleventh Amendment's immunity, which bars suit against the states, including "state agents and state instrumentalities that are, effectively, arms of a state." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (citation omitted); *see also* Opp. at 21–22. The *Ex parte Young* doctrine allows suits like Kalshi's for prospective injunctive relief against New York state officers in their official capacities, notwithstanding Eleventh Amendment immunity. *Reed v. Goertz*, 598 U.S. 230, 234 (2023) (citing *Ex parte Young*, 209 U.S. 123, 159–161

6

**ADD8**

(1908)); *see also Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020).[4]  Defendants contend, however, that the *Ex parte Young* doctrine does not extend to Kalshi's claims against the Gaming Commission because it has not waived its Eleventh Amendment immunity and Congress did not abrogate states' immunity in enacting the CEA.  Opp. at 21–22.  Kalshi has not responded to the Gaming Commission's Eleventh Amendment defense in its briefing.  *See generally* Mem.; Reply.  The Court agrees with Defendants.  *See Walker v. New York State Dep't of Health*, 788 F. Supp. 3d 427, 490–91 (E.D.N.Y. 2025) (holding that the *Ex parte Young* exception "does not extend to suits against state agencies"); *Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 663 (N.D.N.Y. 2025) (dismissing the Gaming Commission from the action because none of the cases cited by the plaintiff "with respect to [the issue of the Gaming Commission's immunity] support the proposition that a state agency may be made a proper party to the suit because its constituent members are simultaneously sued pursuant to *Ex parte Young*").  Accordingly, the Gaming Commission is dismissed from the action because it is immune from suit under the Eleventh Amendment.

II.     Preliminary Injunction

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public

---

[4] The Court's conclusion that Kalshi's claims may proceed against the individual Gaming Commission members in their official capacities for the purposes of determining Kalshi's motion is without prejudice to Defendants' raising an Eleventh Amendment defense in a motion to dismiss.

7

**ADD9**

interest." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 20).

"[W]hen, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (quoting *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014)); *see also Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). Kalshi must, therefore, "establish a clear or substantial likelihood of success on the merits." *New York State Firearms Ass'n*, 157 F.4th at 242 (quoting *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (per curiam)).

A. Likelihood of Success on the Merits

The merits of this case center on whether New York gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi argues that it has demonstrated a likelihood of success on the preemption issue that its sports-event contracts are exclusively regulated by the CFTC. *See* Mem. at 10. Defendants contend that Kalshi cannot show a likelihood of success on the merits because sports-event contracts do not fall within CFTC regulation and, therefore, may be regulated by New York law. *See* Opp. at 9. For the reasons explained below, the Court finds that New York gambling laws as applied to Kalshi's sports-event contracts are not preempted by the CEA and Kalshi has not, therefore, made a clear or substantial showing that it is likely to succeed on the merits.

**ADD10**

### 1. Preemption Legal Standard

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Arizona v. United States*, 567 U.S. 387, 398–99 (2012). "In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (citations and internal quotation marks omitted).

"The key to the preemption inquiry is the intent of Congress." *Id.* at 104. "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress' preemptive intent may be inferred from the scope of the statute such that "Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* at 76–77 (citations omitted). "[T]he party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

9

**ADD11**

### 2. Express Preemption

Kalshi argues that the CEA expressly preempts New York gambling laws as applied to its sports-event contracts because the CFTC has "exclusive jurisdiction" over "transactions involving swaps," including Kalshi's sports-event contracts, that are "traded or executed" on DCMs like Kalshi.  Mem. at 8, 11–13; (citing 7 U.S.C. § 2(a)(1)(A)); *see* Reply at 1–4. Defendants contend that Kalshi's sports-event contracts are not "swaps" within the meaning of the CEA and are, therefore, not explicitly preempted.  *See* Opp. at 9–15.

Courts apply "a presumption against preemption with respect to areas where states have historically exercised their police powers."  *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104; *see Altria Grp.*, 555 U.S. at 77 ("When addressing questions of express or implied pre-emption, we begin our analysis with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. . . . That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." (citations and internal quotation marks omitted).  "The scope of laws regulating gambling and lotteries is clearly a matter of predominantly state concern."  *Chun v. State of N.Y.*, 807 F. Supp. 288, 292 (S.D.N.Y. 1992); *see KalshiEX, LLC v. Schuler* ("*Schuler I*"), No. 25 Civ. 1165, 2026 WL 657004, at *8 (S.D. Ohio Mar. 9, 2026) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare." (citations and internal quotation marks omitted)); *Martin*, 793 F. Supp. 3d at 677 ("It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." (quotation omitted)); *Flaherty*, 172 F.4th at 234 (Roth J., dissenting) ("Throughout U.S. history, gambling regulation has been largely left to the state legislatures.").

The presumption against preemption, therefore, applies to this case, and the Court must analyze whether Kalshi has demonstrated that in enacting the CEA, it was the "clear and manifest purpose of Congress" to preempt New York's authority to regulate gambling where a DCM, like Kalshi, offers sports-event contracts on its platform. *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 96 (citation omitted).

To discern Congress' intent, the Court begins with the CEA's text. It is clear that Congress intended the CEA to preempt certain areas of derivative trading—specifically, as relevant to this action, the CEA grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). For the purposes of resolving Kalshi's motion, consistent with the approach of other courts, the Court assumes without deciding that Kalshi's sports-event contracts are swaps under the CEA. *See Schuler II*, 2026 WL 1295806, at \*3; *see also Commonwealth v. Kalshiex, LLC*, No. 2584 Civ. 2525, 2026 LX 33147, at \*13 (Mass. Super. Ct. Jan. 20, 2026); *Martin*, 793 F. Supp. 3d at 675.[5]

The Court does not, however, end its inquiry there. Although it is clear from the CEA's text that Congress intended for the CFTC to have exclusive jurisdiction over swap transactions on DCMs, the Court must also determine the scope of that preemption—that is, "at what point the state regulation sufficiently interferes with federal regulation that it should be deemed [preempted]." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505

---

[5] The Court notes that some courts considering this issue in other jurisdictions have found that Kalshi's sports-event contracts are swaps within the meaning of the CEA, *see, e.g.*, *KalshiEX LLC v. Johnson*, No. 26 Civ. 1715, 2026 WL 1223373, at \*4–5 (D. Ariz. May 5, 2026), and other courts have not, *see, e.g.*, *Schuler*, 2026 WL 657004, at \*4–7.; *see also QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1166362, at \*2–3 (W.D. Mich. Mar. 10, 2026) (finding that a different prediction contract market's sport-related products do not fall within the CEA's definition of a swap).

U.S. 88, 107, 112 (1992)); *see also Altria Grp.*, 555 U.S. at 76. The scope of Congress' intent to displace state law with its grant of exclusive jurisdiction to the CFTC can be determined by considering both field and conflict preemption as applied to Kalshi's sports-event contracts. *See N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104 ("Even where a federal law contains an express preemption clause, the court still may be required to consider implied preemption as it considers 'the question of the substance and scope of Congress' displacement of state law.'" (quoting *Altria Grp.*, 555 U.S. at 76)); *see also id.* ("By their nature, field preemption and conflict preemption are usually found based on implied manifestations of congressional intent.").

### 3. Implied Preemption

#### a. Field Preemption

The Court first considers the issue of field preemption, which is implicated where congressional action reflects a "decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401. The basic premise of field preemption is that "[s]tates may not enter, in any respect, an area the [f]ederal Government has reserved for itself." *Id.* at 402. Accordingly, "[i]n rare cases, the Court has found that Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation and quotation marks omitted).

Kalshi argues that Congress has "preempted the field of regulating trading on DCMs . . . implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation." Mem. at 11. Defendants contend that New York law is not field preempted as to Kalshi's sports-event contracts because Congress did not intend to regulate so broadly as to exclude all state law. *See* Opp. at 16–17.

Kalshi's field preemption argument, "like all preemption arguments, must be grounded in the text and structure of the statute at issue." *Garcia*, 589 U.S. at 208 (citation and quotation marks omitted). Although § 2 of the CEA grants the CFTC "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM, this grant is not without limits. Section 2 specifies that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA. *See Schuler II*, 2026 WL 1295806, at *5 ("[T]he presence of a savings clause [like in § 2] usually signals that Congress does not mean to preempt the field." (emphasis removed)); *Martin*, 793 F. Supp. 3d at 679 ("[T]he fact that the CEA has some field-preemptive effect does not mean that the 'field' Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws."); *id.* (holding that the clause in § 2 "on balance [] cuts against a finding of field preemption").

The scope of the CEA's preemption is further clarified by looking at the CEA's structure as a whole. Congress' enactment of the Special Rule in 7 U.S.C. § 7a-2(c) demonstrates its intent that some state law and regulation should operate in tandem with the CEA. Under the Special Rule, the CFTC has authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . [, *inter alia*,] activity that is unlawful under any Federal or State law" or "gaming." 7 U.S.C. §7a-2(c)(5)(C)(i). That is, the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Further, because Congress "expressly authorized the [CFTC] to prohibit particular categories of transactions as

13

**ADD15**

contrary to the public interest *based on the fact that the conduct at issue would violate state law*[,]" this provision "severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA." *Id.* at 680 (emphasis in original). Moreover, given that the power to regulate gambling is a traditional police power exercised by New York, the Court also declines to interpret the CEA's grant of exclusive jurisdiction as leaving "no room for supplementary state legislation." *Garcia*, 589 U.S. at 208; *Schuler II*, 2026 WL 1295806, at *4–5; *Dep't of Revenue of Oregon v. ACF Indus.*, Inc., 510 U.S. 332, 345 (1994) ("When determining the breadth of a federal statute that impinges upon or pre-empts the States' traditional powers, we are hesitant to extend the statute beyond its evident scope.").

Finally, Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts. For example, § 16 prohibits the regulation of transactions involving swaps by state gambling laws in certain limited circumstances. *See* 7 U.S.C. § 16(e) (superseding and preempting "any State or local law that prohibits or regulates gaming or the operation of bucket shops" as it relates to certain electronic trading facilities or certain agreements that are excluded or exempted from the CEA). Neither of these circumstances is presented in this action, and Kalshi does not argue that the Court should find otherwise. *See generally* Mem.; Reply. Section 16 also prohibits state regulation of transactions involving swaps in other contexts like insurance contracts. *See, e.g.*, *id.* § 16(h) ("A swap . . . may not be regulated as an insurance contract under the law of any State."). These provisions provide "strong evidence" that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps. *See Martin*, 793 F. Supp.

14

**ADD16**

3d at 681. Therefore, Kalshi has not demonstrated a likelihood of success on the merits that New York's gambling laws are field preempted as applied to its sports-event contracts.

b. Conflict preemption

Next, the Court considers the issue of conflict preemption. Kalshi argues that New York's gambling laws are conflict-preempted as applied to Kalshi's sports-event contracts because it would be impossible for Kalshi to comply with both state and federal law and because New York's laws are an obstacle to the accomplishment and execution of the full objectives of the CEA. *See* Mem. at 16. Defendants contend that Kalshi has failed to provide evidence demonstrating how New York gambling laws would conflict with or stand as an obstacle to achieving the purposes of the CEA. *See* Opp at 20. The Court agrees and holds that Kalshi has not shown that conflict preemption likely applies.

Conflict preemption of state law occurs where "'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Genna v. Sallie Mae, Inc.*, No. 11 Civ. 7371, 2012 WL 1339482, at *8 (S.D.N.Y. Apr. 17, 2012) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)). Under the "purposes and objectives" inquiry, courts consider "whether the state law interferes with a method the federal law uses to promote its goal." *Id.* (quoting *United States Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 703 F. Supp. 2d 329, 334 (S.D.N.Y. 2010)). The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting

15
**ADD17**

preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (quotation marks omitted).

First, Kalshi has not shown that it is impossible to comply with both New York gambling laws and the CEA. Kalshi contends that if it were required to comply with New York law, it would violate the CFTC's requirement that a DCM provide "impartial access to its markets and services" because Kalshi would be required to limit access to its exchange to persons living only in New York, which would be impossible for a nationwide platform such as Kalshi. *See* Mem. at 18–19. Not so. The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide. *See* 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants."). There is nothing preventing Kalshi from obtaining a license pursuant to New York law and establishing a category of New York market participants that does not discriminate within that New York-resident category. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that

Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access. . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *Schuler I*, 2026 WL 657004, at *9 ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"). Although complying with New York gambling laws imposes an additional regulatory requirement on Kalshi, that requirement is not squarely contrary to federal law. Kalshi's attempt, therefore, to avoid that requirement is unavailing.

Second, New York's gambling laws as applied to Kalshi's sports-event contracts do not frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme. Kalshi argues that "once [it] was approved as a CFTC-designated contract market, Kalshi was authorized to list its [sports-]event contracts by self-certifying that the contracts comported with federal law." Mem. at 18. Kalshi contends that New York's attempt to regulate its sports-event contracts "would substantially interfere with the CFTC's discretion" to review Kalshi's self-certification on the ground that it was "contrary to the public interest" because the CFTC ultimately "chose not to do so." *Id.* (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)).

This argument lacks merit and misinterprets the authority of Kalshi's self-certification of its sports-event contracts. As stated above, the CEA's text and structure, as well as the historical context of New York's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs. Instead, the CEA leaves room for states to regulate tangential issues that may arise from trading swaps and other financial products on DCMs. As other courts have noted, the congressional record for the CEA

17
**ADD19**

supports the view that when enacting the Special Rule, Congress sought to prohibit the exact

types of event contracts that Kalshi seeks to offer. *See Flaherty*, 172 F.4th at 240 (Roth J.,

dissenting). For example, when discussing the Dodd-Frank Act, Senator Blanche Lincoln of

Arkansas stated that the purpose of the Special Rule is to "prevent the creation of futures and

swaps markets that would allow citizens to profit from devastating events." 156 Cong. Rec.

S5906 (2010). Senator Lincoln further explained that "it would be quite easy to construct an

'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and [the]

Masters Golf Tournament," which would be contracts that "would not serve any real commercial

purpose" but "[r]ather, . . . would be used solely for gambling." *Id.* at S5906–07. Kalshi states

that its contracts not only allow users to take positions and profit from devastating events, *e.g.*,

"whether an earthquake will take place in Los Angeles County before December 31, 2025," Am.

Compl. ¶ 27, but also sporting events, *e.g.*, "which teams will advance in certain rounds of the

NCAA College Basketball Championship or who will win the U.S. Open Golf Championship,"

*id.* at ¶ 47. Further, although Kalshi can list any contract that it self-certifies, its self-certification

is not tantamount to a declaration that the contract is lawful. The CFTC holds the authority to

determine whether a contract is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i) ("The [CFTC] may

determine that . . . [event] contracts . . . are contrary to the public interest" if they involve

"gaming"); 17 C.F.R. § 40.11(a)(1) ("A registered [DCM] shall not list for trading or accept for

clearing on or through the registered entity any . . . agreement, contract, transaction, or swap . . .

that involves, relates to, or references . . . gaming"). The Court declines to comment on CFTC's

decision not to exercise its authority under the Special Rule or 17 C.F.R. § 40.11 with respect to

Kalshi's sports-event contracts. However, "the agency's inaction is not proof that the sports-

event contracts are regulated by or permissible under the CEA—and the Court has concluded

18
**ADD20**

they are not." *Schuler I*, 2026 WL 657004, at *9. Therefore, New York's gambling laws, which seek to regulate gaming in the state, complement rather than conflict with federal law. Because Kalshi has failed to show likelihood of success on the merits as it relates to the issue of preemption, this factor weighs against the issuance of a preliminary injunction.

### B. Irreparable Harm

To satisfy the irreparable harm requirement, Kalshi "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007)). Irreparable harm must be an injury that "cannot be remedied by an award of monetary damages." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 690 (S.D.N.Y. 2025) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)).

Kalshi argues that without an injunction, it will face the threat of civil and criminal enforcement by the Gaming Commission, disruption to its business in New York and nationwide, including the cost of "comprehensively geolocat[ing] its users on a state-by-state basis," and harm to its reputation, including the possibility that the CFTC could revoke Kalshi's designation as a DCM. Mem. at 20–22. Although the prospect of being subject to criminal prosecution could demonstrate a showing of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22 Civ. 1447, 2022 WL 17689840, at *6 (S.D.N.Y. Dec. 15, 2022), Kalshi's harms "are largely monetary." *Hendrick*, 817 F. Supp. 3d at 1035. As Defendants contend, any civil fines that may be levied against Kalshi can be challenged and vacated if Kalshi ultimately prevails on the merits, which, as stated above, is unlikely. *See* Opp. at 22. Kalshi's argument that

geolocating its users on a state-by-state basis would constitute irreparable injury is unpersuasive because the ordinary burdens and costs of complying with government regulation are typically insufficient to constitute irreparable harm. *See Wheely USA, Inc. v. City of New York*, No. 26 Civ. 1057, 2026 WL 972924, at *7 (S.D.N.Y. Apr. 10, 2026) (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Kalshi has not presented any evidence that the possibility of the CFTC's revocation of its designation as a DCM is more than mere speculation. Over the past year, Kalshi has litigated this issue in various jurisdictions across the country and has been denied injunctive relief in certain of those jurisdictions, but the CFTC has not altered Kalshi's DCM status. Therefore, on balance, the irreparable injury factor weighs against the granting of a preliminary injunction.

### C. Balance of the Equities

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("[W]ith respect to the factors of the public interest and the balance of the equities, '[i]n a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest.'" (quoting *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021))). Kalshi argues that the public has an interest in "ensuring that preempted New York laws are not enforced against federally regulated entities" and that Kalshi users will experience harm if New York laws are enforced against Kalshi by experiencing "intractable technological difficulties on a very short timeframe." Mem. at 23. Defendants contend that the equities weigh in their favor because "New Yorkers are harmed if Kalshi continues to engage in unsupervised sports gambling," especially individuals between the ages of 18 and 24 who are a "'high-risk population' for gambling addictions"; that Kalshi's expansion of "proposition betting" which

20
**ADD22**

usually involves "wagers on an individual player's performance" often is "hazardous to the integrity of college sports"; that gambling on college sports involving any New York-based college team is unlawful under state law; and that if Kalshi continues to operate, other potential DCMs listing sports contracts will proliferate. Opp. at 25–28. Defendants' interests in regulating gaming in New York and ensuring that the Gaming Commission has the ability to effectuate statutes enacted by its state representatives heavily outweigh the interests articulated by Kalshi. It is well established that "[a] prohibition on a state from 'effectuating statutes enacted by representatives of its people' itself inflicts 'a form of irreparable injury.'" *Duffy*, 784 F. Supp. 3d at 690 (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)); *see also id.* (collecting cases). Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

Because all four *Winter* factors weigh against the issuance of a preliminary injunction, Kalshi's motion is denied.

III. Motion to Seal

Kalshi seeks an order sealing two exhibits filed in connection with its reply brief. *See* ECF No. 74. Defendants do not object. *See generally* Opp.; Sur-reply. The exhibits are judicial documents to which the presumption of the common law right of access attaches. *See Coach IP Holdings, LLC v. ACS Grp. Acquisitions LLC*, No. 23 Civ. 10612, 2024 WL 3965936, at *1 (S.D.N.Y. Aug. 27, 2024); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). However, because the exhibits contain confidential information that Kalshi submitted to the CFTC, including certain proprietary business information, competing privacy interests outweigh the presumption of access. *See SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 329211, at *3 (S.D.N.Y. Feb. 3, 2022). Moreover, the proposed redactions at ECF Nos. 79-1

through 2 are narrowly tailored to protect that privacy interest.  Therefore, Kalshi's motion to

seal is granted.

## CONCLUSION

For the foregoing reasons, Kalshi's motion for a preliminary injunction is DENIED.

Kalshi's motion to seal is GRANTED.  The Clerk of Court is respectfully directed to terminate the

motion at ECF No. 74 and terminate the New York State Gaming Commission from the docket.

SO ORDERED.

Dated: July 13, 2026
       New York, New York

_____
ANALISA TORRES
United States District Judge

22
**ADD24**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KALSHIEX LLC,

                          Plaintiff,

            -against-

ROBERT WILLIAMS, in his official capacity as
Executive Director of the New York State Gaming
Commission; BRIAN O'DWYER, in his official
capacity as Chair and Commissioner of the New
York State Gaming Commission; JOHN A.
CROTTY, in his official capacity as Commissioner
of the New York State Gaming Commission;
SYLVIA B. HAMER, in her official capacity as
Commissioner of the New York State Gaming
Commission; MARTIN J. MACK, in his official
capacity as Commissioner    of the New York State
Gaming Commission; PETER J. MOSCHETTI,
JR., in his official capacity as Vice Chair and
Commissioner of the New York State Gaming
Commission; MARISSA SHORENSTEIN, in her
official capacity as Commissioner of the New
York State Gaming Commission; JERRY
SKURNIK, in his official capacity as
Commissioner of the New York State Gaming
Commission,

                          Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  7/27/2026
```

25 Civ. 8846 (AT)

**ORDER**

ANALISA TORRES, District Judge:

On July 15, 2026, Plaintiff, KalshiEx LLC ("Kalshi"), filed a letter motion seeking leave to file a motion for an emergency injunction pending appeal from the Court's July 7[1] order (the "PI Order") denying its motion for a preliminary injunction, or, in the alternative, "short-term administrative relief." *See* Mot., ECF No. 110; PI Order, ECF No. 106; Opp., ECF No. 112. The motion is denied.

Under *Agudath Israel of America v. Cuomo*, when a moving party seeks to obtain an injunction pending appeal, that party must show that they have a "strong" likelihood of success on the merits—a heightened standard than what is required for a typical preliminary injunction. *See Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 225–26 (2d Cir. 2020) (quoting *New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020)) (characterizing this requirement as "more" than the requirement for issuance of a preliminary injunction); *see e.g., Principle*

---

[1] The Court issued a revised Opinion and Order on July 9, 2026, to correct a scrivener's error which has no bearing on the motion at hand. *See* ECF No. 108.

**ADD25**

*Homecare, LLC v. McDonald*, No. 25-466, 2025 WL 946292, at *1 (2d Cir. Mar. 25, 2025) (recognizing *Agudath Israel* as providing the standard for issuance of an injunction pending appeal); *Colony Grill Dev., LLC v. Colony Grill, Inc.*, No. 20 Civ. 213, 2021 WL 4521966, at *1 (D. Conn. Oct. 4, 2021) (same).[2]  Of course, the movant must also demonstrate the remaining factors relevant to issuance of a standard preliminary injunction: (1) a likelihood of irreparable harm in the absence of preliminary relief; (2) that the balance of equities tips in their favor; and (3) that an injunction is in the public interest.  *See Agudath Israel*, 980 F.3d at 225–26; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

Kalshi asks the Court to reverse itself.  In deciding whether to take this drastic step, "the fact that a court previously found that a preliminary injunction was not warranted should carry significant weight, so the circumstances must be of unusual magnitude to justify a district court granting an injunction pending appeal after denying a preliminary injunction."  *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1236 (N.D. Cal. 2025).

The Court held in the PI Order that Kalshi has not met its burden with respect to any of the four factors to be considered when adjudicating a motion for preliminary injunction.  *See generally* PI Order.  Kalshi's motion does not change this, and it does not point to any unusual or compelling circumstances which justify Kalshi's requested relief.  First, Kalshi argues that without an emergency injunction, it will face "a 'Hobson's Choice' of violating New York law and exposing itself to potentially huge liability or violating the CFTC's [Commodity Futures Trading Commission] order and risking its federal registration."  Mot. at 3–4.  The Court previously considered this argument, holding that "Kalshi has not presented any evidence that the possibility of the CFTC revocation of its designation as a [designated contract market] is more than mere speculation."  PI Order at 20.  Kalshi points to a recent order issued by the CFTC which states that Kalshi violated federal law by complying with a Michigan state court order, Mot. at 4, but Kalshi does not argue that its status as a designated contract market is at risk as a result of that action.  Moreover, as the Court already determined, Kalshi's potential harms are "largely monetary" and stem from "the ordinary burdens and costs complying with government regulation [that] are typically insufficient to constitute irreparable harm."  *See* PI Order at 19–20.

Second, Plaintiff cannot make a "strong showing" that it is likely to succeed on the merits.  Kalshi largely repackages its briefing on the preliminary injunction motion to explain why it believes its appeal to the Second Circuit will be successful.  Mot. at 2–3 (claiming, for instance, that the Second Circuit "may disagree with the Court's interpretation" of the relevant federal statutes).  But "[t]he sheer possibility of a reversal—a possibility that exists in every appeal—is insufficient for the Court to find an injunction [] or administrative stay is necessary. . . ." *Delux Pub. Charter, LLC v. Cnty. of Westchester*, No. 22 Civ. 1930, 2024 WL 3744167, at *3 (S.D.N.Y. July 25, 2024).[3]  Plaintiff reports that after briefing on the original preliminary injunction motion the CFTC issued a proposed rulemaking which states, "that the CEA [the

---

2 Kalshi's motion in fact seeks something even more "drastic" than a routine injunction pending appeal—it seeks the very injunctive relief that the Court already denied. *See Agudath Israel*, 980 F.3d at 226.

3 The only circuit court to have ruled on a motion for an emergency preliminary injunction pending appeal filed by Kalshi denied Kalshi's request.  *See Kalshiex LLC v. Schuler*, No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026).

Commodity Exchange Act] 'expressly preempts state laws' with respect to event contracts on [designated contract markets]." Mot. at 2. The Court "must exercise independent judgment in determining the meaning of statutory provisions," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024), however, and has done so in concluding the CEA does not preempt "all state gambling laws from regulations transactions involving swaps." PI Order at 14. Kalshi offers no new authority that would cause the Court to now conclude that Kalshi has made a "strong showing" of success on the merits.

Moreover, the Court's analysis has not changed with respect to its conclusions that the balance of equities weighs in Defendants' favor and that an injunction is not in the public's interest. The Court rejects Kalshi's claim that "there is no evidence that a brief injunction pending an expedited Second Circuit appeal would harm New York's gaming industry or the public." Mot. at 4. Defendants have laid out significant harms associated with halting their efforts to enforce state gaming regulations. Opp. at 4; *see also* ECF No. 66 at 27–29 (brief of *Amici Curiae* organizations and Indian Tribes); PI Order at 20–21.

Plaintiff's request for an emergency injunction pending appeal is DENIED. Plaintiff's request for short-term administrative relief is also DENIED.[4] The Clerk of Court is respectfully directed to terminate the motion at ECF 110.

SO ORDERED.

Dated: July 27, 2026
New York, New York

_____
ANALISA TORRES
United States District Judge

---

4 As Defendants noted, Plaintiff "has not cited any case standing for the proposition that courts in this circuit issue interim administrative *injunctions* rather than administrative stays." Opp. at 4. Regardless, for the forementioned reasons Plaintiff is not entitled to any sort of injunction.

**ADD27**