

# Milbank

**WILL HAVEMANN**
*Partner*
1101 New York Ave., N.W.  |  Washington, DC 20005
T: +1 (202) 835-7518
whavemann@milbank.com  |  milbank.com

August 12, 2026

**By Electronic Filing**

Hon. Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
40 Foley Square
New York, New York 10007

> Re:     *KalshiEX LLC v. Williams*, No. 26-1835

Dear Ms. Wolfe:

Kalshi writes to apprise the Court of a CFTC emergency order issued on August 11, which "directs Kalshi to continue to operate its exchange in accordance with its normal practices" even if the New York Attorney General ("AG") obtains a TRO against Kalshi.  Order at 1; *see* 7 U.S.C. § 12a(9).  The Order highlights the irreconcilable conflict between federal and state law:  Pursuant to federal law, it orders Kalshi not to follow a state-court order.  And it underscores that an injunction pending appeal is needed to prevent existential harm to Kalshi.

The Order finds that the AG's action constitutes a "market emergency."  Order at 1-3.  It notes that the AG "seeks to prohibit Kalshi from offering *all* event contracts."  *Id.* at 2.  "[T]he threat of the sudden, unpredictable shut down of a DCM poses an existential threat to the Commission's registrants, marketplaces, and regulatory jurisdiction."  *Id.* at 5.  It would cause price distortions that "undermine the market's core price discovery function."  *Id.* at 7.  And it would cause an "influx of trading activity" from Kalshi onto its competitors, "artificially impact[ing] event-contract prices" on other exchanges and "undermin[ing] one of the CEA's animating purposes" of promoting " 'fair competition.' "  *Id.* at 7-8.

The Order highlights the improper extraterritorial effect of the AG's requested relief.  The AG's "lawsuit threatens to prevent a CFTC-registered DCM from offering event contracts to anyone in the world"—an "unprecedented assertion of state authority" that would allow "a single State [to] effectively become the nationwide regulator" of DCMs.  *Id.* at 5.  The use of one state's laws to halt trading on a nationwide exchange is "the antithesis of the structure that Congress designed."  *Id.*

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | HONG KONG | SEOUL | SINGAPORE | TOKYO

Finally, the Order explains that if New York could ban event contracts, it "could ban any derivatives product that the Commission regulates." *Id.* at 9. It would be "intolerable" for one state to "wield existential control over every entity that offers derivatives products" and is headquartered in the state. *Id.*

An injunction pending appeal is warranted given the conflict between the Order and the AG's suit and the irreparable harm Kalshi would suffer absent relief.

Respectfully submitted,

/s/ William E. Havemann
William E. Havemann

*Counsel for Appellant KalshiEX LLC*

cc:    All Counsel (via ACMS)
       Word Count: 350

**UNITED STATES OF AMERICA**

**Before the**

**U.S. COMMODITY FUTURES TRADING COMMISSION**

_____

In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration

_____

**ORDER DIRECTING KALSHI TO CONTINUE EXERCISING DCM FUNCTIONS**

On August 1, 2026, KalshiEX LLC ("Kalshi"), a designated contract market ("DCM"), submitted to the Commodity Futures Trading Commission (the "Commission") for review notification of a market emergency in light of the State of New York's pending motion for a temporary restraining order that would prohibit Kalshi from offering event contracts from New York, its principal place of business. Kalshi notes that this emergency risks the DCM's ability to comply with Core Principles 2, 4, 6, 7, 9, 11, 12, and 21.

For the following reasons, and consistent with the Commission's statutory mandate to exercise exclusive jurisdiction over commodity derivatives markets in the United States, the Commission agrees that the threat facing Kalshi and the markets that the Commission regulates compels the exercise of emergency power and directs Kalshi to continue to operate its exchange in accordance with its normal practices and the Commodity Exchange Act's ("CEA's") Core Principles.

## I.    Background

The CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate, among other things, "transactions involving swaps" that are traded on

1

DCMs.[1] Kalshi obtained designation as a CFTC-regulated contract market on November 3, 2020. Kalshi lists CFTC-regulated event contracts for trading as swaps, as defined in the CEA.[2] Accordingly, the Commission has exclusive jurisdiction to regulate event contracts traded on Kalshi's DCM.

At 12:01 a.m. on July 31, 2026, Letitia James, in her capacity as Attorney General of the State of New York, on behalf of the People of the State of New York, filed a Complaint against Kalshi in the Supreme Court of the State of New York for the County of New York, alleging that Kalshi's operations contravene New York gambling laws.[3] The State also moved for a temporary restraining order ("TRO") that would prohibit Kalshi from "operating a business that offers contracts relating to sports, culture, elections, and other events" "within or from New York or to persons in New York."[4] New York offers no limitation on, or definition of, "other events," which means that it seeks to prohibit Kalshi from offering *all* event contracts. New York additionally seeks disgorgement of all Kalshi's profits obtained in connection with the offering of event contracts, plus a penalty of three times the amount of its profits.[5] New York seeks $36 billion in compensatory damages "at minimum pending accounting," excluding punitive damages and

---

[1] *Id.* § 2(a)(1)(A).
[2] *Id.* §§ 1a(47); 2(a)(1)(A).
[3] *People of the State of New York v. KalshiEX LLC*, Index No. 453272/2026 (July 31, 2026); *see People of the State of New York v. KalshiEX LLC*, No. 1:26-cv-06550, Dkt. No. 1 (S.D.N.Y. July 31, 2026) (removed to federal court).
[4] *KalshiEX*, 1:26-cv-06550, Dkt. No 1-3.
[5] *Id.*

costs.[6] As New York acknowledged in its verified petition, Kalshi's publicly reported valuation is \$22 billion.[7]

That next day, Kalshi provided correspondence to the Commission notifying it of an imminent market emergency that would arise if New York obtained a TRO against the company. Kalshi noted that the TRO would enjoin the operation of the DCM completely, not just a category of contracts, and would require the DCM to refund customers and disgorge profits from trades already completed. Beyond the DCM itself, Kalshi noted that the TRO would expose traders to substantial losses exceeding the collateralized value of the contracts and result in market disruptions. According to the DCM, the disruptive effect of New York's lawsuit may be felt even before a TRO would be granted.

## II.   Authority

Section 8a(9) of the CEA provides that whenever the Commission "has reason to believe that an emergency exists," the Commission may "direct [a] registered entity . . . to take such action as in the Commission's judgment is necessary to maintain or restore orderly trading in or liquidation of any futures contract."[8] "The term 'emergency' as used [in Section 8a(9)]" includes "threatened or actual market manipulations" as well as any "major market disturbance which prevents the market from accurately reflecting the forces of supply and demand."[9]

---

[6] *KalshiEX*, 1:26-cv-06550, Dkt. No 1-7.
[7] *KalshiEX*, 1:26-cv-06550, Dkt. No 1-1 ¶ 8.
[8] 7 U.S.C. § 12a(9).
[9] *Id.*

3

An emergency order issued by the Commission is "subject to review only in the United States Court of Appeals for the circuit in which the party seeking review resides or has its principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit."[10]

## III.    Findings

Transactions subject to the CEA "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities."[11]

The Commission's mission is to promote the integrity, resilience, and vibrancy of the U.S. derivatives markets through sound, principles-based regulation. As part of this mission, the Commission ensures continued public confidence in its markets by monitoring for manipulation, supporting price transparency, and ensuring market orderliness.

Having reviewed the complete record in this matter, the Commission makes the following findings:

The Commission finds that New York's enforcement action and TRO motion constitute an emergency because they constitute a "major market disturbance which prevents the market from accurately reflecting the forces of supply and demand" with respect to event contracts.[12]  Even though New York's enforcement action has been removed to federal court and may be delayed by

---

[10] *Id.*
[11] *Id.* § 5(a).
[12] *Id.* § 12a(9).

remand proceedings, the threat of the sudden, unpredictable shut down of a DCM poses an existential threat to the Commission's registrants, marketplaces, and regulatory jurisdiction—as well as to the individuals and entities that trade in the Commission's regulated marketplaces—and thus justifies exercise of the Commission's statutory emergency power. Put simply, New York's lawsuit threatens to prevent a CFTC-registered DCM from offering event contracts to anyone in the world. That unprecedented assertion of state authority cuts at the very heart of the Commission's jurisdiction and would have significant adverse ramifications for national and international financial markets.

If New York's lawsuit, with the extreme relief it seeks, is permitted to continue, then a single State will effectively become the nationwide regulator of event-contract swaps on DCMs. That is the antithesis of the structure that Congress designed for federal derivatives regulation. When Congress created the Commission, "[t]he Act's proponents were concerned that the states . . . might step in to regulate the futures markets themselves. This, they feared, might have subjected the national futures trading apparatus to conflicting regulatory demands."[13] Given the statutorily identified "national public interest" in derivatives transactions, Congress vested a federal agency—the Commission—

---

[13] *American Agriculture Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see also* H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"); S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

with "exclusive jurisdiction" over derivatives transactions traded or executed on DCMs, including event contracts.[14] Allowing one State to use its gambling laws to ban an exchange from offering a class of derivatives—not only to citizens in its own borders, but to anyone, anywhere—would run counter to the system Congress created and that derivatives markets have, for over half a century, relied upon.

If New York can force Kalshi to shut down, the market consequences would be swift and severe. Traders across the United States rely on exchanges like Kalshi to hedge and speculate on events associated with potential financial, economic, and commercial consequences.[15] For instance, traders can currently use Kalshi to take positions on whether the Federal Open Market Committee will move the Federal Funds Rate, when traffic in the Strait of Hormuz will return to normal levels, whether a crypto asset will reach a certain price, whether a State will experience a significant drought in a specific timeframe, and whether the United States will enter a recession in a specific quarter. Individuals or entities with exposure to these underlying events, or who wish to have exposure to these events, can use Kalshi-listed contracts for risk management purposes, which is one of the fundamental purposes of federal derivatives regulation.[16] The immediate loss of access to a major derivatives exchange would have a significant effect on the financial risk profiles of market participants across the country and the world.

If New York is permitted to ban a DCM from offering event contracts, those contracts will no longer truly represent the forces of supply and demand. All event

---

[14] 7 U.S.C. §§ 2(a)(1)(A), 5(a).
[15] *Id.* § 1a(47)(A)(ii).
[16] *Id.* § 5(a).

contracts would necessarily price in a "risk premium" that the market itself could be dissolved by the fiat of a single State. That, in turn, would undermine the market's core price discovery function, and it would violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process.[17]

The market distortions may be exacerbated by the fact that DCMs are headquartered in different States. Kalshi, like other prominent DCMs, is headquartered in New York, and thus, a state ban on offering event contracts "within or from" the jurisdiction would necessarily preclude it from offering contracts to anyone, whether inside or outside New York. Other DCMs, however, are located in States that do not seek to enforce gambling law against derivatives transactions. Traders may prefer to find it "safer" to direct their investments to exchanges that are not headquartered in New York and therefore cannot be directed by the State to cease offering all event contracts. In that circumstance, there would be an additional "risk premium" associated with contracts listed by a New York-based DCM, leading to prices that do not reflect natural supply and demand. This would create inter-exchange arbitrage based on perceived legal risks rather than anything related to the events underlying the relevant contracts. It would also undermine one of the CEA's animating purposes: "to promote … fair competition among boards of trade, other markets and market participants."[18]

---

[17] Core Principle 4, 7 U.S.C. § 7(d)(4).
[18] 7 U.S.C. § 5(b).

7

In the more immediate term, there would be additional market distortions caused by New York's course of action. If Kalshi shuts down, there would be an immediate influx of trading activity from Kalshi onto other exchanges. That spike in activity would artificially impact event-contract prices for reasons having nothing to do with the events underlying the relevant contracts.

Furthermore, New York's proposed TRO would likely require Kalshi to liquidate all open trading positions, causing additional, significant market disturbances. Traders who hold existing positions in event contracts rely on those contractual entitlements to inform their decision making. For instance, a crypto asset trader may have taken a position on Kalshi as to the price of Bitcoin at the end of 2026, and that contract-backed expectation would have informed subsequent trading decisions in Bitcoin and other assets. A forced liquidation of that position could disrupt that trader's strategy, which could require the trader to, in turn, unwind other positions. Likewise, an arbitrageur may have taken a position on Kalshi and an opposite position on another trading platform; if the Kalshi position is liquidated, then the trader is simply left with the opposing position, a one-way exposure that the trader never intended to accept. As a result of dynamics of this variety, there may be significant price volatility in derivatives markets and other markets, threatening systemic harm. This contravenes CEA Core Principles 4 and 9, which require a DCM to "prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process" and "provide a competitive, open, and

8

efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market."[19]

Finally, and more generally, the logical implications of New York's enforcement efforts are not limited to event-contract markets; they threaten to unsettle derivatives markets generally. If New York can ban event contracts, it logically could ban any derivatives product that the Commission regulates, including basic futures contracts, on the erroneous basis that trading in these products contravenes New York's gambling laws. In that case, New York would wield existential control over every entity that offers derivatives products and is headquartered in New York—the financial capital of the world. That prospect is intolerable to the efficient operation of interstate derivatives markets and warrants emergency action from the Commission.

Under the Commission's statutory emergency powers, it may direct Kalshi and its affiliates to continue to perform its functions as an exchange in accordance with the CEA's Core Principles and its normal practices.[20] This exercise of the Commission's emergency authority will give market participants the necessary assurances that a CFTC-registered DCM cannot be shut down by a single State and that the trades they execute will be duly cleared and fulfilled.

---

[19] Core Principle 4 and Core Principle 9, 7 U.S.C. §§ 7(d)(4), 7(d)(9).

[20] *See* CFTC, Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents (July 14, 2026) (exercising statutory emergency power to order Kalshi to fulfill trades that have been executed).

9

**NOW THEREFORE:**

**IT IS HEREBY ORDERED** that, pursuant to Section 8a(9) of the CEA, the Commission having reason to believe that the threat to its market justifies the exercise of its statutory emergency power, Kalshi shall continue to perform its functions as an exchange in accordance with the CEA's Core Principles and its normal practices.

Issued in Washington, DC, on this 11th day of August, 2026.

By the Commission,

_____

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Date:  August 11, 2026

10