# 26-1835

IN THE

## United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

ROBERT WILLIAMS, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of New York
No. 1:25-cv-8846
Hon. Analisa Torres

**JOINT APPENDIX VOLUME II (JA78-JA339)**

LETITIA JAMES
BARBARA D. UNDERWOOD
ESTER MURDUKHAYEVA
GRACE X. ZHOU
*Counsel of Record*
OFFICE OF THE NEW YORK ATTORNEY GENERAL
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6160
grace.zhou@ag.ny.gov

*Counsel for Defendants-Appellees*

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant*

*Additional counsel listed on inside cover*

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant*

August 31, 2026

# TABLE OF CONTENTS

Page

**VOLUME I (JA1-JA77):**

Opinion and Order Denying Motion for Preliminary Injunction ("PI"), Dkt. No. 106 (July 7, 2026) .......... JA1

Order Correcting Scrivener's Error, Dkt. No. 109 (July 13, 2026).......... JA23

Notice of Interlocutory Appeal, Dkt. No. 107 (July 7, 2026).......... JA47

District Court Docket Sheet (S.D.N.Y. 1:25-cv-8846) .......... JA49

**VOLUME II (JA78-JA):**

Declaration of Xavier Sottile in Support of PI, Dkt. No. 18 (Oct. 27, 2026).......... JA78

Complaint with Exhibits, Dkt. No. 35 (filed Oct. 27, 2026; corrected Oct. 28, 2026).......... JA92

Declaration of Katherine Rhodes Janofsky in Opposition to PI with Exhibits, Dkt. No. 53 (Nov. 26, 2025) .......... JA129

Joint Letter on Oral Argument, Dkt. No. 67 (Dec. 8, 2025).......... JA316

Declaration of Xavier Sottile in Support of PI, Dkt. No. 77 (Dec. 15, 2025).......... JA320

Exhibits to Motion for Leave to file Sur-Reply in Opposition to PI, Dkt. No. 81 (Dec. 16, 2025) .......... JA325

Order Denying Motion for Injunction Pending Appeal, Dkt. No. 113 (July 27, 2026).......... JA337

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and NEW YORK STATE GAMING COMMISSION,<br><br>*Defendants*. | Case No.: 1:25-cv-08846 |

**DECLARATION OF XAVIER SOTTILE**

1. I am the Head of Markets at KalshiEX LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2. My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the

regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC"). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4. I offer this Declaration to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the New York State Gaming Commission (the "Gaming Commission") from enforcing its demand that Kalshi immediately cease and desist from offering sporting event-based contracts in New York. Ex. 1 at 1. Without an injunction, Kalshi will be forced into an impossible choice. It must either decline to comply with the letter, subjecting itself and its representatives to the risk of criminal and civil liability. *Id.* at 1-4. Or it must attempt to comply with the letter, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case. This Declaration reflects my preliminary analysis of Kalshi's harms. Other unanticipated harms are possible, and even likely, given the nature of the Gaming Commission's letter and the uncharted territory into which it would lead.

## I. Harms Resulting from Noncompliance

5. If Kalshi declines to comply with the letter and continues to offer sports event contracts in the state of New York, the company and its representatives risk criminal and civil jeopardy in New York.

6. New York authorities have threatened Kalshi and its representatives with civil and criminal penalties. Ex. 1 at 1-4. The Gaming Commission has expressed that it believes that Kalshi's operations in New York are in violation of several New York statutes. *Id.* The Gaming

Commission stated that Kalshi's conduct violates New York State Penal Law § 225.00(2), which can give rise to potential criminal felony charges. *Id.* at 2; Penal Law § 225.10.

7. The Gaming Commission's October 24, 2025 cease & desist letter stated that it "reserves all rights to investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York." Ex. 1 at 4.

8. Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide. As Head of Markets, I have assiduously complied with federal regulations with regard to all our contracts, including the sports-related contracts that New York authorities have highlighted in their letter. *See* Ex. 1 at 1-2. We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for almost five years.

9. Since receiving the cease-and-desist letter, Kalshi's operations—which are lawful under federal law—risk exposing the company and representatives to criminal and civil liability. It is terrifying and stressful to attempt to operate the company while the risk of criminal and civil jeopardy looms. I am deeply concerned that New York will make good on its threat to file criminal and civil charges against Kalshi, its representatives, and possibly even its contractual counterparties. That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with the cease-and-desist letter, which would bring about a whole host of other harms to Kalshi and its users as I describe below.

## II. Harms Resulting from Attempted Compliance

10. Choosing to comply with the cease-and-desist letter would introduce a new set of barriers and challenges that themselves would subject Kalshi and its users to irreparable harm. Technical compliance with the cease-and-desist letter in short order would be exceedingly difficult. But even if Kalshi could implement a technical solution to comply with the letter, halting access to event contracts in New York would cause severe harm to Kalshi's existing user base. Compliance would also risk Kalshi's status as a designated contract market under the

CFTC, throwing away years of efforts to earn and maintain its federal designation. All of these harms would be avoided by this Court's entry of immediate injunctive relief.

11. Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in New York, (c) risk that complying with New York law would jeopardize Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in New York. I describe each of these categories in more detail below.

*a. Harms Resulting from Technical Barriers to Compliance*

12. The cease-and-desist letter requires Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement immediately, under the threat of imminent litigation. Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

13. The Gaming Commission's letter requires Kalshi to cease all of its event contracts in New York under threat of imminent enforcement. Ex. 1 at 1-4. If Kalshi attempted to comply with this demand, it would be required to, first, undertake efforts to geolocate which of its users are in New York, and, second, cease all event contracts for those users. I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance at both of these steps. Compliance would be difficult to implement even under a relaxed timeline and could not be done immediately.

i. <u>Step One – Identifying New York Users</u>

14. Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

15. Traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected

device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

16. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking real-time movement of devices.

17. The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. The precision of geolocation allows sports pools to make refined geographic determinations at the transaction level rather than the user level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than bluntly denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

18. Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

19. Kalshi keeps Know Your Customer (KYC) data on the traders that place positions on its platform. Kalshi knows the permanent residence and IP address of its users but does not geolocate its users and therefore does not know where a user's device is located at any point in time. Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request.

20. Kalshi has no evident way to comply immediately with the cease-and-desist letter. If Kalshi sought to use its existing KYC data to identify New York-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as New York even if they place positions when they are located outside of New York. Conversely, the KYC data could fail to capture users whose permanent residence is outside of New York but who travel to the state and place a position while there.

21. If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform. I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually. Thus, if it attempted compliance with the Gaming Commission's letter, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that New York law does not apply to Kalshi.

22. Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months. Implementing and integrating the geolocation services into our existing platform would take longer still. Thus, attempting to comply with the Gaming Commission's letter could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

ii. Step Two - Geographical Cessation

23. Only after identifying Kalshi users who are physically present in New York could Kalshi cease offering its event contracts to users in New York. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around the state of New York. Again, this process would be technically challenging, time-consuming, and expensive.

24. While geofencing might block *newcomers* from trading on the platform from New York, geographical cessation presents a host of additional difficulties for *existing* Kalshi users. As of today, there are 176,728 accounts on Kalshi that have registered with an New York address; 174,278 of those accounts have passed KYC protocols and become full-fledged Kalshi members. While the precise numbers are not public, these accounts have tens of millions of dollars in open interest on the Kalshi platform, meaning New York users have tens of millions of dollars' worth of open positions on Kalshi markets that have not yet been settled.

25. The Gaming Commission's letter could be understood to require Kalshi to cease its contracts even with respect to these existing positions. But doing so would present intractable technical difficulties.

26. If the Gaming Commission's letter is understood to require Kalshi to unilaterally liquidate all trades that originated in New York, compliance would either be impossible or irreparably harmful. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

27. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally-regulated contract market. In contrast to a casino, an exchange facilitates trades between different users on the platform. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange. To ensure compliance with the CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi does not have access to immediate liquidity like a sports pool or casino that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not now have.

28. Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose. But the immediate threat of criminal and civil liability from New York state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

*b. Irreparable Harms to Kalshi's Users*

29. Ceasing operations in New York would impose irreparable harm on Kalshi's existing user base. Ceasing operations could be understood to require either pausing current trades pending the outcome of the event that is the subject of the contract, or else liquidating user positions. Either option would impose severe harms on users.

i. Pausing Positions

30. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

31. Pausing positions pending the outcome of the event would deny New York users access to their property. Users' capital would be locked on the Kalshi platform and users with significant investments on the platform would be unable to retrieve it. If the event at issue is months or years in the future, users' assets would be locked up for the duration. Given current market conditions and uncertainty, this lack of access funds could result in substantial losses.

32. Pausing positions would also cause a massive disruption to users' investment-backed expectations. Financial traders on Kalshi, like investors in other markets, expect to be able to alter their investments as facts on the ground change. Due to the unique market sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies. Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound. And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term. For example, one of Kalshi's event contracts allows traders to place

positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes, so does the price of the event contract. A trader may make an investment at 45 cents on the electric vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

33. Traders are constantly engaged in the practice of ascertaining risk. As facts on the ground change, so do traders' strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

34. Hitting pause on all New York-based trades would completely upend this investment strategy and destroy traders' expectations. If Kalshi were to pause all trades in New York, traders would no longer be able to take action on their existing contracts in accordance with their investment models. The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be lost. A Kalshi user that entered into a contract on whether President Trump would place tariffs on copper imports to the United States before January 1, 2026, for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.[1] Traders would be forced either to leave the state to change positions or suffer whatever losses they may endure as a result of being locked out.

35. Pausing all New York-based trades would not solely affect New York-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem. Again, exchanges

[1] This is a politics-based event contract that is currently offered through the Kalshi exchange. KalshiEX, *Will Trump launch tariffs on copper?*, https://kalshi.com/markets/kxtariffscopper/copper-tariffs.

do not operate like casinos where gamblers bet against the house. Instead, exchanges facilitate contracts between individual traders on the market. Traders on either side of a contract are often from different states, given that Kalshi does not distinguish between the geographic location of traders. If traders in New York are locked out of their positions, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. Traders in California, for example, may expect to rely on traders in New York on contracts related to water availability in the American Southwest. But if the New York-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states. Pausing transactions in New York would thus disrupt users' positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.

ii. Liquidating Positions

36. Liquidating New York-based positions on Kalshi would similarly subject users to irreparable harm. This would require Kalshi to refund either the current value of users' existing positions or the original cost of their existing positions on their respective open contracts. Unilaterally settling traders' positions based on current market conditions or the original cost of the positions could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, refunding users based either on the cost of their positions or the position's current value would be prohibitively expensive for Kalshi to execute.

37. By the same token, immediately liquidating New York-based users' positions would disrupt the market for out-of-state users by causing a false signal in the market. Event contract

markets respond to market fluctuations. The immediate exit of a large portion of investors on a particular contract would have a distorting effect on the value of the contract, impairing other investors' ability to predict market changes and act accordingly. If, for example, New York traders make up a plurality of the trades on a particular contract, the immediate liquidation of all New York positions would indicate to the market that the contract's value has changed, causing a price change in response. Remaining traders would suffer from the market distortion, resulting in substantial financial losses even for Kalshi's non-New York users. Alternatively, Kalshi could liquidate the entire market for both New York and non-New York users by settling prices at either the current market price or the original contract price, but this would, again, be prohibitively expensive and likely occasion the end of our federally-regulated company simply to stave off potential criminal or civil liability.

*c. Harms to Kalshi Resulting from the Risk of CFTC Decertification*

38. Compliance with New York state law would jeopardize Kalshi's status as a CFTC-designated contract market. It is difficult to overstate how harmful this would be to Kalshi.

39. As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets. In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. Complying with New York state law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

40. CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process." 17 C.F.R. § 38.250. Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[ ] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

41. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "[a]ccess criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would conflict with this requirement, but that is exactly what Kalshi would have to do to comply with New York's cease-and-desist letter. Traders who execute positions in New York would be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts, whereas traders in any other state would have unlimited access to the platform.

42. Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

43. Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long-term.

44. CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of state residence could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions. Yet that is what compliance with the Gaming Commission's letter would require Kalshi to do.

45. Compliance with New York law thus places Kalshi in a regulatory Catch-22: Either it complies with New York law and risks CFTC sanctions, or it continues operations in New York and subjects itself to state criminal and civil liability.

*d. Economic and Reputational Harms to Kalshi*

46. Compliance with the cease-and-desist letter would also cause economic and reputational harm to Kalshi. Losses on both fronts would be irreparable even if Kalshi ultimately wins this case.

47. Kalshi has nearly 175,000 verified users in New York with tens of millions of dollars invested on the exchange. The market uncertainty created by abruptly closing its contracts in New York could lead many users to leave the platform—even users outside of New York. Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with the Gaming Commission's order and the prospect that other states may to follow New York's lead. Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business. Losing those traders would mean that many of those efforts were for naught. Thus, compliance would impose significant and irrevocable economic harm on the company.

48. The threat of state litigation also endangers Kalshi's established partnerships and relationships. One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states because of state cease-and-desist letters. This is a massive disruption for Kalshi given Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to a cease-and-desist letter similar to the one New York issued here. Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

49. The effects of New York's cease-and-desist letter are not limited to the state but instead threaten to open a Pandora's box of regulation for the 49 other states that may wish to impose their local laws on Kalshi's exchange. In the absence of a temporary restraining order and preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

* * *

50. The Gaming Commission's cease-and-desist letter imposes irreparable harms that Kalshi cannot avoid no matter how it responds. If Kalshi did not comply with the Gaming Commission's demands, the company faces civil and criminal liability and its representatives face nothing short of imprisonment. But if Kalshi attempted to comply with the Gaming Commission's demands, it would incur massive costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken. All of these harms are compounded by the real risk that other states will be emboldened by the Gaming Commission's demands to follow New York's lead. And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline. Kalshi has spent years cultivating its reputation and developing its user base. Compliance with the Gaming Commission's demands to ward off New York criminal and civil liability would lead to economic and reputational harm that will be difficult to regain.

51. I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 27th day of October, 2025.

Xavier Sottile

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and the NEW YORK STATE GAMING COMMISSION,<br><br>*Defendants*. | Case No.: 1:25-cv-08846<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

## INTRODUCTION

1. This action challenges the State of New York's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). The New York State Gaming Commission seeks to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering event contracts for trading on its federally regulated exchange. It does so by threatening Kalshi with imminent civil penalties and fines for offering these contracts. New York's attempt to regulate

Kalshi intrudes upon the federal regulatory framework that Congress established for regulating derivatives on designated exchanges. The state's efforts to regulate Kalshi are both field-preempted and conflict-preempted. This Court should therefore issue both a preliminary and a permanent injunction, as well as declaratory relief.

2. Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.

3. Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

4. The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs." The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the drafting process of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen.

Clark). As the conference report to the 1974 amendments explained, they were designed "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

5. For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.). The CFTC itself agrees. It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Appellant Br. *27, *KalshiEx LLC v. CFTC*, 119 F.4th 48 (D.C. Cir. 2024) (emphasis added).

6. Earlier this year, federal courts in Nevada and New Jersey granted Kalshi preliminary injunctions to prevent similar state overreach. These courts enjoined state officials from attempting to prohibit Kalshi's event contracts, explaining that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025); *see also KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi); *but see KalshiEX LLC v. Martin*, No. 25-cv-1283, 2025 WL 2194908, at *13 (D. Md. Aug. 1, 2025), *appeal docketed*, No. 25-1892 (4th Cir. 2025).

7. The district courts in Nevada and New Jersey both also found that Kalshi faced irreparable harm because it:

> faces a 'Hobson's choice': if it does not comply with the defendants' demand to cease it faces civil and criminal liability, but if it does comply it will incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles if Kalshi disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange.

*Hendrick*, 2025 WL 1073495, at *6; *Flaherty*, 2025 WL 1218313, at *7 ("This is virtually the same 'Hobson's choice' discussed in *Hendrick*.").

8. In ruling for Kalshi, the district court in Nevada pointed out that other states—like New York here—"have sent or intend to send Kalshi cease-and-desist letters," which "highlights the problem of allowing the States to regulate a national exchange" because it "raises the possibility that another State would have different rules than not only [] the CFTC, but other States." *Hendrick*, 2025 WL 1073495, at *7. As the court explained, "[p]reventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id*.

9. Defendants' actions have confirmed the Nevada district court's warning. The New York State Gaming Commission and its officers (the "Individual Defendants") seek to intrude on the comprehensive federal scheme for regulating designated exchanges by attempting to prohibit Kalshi from offering contracts that federal law permits.

10. Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have implicitly threatened Kalshi with criminal action and explicitly threatened Kalshi

with civil penalties, including fines, unless it shuts down these contracts in New York *immediately*. Defendants thus seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and to interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

11. Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating futures trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law. Kalshi is entitled to declaratory and injunctive relief to prevent New York authorities from enforcing their preempted state laws against Kalshi.

12. Defendants' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers and commercial counterparties. Shutting down its event contracts in New York would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear. Defendants' acts also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange. For that reason, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

## <u>JURISDICTION AND VENUE</u>

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal

question presented is whether New York law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

14. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. The Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "permits a private party to seek prospective injunctive relief against state officials in their official capacity before those officials violate the plaintiff's federal constitutional or statutory rights." *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023).

15. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties and thus reside in the State of New York. Plaintiff Kalshi is headquartered in this District. A substantial part of the events giving rise to the claim occurred in this District.

**PARTIES**

16. Plaintiff Kalshi is a financial services company with its principal place of business in Manhattan. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

17. Defendant Robert Williams is sued in his official capacity as the Executive Director of the New York State Gaming Commission.

18. Defendant Brian O'Dwyer is sued in his official capacity as the Chair and Commissioner of the New York State Gaming Commission.

19. Defendant John A. Crotty is sued in his official capacity as Commissioner of the New York State Gaming Commission.

20. Defendant Sylvia B. Hamer is sued in her official capacity as Commissioner of the New York State Gaming Commission.

21. Defendant Martin J. Mack is sued in his official capacity as Commissioner of the New York State Gaming Commission.

22. Defendant Peter J. Moschetti, Jr. is sued in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission.

23. Defendant Marissa Shorenstein is sued in her official capacity as Commissioner of the New York State Gaming Commission.

24. Defendant Jerry Skurnik is sued in his official capacity as Commissioner of the New York State Gaming Commission.

25. Defendant New York State Gaming Commission is sued as the state agency that regulates legal gambling in the State of New York by conducting licensing, permitting, collecting, auditing, testing, programming, inspecting, investigating, prosecuting, and reporting activities with respect to covered entities. The Gaming Commission oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in New York. As the state's gaming regulator, the Gaming Commission has jurisdiction over all persons participating in casino gaming.

26. Together, defendants Robert Williams, Brian O'Dwyer, John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Peter J. Moschetti, Jr., Marissa Shorenstein, Jerry Skurnik, and the New York State Gaming Commission would be responsible for enforcing any demand for Kalshi to comply with New York state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.

27. Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This type of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

28. Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

29. The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period,

individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

30. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

31. Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with potential economic consequences.

32. Sports events can have significant economic consequences for a broad ecosystem of stakeholders. Advertisers, sponsors, television networks, local communities, and state-based sportsbooks all stand to gain or lose substantial sums depending on the outcomes of sports events. Sports-event contracts thus offer these entities opportunities to hedge their exposure. For example, sponsors of a particular team or athlete can use event contracts to hedge against the risk that the

Case: 26-1835, 03/31/2026, DktEntry: 42.1, (27 of 265)

team or athlete underperforms. Or sportsbooks, which take on significant financial risk related to sporting events, can use sports-event contracts to reduce their exposure.

33. Event contracts are a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B. Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

34. Futures contracts have long been regulated by the federal government. In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

35. In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA. Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156. One Senator remarked that "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark). As a solution, the House Committee on Agriculture put "all

exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

36. The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(1).

37. Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of

a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* § 1a(47)(A)(ii), (iv), (vi).

38. Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their designations as DCMs. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

39. The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

40. Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

41. The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

42. The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats." 7 U.S.C. § 1a(9) The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9). The CFTC regulates event contracts as a type of "swap" contract. *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

43. In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*

**C. After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.**

44. Kalshi is a regulated exchange and prediction market where users can trade on the outcome of real-world events. In 2020, the CFTC unanimously designated Kalshi as a contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

45. Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

46. Kalshi offers many kinds of event contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

47. Among its menu of event contracts, Kalshi offers sports-event contracts. On January 22, 2025, Kalshi self-certified, pursuant to section 7a-2(c)(1) of the CEA, the first of a

number of sports contracts that are now available on its exchange. Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review. *See, e.g.*, Ex. 1. Kalshi's sports-related contracts allow users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship. While the CEA allows the CFTC to subject these contracts to a 90-day public interest review if the CFTC determines these contracts involve "gaming," the CFTC has declined to review any of Kalshi's sports-event contracts. Unless and until the CFTC takes action on Kalshi's sports-event contracts—all of which have been self-certified under the CEA—they are authorized under federal law. 7 U.S.C. § 7a-2(c)(5).

**D. The New York State Gaming Commission Threatens Kalshi with State Civil Penalties with Regard to Its Sports-Event Contracts.**

48. On October 24, 2025, the New York State Gaming Commission (the "Gaming Commission") sent Kalshi a cease-and-desist letter claiming that offering event contracts based on sporting events "within New York State" without a sports gaming license violated New York law. The letter directed Kalshi to "cease and desist immediately from illegally advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform in New York." Ex. 2 at 4.

49. The Gaming Commission warned that offering sports gaming in New York "in connection with any sports event" under its Racing Laws empowers it to "levy and collect civil penalties and fines for any violation of the Racing Law." *Id.* at 1. Listing 20 of Kalshi's federally self-certified event contracts as unlawful, the Gaming Commission demanded Kalshi cease and desist operations and without providing a compliance date. *Id.* at 1-2.

50. The Gaming Commission added that the activity described on Kalshi's website is "offering sports wagering gambling opportunities to Kalshi customers within the meaning of Penal Law § 225.00(2)" because the customer "is staking or risking 'something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome' with respect to a sports event within the meaning of Racing Law section 1367(1)(t)." *Id*. at 2 (citing Penal Law § 225.00(2); Racing Law § 1367(1)(t)). Consequently, the Gaming Commission claimed that it had the power to "investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York." *Id.*

51. The Gaming Commission demanded that Kalshi confirm that it had complied with the cease-and-desist letter and halted its offerings of sports-event contracts in New York. *Id*. Again, the Gaming Commission warned that it "reserves all rights to investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York." *Id.* at 4.

52. Kalshi has no option but to seek judicial relief. The Gaming Commission's cease-and-desist letter, sent on a Friday evening, demands that Kalshi immediately cease operating in New York or face criminal and civil liability. Because its platform listed contracts that were be traded over the weekend, Kalshi has no other practical choice to protect its commercial interests and those of its users except to bring this suit. Absent judicial relief, Kalshi faces the prospect of criminal enforcement and civil penalties in New York as of the date of this filing.

Case: 26-1835, 03/31/2026, DktEntry: 42.1, (34 of 265)

## REQUISITES FOR RELIEF

53. As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions, including, but not limited to, the enforcement of preempted state law threatened by the cease-and-desist letter, will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

54. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including direct threats to Kalshi, has already and will continue to result in irreparable injury to Plaintiff, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

55. Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants from enforcing New York law that interferes with the operation and function of Plaintiff's futures market described herein.

## COUNT I

### (Supremacy Clause—Preemption by Commodity Exchange Act)

56. Plaintiff incorporates all prior paragraphs by reference.

57. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every

> State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

58. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

59. Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings, at 685 (statement of Sen. Clark). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156; *Leist*, 638 F.2d at 322; *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

60. In threatening to enforce Racing Law Sections 104 and 1367 and Penal Law Section 225.00(2), and any rules adopted thereunder against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter. Likewise, Defendants' threats to abate Kalshi's website for supposedly constituting a nuisance and to revoke the license of an entity that partners with a DCM intrudes on the field that Congress has preempted. Because federal law occupies the entire field of regulating

trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

61. In addition, Defendants' threatened actions conflict with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. In addition, complying with Defendants' demand to immediately cease offering event contracts in New York could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

62. Defendants may not enforce New York's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## PRAYER FOR RELIEF

WHERFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that Racing Law Sections 104 and 1367 and Penal Law Section 225.00(2), any rules adopted thereunder, and any other New York law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;
2. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation

with them who receive actual notice of the injunction, from enforcing Racing Law Sections 104 and 1367 and Penal Law Section 225.00(2), any rules adopted thereunder, or any other New York law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff;

3. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Racing Law Sections 104 and 1367 and Penal Law Section 225.00(2), any rules adopted thereunder, or any other New York law that attempts to effectively regulate Plaintiff's designated contract market.

4. Any other relief within this Court's discretion that it deems just and proper.

Dated: October 28, 2025
New York, New York

Respectfully submitted,

*/s/ Grant R. Mainland*

Grant R. Mainland
Andrew L. Porter
Karen Wong
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com
KWong3@milbank.com

Joshua B. Sterling (pro hac vice forthcoming)
William E. Havemann (pro hac vice forthcoming)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
JSterling@milbank.com
WHavemann@milbank.com

*Attorneys for Plaintiff*

# Exhibit 1

January 22, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <title>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <team> win <title>?" contract (Contract). The Contract will initially be listed on **January 23, 2025**. The Exchange intends to list the contract on a custom basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<team>**
- **<title>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name: "Will <team> win <title>?"**
**Rulebook: TITLE**
**Kalshi Contract Category: Sports**
**January 22, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix E), and the Commission's regulations thereunder.

### I. Introduction

The "Will <team> win <title>?" Contract is a contract relating to American sports leagues.[1]

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

[1] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

- ❑ The Contract complies with the Act and Commission regulations thereunder.
- ❑ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.



______________________

By: Xavier Sottile
Title: Head of Markets
Date: January 22, 2025

Case: 26-1835, 03/31/2026, DktEntry: 42.1, (44 of 265)



**Attachments:**

Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Confidential Appendices

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will <team> win <title>?"**
**Rulebook: TITLE**

# TITLE

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the winner of <title>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are the Associated Press, ESPN, The Wall Street Journal, and Fox Sports.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next year that <title> is awarded.

**<team>:** <team> refers to an entity participating in a sport.

**<title>**: <title> refers to a given sports title, and will include a specified year and/or other distinguishing information, e.g., “The 2025 National Football League Super Bowl” or “The 2025 National Football League American Football Conference Championship”. <title> may refer to the titles of the National Football League, the National Hockey League, National Basketball Association, or the National Collegiate Athletic Association.[2]

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that it is reported that the first official final result of <title> event is that <team> holds the title.

- If the <title> event is postponed past its scheduled date (e.g. because of severe weather or other emergencies), then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event’s original scheduled date.
- If the <title> event is suspended during play, then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event’s original scheduled date.
- If the <title> event is moved to be earlier than its scheduled date, then the market will remain open and will resolve after the winner is reported.

---

[2] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

- If the <title> event is cancelled outright (or declared "no contest") before it is played, or after it has started, then the markets for eligible teams (not disqualified or eliminated) will resolve so "Yes" holders receive $1/[the number of eligible teams (not disqualified or eliminated) remaining for which there is a strike listed] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout.
- If multiple teams are reported <title> holders, then the markets for those teams will resolve so "Yes" holders receive $1/[the number of teams declared <title> holders] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout. For example, if two teams tie in the <title> event and both teams are reported as <title> holder, both "Yes" and "No" holders for each <team> shall receive $0.50 per share.
- If <team> forfeits the <title> event, the market will resolve to "No" for the forfeiting team.
- If the <title> event is ended early, before regulation time has ended, but the associated governing body declares that the event is over and there is a winner or multiple winners, or a tie, then the market will resolve based on that determination.
- If <team> is disqualified before the Contract expires – even if the <title> event has finished – the market for <team> will resolve to "No". If this causes another team to be formally declared the winner of <title>, the contract will resolve on the basis of which team is named <title> holder.
- Note that any revisions after Expiration will not be considered. Therefore if <team> or its opponent is disqualified or stripped of its title after the Contract expires, that will not impact the market's resolution.
- If <team> was eliminated from contention for <title>, then the market will resolve "No". A team is eliminated from contention for <title> when it is reported so by the Source Agency.
- If <team> is eliminated from contention for <title>, and the market for <team> resolved to No, but then <team> is re-entered into contention (for example, because a team that was originally in contention was disqualified), then a new market with the same <team> may be created. The original market will remain resolved to No.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after the day the title event has an official final result. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

**APPENDIX B – TRADING PROHIBITIONS**

In addition to the general prohibition against trading on material nonpublic information, the Exchange will be instituting additional prohibitions for trading the TITLE contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League, the National Hockey League, National Basketball Association, and the National Collegiate Athletic Association;
- Paid employees of the league and league participants;
- Owners of teams and the league;
- and household members and immediate family of all above.

These prohibitions apply to the appropriate values of <title>. For example, former players of the National Football League are not prohibited from trading on iterations of the Contract related to the National Basketball Association unless they are part of any other group listed for that league. To clarify, "league" here refers to any of the four organizations in the first bullet point.

# Exhibit 2

NEW YORK STATE | Gaming Commission

KATHY HOCHUL
Governor

October 24, 2025

**By Electronic Mail (*xsottile@kalshi.com*)**

Xavier Sottile
Head of Markets
KalshiEX LLC
594 Broadway, #407
New York, NY 10012

Re: Unlicensed sports wagering in New York State

Dear Xavier Sottile:

The New York State Gaming Commission ("Commission") has general jurisdiction over all gaming activities within New York State and over the corporations, associations and persons engaged therein, including, specifically, the regulation of sports wagering. Racing Law §§ 104(1) and (24). The Commission is empowered to levy and collect civil penalties and fines for any violation of the Racing Law. Racing Law § 104(9).

This letter constitutes a demand by the Commission that KalshiEX LLC ("Kalshi") cease and desist from illegally operating, advertising, promoting, administering, managing, or otherwise making available an unlicensed mobile sports wagering platform in New York State in connection with any sports event, whether through any of the contracts as described in the filings with the Secretary of the United States Commodity Futures Trading Commission ("CFTC") identified below (collectively, the "CFTC Filings"), or otherwise, including, without limitation, any other contract or product that provides an opportunity to risk something of value based upon an agreement or understanding that a person will receive something of value in the event of a certain outcome in connection with any sports event within the meaning of Racing Law section 1367(1)(t):

- "Will <team> win <event>?" contracts (February 7, 2005 CFTC filing);
- "Will <person> win the golf grand slam before <date>?" contracts (May 23, 2025 CFTC filing);
- "Will the next iteration of <golf tournament> have a first time winner?" contracts (May 23, 2025 CFTC filing);
- "Will <tennis player> win a major before <date>?" contracts (May 23, 2025 CFTC filing);
- "Will a Canadian hockey team win the Stanley Cup before <date>?" contracts (June 11, 2025);

Xavier Sottile
October 24, 2025
Page 2

- “Will <team> have the <best rank/worst rank> record in <league/division> in <season>?” contracts (June 13, 2025);
- “Will <person> win a Grand Slam in <year>?” contracts (July 22, 2025 CFTC filing);
- “How many games will <player> start in the <year> <season_type> <league> season?” contracts (July 25, 2025 CFTC filing);
- “Will <event 1> or <event 2> happen first?” contracts (August 12, 2025 CFTC filing;
- “Will <player/team> score <first/last/any/count> touchdown(s) in <time_period> of <game>?” contracts (August 18, 2025 CFTC filing);
- “Will <game> have <over/under> <count> points in <time period> of <game>?” contracts (August 18, 2025 CFTC filing);
- “Will <player> win another major championship before <date>?” contracts (August 26, 2025 CFTC filing);
- “Will <outcomes> occur in <events>?” contracts (August 30, 2025 CFTC filing);
- “Will <outcomes> occur in <events>?” contracts (September 2, 2025 CFTC filing);
- “Will <player> have <above/below/between/exactly/at least> <count> <statistic> in <time period> of <game>?” contracts (September 15, 2025 CFTC filing);
- “Will <team/person> play in <game>?” contracts (September 17, 2025 CFTC filing);
- “Will <participant> win <competition>?” contracts (September 24, 2025 CFTC filing);
- “Will <participant> be eliminated from <competition> before <date>?” contracts (September 24, 2025 CFTC filing);
- “Will <participant> reach <milestone> in <competition> before <date>?” contracts (September 26, 2025 CFTC filing);
- “Will <participant> be the last <with/without> <outcome> in <competition/season>?” contracts (September 26, 2025 CFTC filing).

The activity described on the Kalshi website and in its CFTC Filings is offering sports wagering gambling opportunities to Kalshi customers within the meaning of Penal Law § 225.00(2), in that the customer, in consummating a transaction through the Kalshi platform, is staking or risking “something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome” with respect to a sports event within the meaning of Racing Law section 1367(1)(t).

Case: 26-1835, 03/31/2026, DktEntry: 42.1, (53 of 265)



> In New York, "sports wagering"
>
> means wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets[.]

Racing Law § 1367(1)(x).

The purported event contracts described generally in Kalshi's CFTC Filings and as offered specifically through its public website (https://kalshi.com/sports/all-sports) are sports wagering within the meaning of New York law when they concern sports events within the meaning of Racing Law section 1367(1)(t).

Sports wagering may be conducted, advertised or promoted in New York only by entities licensed by the Commission. New York law provides:

> No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York.

Racing Law § 1367-a(4)(b).

In-person sports wagering may be conducted in New York only at licensed casinos by entities that also hold gaming facility licenses from the Commission. Racing Law § 1367(2)(a). Mobile sports wagering conducted through servers at licensed casinos may be operated only by entities the Commission licenses pursuant to Racing Law 1367-a:

> No entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission pursuant to this section.

Racing Law § 1367-a(2)(a).

> "Mobile sports wagering platform"
>
> means the combination of hardware, software, and data networks used to manage, administer, or control sports wagering and any associated wagers accessible by any electronic means including mobile applications and internet websites accessed via a mobile device or computer[.]

Racing Law § 1367(1)(k).

Kalshi is not licensed by the Commission to offer a platform for sports wagering in New York, either at a casino or as a mobile sports wagering operator. Accordingly, the Commission demands that Kalshi cease and desist immediately from illegally operating, advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform in New York, and confirm with the Commission through the undersigned that all such activity has ended.

The Commission reserves all rights to investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York.

Sincerely,

Robert Williams
Executive Director

cc: Thomas Fattorusso
Edmund Burns, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KALSHIEX LLC,

Plaintiff,

-against-

ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and the NEW YORK STATE GAMING COMMISSION,

Defendants.

1:25-cv-08846-AT

**DECLARATION OF KATHERINE RHODES JANOFSKY**
**IN SUPPORT OF DEFENDANTS' OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

KATHEIRNE RHODES JANOFSKY, certifies pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1. I am an Assistant Attorney General in the Office of New York State Attorney General Letitia James, counsel for Defendants in this action.

2. Attached as **Exhibit 1** is a true and correct copy of the Gaming Commission's 2024 Annual Report, available at

https://gaming.ny.gov/system/files/documents/2025/09/annualreport_2024_final.pdf (last visited Nov. 26, 2026).

3. Attached as **Exhibit 2** is a true and correct copy of the news article titled *CA tribes want court to stop Kalshi calling its product sports betting*, written by Jessica Welman and published by SCA Americas on September 9, 2025, available at https://sbcamericas.com/2025/09/09/kalshi-california-false-advertising/ (last visited Nov. 26, 2026).

4. Attached as **Exhibit 3** is a true and correct copy of an article titled *The Closing Bell: Kalshi Is Using NFL And College Logos To Advertise Sports Betting*, written by Dustin Gouker as part of his newsletter called Event Horizon, published on Substack on September 5, 2025, available at https://nexteventhorizon.substack.com/p/the-closing-bell-kalshi-is-using-college-nfl-logos (last visited Nov. 26, 2026).

5. Attached as **Exhibit 4** is a true and correct copy of a news article titled *Kalshi, a Prediction Market, Raises Funds and Expands Overseas*, written by Michael J. de la Merced and published by the New York Times on October 10, 2025, available at https://www.nytimes.com/2025/10/10/business/dealbook/kalshi-prediction-market-fundraising.html (last visited Nov. 26, 2026).

6. Attached at **Exhibit 5** is a true and correct copy of a news article titled *Is betting on football gambling? Prediction markets are battling to redefine wagers*, written by Gordon Gottsegen and published by Morningstar on November 24, 2025, available at https://www.morningstar.com/news/marketwatch/2025112455/is-betting-on-football-gambling-prediction-markets-are-battling-to-redefine-wagers (last visited Nov. 26, 2026).

7. Attached at **Exhibit 6** is a true and correct copy of a news article titled *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'*, written by Ben Blatt and Amy Fan and published by the New York Times on October 5, 2025, available at https://www.nytimes.com/2025/10/05/upshot/sports-betting-prediction-markets.html (last visited Nov. 26, 2026).

8. Attached as **Exhibit 7** is a true and correct copy of CFTC advisory letter number 25-36, issued by the CFTC on September 30, 2025.

9. Attached as **Exhibit 8** is a true and correct copy of the news article, *Kalshi Adds More NFL Player Props*, written by Brant James and published by In Game on October 9, 2025, available at https://www.ingame.com/kalshi-adds-more-nfl-player-props/ (last visited Nov. 26, 2025).

10. Attached as **Exhibit 9** is a true and correct copy of a news article titled *Kalshi Trading Volume Soars As Football Betting Season Kicks Off*, written by Eric Ramsey and published by the Legal Sports Report on September 8, 2025, available at https://www.legalsportsreport.com/240961/kalshi-trading-volume-football-week-1/ (last visited Nov. 26, 2025).

11. Attached as **Exhibit 10** is a true and correct copy of printout of a webpage titled "Pools FAQ" on DraftKings's website, available at https://sportsbook.draftkings.com/help/pools/faq retrieved on Nov. 20, 2025.

12. Attached as **Exhibit 11** is a true and correct copy of a notice issued by the Nevada Gaming Control Board to its licensees regarding an update in the Crypto.com litigation. Kashi submitted this notice as an exhibit in the *Hendricks* case (25-cv-575, ECF 183-5) (D. Nev.).

13. Attached as **Exhibit 12** is a true and correct copy of a Kalshi Exchange Notice, dated October 23, 2025, alerting the reader of an updated section of its Member Agreement, available under the Kalshi webpage "Regulatory Documents," kalshi.com/regulatory/notices (last visited Nov. 26, 2025); https://kalshi-public-docs.s3.amazonaws.com/regulatory/notices/Kalshi%20Exchange%20Notice%20(Updated%20Member%20Agreement)%20(23%20October%202025).pdf.

14. Attached as **Exhibit 13** is a true and correct copy of an annual report submitted on March 31, 2024, by Gaming and the New York State Office of Addiction Services and Support to Governor Kathy Hochul and members of the New York State Legislature, available under the Gaming Commission webpage "Sports Wagering," https://gaming.ny.gov/sports-wagering (last visited Nov. 26, 2025); https://gaming.ny.gov/system/files/documents/2024/10/2023mswimpactreport.pdf.

15. Attached as **Exhibit 14** is a true and correct copy of Addiction Data Bulletin (No. 2025-06) written by Rebecca Cooper et al. and issued by OASAS in April 2025, available under the OASAS webpage "Addiction Data Bulletin 6," https://oasas.ny.gov/addiction-data-bulletin-6 (last visited Nov. 26, 2025); https://oasas.ny.gov/system/files/documents/2025/04/gambling-adb6.pdf

16. Attached as **Exhibit 15** is a true and correct copy of a news article titled *Kalshi Recruiting Sportsbook Operators & Targeting College Campuses*, written by Adam Roarty and published by Casino Beats on September 22, 2025, available at https://casinobeats.com/2025/09/22/kalshi-recruiting-sportsbook-operators-targeting-college-campuses/ (last visited Nov. 26, 2025).

17. Attached as **Exhibit 16** is a true and correct copy of a news article titled *Kalshi Adds NBA Prop markets As Betting Crackdowns Surge*, written by Ben Horney and published by Front Office Sports on November 14, 2025, available at https://frontofficesports.com/kalshi-adds-nba-prop-markets-as-betting-crackdowns-surge/ (last visited Nov. 26, 2025).

18. Attached as **Exhibit 17** is a true and correct copy of a news article titled *NFL working with lawmakers, betting partners to enforce prop betting rules amid other betting scandals*, written by Sam Jane and Dianna Russini and published by The Athletic on November 13, 2025, available at https://www.nytimes.com/athletic/6805308/2025/11/13/nfl-memo-prop-bets-rules/ (last visited Nov. 26, 2025).

19. Attached at **Exhibit 1**8 is a true and correct copy of a news article titled *After MLB's reckoning on sports betting offenders, what can leagues do to enforce the rules?*, written by Rustin Dodd et al. and published by The Athletic on June 5, 2024), available at https://www.nytimes.com/athletic/5541836/2024/06/05/mlb-betting-sportsbooks-regulators/ (last visited Nov. 26, 2025).

20. Attached at **Exhibit 19** is a true and correct copy of a letter sent by Scott Bearby, Senior Vice President and Chief Legal Officer of the NCAA, to Kalshi, Inc., on October 30, 2025, linked in the news article *NCAA asks Kalshi to keep its distance from college sports body*, written by Tom Nightingale and published on SBC Americas on November 4, 2025, available at https://sbcamericas.com/2025/11/04/ncaa-kalshi-letter-college-sports-props/ (last visited Nov. 26, 2025).

21. Attached at **Exhibit 20** is a true and correct copy of a printout of a webpage titled "College Basketball (M)" on Kalshi's website, available at https://kalshi.com/sports/basketball/College%20Basketball%20(M) retrieved on Nov. 20, 2025.

22. Attached at **Exhibit 21** is a true and correct copy of a news article titled *NCAA sends concerns over 'integrity' to prediction market Kalshi*, written by Shwetha Surendran and published by ESPN (Nov. 3, 2025), available at https://www.espn.com/college-sports/story/_/id/46838301/ncaa-sends-concerns-integrity-prediction-market-kalshi (last visited Nov. 26, 2025).

23. Attached at **Exhibit 22** is a true and correct copy of a webpage titled "Designed Contract Markets (DCM)" on the CFTC's website, available at https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations, retrieved on Nov. 26, 2025.

24. Attached at **Exhibit 23** is a true and correct copy of a news article titled *Kalshi Puts Geolocation Tech Providers On Edge Amid Rapid Rise*, written by Dan Bernstein et al. and published by Sportico on October 16, 2025, available at https://www.sportico.com/business/tech/2025/kalshi-geolocation-technology-prediction-markets-1234873796/#:~:text=Kalshi%20Puts%20Geolocation%20Tech%20Providers%20on%20Edge%20Amid%20Rapid%20Rise&text=Kalshi%27s%20growth%20has%20concerned,markets%20might%20reshape%20their%20businesses (last visited Nov. 26, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

Dated: November 26, 2025
New York, New York

/s/ *Katherine Rhodes Janofsky*
Katherine Rhodes Janofsky
Assistant Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-8621
Katherine.Janofsky@ag.ny.gov

Case: 26-1835, 08/31/2026, DktEntry: 42.1, (61 of 265)

# Exhibit 1

NEW YORK STATE | Gaming Commission

# 2024 ANNUAL REPORT

DIVISION OF CHARITABLE GAMING

DIVISION OF GAMING

DIVISION OF HORSE RACING AND PARI-MUTUEL WAGERING

DIVISION OF LOTTERY

Letter from the Executive Director — 1
Locations of Gaming Facilities, Racetracks, and Customer Service Centers — 2
About the Commission — 3
Commissioners — 4
Division of Charitable Gaming — 7
Division of Gaming — 10
    Indian Gaming — 10
    Commercial Gaming — 10
    Mobile Sports Wagering — 12
    Video Lottery Gaming — 13
    Interactive Fantasy Sports — 14
Division of Horse Racing and Pari-Mutuel Wagering — 15
    Office of The Equine Medical Director — 24
Division of Lottery — 26
    Traditional Lottery — 26
Minority- and Women-Owned Business — 29
Bureau of Licensing — 29
Responsible Gaming — 31
Rulemaking — 32

**To:** **The Honorable Kathy Hochul, Governor of New York**
**Members of the New York State Legislature**
**Blake G. Washington, Director of the Budget**
**March 31, 2025**

On behalf of the New York State Gaming Commission, I respectfully submit this 2024 Annual Report, as required by N.Y. Racing, Pari-Mutuel Wagering and Breeding Law Section 104(18). Incorporated into this Report is the simulcast report required by N.Y. Racing, Pari-Mutuel Wagering and Breeding Law Sections 236(2), 318(1)(a)(iii), 318(1)(b)(i), and 1002(2). Financial information and other data provided for the Division of Lottery and the Division of Gaming are by the State's fiscal year; all other financial information and data is on a calendar year basis.

Respectfully Submitted,

Robert Williams
*Executive Director*

NEW YORK STATE | Gaming Commission

2024 Annual Report

NEW YORK STATE | Gaming Commission

## Gaming Facility, Racetrack and Customer Service Center Locations




### Indian Gaming

1. Akwesasne Mohawk Casino Resort
2. Seneca Niagara Resort & Casino
3. Seneca Buffalo Creek Casino
4. Seneca Allegany Resort & Casino
5. Point Place Casino
6. Yellow Brick Road Casino & Sportsbook
7. Turning Stone Resort Casino

### Video Lottery & Harness Racetracks

1. Hamburg Gaming & Buffalo Raceway at The Fairgrounds
2. Batavia Downs Gaming & Hotel
3. Vernon Downs Casino Hotel
4. Saratoga Casino Hotel
5. Empire City Casino by MGM Resorts / Yonkers Raceway

### Stand-Alone Video Lottery Gaming Properties

1. Jake's 58 Casino Hotel
2. Resorts World Hudson Valley

### Video Lottery at Thoroughbred Racetracks

1. Resorts World New York City at Aqueduct Racetrack
2. Finger Lakes Gaming & Racetrack

### Thoroughbred Racetracks

1. Aqueduct Racetrack
2. Belmont Park
3. Finger Lakes Racetrack
4. Saratoga Race Course

### Lottery Customer Service Centers

1. Buffalo
2. Syracuse
3. Schenectady
4. Plainview

### Commercial Casino & Harness Racetrack

1. Tioga Downs Casino Resort & Harness Racing

### Commercial Gaming

1. del Lago Resort & Casino
2. Resorts World Catskills
3. Rivers Casino & Resort Schenectady

### Stand-Alone Harness Racetrack

1. Monticello Raceway

# About The Commission

## Mission Statement

It is the Mission of the New York State Gaming Commission to ensure that all lawful gaming and horse racing activity conducted in this State is of the highest integrity, credibility and quality. Operating in the most efficient and transparent manner, the Commission conducts the New York Lottery and serves the best interests of the public by providing responsive and effective state gaming regulation. The Commission strives to ensure that all stakeholders in the gaming and horse racing industries, including the consumers who wager on activities regulated or operated by the Commission, are treated in an equitable and responsible manner and to promote the health and safety of horses and all participants in racing. By consolidating various regulatory functions into one oversight body with broad powers, the Commission seeks to ensure fair and strict regulation of all gaming activity while reducing costs and regulatory burdens to the gaming industry. The Commission aspires to provide the regulatory structure necessary for New York gaming activity to operate effectively in a global, evolving and increasingly competitive marketplace to generate revenue for aid to education and for the support of government, and to contribute to overall economic development and job creation in New York.

## Services to the Public

The Commission regulates and provides oversight for all aspects of lawful gaming and gaming-like activity in the State via four Divisions, which provide the following services, among others, to the public:

The **Division of Charitable Gaming** oversees games of chance conducted by qualified religious and non-profit organizations to raise funds for worthy causes. The Division:

- Issues games of chance ID numbers to qualified organizations
- Approves bell jar tickets and investigates, audits and monitors the sale of such
- Verifies the disbursement of charitable gaming proceeds
- Licenses bingo and games of chance manufacturers and suppliers
- Approves internet raffle ticket sales
- Trains and assists organizations in complying with statutes and regulations

The **Division of Gaming** oversees sports wagering, commercial casinos, video lottery terminal facilities, Indian gaming, and interactive fantasy sports in New York State.

- Sports Wagering: Division staff reviews operators' proposed wagering options and promotions. When considering whether to authorize a wager, staff will evaluate the rules of wager play and the methodology of wager resolution.
- Commercial Gaming: Division staff at each commercial casino are responsible for regulatory reviews of operations and to ensure the gaming is conducted in accordance with all applicable laws, rules, and regulations. The Division also conducts or causes the conduct of background investigations of all employees of the casino and related enterprises who conduct gaming-related business with each facility.
- Class III Indian Gaming: Pursuant to each tribal-state compact, the Division staff jointly regulates or oversees Class III gaming facilities with a Nation or Tribal Gaming Agency. In addition, the Division conducts or causes the conduct background investigations on all employees of the casino and related enterprises who conduct certain business to ensure their suitability.
- Interactive Fantasy Sports: Division staff is responsible for reviewing applications for registration and regulating entities that hold temporary operating permits for entities wishing to engage in Interactive Fantasy Sports within the State. Staff also reviews and considers requests for contests.

The **Division of Horse Racing and Pari-Mutuel Wagering** provides full oversight and regulation of pari-mutuel wagering and harness horse racing. The Division has limited regulatory power over Thoroughbred racing, which is also regulated by the federal Horseracing Integrity and Safety Authority (HISA). The Division:

- Provides stewards and presiding judges to oversee New York tracks
- Reviews and approves operators' plans of operation and wagering menu
- Ensures participants are properly licensed and operate in accordance with all applicable laws, rules, and regulations.
- Promotes equine health and safety and responsible aftercare for racehorses.

The **Division of Lottery** operates the New York Lottery, North America's most profitable lottery, with all proceeds going directly to aid to education for New York's public schools. The Division:

- Oversees all traditional lottery operations and develops and promotes new games
- Ensures all lottery systems, drawings and game conduct meet strict industry requirements and regulations
- Oversees accounting, prize claims and player annuities
- Ensures sales agents, vendors and courier services comply with regulations
- Maintains regional staff who provide support for thousands of licensed sales agents across the State.

## Calendar Year 2024 Commission Meetings

- **3/25/2024**
- **5/20/2024**
- **6/24/2024**
- **9/23/2024**
- **10/28/2024**
- **12/16/2024**

## Commissioners

Commissioners are appointed by the Governor to serve a five-year unpaid term. One member is recommended for appointment by the Speaker of the Assembly and one member is recommended for appointment by the Temporary President of the Senate.



### Brian O'Dwyer: Chair

A lifelong New Yorker, Brian O'Dwyer has been an advocate for working men and women and immigrants.

A graduate of the High School of Music and Art (now LaGuardia High School) he went on to obtain a Bachelor of Arts from The George Washington University in Spanish American Literature, a Masters in Spanish from Middlebury College, a Juris Doctor degree from Georgetown University and a LLM from The George Washington University Law School. He has been awarded the degrees of D. Phil from Dublin City University and DHL from Middlebury College.

He was the founder and first Chair of the Emerald Isle Immigration Center, and served as advisor to the Clinton administration during the Northern Ireland peace process. He was appointed by President Clinton to the Presidential Commission on White House Fellows, and Secretary Clinton to the U.S. Committee for UNESCO. He has spent the majority of his professional career advising labor organizations and immigrant rights groups on workers protections and benefits issues.

Commissioner O'Dwyer (Governor appointment) was confirmed by the Senate on June 3, 2022.



### John A. Crotty

John A. Crotty is an affordable housing developer in New York City-with a particular focus on repositioning distressed multifamily properties as affordable housing.

In total, Mr. Crotty has three decades of experience in housing, government and finance in a variety of capacities. Mr. Crotty was a member of the Board of Directors of the New York City Off-Track Betting Corporation and was appointed by Governor Paterson to a panel to restructure the Off-Track Gaming system statewide. Mr. Crotty was also a member of the New York State Franchise Oversight Board, which oversees the finances of The New York Racing Association, Inc.

Prior to becoming an affordable housing developer, Mr. Crotty was the Executive Director of JPMorgan Chase's municipal housing finance group,  He was the Executive Vice President of the New York City Housing Development Corporation from 2004 to 2007 and was Mayor Michael Bloomberg's Director of City Legislative Affairs. Prior to joining the Bloomberg administration in 2002, he held a variety of financial management positions at MCI, PaineWebber, Winstar and Verizon.  Mr. Crotty is a Founding Member of Santa's Angels, a not-for-profit organization that raises money and distributes gifts to the poor during the holiday season. Through his participation in the Birthplace of Hip Hop (1520 Sedgwick) he works with a number of Hip Hop artists and officials to help promote the culture and its message both domestically and abroad.

Mr. Crotty holds a MBA from Columbia Business School and a BA from the University of Rochester.

Commissioner Crotty (Governor appointment) was confirmed by the Senate on June 19, 2013.



### Sylvia B. Hamer

Sylvia B. Hamer is the Executive Director at the HOPE Community Services, which is a non-profit community organization, providing free services for persons experiencing homelessness, child hunger initiatives, a kosher pantry, community programming, and so much more.

In addition to her current position, Ms. Hamer possesses extensive governmental experience, including Chief of Staff to the Brooklyn Borough President. In 2011, then New York State Governor Andrew M. Cuomo appointed Hamer to serve as Chief Diversity Officer for the New York State Power Authority (NYPA). Also at the request of Governor Cuomo, Hamer was asked to serve as the agency's Equal Employment Officer (EEO). Prior to NYPA, Hamer was the Chief of Staff and Executive Vice President for Corporate Affairs at the New York City Off-Track Betting Corporation. In addition to overseeing the day-to-day operations, she provided counsel and guidance on critical issues, including the corporation's Chapter 9 Bankruptcy proceeding, assisted in the development of a crisis management and restructuring plan, and was instrumental in proposing revisions to the statutory regime governing the racing industry.

In June 2008, Hamer was appointed by then New York State Governor David Paterson to the position of Deputy Secretary for Technology, Government Operations and Gaming. In February 2007, then New York State Governor Eliot Spitzer appointed Hamer to serve as Deputy Secretary for Government Operations, Labor and Technology. In these roles, she was a key advisor to the Governors and oversaw the budgets, programs, policies and legislative initiatives for 11 state agencies, boards and authorities. Hamer also served as the Executive Director for Administration for the New York State Office of the Attorney General, where she was responsible for developing and managing the agency's multi-million dollar annual budget. Sylvia also worked as a Budget and Research Analyst for the New York State Senate. Lastly, she served as a member of the New York State Franchise Oversight Board.

Ms. Hamer holds a Bachelor of Arts and Masters of Science degrees from the College of New Rochelle.

Commissioner Hamer (Senate appointment) was confirmed by the Senate on June 9, 2023.



### Martin J. Mack

Martin J. Mack has served in local and state government for several decades, serving as Mayor of Cortland, Cortland County Attorney, and a Cortland County Assistant District Attorney before serving in the administration of three Attorneys General as Executive Deputy Attorney General, where he managed and supervised the legal work of the Attorney General's thirteen regional offices. Mr. Mack also served in the Executive Chamber as a member of the senior staff for Governors Eliot Spitzer, David Paterson, and Kathy Hochul, serving as Deputy Secretary for Intergovernmental and Legislative Affairs for Governors Spitzer and Paterson, and as Appointments Secretary for Governors Paterson and Hochul. Mr. Mack presently serves as Governor Hochul's representative on the Board of Trustees of Cornell University.

Mr. Mack received an undergraduate degree from the Cornell University School of Industrial and Labor Relations, a Master of Arts in Teaching in Secondary Social Studies from SUNY Cortland, and a law degree from University of South Carolina.

Commissioner Mack (Governor appointment) was confirmed by the Senate on June 5, 2024.



### Peter J. Moschetti, Jr.

Peter J. Moschetti, Jr. is a founding member of the firm of Anderson, Moschetti and Taffany. He served as a prosecutor in the Nassau County District Attorney's Office from 1984 to 1987. Since then, Moschetti has focused on the trial of personal injury and wrongful death cases, including products liability and medical malpractice actions. He represents individuals and corporations in both state and federal courts and has been appointed as a special prosecutor in a number of high-profile criminal cases in the region. He also served as a member of the New York State Temporary Commission on Lobbying, a precursor of the Joint Commission on Public Integrity.

Moschetti has been named one of the top 25 lawyers in the Hudson Valley by New York Super Lawyers Magazine every year since 2007 and has received the highest possible rating by Martindale Hubbell for both legal ability and ethical standards. He has lectured for continuing legal education in the areas of civil and criminal law and has taught at Albany Law School.

Moschetti graduated with honors from both the University of New Haven in Connecticut in 1981 and Albany Law School in 1984.

Commissioner Moschetti (Governor appointment) was confirmed by the Senate on May 14, 2014.



### Marissa Shorenstein

Marissa Shorenstein is the Chief External Affairs Officer for BSE Global. She formerly was Principal in SKDK, a strategic communications firm where she advised global clients on strategic and crisis communications issues as well as legislative and regulatory oversight challenges

Prior to SKDK, Shorenstein served as Global Chief Communications Officer for WeWork after spending more than eight years at AT&T as President - Northern Region, overseeing the company's external affairs for seventeen states. She had previously served as AT&T's Regional President for the Northeast and New York State President.

Prior to joining AT&T, Shorenstein ran Marissa Shorenstein LLC, where she offered strategic communications consulting services. Shorenstein also served as Director of Communications for Andrew M. Cuomo's 2010 gubernatorial campaign and Press Secretary and Deputy Communications Director in Governor David A. Paterson's administration. She also served as a member of the National Press Advance staff for the 2000 Gore Presidential campaign. More recently, Shorenstein served as Director of Executive Transition for New York governor Kathy Hochul.

Shorenstein is a Harvard University and Fordham University School of Law graduate. She also serves on the Executive Committee of Girls Who Code, as Vice-Chair of the Citizens Budget Commission, and as a Board member of the Jewish Community Relations Council of New York.

Commissioner Shorenstein (Governor appointment) was confirmed by the Senate on June 2, 2022.



### Jerry Skurnik

Jerry Skurnik has lived in New York City his entire life. He is currently a Senior Consultant with Engage Voters US. He was previously a partner at Prime New York, a political consulting firm he established in 1988. The firm supplies data for campaigns on local, state and national levels as well as voter engagement tools and services. He first became active in politics in 1966 when he worked as a volunteer for Ted Weiss' Congressional campaign and worked in numerous political campaigns since then. He served eight years as a mayoral advisor, mainly as liaison to elected officials and community groups for New York City Mayor Ed Koch.

More significantly to the responsibilities of the Commission, Jerry served as a member of the Task Force on the Future of Off-Track Betting in New York State.

Commissioner Skurnik (Assembly appointment) was confirmed by the Senate on June 21, 2017.

# Division of Charitable Gaming

The Division of Charitable Gaming oversees games of chance and bingo conducted by qualified charitable organizations to raise funds for worthy causes.

The Division:

- Issues bingo and games of chance ID numbers to qualified organizations
- Approves bell jar tickets and investigates, audits and monitors the sale of such
- Verifies the lawful disbursement of charitable gaming proceeds
- Licenses bingo and games of chance manufacturers and distributors
- Approves internet and mobile raffle ticket sales
- Trains and assists organizations in complying with statutes and regulations

| Program | Amount Wagered | Profit to Charities |
|---|---|---|
| Bell Jar | $231,129,247.39 | $35,548,051.08 |
| Bingo | $27,385,856.94 | $6,080,639.76 |
| Las Vegas Nights | $341,241.47 | $130,673.76 |
| Raffles | $8,774,224.04 | $3,897,204.76 |
| **Total** | **$267,630,569.84** | **$45,656,569.36** |

### Bell Jar Proceeds by County

| County | Deals* | Handle** | Net Profit*** |
|---|---|---|---|
| Albany | 2393 | $5,881,063.00 | $1,087,943.78 |
| Allegany | 2212 | $5,541,242.75 | $818,166.44 |
| Bronx | 0 | $0.00 | $0.00 |
| Broome | 1531 | $4,906,531.00 | $800,780.23 |
| Cattaraugus | 7152 | $11,247,771.25 | $1,545,436.18 |
| Cayuga | 1273 | $2,828,788.50 | $530,316.20 |
| Chautauqua | 10507 | $19,914,209.00 | $2,835,089.85 |
| Chemung | 2202 | $3,593,087.25 | $666,142.67 |
| Chenango | 113 | $361,339.00 | $70,573.02 |
| Clinton | 1695 | $5,275,665.50 | $802,198.20 |
| Columbia | 27 | $87,667.00 | $12,634.55 |
| Cortland | 322 | $939,625.00 | $142,612.58 |
| Delaware | 284 | $817,514.00 | $130,122.97 |
| Dutchess | 427 | $1,519,328.50 | $321,310.13 |
| Erie | 6009 | $14,690,930.25 | $2,625,537.38 |
| Essex | 629 | $1,735,407.00 | $288,042.26 |
| Franklin | 779 | $2,319,491.00 | $421,133.81 |
| Fulton | 1047 | $3,285,935.00 | $529,697.78 |
| Genesee | 613 | $588,019.00 | $127,832.61 |
| Greene | 27 | $95,810.00 | $19,758.00 |
| Hamilton | 0 | $0.00 | $0.00 |
| Herkimer | 1626 | $4,969,111.00 | $726,815.62 |
| Jefferson | 5336 | $13,493,136.00 | $2,018,461.65 |
| Kings | 0 | $0.00 | $0.00 |

| County | Deals* | Handle** | Net Profit*** |
|---|---|---|---|
| Lewis | 2724 | $4,856,386.00 | $697,372.32 |
| Livingston | 917 | $1,705,079.50 | $250,657.24 |
| Madison | 624 | $2,318,068.00 | $378,484.37 |
| Monroe | 7583 | $8,900,129.75 | $1,943,564.39 |
| Montgomery | 811 | $2,240,996.00 | $272,605.84 |
| Nassau | 38 | $138,940.00 | $27,728.98 |
| New York | 0 | $0.00 | $0.00 |
| Niagara | 2257 | $5,645,071.25 | $961,700.08 |
| Oneida | 5844 | $14,276,902.25 | $2,226,884.51 |
| Onondaga | 2816 | $4,347,119.50 | $805,047.31 |
| Ontario | 3010 | $5,997,768.00 | $1,013,898.35 |
| Orange | 547 | $1,442,261.50 | $325,148.53 |
| Orleans | 1768 | $3,542,473.25 | $523,505.68 |
| Oswego | 1533 | $3,575,365.00 | $728,122.83 |
| Otsego | 611 | $1,823,303.00 | $251,674.06 |
| Putnam | 125 | $480,727.50 | $108,750.61 |
| Queens | 11 | $17,642.00 | $3,615.00 |
| Rensselaer | 1350 | $4,116,152.00 | $715,506.46 |
| Richmond | 255 | $242,759.00 | $52,294.46 |
| Rockland | 271 | $605,733.00 | $190,717.77 |
| Saratoga | 4672 | $12,689,634.50 | $1,894,567.86 |
| Schenectady | 1876 | $5,435,461.00 | $907,245.69 |
| Schoharie | 849 | $2,163,612.25 | $362,549.11 |
| Schuyler | 208 | $502,974.00 | $72,294.71 |
| Seneca | 717 | $1,627,774.00 | $260,413.08 |
| St. Lawrence | 1096 | $3,285,371.90 | $524,719.14 |
| Steuben | 7042 | $14,740,181.50 | $2,166,306.73 |
| Suffolk | 910 | $2,065,055.00 | $376,365.91 |
| Sullivan | 25 | $58,652.50 | $12,766.30 |
| Tioga | 292 | $887,209.50 | $123,556.11 |
| Tompkins | 747 | $2,040,298.50 | $310,374.15 |
| Ulster | 228 | $715,730.00 | $143,222.32 |
| Warren | 569 | $1,791,693.00 | $308,960.43 |
| Washington | 646 | $1,979,572.49 | $318,911.98 |
| Wayne | 2069 | $4,436,150.00 | $617,189.56 |
| Westchester | 294 | $913,438.00 | $207,422.19 |
| Wyoming | 1027 | $2,370,444.25 | $376,810.54 |
| Yates | 1256 | $3,025,807.50 | $431,787.14 |
| **TOTAL** | **103822** | **$231,093,607.39** | **$37,413,347.65** |

*Deals: The number of bell jar games that are reported sold by a licensed authorized organization.

**Handle: The gross profit to the organizations from the sale of bell jar tickets prior to deducting prizes, and the cost of bell jar deals.

***Net profit: The total amount retained by the organization from the sale of bell jar tickets.

The Division also considers applications for license for qualified bingo and games of chance manufacturers and suppliers, and monitors licenses issued by municipalities; collects and assists municipalities in the collection of license fees from game operators; determines that commercial bingo hall rental fees are fair and reasonable as a prerequisite to licensure by municipalities; approves bell jar ticket games; considers bingo and games of chance identification numbers for applicant organizations as a prerequisite to their licensing by municipalities; conducts compliance training for bingo and games of chance licensees; and investigates and resolves complaints to ensure the operational integrity of charitable games statewide.

| Identification Numbers Issued by the Commission | | |
|---|---|---|
| Games of Chance | New 37 | Update 43 |
| Bingo | New 16 | Update 9 |

| Bell Jar Ticket Approval | |
|---|---|
| Games Submitted & Reviewed | 3,143 |
| Games Approved | 3,143 |
| Games Denied | 0 |

| Suppliers | |
|---|---|
| **Games of Chance** | |
| Games of Chance Supplier Licenses Issued | 35 |
| Games of Chance License Fees to Commission | $374,266.05 |
| Gross Sales of Bell Jar, Las Vegas Night & Raffle Supplies & Equipment | $18,713,295.16 |
| **Bingo** | |
| Bingo Supplier Licenses Issued | 24 |
| Bingo License Fees to Commission | $8,920.00 |
| Gross Sales of Bingo Supplies & Equipment | $3,315,927.54 |
| Bingo Hall - Rent Determinations | 8 |

| Enforcement | |
|---|---|
| Complaints | 670 |
| Inspections | 0 |
| Investigations | 0 |
| Meetings | 0 |
| Training Seminars | 10 |

| License Issued by Municipal Clerks* | |
|---|---|
| Bell Jar | 683 |
| Bingo | 7225 |
| Las Vegas Nights | 92 |
| Raffles | 149 |

| License Fees Collected by Municipal Clerks | |
|---|---|
| Bell Jar | $17,173.75 |
| Bingo | $151,260.36 |
| Las Vegas Nights | $3,175.00 |
| Raffles | $1,150.00 |

| Additional License Fees Collected by Municipal Clerks & Commission | |
|---|---|
| Bell Jar (Commission) | $1,938,180.73 |
| Bingo (Municipality) | $190,011.25 |
| Las Vegas Nights (Municipality) | $4,135.98 |
| Raffles (Municipality) | $56,595.14 |

* There are 1,105 municipal clerks required to annually report charitable gaming licensing activity to the Commission. The figures reflected are compiled from reports filed by municipal clerks who have complied with the mandatory reporting requirements.

# Division of Gaming

## Indian Gaming

Class III gaming compacts exist between the State of New York and the Oneida Indian Nation of New York, the Saint Regis Mohawk Tribe and the Seneca Nation of Indians.

| Compact Partner | Casino | Location |
|---|---|---|
| **Oneida Indian Nation** | Turning Stone<br>Yellow Brick Road<br>Point Place | Verona<br>Chittenango<br>Bridgeport |
| **St. Regis Mohawk Tribe** | Akwasasne Mohawk Casino | Hogansburg |
| **Seneca Nation of Indians** | Seneca Niagara Casino<br>Seneca Allegany Casino<br>Seneca Buffalo Creek | Niagara Falls<br>Salamanca<br>Buffalo |

These compacts guarantee the State specific regulatory or oversight authority with respect to Class III gaming operations and establish the State's three regulatory goals: ensure public order and safety; protect the integrity of the games authorized by the compacts; and gain mutual agreement on a sound system of fiscal and auditing controls over casino gaming operations.

Each compact and its appendices contain standards and specifications for all authorized games played at a Tribe or Nation's Class III facilities along with the rules and internal controls governing the operation of the gaming facility, procedures for certification and/or registration of gaming employees and companies transacting business with the facility, and a system for mediation of disputes.

The Division maintains a presence within each Indian-operated facility to ensure that gaming operations, such as dealing procedures, internal accounting, and other controls, strictly conform to the applicable provisions of the relevant compact and its appendices. The Division's on-site Inspectors are experienced, professional investigators who monitor the gaming activities with Nation or Tribal gaming inspectors, security officers, and surveillance departments. Casino patrons may seek Commission inspectors to clarify rules of a game and for recourse after filing a complaint.

Each compact requires individuals seeking employment and enterprises desiring to conduct business with a Class III gaming facility to undergo a thorough registration and licensing process. Each business applicant and their principal officers and employees must be fingerprinted and undergo a background review. The State's regulatory expenses, for both personnel and equipment, are paid for or reimbursed by the applicable Indian Nation or Tribe.

## Commercial Gaming

The Division of Gaming regulates four commercial casinos.

In 2024, the commercial properties collectively received an estimated total of 6,222,839 visitors.

To ensure that operations within each commercial casino is conducted with the highest integrity, credibility and quality, Division staff is present at each of the properties. These teams are charged with executing various audits to ensure regulatory compliance across all operations, including but not limited to, cage; drop; soft count; surveillance; table games; poker; sports wagering; underage gaming prevention; floor plan changes; internal controls; surveillance; and operating, policy and procedure amendments.

In 2024, the teams performed a total of 886 audits resulting in 409 documented violations. As of January 1, 2025, the commercial properties collectively had 5,218 slot assets on their floors, 294 live table games, and 54 live poker games. Changes to the number, theme and/or type of devices on the gaming floor at a property require a formal submission from an authorized game developer to the Commission. Division staff research the proposed change(s) and, if approved, place the new devices on the gaming floor for beta testing for up to 270 days, after which the game developer can expect its device to be accepted or denied permanent status. To date, game reorganizations have occurred at each of the commercial properties in keeping with each facility's license level.

## Commercial Gaming for Calendar Year 2024

| | Tioga Downs Casino | del Lago Resort and Casino | Rivers Casino and Resort | Resorts World Catskills | Statewide |
|---|---|---|---|---|---|
| **Opening Date:** | Dec 1, 2016 | Jan 31, 2017 | Feb 6, 2017 | Feb 5, 2018 | |
| ***Gross Gaming Revenue (GGR):*** | | | | | |
| ***Slot/ETG's:*** | | | | | |
| Credits Played | $1,238,849,012 | $1,619,420,403 | $1,889,192,784 | $1,357,781,114 | $6,105,243,312 |
| Promotional Slot Gaming Credits | $15,697,068 | $23,776,415 | $12,301,475 | $27,315,259 | $79,090,218 |
| Credits Won | $1,127,463,572 | $1,469,353,828 | $1,715,268,652 | $1,233,155,834 | $5,545,241,886 |
| Slot & ETG GGR | $95,688,371 | $126,290,159 | $161,622,657 | $97,310,021 | $480,911,208 |
| Avg Daily Slots & ETG's | 893 | 1,665 | 1,041 | 1,618 | 5,218 |
| Win/Unit per Day | $293 | $207 | $424 | $164 | $1,089 |
| ***Table Games:*** | | | | | |
| Avg Daily Tables | 29 | 66 | 62 | 133 | 290 |
| Table Game Drop | $66,634,860 | $143,993,608 | $204,728,174 | $495,624,889 | $910,981,531 |
| Promotional Table Game Credits | $2,400,200 | $2,622,770 | $2,281,830 | $6,078,360 | $13,383,160 |
| Table Game GGR | $11,969,338 | $30,575,643 | $39,595,411 | $99,125,426 | $181,265,817 |
| ***Poker Tables:*** | | | | | |
| Avg Daily Poker Tables | 6 | 14 | 16 | 19 | 55 |
| Poker Table GGR | $519,884 | $2,575,090 | $3,724,104 | $4,348,275 | $11,167,353 |
| ***Sports Wagering:*** | | | | | |
| Sports Wagering Handle | $5,972,851 | $15,492,709 | $48,390,484 | $9,615,933 | $79,471,977 |
| Sports Wagering GGR | $676,831 | $1,266,977 | $2,829,817 | $363,961 | $5,137,587 |
| **Total GGR** | **$108,854,424** | **$160,707,869** | **$207,771,989** | **$201,147,682** | **$678,481,965** |
| ***Gaming Tax:*** | | | | | |
| Slots/ETG Tax [1] | $28,706,511 | $37,887,048 | $48,486,797 | $29,193,006 | $144,273,362 |
| Table/Sports Betting Game Tax [2] | $1,316,605 | $3,441,771 | $4,614,933 | $10,383,766 | $19,757,076 |
| **Total Gaming Tax** | **$30,023,117** | **$41,328,819** | **$53,101,730** | **$39,576,772** | **$164,030,438** |
| Unclaimed Funds [6] | $158,304 | $204,241 | $304,506 | $293,349 | $960,400 |
| Miscellaneous Adjustments [7] | $8,900 | $1,000 | $92,171 | $74,567 | $176,638 |
| **Total Revenue Allocable** | **$30,190,321** | **$41,534,060** | **$53,498,408** | **$39,944,688** | **$165,167,476** |
| **Statutory Allocation of Gaming Tax:** | | | | | |
| Education/Property Tax Relief (80%) | $24,152,257 | $33,227,248 | $42,798,726 | $31,955,751 | $132,133,981 |
| Host County (5%) [3] | $1,509,516 | $2,076,703 | $2,674,920 | $1,997,234 | $8,258,374 |
| Host Municipality (5%) [4] | $1,509,516 | $2,076,703 | $2,674,920 | $1,997,234 | $8,258,374 |
| Non-host Counties within Region (10%) [5] | $3,019,031 | $4,153,407 | $5,349,841 | $3,994,468 | $16,516,747 |
| ***Net Revenue to Operator*** | **$78,831,308** | **$119,379,050** | **$154,670,259** | **$161,570,910** | **$514,451,527** |

| | | | | |
|---|---|---|---|---|
| [1] Slot/ETG tax rate varies by region. | 30% | 30% | 30% | 30% |
| [2] Table/Sports Betting game tax rate. | 10% | 10% | 10% | 10% |
| [3] Host county | Tioga | Seneca | Schenectady | Sullivan |
| [4] Host Municipality | Town of Nichols | Town of Tyre | City of Schenectady | Town of Thompson |

[5] Non-host counties within each region share 10% of the gaming tax on a per capita basis. For a listing of counties within each region and how much they receive, see the monthly commercial gaming reports on the NYS Gaming Commission website at: https://www.gaming.ny.gov/gaming/index.php?ID=1

[6] Unclaimed Funds are distributed in accordance with PML §1345.

[7] Miscellaneous Adjustments are comprised of audit adjustments to gross gaming revenue, fines, and penalties, and are shown net of tax.

# Mobile Sports Wagering

New York State law authorizes mobile sports wagering when a sports wager is made through virtual or electronic means from a location within New York and is transmitted to and accepted by electronic equipment located at a licensed commercial casino gaming facility.

Revenues from mobile sports wagering are distributed as follows: $5 million annually to fund sports programs for under-served youths, $6 million annually to fund problem gambling education and treatment, with the remaining majority to fund education aid.

More than $22.8 billion was wagered in New York State via licensed mobile sports wagering operators in 2024, resulting in more than $1.05 billion in tax revenue for New York State.

Wynn ceased operations on July 28, 2024, after being purchased by Penn Gaming, which operates ESPN Bet. ESPN Bet launched on September 26, 2024.

PointsBet ceased operations on February 28, 2024, after being purchased by Fanatics Inc. Fanatics took over operations on February 29, 2024.

## Mobile Sports Wagering for Calendar Year 2024

| | Bally Bet | Bet MGM | Caesars | DraftKings | ESPN Bet |
|---|---|---|---|---|---|
| **Launch Date** | Jul 4, 2022 | Jan 17, 2022 | Jan 8, 2022 | Jan 8, 2022 | Sep 26, 2024 |
| ***Gross Gaming Revenue (GGR)*** | | | | | |
| Wagers Received | $ 111,648,032 | $ 1,598,027,760 | $ 1,856,957,690 | $ 8,108,028,093 | $ 132,440,701 |
| Voided Wagers | $ - | $ (10,953,349) | $ (209,680) | $ 130,250 | $ - |
| Cancelled Wagers | $ (1,602,408) | $ (552,177) | $ (13,182,068) | $ (27,094,181) | $ (95,896) |
| Winning Wagers Paid Out | $ (102,729,148) | $ (1,483,822,659) | $ (1,712,237,462) | $ (7,373,118,765) | $ (124,199,977) |
| **Total GGR[1]** | **$ 7,316,476** | **$ 102,699,575** | **$ 131,328,480** | **$ 707,945,398** | **$ 8,144,829** |
| **Total Gaming Tax** | **$ 3,731,403** | **$ 52,376,783** | **$ 66,977,525** | **$ 361,052,153** | **$ 4,153,863** |
| Miscellaneous Adjustments [4] | $ 165,544 | $ - | $ 7,000 | $ - | $ - |
| **Net Revenue to Education [2,3]** | **$ 3,896,946** | **$ 52,376,783** | **$ 66,984,525** | **$ 361,052,153** | **$ 4,153,863** |
| ***Net Revenue to Operator*** | **$3,585,073** | **$50,322,792** | **$64,350,955** | **$346,893,245** | **$3,990,966** |
| Mobile Sports Wagering Tax Rate | 51% | 51% | 51% | 51% | 51% |

| | Wynn | Fanatics | Resorts World Bet | FanDuel | Rush Street | Statewide |
|---|---|---|---|---|---|---|
| **Launch Date** | Jan 31, 2022 | Feb 29, 2024 | Mar 1, 2022 | Jan 8, 2022 | Jan 8, 2022 | |
| ***Gross Gaming Revenue (GGR)*** | | | | | | |
| Wagers Received | $ 25,871,183 | $ 1,225,837,900 | $ 88,264,568 | $ 9,118,816,060 | $ 607,604,746 | $ 22,873,496,733 |
| Voided Wagers | $ (3,690) | $ 780,118 | $ - | $ (36,474,252) | $ 5,344 | $ (46,725,258) |
| Cancelled Wagers | $ (41,649) | $ (2,921,462) | $ (695,273) | $ - | $ (2,032,018) | $ (48,217,132) |
| Winning Wagers Paid Out | $ (24,905,153) | $ (1,132,145,583) | $ (80,681,103) | $ (8,120,354,675) | $ (565,062,581) | $ (20,719,257,105) |
| **Total GGR[1]** | **$ 920,691** | **$ 91,550,972** | **$ 6,888,193** | **$ 961,987,132** | **$ 40,515,492** | **$ 2,059,297,238** |
| **Total Gaming Tax** | **$ 469,552** | **$ 46,690,996** | **$ 3,512,978** | **$ 490,613,438** | **$ 20,662,901** | **$ 1,050,241,591** |
| Miscellaneous Adjustments [4] | $ 36,976 | $ - | $ - | $ 288 | $ 500 | $ 210,308 |
| **Net Revenue to Education [2,3]** | **$ 506,528** | **$ 46,690,996** | **$ 3,512,978** | **$ 490,613,726** | **$ 20,663,401** | **$ 1,050,451,899** |
| ***Net Revenue to Operator*** | **$451,138** | **$44,859,976** | **$3,375,214** | **$471,373,695** | **$19,852,591** | **$1,009,055,646** |
| Mobile Sports Wagering Tax Rate | 51% | 51% | 51% | 51% | 51% | |

[1] Sports wagering gross gaming revenue is reported on a cash basis in New York State. Wagers on future events are taxed as current revenue and payouts for winning wagers are recognized in the period redeemed.

[2] $6 Million of Net Revenue to Education shall be distributed for problem gambling education and treatment purposes.

[3] $5 Million of Net Revenue to Education shall be distributed for a youth sports activities and education grant program for the purpose of providing annual awards to sports programs for underserved youth.

[4] Miscellaneous Adjustments are comprised of audit adjustments to gross gaming revenue, fines, and penalties, and are shown net of tax.

# Video Lottery Gaming

Video lottery games, also known as Video lottery terminals (VLTs), are offered on approximately 17,148 video gaming machines spread over nine facilities. The revenue generated from these games is considered part of the New York Lottery, with all proceeds going to Aid to Education.

## Video Lottery Gaming for Calendar Year 2024

| | Saratoga Casino Hotel | Finger Lakes Gaming & Racetrack | Hamburg Gaming | Batavia Downs Gaming | Empire City Casino | Vernon Downs Casino | Jake's 58 Suffolk OTB | Nassau OTB | Resorts World Casino NYC | Resorts World Hudson Valley | Statewide |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *CY 2024 Net Win* | | | | | | | | | | | |
| Credits Played | $2,071,623,379 | $1,678,868,933 | $1,027,986,742 | $1,171,423,241 | $9,071,275,534 | $466,306,303 | $4,680,230,042 | $10,570,345,771 | $9,036,256,474 | $1,180,842,558 | $40,955,158,977 |
| Free Play Allowance | $13,654,908 | $17,258,929 | $11,850,430 | $13,410,346 | $47,296,511 | $5,454,659 | $15,720,907 | $0 | $29,036,269 | $5,742,913 | $159,425,871 |
| Credits Won | $1,910,205,542 | $1,538,536,995 | $940,500,164 | $1,069,951,257 | $8,417,027,770 | $426,072,096 | $4,367,245,455 | $10,286,661,459 | $8,316,658,892 | $1,090,367,013 | $38,363,226,643 |
| Net Win | $147,762,929 | $123,073,010 | $75,636,148 | $88,061,638 | $606,951,253 | $34,779,547 | $297,263,681 | $283,684,312 | $690,561,314 | $84,732,632 | $2,432,506,463 |
| Avg Daily VGM's | 1,226 | 1,174 | 913 | 925 | 4,437 | 512 | 999 | 1,000 | 4,831 | 1,212 | 17,228 |
| Win/VGM/Day | $329 | $286 | $228 | $260 | $374 | $186 | $813 | $775 | $391 | $191 | $383 |
| *Statutory Allocation of Net Win* | | | | | | | | | | | |
| Education Contribution | $68,709,762 | $57,228,950 | $25,716,290 | $34,344,039 | $306,510,383 | $11,825,046 | $133,768,656 | $127,657,940 | $276,224,525 | $34,740,379 | $1,076,725,971 |
| Net Agent Commission [3] | $49,500,581 | $41,229,458 | $34,792,628 | $36,105,271 | $179,050,620 | $15,998,592 | $118,905,472 | $113,473,725 | $234,790,847 | $33,045,727 | $856,892,921 |
| Purses [1] | $12,929,256 | $10,768,888 | $6,618,163 | $7,705,393 | $53,108,235 | $3,043,210 | $6,837,065 | $6,524,739 | $51,792,099 | $7,414,105 | $166,741,154 |
| Breeding Fund | $1,847,037 | $1,538,413 | $945,452 | $1,100,770 | $7,586,891 | $434,744 | $1,486,318 | $1,418,422 | $10,358,420 | $1,059,158 | $27,775,624 |
| NYRA Operations | $0 | $0 | $0 | $0 | $0 | $0 | $2,675,373 | $2,553,159 | $20,716,839 | $0 | $25,945,371 |
| NYRA Capital Expenditures | $0 | $0 | $0 | $0 | $0 | $0 | $3,864,428 | $3,687,896 | $27,622,453 | $0 | $35,174,776 |
| Gaming Floor & Admin | $14,776,293 | $12,307,301 | $7,563,615 | $8,806,164 | $60,695,125 | $3,477,955 | $29,726,368 | $28,368,431 | $69,056,131 | $8,473,263 | $243,250,646 |
| | $147,762,929 | $123,073,010 | $75,636,148 | $88,061,638 | $606,951,253 | $34,779,547 | $297,263,681 | $283,684,312 | $690,561,314 | $84,732,632 | $2,432,506,463 |
| *Local Assistance Funding* [2] | | | | | | | | | | | |
| Eligible Counties | Saratoga $775,198 | Ontario $591,174 | Erie $288,560 | Genessee $200,392 | N/A $0.00 | Oneida $256,796 | N/A $0.00 | N/A $0.00 | N/A $0.00 | Orange $454,173<br>Sullivan $308,570 | |
| Eligible City | Saratoga Springs $2,325,592 | N/A $0.00 | N/A $0.00 | Batavia $440,789 | Yonkers $19,600,000 | N/A $0.00 | N/A $0.00 | N/A $0.00 | N/A $0.00 | N/A $0.00 | |
| Eligible Towns | N/A $0.00 | Farmington $1,777,573 | Hamburg $865,679 | Batavia $160,388 | N/A $0.00 | Vernon $231,788 | N/A $0.00 | N/A $0.00 | N/A $0.00 | Newburgh $780,109<br>Thompson $634,506 | |
| Eligible Village | N/A $0.00 | N/A $0.00 | N/A $0.00 | N/A $0.00 | N/A $0.00 | Vernon $137,103 | N/A $0.00 | N/A $0.00 | N/A $0.00 | Monticello $291,205 | |

[1] NYS Tax Law allows facility operators and horsemen organizations to negotiate purse rates. 1% of gross purse contributions from VLT proceeds are refunded to the Gaming Commission for equine health & safety programs.

[2] Eligible municipalities hosting a video lottery gaming facility receive local assistance funding per State Finance Law, Section 54-L.

[3] Agent Commissions do not reflect "additional commissions" paid to Saratoga, Finger Lakes, Resorts World Hudson Valley, and Vernon Downs pursuant to Section 1612 of the tax Law. Additional commission amounts for 2024 were $14,259,256.68, $12,230,932.67, $7,568,966.83, and $3,009,924.13, respectively.

## Interactive Fantasy Sports

Interactive Fantasy Sports are skill-based contests in which the participants assemble a roster of athletes in a given sport and use the actual aggregated performance statistics of those athletes to determine the contest's winner. Individuals pay fees to enter the contest and, if successful, win prizes. Article 14 gives the Commission the authority to establish consumer fraud and abuse protections and safeguards for both players and operators.

Interactive Fantasy Sports operators seeking to do business in New York State must register with the Gaming Commission and pay a tax equivalent to 15 percent of their interactive fantasy sports gross revenue after residency percentage. In addition, registered operators shall pay a tax equal to ½ of 1 percent, but not to exceed $50,000 annually. All taxes collected from operators, as well as interest and penalties (as applicable) imposed by the Gaming Commission, are deposited, on a monthly basis, directly in the New York Lottery fund for the sole purpose of supporting New York's public K-12 schools.

| Calculation of NYS Resident Percentage: | |
|---|---|
| Total entry fees from NYS locations | $273,226,976 |
| Total entry fees from all players | $3,559,079,094 |
| NYS resident percentage | 7.7% |

| Gross Revenue: | |
|---|---|
| Total entry fees from all players | $3,559,079,094 |
| Total winnings paid out to all players | $3,210,628,766 |
| Gross revenue | $348,450,327 |
| Gross revenue after NYS resident percentage (subject to tax) | $26,768,912 |

| Tax & Other Adjustments: | |
|---|---|
| Tax on NYS gross revenue [1] | $4,015,340 |
| NYS additional tax [2] | $76,827 |
| Total monthly and additional tax | $4,092,167 |
| Forfeited prizes | $0 |
| Adjustments (errors, penalty, interest, audit) | $0 |
| Total tax and other adjustments | $4,092,167 |

| New York Player Account Information: | |
|---|---|
| Number of registrants reporting | 11 |
| Number of accounts held by authorized players | 40,476,718 |
| Number of accounts held by highly experienced players | 778,607 |
| Number of new accounts established in the preceding year | 7,048,005 |
| Number of accounts permanently closed in the preceding year | 255,494 |
| Total players who requested to exclude themselves from contests | 6,434 |

1. Gross revenue totals represent entry fees from all players less winnings paid out to players. In the event that a registrant reports negative gross revenue (winnings paid out exceed entry fees collected) the monthly tax is zero. Positive monthly gross revenue is taxed at 15%.
2. The NYS Additional Tax of 0.5% has an annual cap of $50,000 per registrant for the State Fiscal Year.
3. Data is shown in aggregate for all 11 registrants actively operating and reporting.
4. All figures reported by the registrants are unaudited and subject to change.

# Division of Horse Racing and Pari-Mutuel Wagering

New York State features racing at four Thoroughbred tracks and seven harness tracks.

| Thoroughbred Tracks |
|---|
| Aqueduct Racetrack (NYRA) |
| Belmont Park (NYRA) |
| Finger Lakes Racetrack |
| Saratoga Race Course (NYRA) |

| Harness Tracks | |
|---|---|
| Batavia Downs | Tioga Downs |
| Buffalo Raceway | Vernon Downs |
| Monticello Raceway | Yonkers Raceway |
| Saratoga Raceway | |

While bettors may wager on-track, they may also wager on races remotely through any of the State's five off-track betting corporations or through licensed multi-jurisdictional account wagering providers.

Capital District Regional Off-Track Betting Corporation

Western Regional Off-Track Betting Corporation

Suffolk Regional Off-Track Betting Corporation

Nassau Regional Off-Track Betting Corporation

Catskill Regional Off-Track Betting Corporation

The tracks and off-track betting corporations both feature simulcasting of races taking place within and beyond New York's borders. Additionally, the following companies offer advance deposit wagering (ADW):

- AmWest Entertainment LLC
- Churchill Downs Technology Initiatives Company
- Day at the Track
- Game Play dba b spot
- Lien Games Racing, LLC
- ODS Technologies, L.P. d/b/a TVG Network
- Penn ADW
- Player Management Group LLC
- WatchandWager
- Xpressbet, LLC

## Officiating and Integrity

Each race conducted at a Thoroughbred racetrack is observed by three stewards. Thoroughbred racing is also regulated by the federal Horseracing Integrity and Safety Authority (HISA). At the harness tracks, each race is observed by three judges who are all Commission employees. The stewards' and judges' viewing stands are located near the finish line of each racetrack and are equipped with several monitors to permit the viewing of multiple angles of each race. The stewards and judges observe the races to ensure that all conduct complies with the rules and regulations.

Preparation to become a steward or presiding judge includes coursework and testing. Examples of the testing and preparation are:

- All presiding and associate judges and starters must be licensed by the United States Trotting Association (USTA) before being hired. A test must be passed to obtain each license.

- All full-time stewards must attend the Louisville Equine Steward Certification Class. They must also attend periodic seminars in order to keep their licenses valid.

- All current judges are retested periodically on the rules, equipment, medications and procedures and the training tests are updated frequently.
- New officials receive extensive on-the-job training at their new positions before being hired full-time.

## Regulatory Activities

During calendar year 2024, the Division imposed 416 sanctions for violations of racing laws, rules and regulations at both harness and Thoroughbred tracks. The rulings include driving and riding infractions, general conduct violations, human and equine drug violations, and general business practice violations. The Division also issued 1 violation that was not assigned to a specific track (i.e., Main office). Overall, fines levied in 2024 totaled $132,686.

## Racing Licensing

Participants in New York State racing are required to obtain an occupational license. A substantial number of license applications are reviewed, updated and processed carefully by the Commission's licensing bureau before a license is issued. Also, by statute, fingerprinting is required of each applicant.

Where it is believed that an applicant's background or licensee's conduct may warrant a finding that participation in racing would be inconsistent with the public interest or the best interest of racing generally, a thorough investigation is conducted before action is taken. Licenses are suspended or revoked where warranted.

See Page 29 for information on the number and type of licenses issued by the Division.

## Racing Handle

### 2024 Total Handle on Races Run in New York

**On-Track, Off-Track and Out-of-State Guest**

| | Track Holding Race | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | NYRA | Finger Lakes | Batavia | Buffalo | Monticello | Saratoga Harness | Tioga | Vernon | Yonkers | TOTAL |
| ON-TRACK LIVE | $ 261,504,070 | $ 1,869,025 | $ 920,948 | $ 436,875 | $ 1,039,659 | $ 4,880,172 | $ 648,547 | $ 1,415,589 | $ 3,591,487 | $ 276,306,372 |
| SIMULCAST IMPORTS: | | | | | | | | | | |
| Imported to NYS Tracks: | | | | | | | | | | |
| NYRA | $ 7,630,687 | $ 3,763,185 | $ 475,572 | $ 241,895 | 1,510,488 | $ 1,317,252 | $ 111,036 | $ 222,426 | $ 4,502,694 | $ 19,775,235 |
| Finger Lakes | 1,538,543 | [redacted] | 8,857 | 15,661 | 120,149 | 41,641 | 3,243 | 6,117 | 7,916 | 1,742,127 |
| Batavia | 237,116 | 21,242 | [redacted] | 57,796 | 43,007 | 22,293 | 3,874 | 5,683 | 14,456 | 405,467 |
| Buffalo | 354,943 | 4,397 | 2,277 | [redacted] | 11,673 | 15,376 | 1,766 | 3,207 | 1,146 | 394,785 |
| Monticello | 477,468 | - | - | - | [redacted] | 89,240 | 9,256 | - | 64,243 | 640,207 |
| Saratoga | 7,938,759 | 388,799 | 46,286 | 18,595 | 367,030 | [redacted] | 27,469 | 85,067 | 345,168 | 9,217,173 |
| Tioga | 405,807 | 28,891 | 5,280 | 3,785 | 40,129 | 33,352 | [redacted] | 20,141 | 14,292 | 551,677 |
| Vernon | 797,662 | 72,297 | 21,587 | 16,332 | 232,392 | 155,905 | 38,976 | [redacted] | 29,508 | 1,364,659 |
| Yonkers | 9,591,908 | 105,637 | 60,162 | 39,470 | 359,942 | 198,454 | 41,474 | 55,544 | [redacted] | 10,452,591 |
| TOTAL TO NYS TRACKS | $ 28,972,893 | $ 4,384,448 | $ 620,021 | $ 393,534 | $ 2,684,810 | $ 1,873,513 | $ 237,094 | $ 398,185 | $ 4,979,423 | $ 44,543,921 |
| IMPORTED TO NYS OTB's | | | | | | | | | | |
| Capital | $ 32,911,250 | $ 1,415,606 | $ 94,288 | $ 64,872 | $ 760,981 | $ 1,043,495 | $ 31,015 | $ 199,097 | $ 832,364 | $ 37,352,968 |
| Catskill | 2,075,499 | 121,577 | 12,733 | 7,134 | 193,833 | 38,076 | 10,841 | 5,546 | 171,633 | 2,636,872 |
| Nassau | 24,577,494 | 1,556,041 | 77,665 | 70,718 | 1,480,626 | 434,750 | 56,549 | 68,593 | 1,049,622 | 29,372,058 |
| Suffolk | 15,016,795 | 642,590 | 40,032 | 53,054 | 579,855 | 189,659 | 12,369 | 25,309 | 547,074 | 17,106,737 |
| Western | 7,248,736 | 1,247,682 | 830,419 | 459,833 | 971,743 | 435,671 | 52,703 | 94,684 | 810,424 | 12,151,895 |
| TOTAL TO NYS OTB'S | $ 81,829,774 | $ 4,983,496 | $ 1,055,137 | $ 655,611 | $ 3,987,038 | $ 2,141,651 | $ 163,477 | $ 393,229 | $ 3,411,117 | $ 98,620,530 |
| EXPORTED OUT OF STATE | $ 1,724,231,868 | $ 101,507,844 | $ 14,429,591 | $ 9,000,093 | $ 77,224,437 | $ 43,127,082 | $ 3,978,884 | $ 6,715,718 | $ 101,683,792 | $ 2,081,899,309 |
| **TOTAL HANDLE ON NYS RACING** | **$ 2,096,538,605** | **$ 112,744,813** | **$ 17,025,697** | **$ 10,486,113** | **$ 84,935,944** | **$ 52,022,418** | **$ 5,028,002** | **$ 8,922,721** | **$ 113,665,819** | **$ 2,501,370,132** |

# 2024 Total Betting at New York State Race Tracks

## On-Track Betting on Live and Simulcast Import of All Races

| | 2024 | | | 2023 | | |
|---|---|---|---|---|---|---|
| | Simulcast Imports | Live Racing | On-Track Betting | Simulcast Imports | Live Racing | On-Track Betting |
| RECEIVING TRACK: | | | | | | |
| THOROUGHBRED: | | | | | | |
| Aqueduct | $ 251,334,460 | $ 125,208,842 | $ 376,543,302 | $ 200,745,989 | $ 77,079,736 | $ 277,825,725 |
| Belmont | - | - | - | 64,284,289 | 53,907,152 | 118,191,441 |
| Saratoga | 41,158,835 | 136,295,228 | 177,454,063 | 44,644,741 | 142,918,730 | 187,563,471 |
| NYRA* | $ 292,493,295 | $ 261,504,070 | $ 553,997,365 | $ 309,675,019 | $ 273,905,618 | $ 583,580,637 |
| Finger Lakes | 6,427,462 | 1,869,025 | 8,296,487 | 6,463,002 | 2,078,485 | 8,541,487 |
| | | | | | 0% | |
| THOROUGHBRED TRACKS | **$ 298,920,757** | **$ 263,373,095** | **$ 562,293,852** | **$ 316,138,021** | **$ 275,984,103** | **$ 592,122,124** |
| HARNESS: | | | | | | |
| Batavia | 1,479,371 | 920,948 | 2,400,319 | 1,404,220 | 942,869 | 2,347,089 |
| Buffalo | 1,434,647 | 436,875 | 1,871,522 | 1,613,114 | 515,118 | 2,128,232 |
| Monticello | 2,215,963 | 1,039,659 | 3,255,622 | 1,962,657 | 1,293,597 | 3,256,254 |
| Saratoga | 28,288,447 | 4,880,172 | 33,168,619 | 28,274,464 | 3,497,424 | 31,771,888 |
| Tioga | 2,176,376 | 648,547 | 2,824,923 | 2,459,172 | 686,554 | 3,145,726 |
| Vernon | 4,419,263 | 1,415,589 | 5,834,852 | 4,727,514 | 1,388,519 | 6,116,033 |
| Yonkers | 35,233,451 | 3,591,487 | 38,824,938 | 38,691,565 | 4,542,040 | 43,233,605 |
| HARNESS TRACKS | **$ 75,247,518** | **$ 12,933,277** | **$ 88,180,795** | **$ 79,132,706** | **$ 12,866,121** | **$ 91,998,827** |
| ALL TRACKS | **$ 374,168,275** | **$ 276,306,372** | **$ 650,474,647** | **$ 395,270,727** | **$ 288,850,224** | **$ 684,120,951** |

* Simulcast Imports for NYRA tracks includes $7,630,687 of inter-track simulcasting of NYRA racing to other NYRA tracks for 2024 and $15,383,644 for 2024.

# 2024 Total Betting at New York State Race Tracks

## On-Track Betting By Breed and Location of Race

| | Betting at NYS Thoroughbred Tracks | Percent of Total Thoroughbred | Betting at NYS Harness Tracks | Percent of Total Harness | Total | Percent of Total |
|---|---|---|---|---|---|---|
| **SUMMARY OF ON-TRACK BETTING** | | | | | | |
| LIVE RACING: | | | | | | |
| NYRA | $ 261,504,070 | 46.5% | [redacted] | 0.0% | $ 261,504,070 | 40.2% |
| Finger Lakes | 1,869,025 | 0.3% | [redacted] | 0.0% | 1,869,025 | 0.3% |
| NYS Harness Tracks | [redacted] | 0.0% | 12,933,277 | 14.7% | 12,933,277 | 2.0% |
| All Live Racing at NYS Tracks | **$ 263,373,095** | **46.8%** | **$ 12,933,277** | **14.7%** | **$ 276,306,372** | **42.5%** |
| IN-STATE SIMULCASTING BETWEEN NYS TRACKS: | | | | | | |
| NYRA | 9,169,230 | 1.5% | 19,803,664 | 22.5% | 28,972,894 | 4.5% |
| Finger Lakes | 3,763,185 | 0.7% | 621,264 | 0.7% | 4,384,449 | 0.7% |
| NYS Harness Tracks | 8,584,946 | 1.5% | 2,601,630 | 3.0% | 11,186,576 | 1.7% |
| All Simulcasts from NYS Tracks | **$ 21,517,361** | **3.8%** | **$ 23,026,557** | **26.2%** | **$ 44,543,918** | **6.9%** |
| WAGERING ON NYS RACING AT NYS TRACKS | **$ 284,890,456** | **50.7%** | **$ 35,959,834** | **40.9%** | **$ 320,850,290** | **49.4%** |
| WAGERING ON OUT OF STATE RACES AT NYS TRACKS: | | | | | | |
| Thoroughbred Races | 277,403,396 | 49.3% | 41,067,195 | 46.6% | 318,470,591 | 49.0% |
| Harness Races | - | 0.0% | 11,153,766 | 12.6% | 11,153,766 | 1.7% |
| All Simulcasts from Out-of-State Tracks | **$ 277,403,396** | **49.3%** | **$ 52,220,961** | **59.2%** | **$ 329,624,357** | **50.7%** |
| **TOTAL BETTING AT NYS TRACKS FROM ALL SOURCES** | **$ 562,293,852** | **100.0%** | **$ 88,180,795** | **100.1%** | **$ 650,474,647** | **100.1%** |

# 2024 Thoroughbred Tracks, Harness Tracks, and OTBs

## Thoroughbred Tracks

| | Live Handle | Simulcast Import Handle | Total Facility Handle | Race Dates | Attendance |
|---|---|---|---|---|---|
| **Aqueduct Racetrack** | $125,208,842 | $251,334,460 | $376,543,302 | 151 | 413,326 |
| **Belmont Park** | $0 | $0 | $0 | 0 | 0 |
| **Saratoga Race Course** | $136,295,228 | $41,158,835 | $177,454,063 | 39 | 1,051,092 |
| **Finger Lakes Racetrack** | $1,869,025 | $6,427,463 | $8,296,488 | 90 | NA (Attendance*) |

*Attendance data not required for non-NYRA tracks.

## Harness Tracks

| | Live Handle | Simulcast Import Handle | Total Facility Handle | Race Dates |
|---|---|---|---|---|
| **Batavia Downs** | $920,948 | $1,479,371 | $2,400,318 | 70 |
| **Buffalo Raceway** | $436,875 | $1,434,647 | $1,871,522 | 57 |
| **Monticello Raceway** | $1,039,659 | $2,215,963 | $3,255,622 | 199 |
| **Saratoga Raceway** | $4,880,172 | $28,288,447 | $33,168,620 | 150 |
| **Tioga Downs** | $648,547 | $2,176,375 | $2,824,922 | 58 |
| **Vernon Downs** | $1,415,589 | $4,419,262 | $5,834,851 | 64 |
| **Yonkers Raceway** | $3,591,487 | $35,233,453 | $38,824,940 | 238 |

| | Live Handle | Simulcast Import Handle | Total Facility Handle | Race Dates |
|---|---|---|---|---|
| **TOTAL - ALL RACETRACKS** | **$276,306,372** | **$374,168,275** | **$650,474,647** | **1,116** |

## OTBs

| | In-State Handle | Out-of-State Handle | Total Handle |
|---|---|---|---|
| **Capital OTB** | $37,352,969 | $64,912,788 | $102,265,757 |
| **Catskill OTB** | $2,636,871 | $5,836,942 | $8,473,813 |
| **Nassau OTB** | $29,372,059 | $59,230,119 | $88,602,178 |
| **Suffolk OTB** | $17,106,739 | $31,160,356 | $48,267,095 |
| **Western OTB** | $12,151,896 | $30,501,269 | $42,653,165 |
| **TOTAL - ALL OTBs** | **$98,620,534** | **$191,641,474** | **$290,262,008** |

# 2024 Distribution of On-Track Betting

| | NYRA | Finger Lakes | Batavia | Buffalo | Monticello | Saratoga | Tioga | Vernon | Yonkers | All NYS Tracks |
|---|---|---|---|---|---|---|---|---|---|---|
| Regular | $ 200,417,274 | $ 2,544,955 | $ 735,895 | $ 561,590 | $ 488,548 | $ 9,091,656 | $ 975,950 | $ 2,125,540 | $ 11,472,623 | $ 228,414,031 |
| Multiple | 170,376,155 | 2,645,780 | 708,626 | 594,157 | 939,682 | 10,120,957 | 966,670 | 1,934,498 | 11,230,109 | 199,516,634 |
| Exotic | 175,573,249 | 3,105,753 | 950,579 | 705,700 | 1,827,392 | 13,518,393 | 882,303 | 1,774,813 | 15,778,134 | 214,116,316 |
| Super Exotic | - | - | 5,218 | 10,075 | - | 437,614 | - | | 344,073 | 796,979 |
| NYRA Intra-Simulcasting | 7,630,687 | [redacted] | | | | | | | | 7,630,687 |
| Total Handle | $ 553,997,365 | $ 8,296,488 | $ 2,400,318 | $ 1,871,522 | $ 3,255,622 | $ 33,168,620 | $ 2,824,923 | $ 5,834,851 | $ 38,824,939 | $ 650,474,647 |
| | | | | | | | | | | |
| Takeout | $ 105,728,563 | $ 1,677,142 | $ 500,095 | $ 371,960 | $ 601,987 | $ 6,597,314 | $ 551,264 | $ 1,163,307 | $ 7,792,343 | $ 124,983,975 |
| Breakage | 2,214,192 | 33,774 | 9,042 | 6,231 | 9,877 | 121,205 | 11,224 | 26,368 | 145,701 | 2,577,614 |
| Total Takeout and Breakage | $ 107,942,755 | $ 1,710,916 | $ 509,137 | $ 378,191 | $ 611,863 | $ 6,718,520 | $ 562,488 | $ 1,189,675 | $ 7,938,043 | $ 127,561,588 |
| | | | | | | | | | | |
| State Tax on Handle | $ 5,994,907 | $ 104,445 | $ 23,834 | $ 21,434 | $ 37,594 | $ 402,229 | $ 37,017 | $ 78,563 | $ 445,434 | $ 7,145,458 |
| State Regulatory Fee | 3,280,367 | 49,779 | 14,402 | 11,229 | 19,534 | 199,013 | 16,950 | 35,009 | 232,950 | 3,859,233 |
| State Tax on Breakage | 759,461 | 14,903 | 4,023 | 2,720 | 4,689 | 48,885 | 4,871 | 10,934 | 58,215 | 908,700 |
| Total Tax and Regulatory Fee | $ 10,034,735 | $ 169,127 | $ 42,258 | $ 35,383 | $ 61,818 | $ 650,127 | $ 58,838 | $ 124,506 | $ 736,598 | $ 11,913,390 |
| | | | | | | | | | | |
| Racetrack Commission | $ 93,440,879 | $ 1,480,417 | $ 442,895 | $ 327,024 | $ 519,313 | $ 5,787,968 | $ 474,582 | $ 1,001,812 | $ 6,867,338 | $ 110,342,229 |
| Racetrack Breakage | 1,454,731 | 18,872 | 5,019 | 3,511 | 5,187 | 72,320 | 6,354 | 15,434 | 87,486 | 1,668,914 |
| Total to Racetrack | $ 94,895,610 | $ 1,499,289 | $ 447,915 | $ 330,535 | $ 524,500 | $ 5,860,288 | $ 480,936 | $ 1,017,246 | $ 6,954,824 | $ 112,011,143 |
| | | | | | | | | | | |
| Horse Breeders Fund Share | $ 3,012,410 | $ 42,500 | $ 18,964 | $ 12,273 | $ 25,545 | $ 208,105 | $ 22,716 | $ 47,923 | $ 246,620 | 3,637,057 |
| | | | | | | | | | | |
| Racetrack Payouts | | | | | | | | | | |
| Paid to Simulcast Senders | $ 16,153,806 | $ 354,615 | $ 75,158 | $ 90,728 | $ 107,988 | $ 1,779,206 | $ 117,154 | $ 232,689 | $ 2,163,135 | $ 21,074,480 |
| Paid to NYRA and Finger Lakes | [redacted] | | $ 14,141 | $ 26,592 | $ 22,847 | $ 408,337 | $ 44,393 | $ 44,393 | $ 404,024 | $ 964,726 |
| Gross Purses Paid | $ 156,153,080 | $ 15,940,737 | $ 9,021,050 | $ 6,578,298 | $ 9,917,695 | $ 17,542,265 | $ 7,450,751 | $ 6,068,504 | $ 54,711,700 | $ 283,384,080 |
| Minus Pool | $ 645,495 | $ 2,070 | $ 1,700 | $ 462 | $ (1,135) | $ 17,458 | $ 1,564 | $ 34,826 | $ 247,316 | $ 949,756 |
| | | | | | | | | | | |
| Uncashed Tickets | $ 1,105,938 | $ 38,354 | $ 13,007 | $ 18,827 | $ 28,222 | $ 86,713 | $ 28,936 | $ 29,212 | $ 218,295 | $ 1,567,504 |
| State Admission Taxes | $ 338,097 | [redacted] | | | | $ 39 | [redacted] | | | $ 338,136 |

Note: Handle includes on-track live racing and simulcast imports of all racing.

### NYS Regional Off-Track Betting Corporations

## 2024 Distribution of Revenues

| | Capital | Catskill | Nassau | Suffolk | Western | All Regions |
|---|---|---|---|---|---|---|
| **Pari-Mutuel Revenue:** | | | | | | |
| Statutory Take-Out | $ 20,226,111 | $ 1,709,936 | $ 17,790,696 | $ 9,620,038 | $ 8,908,930 | $ 58,255,711 |
| Breakage | 407,175 | 29,686 | 322,947 | 166,303 | 120,651 | 1,046,762 |
| Minus Pools | (24,592) | (918) | (108,054) | (3,244) | (9,363) | (146,171) |
| Missed Pools | - | - | - | - | - | - |
| Derived from Section 532.3.b.(iv) & 532.7 | 356,495 | 60,329 | 600,651 | 261,775 | 385,841 | 1,665,090 |
| **Total Pari-Mutuel Revenue** | **$ 20,965,189** | **$ 1,799,032** | **$ 18,606,240** | **$ 10,044,872** | **$ 9,406,059** | **$ 60,821,392** |
| **Statutory & Simulcast Payments** | | | | | | |
| New York State ( Pari-Mutuel Tax & Breakage) | $ 739,080 | $ 58,748 | $ 603,136 | $ 383,409 | $ 366,327 | $ 2,150,699 |
| New York State Racing & Wagering Board Regulatory Fee | 613,594 | 50,843 | 531,613 | 289,603 | 255,919 | 1,741,572 |
| NYS Thoroughbred Development & Breeding Fund | 438,117 | 36,727 | 410,347 | 222,047 | 172,820 | 1,280,058 |
| Ag. & NYS Breeding & Dev. Fund Breeders' Fund - Harness | 188,658 | 19,026 | 173,977 | 90,346 | 134,366 | 606,373 |
| In State Thoroughbred Tracks | 5,096,144 | 353,313 | 4,159,557 | 2,452,894 | 1,706,316 | 13,768,223 |
| Out of State Thoroughbred Tracks | 3,231,300 | 256,697 | 2,807,066 | 1,574,163 | 1,107,462 | 8,976,688 |
| In State Harness Tracks | 1,559,246 | 60,177 | 1,047,300 | 451,700 | 847,653 | 3,966,075 |
| Out of State Harness Tracks | 199,277 | 25,065 | 176,282 | 95,912 | 212,680 | 709,215 |
| Special Events | 196,398 | 29,458 | 46,883 | 18,513 | 157,212 | 448,464 |
| **Total Statutory & Simulcast Payments** | **$ 12,261,814** | **$ 890,052** | **$ 9,956,160** | **$ 5,578,586** | **$ 4,960,755** | **$ 33,647,367** |
| **Net Pari-Mutuel Revenue** | **$ 8,703,375** | **$ 908,980** | **$ 8,650,080** | **$ 4,466,286** | **$ 4,445,304** | **$ 27,174,025** |
| **Other Revenue** | | | | | | |
| Admission Income & Tax | $ 4,153 | $ - | $ 14,966 | $ 32,847 | $ - | $ 51,966 |
| Lottery Income | 93,303 | - | 16,541 | 15,522 | 103,057 | 228,423 |
| Concession Income | 41,157 | - | | | 19,192 | 60,349 |
| Derived from Section 509-a(3) | 1,000,000 | - | 120,389 | - | - | 1,120,389 |
| Transfer from Section 509 Reserve Fund | - | - | | | - | - |
| Interest Income | 176,565 | - | 706,964 | 171,822 | 272,331 | 1,327,681 |
| Enterprise Fund - Net Revenue / (Loss) ________________ | (1,176,944) | - | | 38,521,889 | 13,997,324 | 51,342,269 |
| Other Income __________________ | 4,276,856 | 978,791 | 34,563,328 | 3,231,458 | 2,092,093 | 45,142,525 |
| **Net Revenue from Operations** | **$ 13,118,465** | **$ 1,887,771** | **$ 44,072,267** | **$ 46,439,823** | **$ 20,929,301** | **$ 126,447,627** |
| **Operating Expenses** | | | | | | |
| Branch Expenses | $ 7,651,002 | $ 389,695 | $ 12,429,679 | $ 5,283,952 | $ 5,621,251 | $ 31,375,579 |
| General & Administrative Expenses | 3,242,348 | 1,575,909 | 3,557,371 | 8,366,895 | 8,708,909 | 25,451,431 |
| **Total Operating Expenses** | **$ 10,893,350** | **$ 1,965,604** | **$ 15,987,050** | **$ 13,650,847** | **$ 14,330,160** | **$ 56,827,011** |
| **Section 516 Net Revenues from Operations** | **$ 2,225,115** | **$ (77,833)** | **$ 28,085,218** | **$ 32,788,977** | **$ 6,599,141** | **$ 69,620,616** |
| Less: Section 509-a(ii) Contributions to Capital Acquisition Fund | $ 532,384 | | | $ 482,671 | 426,532 | $ 1,441,587 |
| Section 509 Contributions to Reserve Fund | | | | | | - |
| Section 527.6 Obligations | | | | | | - |
| **Section 516 Net Revenue for Distribution** | **$ 1,692,731** | **$ (77,833)** | **$ 28,085,218** | **$ 32,306,306** | **$ 6,172,609** | **$ 68,179,030** |

NYS Regional Off-Track Betting Corporations

## 2024 Summary of Direct and Regional Payments to Tracks

| | Capital | Catskill | Nassau | Suffolk | Western | All Regions |
|---|---|---|---|---|---|---|
| New York State Thoroughbred: | | | | | | |
| NYRA: | | | | | | |
| Aqueduct | $ 714,951 | $ 44,811 | $ 596,021 | $ 393,325 | $ 108,234 | $ 1,857,342 |
| Belmont | 775,254 | 51,825 | 602,551 | 420,494 | 119,481 | 1,969,605 |
| Saratoga | 998,519 | 45,931 | 493,621 | 297,928 | 114,689 | 1,950,688 |
| Total NYRA Direct | $ 2,488,724 | $ 142,567 | $ 1,692,193 | $ 1,111,747 | $ 342,404 | $ 5,777,635 |
| NYRA Regional | 2,103,979 | 170,461 | 1,950,874 | 1,083,448 | 961,678 | 6,270,440 |
| Finger Lakes Direct | 69,675 | 3,813 | 67,863 | 60,268 | 69,765 | 271,384 |
| Finger Lakes Regional | 433,766 | 36,472 | 448,628 | 197,431 | 332,468 | 1,448,765 |
| **Total New York State Thoroughbred** | **$ 5,096,144** | **$ 353,313** | **$ 4,159,558** | **$ 2,452,894** | **$ 1,706,315** | **$ 13,768,224** |
| New York State Harness: | | | | | | |
| Batavia Direct | $ 2,351 | $ 227 | $ 1,361 | $ 695 | $ 46,635 | $ 51,269 |
| Batavia Regional | | | | | 358,628 | 358,628 |
| Buffalo Direct | 1,653 | 124 | 1,245 | 953 | 25,691 | 29,666 |
| Buffalo Regional | | | | | 296,156 | 296,156 |
| Monticello Direct | 20,568 | (35,603) | 85,547 | 33,157 | 24,414 | 128,083 |
| Monticello Regional | | 87,865 | 446,901 | 207,784 | | 742,550 |
| Saratoga Direct | 203,368 | 751 | 7,642 | 3,339 | 7,650 | 222,750 |
| Saratoga Regional | 1,008,133 | | | | | 1,008,133 |
| Tioga Direct | 722 | 479 | 2,991 | 681 | 1,248 | 6,121 |
| Tioga Regional | | 3,518 | 22,245 | 10,840 | | 36,603 |
| Vernon Direct | 9,078 | 100 | 1,193 | 421 | 1,991 | 12,783 |
| Vernon Regional | 292,399 | 402 | | | 64,352 | 357,153 |
| Yonkers Direct | 20,974 | (74,575) | 261,102 | 31,541 | 20,895 | 259,937 |
| Yonkers Regional | - | 76,888 | 217,072 | 162,289 | - | 456,249 |
| **Total New York State Harness** | **$ 1,559,246** | **$ 60,176** | **$ 1,047,299** | **$ 451,700** | **$ 847,660** | **$ 3,966,081** |
| **Total Payments to New York State Tracks** | **$ 6,655,390** | **$ 413,489** | **$ 5,206,857** | **$ 2,904,594** | **$ 2,553,975** | **$ 17,734,305** |
| Out-of-State Thoroughbred | $ 3,231,300 | $ 256,697 | $ 2,807,066 | $ 1,569,176 | $ 1,107,456 | $ 8,971,695 |
| Out-of-State Harness | 199,277 | 25,065 | 176,282 | 95,912 | 212,680 | 709,216 |
| **Total Payments to Out-of-State Tracks** | **$ 3,430,577** | **$ 281,762** | **$ 2,983,348** | **$ 1,665,088** | **$ 1,320,136** | **$ 9,680,911** |
| Special Events: | | | | | | |
| Kentucky Derby | $ 101,705 | $ 18,496 | $ 14,500 | $ 3,929 | $ 107,510 | $ 246,140 |
| Preakness Stakes | 30,057 | 5,637 | 6,101 | 1,058 | 29,913 | 72,766 |
| Breeders Cup | 64,636 | 5,325 | 26,282 | 18,513 | 19,789 | 134,545 |
| **Total Special Events** | **$ 196,398** | **$ 29,458** | **$ 46,883** | **$ 23,500** | **$ 157,212** | **$ 453,451** |
| **Total Payments to All Tracks** | **$ 10,282,365** | **$ 724,709** | **$ 8,237,088** | **$ 4,593,182** | **$ 4,031,323** | **$ 27,868,667** |

### NYS Regional Off-Track Betting Corporations

## Supplemental Information/Definitions

**Enterprise Fund**: Net revenue or loss from the corporations business enterprise. For Capital OTB the amount relates to the operation of a simulcast television channel. For Western OTB the amount relates to the operation of Batavia Downs Racetrack and Video Gaming Facility. For Nassau OTB & Suffolk OTB the amount relates to the operation of a Video Gaming Facility.

**Operating Expenses:**

**GASB 75:** Certain expense include amounts relating to the Government Accounting Standards Board Statement 75 (GASB 75). GASB 75 requires the recognition of Other Post Employment Benefits (OPEB). **GASB 68:** Reporting State and Local Governments for Pensions.

| Expense | Capital | Catskill | Nassau | Suffolk | Western | Total |
|---|---|---|---|---|---|---|
| Enterprise Fund | $ - | $ - | $ - | $ 6,562,469 | $ (4,008,710) | **$ 2,553,759** |
| Branch Expenses | - | - | 2,066,109 | 250,567 | (1,718,019) | **598,657** |
| General & Administrative | (12,488) | 24,943 | 652,455 | 2,022,316 | - | **2,687,226** |
| Total | **$ (12,488)** | **$ 24,943** | **$ 2,718,564** | **$ 8,835,352** | **$ (5,726,729)** | **$ 5,839,642** |

**Section 516 Net Revenue Available for Distribution:** Amounts available after payment of allowable expenses that must be distributed to participating localities on a quarterly basis.

**General Notes:**
Reference to "section" relates to sections within the New York State Racing, Pari-Mutuel Wagering and Breeding Law.

**Distributable Surcharge**

In addition to Section 516 Net Revenue, corporations are required to distribute surcharge levied on winning payoffs to participating and other localities on a monthly basis. The following is a summary of the surcharge available for distribution as of 12/31/2024 for each corporation.

| | Capital | Catskill | Nassau | Suffolk | Western | Total |
|---|---|---|---|---|---|---|
| Participating Localities | $ 546,014 | $ 91,954 | $ 924,169 | $ 414,545 | $ 538,969 | **$ 2,515,651** |
| Other Localities | 187,599 | 31,625 | 323,519 | 152,770 | 140,068 | **835,581** |
| Total Surcharge | **$ 733,613** | **$ 123,579** | **$ 1,247,688** | **$ 567,315** | **$ 679,037** | **$ 3,351,232** |

The above does not include surcharge retained by the corporation for corporate purposes or the capital acquisition fund.

Participating Localities are local governments within the Off-Track Betting Region that have elected to participate under Section 502 of the Racing, Pari-Mutuel Wagering and Breeding Law. Other Localities are local governments which have racetracks located within their borders and receive a portion of the surcharge.

## 2024 Nationwide Thoroughbred Purses

| State | Gross Purses | No. of Races | Average Purse | Race Days | Starters | Starts | Average Field | Average Starts Per Runner |
|---|---|---|---|---|---|---|---|---|
| **Kentucky** | 225,971,756 | 2,006 | $112,648 | 213 | 7,037 | 17,921 | 8.9 | 2.5 |
| **New York** | 179,287,437 | 2,530 | $70,865 | 281 | 5,000 | 18,716 | 7.4 | 3.7 |
| **California** | 148,994,822 | 2,644 | $56,352 | 375 | 4,393 | 18,589 | 7.0 | 4.2 |
| **Florida** | 123,358,500 | 2,738 | $45,054 | 286 | 6,215 | 21,522 | 7.9 | 3.5 |
| **Pennsylvania** | 83,044,758 | 2,823 | $29,417 | 332 | 4,586 | 20,535 | 7.3 | 4.5 |
| **Louisiana** | 74,325,840 | 2,382 | $31,203 | 285 | 4,850 | 18,937 | 8.0 | 3.9 |
| **Maryland** | 61,766,764 | 1,469 | $42,047 | 159 | 3,380 | 10,915 | 7.4 | 3.2 |
| **Ohio** | 60,543,900 | 2,365 | $25,600 | 294 | 3,304 | 15,255 | 6.5 | 4.6 |
| **Arkansas** | 58,241,840 | 651 | $89,465 | 67 | 2,346 | 6,010 | 9.2 | 2.6 |
| **West Virginia** | 42,162,775 | 2,286 | $18,444 | 285 | 3,578 | 16,644 | 7.3 | 4.7 |
| **Indiana** | 32,002,815 | 2665 | $12,009 | 115 | 2,665 | 7,602 | 7.8 | 2.9 |
| **Oklahoma** | 26,824,589 | 953 | $28,148 | 108 | 1,850 | 6,645 | 7.0 | 3.6 |
| **New Jersey** | 25,553,641 | 548 | $46,631 | 60 | 1,803 | 4,205 | 7.7 | 2.3 |
| **New Mexico** | 23,995,465 | 728 | $32,961 | 112 | 1,311 | 5,487 | 7.5 | 4.2 |

Data provided courtesy of The Jockey Club. This only includes races for pari-mutuel meets. Not all states are presented.

## 2024 Nationwide Harness Purses

| State | Gross Purses Paid | Purse Races | Avg. Purses | Race Cards | Starters | Earnings per Starter | Avg. Won by Trotter | Avg. Won by Pacer |
|---|---|---|---|---|---|---|---|---|
| New York | $110,936,110 | 9,048 | $12,261 | 845 | 5,050 | $21,908 | $22,305 | $21,730 |
| Ohio | $93,458,352 | 6,835 | $13,673 | 459 | 6,835 | $17,812 | $17,087 | $18,147 |
| Pennsylvania | $71,568,239 | 5,511 | $12,986 | 407 | 5,377 | $13,310 | $14,776 | $12,427 |
| New Jersey | $44,184,890 | 2,128 | $20,764 | 182 | 2,128 | $16,413 | $22,007 | $13,720 |
| Indiana | $34,013,725 | 2,126 | $15,999 | 164 | 2,165 | $15,711 | $18,852 | $13,988 |
| Kentucky | $32,863,648 | 1,087 | $30,233 | 92 | 1,668 | $19,403 | $21,549 | $17,780 |
| Delaware | $31,454,996 | 2,115 | $14,872 | 158 | 1,553 | $20,254 | $22,029 | $19,616 |
| Massachusetts | $18,761,416 | 1,145 | $16,386 | 115 | 913 | $20,549 | $21,942 | $19,904 |
| Maryland | $11,580,051 | 1,391 | $8,325 | 119 | 1,202 | $9,634 | $10,832 | $9,393 |
| Illinois | $6,795,540 | 605 | $11,232 | 54 | 878 | $7,740 | $10,341 | $6,789 |
| Minnesota | $6,340,958 | 560 | $11,323 | 54 | 504 | $12,581 | $16,563 | $11,252 |
| Maine | $5,830,211 | 1,018 | $5,727 | 100 | 692 | $8,425 | $10,081 | $8,085 |

Data provided courtesy of the United States Trotting Association. This only includes races for pari-mutuel meets. Not all states are presented.

## Office of Equine Medicine

**Scott E. Palmer, VMD**
**Equine Medical Director**

As New York State's Equine Medical Director, Scott E. Palmer, V.M.D., A.B.V.P., Equine Practice, is responsible for equine health, safety, and welfare at New York racetracks and advises the Gaming Commission on equine medication policies as well as the safety and condition of racetrack facilities and surfaces. He supervises all on-track regulatory veterinarians as well as the New York State Equine Drug Testing Program laboratory. He oversees equine testing procedures, ensures compliance with regulatory veterinary protocols, investigates incidents, and monitors the Gaming Commission's necropsy program.

Dr. Palmer also serves as an Adjunct Professor at Cornell University's College of Veterinary Medicine, where he is responsible for developing and coordinating continuing education programs for veterinarians and trainers related to medication and equine injuries. He coordinates research on equine sports medicine topics and collaborates with faculty on epidemiological studies to analyze equine safety issues. Since his graduation from the University of Pennsylvania School of Veterinary Medicine in 1976, Dr. Palmer has worked as a staff clinician at the New Jersey Equine Clinic, serving as the Hospital Director since 1997. He is a two-time recipient of the New Jersey Equine Practitioners Veterinarian of the Year award, as well as a recipient of the AAEP President's Award in 2009 and the AAEP Distinguished Service Award in 2010.

Dr. Palmer is board certified in equine practice by the American Board of Veterinary Practitioners. He has authored dozens of peer-reviewed publications and is a featured speaker at veterinary conferences worldwide. He is a member of several professional organizations and has held leadership positions in many, including the American Veterinary Medical Association, the American Association of Equine Practitioners, the American Board of Veterinary Practitioners, the New Jersey Veterinary Medical Association, and the New Jersey Association of Equine Practitioners.

Dr. Palmer chaired the New York Task Force on Racehorse Health and Safety, which produced a series of recommendations that dramatically improved equine health and safety in New York State and beyond. Dr. Palmer serves as a Board Member for the NTRA Safety and Integrity Alliance Advisory Board and the Thoroughbred Charities of America. He previously served on the ARCI Special Task Force on Medication and chaired the International Summit on Race Day Medication as well as the Ad-Hoc RMTC Committee on Race Day Security and served two terms as a member of the Grayson-Jockey Club Research Advisory Committee.

## Equine Drug Testing

Equine drug testing is mandated by Racing, Pari-Mutuel Wagering and Breeding Law Section 902. Thoroughbred drug testing is managed by the Horseracing Integrity & Welfare Unit (HIWU), the enforcement agency of the Horseracing Integrity and Safety Authority's Anti-Doping and Medication Control (ADMC) Program.

The Equine Drug Testing Program (EDTP) for harness racing in New York State is performed by Morrisville State College under contract with New York State.

When the EDTP detects and confirms the presence of a prohibited substance, the laboratory immediately informs the Division of Horse Racing and Pari-Mutuel Wagering staff and the Commission's General Counsel's office. Division staff will immediately inform the steward or presiding judge at the racetrack where the horse's sample originated, along with other appropriate Commission staff. An investigation into the matter is begun after the presiding judge identifies the horse and its trainer.

The presiding judge matches the sample identifying numbers to the previously locked documentation of collected samples. After identification, investigation into the circumstances, including interviews with involved parties, begins. The trainer is afforded the option of having a residual sample of the original, if available, tested at an approved laboratory of his or her choice at his or her expense. After the investigation is completed and all other information is gathered and studied, the licensee, if appropriate, is assessed a penalty by the presiding judge. The licensee may challenge the penalty through a hearing process. After receipt of the hearing officer's completed report, the Commission renders a decision.

A listing of commonly used medicines in the equine racing world is contained within the applicable rules. Also contained are the number of hours "out" (before race day) that these listed drugs may be administered. The only allowable medication on race day in New York is furosemide. Furosemide is permitted to be administered only to horses properly enrolled in a furosemide medication program.

## 2024 Pre/Post-Race Drug Summary Report

| Race Day Positives | |
|---|---|
| 5-OH flunixin | 2 |
| 7-OH mitragynine | 1 |
| acepromazine | 1 |
| altrenogest | 2 |
| asimilobine | 1 |
| clenbuterol* | 1 |
| cobalt | 1 |
| dexamethasone | 4 |
| flunixin | 3 |
| furosemide | 1 |
| glaucine | 1 |
| guaifenesin | 1 |
| HEPS | 1 |
| ibuprofen | 2 |
| isoflupredone | 1 |
| ketoprofen | 2 |
| liriodenine | 1 |
| medroxyprogesterone | 1 |
| medroxyprogesterone acetate | 3 |
| meloxicam | 1 |
| methocarbamol | 9 |
| methylprednisolone | 2 |
| mitragynine | 1 |
| peimine | 3 |
| peiminine | 3 |
| ranitidine | 1 |
| testosterone* | 1 |
| trazodone | 1 |
| **TOTAL** | **52** |

*Double blind

# Division of Lottery

The Division of Lottery is responsible for the administration of all traditional lottery games and operation of the New York Lottery. The Lottery's constitutional mission is to raise funds for New York Public Schools.

## Traditional Lottery Games

The New York Lottery offers players the chance to participate in various draw and scratch-off games through a network of licensed sales agents. Offerings include nine draw games as well as the introduction of new instant games each year. The wide variety of Lottery games offer different methods of play, ranges of jackpot prizes, and convenience aspects that make playing the games fun, easy, and exciting entertainment.

### MULTI-JURISDICTIONAL DRAW GAMES

**MEGA MILLIONS** is a multi-jurisdictional high-jackpot game in which the New York Lottery participates with 46 other U.S. lottery jurisdictions. Draws are held twice per week, every Tuesday and Friday. Mega Millions is also available by subscription. The largest advertised FY24-25 Mega Millions jackpot was $1.22 Billion.

**POWERBALL** is a multi-jurisdictional high jackpot game in which the New York Lottery participates with 47 other U.S. lottery jurisdictions. Draws are held three times per week, every Monday, Wednesday and Saturday. The largest advertised FY24-25 Powerball jackpot was $1.326 Billion.

**CASH4LIFE** is a multi-jurisdictional "for life" game in which New York Lottery participates with 9 other U.S. lottery jurisdictions. Draws are held nightly.

### NEW YORK DRAW GAMES

**LOTTO** is a jackpot game. Draws are held twice per week, every Wednesday and Saturday. Lotto is also available by subscription. The largest advertised FY24-25 Lotto jackpot was $16.3 Million.

**PICK 10** is a daily draw game with a chance to win up to $500,000.

**TAKE 5** is a pari-mutuel game drawn twice daily. An add-on Instant Win feature allows players to win instantly.

**NUMBERS and WIN 4** are lower top prize New York daily games, drawn twice daily. An add-on Instant Win feature allows players to win instantly.

**QUICK DRAW and MONEY DOTS** Quick Draw is a social game with draws held every four minutes 23.5 hours a day. Quick Draw has 2 additional features, Extra and Money Dots, that are drawn after Quick Draw winning numbers have been drawn.

### SCRATCH-OFF GAMES

Scratch-off games are played by scratching a covering from pre-printed tickets to reveal prizes. There are many themes and price points available with up to 75 games for sale at any given time in FY24-25.

## Lottery Sales Agents

The Division's network of nearly 14,000 licensed sales agents bring Lottery games to New Yorkers 18 years of age or older across the State. Sales agents earn 6% commission on Lottery sales.

# Fiscal Year 2024-2025 Year-End Review

Gaming Commission

The New York State Gaming Commission Division of Lottery and Video Lottery Gaming operations finished fiscal year 2024-25 with $10.3 billion in combined sales and net win, and Aid to Education of $3.6 billion for New York K – 12 public schools.

## LEADING THE NATION IN AID TO EDUCATION




*Includes a one-time Lottery Aid Guarantee transfer in the amount of $692.8 million to offset Covid-19 related revenue decline.

## FUNDS RAISED BY GAME/VIDEO LOTTERY FACILITY

### Jackpot Games

**New York Mega Millions**
Total Sales: $358,368,853
Education Aid: $145,080,155

**New York Powerball**
Total Sales: $327,836,044
Education Aid: $132,719,414

**New York Lottery Cash 4 Life**
Total Sales: $110,062,930
Education Aid: $44,557,296

**New York Lotto**
Total Sales: $53,574,614
Education Aid: $27,046,325

### Daily Games

**Numbers**
Total Sales: $883,965,859
Education Aid: $446,256,659

**Win 4**
Total Sales: $947,646,514
Education Aid: $478,404,865

**Take 5**
Total Sales: $192,650,994
Education Aid: $97,256,911

**New York Pick 10**
Total Sales: $32,395,144
Education Aid: $16,354,194

**Quick Draw**
Total Sales: $565,744,623
Education Aid: $172,458,605

### Scratch-Off Games

**New York Lottery Scratch-Off Games**
Total Sales: $4,339,794,048
Education Aid: $937,855,210

### Video Gaming Facilities

**Batavia Downs Gaming**
Net Win: $89,750,949
Education Aid: $36,539,115

**Empire City Casino**
Net Win: $607,456,935
Education Aid: $317,163,446

**Finger Lakes Gaming**
Net Win: $123,547,213
Education Aid: $47,333,249

**Hamburg Gaming**
Net Win: $76,599,337
Education Aid: $27,354,907

**Jake's 58 Casino Hotel**
Net Win: $300,422,288
Education Aid: $140,332,286

**Nassau OTB**
Net Win: $284,367,064
Education Aid: $132,832,621

**Resorts World Hudson Valley**
Net Win: $86,472,711
Education Aid: $22,674,687

**Resorts World New York**
Net Win: $692,413,386
Education Aid: $288,817,228

**Saratoga Casino Hotel**
Net Win: $148,568,517
Education Aid: $64,058,405

**Vernon Downs Casino Hotel**
Net Win: $33,933,411
Education Aid: $9,395,514

## WHERE DO LOTTERY DOLLARS GO?

**108** prizes of $1,000,000 or more were awarded in FY 2024-2025

Total New York Lottery Sales & VLT Net Win: **$10.3 Billion** - Aid to Education: **$3.6 Billion**

### Traditional Lottery (FY 2024-2025)

**$7.81 Billion in Sales**




### Video Lottery Gaming (FY 2024-2025)

**$2.44 Billion in Video Gaming Net Win**

| Video Gaming Net Win | |
|---|---|
| Credits Played | $40.98 Billion |
| Credits Won | $38.54 Billion |
| Net Win | $2.44 Billion |




* Includes $46 million in Fantasy Sports Aid to Education.

## LOTTERY AID TO EDUCATION BY COUNTY (FY 2024-2025)




| | | | | | |
|---|---|---|---|---|---|
| Albany | $60,687,854.68 | Jefferson | $33,570,151.69 | | |
| Allegany | $13,723,194.94 | Lewis | $7,783,091.79 | | |
| Broome | $51,624,220.34 | Livingston | $13,397,657.90 | | |
| Cattaraugus | $25,503,521.38 | Madison | $16,803,031.75 | | |
| Cayuga | $16,179,528.24 | Monroe | $199,870,774.00 | | |
| Chautauqua | $37,134,245.92 | Montgomery | $15,657,685.54 | Schenectady | $42,122,819.24 |
| Chemung | $21,680,053.76 | Nassau | $250,170,564.60 | Schoharie | $6,463,565.28 |
| Chenango | $15,837,513.40 | New York City* | $1,427,185,199.94 | Schuyler | $2,934,421.56 |
| Clinton | $20,925,014.02 | Niagara | $53,108,869.36 | Seneca | $7,140,353.53 |
| Columbia | $5,961,785.64 | Oneida | $69,730,905.98 | Steuben | $28,098,392.35 |
| Cortland | $11,545,121.14 | Onondaga | $129,763,289.87 | Suffolk | $314,384,515.63 |
| Delaware | $7,776,658.35 | Ontario | $25,266,757.39 | Sullivan | $15,419,351.94 |
| Dutchess | $54,202,913.15 | Orange | $110,650,619.26 | Tioga | $14,679,031.46 |
| Erie | $223,272,414.81 | Orleans | $11,717,435.30 | Tompkins | $14,004,528.95 |
| Essex | $3,968,238.88 | Oswego | $37,698,742.84 | Ulster | $30,828,025.65 |
| Franklin | $13,597,565.51 | Otsego | $11,361,830.31 | Warren | $10,513,831.42 |
| Fulton | $13,667,273.13 | Putnam | $16,632,962.21 | Washington | $15,683,563.33 |
| Genesee | $14,872,765.84 | Rensselaer | $35,396,456.02 | Wayne | $26,172,879.19 |
| Greene | $6,804,050.29 | Rockland | $53,707,912.07 | Westchester | $136,234,133.50 |
| Hamilton | $119,343.81 | St. Lawrence | $30,354,530.19 | Wyoming | $7,126,711.07 |
| Herkimer | $18,293,712.88 | Saratoga | $41,988,718.51 | Yates | $1,979,692.52 |

The above amounts are based on the New York State Education Department's Division of Aid to Localities for Education from the State Lottery Fund as required by law. For a complete listing visit nylottery.ny.gov.

Lottery revenue is distributed to local school districts by the same statutory formula used to distribute other state aid to education. It takes into account both a school district's size and its income level; larger, lower-income school districts receive proportionately larger shares of Lottery school funding.

*Includes Bronx, Kings, New York, Queens and Richmond Counties.

## Minority- and Women-Owned Businesses

Pursuant to Article 15-A of the Executive Law and Parts 140 through 144 of Title 5 of the New York Codes, Rules and Regulations concerning Minority- and Women-Owned Business Enterprises (MWBE) and Article 3 of the Veterans' Services Law for Service-Disabled-Veteran-Owned Businesses (SDVOB); the Commission is eager to promote and encourage the enhancing of economic opportunities for MWBE and SDVOB firms. The Commission's goal for MWBE procurement is 30%, and the goal for SDVOB procurement is 6%. The Commission reached a 31.59% goal for MWBE and a 16.72% goal for SDVOB.

Commission regulations (9 NYCRR § 5311) also require commercial casinos to develop a utilization plan and quarterly reporting while tasking the Commission with monitoring the effectiveness of such plans. The Commission established the Contract Compliance Office to help MWBE's and SDVOB's find contract opportunities, as well as assist in setting these goals in our agency contracts. The Office also provides guidance and assistance to the commercial casinos to find opportunities for MWBE's..

| MWBE FY2024-25 | TOTAL MWBE'S | TOTAL $ |
|---|---|---|
| Gaming Commission | 64 | $44,826,263 |
| Commercial Gaming | 3 | $656,222.68 |
| TOTAL | 67 | **$45,482,485.68** |

| SDVOB's FY2024-25 | TOTAL MWBE'S | TOTAL $ |
|---|---|---|
| Gaming Commission | 8 | $8,092,823,70 |
| TOTAL | 8 | **$8,092,823,70** |

## Bureau of Licensing

New York State requires the majority of operators, agents and employees associated with in-state horse racing; traditional and video lottery gaming; commercial gaming; and sports wagering activities to be licensed. The Commission's Licensing Bureau reviews every application before a license is issued. By statute, fingerprinting is required of each applicant. Where it is believed that an applicant's background or licensee's conduct may warrant a finding that the applicant's actions would be inconsistent with the public interest or the best interest of New York's gaming operations, a thorough investigation is conducted before action is taken in the form of a license denial, suspension, or revocation.

**2024 Horse Racing and Pari-Mutuel Wagering Licenses Granted**

| Occupation | Harness | Thoroughbred | Total |
|---|---|---|---|
| APPRENTICE FARRIER | | 3 | 3 |
| APPRENTICE JOCKEY | | 15 | 15 |
| ASST. TRAINER | | 118 | 118 |
| AUTHORIZED AGENT | | 59 | 59 |
| CLEAN SERVICE | 76 | 36 | 112 |
| DRIVER | 54 | | 54 |
| EXERCISE RIDER | | 342 | 342 |
| FARRIER | 15 | 31 | 46 |
| FOOD SERVICE | 55 | 41 | 96 |
| GAP ATTENDANT | | 1 | 1 |
| GENERAL SERVICES | 260 | 400 | 660 |
| GROOM | 808 | 1,275 | 2,083 |
| GS - EMT | 48 | 63 | 111 |
| GS - FOOD SERVICE | | 2 | 2 |
| GS - JOCKEY ROOM | | 15 | 15 |

| Occupation | Harness | Thoroughbred | Total |
|---|---|---|---|
| GS - RACE DEPT. | 3 | 8 | 11 |
| GS - TOTE | 3 | 19 | 22 |
| GS - TV CREW | 28 | 61 | 89 |
| GS- ADMISSIONS | | 8 | 8 |
| GS- EQUINE DENTIST | 7 | 5 | 12 |
| GS- EQUINE THERAPY | 1 | 6 | 7 |
| GS- HORSE TRANSPORTER | 3 | 25 | 28 |
| GS- MAINTENANCE | 49 | 87 | 136 |
| GS- PARKING | 10 | 11 | 21 |
| GS- SURVEILLANCE | 3 | 2 | 5 |
| GS- VENDOR: MISC. | 25 | 35 | 60 |
| GS- VENDOR: PHARM SALES | 1 | 5 | 6 |
| GS- VET ASST. | 5 | 18 | 23 |
| GS- VET TECH | 2 | 1 | 3 |
| JOCKEY | | 108 | 108 |
| JOCKEY AGENT | | 20 | 20 |
| MUTUEL CLERK | 60 | 281 | 341 |
| ORIG. OWNER OPEN CLAIM | 1 | | 1 |
| OWNER ORIGINAL | 290 | 791 | 1,081 |
| OWNER RENEWAL | 1,090 | 2,397 | 3,487 |
| PEACE OFFICER | 41 | 86 | 127 |
| PRIVATE TRAINER | | 4 | 4 |
| PROVISIONAL DRIVER | 27 | | 27 |
| Qualifier Driver | 5 | | 5 |
| RACING OFFICIAL | | 45 | 45 |
| SECURITY | 134 | 121 | 255 |
| STABLE EMPLOYEE | 1 | 1,016 | 1,017 |
| TEMP ORIGINAL OWNER | | | |
| TOTE EMPLOYEE | 387 | 401 | 788 |
| TOTE OFFICER | 22 | 22 | 44 |
| TOTE OTB | 4 | 2 | 6 |
| TRACK MGT. | 56 | 18 | 74 |
| TRAINER | 143 | 149 | 292 |
| VETERINARIAN | 21 | 26 | 47 |
| DUAL LICENSES | 471 | 201 | 672 |
| **TOTALS** | **4,209** | **8,380** | **12,589** |

### 2024 Indian Gaming Certifications Issued

| License Type | Oneida | Seneca | Mohawk |
|---|---|---|---|
| Non-Gaming | 563 | 185 | 0 |
| Gaming | 548 | 394 | 0 |
| Key Gaming | 20 | 48 | 0 |
| Non-Key | 0 | 0 | 118 |

### 2024 Commercial Casino Licenses Granted

| License Type | Number |
|---|---|
| Non-Gaming | 415 |
| Gaming | 404 |
| Key | 64 |

### 2024 Video Lottery Licenses Issued

| License Type | Number |
|---|---|
| Service/Gaming level | 903 |
| Key level | 256 |

### 2024 Lottery Licenses Issued

| License Type | Number |
|---|---|
| New Retailer | 927 |

### 2024 Charitable Gaming Licenses Issued

| License Type | Number |
|---|---|
| Suppliers | 29 |
| Manufacturers | 22 |

### Commercial Casino Enterprise (Including Mobile Sports)

| License Type | Number |
|---|---|
| Non-Gaming | 97 |
| Gaming | 322 |
| Key | 100 |
| Entities (gaming & non-gaming) | 83 |

### Indian Gaming Enterprise Certifications

| License Type | Number |
|---|---|
| Key | 34 |
| Gaming | 181 |

### Video Lottery Enterprise

| License Type | Number |
|---|---|
| Key | 44 |
| Gaming, Non-Gaming | 307 |
| Entities (Gaming only) | 14 |

## Responsible Gaming

The Commission is a founding member of New York's Responsible Play Partnership (RPP), which also includes the New York State Office of Addiction Services and Supports (OASAS) and the New York Council on Problem Gambling. The goal of the partnership is to address the issues surrounding problem gambling, promote responsible gaming practices, and ensure help is available for those who need it. For gaming venues, this includes undertaking proper outreach measures in addition to ensuring compliance with all rules and regulations. For the Commission, this includes incorporating global responsible gaming best practices into the daily operations of all Divisions and committing to continuous improvement in all fundamental areas, including problem gambling/underage play prevention, voluntary self-exclusion and responsible play/gifting/sales messaging. The Commission is charged with developing and distributing problem gambling/responsible gaming messaging on a regular basis to all New Yorkers.

### Self-Exclusion Enhancements

In November, New York State's all-inclusive Voluntary Self-Exclusion program was enhanced with a HOPELine Opt-In Function, where an individual who self-excludes from gaming opportunities in New York State may opt-in to being contacted by a trained HOPEline operator. The HOPEline is administered by the NYS Office of Addictions Services and Supports (OASAS).

### Gaming Employee Responsible Gaming Training

The Commission contributed and assisted in the rollout of the New York Council on Problem Gambling's comprehensive training to educate those who work in New York State's gaming industry on best practices to promote responsible gaming. The employee training program identifies the symptoms, evidence and warning signs of problem gambling behavior, and how to interact with individuals who may be in crisis. The training also includes an overview of the applicable statutes and regulations, as well as findings from OASAS research.

### Demographic Data

To better inform the statutorily required annual report co-authored by the Gaming Commission and NYS Office of Addiction Services and Supports which details "the impact of mobile sports wagering on problem gamblers in New York, including, to

the extent practicable, an analysis of demographics which are disproportionately impacted by the problem gambling," the Commission promulgated regulations requiring sports wagering operators to report specific data to the Commission each year, including: Total amount wagered and number of bets placed; Total amount and number of bets won; Total amount wagered on each sport; Total number of accounts, including new accounts created and average account balances; and the total number of accounts permanently closed and the number of self-exclusions.

### "Small Risk & Big Gamble" Campaign

The Commission's "Small Risk & Big Gamble" campaign, produced by the New York Lottery's advertising partner McCann NY, took home three of the four responsible gaming award categories at the North American Association of State and Provincial Lotteries' (NASPL) 2024 Batchy awards. The Commission's campaign also won the National Council on Problem Gambling's annual Gift Responsibly Campaign Award in July.

### Language Access

The Request for Statewide Voluntary Self-Exclusion (VSE) vital document was translated into the top 12 languages spoken by New Yorkers who don't speak English as their primary language.

## Rulemaking

The Commission's Office of Counsel provides legal advice to ensure compliance with legal requirements and to reduce exposure to legal risks and liabilities. The Office represents the Commission as legal counsel in governmental and judicial proceedings and advocating and defending its interests in those proceedings. In addition, the Office of Counsel manages the Commission's rulemaking activities across all Divisions.

### Rules adopted in 2024:

| SGC # | Name of Rule | ADDOPTED at GC Meeting | NYS Register Effective Date |
|---|---|---|---|
| SGC-52-23-00014-P | Lottery prize payments and subscriptions amendments | March 25 | April 10 |
| SGC-06-24-00003-P | Pick-five wagering amendments in Thoroughbred racing | May 20 | June 5 |
| SGC-06-24-00002-P | Pick-four wagering amendments | May 20 | June 5 |
| SGC-06-24-00004-P | Thoroughbred claiming rules amendments | June 24 | July 10 |
| SGC-15-24-00011-P | Commission address | June 24 | July 10 |
| SGC-25-24-00003-P | Whip use in harness racing | Sept 23 | Oct 9 |

### Explanation of 2024 Rulemaking

**SGC-52-23-00014-P — Lottery prize payments and subscriptions amendments.** The Commission adopted rules to: change the manner in which "for life" prizes are paid to group claims, claims by entities and claims on behalf of minors under the age of 18, to create uniformity across the "for life" games; limit the Lottery subscription program to individuals only; make explicit that a subscription is void if payment for the ticket is rejected for non-sufficient funds; reserve authority to suspend a subscription in the event of suspicious transactions; require prizes of exactly $600 to be presented directly to the Commission for payment; codify existing practice of allowing a claimant to direct payment to a bank account; allow delivery of a prize by means other than the United States Postal Service; add a reference to the statutory offset for past-due State tax liabilities; and make technical stylistic edits to sections relating to prize payments and subscriptions.

**SGC-06-24-00003-P — Pick-five wagering amendments in Thoroughbred racing.** The Commission adopted rules to allow each Thoroughbred racetrack the option of offering a consolation payout for pick-five wagers.

**SGC-06-24-00002-P — Pick-four wagering amendments.** The Commission adopted rules in regard to consolation pools and carryovers in Thoroughbred and harness racing pick-four wagers.

**SGC-06-24-00004-P — Thoroughbred claiming rules amendments.** The Commission adopted rules to: allow claims by claimants who have raced on a circuit within 120 days; allow 30 additional days for holders of a certificate of eligibility to claim, when the owner has lost an opportunity to claim within the first 30 days of a race meeting; reduce the waiting period to run a claimed horse in the same value class; and extend the prohibition to run a claimed horse outside of New York.

**SGC-15-24-00011-P — Commission address.** The Commission adopted a consensus rulemaking to update the agency address in various rules.

**SGC-25-24-00003-P — Whip use in harness racing.** The Commission adopted amended rules governing the use of whips in harness racing, including kick violations and amended penalty structures.

# Exhibit 2

# CA tribes want court to stop Kalshi calling its product sports betting

By **Jessica Welman** - September 9, 2025



*Image: Shutterstock*

The group of **California** tribes suing **Kalshi** in **California Northern District Court** have more requests for the judge.

In addition to suing **Kalshi** and **Robinhood** for offering what they claim is illegal sports betting in the state, the tribes are also seeking an injunction to muzzle some of Kalshi's efforts in the meantime.

The injunction seeks two things. Firstly, the tribes want the court to order Kalshi to stop offering sports-related event contracts on tribal lands. Secondly, it wants the court to prohibit Kalshi from advertising its product as "legal in all 50 states" on a national level.

## Injunction wants Kalshi sports contracts off tribal lands

As the tribes argued in the initial complaint, the injunction claims that Kalshi's sports contracts qualify as class III gaming and are in violation of the **Indian Gaming Regulatory Act** (IGRA) if offered on tribal lands.

The injunction seeks to stop Kalshi from offering contracts related to sports. The request asks the court to prohibit event contracts involving these two questions and any related iterations on these questions:

- “Will <team> win <title>?”
- “Will <team> win <event>?”

The other element of the injunction takes issue with Kalshi’s aggressive advertising campaign, which the tribes claim is in violation of the **Lanham Act**, a federal law that includes false advertising.

The Kalshi advertising campaign not only highlights the nationwide availability of the product but has repeatedly touted what it offers as sports betting.




## Tribes say Kalshi is guilty of false advertising

The tribes argued that Kalshi’s marketing push is deliberately confusing and misleading. They also contend it is unequivocally false advertising to present its offering as sports betting that is legal and available across the country.

“These statements are not susceptible to more than one reasonable interpretation; the only reasonable interpretation is that Kalshi offers ‘sports betting’ and that sports betting is ‘legal in all 50 states.’ These statements are literally false,” the brief argued.

The filing also called out an advertisement that mentioned **March Madness** betting as something that high schoolers did, which the tribes noted would not be legal in any jurisdiction considering most high schoolers are under the age of 18.

In court, Kalshi has repeatedly argued that what it is offering is not something that should be covered by gaming regulators, as they are financial contracts covered by the **Commodity Exchange Act** (CEA) and the **Commodity Futures Trading Commission** (CFTC).

Counsel for Kalshi has also stated publicly that the fact that it has not been presenting those contracts in odds format differentiates them from sports betting as well.

However, in the marketing campaign, Kalshi is very clearly positioning itself as a venue to wager on sports, which remain some of the most popular types of contracts the company offers.

The group traded over $400 million in contracts during the first week of NFL action, the vast majority of which was on sports. That pales in comparison to the combined handle of regulated sportsbooks, although sports betting handle and trading volume are not the same metric.

The tribes are set to appear in court on Oct. 9 in regards to the injunction.

## No posts to display

# Exhibit 3

# The Closing Bell: Kalshi Is Using NFL And College Logos To Advertise Sports Betting

Prediction markets roundup: A look back at the Underdog-Crypto.com deal; Kalshi launches touchdown props and a sports parlay; updates from three Kalshi court cases; CFTC and SEC talk event contracts.



DUSTIN GOUKER
SEP 05, 2025

1 1 Share

The start of football season is unquestionably a key time for Kalshi, much like it is at sportsbooks. The prediction market has been leaning into sports betting, with 90% of all trading volume this week likely to come from sports.

Type your email... Subscribe

So, naturally, Kalshi is promoting that in a lot of places, including paid promotion on social media. Interestingly, it's using team logos and player images on ads on Facebook.

Kalshi

**Kalshi - Trade the Headlines**
Sponsored

Bet on football legally with Kalshi.




Kalshi: Trade the Future

Install Now

Kalshi

**Kalshi - Trade the Headlines**
Sponsored

Bet on football legally with Kalshi.




Kalshi: Trade the Future

Install Now

Kalshi Kalshi - Trade the Headlines
Sponsored
Library ID: 2276479232786284

•••

Bet on football legally with Kalshi.



In the macro, Kalshi wants pro leagues and players associations (and the NCAA) to buy into prediction markets as good, legal, etc. I am not sure using trademarks and player images for paid promotion of sports betting is going to be the means to that end.

A few quick asides on these ads:

- Yes, Kalshi is still using betting terminology.
- Kalshi is inexplicably using rugby fields in NFL ads:




Type your email... Subscribe

## This week at The Event Horizon and The Closing Line

ICYMI; if you read all of this, skip to the roundup!

- **Outgoing CFTC Commissioner: 'Too Few Guardrails' On Prediction Markets**
- **Polymarket CEO Says CFTC Just Gave Green Light For US Return**
- **Kalshi Posts Highest Volume Since 2024 Election As College Football Begins**
- **Webull Launching Football Betting Markets Via Kalshi Partnership**
- **Sports Prediction Markets Are Moving Faster Than Anyone Thought**
- **Episode 33: I Don't Really Hate Prediction Markets**
- **The Takeaway: Prediction Markets Will Be The New Source Of Problem Gambling**
- **The Current: Kalshi Could Launch Prebuilt Parlays For Sports As Soon As Tomorrow**

## The roundup

- **Underdog gets into prediction markets:** There was a lot of news this week, but I think the biggest was the deal between Underdog and Crypto.com. You can now bet on who will win games at Underdog in 16 states, including California and Texas.
  - It's the first time someone from the sports/betting/fantasy segment has gotten into the prediction markets space. (FanDuel technically did a deal first, but they aren't live and likely aren't doing sports at the start.)
  - While I understand some people want everyone to sit on the sidelines, ceding the entire market to Kalshi and Polymarket while everyone waits for this to play out in the courts is a terrible idea. Someone has to provide competition.
  - And Underdog getting into this is arguably… good in the macro? Did I just say that? While they don't call it "gambling," everyone understands that what they are doing at Underdog is gambling, and the company is not going to gaslight us into thinking it's not gambling. They also actually have real responsible gambling tools. Sports betting via prediction markets — since they aren't going away in the short term — needs to live in a gambling space, whether that comes from existing PMs changing how they operate or via external partnerships like this one. That dovetails with the ideas in this excellent Substack:

  - **The Worst Thing Since Sliced Bread (Man of the Vig Substack):** "In a class of its own is Kalshi, who has expanded its 'we invented sports, gambling, and the internet' campaign to include bizarre half-endorsements of market manipulation. In inducing participation in derivative markets and capturing benefits from such flow via internal market making exchanges are, in all practical aspects, a sportsbook. … ***Should we put a roulette table in the bank?*** I have some friends that would open an account overnight, but common sense tells most sane Americans that we should not, in fact, open a roulette table in the bank. Further to that point, to the extent there was a roulette table in the bank, it would be morally objectionable for the bank to cross-sell roulette spins when a consumer walks in to open a high-yield savings account. With that context in mind, consider for a moment your investment advisor called with a reallocation opportunity – for a low fee you are able to gain access to the highly liquid Alabama moneyline ~~fund~~ contract. Do you want to invest? As asinine and objectionable as both scenarios sound, this is the world we find ourselves in. A retail user at the moment can open their Robinhood account, which as a brokerage plausibly stores a material portion of their net worth, and be cross-sold sports gambling alongside investment in traditional asset classes."

- Soon after Tuesday's announcement, Underdog also shipped a prediction market-fantasy parlay mashup. It lets you place a bet on a team to win or lose, and combine that with a fantasy parlay on player statistics. It's not a wild divergence from Underdog's current product, but it does make the offering more like the parlay experience at a sportsbook with more than just player props. The logistics are such that Underdog is never technically handling the money that comes from the prediction market bet. Here's what the selection screen looks like at Underdog for last night's game:


9:41
Search
$100 +
Featured
NFL
MLB
WNBA
NFL Games
DAL
0–0
Thu, 8:20pm
61° • NBC •
PHI
0–0
Cowboys to win
+300
@
Eagles to win
-400
Popular picks
S. BARKLEY
117.6K picks
96.5
Rushing yards
DAL @ PHI • 8:20pm
Higher
Lower
D. PRESCOTT
66.2K picks
246.5
Passing yards
DAL @ PHI • 8:20pm
Higher
Lower




- Can we take a moment to appreciate how many hoops people are jumping through to try to offer sports betting outside the state-regulated sports betting frameworks? Like this whole thing is kind of genius but also makes you realize how ineffective prohibitions are. Underdog is mostly serving this to states that don't have sports betting currently.
- More on Underdog from a logistics standpoint from Fifty-Cent Dollars:

> 50¢ Dollars
>
> **Underdog's novel regulatory maneuver lets them deliver Same Game Parlays to 16 new states**
>
> On Tuesday, Underdog and Crypto.com made waves by announcing a significant partnership. Jeremy was on TV and everything…
>
> Read more
>
> 2 months ago · 2 likes · Adhi Rajaprabhakaran

- **CFTC, SEC talk events contracts:** The CFTC published a joint statement from the Chairman of the SEC and Acting Chairman of the CFTC on Friday. In it was this section about "Event Contracts":

- "Prediction markets, while they have existed around the world for decades, are undergoing rapid growth with growing demand from both market operators and the public. We should work together to provide clarity for innovators that want to list event contracts on prediction markets responsibly, including those based on securities. The SEC and CFTC should examine opportunities to collaborate to consider where event contracts may be made available to U.S. market participants regardless of where the jurisdictional lines fall."
- What exactly does this mean for prediction markets? We'll see, but it's certainly not bad for them.




- **Kalshi volume for NFL opener:** I have been tracking the volume at Kalshi as the football season started. Last night was the kickoff game between the Philadelphia Eagles and the Dallas Cowboys (Go Birds). What did we see Thursday?
  - $52.4 million in trading volume across all markets
  - 84% of volume was sports.
  - 38% of all trading on Eagles-Cowboys moneyline

| | | |
|---|---|---|
| Sports | $43,774,698 Volume | 83.5% Abs % |
| Football | $24,432,946 | 46.6% |
| NFL Games | $21,682,489 | 41.4% |
| KXNFLGAME-25SEP04DALPHI | $20,105,745 | 38.3% |

- Sports is 88% of all trading over the trailing seven days

| | | |
|---|---|---|
| Sports | $317,977,614 Volume | 88.1% Abs % |
| Economy | $29,434,554 Volume | 8.2% Abs % |
| Politics | $7,965,334 Volume | 2.2% Abs % |
| Entertainment | $4,832,060 Volume | 1.3% Abs % |
| Uncategorized | $653,472 Volume | 0.2% Abs % |

- **Kalshi expands the sports betting product:** First, it was point spreads and point totals last week. Now we have touchdown props and parlays. More from *InGame* here and here.
  - Kalshi also rolled out a new setting that replicates the “6 box” treatment that is the bread and butter of sportsbooks:

| College Football | Moneyline | Spread | Total |
|---|---|---|---|
| James Madison | +529 | +14.5 -111 | O 55.5 -116 |
| Louisville | -725 | -14.5 -115 | U 55.5 -121 |

Sep 5 @ 7:00pm EDT

| College Football | Moneyline | Spread | Total |
|---|---|---|---|
| Northern Illinois | +625 | +16.5 -126 | O 45.5 -226 |
| Maryland | -793 | -16.5 -126 | U 45.5 -226 |

Sep 5 @ 7:30pm EDT

| Pro Football | Moneyline | Spread | Total |
|---|---|---|---|
| Kansas City | -175 | -3.5 +105 | O 47.5 -107 |
| Los Angeles C | +145 | +3.5 -126 | U 47.5 -121 |

Sep 5 @ 8:00pm EDT

| College Football | Moneyline | Spread | Total |
|---|---|---|---|
| Iowa | +139 | +3.5 -136 | O 41.5 -113 |
| Iowa St. 16 | -175 | -3.5 -131 | U 41.5 -122 |

Sep 6 @ 12:00pm EDT

- You have to go into settings to get this UI, and it also appears to be live only on the site, not the app. But this is light years better than Kalshi's current UI/UX for sports.
- I love how Kalshi insists it's not a sportsbook while just copying sportsbooks. Amazing stuff.

- I remember a few months ago when people were still saying the prediction market product would have a hard time replicating what sportsbooks do. It’s still not there, but it’s a lot closer today.

- **Legal updates:** There were developments in several of the ongoing court cases involving Kalshi and the legality of prediction markets; I’ll rely heavily on attorney Andrew Kim on Twitter:
  - **California:** The three tribes suing Kalshi to stop them from offering sports betting on their lands asked for a preliminary injunction. Will they be able to get one? More from Kim on Twitter (click through for all his thoughts on this):
    - *I'm skeptical about whether they'll get a preliminary injunction. First, in order to get a preliminary injunction, you need to show likelihood of success on the merits. The Tribes' IGRA claim is novel, to say the least. Their theory is that Kalshi's contracts are, by rule (40.11), contrary to the public interest, and thus, Class III gaming. I don't really see how you get from here (contracts violate 40.11) to there (Class III gaming activity). I think there are serious questions about whether "contracts involving gaming" constitute "forms of gaming" under IGRA. But by no means is that proposition self-evident.*
    - Full motion:

      **Ntc Of Mtn Mpas Iso Pi**
      401KB · PDF file
      Download

      Download

  - **Nevada:** The judge in Kalshi vs. Nevada denied Kalshi’s motion to stay discovery in the case. More from Kim:
    - *Magistrate Judge Weksler denied Kalshi's motion to stay discovery in Nevada. Kalshi moved for **early** summary judgment and argued that discovery (fact development) was not necessary, or that any evidence out there would support Kalshi's arguments. Judge Weksler said, "not so fast." For one, she doesn't think that Nevada needs to accept Kalshi at its word that its contracts have economic consequences.The same for Kalshi's assertion that there's a conflict between state gaming laws and CFTC*

*requirements—Judge Weksler thinks that Nevada should be able to probe that issue, too*

- **New Jersey**: Per Kim: "The panel for next week's Third Circuit argument in Kalshi v. New Jersey will be Chief Judge Chagares, Judge David Porter, and Senior Judge Jane Roth."
  - Oral argument is set for Sept. 10 at 9:30 am.

Thanks for reading Event Horizon! Subscribe for free to receive new posts and support my work.

Type your email... Subscribe



1 Like · 1 Restack

## Discussion about this post

Comments Restacks

Write a comment...

© 2025 Dustin Gouker · Privacy · Terms · Collection notice
Substack is the home for great culture

# Exhibit 4

The New York Times https://www.nytimes.com/2025/10/10/business/dealbook/kalshi-prediction-market-fundraising.html

# *Kalshi, a Prediction Market, Raises Funds and Expands Overseas*

The fund-raising round comes as online prediction marketplaces gain mainstream prominence.

Listen to this article · 3:21 min Learn more



**By Michael J. de la Merced**

Oct. 10, 2025

**The DealBook Newsletter** Our columnist Andrew Ross Sorkin and his Times colleagues help you make sense of major business and policy headlines — and the power-brokers who shape them. Get it sent to your inbox.

Online prediction markets have jumped into the mainstream, as users flock to sites to bet on politics, sports, the next pope and more. That growth has drawn interest from investors.

Kalshi, one of the most prominent prediction markets, plans to announce on Friday that it has raised more than $300 million in a new round of financing at a valuation of $5 billion. The company also plans to disclose that it will start letting customers in more than 140 countries place bets on its website.

The fund-raising announcement, in the same week that Polymarket, Kalshi's chief rival, said the parent of the New York Stock Exchange would invest up to $2 billion, underscores how big a business prediction markets have become.

Kalshi is on track for $50 billion in trading volume on an annualized basis, a big jump from the roughly $300 million it recorded last year.

Last month, Kalshi overtook Polymarket to become the biggest player in the prediction-market industry, with a global market share of prediction-market activity of more than 60 percent, according to the data provider Dune.

“We have not expected this level of growth,” Tarek Mansour, a Kalshi co-founder and its chief executive, said in an interview.

That rapid expansion drew the attention of venture capital firms, including Sequoia Capital — which first backed the company in 2020 — and Andreessen Horowitz, a new investor. Despite closing its previous investment round in June, Kalshi negotiated the new fund-raising effort, which more than doubled its valuation, in August.

Other investors in the round include Paradigm, CapitalG and Coinbase Ventures.

Kalshi’s recent growth has been powered by sports, especially after it began offering the kind of complex wagers known as parlays. Its push into sports has rattled the traditional sportsbooks, with the shares of DraftKings and the parent of FanDuel falling by double-digit percentages over the past month.

Kalshi has also benefited from a series of deals that allow customers of brokerages like Robinhood and Webull to bet on contracts directly from those sites, as easily as they can buy stocks.

Until now, Kalshi operated only in the United States. Polymarket, on the other hand, was barred from letting Americans participate on its platform in 2022 and only recently resumed doing business in the country. Donald Trump Jr., President Trump’s eldest son, is an adviser to both companies, joining Kalshi in January and Polymarket in August.

In May, the U.S. Commodity Futures Trading Commission dropped a legal challenge to Kalshi’s election-related betting business.

But the company is now facing pushback from U.S. state regulators over sports betting. Several states have sued the company, arguing that it is essentially skirting their rules around online sports gambling, which remains illegal in 20 states, by

offering financial products tied to the outcome of sporting events.

“Every time there’s a new type of financial innovation, there’s always a series of questions around regulation,” Mr. Mansour said. If there weren’t questions, he added, then “what you’re doing is probably not meaningful or innovative enough.”

**Michael J. de la Merced** has covered global business and finance news for The Times since 2006.

---

A version of this article appears in print on , Section B, Page 5 of the New York edition with the headline: Online Bettors Rake In Funds: 2 Rivals Enjoy A Boom Week

# Exhibit 5

# Is betting on football gambling? Prediction markets are battling to redefine wagers.

Provided by Dow Jones • Nov 24, 2025, 9:30:00 AM

By Gordon Gottsegen

Kalshi and other prediction markets are booming because of sports betting. This is why they insist what's taking place on their platforms is not gambling.

The current NFL season has been a boon for Kalshi's growth.

When the Kansas City Chiefs play the Dallas Cowboys on Thanksgiving, people across America will be able to use Kalshi's prediction-market platform to bet on which football team will win. Kalshi is allowing its users to place their wagers on the Chiefs or Cowboys by buying an event contract built on a yes-or-no question. The contract trades on the platform like a stock and pays out if the user bets correctly.

Kalshi launched its sports contracts at the beginning of 2025, and business started booming in the late summer with the start of the professional football season. On the first Saturday of September, 96% of the $107 million in volume that changed hands on Kalshi came from sports contracts, according to data platform Dune. And since Kalshi's founding in 2018 through Nov. 19, some $12.5 billion of the volume on the platform has come from U.S.-based sports contracts - nearly 73% of its total $17.2 billion of volume, data from Dune show.

Kalshi gained popularity by allowing people to bet on the 2024 U.S. presidential election, and its "Who will win the Presidential Election?" prediction market is still the platform's single biggest volume generator, with $535 million traded. In recent weeks, Kalshi users also bet on how long the U.S. government shutdown would last, and the shifting odds were closely followed on Wall Street and in Washington, D.C.

But presidential elections happen once every four years, and there have only been five major federal government shutdowns since 1981, according to the Peter G. Peterson Foundation. On the other hand, dozens of sports contests take place every week across multiple professional and collegiate leagues.

Prediction markets provide useful insights that can be used by decision makers, including investors, executives and policy makers. They can supply a helpful gut check on what the general public thinks about a future event and may reflect the wisdom of crowds. But as prediction markets become more popular, the companies running them are leaning into something that many observers say looks less utilitarian and more like straight-up gambling. This move into sports by Kalshi and other prediction-market companies comes as the lines between gambling and investing are blurring, and as attitudes toward consumer protections shift amid an explosion of American sports betting promoted by tech companies and the big sports leagues.

Kalshi CEO Tarek Mansour has said that what takes place on his platform is not gambling. "I just don't really know what this has to do with gambling," Mansour said in an interview with Axios. "If we are gambling, then I think you're basically calling the entire financial market gambling."

Legal experts say that Mansour has a good business reason to distance Kalshi's sports-prediction markets from gambling. The company and its prediction markets are regulated on the federal level by the Commodity Futures Trading Commission. If Kalshi's sports contracts are deemed to be gambling, they say, the company could be subject to state laws and prohibitions, and those contracts could be removed from the regulation of federal commodities and futures markets under which the company currently operates.

"Of course it's gambling," said I. Nelson Rose, a professor emeritus at Whittier College who specializes in gambling law, about sports-event contracts. "The idea that it's a market doesn't make it any less gambling."

Kalshi generates revenue by charging transaction fees when contracts are traded on its platform. A private company, Kalshi announced in June that it had raised $185 million in equity funding, valuing the company at $2 billion. Just four months later, during the heart of football season in October, Kalshi announced it had raised another $300 million at a valuation of $5 billion, a 150% valuation increase in 107 days that coincided with the kickoff of America's most popular sport. Then in November, Kalshi reportedly raised another $1 billion in a funding round that valued the company at $11

billion - more than double its valuation from the previous month. Kalshi declined to comment on the November funding round.

"Kalshi has done $441 million of volume since NFL kickoff," Mansour posted on the social-media platform X in early September. "NFL week 1 is equal to a US election. Probably nothing."

"Sports represent an amazing growth vertical for Kalshi, which is expected, given the sheer amount of sporting events compared to major political or economic events," a Kalshi spokesperson told MarketWatch.

Competing prediction-market giant Polymarket is gearing up to re-enter the U.S. soon, and it's expected to primarily feature sports markets upon launch. Several of Polymarket's promotional ads focus on sports. Both Kalshi and Polymarket are official partners of the National Hockey League.

"Legal sports betting on the world's largest prediction market is coming to all 50 states," Polymarket Sports posted on X in early September.

Gambling or risk management?

Like countless Americans, Joey Shadeck grew up watching football on Sundays with his family. When he moved out of his childhood home, he kept up the tradition. Shadeck said he would play fantasy football with friends and bet on games from time to time.

"Every time you watch TV or listen to a podcast, there's just so much advertising [for sports betting]. It's kind of hard not to get into it," said Shadeck, who lives in Michigan and works as an online content strategist. "And once you start getting into it, it's fun and just kind of becomes a hobby."

As that hobby evolved for Shadeck, he started his own YouTube channel with tips and tricks for sports betting. He has tried some of the country's most prominent online sportsbooks, including DraftKings, FanDuel and BetMGM, which are currently available in Michigan and as many as 25 other states. He's also tried betting on Kalshi, which offers sports contracts nationwide. Shadeck said that Kalshi offers a similar, perhaps more basic experience compared with the other platforms, but he noticed that it has expanded to more closely resemble traditional sportsbooks, offering options like

parlays and prop bets. Shadeck said it was hard for him to reframe sports contracts on prediction markets as something other than gambling.

"If you're 'predicting' who's going to win a football game, that's just a bet," Shadeck said. "The whole package, sure, you can make the argument that it's something different. But the sports? I mean, just because it says 'yes' or 'no' and there's a cent price instead of '-110 odds' - it's still gambling."

The American Gaming Association, a lobbying organization that represents brick-and-mortar casinos, sportsbooks and other entities in the traditional gambling industry, surveyed 2,025 registered voters in the U.S. to get their opinions on sports betting and sports-related prediction markets. The survey was conducted by YouGov, and the data was weighted to reflect the demographics of U.S. voters. The survey found that 85% of respondents considered sports-related prediction markets to be gambling and not financial instruments. And 84% of the respondents in that survey said that companies offering sports-related event contracts should be registered as sportsbooks in the states where they operate.

In its effort to protect its members from a tidal wave of sports-event contracts, the AGA's stance is that prediction-market companies are simply trying to avoid state regulation. "No matter the name, it's still sports betting," the AGA says on its website. "Prediction-market platforms are using sports-event contracts to evade state regulations and ignore the voice of voters and elected leaders at the state level."

The AGA declined to comment.

The people running the prediction-market platforms, meanwhile, say they have nothing to do with gambling. Popular retail brokerage Robinhood Markets Inc. (HOOD), which partners with Kalshi to offer sports-related event contracts on its investing app, says on an online support page that "Robinhood event contracts allow for speculation in prediction markets - these are not bets."

The Supreme Court legalized sports betting on the federal level in a landmark decision in 2018, leaving it up to state governments to decide both whether to allow sports gambling and how to regulate it. Numerous companies began offering online sports betting to customers following the decision, and state regulatory groups were formed to oversee their activities.

But Kalshi has a federal overseer, the CFTC, which regulates Kalshi as a designated contract market - an exchange able to list futures and other financial contracts that allow for hedging, managing risk or price discovery, legal experts say. Kalshi has long said it offers regulated event contracts, but if it is ever deemed to be facilitating gambling, it could legally be found to be operating outside the CFTC's purview and become subject to state laws, legal experts say.

Sports gambling is illegal in 11 states, including California and Texas, according to the AGA, and many other states put meaningful restrictions on sports betting. Most states that regulate sports betting, for example, set the minimum age at 21. But the minimum age set by the CFTC to trade futures contracts is 18, and Kalshi allows Americans age 18 and over to open accounts and trade on its sports-prediction markets.

"We are a federally regulated exchange under the exclusive jurisdiction of the CFTC; the law is clear on this front," a Kalshi spokesperson told MarketWatch. The spokesperson added that the company's sports contracts are different from sportsbooks because Kalshi is a financial exchange where people bet against other bettors, and not a platform where gamblers bet against the house.

(MORE TO FOLLOW) Dow Jones Newswires

11-24-25 0930ET

Copyright (c) 2025 Dow Jones & Company, Inc.

**Take Action with Morningstar Investor: Screen for best investments using our stock star ratings, fair value estimates, moat ratings, and unbiased analyses.**

Get 7 Days Free

The articles, information, and content displayed on this webpage may include materials prepared and provided by third parties. Such third-party content is offered for informational purposes only and is not endorsed, reviewed, or verified by Morningstar.

Morningstar makes no representations or warranties regarding the accuracy, completeness, timeliness, or reliability of any third-party content displayed on this site. The views and opinions expressed in third-party content are those of the

respective authors and do not necessarily reflect the views of Morningstar, its affiliates, or employees.

Morningstar is not responsible for any errors, omissions, or delays in this content, nor for any actions taken in reliance thereon. Users are advised to exercise their own judgment and seek independent financial advice before making any decisions based on such content. The third-party providers of this content are not affiliated with Morningstar, and their inclusion on this site does not imply any form of partnership, agency, or endorsement.

**More in Markets** View All >

## 3 Real Estate Funds That Still Offer Real Benefits



Real estate has been out of favor this year, but these strategies still have long-term appeal.

Janet Yang Rohr, CFA • Nov 25, 2025

## A December Interest Rate Cut Looks Likely—Again



Traders have dramatically shifted their expectations for whether the Fed will lower rates next month.

Sarah Hansen • Nov 24, 2025

## 6 Stocks to Sell Before the End of the Year



Plus, whether Nvidia is a buy after earnings.

David Sekera, CFA and Susan Dziubinski • Nov 24, 2025

**More in Stocks** View All >

## The Best Tech Stocks to Buy



These 12 undervalued technology stocks look attractive today.

Tori Brovet • Nov 20, 2025

## The Best Healthcare Stocks to Buy



These 12 undervalued healthcare stocks look attractive today.

Tori Brovet • Nov 24, 2025

## The Best Basic Materials Stocks to Buy



These 12 undervalued basic materials stocks look attractive today.

Tori Brovet • Nov 25, 2025

United States

© Copyright 2025 Morningstar, Inc. All rights reserved. Dow Jones Industrial Average, S&P 500, Nasdaq, and Morningstar Index (Market Barometer) quotes are real-time.

# <u>Exhibit 6</u>

# *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'*

Prediction markets like Kalshi, once known for offering wagers on elections, are now in the multibillion-dollar sports betting business and outside the reach of state regulations and taxes.

Listen to this article · 8:52 min Learn more




**By Ben Blatt and Amy Fan**

Oct. 5, 2025

Online sports betting is not legal in Minnesota, but that hasn't stopped Ian White from trading money on the outcomes of N.F.L. games. Mr. White, a special education paraprofessional, said he downloaded Kalshi, a "prediction market" app, after seeing an ad on TikTok. He buys contracts worth $10 a game and has made about $130.

"I do consider Kalshi betting," he said, "but I love how they get around it by selling futures."

Kalshi can "get around" state gambling laws because on paper it is not a sports gambling app, like FanDuel or DraftKings. Those kinds of online sportsbooks are banned in 20 states, including Minnesota, California and Texas. Instead, Kalshi is an exchange selling financial products tied to the outcome of sporting events — and, with the tacit approval of the Trump administration, is currently available everywhere in the country.

If you wanted to, for example, wager $100 on a Dallas Cowboys victory this weekend, your experience on FanDuel and Kalshi would look remarkably similar:







Prediction markets are smaller than online sportsbooks, but they are growing fast. In September, with the N.F.L. season underway, more than $2.5 billion of sports contracts were traded on Kalshi, the largest such market. The American Gaming Association estimated that online sportsbooks accepted a combined $14 billion in bets in September 2024.

Kalshi's entry into sports coincides with rising skepticism of legal gambling, with 43 percent of American adults in a recent Pew Research poll saying legal sports betting is "a bad thing" for society (7 percent said it was a good thing). Pushback on Kalshi and other prediction markets has come not just from politicians in states where sports gambling is illegal, but also from states where it is legal, licensed and taxed — and where prediction markets are avoiding those regulations and taxes.

"What they're doing is essentially calling sports betting by another name, and that's just wrong," said Senator Catherine Cortez Masto, Democrat of Nevada.

Kalshi says prediction markets are fundamentally different from sportsbooks. Gamblers place bets against the sportsbook itself, and the sportsbook keeps their losses; prediction markets facilitate trading of contracts between users, taking a cut as a service fee. Tarek Mansour, Kalshi's chief executive, said in an email: "Kalshi doesn't win when our customers lose, which creates a fair, transparent environment for people to trade."

Sports gambling was illegal in most states until 2018, when the Supreme Court struck down a federal ban and allowed states to make their own rules. The 30 states that now permit online sportsbooks collectively pull in billions of dollars in tax revenue.

But the prediction markets, unlike the sportsbooks, have been operating outside the reach of state regulators. That's because the sites are considered financial markets and regulated by the Commodity Futures Trading Commission, a federal financial

regulator, which under the Trump administration has pivoted toward a hands-off approach.

In the past, prediction markets were best known among forecasting nerds, with the largest run in part by academics from Victoria University of Wellington in New Zealand. Their exchange, PredictIt, focused almost entirely on political predictions like “Who will win the 2016 U.S. presidential election?”

But this year Kalshi started to emphasize sports in its product design and advertising. So far this year, sports-related contracts have accounted for 77 percent of the money wagered on Kalshi.

**Sports bets now account for most money traded on Kalshi**




Source: Kalshi

Under the Biden administration, the C.F.T.C. was controlled by a majority of Democratic commissioners and tried to stop prediction markets from accepting wagers on elections, let alone sports. In 2023, the agency issued an order barring Kalshi from offering election contracts, but it was later overturned by a federal court. In 2024, it proposed a rule that would have disallowed sports contracts.

Things changed in January. One week before President Trump took office, Kalshi named his son Donald Trump Jr. as a strategic adviser. Three days after Mr. Trump started his term, Kalshi listed its first sports contracts on two N.F.L. playoff games.

Caroline Pham, whom Mr. Trump named as the C.F.T.C.'s acting chairwoman, said in a statement in February that the agency "must break with its past hostility to innovation and take a forward-looking approach to the possibilities of the future." In May, the agency dropped its election market litigation against Kalshi.

Ms. Pham and the C.F.T.C. did not respond to requests for interviews. A spokesman for Donald Trump Jr. declined to comment.

Senator Cortez Masto, together with Senator John Curtis, Republican of Utah, and five other Democratic senators, sent a letter to the agency last week asserting it was overriding state law by "implicitly permitting sports gaming products."

"We have laws on the books right now that the C.F.T.C. needs to enforce," Ms. Cortez Masto said in an interview. "Using event contracts that facilitate sports betting illegally circumvents the authority of state and local governments like Nevada."

Nevada, Arizona, Illinois, Maryland, New Jersey, Montana and Ohio have all sent cease-and-desist letters to Kalshi, yet the company continues to offer sports prediction markets in all 50 states. "The C.F.T.C.'s continued inaction is disappointing, to say the least," said Marcus Fruchter, the Illinois Gaming Board administrator, who asked the agency for help in shutting down the markets.

States with legalized online sports gambling often cite tax revenue as a benefit. New York, for instance, collected $1 billion in tax revenue in the last 12 months from its 51 percent tax of "gross sports wagering revenue." Prediction markets operating in New York, or any other state, owe no such local tax.

The Massachusetts attorney general sued Kalshi last month, saying the company "disguises" sports wagering as event contracts. A sportsbook must pay Massachusetts $1 million a year for a license, and must follow guidelines like restricting access to those under 21; prediction markets can offer services to anyone 18 and over without a state license.

The National Council on Problem Gambling, in a letter to the C.F.T.C., said prediction markets should be required to add age restrictions, optional betting limits and other safeguards if they offer sports contracts. “From a problem gambling standpoint, betting on futures is functionally gambling,” it wrote.

Just last year, when Kalshi was trying to defend its election contracts as distinct from “gaming,” it pointed to Super Bowl predictions as an example of an unlawful gaming market. This year, it marketed its sports contracts with ads that said users could “bet on football legally.”

Football season has accelerated Kalshi’s sports trading growth, with more money traded on its sports markets last week than was traded the entire week of the 2024 election.

**Kalshi’s most popular trading categories are mostly sports**

| 2024 | Volume | 2025 | Volume |
|---|---|---|---|
| Presidential winner | $527 mil. | **N.F.L.** | $1.15 bil. |
| Popular vote margin of victory | 326 | **N.C.A.A. football** | $965 mil. |
| State-by-state presidential winner | 155 | **N.B.A.** | 520 |
| Electoral College margin of victory | 86 | **M.L.B.** | 488 |
| S&P 500 | 70 | **March Madness** | 410 |
| Senate races | 58 | Bitcoin price | 358 |
| Nasdaq | 52 | **PGA Tour** | 242 |
| State-by-state margin of victory | 34 | **Men’s tennis** | 234 |
| Electoral College and popular vote winner | 28 | Federal Reserve decision | 225 |
| House, Senate and presidency winner | 25 | **Women’s tennis** | 220 |

Source: Kalshi Note: Market series events grouped into categories for clarity.

Last week, Kalshi introduced more complex contracts known as parlays (“Will the Bears, Bills and Browns all win?”). These long-shot bets are considered the most profitable for major sportsbooks. Shares of FanDuel and DraftKings dropped more than 10 percent after the announcement.

Kalshi has benefited from a partnership with the popular brokerage app Robinhood, which allows its users to trade Kalshi contracts with the same account they use to trade stocks.

It has also probably benefited from the state bans on online sportsbooks. “If Minnesota had legal sportsbooks, I wouldn’t have used Kalshi,” Mr. White said.

Other companies are testing other legal gray areas. Earlier this year, the Upshot reported on online sweepstakes casinos, which offer payouts on blackjack and roulette by framing them as legal “sweepstakes.” Last month, the company Betr, co-founded by the social media star Jake Paul, started a “social sportsbook” that uses the same sweepstakes loophole to essentially offer sports gambling in its app, including in many states where sports gambling is illegal.

Another prediction market, Polymarket, has had more run-ins with the C.F.T.C. The agency fined Polymarket $1.4 million in 2022, and later investigated it for continuing to offer trading services to Americans. That investigation, and another by federal prosecutors, ended in July. Polymarket is set to resume offering sports and elections contracts to U.S. users this week.

In August, Donald Trump Jr.’s venture capital firm invested in Polymarket, despite his position with its rival Kalshi.

If state regulators can’t stop prediction markets from becoming sportsbooks, another potential issue is around the corner: Sportsbooks could become prediction markets. In August, FanDuel announced it would create a prediction market of its own.

**Ben Blatt** is a reporter for The Upshot specializing in data-driven journalism.

**Amy Fan** is a Times reporter and a member of the 2025-26 Times Fellowship class, a program for journalists early in their careers.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Sports Bets, by Another Name, Skirt State Bans

# Exhibit 7

**U.S. COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581
www.cftc.gov

CFTC Staff Advisory
Market Participants Division
Division of Market Oversight
Division of Clearing and Risk

September 30, 2025

**To: All Futures Commission Merchants ("FCMs"), Introducing Brokers ("IBs"), Designated Contract Markets ("DCMs"), Derivatives Clearing Organizations ("DCOs"), and Registered Futures Associations ("RFAs")**

**Re: Certain Contract Markets**

Ladies and Gentlemen:

The Market Participants Division ("**MPD**"), Division of Market Oversight ("**DMO**"), and Division of Clearing and Risk ("**DCR**" and, together with MPD and DMO, the "**Divisions**") of the Commodity Futures Trading Commission ("**CFTC**" or "**Commission**") are issuing this letter in connection with a potential lapse in government appropriations to advise FCMs, IBs, DCMs, DCOs, and RFAs to be prepared for all foreseeable conditions that may result from facilitating the trading and clearing of sports-related event contracts for customers, market participants, and clearing members.[1]

The Divisions are aware that certain registered entities and registrants are listing or facilitating the trading or clearing of sports-related event contracts, or may be interested in the future in doing so, and that there are market participants interested in trading these products. The Divisions are also aware of

[1] *See* CFTC Press Release No. 9046-25, *CFTC Announces Prediction Markets Roundtable* (Feb. 5, 2025), *available at* https://www.cftc.gov/PressRoom/PressReleases/9046-25.

Case: 26-1835, 03/31/2026, DktEntry: 42.1, (136 of 265)

various forms of State regulatory actions[2] and pending and potential litigation concerning the legality of sports-related event contracts listed on DCMs.[3]

The Divisions are issuing this Advisory to caution FCMs, IBs, DCMs, and DCOs that State regulatory actions and pending and potential litigation, including enforcement actions, should be accounted for with appropriate contingency planning, disclosures, and risk management policies and procedures.[4] The Divisions note that FCMs, IBs, DCMs, and DCOs should be prepared to identify such contingency plans, disclosures, and risk management policies and procedures as part of the routine registration, oversight, and examination activities of the CFTC and applicable self-regulatory organizations, including monitoring legal developments and have risk mitigation and contingency plans in place to deal with any developments that may affect customer, market participant, or clearing member positions and funds.

FCMs, IBs, DCMs, and DCOs should provide customers, market participants, and clearing members with regularly updated information, including information based on any States in which they operate or engage in activity, to ensure that such customers, market participants, and clearing members understand the possible effects should State regulatory actions or ongoing or new litigation, including enforcement actions, result in termination of sports-related event contract positions. Among other things, FCMs and DCOs should ensure that their customers and clearing members are aware of liquidation or close-out policies and procedures that the FCM or DCO may deploy for sports-related event contracts as well as how the FCM or DCO will handle any necessary disposition of customer or clearing member funds and property.

---

[2] *See, e.g.,* Illinois Gaming Board, *Cease and Desist Letters Related to Unlicensed Sports Wagering Activity, available at* https://igb.illinois.gov/sports-wagering/cease-and-desist-letters.html (accessed Sept. 5, 2025); *OH Regulator Warns Sportsbooks about Wading Too Deep into Sports Contracts*, SBC Americas (Aug. 25, 2025), *available at* https://sbcamericas.com/2025/08/25/ohio-sports-contracts-letter/.

[3] For example, at least one federal district court has found that the Commodity Exchange Act ("CEA") does not preempt the application of State gambling, wagering, and gaming laws to sports-related event contracts listed and traded on a CFTC-registered trading venue. *See KalshiEX LLC v. Martin*, No. 25-CV-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025), on appeal to the U.S. Court of Appeals for the Fourth Circuit, Case No. 25-1892. *See also KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694 at *8 (D.D.C. Sept. 12, 2024) ("The Court finds no reason to stray from the ordinary definitions of 'gaming,' which are 'the practice or activity of playing games' and 'playing games for stakes.'").

[4] The Commission has not, to date, been requested to take or taken any official action to approve the listing for trading of sports-related event contracts on any DCM pursuant to sections 5c(c)(4)-(5) of the CEA and Commission regulation 40.3. 7 U.S.C. § 7a-2(c)(4)-(5), 17 CFR 40.3. *See also* 17 CFR 38.4(a). All sports-related event contracts that are currently listed for trading on DCMs have been listed pursuant to self-certifications filed by the relevant DCM pursuant to CEA section 5c(c)(1) and Commission regulation 40.2, 7 U.S.C. § 7a-2(c)(1).17 CFR 40.2, and the Commission has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under CEA section 5c(c)(5)(C)(i), 7 U.S.C. § 7a-2(c)(5)(C)(i), or Commission regulation 40.11(a), 17 CFR 40.11(a). The activities enumerated under CEA section 5c(c)(5)(C)(i) and Commission regulation 40.11(a) are: activity that is unlawful under any Federal or State law; terrorism; assassination; war; and gaming. *See* Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011) ("[T]he Commission would like to note that its prohibition of certain 'gaming' contracts is . . . to 'protect the public interest from gaming and other event contracts.'") and at 44786, FN 35 ("[T]he Commission 'needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed event contracts.'"). Transactions subject to the Commission's jurisdiction "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

FCMs are reminded that Commission regulation 1.55[5] prohibits an FCM from entering into a customer account agreement or accepting funds from a customer unless the FCM discloses to the customer all information about the FCM, including its business, operations, risk profile, and affiliates, that would be material to the customer's decision to entrust such funds to and otherwise do business with the FCM and that is otherwise necessary for full and fair disclosure.[6] In particular, FCMs are reminded that Commission regulations require an FCM to disclose a summary of the FCM's current risk practices, controls and procedures,[7] expanding upon such information as necessary to keep such disclosure from being misleading, whether through omission or otherwise.[8]

FCMs are required to update such information as and when necessary to keep such information accurate and complete and to promptly disclose such updated information to all of its customers.[9] In connection with such obligation to update information, an FCM must take into account any material change to its business operations, financial condition, and other factors material to a customer's decision to entrust the customer's funds and otherwise do business with the FCM since its most recent disclosure.[10]

FCMs are further reminded that each FCM is required to adopt policies and procedures reasonably designed to ensure that advertising and solicitation activities by each such FCM and any IBs associated with such FCM are not misleading to its customers in connection with their decision to entrust funds to and otherwise do business with such FCM.[11]

DCMs are reminded that certain statutory and regulatory requirements apply to providing complete and accurate information, and promoting transparency and fair and equitable trading.[12] For example, DCMs are reminded that Commission regulation 38.401(b) provides that, with respect to any information required to be transmitted or made available to market participants and the public, including on the DCM's website or otherwise, the DCM must provide information that it believes, to the best of its knowledge, is accurate and complete, and must not omit material information.[13]

DCOs are reminded that Commission regulation 39.21 requires that a DCO must provide to market participants sufficient information to enable the market participants to identify and evaluate accurately the risks and costs associated with using the services of the DCO and must make information concerning the rules and the operating and default procedures governing the clearing and settlement systems of the DCO available to market participants.[14]

---

[5] 17 CFR 1.55.

[6] *See* 17 CFR 1.55(i).

[7] *See* 17 CFR 1.55(k)(11).

[8] *See* 17 CFR 1.55(i).

[9] *Id*.

[10] *Id*.

[11] *See* 17 CFR 1.55(l).

[12] Relevant requirements include but are not limited to: DCM Core Principle 4 (Prevention of Market Disruption), DCM Core Principle 7 (Availability of General Information), and DCM Core Principle 12 (Protection of Markets and Market Participants), as well as implementing regulations thereunder.

[13] 17 CFR 38.401(b).

[14] *See* 17 CFR 39.21(a) and (b).

Under the CEA and Commission regulations, persons are prohibited from engaging in regulated activities unless appropriately registered.[15]

*****************************************************************

This Advisory is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter. This Advisory does not provide any no-action position with respect to a recommendation by any Division that the Commission initiate an enforcement action for failure to comply with the CEA or Commission regulations. Further, this Advisory is not intended to, does not, and may not be relied upon to create any new binding rules or regulations, or to amend existing rules or regulations. This Advisory represents only the views of the Divisions and does not necessarily represent the views of the Commission or of any other division or office of the Commission. Nothing in this Advisory is intended to waive any pre-decisional or other privileges that may apply to the Commission's or Divisions' deliberations or decision making regarding potential enforcement actions or potential rulemaking.

[15] *See, e.g.*, definitions of FCM and IB in Commission regulation 1.3, 17 CFR 1.3, sections 4d(a) and (g) of the CEA, 7 U.S.C. §§ 6d(a) and (g). *See also* frequently asked questions (FAQs) regarding registering an entity as a futures commission merchant, available at: https://www.cftc.gov/PressRoom/PressReleases/9091-25.

Questions concerning this Advisory may be directed to Thomas J. Smith, Acting Director, MPD, tsmith@cftc.gov, Rahul Varma, Acting Director, DMO, rvarma@cftc.gov or Richard Haynes, Acting Director, DCR, rhaynes@cftc.gov.

Sincerely,

_________________________

Thomas J. Smith
Acting Director
Market Participants Division

_________________________

Rahul Varma
Acting Director
Division of Market Oversight

________________________

Richard Haynes
Acting Director
Division of Clearing and Risk

# Exhibit 8

NEWS 1 min

# Kalshi Adds More NFL Player Props

Prediction market posts QB, RB, WR yardage offerings for Eagles-Giants; users bemoan parlay absence



by Brant James Last updated: October 9, 2025



Kalshi continues to add new sportsbook-style sports event contracts, posting several over/under markets ahead of the Thursday night NFL game between the Philadelphia Eagles and New York Giants. Users fear, though, that it might have suspended offering parlays.

These new markets include:

- Passing yards
- Receiving yards
- Rushing yards




Trading was light on these markets as of Thursday morning.

These markets have yet to be launched for any other Week 6 NFL game.

Several users, meanwhile, were concerned that Kalshi might have suspended its parlay optionality. Multiple customers in a chat function noted that they'd been unable to find "combos" for Week 5 of the NFL season, and some that did said they'd failed to post. Another, however, noted that they'd been successful finding them just before the Monday Night Football (MNF) game.



A loss of same-game parlays, which may have brought in less than $2,000 in fees, might disgruntle Kalshi customers but thrill Wall Street investors. The stocks of leading sportsbooks DraftKings and FanDuel lost almost $7 billion in value in response to the launch last week for MNF.

The reasoning: With much-improved betting volume, Kalshi would be able to offer better odds than the United States' market share duopoly, thus cutting into DraftKings' and FanDuel's profits.

The same-game parlays came a month after Kalshi self-certified with the Commodity Futures Trading Commission to offer multi-leg markets. The company launched pre-built parlays just before Week 1.

## RECOMMENDED

LEGAL 5 min

### Expect Prediction Market Lawsuits To Reach Supreme Court, G2E Panelists Say, But It May Take Years


by Daniel O'Boyle October 8, 2025

## DON'T MISS



## Pulled From Assembly Voting Agenda

by Jill R. Dorson November 19, 2025



NEWS 1 min

## Florida Bill That Would Legalize DFS Advances Through Subcommittee

by Jill R. Dorson November 18, 2025



NEWS 1 min

## North Carolina, Tennessee Post Record Handles In October

by Chris Altruda November 18, 2025

ALL ARTICLES

MOST POPULAR




ANALYSIS 9 min

Massachusetts Puts Kalshi On The Defensive, Sues In State Court




Arizona Warns Regulated Operators, Via Letter, Against Offering Prediction Markets




ANALYSIS 9 min

States Rights Vs. Federalism: Can Prediction Markets Be Kept At Bay?




ANALYSIS 13 min

HG Vora's Gambling History Raises Questions On Regulatory Track Record




INDUSTRY 3 min

Illinois Bettor Backlash Begins Over New Fees, Minimum Bets

IN GAME

TOP OF PAGE

BROWSE +

ARTICLES +

All betting content on InGame.com is for USA residents who are permitted to gamble in legal states. InGame.com may earn revenue from site visitor referrals to betting services.

© 2025 Third Planet LLC. All Rights Reserved

# Exhibit 9

Sports News

# Kalshi Trading Volume Soars As Football Betting Season Kicks Off



Written By: Eric Ramsey

Published on: September 8, 2025

**Kalshi** is trending sharply upward as football betting season begins in the US.

Trading volume on the prediction platform topped **$300 million** over the weekend, including **$196 million** on **Sunday** alone. It was the third-biggest day ever for Kalshi and its busiest since the election **last November**.

More than **95%** of all trading involved sports contracts, which the site launched nationwide earlier this year. These contracts mimic sports bets but are federally regulated as commodities and therefore legally available for trading in **all 50 states**.

# Football powers Kalshi's production

Football trading alone surpassed a quarter of a billion dollars.

College football set the bar on Saturday, producing **$85.1 million** in single-day volume. The **Michigan vs. Oklahoma** game ticked over **$10 million** by itself and was the only college game to reach eight figures this week. Three college games crossed that threshold last week without much competition.

The Saturday simmer became a full boil on Sunday, with **13 NFL games** accounting for **$161 million** in combined trading. The primetime matchup between the **Baltimore Ravens** and the **Buffalo Bills** alone generated **$35.6 million** in volume, twice as much as any other game. Nine of the weekend's NFL games eclipsed **$10 million**.

The season opener last Thursday saw **$20.1 million** in volume, and Friday's island game reached **$25.7 million** – the third- and second-largest games of the week for traders.

As big as these numbers are, they still represent just a fraction of the total betting handle from regulated US sportsbooks.

# Don't call Kalshi a sportsbook

The surge in volume for football event contracts coincides with major platform updates that bring Kalshi's trading experience closer than ever to traditional betting.

The site last week introduced a new six-box layout that is not exactly revolutionary, mirroring the way modern sports betting apps present the moneyline, spread, and total. It even uses American odds rather than contract prices that are typically standard for prediction markets.

| | | | |
|---|---|---|---|
| Minnesota | -126 | -1.5<br>-107 | O 43.5<br>-111 |
| Chicago | +105 | +1.5<br>-111 | U 43.5<br>-107 |

Kalshi has also added limited player props and a small set of premade parlays to their list of available markets, further blurring the lines between trading and betting.

Who will score a touchdown?

| | | | |
|---|---|---|---|
| Justin Jefferson | 44% | Yes<br>+118 | No<br>+118 |
| D'Andre Swift | 41% ▼1 | Yes<br>+134 | No<br>+134 |
| Aaron Jones Sr. | 37% ▼1 | Yes<br>+158 | No<br>+158 |

More markets

Trading volume is not a direct analog for sportsbook handle, and those secondary sports markets are not yet popular in the realm of event contracts. Anytime Touchdown markets were the most-traded prop this past weekend, yielding just **$783,000** in volume.

# Tennis pops on prediction platforms

The finals of the **US Open** for tennis were also popular among traders on Kalshi.

The men's final between **Jannik Sinner** and **Calos Alcaraz** drew **$19.6 million** in trading over the weekend, outpacing all college football games. It was, in fact, the second-most traded match behind that Sunday Night Football thriller. Total lifetime volume for this market reached **$35.4 million** to crack the top 20 largest sporting events in the platform's brief history.

The women's final between **Aryna Sabalenka** and **Amanda Anisimova** was meanwhile just outside the weekend's top 10, generating **$8.93 million** in trading on Saturday and more than **$20.0 million** in lifetime volume dating back to its open in mid-May.

One other tennis market saw action this weekend: odds for **Novak Djokovic** to win a major this year have officially dropped to zero with his semifinal loss to Alcaraz in the final grand slam of 2025.

Both tennis and golf are disproportionately popular on trading exchanges like Kalshi.

# Competition incoming for Kalshi

Kalshi is not the only federally regulated prediction platform, but it was an early mover in what is becoming a hotly contested segment.

It first opened for business in **July 2021** following approval from the **Commodity Futures Exchange Commission**, which oversees futures markets at the federal level. The CFTC's self-certification mechanism ultimately facilitated the launch of Kalshi's first sports contracts earlier this year, transforming their business and their bottom line essentially overnight.

Competitors, including existing sports betting brands, are now scrambling to enter the space lest Kalshi establish a firm foothold.

- **Polymarket** is imminently returning to the US three years after voluntarily exiting due to legal pressure that has since dissipated.
- **Underdog** has gone live with a prediction product in **16 states** via **Crypto.com** and its federally registered exchange.
- **FanDuel** has announced a joint venture with **CME Group** to launch event contracts through its exchange. Regulatory caution will keep these contracts limited (at least initially) to non-sporting events like economic markets.
- **DraftKings** CEO **Jason Robins** thinks it will be hard for prediction platforms to compete with sportsbooks, but that hasn't stopped his company from dabbling. DraftKings has taken the preliminary step of registering with the **National Futures Association** (NFA), reportedly in talks to acquire a startup called **Railbird Exchange**.
- **Fanatics** and **PrizePicks** are also registered with the NFA in an apparent first step toward prediction products of their own.

These new products could be especially useful in **California** and **Texas**, two markets with massive unmet demand from the continued absence of state-regulated sports betting.

Photo by https://www.shutterstock.com/image-photo/superdog-vizsla-red-superhero-cape-flying-2574430297



By Eric Ramsey

Eric is a data and policy analyst covering regulated US gambling, including sports betting and DFS. His work is cited extensively in major media outlets including the Wall Street Journal and New York Times. Eric began writing for Legal Sports Report in 2017, just prior to the repeal of PASPA. Most of his early reporting followed the legislative beat as states outside of Nevada began to legalize and regulate sports betting. He has tracked hundreds of bills and across dozens of jurisdictions, and he was on site for the first launches in Delaware and New Jersey in 2018. In his role for LSR's former sister site, Online Poker Report, Eric was also inside the federal courthouse in New Hampshire as the US Department of Justice defended its reinterpretation of the Wire Act in 2019. He comes from a poker background, formerly on staff at PokerNews and the World Poker Tour.

Editorial Guidelines | About Us

## MORE ARTICLES LIKE THIS

### Eric Ramsey



11.19.25 | Sports News

**'Big Three' Online Casino States Set New Records In October**






10.10.25 | Sports News

**Kalshi Squeezing More From Football Games With Prop, Parlay Markets**

**VIEW ALL ARTICLES BY AUTHOR**

## DISCLAIMER

LegalSportsReport is a comprehensive online gambling resource that provides tested and verified promotions, unbiased reviews, expert guides, and industry-leading news. We also hold a strong commitment to Responsible Gaming, and we only cover legally-licensed companies to ensure the highest level of player safety and security
*Call 1-800-GAMBLER or visit ncpgambling.org if you have a gambling problem. Legalsportsreport.com and all content herein is intended for audiences 21+.* (See responsible gambling)

ABOUT US

CAREERS

RESPONSIBLE GAMBLING

CONTACT US

PRIVACY POLICY

EDITORIAL & POLICY GUIDELINES

MEDIA ENQUIRIES

Case: 26-1835, 08/31/2026, DktEntry: 42.1, Page 153 of 265

SLOTS

FREE SPIN CASINOS

ROULETTE

BLACKJACK

MICHIGAN SPORTS BETTING

PA ONLINE CASINOS

NJ ONLINE CASINOS

ALBERTA ONLINE CASINOS

FLORIDA ONLINE CASINOS

TEXAS ONLINE CASINOS

WV ONLINE CASINOS

NY ONLINE CASINOS

CALIFORNIA ONLINE CASINOS

CT ONLINE CASINOS

Follow Us on Social Media

Please Gamble Responsibly. 21+ Only

Copyright © 2025 Catena Operations Ltd.

# Exhibit 10

# Pools FAQ

## Where are paid Pools available?

DraftKings Sportsbook paid Pools are currently only available in Arizona, Colorado, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Tennessee, Vermont, Virginia, Washington, Washington Tulalip, West Virginia and Wyoming. You must be physically located in one of these states to participate in paid Pools.

## What are Pools?

Pools are a fixed price point form of betting where wagers are placed against other bettors who have entered the same event. Each winner's prize depends on the number of other players in the pool and the number of winners.

## What are the different types of Pools?

There are many types of pools, including

- Pick'Em Pools (Game Winner, Against the Spread, Single, Game, 3 Way, etc)
- Squares
- Brackets
- Survivors
- And More

There are also different structures for Prizes within each of these types of Pools

- Guaranteed (Fixed Prize Pool, Fixed number of Entries)
- Pari-Mutuel with Rollovers (Growing Prize Pool with 'roll over' should no user meet the winning criteria)
- Pari-Mutual Guaranteed (Growing Prize Pool with winners guaranteed)

## What types of pools can I enter?

Currently, DraftKings Sportsbook offers various Pick'Em Pools. We will be adding more pools types soon- stay tuned!

## What are the rules of Survivor Pools?

**CBB Tournament Survivor Rules:**

Pick one team to win their game each day of the tournament (except for the round of 8 where each entry will pick only one team to advance from the four games that happen Saturday and Sunday). If your team wins, your entry advances to the next day. If your team loses, your entry will be eliminated.

You may only pick each team once per entry. If you reach a point in the contest where you are no longer able to make a pick, your entry will be eliminated provided that at least one other entry in your contest is able to advance past that round.

All prizes will be paid out when the entire tournament has concluded.

If multiple entries are still alive at the end of the contest, all surviving entries will split the prize pool. If there is one entry remaining at the end of any day of the contest, that entry will win the entire prize pool. If all remaining entries are eliminated before the conclusion of the contest, the longest surviving entries will split the prize pool.

Picks must be submitted each day before the first game of that day locks. You may edit your selection anytime before the first game of the day starts.

## How do I win?

Users who choose the set number of correct picks for any individual Pool will win a share of the Prizes based on the number of correct picks and the number of winners. Full contest details and prize structures can be found via the information icon within any Pools contest.

## If I've entered a Pool but change my mind, can I withdraw my entry?

No, due to the Pari-mutuel nature of Pools contests, contest withdrawal is not available at this time.

## Can I edit my picks after I've submitted them?

Yes, you can edit picks up until the start time of the pool, as listed on the Pools entry screen.

## How are contests scored?

Contests are scored based on the real life events taking place within the Pool. Each question as part of the Pools ticket will have a 'right' and a 'wrong' answer that are determined based on the question posed and the real life outcome.

## Where can I see my Pools bets?

You can find your Pools betting history, including active pools, in the Pools Lobby under the "Live, Upcoming, and Recent" sections.

## Glossary of Terms

- **Lobby:** Where all Pools can be found for entry
- **Entry:** A recorded contest entry into a Pool. Users can submit multiple entries on one ticket by selecting both sides of any question (game)
- **Quick Picks:** An easy mechanic to quickly auto fill remaining picks on any Pools ticket being submitted
- **Prize Pool:** The total funds available for users who successfully win a share of the contest

Must be 21+ and physically present in New York to place wagers. If you or someone you know has a gambling problem, text HOPENY (467369) or call 877-846-7369. Subject to regulatory licensing requirements.

US Office: **222 Berkeley Street Boston, MA 02116**
New Jersey Office: **PO Box 399 Hoboken, NJ 07030**
UK Office: **15 Ingestre Place Suite 265 Soho, London W1F OJH**

© 2012-2025 DraftKings All Rights Reserved.

Server Time: 11/20/2025 2:06:22 PM

# Exhibit 11

# EXHIBIT 4

# Nevada Gaming Control Board Notice to Licensees Re: Crypto.com Litigation Update

Case: 26-1835, 08/31/2026, DktEntry: 42.1, (160 of 265)

**NEVADA GAMING CONTROL BOARD**
1919 College Parkway, Suite 110, P.O. Box 8003, Carson City, Nevada 89702
7 State of Nevada Way, Las Vegas, Nevada 89119
3650 S. Pointe Circle, Suite 203, P.O. Box 31109, Laughlin, Nevada 89028
557 W. Silver Street, Suite 207, Elko, Nevada 89801
9670 Gateway Drive, Reno, Nevada 89521

JOE LOMBARDO
*Governor*

MIKE DREITZER, *Chairman*
HON. GEORGE ASSAD (RET.), *Member*
CHANDENI K. SENDALL, *Member*

# NOTICE TO LICENSEES

Notice #2025-85 Issuing Division: Administration

**DATE:** October 24, 2025

**TO:** All licensees

**FROM:** Mike Dreitzer, Chairman

**SUBJECT:** Crypto.com Litigation Update

As licensees are probably aware, the Board has been working diligently to uphold its statutory charge to protect the safety, morals, good order and general welfare of the inhabitants of the State and to foster the stability and success of gaming and to preserve the competitive economy and policies of free competition of the State of Nevada. See NRS 463.0129(d). In furtherance of the Board's goal to preserve the competitive gaming economy in Nevada, the Board provides an update on the ongoing litigation involving North American Derivatives Exchange, Inc., dba Crypto.com (Crypto.com).

Earlier this year, Crypto.com sought a preliminary injunction to enjoin the Board from enforcing Nevada law against it. On October 14, 2025, U.S. District Judge Andrew P. Gordon denied that motion. Crypto.com has indicated that it intends to appeal that decision. In the meantime, the Board has confirmed that after November 3, 2025, and until the resolution of its appeal, Crypto.com will not be offering sports event contracts to Nevada residents. That means Crypto.com will no longer hold open positions in sports event contracts for Nevada residents and will not permit new contracts to be opened.

While the Board continues to seek legal avenues to protect gaming and foster a competitive economy, the Board takes this opportunity to re-affirm and re-issue the guidance it issued to licensees regarding event contracts offered in Nevada and other states:

> The Board considers offering sports event contracts, or certain other events contracts, to constitute a wagering activity under NRS 463.0193 and 463.01962. Wagering occurs whether the contract is listed on an exchange regulated by the Commodity Futures Trading Commission (CFTC) or elsewhere. Examples of event contracts that the Board specifically considers to be wagering subject to its jurisdiction include event contracts based on the outcome or partial

Case: 26-1835, 08/31/2026, DktEntry: 42.1, (161 of 265)



outcome of any sporting or athletic event, or other selected events such as the World Series of Poker, the Oscars, Esports, and political elections ("Sports and Other Event Contracts").

Offerings for Sports and Other Events Contracts may be conducted in Nevada only if the offering entity possesses a nonrestricted gaming license with sports pool approval in Nevada and meets the other requirements for sports wagering including, without limitation, wagering accounts and sports book systems.

If a Nevada licensee chooses to offer Sports and Other Event Contracts in Nevada or decides to partner with other entities offering Sports and Other Event Contracts in the state, the Board will consider these developments as it evaluates the suitability of the entity to maintain a Nevada gaming license under NRS 463.170. Moreover, if a licensee offers Sports and Other Event Contracts in another state without complying with the other state's restrictions, prohibitions, or licensing regime; partners with another entity that engages in such activities; or acts in violation of a compacted tribal right, the licensee may be subject to discipline under the Gaming Control Act. See NRS 463.720 and/or NGC Regulation 5.011.

Engaging in unlawful sports wagering in another state or entering into a business relationship with another entity offering unlawful sports wagering in another state may call into question the good character and integrity of the licensee. See NRS 463.170(2)(a).

The Board reminds licensees to be mindful of their obligations to maintain suitability and comply with all applicable laws in all jurisdictions where they operate. See NRS 463.720.

The Board remains committed to fostering stability and promoting a thriving legal gaming industry. We will keep licensees apprised of future developments in litigation as they arise.

# Exhibit 12

Kalshi

**Kalshi Exchange Notice**
October 23, 2025

Kalshi will update its Member Agreement to include an additional representation and warranty in Section VI ("Representations and Warranties") relating to jurisdictional restrictions on access and trading on the Platform. This amendment clarifies that Members are prohibited from accessing, using, or trading on the Platform from certain restricted jurisdictions. These amendments will be effective as of the date of this Exchange Notice.

As described in Section VII.E of the Member Agreement, "This Agreement may be amended unilaterally by Kalshi upon notice to You. You will be deemed to agree to each such amendment if You do not terminate this Agreement prior to the effective date of the amendment."

Kalshi reserves the right to modify this list at any time to ensure ongoing compliance with applicable laws, regulations, or restrictions imposed by any competent authority in any jurisdiction.

Please direct legal questions relating to the Member Agreement to legal@kalshi.com and general questions to support@kalshi.com.

The updated section is provided below for convenience:

**Additional Representation and Warranty in Section VI:**

You hereby further represent, warrant, and covenant to Kalshi that you are not domiciled in, organized in, or located in any jurisdiction in which access to, use of, or trading on the Platform is prohibited under Applicable Law or by Kalshi policy. Without limiting the foregoing, you acknowledge and agree that you are prohibited to access, use, or trade Contracts on the Platform if you are domiciled in, organized in, or located in any of the following jurisdictions (collectively, the "Restricted Jurisdictions"): Afghanistan, Algeria, Angola, Australia, Belarus, Belgium, Bolivia, Bulgaria, Burkina Faso, Cameroon, Canada, Central African Republic, Côte d'Ivoire, Cuba, Democratic Republic of the Congo, Ethiopia, France, Haiti, Iran, Iraq, Italy, Kenya, Laos, Lebanon, Libya, Mali, Monaco, Mozambique, Myanmar (Burma), Namibia, Nicaragua, Niger, North Korea, Poland, Russia, Singapore, Somalia, South Sudan, Sudan, Syria, Taiwan, Thailand, Ukraine (Crimea, Donetsk, Luhansk, Zaporizhzhia, and Kherson regions), United Kingdom, Venezuela, Yemen, and Zimbabwe, or any jurisdiction or territory that is the subject of comprehensive country-wide, territory-wide, or regional economic sanctions imposed by the United States.

# Exhibit 13

NEW YORK STATE | Gaming Commission

NEW YORK STATE | Office of Addiction Services and Supports

OASAS. Every Step of the Way.

March 31, 2024

To: The Honorable Kathy Hochul
Members of the New York State Legislature

On behalf of the New York State Gaming Commission and the Office of Addiction Services and Supports (OASAS), we respectfully submit this annual report as required by N.Y. Racing, Pari-Mutuel Wagering and Breeding Law Section 1367-a(6).

The statute requires the Gaming Commission (Commission) and OASAS to submit an annual report to the Governor and Legislature "on the impact of mobile sports wagering on problem gamblers in New York, including, to the extent practicable, an analysis of demographics which are disproportionately impacted by the problem gambling."

New York has completed the second full year of mobile sports wagering operation. This year's report includes a summary of the available data on the impact of problem gambling in New York. The Commission requested various additional datasets from mobile sports wagering operators ("operators"). Unfortunately, many operators did not maintain or provide standardized data points, thus limiting the ability to analyze the data on mobile sports wagering in a meaningful way. Therefore, at the close of this report, we jointly provide recommendations including creating regulations to require operators to collect data to enable the Commission and OASAS to accurately report and analyze the social and health impact of mobile sports wagering in New York State.

The Commission and OASAS continue to collaborate on how to best establish this procedure so that future reports will include a more consistent and detailed analysis.

Respectfully Submitted,

Robert Williams
Executive Director
New York State Gaming Commission

Chinazo Cunningham, M.D.
Commissioner
NYS Office of Addiction Services and Supports

## N.Y. Racing, Pari-Mutuel Wagering and Breeding Law § 1367-a(6).

*The commission, in conjunction with the office of addiction services and supports, shall annually cause a report to be prepared and distributed to the governor and the legislature on the impact of mobile sports wagering on problem gamblers in New York, including, to the extent practicable, an analysis of demographics which are disproportionately impacted by the problem gambling. The costs associated with the preparation and distribution of the report shall be borne by mobile sports wagering licensees and the commission shall be authorized to assess a fee against mobile sports wagering licensees for these purposes. The commission, or in the case that an independent integrity monitor has been established, such independent integrity monitor shall also report biannually to the governor and the legislature on the effectiveness of the statutory and regulatory controls in place to ensure the integrity of mobile sports wagering operations.*

## N.Y. Mental Hygiene Law § 19.07(a).

*The office of alcoholism and substance abuse services is charged with the responsibility for assuring the development of comprehensive plans, programs, and services in the areas of research, prevention, care, treatment, rehabilitation, including relapse prevention and recovery maintenance, education, and training of persons who abuse or are dependent on alcohol and/or substances and their families. Such plans, programs, and services shall be developed with the cooperation of the office, the other offices of the department where appropriate, local governments, consumers and community organizations and entities. The office shall provide appropriate facilities and shall encourage the provision of facilities by local government and community organizations and entities. The office is also responsible for developing plans, programs and services related to compulsive gambling education, prevention and treatment consistent with section 41.57 of this chapter.*

## Background

Chapter 59 of the Laws of 2021 amended N.Y. Racing, Pari-Mutuel Wagering and Breeding Law § 1367 and added § 1367-a to authorize mobile sports wagering when the sports wager is made through virtual or electronic means from a location within New York and is transmitted to and accepted by electronic equipment located at a licensed commercial casino gaming facility. The statute also directed the Gaming Commission to conduct a competitive bidding process to award mobile sports wagering licenses. The Commission unanimously accepted the review committee's recommendations and awarded nine platform providers and operators with 10-year licenses at a tax rate of 51 percent. The first mobile sports wager in New York State was placed January 8, 2022.

OASAS oversees a continuum of care for addiction services that includes prevention, treatment, harm reduction and recovery support. Access to both inpatient and outpatient services for those affected by harms related to gambling, including for those who have been diagnosed with gambling disorder, are available throughout the state. Further, there are a range of community-based prevention efforts both to raise the awareness about problem gambling and to prevent problem gambling and gambling disorder. Further, OASAS seeks to mitigate potential harms

associated with gambling by promoting harm reduction strategies such as setting additional time and money wagered limits, and limiting alcohol and drug use while gambling.

The Commission ensures that all lawful gaming conducted in this State is of the highest integrity, credibility and quality. The Commission serves the best interests of the public by providing responsive and effective state gaming regulation and strives to ensure that all stakeholders in the gaming industry, including the consumers who wager on activities regulated or operated by the Commission, are treated in an equitable and responsible manner. The Commission seeks to ensure fair and strict regulation of all gaming activity while reducing costs and regulatory burdens to the gaming industry. The Commission aspires to provide the regulatory structure necessary for New York gaming activity to operate effectively in a global, evolving and increasingly competitive marketplace to generate revenue for aid to education and for the support of government, and to contribute to overall economic development and job creation in New York.

## Revenue for Problem Gambling Treatment & Education

Currently, $6 million annually from New York State's tax imposed on mobile sports wagering is dedicated for problem gambling education and treatment purposes, pursuant to N.Y. Racing, Pari-Mutuel Wagering and Breeding Law § 1367(8).

In addition to revenue from sports wagering operators, commercial casino operators, of which there are currently four in New York State, pay an annual fee of $500 per slot machine and table to the State for OASAS-directed problem gambling treatment and education. New York State has begun the process to site up to three additional commercial casinos in the New York Metro Region. By statute, any casino sited in the New York Metro Region must pay a $750 annual fee per slot machine and table to the state for problem gambling treatment and education.

## Marketing and Advertising Regulations

Mobile sports wagering regulations in New York:

- Hold licensees responsible for the content of their advertising, marketing and branding
- Require all public-facing advertisements to clearly include the HOPEline to increase awareness and availability of problem gambling treatment, support and education services
- Prohibit false, deceptive, or misleading statements
- Require that material facts and terms and conditions in all marketing and promotions be clearly and conspicuously disclosed
- Allow customers to opt-out of receiving future direct advertisements
- Prohibit advertisements to underage persons or design elements that appeal primarily to underage persons
- Prohibit sports wagering from being promoted or advertised in college or university-owned news assets such as school newspapers, radio, or television broadcasts

The Commission's Gaming Division and Compliance unit review all operators' proposed marketing and advertising materials to ensure they are in compliance with these regulations.

**Licensed Mobile Sports Wagering Operators – 2023:**

- FanDuel

- Bally Bet*
- BetMGM
- DraftKings
- Rush Street Interactive
- Caesars Sportsbook
- WynnBET
- Resorts World Bet
- Fanatics/PointsBet**

*Bally Bet did not offer wagers in New York State between July 2 and November 19, 2023.
**Fanatics purchased PointsBet on June 29, 2023. The Commission approving Fanatics' acquisition of PointsBet's license on October 3, 2023.

## Statistics & Demographics

**Wager Determination**: The Commission currently permits wagers on the following sports:

| Sport | Leagues, Levels or Sanctioning Bodies | Wager Variations Allowed |
|---|---|---|
| Auto racing | 9 | 31 |
| Baseball | 5 | 143 |
| Basketball | 14 | 154 |
| Boxing | 6 | 20 |
| Cycling | 2 | 3 |
| Combat sports | 2 | 8 |
| Football | 4 | 261 |
| Golf | 8 | 112 |
| Hockey | 9 | 53 |
| Lacrosse | 1 | 5 |
| Rugby | 2 | 10 |
| Soccer | 37 | 124 |
| Softball | 1 | 5 |
| Tennis | 5 | 70 |
| Volleyball | 1 | 2 |
| **Total** | **106** | **1,001** |

**Sports with Limited Menu and Restricted Wagering ($500 max) set by Commission:**

- Athletes Unlimited
- Cornhole
- National Lacrosse League and NCAA Division I
- Professional Fighters League
- USFL and Indoor Football League
- Cricket
- Professional Darts

- Snooker
- Table Tennis

**Sports with Limited Menu/Wagers set by operator house rules w/Commission approval:**

- Aussie Rules Football
- Auto Racing
- Baseball
- Basketball
- Cycling
- Fighting
- Football
- Golf
- Hockey
- Lacrosse
- Rugby
- Soccer
- Tennis
- Volleyball

**Sports Wagering Regulation**

Mobile sports wagering is codified in New York State Racing, Pari-Mutuel Wagering and Breeding Law § 1367. The Commission's regulation of mobile sports wagering is covered by section 5330.

**Geolocation**: State law defines an authorized sports bettor as "an individual who is physically present in this state when placing a sports wager…" Part 5330 of the Commission's regulations require licensed operators to obtain Commission-approved geolocation services to ensure that all wagering account activity takes place within New York's borders (§ 5330.44).

According to geolocation services provider GeoComply: More than 3.6 million unique sports betting accounts were created between January 8, 2023 and January 7, 2024, conducting more than 1.4 billion transactions within New York State. Generally, the specific location of account activity within the state was consistent with population density across the state.

**Operator-Provided Data**: The Commission sought to obtain additional statistical and demographic information from licensed operators relating to voluntary self-exclusions, "cooling off" periods, responsible gaming-related interactions with accountholders, and other data points. Operator maintenance and reporting of such information to the Commission is not currently a regulatory requirement.

The Commission requested that operators provide such information voluntarily with the understanding that it would be used for research purposes and be subject to the exemptions from disclosure detailed in New York State's Freedom of Information Law (FOIL). Upon receipt of the submitted material, the Commission removed any potentially exempt information, including language that would identify the operator or any personally identifiable information.

Responses to the inquiry were varied. Several operators informed the Commission that much of the requested information was not available or was not being maintained by the operator.

**Underage Access:** N.Y. Racing, Pari-Mutuel Wagering and Breeding Law § 1367-a(4)(a)(iii) obligates each mobile sports wagering operator to implement measures to prohibit minors from participating in any sports wagering activity.

Additionally, as part of Commission Rule 5325.2(b)(3)(x) and N.Y. Racing, Pari-Mutuel Wagering and Breeding Law § 1367-a(4)(a)(xv), applied through Commission Rules 5329.34 and 5330.34, each operator was obligated to submit for approval, a problem-gaming plan that includes procedures to prevent gaming by minors. Through the end of 2023, the Commission was informed of 54 alleged occasions of underaged participation through lawfully created accounts. In all circumstances, the subject account was closed.

**Voluntary Self-Exclusion:** New York State has a robust voluntary self-exclusion program for those individuals who recognize that they should no longer participate in legal gambling. An individual who believes they have a problem may self-exclude from all forms of gaming regulated by the Commission, pursuant to Part 5402 of the Commission's rules. For those wishing to voluntarily self-exclude, OASAS supports a program that provides assistance in understanding the process and filling out the application as well as providing connections to local community-based services.

**HOPEline:** The 24/7 confidential HOPEline is funded by OASAS and is often the first point of contact for someone who is experiencing harm related to gambling. The HOPEline is answered by Bachelor's- and Master's-level clinicians who provide support and referrals to local community-based services, as well as immediate crisis intervention. Calls to the HOPEline have remained steady since the introduction of Mobile Sports Wagering in 2022. Prior to 2022, the top three types of gambling that those who called the HOPEline seeking assistance identified casinos, the Lottery and online wagering. Since 2022, callers have cited online wagering as their top concern. The demographic group contacting the HOPEline the most was males between the ages of 25-34.

## Looking Forward

**Mobile sports wagering operators are deficient in adequately collecting appropriate datapoints.** Despite mobile sports wagering taking place on entirely digital platforms which collect user data, many mobile sports wagering operators do not track or maintain neither quantitative nor qualitative information regarding who is participating in mobile sports wagering. The lack of data prevents the Commission and OASAS from accurately measuring the impact of mobile sports wagering on the gambling behavior of New Yorkers and prevents the appropriate focusing of public campaigns, outreach, and education efforts to those at high risk for experiencing gambling harms.

**New York has updated its voluntary self-exclusion program to capture additional data**, including: Name and any aliases; mailing address: phone number and email address, social security number or equivalent government ID number; date of birth; gender, height, weight, hair and eye color; race; selected self-exclusion duration (1, 3, 5 years or lifetime); and the type(s) of gaming most often played by the individual requesting exclusion.

The Mobile Sports Wagering industry is coalescing around improving responsible gaming practices. The recently launched Responsible Online Gaming Association (ROGA), consisting of the seven largest online sports betting operators in the country, provides regulators and other stakeholders an opportunity to coordinate best practices on the reporting of such data. The Commission and OASAS will engage ROGA to discuss how to best capture this information from the industry.

Additionally, the Commission and OASAS are working together to develop potential regulatory requirements for the tracking, standardization and reporting of such data, which would also be subject to the exemptions detailed in FOIL.

###

Case: 26-1835, 03/31/2026, DktEntry: 42.1 (172 of 265)

# Exhibit 14

Case: 26-1835, 03/31/2026, DktEntry: 42.1 (173 of 265)

NEW YORK STATE | Office of Addiction Services and Supports

Addiction Data Bulletin
Apr 2025, No. 2025-06

# Gambling Harms and Gambling Disorder Service and Treatment Utilization in New York State

## PURPOSE OF THIS BULLETIN

This bulletin provides an overview of the continuum of services and treatment provided and overseen by the New York State (NYS) Office of Addiction Services and Supports (OASAS) for those affected by gambling harms and gambling disorder. We highlight several specific services and treatment in this bulletin, including workforce training, a 24/7 helpline, inpatient and outpatient treatment, and a voluntary self-exclusion (VSE) program.

### Key Take Aways

- Service and treatment utilization in NYS for gambling harms, including gambling disorder, has increased since at least 2020.
- The helpline, VSE program, and inpatient and outpatient treatment had the largest single year increase from 2021-22, following the implementation of legalized mobile sports betting in January 2022.
- As of 2022, mobile sports betting surpassed casino gambling as the primary reason for gambling-related helpline calls made by New Yorkers.

## Providing A Continuum of Services and Treatment for New Yorkers Affected by Gambling Harms and Gambling Disorder

NYS OASAS provides and oversees a continuum of services to reduce gambling harms that span prevention, treatment, harm reduction, and recovery. (Table 1)

### Definitions

**Gambling risk environment** includes the range of policies, gambling establishments and operators, services and supports, and individual family and social supports, that influence the likelihood and the severity of gambling harms.

**Legal gambling activities** in NYS include lottery (e.g., Mega Millions, Lotto, scratch-offs), mobile sports betting, commercial casinos, tribal casinos, video lottery, horse racing, charitable activities (e.g., bingo, raffles).

**Gambling Disorder** (DSM-5-TR)[5] is a persistent and recurring pattern of problematic gambling behavior leading to significant distress or impairment. At least 4 of 9 criteria must be met in a 12-month period for a diagnosis. Gambling disorder is diagnosed as mild (4-5 criteria met), moderate (6-7 criteria met), or severe (8-9 criteria met). Criteria include the following (in brief):

- preoccupation with gambling
- need to gamble with increasing amounts of money to achieve desired excitement
- unsuccessful attempts to stop or control gambling
- restlessness or irritability when attempting to stop gambling
- gambling when feeling distressed
- chasing losses
- lying to conceal the extent of gambling involvement
- jeopardizing or losing important relationships, jobs, or educational/career opportunities
- relying on others to provide money to relieve desperate financial situations caused by gambling.

**Gambling Harms** refers to negative consequences associated with gambling disorder.

**At Risk for Gambling Disorder** includes those who experience gambling harms such as financial problems and interpersonal difficulties. The Problem Gambling Severity Index is an instrument used to assess risk for gambling disorder.[6]

### The Helpline

OASAS operates a multi-lingual 24/7 confidential helpline which provides on-demand crisis support and referrals for those experiencing gambling harms and/or substance use harms. Calls are answered by bachelor's- and master's-level clinicians who have training in crisis response and who have extensive knowledge of gambling and substance use harms. Callers receive referrals as needed including to community-based supports as well as warm transfers to one of seven Problem Gambling Resource Centers throughout the state. Further, all callers have the option to talk to a peer with lived experience.

**Figure 1. Helpline Calls for Services to Address Gambling Harms, 2020-24**




From 2020-24, there was a steady volume of calls to the helpline ranging from 2,345 in 2020 to 3,064 in 2024 with a peak call volume in 2022 (n=3,397). The volume of calls during this timeframe increased 30.7% from 2020 (n=2,345) to 2024 (n=3,064), with the largest single year increase of 25.9% from 2021 (n=2,698) to 2022 (n=3,397). (Figure 1)

In January 2022, mobile sports betting was implemented in NYS. Prior to 2022, the top reason for calls made by those experiencing gambling harms were harms related to casino-based gambling. Since 2022, the top reason has been online betting (e.g., mobile sports betting). (Figure 2)

**Figure 2. Top Three Gambling Activities Cited as Reason for Calling Gambling Harms Helpline, 2020-24**




## DATA ELEMENTS AND DEFINITIONS

**Gambling disorder treatment** data include unique individuals engaged in inpatient and outpatient treatment. Gambling disorder was identified by either identifying individuals through gambling disorder screening or by having had gambling disorder treatment goals in their treatment plan.

**Unique individuals** If individuals were receiving both inpatient and outpatient treatment in a single year, they were counted only once in analyses.

| Table 1. NYS OASAS Continuum of Services and Treatment for Gambling Harms and Gambling Disorder | | |
|---|---|---|
| **Continuum of Care** | **Approach** | **Services and Treatment Availability** |
| **Prevention** | Provide proactive and data-driven initiatives that utilize effective strategies to reduce or prevent gambling harms across the lifespan | • 145 OASAS prevention providers offer community trainings on the prevention and identification of gambling harms<br>• 7 Problem Gambling Resource Centers provide population-specific needs assessments and support the implementation of initiatives to high-risk populations including those aged 18-24 years and those experiencing both gambling harms and substance use disorder |
| **Treatment** | Provide gambling disorder treatment, including multi-lingual and low threshold treatment regardless of ability to pay | • Screening for gambling harms at all OASAS inpatient and outpatient substance use disorder clinics<br>• 44 OASAS gambling-designated and 100 private practitioners providing outpatient treatment<br>• 11 OASAS Addiction Treatment Centers inpatient treatment |
| **Harm Reduction** | Provide strategies and services to reduce the harms associated with gambling | • Self-Assessments measure current gambling behaviors and provides normative feedback and support<br>• Healthy Gambling Behaviors strategies to reduce harm while gambling<br>• GamFin free financial counseling to anyone experiencing gambling harms<br>• Voluntary Self Exclusion Program option to exclude oneself from NYS gambling opportunities to reduce further harms from gambling |
| **Recovery** | Provide strategies and services to individuals to improve their health and wellness, and to live self-directed lives to reach their full potential | • Access to individual peer supports<br>• Incorporating gambling recovery supports in the network of Recovery Community Outreach Centers<br>• Community-based self-help |
| **Public Awareness** | Implement extensive statewide public awareness campaigns to reduce the harms associated with gambling, including how to access strategies, services, and treatment | • A 24/7 confidential helpline to support those experiencing gambling harms<br>• Educational information to promote public education of gambling harms including gambling disorder<br>• "Take a Pause" public campaign to encourage self-assessment of gambling behaviors and promote resources |
| **Workforce Development** | Conduct extensive technical assistance to providers and provide free workforce training and supervision | • 363 Credentialed Alcohol and Substance Abuse Counselors with a Gambling Designation (CASAC-G's)<br>• Available workforce technical assistance and training include Clinical Resources, Providing Treatment, Supervision |

## Voluntary Self-Exclusion Program

NYS has a robust voluntary self-exclusion (VSE) program operated by the NYS Gaming Commission. Individuals can voluntarily choose to ban themselves from engaging in gambling at specific establishments or with mobile operators for time periods of 1-year, 3-years, or 5-years or lifetime. The VSE program includes the

option of receiving a follow-up call from the helpline to receive further gambling services and/or treatment if needed.

From 2017-23, the annual volume of VSE applications ranged from 980 in 2017 to 1,646 in 2023, with peak application volume in 2023. VSE applications during this timeframe significantly increased. (Figure 3)

From 2017-23, the volume of VSE applications increased 68.0% from 2017 (n=980) to 2024 (n=1,646). Similar to the helpline annual call trends described above, the largest single year increase of 36.0% was from 2021 (n=957) to 2022 (n=1,333). (Figure 3)

Further, the annual volume of VSE applications for a 1-year ban significantly increased more than any other duration (3-year, 5-year and lifetime). This pattern could suggest an increase in those who may be newly experiencing gambling harms and/or who may be using VSE as a time-limited harm reduction strategy.

Of note, the VSE application processing was stopped then reduced during 2020 due to the COVID-19 pandemic, with processing fully reinstated by December 2020. Direct comparisons between 2020-21 were therefore excluded.

**Figure 3. Voluntary Self-Exclusion Program, NYS, 2017-2023**




Source: NYS Gaming Commission

## Inpatient and Outpatient Treatment Utilization

OASAS provides a continuum of care for those affected by gambling harms across the state. All services are available to anyone affected by gambling harms, including individuals, family members, significant others and community members. Services are available regardless of ability to pay.

*Psychosocial Interventions*
Cognitive-behavioral therapy (CBT) is an effective evidence-based treatment that focuses on developing coping skills to manage high-risk situations that can lead to gambling harms. While CBT usually involves a therapist to guide treatment, self-directing formats such as CBT workbooks and online programs are also available.[1]

**FINANCIAL COUNSELING:**
**GamFin** is a new initiative which offers free online financial counseling to individuals and families in financial distress related to gambling. Counseling is aimed at relieving the pressure and stresses of financial harms due to gambling. All financial counselors have experience of gambling harms and are credentialed/certified in financial counseling.

Motivational interviewing, a brief counseling intervention that can enhance motivation to change, delivered alone or in combination with CBT, is also an effective treatment for gambling disorder.[2] Further, Gamblers Anonymous (GA) is modeled after 12-step programs such as Alcoholics Anonymous, but little is known about its effectiveness because the anonymous nature of this intervention limits research opportunities. Currently, there are no effective medications for the treatment of gambling disorder, despite numerous research trials.[3]

*Treatment Service Utilization*

From 2020-23, the annual number of New Yorkers engaged in inpatient or outpatient treatment with gambling disorder ranged from 3,535 in 2020 to 5,173 in 2023. (Figure 4)

The annual number of New Yorkers engaged in inpatient or outpatient treatment with gambling disorder increased 46.3% from 2020 (n=3,535) to 2023 (n=5,173).

Similar to the helpline annual call trends described above, the largest single year increase of 22.4% was from 2021 (n=3,983) to 2022 (n=4,876).

**Figure 4. Individuals Engaged in Inpatient and Outpatient Treatment with Gambling Disorder, NYS, 2020-23**




## Summary

NYS OASAS uses service and treatment utilization data to inform resource allocation and expansion of services as part of our data-driven approach to meet the needs of New Yorkers experiencing gambling harm. Data demonstrate increases in the number of New Yorkers engaging in the following services and treatment: the helpline, the VSE program, and treatment. Service and treatment utilization in NYS for gambling harms, including gambling disorder, has increased since at least 2020. The largest single year increases for all presented service and treatment utilization data were observed between 2021-22, following the implementation of legalized mobile sports betting in January 2022. As of 2022, mobile sports betting surpassed casino gambling as the primary reason for gambling-related helpline calls made by New Yorkers

Please see Addiction Data Bulletin No. 2025-05 *The Gambling Risk Environment and Public Perceptions of Gambling Harms in New York State*

**Suggested Citation**: Rebecca Cooper, Grace Hennessy, Shawna Black, Tracy Stickle, Jennifer Farrell, Sean Locke, Shuo Chen, Nina Gargon, Andrew Heck, Chinazo O Cunningham, Ashly E Jordan. *Gambling Harms and Gambling Disorder Healthcare and Service Utilization in New York State*. Addiction Data Bulletin (No. 2025-06). Apr 2025.

**Resources**

OASAS Gambling Harms and Gambling Disorder Public Website https://oasas.ny.gov/gambling

OASAS Gambling Harms and Gambling Disorder Clinical Resources https://oasas.ny.gov/providers/problem-gambling-treatment

OASAS CASAC-G https://oasas.ny.gov/credentialing/gambling-specialty-designation-gsd

OASAS Gambling Disorder Treatment Designation https://oasas.ny.gov/problem-gambling-designation-part-857

OASAS HOPELine https://oasas.ny.gov/hopeline

NYS Responsible Gaming https://gaming.ny.gov/responsible-gaming

Problem Gambling Resource Centers https://nyproblemgamblinghelp.org/

GamFin https://www.gamfin.org/

**References**

1. Potenza MN, Balodis IM, Derevensky J, et al. Gambling disorder. *Nature Reviews Disease Primers*. 2019/07/25 2019;5(1):51. doi:10.1038/s41572-019-0099-7
2. Cowlishaw S, Merkouris S, Dowling N, Anderson C, Jackson A, Thomas S. Psychological therapies for pathological and problem gambling. *The Cochrane database of systematic reviews*. Nov 14 2012;11:Cd008937. doi:10.1002/14651858.CD008937.
3. Mestre-Bach G, Potenza MN. Pharmacological management of gambling disorder: an update of the literature. *Expert Rev Neurother*. Apr 2024;24(4):391-407. doi:10.1080/14737175.2024.2316833
4. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders: DSM-5. American Psychiatric Association; 2013.
5. Ferris JA, Wynne HJ. The Canadian Problem Gambling Index. Canadian Centre on Substance Abuse; 2001.

# Exhibit 15

# Kalshi Recruiting Sportsbook Operators & Targeting College Campuses

Last Updated on September 22, 2025



*Photo by Steve DiMatteo on Unsplash*



Written by
**Adam Roarty**

Share Tweet Share Share Post

**Kalshi** is increasing its focus on sports markets by recruiting experienced sportsbook operators and targeting college campuses to appeal to new users.

The prediction market platform posted a job advert on its site for a new role in **Sports Operations**.

Part of the job description includes, “Sportsbook Operations Excellence: Leverage deep understanding of how sportsbooks operate to identify market opportunities, understand edge cases in settlement scenarios, and ensure our markets capture the sophistication that sports traders expect.”

And one of the key qualifications required is “Extensive experience with sportsbooks.” The need for sportsbook knowledge and experience comes as the site sees rapid growth in sports markets.

## NFL Sees Record Trading Volume

The company reached over $1 billion in monthly trading, driven by football markets. For NFL Week 2, the site saw 588,520 trades. That surpassed the previous record set by the presidential election.

The range of markets now rivals many sportsbooks with totals, point spreads, parlays, and prop markets. It is therefore no surprise that the company is hiring individuals with sportsbook experience.

In noting the record levels of trading volume, Kalshi also stressed that financials and economics are also areas where the site is seeing growth. The market on the September Federal Reserve decision processed $91 million in volume, more than the previous five Federal Reserve decision markets combined.

This pales in comparison to NFL markets, however. For the Chiefs-Giants game on Sunday, there was over $37 million traded. Over 80% of total trading is now on sports.

In court battles, Kalshi continues to argue that it is not offering sports betting; however, its advertising promotes the perception that it has effectively legalized sports betting in all 50 states.

## Kalshi Targets College Campuses to Expand User Base

While Kalshi can target states that have not yet legalized sports betting, it can also focus on those under the legal betting age in many states. To use the platform, users must be over 18 years old, not 21, as is the betting age in most states.

Filling a gap in the market, the company launched the **Kalshi Ambassadors Program**, which aimed to recruit individuals on college campuses to lead promotional drives. The ambassadors page on the site has now been deleted.

A now-deleted post on X also wrote, “Excited to welcome Yale, Harvard, Berkeley, Penn, Cornell, UVA, Michigan, Texas, Stanford, and NYU clubs into our ecosystem to both trade and build.”

The post added, “College campuses are the best place to spark new financial movements and will play a key role in bringing the next 100M users to prediction markets.”

After sparking criticism, the campaign has been removed from social media and the site. The NCAA said it is “deeply concerned” about the possibility of trading on college football on prediction market platforms.

The organization holds little power to stop the continued expansion of sports markets. States and tribes have ongoing court battles, but there does not appear to be any resolution on the horizon in the near future.



**Adam Roarty**

Adam Roarty is a journalist covering sports betting, regulation, and industry innovation for CasinoBeats. His coverage includes tax increases in the UK, covering breaking stories in the ever-evolving landscape of US betting...

**Read Full Bio**

# Exhibit 16

She's Connected by AT&T
Connecting you to stories of success from the women athletes you know and love



EXCLUSIVE Sports Betting

# Kalshi Adds NBA Prop Markets As Betting Crackdowns Surge

While the sports world grapples with a growing number of prop-betting scandals, Kalshi is adding NBA prop bets, *Front Office Sports* has learned.

BY BEN HORNEY

NOV 14, 2025 | 10:04 AM

*UPDATED NOV 14, 2025 | 02:04 PM*



ROB GRAY-IMAGN IMAGES

As professional sports leagues scramble to contain a wave of prop-betting scandals, Kalshi is quietly moving into NBA player prop markets.

Latest Stories

NFL Morning Games Break Ratings Record As Global Slate Grows

MLB's TV Hot Stove Market Heating Up

Jake Paul Takes Massive Risk With Anthony Joshua Netflix Fight

The prediction-market platform is once again expanding its sports-related offerings, this time to include NBA prop bets, a source familiar with the matter tells *Front Office Sports*. This weekend, users of the prediction-markets platform will be able to put money on player over/unders for the following categories: points, rebounds, assists, and three-pointers, the source says.

Miami Dolphins NFL Game Day Food Tour | B...

The expansion comes as prop bets have faced increasing scrutiny in the wake of recent scandals in both pro and college sports. In MLB, two Guardians pitchers—including All-Star closer Emmanuel Clase—were indicted last week for alleged involvement in a scheme to rig individual pitches. In the NBA, Trail Blazers coach Chauncey Billups, Heat guard Terry Rozier, and former NBA player and coach Damon Jones were indicted last month as part of a sprawling federal investigation that includes allegations about providing nonpublic information to bettors. (Billups was indicted over an allegedly rigged poker ring, although circumstantial evidence ties him to the betting indictment even though he was not named.)

Meanwhile, on Thursday evening, New Jersey law enforcement authorities charged 14 people for an array of crimes as part of a scheme that allegedly involved college athletes who were part of a multimillion-dollar sports betting ring with links to organized crime.

The scandals have pro leagues racing to do something about prop bets in particular. These are wagers on a specific event or individual performance—like how many 3-pointers a player will make in the first quarter—and aren't tied to the result of a game; they are easier to manipulate by individuals than game outcomes. The NBA is reviewing with its sportsbook partners how to stem the tide of bets vulnerable to manipulation, MLB has unveiled a nationwide plan with top sportsbooks to restrict prop bets on the sport, and on Thursday the NFL asked the sportsbooks it's in business with to stop offering certain prop bets.

Kalshi, which confirmed the plans to *FOS* Thursday evening, is aware of the sensitivity of the current moment. Spokesperson Sara Slane tells *FOS* the

new NBA prop bets are being added with protections in place.

“It’s going to be limited,” she says. “We have robust integrity protections in place.”

Slane stressed that the rollout is intentionally narrow: individual users will be limited to $10,000 per trade on the NBA props, the platform will only offer prop markets for roughly 50 NBA players to keep the scope tight. The guardrails are designed to keep the product transparent and controlled at a time when betting integrity is under heightened scrutiny.

Kalshi already works with a betting integrity monitor, IC360, and Slane says the company has imposed trading prohibitions on current and former NBA players, coaches, and staff.

“We are all over this,” she says. “We have 24-hour monitoring.”

Kalshi, which is fighting numerous court battles against state regulators that believe its sports event contracts constitute illegal sports betting,

previously added NFL prop bets ahead of the start of this season.

The new offerings come as Kalshi faces increased competition. Its main rival, Polymarket, has finally relaunched in the U.S. following a delay experts attributed to the federal government shutdown, although in a limited capacity for now as it tests its platform. Traditional sports betting giants FanDuel and DraftKings are each preparing prediction-markets products that could be available as soon as next month. Other players include President Donald Trump's social media platform Truth Social, Crypto.com, Robinhood, PrizePicks, Underdog, and Novig.

SHARE

**What to Read**

**Featured Today**



## NFL Morning Games Break Ratings Record As Global Slate Grows

International games on NFL Network averaged 6.2 million viewers.

BY DAVID RUMSEY



### MLB's TV Hot Stove Market Heating Up

## Trump-MBS White House Dinner Showcases Saudi Sports Influence

Attendees included Ronaldo, Bryson DeChambeau, and the owner of the 76ers.

### ABC, ESPN Bounce Back With Big CFB Ratings After YouTube TV Deal

Oklahoma-Alabama and Texas-Georgia drew more than 10 million viewers.

### Congress Turns Up Heat on Sports Leagues Over Betting Integrity Issues

MLB, the NBA, and the NCAA are all in lawmakers' crosshairs.

### NCAA-CHL Rule Change Has Already Shaken Up Hockey

Inside how leagues feel a year since the

announcement.



**Jake Paul Takes Massive Risk With Anthony Joshua Netflix Fight**



More in Sports Betting >

**Manfred Defends MLB Prop-Bet Rules As Congress Turns Up Heat**

**Nevada Going All Out in War Against Prediction Markets**

## College Athletes Allegedly Involved in $2M Illegal Sports Betting Ring

**Emmanuel Clase Pleads Not**

Unnamed college athletes allegedly operated sportsbooks for the gambling ring.

BY AMANDA CHRISTOVICH

**Guilty to Sports Betting Scheme**

**NFL QB Christian Ponder Is Preparing Athletes for Business**

**Sponsored Content**

Dianomi

**Protect and grow your investments while trading smarter. Free Guide**
TRADEWINS

**Here Are 29 of the Coolest Gifts for This 2025**
CONSUMERBAGS

**Florida-Japan real estate agreement, direct flight proposal could...**
HOMES.COM

**7 Ways to Generate Income With a $1,000,000 Portfolio [Free Guide]**
FISHER INVESTMENTS

**Leverage TradeStation's platform designed for self-directed traders.**

**Trade crypto easily on Kraken, the trusted leader in digital assets.**

**See how we're laying foundations for the AI frontier.**
STONEPEAK

**A financial professional can help you alleviate stress. See how.**
GUARDIAN

**FRONT OFFICE SPORTS**

Front Office Sports covers the influence of sports on business and culture.

**Front Office Sports**

Homepage
Learning
Newsletters
Games
Videos
Honors
Events
Shop

**Company**

About Us
Studios
Newsroom
Careers
Advertise
Contact
Company News
Submit a Tip
Press

Case: 26-1335, 08/31/2026, DktEntry: 42.1 (192 of 265)

Terms of Use Privacy Policy

© 2025 Front Office Sports. All Rights Reserved.

# Exhibit 17

# NFL working with lawmakers, betting partners to enforce prop betting rules amid other betting scandals




The league says it's working with state regulators and its betting partners to limit and where possible prohibit prop bets in the NFL. Patrick Smith / Getty Images

By **Sam Jane** and **Dianna Russini**
Nov. 13, 2025 | Updated Nov. 14, 2025

Share 19

The NFL is engaging with state lawmakers, regulators and its sports betting partners in an attempt to better enforce rules on player-based prop bets following recent betting controversies across professional sports. In a memo sent to all 32 teams and obtained by *The Athletic*, the league detailed restrictions on bets tied to player injuries,

ADVERTISEMENT

StubHub
It's better at the stadium
Catch all the College Football action from the 50-yard line. Score your seats!
BUY TICKETS NOW

The league says it's working to limit, and where possible prohibit, prop bets in the NFL. The prohibitions outlined in the memo are not new and were in place before recent news events, a league source confirmed to *The Athletic*. According to the memo, prop bets involving injuries, fan safety, officiating (including penalties and replays), plays determined solely by one player and pre-determined outcomes directly related to on-field competition (such as will a QB start this week? Will the team's first play from scrimmage be a run or pass) are prohibited.

The memo was essentially a reminder to teams about what prop bets are banned. The league source would not share which, if any, other prop bets might be considered for prohibition. It is unclear what other steps the NFL is taking to limit prop bets.

No sport drives more wagering in the United States than the NFL, which remains the centerpiece of the country's legal betting market. NFL bettors were expected to wager approximately $30 billion on the league this season with legal sportsbooks in the United States, according to an estimate released by the American Gaming Association.

TOP NFL STORIES

Case: 26-1835, 03/31/2026, DktEntry: 42.1, (196 of 265)



facing each team

QB stock report: Overhyped or underrated? What to make of Shedeur Sanders' first start

2026 NFL Mock Draft, top 10 picks: Caleb Downs to Jets, Fernando Mendoza to Browns

---

Other leagues have become embroiled in betting controversies, though, which likely prompted the league's steps. In Major League Baseball, Cleveland Guardians pitchers Emmanuel Clase and Luis Ortiz were indicted on a host of charges tied to allegedly rigging pitches thrown during games.

Clase allegedly threw rigged pitches on the first pitch of an at-bat, typically throwing pitches well outside the strike zone, even in the dirt, to ensure it wouldn't be called a strike. He allegedly received on occasion "bribes and kickbacks from the bettors," federal prosecutors said, and "sometimes provided money to the bettors in advance to fund the scheme."




View more on Instagram

81 likes

**theathletichq**

What are prop bets and why are they so controversial?

How people bet on sports could change in the near future.

View all comments

MLB subsequently capped pitch-level bets at $200 and barred them from parlays under new rules made with major sportsbooks, the league announced Monday.

ADVERTISEMENT

Ohio Gov. Mike DeWine, who had been adamant in encouraging MLB to ban micro-bets, said, “I urge other sports leagues to follow Major League Baseball’s example with similar action,” in the league’s release.

In the NBA last month, federal investigators arrested several people for allegedly sharing inside information. Portland Trail Blazers coach Chauncey Billups was implicated in an indictment for allegedly sitting star players and informing a bettor about the decision before games.

The NFL has avoided any major gambling scandals over the past two seasons. The last suspensions the league handed out for betting were in 2023, when it suspended 10 players for violating gambling policies. In Thursday’s memo, the league outlined several rules for NFL personnel to follow in regards to gambling.

Personnel were instructed to never bet on the NFL, not to have family or friends bet for them, not to gamble at teams’ facilities or while traveling, not to share insider information and not to enter a sportsbook during the NFL playing season, among other rules.

his play. Gano, who's been in the league since 2009 and seen the league's betting rules be reshaped, said "nobody wants to hear that stuff."

"Ever since sports betting started happening, I get people telling me to kill myself every week," Gano said. "Because I'll hit a kick that loses them money. I'll miss a kick, and it loses them money. It was the other day, somebody told me to get cancer and die."

 

By **Sam Jane** and **Dianna Russini**

Tagged To: NFL, Sports Business

## YOUR NEXT READ

NFLPA pushes back on NFL owners' attempt to block annual report cards

Dallas Cowboys co-owner defends Bad Bunny Super Bowl halftime show

NFL Week 11 projected scores: Model predicts point spreads and totals for every game

## LATEST LEAGUE STORIES

49ers' Jauan Jennings swings at Panthers' Tre'von Moehrig after 'cheap shot'

Christian McCaffrey leads 49ers to MNF victory over Panthers: Takeaways

struggles

**LATEST HEADLINES**

Why Tyler Skaggs' iPad could trigger millions in punitive damages against Angels

Lawsuit claims Suns owner Mat Ishbia treated team like his 'personal piggy bank'

Elle Duncan is set to become the face of Netflix's sports coverage: Sources

NOV 25, 2025

**Connections: Sports Edition**

Find the hidden link between sports terms

Play today's puzzle ›

**COMMENTS** 19

F Fernando D. · Nov 13

So even the rules are brought to you by FanDuel?

G Glenn K. · Nov 13

False concern. How about all leagues saying NO prop bets at all? You want the leagues' cooperation, win/loss and over/under are the only bets permissible. Otherwise, we're out: no gambling commercials during games, no gambling ads in stadiums, no more use of our player or team names, no more public injury reports, no more permission to show our games in casinos. Try it that way and see who caves first.

S Shai F. · Nov 13

View all comments

**National**

Boxing
Bundesliga
Champions League
Championship
College Football
College Sports
Copa America
Copa del Rey
Cricket
Culture
Cycling
Europa League
European Championship
FA Cup
Fantasy Baseball
Fantasy Basketball
Fantasy Football
Fantasy Hockey
Fantasy Premier League
FIFA Club World Cup
FIFA Men's World Cup
FIFA Women's World Cup
Formula 1
Gaming
Global Sports
Golf
International Football
La Liga
League Cup
Memorabilia & Collectibles
Men's College Basketball
Mixed Martial Arts
MLB
MLS
Motorsports
NASCAR
NBA
NFL
NHL
NWSL
Olympics
Opinion
Peak
Premier League
Sailing
Scottish Premiership
Serie A
Soccer
Sports Betting
Sports Business
Tennis
Top Sports News
WNBA
Women's College Basketball
Women's Euros
Women's Hockey
Women's Soccer
The Athletic Ink
Podcasts

**US**

Arizona
Atlanta
Baltimore
Bay Area
Boston
Buffalo
Carolina
Chicago
Cincinnati
Cleveland
Columbus
Dallas
Denver
Detroit
Houston
Indiana
Jacksonville
Kansas City
Las Vegas
Los Angeles
Memphis
Miami
Minnesota
Nashville
New Orleans
New York
Oklahoma
Oregon
Orlando
Philadelphia
Pittsburgh
Sacramento
San Antonio
San Diego
Seattle
St. Louis
Tampa Bay
Utah
Washington DC
Wisconsin

**Canada**

Calgary
Edmonton
Montreal
Ottawa
Toronto
Vancouver
Winnipeg

**Partners**

Collectibles by eBay
Odds by BetMGM
Streaming by Fubo
Tickets by StubHub

**Subscribe**

Start Subscription
Buy a Gift
Student Discount
Group Subscriptions

**HQ**

About Us
Careers
Code of Conduct
Editorial Guidelines
Business Inquiries
Press Inquiries

**Support**

FAQ
Forgot Password?
Contact Us
Terms of Service

**Newsletters**

The Pulse
The Bounce
The Windup
Prime Tire
Full Time
Until Saturday
Scoop City
The Athletic FC
MoneyCall
Red Light

Case: 26-1835, 08/31/2026, DktEntry: 42.1 (202 of 265)

NFL Teams ••• Subscribe

©2025 The Athletic Media Company, A New York Times Company Your Privacy Choices Privacy Policy Cookie Policy Support

Sitemap

# Exhibit 18

nytimes.com

# After MLB's reckoning on sports betting offenders, what can leagues do to enforce the rules?

*Rustin Dodd, Cody Stavenhagen, Stephen J. Nesbitt*

10–13 minutes

---

**By Rustin Dodd, Stephen J. Nesbitt and Cody Stavenhagen**

When Major League Baseball announced a lifetime ban for San Diego Padres infielder Tucupita Marcano on Tuesday, the particulars of his wrongdoing were laid out in specific detail: 387 bets placed at legal sportsbooks, 231 wagers related to MLB and 25 on the Pittsburgh Pirates, his employer at the time. He allegedly bet more than $150,000 on baseball.

Marcano was not a particularly savvy bettor; according to MLB, he won just 4.3 percent of his wagers, most of them parlays. But the copious facts released by the league on Tuesday — the same day Ippei Mizuhara, Shohei Ohtani's ex-interpreter, pleaded guilty to bank and tax fraud — underscore a recurring theme as the sports world grapples with more blowback from the precipitous rise of legalized gambling in the United States.

In a majority of states, it's never been easier to place a bet. But in a world of legal online sportsbooks and smartphones, it's also never been easier for leagues to track the betting and, as they see it, protect the competitive

integrity of the sport. In addition to Marcano's lifetime ban, MLB announced year-long suspensions for Oakland A's pitcher Michael Kelly and three minor leaguers — the Padres' Jay Groome, the Philadelphia Phillies' José Rodríguez and the Arizona Diamondbacks' Andrew Saalfrank. All four were found to have placed bets on MLB while in the minors.

The announcement came, according to MLB, after an investigation that included interviews and cooperation from the league's sportsbook partners, a process that offers a window into the monitoring system in place at legal sportsbooks. That system includes outside firms like U.S. Integrity, a monitoring service that works with major sports leagues and sportsbooks.

"As betting becomes more acceptable and widespread, having these players getting in the sports betting market is dangerous," said John Wolohan, a sports law professor at Syracuse. "It's really uncomfortable for the leagues. That said, the leagues are in bed with the DraftKings and the FanDuels of the world anyway, and casinos, so in some ways they're taking the money and hoping things don't blow up in their face."

While leagues like MLB increasingly court gaming partners, they have attempted to implement safeguards to deter athletes, coaches and team or league employees from gambling on their respective sports.

When a bettor — any bettor, for that matter — logs into a betting app, their location is immediately pinned by integrity analysts within a matter of feet. Global positioning is one way of ensuring no athlete can place bets from within a team facility without being caught. There are other methods, too. Social media is monitored closely, and companies use real-time data and proprietary algorithms to monitor betting trends and flag any unusually large line movement. If a troubling trend is spotted, it is generally sent to a

person on an investigative team who will look deeper into the matter.

If a case rises to a higher degree of suspicion, a monitoring service alerts both sportsbooks and the league. In some cases, sportsbooks have internal teams watching for abnormal line movement and betting behavior.

U.S Integrity is now part of a joint venture called ProhiBet working to use encryption technology that will prevent athletes, coaches and league officials from placing bets in the first place. In May 2023, the company launched a tip hotline to allow people within the sports world to report gambling suspicions.

U.S. Integrity did not respond to a request for comment on Tuesday.

In the case of Marcano and the other suspended players, MLB said a legal sports betting operator alerted the league in March of past betting activities from accounts connected to major- or minor-league players, none of whom were found to have played in a game on which they bet. A person briefed on the league's investigation told *The Athletic*'s Evan Drellich, "This information came to light as a result of a legal sportsbook's new proactive measures to enforce their policies," though they did not detail the changes.

Peter Bayer, a former A's minor league pitcher, went public last year saying he'd been ruled ineligible by MLB since 2021 for betting on baseball. League investigators found that Bayer placed over 100 baseball-related wagers in 2020, including at least 12 on his organization, and accused him of attempting to obstruct the league's investigation.

Bayer's bets were first discovered by the Colorado Division of Gaming, which identified him as a prohibited bettor and reported his bets to MLB.

From the perspective of Dan Hartman, who was director of the Colorado

Case: 26-1835, 03/31/2026, DktEntry: 42.1 (207 of 265)

Division of Gaming at the time, cases such as Bayer's are a testament to the collaboration between regulators, law enforcement and leagues.

"We're not gonna stop incidents like this," Hartman said last year, but proper oversight allows leagues to address them.

A player placing legal bets under their own name may come with obvious consequences.

"Honestly, in the years I've been involved in this, I see it time and time again," said Steve Paine, co-founder of the advisory firm Evolve Sports Integrity. "It's those basic checks. You think, if they were trying to do wrongdoing, they'd go out of their way to really hide it — use pseudonyms and fake accounts. But they don't. They just bet in their own name."

Leagues and integrity companies, however, are also working to eliminate more complicated occurrences, such as an athlete placing bets through a friend or family member.

In 2020, an independent regulatory commission found former Liverpool striker Daniel Sturridge guilty of giving his brother inside information about a potential transfer to Sevilla FC. In 2021, Atlético Madrid defender Kieran Trippier served a brief ban for allegedly tipping off friends to his transfer destination. More recently on U.S. soil, it was revealed one of the more than two dozen Iowa and Iowa State athletes penalized for gambling-related offenses used a FanDuel account under his mother's name.

Last spring, Alabama baseball coach Brad Bohannon was fired just days after U.S. Integrity flagged suspicious wagering on an Alabama–LSU baseball game made in Cincinnati by a man named Bert Neff. The incident produced a black eye for the NCAA and has since led to criminal charges against Neff, but it also served as a prime example of the sports-gambling machine's monitoring process working properly and swiftly.

"The system worked," Louisiana Gaming Control Board chair Ronnie Johns said last year of the Alabama case. "We have to protect the integrity of sports wagering or the system will crater."

It's not difficult to imagine a scheme evading the system for some time. Especially if an account isn't in the name of the prohibited bettor, or someone with the same last name, or if it makes only modest and unalarming wagers. But as time passes sportsbooks, regulators and betting-integrity companies are becoming more streamlined, sophisticated and savvy to new ways bettors are trying to game the system.

"I think it's always going to be a bit of a cat-and-mouse scenario," Paine said. "People who are trying to place bets that they're not supposed to place, they'll always look for methods to try and disguise that — whether it be betting through family members, or betting through using other third parties, or trying to use technology like VPNs to make bets appear like they're coming from another country. All of those things exist."

But the technology used to monitor such activity is not rudimentary. There are ways to identify even those who attempt to find loopholes.

"If they're using the same iPhone that they used to place the bets when they placed it in their own name two years ago, the companies can find links," Paine said. "It's not just the account name. It's, 'Was it your home router that you came through when you placed bets? Was it the same device?' There's lots of technical data points these sophisticated companies can use to detect fraud."

A problem leagues face: These safeguards only apply to legally placed bets, not wagers placed through illegal sportsbooks, like in the case of Mizuhara, who admitted to stealing more than $17 million from Ohtani to pay off gambling debts. "Those you'll never catch," Wolohan said. "Or you

Case: 26-1235, 03/31/2026, DktEntry: 42.1 (209 of 265)

shouldn't catch, unless there's a criminal investigation into the bookie." Mizuhara's case stemmed from a criminal investigation into the bookmaker believed to be at the center of a Southern California-based gambling ring, Mathew Bowyer.

MLB commissioner Rob Manfred in a statement Tuesday spoke to the importance of the league's continued collaboration with regulators and sportsbooks.

"Since the (2018) Supreme Court decision opened the door to legalized sports betting, we have worked with licensed sports betting operators and other third parties to put ourselves in a better position from an integrity perspective through the transparency that a regulated sports betting system can provide," Manfred said. "MLB will continue to invest heavily in integrity monitoring, educational programming and awareness initiatives with the goal of ensuring strict adherence to this fundamental rule of our game."

Paine led the UK Gambling Commission's sports-betting intelligence unit before co-founding a betting-integrity firm that advises the governing bodies of several European and international sports leagues. He recalled hearing an official for an international federation discussing the overarching gambling issue. The official, Paine said, mused that the league could do everything right, and be prepared for every possibility, yet still there would be a small number of bad actors who'd disobey the rules — no matter how robust the education, no matter how diligent the enforcement.

"You can't prevent everything bad from ever happening," Paine said. "But when it does, can you identify it? And can you tackle it swiftly, fairly and robustly? I think that's the key. It's unrealistic to think any sport is immune to this. Put the right safeguards in place. Take it seriously. Invest in it

Case: 26-1835, 03/31/2026, DktEntry: 42.1 (210 of 265)

properly. Work with the stakeholders. And when bad stuff does happen, be prepared for it and tackle it. I think that's what (MLB) have done here.

"No one wants a big news story like this, but they've identified it and dealt with it. I don't see what stronger message they can send out."

*(Top photo of Marcano: George Kubas / Diamond Images via Getty Images)*

# Exhibit 19

NCAA®

October 30th, 2025

VIA EMAIL (rheaslip@kalshi.com)

Kalshi, Inc.
594 Broadway
New York, NY 10012

Dear Mr. Heaslip:

I am reaching out to address some language currently being used on Kalshi.com. It has been brought to our attention that Kalshi uses the language "Outcome verified from NCAA" (with a hyperlink to NCAA.COM.) See attached for an example.

The NCAA is concerned that this language will imply to the consuming public that the NCAA has some relationship with Kalshi which involves the NCAA "verifying" or "approving" data for Kalshi. Given the NCAA's stance on sports betting, this could cause significant harm to the value and goodwill of the NCAA brand.

We are hopeful that you share our concern and are willing to amend the language to something which clearly reflects the reality of the relationship. For example, replacing the verified language with something like, "Outcome sourced from NCAA.COM". We also ask that Kalshi add a disclaimer to any page related to an NCAA game or contest. For example, "Kalshi is an independent sports betting platform and is not affiliated, associated, authorized, endorsed by, or in any way officially connected with the NCAA. All trademarks, logos, and brand names are the property of their respective owners."

Additionally, the NCAA is concerned with Kalshi's commitment to contest integrity and the protection of contest participants. As such, we welcome Kalshi's stance on its efforts to protect the integrity of NCAA competitions and to reduce instances of abuse and harassment directed at student-athletes and other participants.

(1) Is Kalshi willing to cooperate fully with NCAA integrity or prohibited customer (e.g. coach, official, athlete) investigations, including providing timely and comprehensive responses to transaction level data and geolocation requests?
(2) What proactive steps does Kalshi take to monitor collegiate sports markets for integrity concerns and prohibited customers?
(3) Will Kalshi promptly report integrity concerns and prohibited customers to the NCAA?
(4) What classifies a prohibited customer under Kalshi's guidelines?

(5) Many State legislators and gaming authorities have agreed with the NCAA's stance that prop betting markets heighten the risk of integrity and harassment concerns. Is Kalshi committed to forbidding similar predictive markets on their platforms (i.e. markets based on part of a competition or individual competitor as opposed to the entire team/competition)?

If you would like to discuss further, please let us know. Otherwise, we look forward to your response.

Sincerely,



Scott Bearby
Senior Vice President and
Chief Legal Officer

# Exhibit 20

Kalshi

Log in Sign up

Trending New All Politics **Sports** Culture Crypto Climate Economics Mentions Com

# College Basketball (M)

Games Futures Awards Conference

Game Winner

| | |
|---|---|
| Lindenwood | <1% |
| Indiana | 99% |

Nov 20 @ 6:00pm EST Spread and Total

Game Winner

| | |
|---|---|
| Memphis | 9% |
| Purdue | 91% |

Nov 20 @ 6:00pm EST Spread and Total

Game Winner

| | |
|---|---|
| Robert Morris | 14% |
| St. Bonaventure | 86% |

Nov 20 @ 6:00pm EST Spread and Total

Game Winner

| | |
|---|---|
| Bucknell | <1% |

Explore Live Search Ideas

Kalshi

Sign up

Trending New All Politics **Sports** Culture Crypto Climate Economics Mentions Com

Chicago St. <1%

Iowa 99%

Nov 20 @ 7:00pm EST — Spread and Total

Game Winner

Miami (FL)

Nov 20 @ 7:00pm EST — Spread and Total

Game Winner

LIU 40%

Fordham 60%

Nov 20 @ 7:00pm EST — Spread and Total

Game Winner

Pacific 23%

Florida Atlantic 77%

Nov 20 @ 7:00pm EST — Spread and Total

Explore Live Search Ideas

Kalshi

Sign up

Trending New All Politics **Sports** Culture Crypto Climate Economics Mentions Com

Company

Brand Kit

Instagram

Reddit

TikTok

Trading Hours

Fee Schedule

Trading Prohibitions

Incentive Program

© 2025 Kalshi Inc.

Trading on Kalshi involves risk and may not be appropriate for all. Members risk losing their cost to enter any transaction, including fees. You should carefully consider whether trading on Kalshi is appropriate for you in light of your investment experience and financial resources. Any trading decisions you make are solely your responsibility and at your own risk. Information is provided for convenience only on an "AS IS" basis. Past performance is not necessarily indicative of future results. Kalshi is subject to U.S. regulatory oversight by the CFTC.

Explore Live Search Ideas

# Exhibit 21

2025 FORD F-150® TRUCK
Learn More
Build & Price
buyfordnow.com

NCAA sends concerns to prediction market Kalshi
17d - Shwetha Surendran

Women's College Volleyball Bracketology: Top seedings, bracket watch and more
1d - Charlie Creme




Western Michigan won the men's hockey natty! Now what?
42d - Adam Rittenberg

Commission moves to bolster NIL policing power
1d - Dan Murphy

B1G denies Michigan coercion claim over PE deal
MICHIGAN WOLVERINES 2d

U-M, USC opposition pauses $2.4B Big Ten deal

# NCAA sends concerns over 'integrity' to prediction market Kalshi



Shwetha Surendran
Nov 3, 2025, 07:40 PM ET

Terms of Use Privacy Policy Your US State Privacy Rights Children's Online Privacy Policy Interest-Based Ads About Nielsen Measurement
Do Not Sell or Share My Personal Information Contact Us Disney Ad Sales Site Work for ESPN Corrections

ESPN BET Sportsbook is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.
Copyright: © 2025 ESPN Enterprises, Inc. All rights reserved.

letter obtained by ESPN.

In the letter, dated Oct. 30, NCAA chief legal officer Scott Bearby asked Kalshi how it monitors collegiate sports markets for integrity concerns and activity by prohibited customers, who it considers a prohibited customer, whether it will report integrity concerns to the NCAA and whether the company will cooperate with NCAA investigations.

"We welcome Kalshi's stance on its efforts to protect the integrity of NCAA competitions and to reduce instances of abuse and harassment directed at student-athletes and other participants," Bearby wrote.

**EDITOR'S PICKS**



**Sports betting isn't legal in all 50 states ... or is it?**

David Purdum and Shwetha Surendran

The NCAA also asked if Kalshi would ban prediction markets similar to prop bets, which the company began offering this fall.

Prop betting markets, Bearby noted in the letter, heighten "the risk of integrity and harassment concerns." In March last year, NCAA president Charlie Baker called for a ban on prop bets on college athletes in states with legal sports wagering.

The NCAA also asked Kalshi in the letter to review language on its website that the NCAA says implies a relationship between them.

"Kalshi has robust market integrity provisions required by our status as a federally licensed financial exchange," a Kalshi spokesperson said in a statement to ESPN. "We value the NCAA's feedback and are working on adjusting the language on our site. We are currently reviewing and addressing their additional requests."

Prediction markets like Kalshi have emerged over the past year and are competing with traditional sportsbooks in the betting market. Kalshi is battling multiple lawsuits by state gambling regulators, who allege that the company is violating state laws by offering event contracts that mimic sports bets. Kalshi argues that it does not fall under state jurisdiction and is instead regulated by the Commodity Futures Trading Commission, a federal agency.

In March, Kalshi announced a partnership with IC360, an integrity monitor used by many collegiate and professional leagues.

Terms of Use Privacy Policy Your US State Privacy Rights Children's Online Privacy Policy Interest-Based Ads About Nielsen Measurement
Do Not Sell or Share My Personal Information Contact Us Disney Ad Sales Site Work for ESPN Corrections

ESPN BET Sportsbook is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2025 ESPN Enterprises, Inc. All rights reserved.

into potential betting violations by approximately 30 current or former men's basketball players.

**You May Like** Sponsored

**Dementia and Memory Loss Have Been Linked to a Common Habit**
Magazine Health Learn More

**Tinnitus? Do This When The Ringing Won't Stop**
Magazine Health Learn More

**Cardiologist: Strong Arms After 60 Comes Down To This**
Apex Labs

**Delhi: Get A No-Cost Solar Install If You Live In These Zips**
Energy Bill Cruncher Click Here

**Top Health Experts Warn: If You Cook With This Pan, Stop Immediately**
Healthy Living Daily Learn More

**Dementia Has Been Linked To This Common Habit. Do You Do It?**
Memory Health Learn More

# Women's College Volleyball Bracketology: Top seedings, bracket watch and more

Terms of Use Privacy Policy Your US State Privacy Rights Children's Online Privacy Policy Interest-Based Ads About Nielsen Measurement
Do Not Sell or Share My Personal Information Contact Us Disney Ad Sales Site Work for ESPN Corrections

ESPN BET Sportsbook is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2025 ESPN Enterprises, Inc. All rights reserved.




Kayla Wolf/Getty Images

Charlie Creme
Nov 19, 2025, 03:00 PM ET

Share Like 71

For most leagues across the country, the regular season is over and conference tournaments are set to begin later this week. The final sprint to Selection Sunday on Nov. 30 (6 p.m. ET, ESPN) has arrived.

There are 31 automatic bids with 33 at-large teams chosen by the NCAA volleyball committee. Volleyball seeds the top eight teams in each region, and the top four in each region serve as first- and second-round hosts. The rest of the bracket is filled out to balance it competitively and geographically. The highest-remaining seeds also host the regionals, and the 2025 Final Four is in Kansas City, Missouri, on Dec. 18 with the finals on Dec. 21.

## Bracket watch

**Volleyball Championship Challenge**

Terms of Use Privacy Policy Your US State Privacy Rights Children's Online Privacy Policy Interest-Based Ads About Nielsen Measurement
Do Not Sell or Share My Personal Information Contact Us Disney Ad Sales Site Work for ESPN Corrections

ESPN BET Sportsbook is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2025 ESPN Enterprises, Inc. All rights reserved.




Fill out NCAA Women's Volleyball Championship brackets! $5K in prizes. **Make Your Picks**

The ACC does not hold a postseason tournament. The regular season, which concludes Nov. 29, decides the automatic bid to the NCAA. A tournament doesn't seem necessary with the level of excitement the conference has already provided with more to come in the final two weekends. Last Friday Stanford and Pittsburgh had perhaps the match of the year that the Cardinal won 16-14 in the final set. Louisville pulled a reverse sweep on Miami on Sunday, while SMU took down Stanford in four sets. Six teams are within two games of the top spot and five of those teams sit inside the top-16 of this week's Bracketology. Louisville, Pittsburgh and Stanford lead the ACC at 14-2 and the Cardinals still have to play the Panthers and Stanford in the final two weeks. Not only will those games decide the ACC champion but will go a long way to deciding the No. 2 seeds and possibly the final No. 1 seed for the NCAA tournament.

## Top seedings

**No. 1 seeds:** Nebraska, Kentucky, Texas, Arizona State

**No. 2 seeds:** Pittsburgh, SMU, Stanford, Texas A&M

**No. 3 seeds:** Louisville, Purdue, Creighton, Wisconsin

**No. 4 seeds:** Kansas, Minnesota, Indiana, Miami

**No. 5 seeds:** USC, Iowa State, TCU, Colorado

**No. 6 seeds:** Tennessee, Baylor, BYU, North Carolina

**No. 7 seeds:** Kansas State, Penn State, UTEP, Florida

Terms of Use Privacy Policy Your US State Privacy Rights Children's Online Privacy Policy Interest-Based Ads About Nielsen Measurement
Do Not Sell or Share My Personal Information Contact Us Disney Ad Sales Site Work for ESPN Corrections

ESPN BET Sportsbook is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.
Copyright: © 2025 ESPN Enterprises, Inc. All rights reserved.

Michigan State, Northern Arizona, Northern Kentucky, Northern Iowa, Prairie View A&M, Princeton, Oregon, Rice, San Diego, South Florida, Stephen F. Austin, Utah State, Utah Valley, Villanova, Winthrop, Xavier

*(The rest of the field teams wouldn't be seeded)*

## Bubble watch

**All of ESPN. All in one place.**




Watch your favorite events in the newly enhanced ESPN App. Learn more about what plan is right for you. **Sign Up Now**

Terms of Use Privacy Policy Your US State Privacy Rights Children's Online Privacy Policy Interest-Based Ads About Nielsen Measurement
Do Not Sell or Share My Personal Information Contact Us Disney Ad Sales Site Work for ESPN Corrections

ESPN BET Sportsbook is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2025 ESPN Enterprises, Inc. All rights reserved.

UCLA on the schedule. With a win in one of those matches, the Spartans are likely in. Missouri and Oklahoma, sitting on the wrong side of the bubble right now, have the SEC tournament starting Friday. A good showing, perhaps with an upset -- Oklahoma would meet Kentucky in the quarterfinals, Missouri is set up to meet Texas in the quarters -- will be necessary for an at-large bid.

**Last Four In:** Georgia Tech, Michigan State, South Florida, Oregon

**First Four Out:** Missouri, Oklahoma, Cincinnati, Florida State

**Next Four Out:** Georgia, Central Florida, Tulsa, Pepperdine

## Conference breakdown

**Big 12:** 8
**Big Ten:** 10
**ACC:** 7
**SEC:** 5
**Big East:** 4
**American:** 2
**CUSA:** 2

Case: 26-1835, 03/31/2026, DktEntry: 42.1 (226 of 265)

# Exhibit 22

An official website of the United States government Here's how you know

# Designated Contract Markets (DCM)

Search Designated Contract Markets (DCM) using the following criteria

**Status**

ALL

**Status Date From**

mm/dd/yyyy

**Status Date To**

mm/dd/yyyy

☐ Show All

Search    Reset (/IndustryOversight/IndustryFilings/TradingOrganizations)

| **Organization (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Organization)** | **Status (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Status)** |
|---|---|
| RSBIX, LLC | Pending |
| Aristotle Exchange DCM, Inc. | Designated |
| Electron Exchange DCM, LLC | Designated |
| OneChronos Markets DCM LLC | Pending |
| Xchange Alpha, LLC | Pending |
| QCX LLC d/b/a Polymarket US | Designated |
| Railbird Exchange, LLC | Designated |
| Quanta Exchange, Inc. | Designated |
| Gemini Titan, LLC | Pending |
| ForecastEx LLC | Designated |
| IMX Health, LLC | Designated |

Case: 26-1835, 03/31/2026, DktEntry: 42.1 (228 of 265)

| Organization (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Organization) | Status (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Status) |
|---|---|
| Inet Futures Exchange, LLC | Vacated |
| OneChicago LLC | Vacated |
| Coinbase Derivatives, LLC | Designated |
| Kalshi | Designated |
| NASDAQ Futures, Inc. | Vacated |
| Bitnomial Exchange, LLC | Designated |
| Small Exchange, Inc. | Designated |
| trueEX LLC | Dormant |
| LedgerX LLC d/b/a MIAX Derivatives Exchange | Designated |

| **Organization (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Organization)** | **Status (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Status)** |
|---|---|
| ELX Futures, L.P. | Dormant |
| American Gas Exchange, LLC | Pending |
| Aqua-Index Exchange, LLC | Pending |
| EOX Exchange LLC | Withdrawn |
| DCM Global Worldwide (Test) | Designated |
| NYSE Liffe US, LLC | Vacated |
| Kansas City Board of Trade | Vacated |
| Nodal Exchange, LLC | Designated |
| The Trend Exchange, Inc. | Dormant |
| GFI Futures Exchange LLC | Pending |
| Chicago Climate Futures Exchange, LLC | Dormant |

| **Organization (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Organization)** | **Status (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Status)** |
|---|---|
| Green Exchange, LLC | Vacated |
| NexTrade Futures Exchange, Inc. | Withdrawn |
| Cboe Digital Exchange | Designated |
| NQLX LLC Futures Exchange | Vacated |
| FMX Futures Exchange, L.P. | Designated |
| U.S Futures Exchange, L.L.C. | Dormant |
| Cantor Exchange, LLC | Withdrawn |
| Pacific Futures Exchange | Vacated |

| Organization (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Organization) | Status (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Status) |
| --- | --- |
| Merchants Exchange | Dormant |
| ICE Futures U.S., Inc. | Designated |
| Citrus Associates of the New York Cotton Exchange | Vacated |
| New York Cotton Exchange | Vacated |
| Coffee, Sugar & Cocoa Exchange | Vacated |
| Exchange Place Futures Exchange, L.L.C | Dormant |
| MidAmerica Commodity Exchange | Vacated |

| **Organization (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Organization)** | **Status (/IndustryOversight/IndustryFilings/TradingOrganizations?dir=ASC&col=Status)** |
|---|---|
| North American Derivatives Exchange, Inc. d/b/a Crytpo.com | Designated |
| New York Futures Exchange | Dormant |
| AMEX Commodities Corporation | Dormant |
| onExchange Board of Trade, Inc. | Dormant |

1 (?page=0) 2 (?page=1) Next (?page=1) Last (?page=1)

# <u>Exhibit 23</u>

# Kalshi Puts Geolocation Tech in Spotlight With Rise, Court Battles

www.sportico.com/business/tech/2025/kalshi-geolocation-technology-prediction-markets-1234873796/

October 16, 2025




Los Angeles Chargers quarterback Justin Herbert, who has appeared in Kalshi promotional material, plays in one of the states that could require geoblocking technology. *Illustration by Sportico; Photo by Getty Images*

Kalshi's growth has concerned U.S. geolocation technology providers, who, like many in the gambling industry, are scrambling to figure out how federally regulated sports prediction markets might reshape their businesses.

Kalshi, unlike traditional sportsbooks, offers bets in all 50 states and has no legal mandate to sign geolocation deals for advanced customer tracking. The geolocation firms that earn hundreds of millions of dollars annually from established gaming operators could lose out if this model continues to proliferate. Kalshi is already expanding its footprint, and some prominent sportsbooks are considering launching similar prediction market products nationwide.

As Kalshi argues its broader case that federal Commodity Futures Trading Commission (CFTC) rules preempt gambling laws elsewhere, it has said in court that adopting geolocation tools to shut out customers in regions where its services are banned would

cause both economic and "irreparable harm," a legal term that encompasses harm monetary damages can't later remedy.

Geolocation companies are fuming about this stance. Gaming operators that pay for geolocation technology in part so they can keep their state gaming licenses aren't thrilled, either.

Soon, Kalshi will need to furnish evidence and testimony to demonstrate the burden it claims is legitimate. U.S. District Judge Brenda Weksler recently green-lighted Nevada's pursuit of related materials for pretrial discovery after Kalshi argued such fact-finding was unnecessary.

The process could shed light on the intricacies of geolocation businesses and test federal commodity laws about limiting access to prediction markets.

"Kalshi is proudly the largest federally regulated prediction market in the country," Kalshi wrote in an emailed statement. "As a responsible actor, we strictly follow all CFTC regulations in order to further our mission of democratizing information and providing a safe and accountable platform for our consumers to trade on. That is exactly what we are doing in this case."

---

GeoComply, Radar and Xpoint Tech, the three biggest U.S. geolocation firms that work in gaming, have all built their operations to meet the sector's regulatory needs, benefitting from a fractured landscape in which only some states allow gambling.

To ensure compliance, their technology digs deeper than basic IP address recognition to monitor the exact place someone tries to place a wager, sifting through real-time data from sources such as GPS coordinates, cell phone towers, WiFi access points and Bluetooth beacons. They can tell with a high degree of certainty, for instance, whether someone is on the New York or New Jersey side of the George Washington Bridge, which was essential when only the latter had legalized online betting.

As they now try to convince prediction market exchanges to enter commercial partnerships, they are emphasizing that their products can also be used for other reasons, an employee at a data provider told *Sportico* on the condition of anonymity because the discussions were private.

Additional uses of geolocation data, the providers say, include proving a bettor is dishonestly disputing credit card charges, revealing sign-up bonus abuse or showing that someone is illegally making proxy wagers across state lines. It can also be deployed as an integrity tool by seeing in real time whether suspicious bets are happening from, say, a sports team's facilities or, in the case of Kalshi's political wagers, from Congress or the White House.

Almost all U.S. gaming companies—some valued at a small fraction of Kalshi's reported $5 billion worth—license geolocation technology to ensure they only offer their products where legally permitted. State commissions have the power to revoke licenses if they don't do this.

While Kalshi has an integrity monitoring agreement with IC360, the deal notably does not include the geolocation technology IC360 makes available through its partnership with Radar, IC360 co-CEO Scott Sadin confirmed to *Sportico*. Kalshi argues that paying for a geolocation suite would come with dire financial consequences.

(In an interesting twist, Kalshi head of corporate development Sara Slane is a former GeoComply advisor, having worked in the traditional gaming space for many years before joining Kalshi.)

The company did not answer whether it has given any thought to adding a geolocation service for the purpose of anti-fraud or integrity measures.




When states began to legalize sports betting in the wake of *Murphy v. NCAA* in 2018, geolocation firms primarily charged clients per ping, which activated when a user logged in, tried to place a bet, had been on the app for a certain amount of time, or if they were near a relevant border.

Some betting operators saw this as an inefficient method that risked overcharging relative to user count. In response, geolocation firms have begun presenting alternative options that tie prices to monthly unique active users, or in some cases, revenue.

New pricing options and increased competition between GeoComply, the market share leader, and Radar and Xpoint, have helped limit geolocation fees from shooting upward at an unsustainable rate. This has kept geolocation deals from causing severe economic harm

Case: 26-1835, 03/31/2026, DktEntry: 42.1 (238 of 265)

compared to revenue, multiple people at betting companies told *Sportico*.

The biggest sportsbooks in the U.S.— DraftKings and FanDuel—spend in the mid-tens-of-millions per year, according to the source at the data provider with knowledge of their agreements. That figure, which is at the highest end of annual geolocation payments, does not include initial integration costs.

DraftKings projects $6.2 billion to $6.4 billion in revenue in fiscal year 2025, likely putting its geolocation expenses well below 1% of total income.

It is unclear whether large sportsbooks' potential forays into prediction markets might change their expenses. FanDuel is close to launching a prediction market product with CME Group, while DraftKings has said it is considering its options as it determines the risks of upsetting the state regulators it works closely with.

---

Kalshi's proclamations about geolocation expenses having a serious adverse effect on its budget are disputed by people and companies from the gambling establishment.

It is not known the exact amount Kalshi would need to pay to adopt geolocation technology; the company said in a legal declaration in the Nevada case that it would be at least "tens of millions" and take "many months" to set up any geolocation service.

Kalshi does not share its monthly active user total or state-by-state engagement numbers, so geolocation costs cannot be reasonably estimated by an outside party.

Sporttrade chief operating officer David Huffman said the cost of geolocation was "not at all" financially crippling to his business and would still be "quite useful" if the prediction market company transitions from a state licensed entity to one under CFTC oversight.

The CEO of a prominent gaming company that operates in most U.S. states, who spoke on the condition of anonymity to talk frankly about an issue that concerns a competitor, told *Sportico* they consider their geolocation fees quite cheap relative to overall expenses.

The founder of a gaming startup with fewer than 50,000 users—an example of a smaller operation that makes geolocation work in its budget—said the cost of the technology is not prohibitive to the operations of their company. The person, also speaking under the condition of anonymity because the topic is sensitive, noted that geolocation is ubiquitous throughout sportsbook, fantasy and sweepstakes apps of all sizes, and that payment processors often require it.

It is worth noting that because entrenched betting companies pay for geolocation while Kalshi does not—and Kalshi poses a threat to their market share—they have an incentive to tout the merits of tracking services.

“GeoComply works with companies of all sizes across a wide range of industries,” a representative for GeoComply wrote in an emailed statement. “Fraud prevention and compliance should never be viewed as a barrier to entry. It is an investment in consumer protection, regulatory trust and long-term sustainability. Our customers consistently find that the value our tools deliver far outweighs the cost of implementation.”

Radar and Xpoint did not respond to requests for comment.

---

As Kalshi has complained in court of the potential costs associated with geolocation, the company has flashed its cash elsewhere.

On Sept. 12, *The Information* reported that Kalshi was raising funds at a valuation of $5 billion—roughly the market cap of Caesars Entertainment. The company confirmed the round last week, more than doubling its valuation since June, when it announced a $185 million raise valuing it at $2 billion.

On the back of the new cash, Kalshi has also announced an international expansion into more than 140 countries. It said the move will include China and India, the world’s most populated countries, though it could meet government resistance. Kalshi has not indicated whether moving into new territories will force it to adopt geolocation technology.

States have taken note of Kalshi’s apparent financial strength as it sees rapid growth.

“Would the purported ‘tens of millions of dollars annually’ spent on geolocation implementation (for ‘10,000 Nevada users’) torpedo Kalshi’s entire existence, or is it a mere drop in Kalshi’s revenue bucket?” Nevada lawyers wrote in an April 4 filing, which came well before the company’s valuation ballooned into the billions this summer.

---

In its unsuccessful Aug. 22 motion to stay discovery, Kalshi said its legal claims present “purely legal questions that require no further factual development,” thus making Nevada’s geolocation discovery inquiries irrelevant. Kalshi’s core argument has been that CFTC rules should take precedence over the application of state gambling regulations. From its perspective, this is a matter of legal interpretation that “fact finding” in pretrial discovery wouldn’t influence.

Kalshi also portrayed the requests for emails, texts and other company materials related to geolocation as burdensome, given that identifying and organizing materials would require additional legal expenses and disruption.

While the company failed to convince Weksler to issue a stay that would have postponed pretrial discovery, a motion for summary judgement is still pending. The court’s determination will occur after the parties have shared evidence and testimony. Summary judgment is

granted if the court believes the parties aren't in dispute about key facts and that the legal debate should be resolved a particular way.

As the Nevada case and similar ones develop—Kalshi is also in court battles with Maryland, New Jersey and Massachusetts—Kalshi will likely continue to argue that requiring it to geolocate users, even on a temporary basis, risks irreparable harm in addition to its alleged financial harm.

For instance, an injunction to stop a company from polluting a lake is premised on the idea that damage to a lake and the life in it is irreparable. In sports, an athlete can sometimes show that loss of the chance to play games—games that will never be replayed—is a type of irreparable harm, as is reputational damage that irreversibly alters one's reputation or a company's brand.

The toll from adding geolocation capabilities, Kalshi claims, fits the irreparable harm definition because it would require alterations to its business model and impact the company's goodwill and brand. It has said that blocking any U.S. user from its service based on where they are attempting to place wagers would break CFTC rules, potentially leading to punitive action from the agency.

CFTC core principles dictate that exchanges cannot prevent anyone from participating in the purchase or sale of contracts, with the exception of parties privy to inside information and those who break platform rules.

In a supporting document filed by Kalshi in the Nevada case in April, Kalshi head of markets Xavier Sottile noted how ErisX, a predecessor to the current sports prediction market craze, previously butted up against the impartial access issue. After the CFTC stopped ErisX from facilitating sports prediction markets for sportsbooks to hedge activity on their own apps in 2021, then-CFTC commissioner Dan Berkovitz wrote in a statement that the "proposed exclusion of the general public from trading the contract on the [exchange] would violate DCM Core Principles and CFTC regulations regarding impartial access."

But much has changed at the CFTC since 2021. It is not a foregone conclusion that the agency will punish Kalshi if it uses a geolocation tool under court orders to halt access in certain states or tribal lands. Sottile did not identify any actual threat of action from the CFTC toward Kalshi this year in his court declaration.

Joshua Sterling, a Milbank attorney who represents Kalshi in court, declined to comment when asked whether the CFTC has said anything to Kalshi about the matter. The CFTC did not respond to a request for comment, but in an advisory sent to exchanges two weeks ago, the contents of which were first reported by *Sportico*, the agency implied the CFTC would not punish Kalshi or anyone else offering sports prediction market contracts for following court orders that impede impartial access.

Instead, it warned exchanges that they might need to shut off their services in certain states, asking operators to prepare accordingly.

Kalshi did not provide a comment addressing whether the CFTC had made any threat of action over the impartial access issue.

Sportico

Case: 26-1635, 08/31/2026, DktEntry: 42.1, Page 242 of 265

December 8, 2025

**VIA ECF**

The Honorable Analisa Torres
U.S. District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: *KalshiEX LLC v. Williams*, Case No. 1:25-cv-08846-AT
Joint Letter in Response to Court's December 4, 2025 Order (ECF No. 61)

Dear Judge Torres,

The parties write jointly in response to the Court's December 4, 2025 Order (ECF No. 61) ("Order"). The Order directs the parties to file a joint letter "detailing which facts relevant to Plaintiff's pending motion, if any, are in dispute." It also instructs that "[i]f the parties wish to argue only issues of law, they shall jointly define the issue for oral argument[.]"

The parties note that this joint letter is submitted before Plaintiff's motion has been fully briefed. Defendants' opposition to Plaintiff's motion for preliminary injunctive relief was filed on November 26, 2025 (ECF No. 52), and Plaintiff's reply brief, due December 15, 2025, has not yet been filed. Defendants therefore join in this letter without prejudice and reserve the right to respond or otherwise change their position based on Plaintiff's reply papers, including regarding any facts that are put in dispute.

**Joint Issues of Law For Oral Argument**[1]

The parties respectfully submit that the issues of law for oral argument are:

1. Whether Kalshi must establish the standard of "a clear or substantial likelihood of success on the merits" or a standard of "likely to succeed on the merits" in order to obtain preliminary injunctive relief.

2. Whether Kalshi's sports event contracts constitute "swaps" as defined in Section 1a(47)(A)(ii) of the Commodity Exchange Act ("CEA").

3. If Kalshi's sports event contracts are "swaps" under the CEA, whether the CEA field-preempts Article 1, Section 9 of the Constitution of the State of New York ("State Constitution") and New York Racing, Pari Mutuel Wagering and Breeding Law ("Racing Law") §§1367(2) and 1367-a, with respect to regulation of Kalshi's contracts.

[1] An additional issue of law that is not joint is identified below.

4. If Kalshi's sports event contracts are "swaps" under the CEA, whether the CEA conflict-preempts the State Constitution and the Racing Law with respect to regulation of Kalshi's contracts.

5. Whether the Eleventh Amendment bars litigation against the defendant the New York State Gaming Commission.

6. Whether Kalshi has shown a likelihood of irreparable harm in the absence of relief.

7. Whether the balance of equities and the public interest weigh in favor of a preliminary injunction.

**Parties' Disagreements Regarding Issues of Law For Oral of Argument**

Plaintiff's Position: Another issue of law for oral argument is whether, setting aside whether Kalshi's event contracts are swaps, they are "contracts of sale of a commodity for future delivery" subject to the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A). Both Kalshi's complaint and its motion for a preliminary injunction state that the CFTC's exclusive jurisdiction extends not just to swaps but to contracts of sale of a commodity. *See, e.g.*, Compl. ¶¶ 37, 42; Motion at 11.

Defendants' Position: Defendants understand Plaintiff's position to be that the oral argument should also concern the alternative issue of, if Kalshi's sports events contracts are not "swaps" as defined in Section 1a(47)(A)(ii), whether they are then "another type of financial instrument" that would be subject to the exclusive jurisdiction of the CFTC under the CEA. Defendants' position is that Plaintiffs' opening papers do not make such an argument, neither paragraphs 37 and 42 of the Complaint nor page 11 of the memorandum of law states this, and such an argument is contrary to other assertions. Defendants therefore state that, in the event Plaintiff, on reply, argues any additional ground for why its sports events contracts are subject to the CEA, Defendants reserve the right to move to strike that portion of Plaintiffs' reply or, in the alternative, to move for a surreply. Defendants therefore respectfully submit that this issue is not a valid issue for oral argument.

**Disputed Facts Relevant to Plaintiff's Motion**

Joint Position: The parties have conferred and agree that there are no relevant facts in dispute that necessitate an evidentiary hearing and disputed facts are amenable to complete resolution on a paper record.

Defendants' Position: It is Defendants' position that the following facts are in dispute:

1. Whether Plaintiff has any credible and/or non-speculative evidence of irreparable harm concerning alleged monetary damages, including alleged "geolocating costs" and business losses, and, if Plaintiff has provided any such evidence, the degree of that

harm (*see, e.g.,* Mem. 20–21, 23; Sottile Decl. ¶¶ 12-28; Opp. 22–23, 28–29; Janofsky Decl. Exs. 4, 7, 12, 23).

2. Whether Plaintiff has any credible and/or non-speculative evidence of irreparable harm concerning the alleged potential loss of its Commodity Futures Trading Commission ("CFTC") certification or other consequences (*see, e.g.,* Mem. 22, Sottile Decl. ¶¶ 38–45; Opp. 21, 23; Janofsky Decl. Ex. 7, 11).

3. Whether Plaintiff has any credible and/or non-speculative evidence of irreparable harm concerning alleged economic and reputational harm or loss of good-will (*see, e.g.,* Mem. 22, Sottile Decl. ¶¶ 46–49; Opp. 23–24; Janofsky Decl. Ex. 2, 3, 5, 6, 7).

4. Whether the "sports event contracts" Plaintiff offers have the financial, economic, or commercial consequences necessary to meet the definition of Section 1a(47)(A)(ii) of the CEA (*see, e.g.,* Mem. 7; Compl. ¶¶ 31-33; Opp. 11–15; Janofsky Decl. Ex. 6, 8, 9, 15, 16).

5. Whether Plaintiff has any credible and/or non-speculative evidence that it is impossible for it to comply with the CEA and the State Constitution and Racing Law (*see, e.g.,* Mem. 18–19, Sottile Decl. ¶¶ 41; Opp. 19–21; Janofsky Decl. Ex. 7, 11).

Defendants' list of disputed facts is limited by the current procedural posture. For example, Defendants do not anticipate that Plaintiff will dispute evidence of its own marketing or that it offers proposition and parlay sports event contracts, among other things. In the event Plaintiff puts additional facts in dispute on reply, Defendants will provide the Court an update.

Plaintiff's Position: For the following reasons, Plaintiff's position is that the issues of fact described by Defendants above either are not subject to genuine dispute or instead turn on questions of law:

1. Whether Plaintiff will suffer irreparable harm (*see* Defendants' facts 1-3) turns on the legal question whether the CEA preempts state regulation of Kalshi's federally regulated exchange (*see* Issues of Law 3-4) and the legal question whether Eleventh Amendment immunity would prevent Kalshi from recovering damages to recoup the costs of geofencing (*see* Issue of Law 5).

2. Whether sports event contracts constitute "swaps" (*see* Defendants' fact 4) or other financial instrument subject to the exclusive jurisdiction of the CFTC turns on a legal question of statutory interpretation rather than any factual question (*see* Issue of Law 2).

3. Whether Plaintiff can simultaneously comply with the CEA and the State Constitution and Racing Law turns on the legal question whether state regulation is preempted (*see* Issues of Law 3-4).

* * *

If the Court perceives there to be any additional disputed issues of material fact for resolution of the preliminary injunction, the parties respectfully request the opportunity to present evidence regarding those issues to the Court's satisfaction.

Respectfully submitted,

MILBANK LLP
*Counsel for Plaintiff*

Andrew Porter
55 Hudson Yards
New York, NY 10016
aporter@milbank.com

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

Katherine Rhodes Janofsky
Assistant Attorney General
28 Liberty Street
New York, NY 10005
Katherine.Janofsky@ag.ny.gov

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and NEW YORK STATE GAMING COMMISSION,<br><br>*Defendant*s. | Case No.: 1:25-cv-08846 |

**DECLARATION OF XAVIER SOTTILE**

1. I am the Head of Markets at KalshiEX LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2. My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the

regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC"). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4. I offer this Declaration to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the New York State Gaming Commission (the "Gaming Commission") from enforcing its demand that Kalshi immediately cease and desist from offering sporting event-based contracts in New York. In particular, this Declaration is intended to reaffirm the harms that Kalshi faces as a result of the Gaming Commission's cease-and-desist letter, including the impracticability of requiring Kalshi to develop geofencing technology, and to describe the obstacles and harms Kalshi would face if forced to exclude New York users from trading sports- and political-event contracts on its platform (an exercise distinct from geofencing).

5. On October 27, 2025, I submitted a declaration in support of Kalshi's Motion for a Preliminary Injunction (the "October Declaration," ECF No. 18). In the October Declaration, I detailed the harm that would result from both noncompliance with New York's cease-and-desist letter (¶¶ 5–9), and attempted compliance with the same. These included: (a) harms imposed by technical barriers to compliance (¶¶ 12–28), (b) harms to Kalshi's users from abruptly ceasing operations in New York (¶¶ 29–37), (c) risk that complying with New York law would jeopardize Kalshi's CFTC designation (¶¶ 38–45), and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in New York (¶¶ 46–49).

6. The harms detailed in the October Declaration would still apply to Kalshi today.

7. As was the case when I submitted the October Declaration, Kalshi does not have a geofencing mechanism to identify which of its users are located in any particular state at any particular time. And as further detailed in the October Declaration, it would be exceedingly difficult and expensive for Kalshi to immediately develop and implement geofencing technology to prevent New York users from trading in sports- and political-event contracts on its exchange. Even if Kalshi could implement a technical solution to comply with a geofencing order from this Court, halting New York users' access to Kalshi's event contracts will cause severe harm to those users and the futures commissions merchants ("FCMs") with whom Kalshi partners, as well as impact counterparties in other states. Kalshi also fears that compliance would risk its status as a designated contract market under the CFTC, as compliance would violate the CFTC's impartial-access requirement, 17 C.F.R. § 38.151(b).

8. There are two ways that users enter into event contracts on Kalshi's exchange. First, users may directly access Kalshi's exchange through its website or app ("Direct Users"). Second, they may enter into certain Kalshi event contracts on external FCMs ("FCM Users"). FCMs facilitate trading for users by accepting orders to buy or sell futures contracts. They also must be registered with the National Futures Association and are subject CFTC regulations, such as minimum net capital requirements. 17 C.F.R. § 1.17. Kalshi partners with three FCMs, Robinhood Derivatives LLC, Webull Financial LLC, and Performance Predictions II, LLC.

9. Federal law requires that Kalshi keep Know Your Customer (KYC) data on the Direct Users that place positions on its platform. Kalshi maintains a database of its Direct Users' KYC data, which is available for CFTC inspection upon request. In compliance with that requirement, Kalshi knows the permanent residence and IP address reported by its Direct Users, but does not geolocate its Direct Users and therefore does not know where a Direct User's device is located

at any point in time.[1] And if a Direct User has changed his or her state of residence since originally reporting it to Kalshi, Kalshi may not be aware of the change.

10. That means that while Kalshi can generally identify which Direct Users are New York residents, it cannot determine whether a Direct User New York resident is located in or outside of New York when they are accessing Kalshi. Likewise, Kalshi cannot determine if a Direct User who is a resident of a different state is located in or outside of New York when they are accessing Kalshi.

11. Kalshi restricts users who reside in certain foreign jurisdictions, including Canada, from trading on its platform. These restrictions are based on residency information provided at user sign-up, and not geographic location monitoring.

12. Kalshi has significantly less data about FCM Users than Direct Users. FCM Users are direct customers of the FCM, and when they trade on Kalshi's exchange through the FCM, the FCM does not provide Kalshi with KYC information for those customers. Instead, the FCMs Kalshi partners with only provide Kalshi with a customer identification number, which is used to anonymously associate transactions with a specific FCM User. That means Kalshi does not have KYC information, or IP address information, for FCM Users.

13. As a designated contract market, Kalshi has the authority to cancel trades when necessary to mitigate market-disrupting events caused by malfunctions on its platform or errors in orders submitted by traders. However, due to the fully collateralized and short-term nature of trading on Kalshi, the circumstances in which this authority may be exercised are limited, and

---

[1] While IP addresses are associated with locations, identifying a user's location via IP address is less consistent and reliable than using geolocation services, which allow real-time identification of the physical location of a device using several sources of data, including IP addresses, Bluetooth data, cell phone towers, WiFi access points, and GPS signals. IP addresses provide only city-level location data. As such, IP address data will risk misidentifying users who are located near the border of another state. IP data can also be manipulated by readily available methods that allow individuals to mark their IP-based location as anywhere in the world through use of virtual private networks ("VPNs") and other methods.

there is generally no cancellation or adjustment of an erroneous trade except in extraordinary circumstances, such as serious cybersecurity incidents or physical disasters.

14. Additionally, excluding users in New York could severely harm, or destroy, Kalshi's relationship with current FCM partners, and harm the prospects for future FCM relationships. This would be devastating for Kalshi, given the significance of FCM Users to its exchange. Mere months after launching its partnership with FCMs, those FCMs would lose the ability to offer certain Kalshi contracts to their New York users, a deterioration in service. They also may need to inform their New York users that all open positions they have on Kalshi must be immediately closed or frozen. This would cause the FCMs to suffer reputational harm among their users, undermining their users' trust in their platforms, and Kalshi, in turn, would suffer immense harm to its reputation in the industry as a reliable business partner that it cannot repair.

15. I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 15th day of December, 2025.

Xavier Sottile

# <u>Exhibit 1</u>

CFTC
COMMODITY FUTURES TRADING COMMISSION

Transparency | Contact Us

Search

About the CFTC | Industry Oversight | Law & Regulation | Market Data & Economic Analysis | Forms & Submissions | Learn & Protect | News & Events

## Designated Contract Market Products

Search Designated Contract Market Products using the following criteria

Organization
KEX

Type
ALL

Status
Certified

Status Date From
mm/dd/yyyy

Status Date To
mm/dd/yyyy

Category
ALL

Subcategory
ALL

☐ Show All

Search   Reset

| Organization | Product Name | Type | Status | Date | Category | Subcategory | Remarks | Documents |
|---|---|---|---|---|---|---|---|---|
| KEX | Will <team> win <time period> of <soccer game> by <above/below/between/exactly/at least> <count> goals? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | | 2 |
| KEX | Will the <goals> recorded in <time period> of <soccer game> be <above/below/exactly/at least/between> <count> goals? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | | 2 |
| KEX | Will <entity> record <above/below/exactly/at least/between> <count> <stat> in <time period> of <soccer game>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | | 2 |
| KEX | Will <word> be said by <person> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | | 2 |
| KEX | Will <weather event> happen in <area> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | | 2 |
| KEX | Will <entity> be replaced as <role> in <event> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | | 2 |
| KEX | Will <seed> hold <achievement>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KEX | Will <person> be pardoned in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <bout> conclude in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <competitor> win <bout> by <method> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <stat> be recorded by <entity> in <time period> of <basketball game>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <team> win <time period> of <basketball game>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <team> be the first to reach <points threshold> in <time period> of <basketball game>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will the goal differential recorded in favour of <team> in <time period> of <hockey game> be <above/below/exactly/at least/between> <count> goals? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <entity> record <stat> in <time period> of <hockey game>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <team> win <time period> of <hockey game>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <team> be the first to reach <goal threshold> in <time period> of <hockey game>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <person 1> <meet> <person 2> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will the holder of <achievement> in <time period> be <characteristic>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <team> <join/leave> <conference> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <above/below/exactly/at least/between> <count> people enter <event> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will <company> be <added to/removed from> <index> in <time period>? | Swap (Binary Option) | Certified | 12/15/2025 | Event | Binary Option | 2 |
| KEX | Will acquirer's takeover of target company be announced to succeed in time period? | Swap (Binary Option) | Certified | 12/11/2025 | Event | Binary Option | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KEX | Will <location> have <above/below/between/exactly/at least> <count> inches of new snowfall in <month> <year>? | Swap (Binary Option) | Certified | 12/01/2025 | Event | Binary Option | 2 |
| KEX | Will organization punitive action country/participant/company/person/item for event in time period? | Swap (Binary Option) | Certified | 11/28/2025 | Event | Binary Option | 2 |
| KEX | Will the points differential recorded in favour of <team> in <time period> of <basketball game> be <above/below/exactly/at least/between> <count> points? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <entity> record <above/below/exactly/at least/between> <count> <stat> in <time period> of <basketball game>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will the <points> recorded in <time period> of <basketball game> be <above/below/exactly/at least/between> <count> points? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <legislative body> return to session in <time period>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will OPEC+ announce a production adjustment of <above/below/exactly/at least/between> <value>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <person> perform at <venue>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | What will the <vote> count for <person/party/option> be in <election> in <geography>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <campaign/person> raise <above/below/exactly/at least/between> <value> in <time period>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <person>'s approval rating on <topic> be <above/below/between/exactly/at least> <value> during <time period> according to <polling organization>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <competitor> achieve <milestone> in <competition>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <entity> be replaced as <role> in <event> in <time period>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will a bioprinted heart be implanted in <time period>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | Will <geography> win <above/below/exactly/at least/between> <count> championships from <leagueset> in <time period>? | Swap (Binary Option) | Certified | 11/25/2025 | Event | Binary Option | 2 |
| KEX | ?"Will <political and economic outcomes> occur in <events>?"? | Swap (Binary Option) | Certified | 11/24/2025 | Event | Binary Option | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KEX | Will above/below/exactly/at least/between count people serve in role in time period? | Swap (Binary Option) | Certified | 11/14/2025 | Event | Binary Option | 2 |
| KEX | Will price of product on platform be above/below/exactly/at least/between value in time period | Swap (Binary Option) | Certified | 11/14/2025 | Event | Binary Option | 2 |
| KEX | Will the price of commodity be above/below/exactly/at least/between value in/at time period? | Swap (Binary Option) | Certified | 11/14/2025 | Event | Binary Option | 2 |
| KEX | Will rank media in set on platform in time period be item? | Swap (Binary Option) | Certified | 11/14/2025 | Event | Binary Option | 2 |
| KEX | Will performer sing song at event? | Swap (Binary Option) | Certified | 11/14/2025 | Event | Binary Option | 2 |
| KEX | ?"Will <team> win baseball <game> by <above/below/between/exactly/at least> <count> runs?"? | Swap (Binary Option) | Certified | 09/30/2025 | Event | Binary Option | 2 |
| KEX | ?"Will baseball <game> have <above/below/between/exactly/at least> <count> runs in <time period>?"? | Swap (Binary Option) | Certified | 09/30/2025 | Event | Binary Option | 2 |
| KEX | ?"Will <either team/team> score in the first inning of <game>?"? | Swap (Binary Option) | Certified | 09/30/2025 | Event | Binary Option | 2 |
| KEX | ?"Will the number of justices voting <in the majority/in dissent> on the final judgment of <case> be <above/below/between/exactly/at least> <count>"?? | Swap (Binary Option) | Certified | 09/26/2025 | Event | Binary Option | 2 |
| KEX | ?"Will <participant> reach <milestone> in <competition> before <date>?"? | Swap (Binary Option) | Certified | 09/26/2025 | Event | Binary Option | 2 |
| KEX | ?"Will <entity> <action> <contract> with <counterparty> in <time period>?"? | Swap (Binary Option) | Certified | 09/26/2025 | Event | Binary Option | 2 |

1 2 3 4 5 6 7 8 9 ... Next Last

# <u>Exhibit 2</u>

January 17, 2025

**SUBMITTED VIA EMAIL**

Division of Market Oversight and Division of Clearing and Risk
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

**Re: KalshiEX LLC and Kalshi Klear LLC – Request to modify NAL 24-15**

Dear Sir or Madam,

KalshiEX LLC ("Kalshi") and Kalshi Klear LLC ("Klear") hereby request modifications to NAL 24-15, as discussed herein.

I. Background

Kalshi is a Designated Contract Market ("DCM") that lists contracts on the outcome of various events ("Kalshi Contracts"). Klear is a Derivatives Clearing Organization ("DCO") that clears transactions occurring on Kalshi. Kalshi Contracts are swaps under the Commodity Exchange Act ("CEA"). CEA section 1a(47)(A), in relevant part, provides that "the term "swap" means any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." Kalshi Contracts provide for a payment that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence, and therefore are swaps. Kalshi Contracts are fully collateralized; each party to a Kalshi Contract is required to pay at the time of the transaction sufficient funds to cover the maximum possible loss that the party could incur upon liquidation or expiration of the contract.

To enhance transparency, promote standardization, and reduce systemic risk, Section 727 of the Dodd-Frank Act added to the CEA new section 2(a)(13)(G), which requires all swaps, whether cleared or uncleared, to be reported to swap data repositories ("SDRs"). This requirement was implemented in parts 43 and 45 of the Commission Regulations. DCMs such as Kalshi are required to report swaps traded on and/or pursuant to the rules of the DCM to SDRs under Commission Regulation 38.10. DCOs that clear swaps must maintain swap data in accordance with the requirements of part 45 of the Commission Regulations.

On October 4, 2024, the Division of Market Oversight ("DMO"), in conjunction with the Division of Clearing and Risk ("DCR", collectively "the Divisions"), granted relief to Kalshi

and Klear from SDR reporting and related requirements in NAL 24-15[1] ("NAL"). The "Background" section of the NAL noted that "Kalshi represents that the Kalshi Contracts [as defined in the NAL] 'are binary option contracts on the outcome of various events' and 'are swaps under the Commodity Exchange Act ('CEA')." Kalshi represents that the Kalshi Contracts "provide for a payment that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence, and therefore are swaps.'" (Footnotes omitted.)

The NAL did not define "binary option". A binary option has been understood as a contract with a settlement structure that (i) pays an absolute amount to the holder of one side of the contract and no payment to the counterparty, depending on the occurrence or non-occurrence of the event that is the subject of the contract, and (ii) whose settlement obligations do not vary based on the amplitude by which the price at expiration exceeds the strike or strike price, Kalshi and Klear request that the Divisions amend NAL 24-15 to expand the scope of contracts subject to no-action relief to include contracts with a binary payout structure and additionally contracts with a variable payout structure, as described in this request. Kalshi and Klear now intend to list and clear contracts that have a settlement structure that (i) can result in a payout to both counterparties to the contract (although by definition, only one side of the contract can profit, meaning receive a payout in excess of basis) and (ii) whose settlement obligations vary based on the amplitude by which the price at expiration exceeds the strike or strike price. These contracts will continue to be fully collateralized, as noted, and will accordingly have preset price caps and floors that limit potential profit and loss.

Additionally, the NAL included as condition (6) that, "No Kalshi participant clears a Kalshi Contract through a third-party clearing member." In November 2023 Kalshi submitted a petition to amend the DCM Designation Order to permit participants to clear contracts through third-party clearing members, and Kalshi's designation order was amended accordingly on January 17, 2025. In connection with that request, Kalshi requests that the Divisions amend the NAL to remove this condition.

## II. Relevant Swap Data Requirements

### A. *Relevant Rules and Regulations*

To enhance transparency, promote standardization, and reduce systemic risk, Section 727 of the Dodd-Frank Act added to the CEA new section 2(a)(13)(G), which requires all swaps, whether cleared or uncleared, to be reported to swap data repositories ("SDRs"). This requirement was implemented in parts 43 and 45 of the Commission Regulations. DCMs and DCOs are subject to various swap data reporting and recordkeeping requirements. Because Kalshi Contracts are swaps,[2] CEA section 2(a)(13)(G) requires that they be reported to an SDR.[3] Certain Commission regulations regarding swap data reporting and recordkeeping also apply. Relevant regulations applicable to Kalshi and to Klear include the following:

---

[1] 24-15 was issued as a supplemental NAL to 21-11 to expand the scope of no-action coverage to Kalshi Klear LLC.
[2] See 7 U.S.C § 1a(47)(A)(ii).
[3] *See* 7 U.S.C. § 2(a)(13)(G) (requiring that each swap, whether cleared or uncleared, be reported to a registered SDR).

- Commission Regulation 38.10 (relevant to Kalshi): "With respect to swaps traded on and/or pursuant to the rules of a designated contract market, each designated contract market must maintain and report specified swap data as provided under parts 43 and 45 of this chapter."[4]
- Commission Regulation 38.951 (relevant to Kalshi): "A designated contract market must maintain such records, including trade records and investigatory and disciplinary files, in accordance with the requirements of § 1.31 of this chapter, and in accordance with part 45 of this chapter, if applicable."[5]
- Commission Regulation 39.20(b)(2) (relevant to Klear): "A derivatives clearing organization that clears swaps must maintain swap data in accordance with the requirements of part 45 of this chapter."[6]
- Commission Regulation Part 43 (relevant to Kalshi): Part 43 generally sets forth rules relating to the reporting and public dissemination of swap data.
- Commission Regulation Part 45 (relevant to Kalshi and Klear): Part 45 generally sets forth various swap data recordkeeping and reporting requirements for DCMs and DCOs.

Collectively, these requirements are called here "the Relevant Regulations."

B. *Regulatory Purpose*

The stated goals of the swap data reporting rules, and the amendments thereto, are to mitigate systemic risk, enhance transparency to the public of pricing and trade data, promote standardization, and improve the regulatory experience for market participants.[7] More specifically, Part 43 of the Commission's regulations relate to the real-time public reporting of swap pricing and transaction data, which appear on the "public tape", and Part 45 relates to the regulatory reporting of swap data to the Commission – by swap dealers and other covered entities – in the interest of increasing insight into the swaps markets to assist with regulatory oversight. Moreover, the Commission's interests in swap data reporting rules, and the recent amendments thereto, align with Congress' stated purpose in directing the Commission to adopt real-time public reporting regulations,[8] as well as Congress' intent of improving reporting and transparency under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act").[9]

---

[4] 17 C.F.R. § 38.10.

[5] 17 C.F.R. § 38.951.

[6] 17 C.F.R. § 39.20(b)(2).

[7] *See* Swap Data Recordkeeping and Reporting Requirements, 77 FR 2136, 2137, January 13, 2012 (Part 45 Final Rule); Statement of Chairman Heath P. Tarbert in Support of Final Rules on Swap Data Reporting (Sept. 17, 2020 ), *https://www.cftc.gov/PressRoom/SpeechesTestimony/tarbertstatement091720c* (hereinafter, Tarbert, Final Statement).

[8] *See* 7 U.S.C. 2(13)(B) (stating ''[t]he purpose of this section is to authorize the Commission to make swap transaction and pricing data available to the public in such form and at such times as the Commission determines appropriate to *enhance price discovery*.'') (emphasis added).

[9] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, section 727, Pub. L. 111–203, 124 Stat. 1376 (2010).

III. Requested modifications to NAL 24-15

Kalshi and Klear request that the Divisions (i) modify the scope of the NAL to include Kalshi Contracts described in this request that do not have a binary payout structure, and (ii) remove condition 6 from the NAL to permit the NAL to apply even if participants clear contracts through third-party clearing members.

Kalshi and Klear are not requesting modification to any of the other conditions.

IV. Undertakings

Should DMO and DCR grant the requested no-action relief, Kalshi and Klear undertake to do the following as it pertains to the Kalshi Contracts in order for the no-action relief to remain in effect:

1) Both Kalshi and Klear will require that all Kalshi Contracts be fully collateralized;
2) Kalshi will clear the Kalshi Contracts only through Klear;
3) Kalshi will publish on its website the following time and sales data for all Kalshi Contracts transactions promptly after execution thereof – trade timestamp, contract, quantity, and price (in USD);
4) Kalshi shall provide the Commission with transactional information as described in Commission Regulation 16.02;
5) Kalshi and Klear shall continue to comply with all swap reporting and recordkeeping requirements of the CEA and Commission regulations, other than the Relevant Regulations, including (without limitation) the applicable requirements of Parts 38 and 39 of the CFTC's regulations (the records described in this Undertaking 5 are referred to below as the "Required Records"); and
6) Kalshi and Klear shall keep the Required Records open to inspection upon request by any representative of the Commission, the United States Department of Justice, or the Securities and Exchange Commission, or by any representative of a prudential regulator as authorized by the Commission. Copies of all such records shall be provided at the expense of the producing party (Kalshi or Klear) to any representative of the Commission upon request. The producing party (Kalshi or Klear) shall provide copies of the Required Records either by electronic means, in hard copy, or both, as requested by the Commission, with the sole exception that copies of records originally created and exclusively maintained in paper form may be provided in hard copy only.

V. Justification

A. *Kalshi Contracts Merit Distinct Treatment*

Kalshi Contracts are primarily traded on a Central Limit Order Book by market participants ("Kalshi Members or Participants"). While legally classified as swaps, the Kalshi Contracts share most of the characteristics of exchange traded futures or options thereon (fungibility, offset, exchange traded with standardized terms on a single marketplace) with few of the indicia of traditional swaps (bilateral, traded over-the-counter and customized). Importantly, Kalshi Contracts are fully collateralized and potential market participant exposures associated with the

Kalshi Contracts are anticipated to be far lower than those associated with traditional swaps and with swaps market participants. Kalshi Contracts have no bearing on systemic risk or potential transmission of risk or contagion on systemically important financial institutions. Thus, the regulatory goals of Part 43 and Part 45 regulatory swaps reporting applicable to other swaps have limited to negligible application to Kalshi Contracts. This continues to be the case with the requested modifications. The introduction of FCMs and the inclusion of non-binary contracts does not increase the bearing on systemic risk, as all trading, including that intermediated by FCMs and on all contracts, will continue to be fully collateralized. Additionally, these developments do not render Kalshi Contracts less similar to futures contracts, which are not subject to SDR reporting.

Kalshi and Klear concur with the Commission's belief that price transparency fosters price competition and reduces the cost of hedging.[10] However, as Kalshi intends to continue to fully comply with Part 16 of the Commission's regulations – and to publish on its website relevant time and sales data for all transactions promptly after execution thereof – the goals of the swap data reporting rules, and the recent amendments thereto, of enhancing price transparency and reducing risk are satisfied without swap data reporting.

### *B. Prior NALs Suggest No-Action Relief is Appropriate*

The most relevant prior No-Action relief is the relief that was granted a few months ago to Interactive Broker's exchange ForecastEX in NAL 24-09 ("IBKR NAL"). This letter was comparable to the relief previously granted in CFTC Letters Nos. 17-31, 17-32, and 21-11 (collectively, including the IBKR NAL, "Prior NALs").[11] However, the IBKR NAL did not include the restriction on participants clearing through third-party clearing members.[12]

Swap data reporting and recordkeeping requirements impose substantial operational and financial burdens on Kalshi and on Klear. Integrating with an SDR requires significant expenditures of engineering resources. The burden imposed by such requirements are significant, and consume valuable resources of new entrants and market innovators. Those resources can be put to better use through direct reporting to market participants and the CFTC. Moreover, the cost of reporting to the SDRs, in the context of the relatively small scale of the Kalshi Contracts, would be uneconomical, as the overall costs of reporting would not readily be passed through to end users or absorbed by Kalshi and Klear, while the regulatory value of such reporting, and its relationship to the policy goals of Part 43 and Part 45 reporting, is negligible.

Additionally, the Kalshi Contracts that do not have a binary payout structure are similar to the "spread contracts" that were included in the no-action relief granted to Nadex in NAL 17-31. Those spread contracts also did not have a binary structure. Like the spread contract, the Kalshi Contracts also have a defined price cap and floor. This Nadex NAL included these contracts in the no-action relief, and Kalshi's Contracts that do not have a binary payout would similarly be appropriately included in the no-action relief.

---

[10] *See* Statement of Commissioner Dan M. Berkovitz Regarding Amendments to the Swap Data Reporting Rules (Sept. 17, 2020), *https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement091720#_ftn2*.

[11] See CFTC Letter No. 17-31 (Jun. 30, 2017), available at https://www.cftc.gov/csl/17-31/download; CFTC Letter No. 17-32 (Jun. 30, 2017), available at https://www.cftc.gov/csl/17-32/download; CFTC Letter No. 21-11 (Apr. 22, 2021), available at https://www.cftc.gov/csl/21-11/download

[12] Note that ForecastEX's designation also did not include a prohibition on FCMs carrying customer accounts.

The Prior NALs resulted in the delivery of accurate and rapid reporting of swap data to both market participants and the Commission, and this will continue under the requested relief. Information can be publicly disseminated directly to the market quickly and reliably by Kalshi itself, without using an intermediary in the form of an SDR. As noted, Kalshi intends to continue to comply with Part 16 and will provide the Commission and the public with the information regarding transactions and markets that will satisfy the goals of increasing transparency and reducing risk. Thus, the relief previously granted to others would also serve the interests of the Commission and the market in this case by reducing burdens while still fully achieving the goals of swap data reporting.

Conclusion

Kalshi and Klear greatly appreciate the Divisions' time and attention to its request to modify NAL 24-15. If you have any questions or comments or require further information, please do not hesitate to contact me.

Sincerely,

Elie Mishory
KalshiEX LLC & Kalshi Klear LLC
emishory@kalshi.com

Certifications

I hereby certify that the material facts set forth in the attached letter dated January 17, 2025 are true and complete to the best of my knowledge.

If at any time prior to issuance of a Letter, any material representation made in this request ceases to be true and complete, I will ensure that Commission staff is informed promptly in writing of all materially changed facts and circumstances. If a material change in facts or circumstances occurs subsequent to the issuance of this Letter, KalshiEX LLC and Kalshi Klear LLC understand that they must promptly so inform Commission staff.

Elie Mishory
Eliezer Mishory
CRO – KalshiEX LLC
CCO – Kalshi Klear LLC

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 7/27/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KALSHIEX LLC,

Plaintiff,

-against-

ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission,

Defendants.

25 Civ. 8846 (AT)

**ORDER**

ANALISA TORRES, District Judge:

On July 15, 2026, Plaintiff, KalshiEx LLC ("Kalshi"), filed a letter motion seeking leave to file a motion for an emergency injunction pending appeal from the Court's July 7[1] order (the "PI Order") denying its motion for a preliminary injunction, or, in the alternative, "short-term administrative relief." *See* Mot., ECF No. 110; PI Order, ECF No. 106; Opp., ECF No. 112. The motion is denied.

Under *Agudath Israel of America v. Cuomo*, when a moving party seeks to obtain an injunction pending appeal, that party must show that they have a "strong" likelihood of success on the merits—a heightened standard than what is required for a typical preliminary injunction. *See Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 225–26 (2d Cir. 2020) (quoting *New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020)) (characterizing this requirement as "more" than the requirement for issuance of a preliminary injunction); *see e.g., Principle*

1 The Court issued a revised Opinion and Order on July 9, 2026, to correct a scrivener's error which has no bearing on the motion at hand. *See* ECF No. 108.

*Homecare, LLC v. McDonald*, No. 25-466, 2025 WL 946292, at *1 (2d Cir. Mar. 25, 2025) (recognizing *Agudath Israel* as providing the standard for issuance of an injunction pending appeal); *Colony Grill Dev., LLC v. Colony Grill, Inc.*, No. 20 Civ. 213, 2021 WL 4521966, at *1 (D. Conn. Oct. 4, 2021) (same).[2] Of course, the movant must also demonstrate the remaining factors relevant to issuance of a standard preliminary injunction: (1) a likelihood of irreparable harm in the absence of preliminary relief; (2) that the balance of equities tips in their favor; and (3) that an injunction is in the public interest. *See Agudath Israel*, 980 F.3d at 225–26; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

Kalshi asks the Court to reverse itself. In deciding whether to take this drastic step, "the fact that a court previously found that a preliminary injunction was not warranted should carry significant weight, so the circumstances must be of unusual magnitude to justify a district court granting an injunction pending appeal after denying a preliminary injunction." *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1236 (N.D. Cal. 2025).

The Court held in the PI Order that Kalshi has not met its burden with respect to any of the four factors to be considered when adjudicating a motion for preliminary injunction. *See generally* PI Order. Kalshi's motion does not change this, and it does not point to any unusual or compelling circumstances which justify Kalshi's requested relief. First, Kalshi argues that without an emergency injunction, it will face "a 'Hobson's Choice' of violating New York law and exposing itself to potentially huge liability or violating the CFTC's [Commodity Futures Trading Commission] order and risking its federal registration." Mot. at 3–4. The Court previously considered this argument, holding that "Kalshi has not presented any evidence that the possibility of the CFTC revocation of its designation as a [designated contract market] is more than mere speculation." PI Order at 20. Kalshi points to a recent order issued by the CFTC which states that Kalshi violated federal law by complying with a Michigan state court order, Mot. at 4, but Kalshi does not argue that its status as a designated contract market is at risk as a result of that action. Moreover, as the Court already determined, Kalshi's potential harms are "largely monetary" and stem from "the ordinary burdens and costs complying with government regulation [that] are typically insufficient to constitute irreparable harm." *See* PI Order at 19–20.

Second, Plaintiff cannot make a "strong showing" that it is likely to succeed on the merits. Kalshi largely repackages its briefing on the preliminary injunction motion to explain why it believes its appeal to the Second Circuit will be successful. Mot. at 2–3 (claiming, for instance, that the Second Circuit "may disagree with the Court's interpretation" of the relevant federal statutes). But "[t]he sheer possibility of a reversal—a possibility that exists in every appeal—is insufficient for the Court to find an injunction [] or administrative stay is necessary. . . ." *Delux Pub. Charter, LLC v. Cnty. of Westchester*, No. 22 Civ. 1930, 2024 WL 3744167, at *3 (S.D.N.Y. July 25, 2024).[3] Plaintiff reports that after briefing on the original preliminary injunction motion the CFTC issued a proposed rulemaking which states, "that the CEA [the

2 Kalshi's motion in fact seeks something even more "drastic" than a routine injunction pending appeal—it seeks the very injunctive relief that the Court already denied. *See Agudath Israel*, 980 F.3d at 226.

3 The only circuit court to have ruled on a motion for an emergency preliminary injunction pending appeal filed by Kalshi denied Kalshi's request. *See Kalshiex LLC v. Schuler*, No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026).

Commodity Exchange Act] 'expressly preempts state laws' with respect to event contracts on [designated contract markets]." Mot. at 2. The Court "must exercise independent judgment in determining the meaning of statutory provisions," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024), however, and has done so in concluding the CEA does not preempt "all state gambling laws from regulations transactions involving swaps." PI Order at 14. Kalshi offers no new authority that would cause the Court to now conclude that Kalshi has made a "strong showing" of success on the merits.

Moreover, the Court's analysis has not changed with respect to its conclusions that the balance of equities weighs in Defendants' favor and that an injunction is not in the public's interest. The Court rejects Kalshi's claim that "there is no evidence that a brief injunction pending an expedited Second Circuit appeal would harm New York's gaming industry or the public." Mot. at 4. Defendants have laid out significant harms associated with halting their efforts to enforce state gaming regulations. Opp. at 4; *see also* ECF No. 66 at 27–29 (brief of *Amici Curiae* organizations and Indian Tribes); PI Order at 20–21.

Plaintiff's request for an emergency injunction pending appeal is DENIED. Plaintiff's request for short-term administrative relief is also DENIED.[4] The Clerk of Court is respectfully directed to terminate the motion at ECF 110.

SO ORDERED.

Dated: July 27, 2026
New York, New York

ANALISA TORRES
United States District Judge

4 As Defendants noted, Plaintiff "has not cited any case standing for the proposition that courts in this circuit issue interim administrative *injunctions* rather than administrative stays." Opp. at 4. Regardless, for the forementioned reasons Plaintiff is not entitled to any sort of injunction.