# 26-1835

IN THE

## United States Court of Appeals
## for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

ROBERT WILLIAMS, *et al*.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of New York
No. 1:25-cv-8846
Hon. Analisa Torres

**OPENING BRIEF FOR KALSHIEX LLC**

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

August 31, 2026

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant KalshiEX LLC discloses Kalshi Inc. as its parent company. No publicly held corporation owns 10% or more of KalshiEX LLC's stock.

## TABLE OF CONTENTS

Page


INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

STATEMENT OF ISSUES FOR REVIEW ........ 4

STATEMENT OF THE CASE ........ 4

I. LEGAL BACKGROUND ........ 4

A. Statutory Scheme ........ 4

B. Statutory History ........ 8

C. Regulatory Framework ........ 17

II. FACTUAL AND PROCEDURAL BACKGROUND ........ 22

SUMMARY OF ARGUMENT ........ 29

STANDARD OF REVIEW ........ 32

ARGUMENT ........ 32

I. THE CEA EXPRESSLY PREEMPTS STATE GAMBLING LAWS AS APPLIED TO KALSHI ........ 33

A. The CEA's Exclusive-Jurisdiction Provision Expressly Preempts State Regulation ........ 33

B. Kalshi's Event Contracts Fall Within The Scope Of The CEA's Express-Preemption Provision ........ 40

II. THE CEA IMPLIEDLY PREEMPTS STATE GAMBLING LAWS AS APPLIED TO KALSHI ........ 50

A. New York's Gaming Laws Are Field-Preempted As Applied To Kalshi ........ 50

## TABLE OF CONTENTS—Continued

Page

B. New York's Gaming Laws Are Conflict-Preempted As Applied To Kalshi ..... 51

III. OTHER COURTS' CONTRARY CONCLUSIONS ARE UNPERSUASIVE ..... 55

A. The District Court Erred In Holding That The CEA Does Not Preempt State Law ..... 55

B. The Ninth Circuit Erred In Holding That Sports-Event Contracts Fall Outside The CFTC's Exclusive Jurisdiction ..... 60

IV. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI ..... 65

CONCLUSION ..... 69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM A

ADDENDUM B

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Air Transp. Ass'n of Am., Inc. v. Cuomo*,
520 F.3d 218 (2d Cir. 2008) ............ 32

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ............ 2, 38, 39, 52, 53

*Arizona v. United States*,
567 U.S. 387 (2012) ............ 32, 33, 51, 54, 58

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) ............ 8

*California v. FERC*,
495 U.S. 490 (1990) ............ 54

*Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*,
450 U.S. 311 (1981) ............ 54

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ............ 38, 39

*Churchill Downs Tech Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ............ 68

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) ............ 8

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ............ 32, 33, 50, 51

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) ............ 9, 63

*Dunn v. CFTC*,
519 U.S. 465 (1997) ............ 11

**TABLE OF AUTHORITIES—Continued**

Page

*Garcia v. United States*,
469 U.S. 70 (1984) ........ 50

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ........ 34

*Inv. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) ........ 16, 49

*KalshiEX LLC v. Assad*,
--- F.4th ----, No. 25-7516, 2026 WL 2543846
(9th Cir. Aug. 28, 2026) ........ *passim*

*KalshiEX LLC v. CFTC*,
No. 23-3257, 2024 WL 4164694
(D.D.C. Sep. 12, 2024) ........ 22

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ........ 47, 52, 53, 67, 68

*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) ........ 26

*KalshiEX LLC v. Williams*,
No. 1:25-cv-8846, 2026 WL 1961872
(S.D.N.Y. July 7, 2026) ........ 4

*KalshiEX LLC v. Williams*,
No. 1:25-cv-8846, 2026 WL 2017466
(S.D.N.Y. July 13, 2026) ........ 4

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ........ 1, 2, 11, 33, 38, 56

*Lockhart v. United States*,
577 U.S. 347 (2016) ........ 40, 41

## TABLE OF AUTHORITIES—Continued

Page

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................... 39

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 67

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .................... 4, 5, 11, 12, 51

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .................... 33

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .................... 65

*N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nevada Gaming Control Bd.*,
815 F. Supp. 3d 1169 (D. Nev. 2025) .................... 60

*N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*,
635 F.3d 66 (2d Cir. 2011) .................... 34

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013).................... 68

*Nat'l Inst. of Fam. & Life Advocs. v. James*,
160 F.4th 360 (2d Cir. 2025).................... 32

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) .................... 52

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .................... 67

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022).................... 2

**TABLE OF AUTHORITIES—Continued**

Page

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
738 F.3d 192 (9th Cir. 2013) .................................................... 35

*Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,
990 F.3d 217 (2d Cir. 2021) ..................................................... 32

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .............................................................. 55

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) .................................................... 38

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ................................................ 67, 68

*Rice v. Bd. of Trade of Chi.*,
331 U.S. 247 (1947) ................................................................ 9

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ............................................................ 1, 34

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
749 F.2d 124 (2d Cir. 1984) ..................................................... 66

*Semmes Motors, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970) .................................................... 66

*Slaney v. Int'l Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) .................................................... 34

*Tanvir v. Tanzin*,
894 F.3d 449 (2d Cir. 2018) ..................................................... 39

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) .................................................... 34

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) .................................................... 38

## TABLE OF AUTHORITIES—Continued

Page

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 15, 49

*Yousefzadeh v. J&J Consumer Inc.*,
184 F.4th 130 (2d Cir. 2026) .......... 40, 55

**CONSTITUTION:**

U.S. Const. art. VI, cl. 2 .......... 32

**STATUTES:**

5 U.S.C. § 551(13) .......... 61

7 U.S.C. §§

1a(6) .......... 6

1a(9) .......... 5, 51, 63

1a(19) .......... 13, 51

1a(19)(iv) .......... 13, 37

1a(37) .......... 6

1a(40) .......... 14

1a(47) .......... 51

1a(47)(A) .......... 5

1a(47)(A)(ii) .......... 5, 6, 16, 41, 42

1a(47)(A)(iv) .......... 6, 16, 41, 45, 63

1a(51)(A)(ii) .......... 6

2(a)(1)(A) .......... *passim*

## TABLE OF AUTHORITIES—Continued

Page

2(e) .......... 15

5(a) .......... 7, 23

6a .......... 6

6b .......... 6

6c .......... 6

6c (1936) .......... 35

7(d) .......... 6, 17

7(d)(1)(A)(ii) .......... 18, 52

7(d)(3) .......... 18, 49

7(d)(4) .......... 18

7(d)(5) .......... 17

7(d)(11) .......... 18

7(d)(18) .......... 17

7(d)(21)(B) .......... 17, 18

7a-1 .......... 6, 18

7a-2(c) .......... 18

7a-2(c)(1) .......... 18

7a-2(c)(5)(B) .......... 18, 19

7a-2(c)(5)(C) .......... 16

7a-2(c)(5)(C)(i) .......... *passim*

## TABLE OF AUTHORITIES—Continued

Page

7a-2(c)(5)(C)(ii) .......... 6, 17

8(b) .......... 19

9(10)(C) .......... 19

12a(5) .......... 18

12a(9) .......... 28, 29

13 .......... 19

13a .......... 68

13a-2(1) .......... 12, 36, 58

13a-2(7) .......... 12, 36, 58

16(e)(1)(B)(i) .......... 7, 12, 36, 41

16(e)(2) .......... 37, 58

16(e)(2)(B) .......... 14

15 U.S.C. § 8302(d)(1) .......... 16, 47

28 U.S.C. § 1292(a)(1) .......... 4

28 U.S.C. § 1331 .......... 4

31 U.S.C. § 5362(1)(E)(ii) .......... 15, 38

31 U.S.C. § 5362(10) .......... 15, 38

Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936) .......... 9

Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A–365 .......... 12, 13, 14, 37

**TABLE OF AUTHORITIES—Continued**

Page

Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 ..................... 8, 9

N.Y. Comp. Codes R. & Regs. tit. 9, § 5329.19(c) ....................................... 48

N.Y. Penal Law § 225.10 ........................................................................ 26

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 104(9) ....................................... 26

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367-a(4)(a)(ii) ........................ 53

**REGULATIONS:**

17 C.F.R. §§

38.4(b) ................................................................................................ 18

38.151(b) ............................................................................................ 53

38.251(a) ............................................................................................ 49

40.2 .................................................................................................... 18

40.2(a)(1) ........................................................................................... 18

40.3 .................................................................................................... 18

40.3(b) ........................................................................................... 18, 19

40.11(c) .............................................................................................. 64

40.11(c)(2) .......................................................................................... 20

Concept Release,
73 Fed. Reg. 25,669 (May 7, 2008) ....................................... 19, 21, 22, 39

Contract Market Designation,
40 Fed. Reg. 25,849 (June 19, 1975) ...................................................... 18

**TABLE OF AUTHORITIES—Continued**

Page

Event Contracts,
89 Fed. Reg. 48,968 (June 10, 2024) .......... 20, 22, 39

Event Contracts; Withdrawal of Proposed Regulatory Action,
91 Fed. Reg. 5,386 (Feb. 6, 2026) .......... 20

Further Definition of "Swap,"
77 Fed. Reg. 48,208 (Aug. 13, 2012) .......... 47

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026) .......... *passim*

Provisions Common to Registered Entities,
76 Fed. Reg. 44,776 (July 27, 2011) .......... 20, 64

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30464 (1974) .......... 35

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) .......... 60

156 Cong. Rec. S5923 (daily ed. July 15, 2010) .......... 15

H.R. Rep. No. 74-421 (1935) .......... 9

H.R. Rep. No. 93-975 (1974) .......... 10

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .......... 1, 10, 11, 30, 50, 57

H.R. Rep. No. 97-565, pt. 1 (1982) .......... 12, 37

H.R. Rep. No. 106-711, pt. 2 (2000) .......... 14, 37, 38, 58

S. Rep. No. 93-1131 (1974) .......... 10, 35, 36

*Hearings Before the H. Comm. on Agric.*, 93d Cong. (1974) .......... 9, 10

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong.
(1974) .......... 10, 61

**TABLE OF AUTHORITIES—Continued**

Page

**OTHER AUTHORITIES:**

Alex Edmans et al., *Sport Sentiment and Stock Returns*, 62 J. Fin. 1967 (2007) .......... 43

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5 .......... 44

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679 .......... 44

*Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .......... 42

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM .......... 44

Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://perma.cc/BT4A-BK8T .......... 45

*CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA .......... 45

Dylan Duke, *How much of an economic boom is the 2026 FIFA World Cup for the U.S. hosting cities?*, NPR (June 15, 2026), https://perma.cc/F64B-G5F4 .......... 43

*Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) .......... 62

*Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009) .......... 62

*Exclusive*, American Heritage Dictionary (5th ed. 2022) .......... 33

**TABLE OF AUTHORITIES—Continued**

Page

*Futures Glossary*, CFTC, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited August 31, 2026) .............................. 5

John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825 (1982) .............................................................. 8

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1 (1977) ..................................................... 8

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) .................................................. 11, 35, 36

Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ................................................................ 45

*Mandatory KYC and Surveillance*, Kalshi, https://kalshi.com/market-integrity/kyc-surveillance (last visited August 31, 2026) ........................................................................... 69

Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD .... 43

*Pro Basketball Champion*, Kalshi, https://kalshi.com/markets/kxnba/pro-basketball-champion/kxnba-26 (last visited August 31, 2026).............. 25

*Responsible Trading*, Kalshi, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited August 31, 2026) .................................................. 69

*Round of 16 exits fuel World Cup quarterfinal ticket price drops*, Sports Bus. J. (July 10, 2026), https://perma.cc/E32Q-5N4K.............. 43

*Which party will win the U.S. Senate?*, Kalshi, https://kalshi.com/markets/controls/senate-winner/controls-2026 (last visited August 31, 2026)........................................................ 24

## INTRODUCTION

Defendants have threatened to prosecute KalshiEX LLC ("Kalshi") under New York gambling laws for offering contracts subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Their efforts flout the plain text of the Commodity Exchange Act ("CEA"), contravene the CFTC's longstanding understanding of its own jurisdiction, and break from the precedents of this Court and other Circuits. The district court badly erred in denying Kalshi a preliminary injunction, and this Court should reverse.

Kalshi is a CFTC-licensed and regulated derivatives exchange, known as a designated contract market ("DCM"). Section 2(a)(1)(A) of the CEA expressly preempts state regulation of trading on DCMs like Kalshi by granting the CFTC "exclusive jurisdiction" over all instruments "traded or executed" on DCMs. There is no way to read that provision to permit concurrent state jurisdiction over instruments traded on DCMs. The Supreme Court has held that statutes granting "exclusive" jurisdiction to a federal regulator preempt state law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233-234 (1947). Congress in the CEA announced its intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). For that reason, this Court has long recognized that the CEA "preempts the

application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).

Congress's decision to preempt state law reflects its view that exchanges "could not operate efficiently, and perhaps not at all," if subject to state law. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). If New York could use its gambling laws to regulate instruments traded on federally designated exchanges, so could 49 other states. A patchwork of contradictory, state-specific regulations would destroy the uniform, nationwide markets that Congress envisioned, resulting in "total chaos." *Id.* (citation omitted).

Nonetheless, the district court denied Kalshi's request for a preliminary injunction. The court assumed without deciding that Kalshi's contracts are swaps subject to the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A); JA11. That should have been the ballgame. If the CFTC's jurisdiction is exclusive, there is no conceivable basis to permit state regulation. Instead, the court understood *exclusive* to mean *concurrent* and concluded that the CEA does not preempt state gambling laws. The decision relied entirely on "purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). And it got Congress's intent flat wrong. For as long as derivatives trading has

existed, states have sought to ban it as a form of gambling. Congress addressed these efforts by drawing a clear line: States may apply their gambling laws to almost any *off*-exchange transaction, but the CFTC alone may regulate instruments traded on DCMs.

The district court's decision denying a preliminary injunction has led to stunning state overreach that underscores Kalshi's entitlement to relief. The state recently filed a state-court lawsuit seeking to ban *all* Kalshi's event contracts, to prevent Kalshi from offering those contracts *nationwide*, and to require Kalshi to pay *tens of billions of dollars* to the state. The CFTC responded by declaring a market emergency and ordering Kalshi not to comply with any state-court order. Kalshi is caught in the middle of these irreconcilable demands. Unless this Court grants relief, Kalshi will face existential harm no matter how it proceeds.

Congress granted the CFTC exclusive jurisdiction precisely to avoid situations like these—where different state regulators seek to invade the CEA's statutory jurisdiction and substitute state-by-state regulation for the nationwide uniformity necessary for derivatives markets to function. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the U.S. Constitution. Judge Analisa Torres denied a preliminary injunction in an opinion and order dated July 7, 2026. *KalshiEX LLC v. Williams*, No. 1:25-cv-8846, 2026 WL 1961872 (S.D.N.Y. July 7, 2026), *as amended*, 2026 WL 2017466 (S.D.N.Y. July 13, 2026). Kalshi timely appealed the same day. JA47-48. Judge Torres issued an amended opinion and order on July 13, 2026. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES FOR REVIEW

1. Whether the CEA expressly preempts state regulation of event contracts traded on DCMs.

2. Whether the CEA impliedly preempts state regulation of event contracts traded on DCMs.

3. Whether the balance of harms and equities favor a preliminary injunction.

## STATEMENT OF THE CASE

### I. LEGAL BACKGROUND

#### A. Statutory Scheme

1. The Commodity Exchange Act establishes a "comprehensive regulatory structure" to oversee derivatives trading on federally designated

contract markets, known as DCMs. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). It grants a federal agency—the CFTC—"exclusive jurisdiction" to regulate the derivatives traded on DCMs. 7 U.S.C. § 2(a)(1)(A).

Derivatives are tradeable financial instruments whose prices depend on underlying commodities. The CEA defines "commodities" broadly to include tangible commodities as well as "all services, rights, and interests" in which "contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Under the CEA, derivatives largely assume one of three forms. "Futures" are contracts obligating a party to buy or sell a commodity at a price fixed now for delivery in the future. *See Futures Glossary*, CFTC.[1] "Options" give a party the right (but not the obligation) to buy or sell a commodity in the future at a price fixed now. *See id.* And "swaps" are contracts where parties trade revenue streams, liabilities, or promises to pay independent of the delivery of any commodity. *See* 7 U.S.C. § 1a(47)(A). As most relevant here, Congress has defined "swap" to include instruments known as event contracts—that is, any contract providing for payment "dependent on the occurrence … of an event or contingency associated with

[1] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited August 31, 2026).

a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Congress also defined swaps to include any "transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

2. DCMs are federally regulated "trading facilit[ies]" for derivatives. 7 U.S.C. §§ 1a(6), (37). Trading facilities work through a "pre-determined non-discretionary" algorithm that automatically matches bids and offers. *Id.* § 1a(51)(A)(ii). This ensures that contract prices are set by market forces, and that DCMs cannot establish or manipulate prices to ensure their own profits. Other CEA provisions further serve those purposes, including prohibitions on fraud, manipulation, and disruptive trading, as well as requirements for position-size limits in certain transactions. *Id.* §§ 6a, 6b, 6c, 9. Still other provisions require that all positions be collateralized through federally regulated clearinghouses. *Id.* § 7a-1. The CEA provides detailed guidance about how exchanges can obtain federal designations as DCMs, how they should operate upon designation, and what kinds of instruments can be traded on DCMs. *See id.* § 7(d). As particularly relevant here, the CEA specifies when "[e]vent contracts" may be traded on DCMs. *Id.* § 7a-2(c)(5)(C)(ii).

This detailed statutory framework recognizes that derivatives trading serves the "national public interest" by establishing "a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). DCMs facilitate those functions by creating a nationwide marketplace where prices are set by supply and demand, and the extensive regulations governing DCMs prevent manipulation or disruption while keeping trades "liquid, fair and financially secure." *Id.*

3. Federal preemption is the cornerstone of the CEA. Section 2(a)(1)(A) grants the CFTC exclusive jurisdiction over "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on a [designated] contract market" or other federally regulated "board of trade." Section 2(a)(1)(A) then makes clear that the CEA's "exclusive jurisdiction" does not "supersede" states' authority over instruments that are not "traded or executed" on DCMs. *See also* 7 U.S.C. § 16(e)(1)(B)(i) (subject to enumerated exceptions, "[n]othing" in the CEA "shall supersede or preempt" state law regarding any transaction "that is not conducted on" a DCM). The CEA thus draws a clear line: States are not preempted from regulating off-DCM trading, subject to specific exceptions. But states may not regulate trading on DCMs, which is regulated exclusively by the CFTC.

### B. Statutory History

1. Derivatives trading has not always been federally regulated. The first organized U.S. futures market was the Chicago Board of Trade, established in 1848. Traders exchanged contracts for future delivery of commodities, settling in cash at day's end. *See Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 245 (1905). The Board then telegraphed price information to interested parties nationwide. *Id.* at 245-246.

The Board, however, was not initially subject to federal regulation. In fact, because futures contracts normally involved speculation without transfer of the underlying commodity, many states decried futures trading as "gambling in grain." *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling). States thus enacted "anti-gaming" and "anti-bucket shop" laws to make it "as difficult as humanly possible to trade futures." John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982) (quotation marks omitted); *see* Addendum B (enumerating early state statutes banning futures trading as gambling).

2. Congress began regulating derivatives trading with the Grain Futures Act of 1922, which sought to centralize futures trading on federally

approved "contract market[s]." Pub. L. No. 67-331, 42 Stat. 998, 1000-02. But that statute did not preempt state laws. Accordingly, the Supreme Court confirmed that states remained free to regulate derivatives by upholding the application of a Missouri prohibition against "gambling in grain futures" to contracts traded on federal exchanges. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

In 1936, Congress enacted the original CEA, which subjected additional commodities to the framework governing grain futures and added anti-fraud protections for market participants. Pub. L. No. 74-675, 49 Stat. 1491, 1491-99. But Congress again stopped short of preemption, instead adding a proviso preserving "any State law applicable" to certain "transaction[s]" regulated by the Act. *Id.* at 1494. The drafters' "intention" was "not to occupy the field." H.R. Rep. No. 74-421, at 5 (1935). The proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).

Over the following decades, that decision produced a patchwork of regulations, leading exchanges to recommend that "federal policy … be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1974) ("House Hearings").

3. Congress responded with the Commodity Futures Trading Commission Act of 1974, which was designed to "[b]ring[ ] all futures trading under federal regulation." H.R. Rep. No. 93-975, at 54 (1974). This statute created the CFTC and made federal authority supreme through Section 2(a)(1)(A)'s "exclusive jurisdiction" provision. In enacting that provision, Congress sought to avoid "any possible conflicts over jurisdiction." *House Hearings* at 128. "[D]ifferent State laws would just lead to total chaos" absent "preemption." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) ("Senate Hearings") (statement of Sen. Clark).

Drafting history reinforces Congress's preemptive intent. When the House introduced the state-law savings clause to Section 2(a) in its version of the bill, the Senate promptly revised the provision to ensure it applied "except as hereinabove provided" in the exclusive-jurisdiction provision. S. Rep. No. 93-1131, at 31 (1974). The proviso ensured "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id.* at 6. The Senate also "struck" the provision that had previously preserved "any State law applicable" to derivatives transactions. H.R. Rep. No. 93-1383, at 35 (citation modified). As the Conference Report explained, these amendments sought to "preempt the field insofar as futures regulation is

concerned." *Id.* Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." *Id.* at 36.

Congress in 1974 likewise "dramatically expanded" the CEA's "coverage" to include any service or interest " 'in which contracts for future delivery are presently or in the future dealt in.' " *Dunn v. CFTC*, 519 U.S. 465, 469 (1997) (citation omitted). Congress thus gave the CFTC exclusive jurisdiction and recognized that this authority would evolve over time to account for innovation in the markets.

This Court was quick to recognize the CEA's new preemptive force, explaining in 1980 that the amended CEA "preempts the application of state law" to trading on federal exchanges. *Leist*, 638 F.2d at 322. The CFTC likewise understood that these amendments superseded state laws, including laws that would bar futures as "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (citation omitted).

4. In subsequent legislation, Congress enacted provisions specifically addressing states' authority under the CEA. Each reinforced that the CEA preempts state regulation of trading on DCMs.

In 1978, Congress enacted a CEA provision entitled "Jurisdiction of States." 7 U.S.C. § 13a-2. This provision allows states to seek "injunctive or

monetary relief for certain violations of the CEA" as *parens patriae*, *Curran*, 456 U.S. at 366-367, but provides that states may bring suit against only entities "*other than* a [designated] contract market," *id.* § 13a-2(1). The sole exception is that states may enforce their "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7), but not the gambling laws they had previously applied to futures trading.

In 1982, Congress recognized that the 1974 amendments had "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). But Congress concluded that "States should be extensively involved in … policing transactions outside those preserved exclusively" for the CFTC. *Id.* Congress therefore added a CEA provision clarifying that "[n]othing in this chapter shall supersede or preempt" the application of state law to a transaction "that is not conducted on or subject to the rules" of a DCM. 7 U.S.C. § 16(e)(1)(B)(i). Congress thus reaffirmed the grant of "exclusive CFTC jurisdiction over exchange-traded futures" while permitting states to police off-DCM transactions. H.R. Rep. No. 97-565, pt. 1, at 45.

5. In 2000, Congress enacted the Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763A–365, which amended

the CEA by including a new term: "excluded commodity." Excluded commodities include intangibles such as "interest rate[s]" and "commercial index[es]." 7 U.S.C. § 1a(19). The 2000 amendments labeled these commodities "excluded" not because they were barred, but because they were excluded from the CEA's requirement that instruments must be traded on DCMs. 114 Stat. at 2763A–377. Sophisticated market participants known as "eligible contract participants" could enter such transactions "over-the-counter"—*i.e.*, off-exchange. *Id.* at 2763A–366, 2763A–379.

Congress defined excluded commodities to include financially consequential "occurrence[s]." 7 U.S.C. § 1a(19)(iv). Thus, Congress contemplated derivatives instruments that turn on occurrences, known as event contracts. Farmers, for example, may buy contracts that pay out if there is a drought to hedge crop losses. Or sporting goods retailers might buy contracts that pay out if a team underperforms. The price participants pay for the event contract reflects their predictions for the future. Prices are therefore crowd-sourced by parties with economic incentives to predict accurately. Event contracts, like other instruments involving excluded commodities, were exempt from the CEA's on-DCM trading requirement, meaning that they could be traded over-the-counter.

To prevent state regulation of this new category of off-DCM transactions, Congress listed excluded commodities in a new preemption provision now codified at Section 16(e)(2). That provision mandated that the CEA "shall supersede and preempt" any state law "that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" to transactions that are "excluded" or "exempted" from the on-DCM trading requirement. 7 U.S.C. § 16(e)(2). The Committee Report explained that the then-"current" CEA already "supersede[d] and preempt[ed]" state laws "in the case of transactions conducted on a registered entity," such as a DCM. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). The new preemption provision clarified that the CEA likewise "supersedes and preempts State gaming and bucket shop laws" as to excluded off-DCM transactions. *Id.*; *see also* 7 U.S.C. § 1a(40) (defining "registered entity" to include DCMs).

The 2000 amendments also addressed derivative instruments known as "swaps." As with excluded commodities, Congress in 2000 exempted most swaps from the CEA's on-DCM trading requirement. 114 Stat. at 2763A–379. Congress also barred the CFTC and SEC from regulating most swaps, including over-the-counter swaps markets. *See id.* at 2763A–452.

6. In 2006, Congress addressed the application of gambling laws to interstate transactions over the internet in the Unlawful Internet Gambling Enforcement Act ("UIGEA"). That statute generally treats a "bet or wager" made over the internet as "unlawful" if it is illegal in the state where it is initiated or received. 31 U.S.C. § 5362(10). But Congress expressly specified that UIGEA's prohibitions do not apply to "any transaction conducted on" a DCM under the "Commodity Exchange Act," in keeping with the CFTC's exclusive jurisdiction over trading on DCMs. *Id.* § 5362(1)(E)(ii).

7. Congress returned to the CEA in the Dodd-Frank Act of 2010. Following the financial crisis, Congress sought to bring unregulated derivatives under federal control. *See United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Thus, while Congress had previously exempted swaps from the obligation to trade on DCMs, Dodd-Frank generally required that swaps be traded on federally regulated exchanges and placed swaps within the CFTC's "exclusive jurisdiction." 7 U.S.C. §§ 2(a)(1)(A), (e).

Congress also adopted a "broad and expansive" six-part definition of the term "swap" to capture not just the credit default swaps that had fueled the financial crisis, but other products that market participants might adopt to "evade these important new legal requirements." 156 Cong. Rec. S5923 (daily ed. July 15, 2010) (statement of Sen. Lincoln). As relevant here,

Congress defined swaps to include event contracts—that is, any contract providing for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Congress also defined swaps to include any contract "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). And Congress authorized the CFTC and SEC to "further define" swap by regulation. 15 U.S.C. § 8302(d)(1).

Congress thus sought to keep pace with market innovation by capturing instruments structured like those that caused the crisis—instruments allowing financial risk to be traded and re-traded, thereby "permitt[ing] enormous exposure to risk to grow out of the sight of regulators and other traders." *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 173-174 (D.D.C. 2012). The CEA shifted those products onto DCMs to place them under federal oversight and subjected them to the CEA's panoply of federal protections.

Dodd-Frank also specifically addressed event contracts in a provision known as the Special Rule. 7 U.S.C. § 7a-2(c)(5)(C). This provision refers to "event contracts" as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon [an] occurrence, extent of an

occurrence, or contingency." *Id.* Recognizing that some categories of event contracts may pose public-interest concerns, Congress authorized the CFTC to review and prohibit six categories of event contracts if it concludes they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule provides that the CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve":

> (I) activity that is unlawful under any Federal or State law;
> (II) terrorism;
> (III) assassination;
> (IV) war;
> (V) gaming; or
> (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i). If an event contract is "determined by the [CFTC] to be contrary to the public interest," it may not be listed on a DCM. *Id.* § 7a-2(c)(5)(C)(ii). Absent an adverse public-interest determination, however, Congress did not bar event contracts involving the enumerated activities.

### C. Regulatory Framework

1. The CEA identifies 23 "[c]ore principles" that exchanges must satisfy to obtain and keep their federal designation as DCMs. 7 U.S.C. § 7(d). DCMs must impose position limitations to avoid market manipulation, *id.* § 7(d)(5); keep five years' worth of trading records, *id.* § 7(d)(18); maintain capital reserves sufficient to cover "operating costs" for a one-year period, *id.*

§ 7(d)(21)(B); list only contracts not "readily susceptible to manipulation," *id.* § 7(d)(3); monitor for "manipulation," *id.* § 7(d)(4); and use a CFTC-regulated clearinghouse to ensure sufficient liquidity, *id.* §§ 7(d)(11), 7a-1. The CEA further expressly delegates authority to the CFTC "to make and promulgate … regulations … reasonably necessary to effectuate" these core principles. *Id.* § 12a(5). Congress specified that DCMs "shall comply with" "any requirement that the [CFTC] may impose" pursuant to that delegation. *Id.* § 7(d)(1)(A)(ii). And the CFTC has adopted comprehensive regulations elaborating on the core principles Congress established. *See* 17 C.F.R. pt. 38.

The CEA charges the CFTC with overseeing listing of contracts on DCMs. *See* 7 U.S.C. § 7a-2(c). Until 2000, the CEA required DCMs to obtain CFTC preapproval before listing contracts. *See* Contract Market Designation, 40 Fed. Reg. 25,849, 25,850 (June 19, 1975). But this preapproval process proved onerous and inefficient, causing Congress in 2000 to allow DCMs to list contracts by self-certifying their compliance with applicable CEA requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a)(1). Today, DCMs seeking to list new contracts must submit detailed certifications to the CFTC to demonstrate compliance with the CEA. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 40.2, 40.3. The CFTC may review these

certifications and determine whether the contracts violate applicable law. 7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b).

Congress gave the CFTC multiple enforcement tools to ensure DCMs adhere to the CEA and CFTC requirements. Those tools include civil penalties, 7 U.S.C. § 9(10)(C), revocation of licensing, *id.* § 8(b), and referral for criminal enforcement, *id.* § 13.

2. The CFTC has repeatedly addressed event contracts. In 2008, the CFTC solicited public comment on how to regulate event contracts. Concept Release, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008). Recognizing that these contracts may be based on "varied" eventualities, such as "the results of political elections, or the outcome of particular entertainment events," the agency viewed them as akin to "either options or futures contracts." *Id.* The CFTC further explained that the CEA "supersedes and preempts other laws, including state and local gaming … laws" as to on-DCM transactions. *Id.* at 25,673. It therefore sought comments on "the implications of possibly preempting state gaming laws with respect to event contracts" by permitting them to be traded on-DCM. *Id.* That rulemaking was never finalized, however, because Congress in Dodd-Frank expressly included event contracts within the "swap" definition, eliminating any doubt that they fell within CFTC jurisdiction.

In 2011, following Dodd-Frank, the CFTC implemented the Special Rule by generally prohibiting contracts involving the enumerated categories while authorizing the CFTC to "issue an order approving or disapproving" such contracts on a case-by-case basis. 17 C.F.R. § 40.11(c)(2). As the CFTC explained in promulgating Rule 40.11, DCMs "may always" self-certify contracts subject to review "on a case-by-case basis." Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011).

In 2024, the CFTC proposed a regulation that would have interpreted "gaming" to include sports-event contracts and categorically deemed those contracts contrary to the public interest. Event Contracts, 89 Fed. Reg. 48,968, 48,978 (June 10, 2024). But the proposal was never finalized, and the CFTC formally withdrew it in February 2026. Event Contracts; Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5,386 (Feb. 6, 2026). Thus, the CFTC never categorically prohibited event contracts involving gaming.

In June 2026, the CFTC promulgated a Notice of Proposed Rulemaking ("NPRM") announcing a comprehensive framework for regulating event contracts under the Special Rule. *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The NPRM confirms that the CEA "expressly preempts state laws" with respect

to event contracts on DCMs. *Id.* at 35,808. It recognizes event contracts are "swaps" that serve "price discovery" functions and permit market participants to hedge exposure to events "for which no traditional financial instrument otherwise exists," including "sporting events" generating "billions of dollars in economic activity." *Id.* at 35,807-08 (citation modified).

The NPRM also proposes revisions to Rule 40.11 by: (1) specifically defining "gaming" to include event contracts involving sporting events, (2) making clear that these event contracts are *not* (and never have been) categorically prohibited, but instead are subject to case-by-case public-interest review, (3) providing a framework for the CFTC to evaluate whether event contracts comport with the public interest, and (4) explaining that many (but not all) event contracts involving sporting events "can be operated consistent with the public interest." *Id.* at 35,818, 35,836, 35,853. The NPRM's comment period closed on July 27, 2026. *Id.* at 35,806.

3. The CFTC has consistently recognized its exclusive jurisdiction to regulate instruments traded on DCMs, including event contracts. In 2008, it recognized that "the CEA supersedes and preempts other laws, including state and local gaming and bucket shop laws, with respect to transactions executed on" a DCM, including "event contracts." 73 Fed. Reg. at 25,673

(emphasis added). In 2024, it told the D.C. Circuit that "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. 27, *KalshiEX v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583 ("CFTC D.C. Cir. Br."). And its now-withdrawn 2024 proposed rule confirmed that the CFTC's "exclusive jurisdiction … preempt[s] the application of state law." 89 Fed. Reg. at 48,977 n.84.

## II. Factual And Procedural Background

1. In 2020, the CFTC designated Kalshi as a DCM. *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Kalshi has since been federally regulated alongside other DCMs like the Chicago Mercantile Exchange.

Kalshi offers many kinds of event contracts related to climate, technology, popular culture, economics, and agricultural commodities. Each contract has a yes (the event will occur) and a no (it will not) position, allowing customers to trade on financially significant events. Users can hedge risks associated with these events, and contract prices fluctuate in real time based on the market's perceptions of how likely the event is to occur, giving these contracts extraordinary predictive value.

That is why Kalshi is known as a "prediction market"—its contracts provide market-driven predictions about future events, crowdsourced by

users with financial incentives to predict accurately. The public benefits of these contracts therefore extend well beyond those who trade. Indeed, most people who interact with Kalshi do not trade, but rather consult Kalshi's publicly available forecasts. Kalshi's event contracts therefore serve the "public interests" specified by Congress in the CEA—"providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. §5(a).

The illustration below, for example, shows the Kalshi contract regarding which party will control the U.S. Senate after the 2026 midterm election:



[2]

In January 2025, Kalshi began offering contracts on sports events. These contracts are structured like Kalshi's other event contracts, and they offer the same public benefits—they allow users to hedge risks associated with sports events and they provide crowdsourced predictions.

The illustrative contract below shows the Kalshi contract regarding which team would win the NBA Championship:

---

[2] *Which party will win the U.S. Senate?*, Kalshi, https://kalshi.com/markets/controls/senate-winner/controls-2026 (last visited August 31, 2026).



[3]

While the underliers of these event contracts are sports events, any similarity between these contracts and bets offered by sportsbooks is skin-deep. Sportsbooks are bookmakers, which means they are counterparties to bets placed by customers and they set the odds. Bookmakers win when bettors lose, giving them an incentive to stack the odds against bettors. Kalshi, by contrast, is an exchange. It acts as an intermediary and does not favor one side of the trade. The market—not Kalshi—sets the prices.

2. Nonetheless, in October 2025, the New York State Gaming Commission sent Kalshi a cease-and-desist letter asserting that Kalshi's

---

[3] *Pro Basketball Champion*, Kalshi, https://kalshi.com/markets/kxnba/pro-basketball-champion/kxnba-26 (last visited August 31, 2026).

sports contracts are prohibited by New York gambling law and demanding that Kalshi immediately cease offering them in New York. The Commission threatened "civil penalties and fines" pursuant to New York gambling laws and accused Kalshi of violating state criminal laws that could subject Kalshi or its officers to imprisonment. JA125-128; *see also* N.Y. Penal Law § 225.10; N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 104(9). Kalshi filed this suit, asserting that the CEA preempts state regulation of Kalshi.

3. While Kalshi's PI motion was pending, the CFTC confirmed that its exclusive jurisdiction over trading on DCMs encompasses Kalshi's sports-event contracts. The CFTC filed preemption suits against multiple states—including New York—to prevent states from enforcing preempted state laws against DCMs. *See, e.g.*, *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954 (D. Ariz. 2026) (granting CFTC's motion for preliminary injunction against Arizona); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. filed Apr. 24, 2026); *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn. filed Apr. 2, 2026). The CFTC has explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction … by re-characterizing swaps trading on DCMs as illegal gambling." CFTC Amicus Br. 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br."). State regulation of Kalshi's contracts, in the CFTC's view, poses "a

fundamental threat to Congress's statutory design" and would result in "a seismic shift in the longstanding status quo between CFTC and state authority." *Id.*

4. The district court denied Kalshi a preliminary injunction. *See* JA1-22. It began by "assum[ing]" Kalshi's contracts are "swaps." JA11. It also recognized that "it is clear from the CEA's text that Congress intended for the CFTC to have exclusive jurisdiction over swap transactions on DCMs." JA11. But the court nevertheless concluded that the CEA did not preempt the application of New York gambling laws to DCM-traded swaps. The court held that the CEA does not preempt state gambling law because Section 2's savings clause and the Special Rule's reference to state law indicate that Congress meant to "leave room" for state regulation. JA13. As to conflict preemption, the court reasoned that Kalshi could "obtain[ ] a license pursuant to New York law," and that New York's gambling laws "complement rather than conflict" with federal objectives. JA16-19. The court further concluded that Kalshi had not shown irreparable harm because Kalshi could secure the reversal of any civil fines on appeal and the threat of CFTC enforcement was "speculation." JA19-20. Finally, the court held that the equities favored New York. JA20-21.

Kalshi moved for an injunction pending appeal in this Court on July 23, 2026. Dkt. No. 27. The panel has yet to rule on the motion.

5. A week later, the New York Attorney General filed suit in the New York Supreme Court, seeking a temporary restraining order that would force Kalshi to cease offering all event contracts nationwide. Pet., *People v. KalshiEX LLC,* No. 453272/2026 (N.Y. Sup. Ct. July 31, 2026), Dkt. No. 1. Although Defendants' cease-and-desist letter had focused on sports-event contracts, New York's lawsuit sought to prohibit Kalshi from offering contracts on *all* events. *Id.* at 29 (seeking to prohibit Kalshi from "operating a business that offers contracts relating to sports, culture, elections, and other events"). The suit seeks to prohibit Kalshi from offering event contracts "*within or from* New York." *Id.* (emphasis added). Because Kalshi is based in New York, this relief would prohibit Kalshi from offering event contracts to anyone. The suit seeks a minimum of $36 billion in restitution and damages. Ex. B to Dkt. No. 34.1. Kalshi removed that suit to federal court, and the state has moved to remand.

In response to New York's enforcement action, the CFTC issued an emergency order on August 11, 2026, directing "Kalshi to continue to operate its exchange in accordance with its normal practices" even if New York obtains relief against Kalshi. Dkt. No. 39.1 at 3; *see* 7 U.S.C. § 12a(9) (CFTC's

emergency authority). The CFTC determined that the AG's attempt to "prohibit Kalshi from offering *all* event contracts" constitutes a "market emergency." Dkt. No. 39.1 at 3-5. It found that "the sudden, unpredictable shut down of a DCM" would "existential[ly] threat[en]" the nationwide marketplaces run by the CFTC by causing an "influx of trading activity from Kalshi onto other exchanges" that would artificially inflate derivative prices. *Id.* at 7, 10. The order, from Kalshi's exclusive federal regulator, directed Kalshi not to comply with a state-court order.

## SUMMARY OF ARGUMENT

**I.** The CEA expressly preempts state regulation of trading on DCMs like Kalshi.

**A.** Section 2(a) grants the CFTC "exclusive jurisdiction" to regulate on-DCM trading, which necessarily denies jurisdiction to state regulators. Courts, including this one, have uniformly held that the CEA preempts state law.

**B.** Kalshi's sports events contracts fall within Section 2(a)'s scope as "agreements" traded on DCMs and as "transaction[s] involving swaps." Their structure as tradeable instruments mirrors the structure of other swaps, differing only in that the underlier of the contract is a sports event rather than some other event or commodity. The CEA provides no basis to

single out contracts involving sports events and exclude them categorically from the swap definition, especially given that sports events carry clear financial consequences and the CEA expressly refers to "swaps" involving "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). Sports-event contracts differ structurally from sports bets, and recognizing Kalshi's contracts as swaps will not disturb state regulation of sports betting.

**II.** The CEA also impliedly preempts state regulation of trading on DCMs.

**A.** Congress's avowed purpose in establishing a uniform set of rules for trading on DCMs was to "preempt the field." H.R. Rep. No. 93-1383, at 35. The comprehensive regulatory framework Congress created to oversee futures trading leaves no room for parallel state regulation.

**B.** New York gambling laws are also conflict-preempted as applied to Kalshi. New York seeks to prohibit Kalshi from offering all event contracts, and the CFTC has responded with an order directing Kalshi to disobey any state-court TRO rather than cease operations. That makes the conflict undeniable. Moreover, allowing 50 states to regulate trading on DCMs would thwart Congress's objective of uniform federal regulation of DCMs.

**III.** The contrary conclusions of the district court and Ninth Circuit are mistaken in multiple respects.

**A.** The district court erred in concluding that the CEA does not preempt state gambling laws as applied to trading on DCMs. The court assumed that Kalshi's contracts are swaps, then created an impermissible extratextual carveout from preemption for state gambling laws. While the court rejected conflict preemption on the ground that DCMs can operate fractured state-by-state markets, the CFTC has confirmed that compliance with state laws is "impossib[le]." CFTC Br. 26-27.

**B.** The Ninth Circuit concluded that Kalshi's contracts are not swaps. That conclusion cannot be reconciled with the CEA's text and overlooks the Special Rule's reference to "[e]vent contracts" involving "gaming" as one type of "swap[ ]," 7 U.S.C. § 7a-2(c)(5)(C)(i). The Ninth Circuit's results-driven conclusions that an event cannot be an "outcome" and that swaps must be based on events with "inherent" financial consequences cannot be reconciled with the CEA's plain text.

**IV.** Kalshi will suffer numerous irreparable harms absent an injunction, including irreparable monetary harm and the jeopardization of its status as a DCM, to say nothing of the harms to its users. By contrast, a state suffers no harm from being denied the ability to enforce preempted laws.

## STANDARD OF REVIEW

To secure a preliminary injunction, a plaintiff must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in his favor, and (4) that an injunction is in the public interest." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025) (citation modified). This Court reviews the denial of a preliminary injunction "for abuse of discretion." *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 225 (2d Cir. 2021).

## ARGUMENT

Under the Supremacy Clause, Congress "has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see* U.S. Const. art. VI, cl. 2. Express preemption arises when "a federal statute expressly directs that state law be ousted." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (per curiam) (citation omitted). Field preemption exists where states regulate in a field that Congress "has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Conflict preemption exists where compliance with both state and federal law is an "impossibility" or where state law stands as an "obstacle" to Congress's objectives. *Id.*

(citations omitted). These "categories of preemption are not 'rigidly distinct.'" *Crosby*, 530 U.S. at 372 n.6 (citation omitted). New York gambling laws are preempted as applied to Kalshi under all three principles.

# I. THE CEA EXPRESSLY PREEMPTS STATE GAMBLING LAWS AS APPLIED TO KALSHI.

## A. The CEA's Exclusive-Jurisdiction Provision Expressly Preempts State Regulation.

1. Section 2(a)(1)(A) expressly preempts state law. It grants the CFTC "exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery …, traded or executed on a contract market designated" by the CFTC. The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (5th ed. 2022) ("Not divided or shared with others"; "sole"; "incompatible"). The CEA's grant of jurisdiction to the CFTC thus "excludes all others." *KalshiEX LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026). This Court has therefore held that Section 2(a)(1) "preempts the application of state law." *Leist*, 638 F.2d at 322. The Ninth Circuit recently agreed that Section 2(a)(1)(A) "expressly preempts state law regulating swaps 'traded or executed on' a DCM." *Assad*, 2026 WL 2543846, at *7.

A mountain of precedent is in accord. The Supreme Court has concluded that a materially identical grant of exclusive jurisdiction to a federal regulator preempts state law. In *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), the Court held that a grant of "jurisdiction" to the Secretary of Agriculture that is "exclusive" meant that "the matters regulated by the Federal Act cannot be regulated by the States." *Id.* at 233-234 (citation modified). More recently, the Supreme Court held that a grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

In other contexts, too, this Court and others have held that when "jurisdiction is exclusive," it "preempts other law." *N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 72 (2d Cir. 2011) (interpreting Interstate Commerce Commission Termination Act); *see Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024) ("explicit statutory conferral of *exclusive* jurisdiction" plainly "withdraws any concurrent jurisdiction" that state authorities may have)*; Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (statutory grant of "exclusive jurisdiction" to committee preempted state law).

2. Other features of Section 2(a)'s text confirm express preemption. Section 2(a)(1)(A)'s savings clause provides that it does not "supersede" the jurisdiction of "other regulatory authorities" under state laws "*[e]xcept as hereinabove provided*" (emphasis added). The text "hereinabove" grants exclusive jurisdiction to the CFTC over on-DCM transactions, reinforcing that state laws as to on-DCM transactions *are* superseded. *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-196 (9th Cir. 2013) (interpreting savings clause with "[e]xcept as provided" proviso). If the provision "was not intended to have preemptive effect, the '[e]xcept as hereinabove provided' clause would be superfluous." *Assad*, 2026 WL 2543846, at *7. Indeed, Congress added the proviso to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6.

3. Statutory history reaffirms that the express-preemption provision means what it says. Before 1974, the CEA did not "impair any State law" applicable to certain "transactions" covered by the CEA. 7 U.S.C. § 6c (1936). Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis). The Senate also clarified that the state-law savings clause applies "except as hereinabove provided" by the CFTC's exclusive jurisdiction over

on-DCM trading. S. Rep. No. 93-1131, at 31. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court previously relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692-693. Each change would be incomprehensible if Congress intended for states to regulate DCMs.

4. Later-enacted provisions further confirm preemption. Following the 1974 amendments, Congress enacted other provisions addressing states' authority; each underscores that the CFTC's exclusive jurisdiction prohibits state regulation of trading on DCMs.

The 1978 amendments, for example, authorize state officials to sue over "any act or practice constituting a violation of any provision of [the CEA] or any [CFTC] rule." 7 U.S.C. § 13a-2(1). They also let states enforce general state "antifraud statute[s]"—but not state gambling laws. *Id.* § 13a-2(7). And, as relevant here, they expressly provide that states may enforce the CEA *only* against a party "*other than a [designated] contract market*." *Id.* § 13a-2(1) (emphasis added). Congress included this limitation because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, *supra*, at 708.

Similarly, the 1982 amendments instruct that the CEA does *not* "supersede or preempt" state law as to transactions "*not* conducted on" a

DCM. 7 U.S.C. § 16(e)(1)(B)(i) (emphasis added). The only plausible inference of specifying no preemption as to off-DCM transactions is that Congress *did* intend preemption as to on-DCM transactions. Indeed, Congress in 1982 expressly recognized that the 1974 amendments already "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44.

The 2000 amendments are equally on-point. That year, Congress expanded the CEA to cover event contracts by defining "excluded commodity" to include an "occurrence" that is "beyond the control of the parties" to the transaction and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). Congress also provided that "excluded commodit[ies]" could be traded *off*-DCM by sophisticated market participants. 114 Stat. 2763A–377-379. To protect these off-exchange trades from state gaming laws, Congress amended the CEA to "supersede and preempt" "any State or local law that prohibits or regulates gaming" with respect to these newly permitted off-DCM transactions. 7 U.S.C. § 16(e)(2). That targeted preemption was necessary only because off-DCM transactions were not subject to the CFTC's exclusive jurisdiction. Indeed, Congress in

2000 recognized that the CEA "supersede[d] and preempt[ed]" state law as applied to on-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71.

A subsequent federal gambling law further indicates that Congress viewed on-DCM transactions as distinct from standard sports betting. UIGEA, enacted in 2006, generally treats "Internet gambling" as "unlawful" if the "bet or wager" is unlawful in the state where it is "initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). But Congress expressly excluded "any transaction conducted on or subject to the rules of a" DCM from UIGEA's reach. *Id.* § 5362(1)(E)(ii). UIGEA thus confirms Congress's intent to prevent state gambling laws from applying to on-DCM transactions.

5. Precedent reinforces preemption. When Congress returned to the CEA after 1974, courts of appeals, including this Court, had repeatedly and uniformly held that the CEA's exclusive jurisdiction over DCMs "preempts the application of state law." *Leist*, 638 F.2d at 322; *see Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (state-law "commercial gambling" claim could not proceed because the CEA "preempts all state laws inconsistent with its provisions"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation."); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th

Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"); *Am. Agric.*, 977 F.2d at 1157 (state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"). This Court "assume[s] that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Tanvir v. Tanzin*, 894 F.3d 449, 463 (2d Cir. 2018) (citation omitted). Congress therefore would have understood when it revisited the CEA in Dodd-Frank that granting the CFTC exclusive jurisdiction over event contracts as one type of swap would preempt state law.

6. Kalshi's federal regulator agrees—and always has. In 2008, the CFTC recognized that "the CEA supersedes and preempts other laws, *including state and local gaming and bucket shop laws*, with respect to transactions executed on" a DCM, including "event contracts." 73 Fed. Reg. at 25,673 (emphasis added). Its proposed 2024 rule confirms that its "exclusive jurisdiction … preempt[s] the application of state law." 89 Fed. Reg. at 48,977 n.84. And it told the D.C. Circuit—when litigating a case *against* Kalshi—that "due to federal preemption, event contracts never violate state law when they are traded on a DCM." CFTC D.C. Cir. Br. 27; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388, 394, 402 (2024) (courts may account for an agency's "body of experience and informed judgment" in interpreting a statute (citation omitted)).

### B. Kalshi's Event Contracts Fall Within The Scope Of The CEA's Express-Preemption Provision.

After concluding that a statute contains an express-preemption clause, this Court considers "the *substance and scope*" of the clause to determine whether state regulation falls within the clause's scope. *Yousefzadeh v. J&J Consumer Inc.*, 184 F.4th 130, 145 (2d Cir. 2026) (citation omitted).

Section 2(a)(1)(A) gives the CFTC exclusive jurisdiction over "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed" on a DCM. The scope of this provision is broad, covering *all* "agreements" and *all* "transactions involving swaps" that are traded on DCMs. Kalshi's event contracts are both.

1. Kalshi's events contracts are "agreements" traded on DCMs. By its plain meaning, the term "agreement[ ]" covers all contracts. And statutory context confirms the term's breadth. For one thing, the word "agreement" is followed by a parenthetical listing a wide, non-exhaustive range of agreements that are expressly "includ[ed]," illustrating that Congress sought to cover the waterfront. 7 U.S.C. § 2(a)(1)(A). For another, while the final term in the list—"transactions"—is modified by the limiting phrase "involving swaps," the rule of the last antecedent dictates that this limiting phrase does not apply to "agreements" or the other enumerated terms that are separated from "transactions involving swaps" by a comma. *See*

*Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows" (citation omitted)). And Section 16(e)(1)(B)(i) separately preserves state authority over any transaction "that is *not* conducted on" a DCM, confirming that the CEA broadly preempts all trading that occurs on a DCM (emphasis added).

2. Regardless, Kalshi's event contracts also qualify as "transactions involving swaps" traded on DCMs. 7 U.S.C. § 2(a)(1)(A). Congress defined "swap" in a broad six-part definition that includes contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). It also includes any contract "that is, or *in the future* becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv) (emphasis added). Kalshi's event contracts easily fall within this definition.

To begin, event contracts—including sports-event contracts—provide for a payment that is "dependent" on the "occurrence" of an "event." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's event contracts are all structured to pay out if a specified event (like the Federal Reserve increasing interest rates or Spain winning the World Cup) occurs. Kalshi's contracts are also predicated on events "associated with a potential financial, economic, or commercial

consequence." *Id.* To "associate" with means "to join or connect together," or "to bring together or into relationship in any of various intangible ways." *Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Kalshi therefore lists contracts only after determining that the underlying event is connected with a potential financial, economic, or commercial consequence.

That is no less true for Kalshi's sports-event contracts. Indeed, there should be no dispute that sports-event contracts are swaps, because the CEA's Special Rule expressly recognizes as much. That provision describes "[e]vent contracts" as "agreements, contracts, transactions, or *swaps*," and then gives the CFTC discretion to prohibit DCMs from offering certain categories of event contracts—including contracts "involving … *gaming*"—if the agency determines that those contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphases added). The term "gaming" "capture[s] professional sports, which are commonly understood to be games." 91 Fed. Reg. at 35,825. It would make no sense for Congress to grant the CFTC discretion to prevent the trading of certain event contracts "involving … gaming" if those event contracts cannot be traded on DCMs *at all*. The Special Rule therefore makes plain that sports-event contracts can fit within the swap definition.

There is also no way to read the text of the swap definition to categorically exclude sports events contracts. As the CFTC put it, sports teams "generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake. 91 Fed. Reg. at 35,807, 35,830 (citation modified). Examples abound. The 2026 World Cup produced an estimated "$17 billion boost in U.S. GDP."[4] Wins and losses, too, have financial consequences. World Cup ticket prices spiked or fell depending on which teams advanced.[5] Each 2026 New York Knicks "home playoff game was worth roughly $91 million" to New York City businesses, with the full postseason generating "as much as $832 million."[6] Studies show that losses in soccer matches have a statistically significant negative effect on the losing country's stock market. For instance, "elimination from a major international soccer tournament is associated with a next-day return on the national stock market index that is 38 basis points lower than average."[7] Sports events have financial consequences for sponsors that pay

---

[4] Dylan Duke, *How much of an economic boom is the 2026 FIFA World Cup for the U.S. hosting cities?*, NPR (June 15, 2026), https://perma.cc/F64B-G5F4.

[5] *Round of 16 exits fuel World Cup quarterfinal ticket price drops*, Sports Bus. J. (July 10, 2026), https://perma.cc/E32Q-5N4K.

[6] Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD.

[7] Alex Edmans et al., *Sport Sentiment and Stock Returns*, 62 J. Fin. 1967, 1967 (2007).

performance bonuses, advertisers with a financial stake in who performs well, television networks that benefit from high viewership, local businesses that profit from team wins—the list goes on. These are *actual* and *substantial* economic consequences—they easily qualify as "potential" economic consequences.

Because sports events can have economic consequences, the record of hedging on Kalshi grows all the time. An insurance company "expects to hedge about $30 million annually through" Kalshi to help teams and sponsors "manage the financial risks of performance incentives in athletes' and coaches' contracts."[8] Businesses use Kalshi "to hedge" on promotions tied to whether particular teams win and by how much.[9] Sportsbooks themselves use Kalshi to hedge their exposure to sports events.[10] Hedge

[8] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.
[9] Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM; Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.
[10] Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

funds find that "prediction markets allow us to be much more creative with the types of hedging."[11]

Other DCMs have also begun offering sports-event contracts as swaps, including not just young companies like Kalshi, but also incumbents like the Chicago Mercantile Exchange.[12] The CFTC itself recognizes that sports-event contracts are swaps "[u]nder the plain language of the CEA." 91 Fed. Reg. at 35,808. The NPRM confirms that the CEA "expressly preempts state laws" with respect to event contracts on DCMs. *Id.* Thus, sports-event contracts have become "commonly known to the trade as a swap"—yet another reason they qualify as swaps under the CEA's definition, which Congress ensured would evolve to capture innovation in the markets. 7 U.S.C. § 1a(47)(A)(iv).

3. Congress defined swaps broadly, but that does not mean that any contract involving speculation can qualify as a swap. To the contrary, the CEA imposes at least three distinct limits, and empowers the CFTC to establish more.

---

[11] Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ.

[12] *CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA.

*First*, because a swap must involve events that are "associated with" potential financial consequences, a DCM cannot list contracts involving events with potential financial consequences that are too attenuated, remote, or speculative to establish the requisite association. That means that not every sports event will qualify. For example, Kalshi does not offer trades on sports events that are commonly the subject of sportsbook bets—from the winner of a coin flip to the color of a Gatorade shower to the precise scores of certain games. These causation principles, however, do not suggest that sports events categorically lack economic consequences.

Drawing the line between contracts that are sufficiently connected to potential economic consequences and those that are not is necessary in contexts beyond sports. There can be no real dispute, for example, that an event contract regarding the attendance figures for a Broadway play could readily fit within the swap definition because of the obvious financial consequences of Broadway attendance. That does not mean it would be appropriate to list a similar contract involving attendance at a free school play. Still, it would not be reasonable to hold that *all* theater event contracts are impermissible merely because the high-school drama contract might be.

*Second*, swaps must be capable of being traded. That much is clear from their inclusion in the Commodity *Exchange* Act, a statute dedicated to

establishing markets for *exchanging* derivatives. If an instrument cannot be "traded," it cannot be exchanged on a DCM, and it does not fall within the CEA. 7 U.S.C. § 2(a)(1)(A).

The CFTC and SEC expressly articulated this "tradability" requirement in a 2012 regulation the agencies promulgated under their statutory authority to "further define" the term swap. 15 U.S.C. § 8302(d)(1); *see KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026). That regulation distinguishes swaps from other "consumer or commercial arrangements" principally by asking whether an instrument's "payment provisions" are "severable" and whether the instrument is "*traded on an organized market or over-the-counter*." Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,247-48 (Aug. 13, 2012) (emphasis added). Event contracts, including sports-event contracts, satisfy this requirement because they are structured like every other derivative contract—they can be traded and re-traded with severable payment obligations and prices set by market forces rather than the exchange.

But many other contracts that similarly pay out depending on the occurrence of an event flunk this tradability requirement. A flood insurance contract, for example, will pay out upon the occurrence of a weather event—a flood—but it does not qualify as a swap because it is structured as a promise

to pay a specific entity for a specific loss. A homeowner cannot sell his insurance policy to someone with no connection to his house, insurance policies cannot be traded and re-traded, and prices are set by the insurance company rather than market forces.

The same is true of traditional sports bets. Sports bets take the form of contracts between an individual and a casino or sportsbook that sets the terms of the contract—including the price and the odds. As a result, a gambler cannot sell his bet once he has made it. Indeed, sports bets are specifically designed so that they cannot be traded—both because casinos want to know who their customers are to avoid the most skilled gamblers and because state laws usually bar the exchange of these bets. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 5329.19(c) (prohibiting casinos from paying out sports wagers to persons "collecting the payment" on another's behalf).

Sports-event contracts, by contrast, are specifically designed to be traded because that is how their price is determined, and that is how they fulfill their price-discovery purposes. Moreover, unlike sportsbooks, exchanges do not screen out skilled customers; rather, those customers are essential in ensuring the market's success.

The tradability of event contracts explains why Congress placed them within the "swap" definition and under exclusive CFTC jurisdiction in Dodd-

Frank. The financial crisis showed that when instruments are traded without federal oversight, their financial risks can migrate to other markets and "permit[ ] enormous exposure" to grow unmonitored. *Inv. Co. Inst.*, 891 F. Supp. 2d at 173-174; *see Phillips*, 155 F.4th at 113. Congress thus mandated that tradeable instruments like event contracts must be exchanged on-DCMs, subject to extensive and exclusive federal oversight.

*Third*, the CEA and its implementing regulations prohibit DCMs from listing any contract that is readily susceptible to "manipulation." *See* 7 U.S.C. § 7(d)(3); 17 C.F.R. § 38.251(a). A swap would flunk this test if it took the form of an event contract that depends on a manipulable occurrence. For example, the CFTC's recent NPRM implementing its authority under the Special Rule explains that certain sports-event contracts are likely off-limits because they settle based on "a discrete action, event, or occurrence in sporting events" or involve "[p]re-collegiate sports event[s]" or "penalties," which raise "public interest concerns relating to manipulation." 91 Fed. Reg. at 35,836-37. On the other hand, sports events including "win-loss results" and "season long performance metrics" do not raise these concerns because "no individual participant has determinative capacity to affect settlement through their own conduct." *Id.* at 35,835. And the CFTC may promulgate

additional limits both under the Special Rule, and under its express authorization to further define swaps.

## II. THE CEA IMPLIEDLY PREEMPTS STATE GAMBLING LAWS AS APPLIED TO KALSHI.

### A. New York's Gaming Laws Are Field-Preempted As Applied To Kalshi.

The CEA also preempts the field of regulating trading on DCMs—both through its express text and by setting out a comprehensive scheme that displaces state regulation. *See Crosby*, 530 U.S. at 372 n.6 (field preemption can be express or implied).

Begin with the text. The grant of exclusive jurisdiction to the CFTC expressly preempts the field of on-DCM trading by withdrawing all concurrent state jurisdiction. This Court need not consider legislative history given the clear statutory text and context, but the Conference Report to the 1974 amendments eliminates any doubt about field preemption, noting that Congress sought to "*preempt the field* insofar as futures regulation is concerned" and that Congress thus did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35-36 (emphasis added); *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (when resort to legislative history is warranted, committee reports are the "authoritative source").

The CEA's field-preemptive text is confirmed by Congress's adoption of a "comprehensive regulatory structure" to oversee the "futures trading complex." *Curran*, 456 U.S. at 356 (citation omitted). The CEA comprehensively regulates DCMs, covering everything from recordkeeping to capital requirements to market monitoring to how trades are matched and executed. *See supra* pp.17-22. It also contains an elaborate set of provisions defining what types of derivatives may be traded on DCMs and what qualifies as a commodity. *See* 7 U.S.C. §§ 1a(9), (19), (47). As relevant here, the CEA refers to "event contracts" as including "swaps," and authorizes *the CFTC* (not states) to decide whether to bar "event contracts" "involv[ing]" "gaming" or conduct proscribed by state law as "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i). This comprehensive framework ensures that DCMs will operate on an interstate basis to provide 50-state markets, thereby ensuring uniform nationwide pricing of derivatives contracts. The regime leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (citation omitted).

### B. New York's Gaming Laws Are Conflict-Preempted As Applied To Kalshi.

In multiple respects, complying with New York law would be "impossible" for Kalshi or pose an "obstacle" to the CEA's purposes. *Crosby*, 530 U.S. at 372-373 (citation modified).

1. This is a quintessential case of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012). New York has taken the extraordinary step of filing a lawsuit to prohibit Kalshi from offering *all* event contracts, to prevent Kalshi from offering those contracts to *anyone*, whether inside or outside of New York, and to require Kalshi to pay $36 billion or more in damages. *Supra* pp.28-29. Simply put, New York asserts jurisdiction to ban every single event contract Kalshi offers. The CFTC responded with an order directing Kalshi to disobey any state-court TRO rather than cease operations, which would subject the markets to "an existential threat." Dkt. No. 39.1 at 7. The CEA provides that DCMs "shall comply" with CFTC requirements. *See* 7 U.S.C. § 7(d)(1)(A)(ii). Kalshi thus faces irreconcilable demands from state and federal regulators. Conflicts do not get any clearer than that.

2. In addition, applying New York's gaming laws to Kalshi subverts Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. As the Third Circuit recently held, Congress intended "to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. Letting states enforce gambling laws against Kalshi hinders the CEA's objectives by reinstating "exactly the patchwork

that Congress replaced wholecloth" with the CFTC. *Id.* The Seventh Circuit has likewise held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Am. Agric.*, 977 F.2d at 1156-57 (citation omitted).

3. Specific provisions of New York law also directly conflict with the federal scheme. New York, for example, requires any entity offering sports wagering to ensure "that authorized sports bettors are physically located within the state." N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367-a(4)(a)(ii). Sportsbooks can comply with this requirement because they are the counterparties to bets with their customers. But DCMs like Kalshi, which match traders with other traders nationwide, cannot. It is literally impossible to offer an *interstate* marketplace while complying with 50 state laws demanding *intrastate* marketplaces. That would create fragmented markets with separate liquidity pools, meaning that the same contracts would trade at different prices in different states. Federal law, moreover, requires DCMs to provide "impartial access to [their] markets and services." 17 C.F.R. § 38.151(b). A DCM cannot treat all users equally if forced to discriminate based on geography. Thus, as the CFTC has made clear,

compliance with state geographic limitations is "impossib[le]" for DCMs. CFTC Br. 26-27.

4. Allowing Defendants to prosecute Kalshi would also conflict with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Congress addressed event contracts involving "gaming" in the Special Rule by giving the CFTC, and only the CFTC, authority to prohibit such contracts if they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC has proposed a regulation concluding that many sports-event contracts "can be operated consistent with the public interest" and setting forth detailed criteria to guide its public-interest review. 91 Fed. Reg. at 35,836-37. Letting states ban sports-event contracts squarely conflicts with that method of enforcement, because it "would disturb and conflict with the balance embodied" in a discretionary judgment Congress delegated to a federal agency. *California v. FERC*, 495 U.S. 490, 506 (1990). Where Congress grants a federal agency "exclusive" authority, state law conflicts with federal law where it would allow states to punish what the federal agency may authorize. *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 325-326 (1981).

## III. OTHER COURTS' CONTRARY CONCLUSIONS ARE UNPERSUASIVE.

### A. The District Court Erred In Holding That The CEA Does Not Preempt State Law.

The district court assumed that Kalshi's contracts are "swaps" subject to the CFTC's exclusive jurisdiction. JA11. But the court then concluded that states could exercise concurrent jurisdiction over those contracts. That reasoning conflicts with the decisions of both the Third and Ninth Circuits and is plainly incorrect.

1. *Express preemption.* The district court began by applying "a presumption against preemption." JA10 (citation omitted). But courts "do not invoke any presumption against pre-emption" where, as here, a statute "contains an express pre-emption clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified). In such cases, courts "should not invoke the presumption against preemption," because the "plain wording of the clause" "necessarily contains the best evidence of Congress' preemptive intent." *Yousefzadeh*, 184 F.4th at 145 (citation modified).

The remainder of the district court's express-preemption analysis was severely flawed. The court "assume[d]" Kalshi's sports-event contracts "are swaps under the CEA." JA11. The court also noted "it is clear from the CEA's text that Congress intended for the CFTC to have exclusive jurisdiction over swap transactions on DCMs." *Id.* That should have been the end of the

inquiry. If Kalshi's contracts are DCM-traded swaps, and if Congress gave the CFTC "exclusive jurisdiction" over DCM-traded swaps, it follows that states cannot have jurisdiction to regulate those contracts. *Assad*, 2026 WL 2543846, at *7. The district court did not cite, let alone distinguish, this Court's holding that the CEA "preempts the application of state law." *Leist*, 638 F.2d at 322.

Instead, without construing the plain meaning of the CEA's express-preemption provision, the court declared that the "scope of Congress' intent to displace state law" can be determined by only "considering" "implied preemption." JA12 (citation omitted). That reasoning is baffling. The scope of express preemption follows from the CEA's text, not from "implied preemption." The court left the task of interpreting the CEA's express-preemption clause unfinished, simply moving on to address implied preemption without addressing the CEA's text.

2. *Field preemption.* The district court's grounds for rejecting field preemption are equally untenable.

The district court relied on Section 2(a)'s savings clause but omitted the relevant portion. JA13. The court quoted the savings clause as providing that Section 2 does not "supersede" or "limit" the jurisdiction of "other regulatory authorities" under the laws "of any State." JA13 (citation

omitted). But that skips the critical proviso, which makes clear that the savings clause applies "*[e]xcept as hereinabove provided*" by the grant of "exclusive jurisdiction" to the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Congress added the proviso specifically to "clarify[ ]" that "where applicable," the CFTC's jurisdiction "supersedes State as well as Federal agencies." H.R. Rep. No. 93-1383, at 35. Rather than undermine preemption, the savings clause reinforces that the CFTC's exclusive jurisdiction *does* "supersede" state regulations as applied to on-DCM transactions. 7 U.S.C. § 2(a)(1)(A).

The court interpreted the Special Rule to "demonstrate[ ]" some state law can "operate in tandem with the CEA." JA13. But nothing about the Special Rule grants states concurrent jurisdiction to regulate DCM-traded instruments. Instead, it grants the *CFTC*—not 50 states—authority to prohibit as "contrary to the public interest" event contracts that "involve" "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i).

The district court relied on Section 13a-2(1) to conclude that the CEA leaves "room for supplementary state legislation." JA12. But that provision permits states to enforce the CEA against entities "other than a [designated] contract market." The *only* exception is that states may apply state "general civil or criminal antifraud statute[s]." *Id.* § 13a-2(7). Congress's

enumeration of one type of generally applicable law states may enforce against DCMs refutes the suggestion that Congress allowed states to apply their gambling laws to target trading on DCMs.

The court cited the express-preemption clauses in Section 16 and concluded that "Congress' intended scope of preemption" is limited to those clauses. JA14. That conclusion is plainly mistaken. Each of these clauses preempts state law as to transactions that *need not occur on DCMs*. Section 16(e)(2) preempts the application of state gaming laws to certain agreements "excluded" or "exempted" from the CEA's regulatory scheme. Section 16(h) prevents states from regulating swaps as insurance—even if they are traded off-DCM. These provisions extend the preemptive force of the CEA to certain off-DCM transactions; they do not claw back Section 2(a)'s preemption of on-DCM trading. Indeed, Congress's enactment of these provisions turned on its recognition that "the current" CEA already "supersedes and preempts" state laws with respect to on-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71; *see also Arizona*, 567 U.S. at 406 ("the existence of an express preemption provision does *not* … impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause" (citation modified)).

3. *Conflict preemption*. The district court acknowledged that the "CFTC holds the authority to determine whether" Kalshi's contracts are legal. JA18. But the court failed to acknowledge that the CFTC *has* determined Kalshi's contracts are legal, and has proposed a rule concluding that many sports-event contracts "can be operated consistent with the public interest when prediction markets maintain the structural protections" specified in CFTC regulations. 91 Fed. Reg. at 35,836. The district court suggested that the CFTC *should* ban Kalshi's contracts. *See* JA18. But that decision lies with the CFTC, not the court.

The district court asserted the CEA allows states "to regulate tangential issues that may arise from trading" on DCMs. JA17. But New York's assertion of power to ban transactions on DCMs, and even shut down Kalshi altogether, is not a tangential issue.

The court maintained that Kalshi has cited nothing to suggest "the CFTC would view geographic restrictions predicated on compliance with state law" to be impermissible. JA17. (citation omitted). To the contrary, the CFTC has made clear that compliance with state laws like New York's is an "impossibility" because a DCM "cannot fulfill its federal mandate" if it imposes geographical state by-state restrictions. CFTC Br. 26-27. The court's contrary reasoning would require DCMs to offer up to 50 different

markets for the same contracts—precisely the "seismic shift" that the CEA's express preemption clause was designed to prevent. *Id.* at 2.

The district court relied on floor statements to conclude that no conflict exists. JA18. To the extent the Court deems such statements relevant, they suggest that "*[t]he Commission* needs the power to … prevent" contracts on "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament." 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (emphasis added). The statement is entirely consistent with giving *the CFTC* power to make a public interest determination in the Special Rule. 7 U.S.C. § 7a-2(c)(5)(C)(i).

### B. The Ninth Circuit Erred In Holding That Sports-Event Contracts Fall Outside The CFTC's Exclusive Jurisdiction.

The Ninth Circuit agreed that the CEA expressly preempts state regulation of swaps traded on DCMs but held that Kalshi's contracts do not fall within the CEA's express-preemption provision. *Assad*, 2026 WL 2543846, at *7-12; *see N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180-84 (D. Nev. 2025). Its reasoning is unpersuasive.

1. The Ninth Circuit first suggested that the sports-event contracts do not fall within the CFTC's exclusive jurisdiction because they are not "swaps."

That argument fails at the threshold because the CFTC's exclusive jurisdiction applies to *all* "agreements," not just "swaps" or other specifically defined instruments. 7 U.S.C. § 2(a)(1)(A). Otherwise, states would have a roving license to police any contract traded on an exchange to decide whether—in each state's view—it qualifies as a "swap" or "future"—all with the looming threat of criminal prosecution if state regulators anywhere conclude that any such contract is not a swap or a future after all. The result would be the "total chaos" that Congress has long sought to avoid. Senate Hearings at 685.

That does not leave states powerless if they believe the CFTC has permitted a DCM to offer an improper contract. Instead, states may bring suit under the Administrative Procedure Act ("APA") against the CFTC for improperly enforcing (or failing to enforce) the CEA. *See* 5 U.S.C. § 551(13). States may also challenge any CFTC rule dictating what instruments may be traded on DCMs, including the CFTC's forthcoming rule regulating event contracts. But states cannot short-circuit these procedures by applying their state laws on the belief that the CFTC should not have allowed those contracts on DCMs.

2. Regardless, the Ninth Circuit erred in holding that that the swap definition categorically excludes sports events. To reach that conclusion, it

implausibly asserted that sports-event contracts involve "outcome[s]" rather than events. *See Assad*, 2026 WL 2543846, at *11-12. But an outcome is an event. Dictionaries define "event" to include "the *outcome*, issue, or result of anything," *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) (emphasis added), or—more generally—as any "thing that happens or takes place," *Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009). And common usage is in accord. One might, for example, refer to a Super Bowl win as a major "event" or "outcome."

The Ninth Circuit also held that sports events categorically lack an association with potential financial consequences. *Assad*, 2026 WL 2543846, at *12. It reached this conclusion by holding that swaps capture only events that are "inherently" connected to financial consequences. *Id.* at *12. But this results-oriented interpretation simply rewrites the statutory text, which requires events associated with a *potential* economic consequence—effectively the opposite of *inherent*.

The Ninth Circuit believed it was entitled to engage in this statutory rewrite because—in its view—"Kalshi's sports event contracts have the hallmarks of sports betting," and Congress could not have intended for the CEA to regulate anything that might be viewed as gambling. *Assad*, 2026 WL 2543846, at *9. The Court was wrong on both counts.

*First*, sports-event contracts are materially distinct from sports betting: There is no sportsbook or casino that sets the odds, the price, and the terms to ensure that the gambler is always at a disadvantage. There is only an exchange that, by law, must set the price according to a neutral algorithm and afford equal access to all. *See* 7 U.S.C. § 1a(51). And because of these distinctions, sports-event contracts can be used for hedging and price discovery—serving the public interest for which the CEA was designed.

*Second*, while sports events contracts nonetheless draw comparisons to gambling, that is nothing new and certainly not a reason to assume Congress intended to exclude them from the CEA. For as long as derivatives trading has existed in this country, states have sought to regulate it as gambling. *See* Addendum B. Prior to the CEA, one of the principal ways states regulated derivatives was by banning them as "gambling in grain." *Dickson*, 288 U.S. at 198. It therefore would have been overwhelmingly clear to Congress in 1974 that granting the CFTC exclusive jurisdiction to regulate trading on DCMs would preempt state laws seeking to ban derivatives trading as a form of gambling. And it would have been overwhelmingly clear that by explicitly extending the CFTC's exclusive jurisdiction to cover instruments that develop "in the future," *see* 7 U.S.C. §§ 1a(9), 1a(47)(A)(iv),

Congress intended to prevent states from interfering with evolution in the markets by decrying those products as gambling.

3. Perhaps because of the weakness of its statutory interpretation, the Ninth Circuit also relied heavily on a CFTC regulation, Rule 40.11, which the panel viewed as a categorical prohibition on sports-event contracts. *See Assad*, 2026 WL 2543846, at *12; *see also id.* at *19 (Lee, J., concurring) (noting that Rule 40.11 "controls the outcome of this appeal"). But that is mistaken. While subsection (a) of the regulation generally prohibits contracts involving gaming, subsection (c) permits the CFTC to conduct public-interest review of such contracts on a case-by-case basis. *See* 17 C.F.R. § 40.11(c). When the CFTC adopted the rule in 2011, it explained that DCMs "may always" self-certify contracts and that Rule 40.11 operates to allow review "on a case-by-case basis." 76 Fed. Reg. at 44,785-86. The availability of case-by-case review is necessary to render the regulation consistent with the statutory text, which allows the CFTC to prohibit contracts only upon determining that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC recently confirmed that it "has consistently applied § 40.11 to operate a discretionary review framework rather than a self-executing per se prohibition, because the opposite interpretation would violate the statute." 91 Fed. Reg. at 35,815.

Even if Rule 40.11 categorically prohibits contracts involving gaming, however, that has no bearing on the preemptive scope of the CEA. Indeed, if a CFTC regulation prohibits gaming contracts, that only underscores that the CFTC possesses jurisdiction to regulate these contracts in the first place. Nothing about Rule 40.11 deprives the CFTC of jurisdiction to regulate contracts involving gaming or transfers that authority to 50 states. And the CFTC is in the process of revising Rule 40.11 to confirm that contracts involving gaming are not categorically prohibited, further undercutting the Ninth Circuit's reasoning.

## IV. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI.

The district court's conclusion that the equities favor Defendants turned on its view that Kalshi was unlikely to succeed on the merits. If Kalshi succeeds on its merits burden, the remaining factors unquestionably favor an injunction.

1. Kalshi will suffer irreparable harm absent relief. JA19-20. Unless the Court issues an injunction, Kalshi will face a "Hobson's choice" of "violat[ing]" state law and exposing itself to "huge liability," or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

If Kalshi exercises its right under the CEA to continue offering event contracts as this case is litigated, Kalshi will face catastrophic harm under state law. New York has sued Kalshi in state court, and its lawsuit seeks to prevent Kalshi from "operating a business" that offers *any* event contracts "*within or from* New York"—which is Kalshi's principal place of business. Ex. A to Dkt. No. 34.1 at 5 (emphasis added). New York also seeks to subject Kalshi to at least $36 billion in restitution and damages. Ex. B to Dkt. No. 34.1. Shuttering Kalshi and subjecting it to ruinous liability would amount to irreparable harm. *See Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-126 (2d Cir. 1984) (per curiam) (holding loss of business constitutes irreparable harm, which tips the equities "(rather heavily) in favor of granting a preliminary injunction"); *see also Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970) (Friendly, J.).

If Kalshi instead attempts to comply with New York's demands, Kalshi will face countervailing irreparable harms. The CFTC has declared New York's state-court action against Kalshi a "market emergency" and has ordered Kalshi not to comply with any order entered pursuant to state law. Dkt. No. 39.1 at 3-5. As the CFTC's order explains, "the threat of the sudden, unpredictable shut down of a DCM poses an existential threat to the [CFTC]'s

registrants, marketplaces, and regulatory jurisdiction" by causing price distortions that "undermine the market's core price discovery function" and causing an "influx of trading activity from Kalshi" into its competitors, "artificially impact[ing] event-contract prices." *Id.* at 7-10. Disobeying a federal order would subject Kalshi to liability that is "*certainly* impending." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (citation omitted); *see* 7 U.S.C. § 13a. The CFTC's order refutes the district court's characterization of Kalshi's federal consequences as "mere speculation." JA20.

Kalshi will face myriad other irreparable harms if it attempts to comply with Defendants' demands. Compliance with New York law would require terminating trading for hundreds of thousands of users in New York, many of whom have open investments on the platform. JA84. State law could also require Kalshi to shut down *all* event contracts nationally. Because Defendants have immunity from liability for damages, Kalshi could not recoup that lost business even if it ultimately prevails. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam) ("loss of money" irreparable if "funds 'cannot be recouped'" (citation omitted)). Thus, compliance with Defendants' demands would subject Kalshi to "economic and reputational harm, including loss of business and goodwill." *Flaherty*,

172 F.4th at 231; *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (holding "loss of reputation, good will, and business opportunities" constitutes irreparable harm).

2. Given these irreparable harms, the balance of equities and public interest decisively favor Kalshi. A state suffers no harm from an injunction that prevents it from enforcing a preempted law. "The Government does not have an interest in the enforcement of an unconstitutional law," so an injunction "is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation modified).

The district court invoked New York's interest in "regulating gaming." JA21. But New York has not "los[t] its ability to regulate gambling other than" what is preempted by the CEA's grant of exclusive jurisdiction to the CFTC. *Churchill Downs Tech Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025). New York is free to apply its gambling laws to off-DCM conduct while this appeal is pending.

The district court invoked the protections afforded by state gambling laws. JA20-22. But Defendants have not identified any New York resident injured by Kalshi's availability in the state. Kalshi is subject to the rigorous market protections afforded by federal law. Kalshi also employs Know-Your-Customer procedures and lets users self-exclude from trading, take trading

breaks, and set personal funding caps limiting deposits to Kalshi.[13] The question is not whether Kalshi should be regulated, but rather by whom. Congress's clear answer is the CFTC.

## CONCLUSION

This Court should reverse the denial of preliminary injunction.

Dated: August 31, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant KalshiEX LLC*

[13] *Mandatory KYC and Surveillance*, Kalshi, https://kalshi.com/market-integrity/kyc-surveillance (last visited August 31, 2026); *Responsible Trading*, Kalshi, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited August 31, 2026).

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32.1(a)(4)(A) because it contains 13,820 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Georgia font.

August 31, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using ACMS on August 31, 2026.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.

August 31, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant*
*KalshiEX LLC*

# ADDENDUM A:

## Pertinent Statutes and Regulations

# TABLE OF CONTENTS

Provisions from the Commodity Exchange Act (as codified at 7 and 15 U.S.C.):

7 U.S.C. § 1a(9) .......... A1
7 U.S.C. § 1a(19) .......... A1
7 U.S.C. § 1a(27) .......... A2
7 U.S.C. § 1a(36) .......... A2
7 U.S.C. § 1a(47) .......... A2
7 U.S.C. § 2(a)(1)(A) .......... A7
7 U.S.C. § 2(e) .......... A7
7 U.S.C. § 7a-2(c)(5)(C) .......... A8
7 U.S.C. § 13a-2 .......... A9
7 U.S.C. § 16(e) .......... A11
15 U.S.C. § 8302(d)(1) .......... A12

Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)

Section 103 - 114 Stat. at 2763A-377-378 .......... A12

Provisions from Title 17 of the Code of Federal Regulations:

17 C.F.R. § 38.4 .......... A13
17 C.F.R. § 38.5 .......... A14
17 C.F.R. § 40.2 .......... A15
17 C.F.R. § 40.3 .......... A17
17 C.F.R. § 40.11 .......... A20

**Provisions from the Commodity Exchange Act (as codified at 7 and 15 U.S.C.):**

**7 U.S.C. § 1a(9)**

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

**7 U.S.C. § 1a(19)**

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

> (I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or
>
> (II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

> (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and
>
> (II) associated with a financial, commercial, or economic consequence.

**7 U.S.C. § 1a(27)**

The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

**7 U.S.C. § 1a(36)**

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

**7 U.S.C. § 1a(47)**

(A) In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;
>
> (ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;
>
> (iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—
>
> > (I) an interest rate swap;

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

(B) Exclusions

The term “swap” does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii) any agreement, contract, or transaction that is—

(I) based on a security; and

(II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

(C) Rule of construction regarding master agreements

(i) In general

Except as provided in clause (ii), the term “swap” includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii) Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

(D) Mixed swap

The term “security-based swap” includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

(E) Treatment of foreign exchange swaps and forwards

(i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

(I) should be not be regulated as swaps under this chapter; and

(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

(ii) Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii) Reporting

Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv) Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v) Secretary

For purposes of this subparagraph, the term “Secretary” means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i) Registered entities

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii) Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

### 7 U.S.C. § 2(a)(1)(A)

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

### 7 U.S.C. § 2(e)

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

**7 U.S.C. § 7a-2(c)(5)(C)**

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider—

(aa) the financial integrity of the derivatives clearing organization; and

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

**7 U.S.C. § 13a-2**

(1) Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2) The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the

Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4) Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5) For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)

(A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

(B) The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for

removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

**7 U.S.C. § 16(e)**

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

**15 U.S.C. § 8302(d)(1)**

Notwithstanding any other provision of this title and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 78c(a)(78) of this title.

**Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)**

**Section 103 – 114 Stat. at 2763A-377-378**

Section 2 of the Commodity Exchange Act (7 U.S.C. 2, 2a, 3, 4, 4a) is further amended by adding at the end the following:

"(d) EXCLUDED DERIVATIVE TRANSACTIONS.—

> "(1) IN GENERAL—Nothing in this Act (other than section 5b or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—
>
> > "(A) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants at the time at which the persons enter into the agreement, contract, or transaction; and
> >
> > "(B) the agreement, contract, or transaction is not executed or traded on a trading facility.
>
> "(2) ELECTRONIC TRADING FACILITY EXCLUSION.—Nothing in this Act (other than section 5a (to the extent provided in section 5a(g)), 5b, 5d, or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—
>
> > "(A) the agreement, contract, or transaction is entered into on a principal-to-principal basis between parties trading for their own accounts or as described in section 1a(12)(B)(ii);
> >
> > "(B) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants described in subparagraph (A), (B)(ii), or (C) of section 1a(12)) at the time at which the persons enter into the agreement, contract, or transaction; and

"(C) the agreement, contract, or transaction is executed or traded on an electronic trading facility.".

**Provisions from Title 17 of the Code of Federal Regulations:**

**17 C.F.R. § 38.4**

(a) Request for Commission approval of rules and products.

(1) An applicant for designation, or a designated contract market, may request that the Commission approve under section 5c(c) of the Act, any or all of its rules and contract terms and conditions, and subsequent amendments thereto, prior to their implementation or, notwithstanding the provisions of section 5c(c)(4) of the Act, at any time thereafter, under the procedures of § 40.3 or § 40.5 of this chapter, as applicable. A designated contract market may label a future, swap or options product in its rules as "Listed for trading pursuant to Commission approval," if the future, swap or options product and its terms or conditions have been approved by the Commission, and it may label as "Approved by the Commission" only those rules that have been so approved.

(2) Notwithstanding the timeline under §§ 40.3(c) and 40.5(c) of this chapter, the operating rules, and terms and conditions of futures, swaps and option products that have been submitted for Commission approval at the same time as an application for contract market designation or an application under § 38.3(b) of this part to reinstate the designation of a dormant designated contract market, as defined in § 40.1 of this chapter, or while one of the foregoing is pending, will be deemed approved by the Commission no earlier than when the facility is deemed to be designated or reinstated.

(b) Self-certification of rules and products. Rules of a designated contract market and subsequent amendments thereto, including both operational rules and the terms or conditions of futures, swaps and option products listed for trading on the facility, not voluntarily submitted for prior Commission approval pursuant to paragraph (a) of this section, must be submitted to the Commission with a certification that the rule, rule amendment or futures, swap or options product complies with the Act or rules thereunder pursuant to the procedures of § 40.6 of this chapter, as applicable. Provided, however, any rule or rule amendment that would, for a delivery month having open interest, materially change a term or condition of a swap or a contract for future delivery in an agricultural commodity enumerated in section 1a(9) of the Act, or of an option on such

contract or commodity, must be submitted to the Commission prior to its implementation for review and approval under § 40-4 of this chapter.

(c) An applicant for designation, or a designated contract market, may request that the Commission consider under the provisions of section 15(b) of the Act any of the contract market's rules or policies, including both operational rules and the terms or conditions of products listed for trading.

**17 C.F.R. § 38.5**

(a) Requests for information. Upon request by the Commission, a designated contract market must file with the Commission information related to its business as a designated contract market, including information relating to data entry and trade details, in the form and manner and within the time specified by the Commission in its request.

(b) Demonstration of compliance. Upon request by the Commission, a designated contract market must file with the Commission a written demonstration, containing supporting data, information and documents, in the form and manner and within the time specified by the Commission, that the designated contract market is in compliance with one or more core principles as specified in the request, or that is requested by the Commission to show that the designated contract market satisfies its obligations under the Act.

(c) Equity interest transfers—

(1) Equity interest transfer notification. A designated contract market shall file with the Commission a notification of each transaction that the designated contract market enters into involving the transfer of ten percent or more of the equity interest in the designated contract market.

(2) Timing of Notification. The equity transfer notice described in paragraph (1) shall be filed electronically with the Secretary of the Commission at its Washington, DC headquarters at submissions@cftc.gov and the Division of Market Oversight at DMOSubmissions@cftc.gov, at the earliest possible time but in no event later than the open of business ten business days following the date upon which the designated contract market enters into a firm obligation to transfer the equity interest.

(3) Rule filing. Notwithstanding the foregoing, any aspect of an equity interest transfer described in paragraph (c)(1) of this section that necessitates the filing of a rule as defined in part 40 of this

chapter shall comply with the requirements of 5c(c) of the Act and part 40 of this chapter, and all other applicable Commission regulations.

(d) Delegation of authority. The Commission hereby delegates, until it orders otherwise, the authority set forth in paragraph (b) of this section to the Director of the Division of Market Oversight or such other employee or employees as the Director may designate from time to time. The Director may submit to the Commission for its consideration any matter that has been delegated in this paragraph. Nothing in this paragraph prohibits the Commission, at its election, from exercising the authority delegated in this paragraph.

**17 C.F.R. § 40.2**

(a) Submission requirements. A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3. A submission shall comply with the following conditions:

(1) The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;

(2) The Commission has received the submission by the open of business on the business day preceding the product's listing; and

(3) The submission includes:

(i) The information required by appendix D to this part;

(ii) A copy of the rules that set forth the contract's terms and conditions;

(iii) The intended listing date;

(iv) A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

(v) A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with applicable

law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi) A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(vii) A request for confidential treatment, if appropriate, as permitted under § 40.8.

(b) Additional information. If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder.

(c) Stay. The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act. The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

(d) Class certification of swaps.

(1) A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a "major foreign currency," as defined in § 15.03(a) of this chapter, or an "excluded commodity," as defined in section 1a(19)(ii)-(iv) of the Act, provided the designated contract market or swap execution facility certifies, under paragraphs (a)(1) and (2) and (a)(3)(i), (iv), and (vi) of this section, the following:

(i) Each particular swap within the certified class of swaps is based upon an excluded commodity specified in paragraph (d)(1) of this section;

(ii) Each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations;

(iii) The pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to this section or § 40.3; and

(iv) Each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under paragraph (d)(1) of this section and to submit each individual swap or certain individual swaps within the submission for Commission review pursuant to this section or § 40.3.

**17 C.F.R. § 40.3**

(a) Request for approval. Pursuant to section 5c(c) of the Act, a designated contract market, a swap execution facility, or a derivatives clearing organization may request that the Commission approve a new product prior to listing the product for trading or accepting the product for clearing, or if a product was initially submitted under § 40.2 or § 39.5 of this chapter, subsequent to listing the product for trading or accepting the product for clearing. A submission requesting approval shall:

(1) Be filed electronically in a format and manner specified by the Commission;

(2) Include the information required by appendix D to this part;

(3) Include a copy of the rules that set forth the contract's terms and conditions;

(4) Include an explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be

accompanied by the documentation relied upon to establish the basis for compliance with the applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(5) Describe any agreements or contracts entered into with other parties that enable the registered entity to carry out its responsibilities;

(6) Include the certifications required in § 41.22 for product approval of a commodity that is a security future or a security futures product as defined in Sections 1a(44) or 1a(45) of the Act, respectively;

(7) Include, if appropriate, a request for confidential treatment as permitted under § 40.8;

(8) Include the filing fee required under appendix A to this part;

(9) Certify that the registered entity posted a notice of its request for Commission approval of the new product and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(10) Include, if requested by Commission staff, additional evidence, information or data demonstrating that the contract meets, initially or on a continuing basis, the requirements of the Act, or other requirement for designation or registration under the Act, or the Commission's regulations or policies thereunder. The registered entity shall submit the requested information by the time specified by Commission staff, or at the conclusion of any extended period agreed to by Commission staff after timely receipt of a written request from the registered entity.

(b) Standard for review and approval. The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations.

(c) Commission review.

(1) All products submitted for Commission approval pursuant to, and in compliance with the submission requirements of, paragraph (a) of

this section shall be subject to review by the Commission for a period of 45 days after receipt by the Commission.

(2) The Commission may extend the initial 45-day review period for up to an additional 45 days if the product raises novel or complex issues that require additional time to analyze, the submission is incomplete or the requestor does not respond completely to Commission questions in a timely manner, in which case the Commission shall notify the submitting registered entity within the initial 45-day review period and shall briefly describe the nature of the specific issues for which additional time for review shall be required.

(3) At any time during its review of a proposed product under this section, the Commission may extend the review period for any period of time to which the registered entity agrees in writing.

(4) Any amendment or supplementation made by the registered entity to the submission will be treated as the filing of a new submission under this section and be subject to the initial 45-day review period in accordance with paragraph (c)(1) of this section, unless the amendment or supplementation is requested by the Commission or is made for correction of typographical errors, renumbering or other non-substantive revisions.

(5) If the review period described in paragraph (c)(1) of this section would end on a day that is not a business day, such review period shall instead be extended to end on the next business day.

(d) Commission Determination—

(1) Approval. Any product submitted for Commission approval in compliance with paragraph (a) of this section shall be deemed approved by the Commission under section 5c(c) of the Act at the conclusion of the applicable review period under paragraph (c) of this section, unless the Commission issues a notice of non-approval to the registered entity under paragraph (d)(2) of this section within the applicable review period.

(2) Notice of non-approval. Any time during its review under this section, the Commission may notify the registered entity that it will not, or is unable to, approve the new product. This notification will briefly specify the nature of the issues raised and the specific provision of the Act or the Commission's regulations, including the form or content requirements of this section, with which the new

product is inconsistent or appears to be inconsistent with the Act or the Commission's regulations.

(e) Effect of non-approval.

(1) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product does not prevent the entity from subsequently submitting a revised version of the product for Commission approval, or from submitting the product as initially proposed, in a supplemented submission; the revised or supplemented submission will be reviewed without prejudice.

(2) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product shall be presumptive evidence that the entity may not truthfully certify under § 40.2 that the same, or substantially the same, product complies with the Act and the Commission's regulations thereunder.

**17 C.F.R. § 40.11**

(a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90-day review and approval of certain event contracts. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day

review. The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

# ADDENDUM B:

## State Gambling and Bucket-Shop Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936

### ALABAMA

- "If any person, corporation, or other association of persons ... shall establish or open an office or other place of business in this state for the purpose of carrying on or engaging in any business of making contracts to sell and deliver any cotton, Indian corn, wheat, rye, oats, tobacco, meal, lard, bacon, salt pork, salt fish, beef cattle, sugar, coffee, stocks, bonds, or choses ... when ... **it is not intended by the parties thereto that the articles or things so agreed to be sold and delivered shall be actually delivered or the value thereof paid,** but it is intended and understood by then, that money or other thing of value shall be paid to the one party by the other, ... he shall be guilty of a misdemeanor." Ala. Code § 3579 (1928).

### ARKANSAS

- "[T]he buying or selling or otherwise [dealing] in what is known as futures, either in cotton, grain or anything whatsoever, with a view to profit, is hereby declared to be **gambling**." Act of March 30, 1883, 1883 Ark. Acts 29.

### CALIFORNIA

- Outlawing "'[b]ucketing' or 'bucket shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale of any securities or commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in and **without a bona fide purchase or sale of the same**." Cal. Gen. L., tit. 75, § 2 (1923).

### COLORADO

- Outlawing bucket-shop transactions "respecting the purchase or sale ... of any ... commodities, ... intending that such contract or other transaction shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities ... are dealt in, **and without intending a bona fide purchase or sale of the same**." Colo. L. ch. 57, § 1(a) (1931).
- "All contracts, agreements, trades or transactions of the nature described in Section 1 of this Act [on bucket shops]," including those

"respecting the purchase or sale" of "commodities, not intending the actual bona fide receipt or delivery of any such … commodities, but intending a settlement of such contract or other transaction based upon the difference in such public market quotations of or such prices at which said … commodities are, or are asserted to be, bought or sold," "are hereby declared **gambling** and criminal Acts and absolutely null and void." Colo. L., ch. 57, §§ 1(c), 5 (1931).

**CONNECTICUT**

- Outlawing bucket shops, which are defined as, in relevant part, "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … shall conduct the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any … grain, provisions or other commodity …, wherein both parties thereto, or such proprietor or keeper, shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Conn. Gen. Stat. §§ 6345-6346 (1930).

**DISTRICT OF COLUMBIA**

- Outlawing "'[b]ucketing' or 'bucket-shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in and **without a bona fide purchase or sale of the same**." D.C. Code tit. 6, §§ 158-159 (1929).

**FLORIDA**

- "[D]eclaring unlawful all the transactions conducted in and through a bucket shop," which is defined "to be an office, store, or other place wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of

any … cotton, grain, provisions or other commodities … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in and **without a bona fide transaction on such board of trade or exchange**." Fla. Comp. L. § 7899 (1927).

**GEORGIA**

- Futures contracts are valid when they are "(1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange, or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of Georgia or any other State." Ga. Code Ann. § 4264(2) (1926 Code, 1930 Supp.).
- Outlawing bucket shops, which are "defined to be and mean any place of business where" persons make "any contract of sale for future delivery of cotton, grain, stocks, or other commodities, **where it is not the bona fide intention of parties that the things mentioned therein are to be delivered**, but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution**, in accordance with the rules thereof." Ga. Code Ann. §§ 4264(3)-(4) (1926 Code, 1930 Supp.).

**ILLINOIS**

- "Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity … shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered **gambling contracts,** and shall be void." Ill. Rev. Stat. Crim. Code § 130 (1874).

- Outlawing "any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ill. Rev. Stat. ch. 38, §§ 317-318 (1931).

**INDIANA**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Act of April 10, 1907 §§ 3837-3838.

**IOWA**

- Outlawing bucket shops, which are defined to include "office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, cotton, or other commodity…" "[w]herein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades, or transactions are dealt in by competitive buying and selling, and **without a bona fide transaction on such board of trade or exchange**." Iowa Code §§ 9895, 9899, 9901 (1931).

**KANSAS**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, cotton or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Kan. Rev. Stat. Ann., ch. 50, § 122 (1923) (citing Kan. L., ch. 121 § 2 (1909)).
- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Kan. Rev. Stat. Ann., ch. 50, § 123 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

**MAINE**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades, or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Me. Rev. Stat., ch. 136, §§ 14-15 (1930).

**MASSACHUSETTS**

- Outlawing bucket shops, which are defined to include places where "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**" takes place. Mass. Gen. L., ch. 271, §§ 35-36 (1921).

**MICHIGAN**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale of any … grains, provisions or other commodity … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Mich. Acts, no. 328 §§ 126-128 (1931).
- The "pretended buying or selling of … petroleum, cotton, grain, provisions or other produce, … without any intention of receiving and paying for the property so bought or of delivering the property so sold" is "hereby declared **gambling** and [a] criminal act[ ]." Mich. Acts, no. 328 § 311 (1931).

**MINNESOTA**

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplates or intends that such contracts, agreement, trades or transactions, shall be, or may be, closed, adjusted or settled,

according to, or upon the basis of the public market quotations, of prices made on any board of trade or exchange, upon which the commodities … referred to in said contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Minn. Stat. §§ 10488-10489 (1927).

**MISSISSIPPI**

- As "**[g]ambling [c]ontracts**," "contract[s] for the purchase or sale of a commodity of any kind, to be delivered at a future date, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court; nor shall any contract of the kind commonly called 'futures' be enforced …." Miss. Code Ann., ch. 31, § 2034 (1927) (citing 1882 Miss. Laws 140).

**MISSOURI**

- Outlawing bucket shops, which are defined as "place[s] wherein the person carrying on the bucket shop, then and there, either as principal or agent, pretends to buy or sell, or goes through the form of buying or selling, to or for any other person or persons, … petroleum, cotton, grain, provisions and other commodities, or any one or more of the same, at prices fixed or pretended to be fixed by trades or transactions made or offered to be made in same on boards of exchange or otherwise, but **wherein there is in fact no actual purchase and sale, or sale and purchase of such commodity for or on account of the party or parties thereto**." Mo. Rev. Stat. §§ 4316-4318 (1929) (citing Mo. Rev. Stat. § 3565 (1919)).
- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Mo. Rev. Stat. § 4318 (1929) (citing Mo. Rev. Stat. § 3566 (1919)).

**NEBRASKA**

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, where there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the

party or parties thereto, are hereby declared **gambling** and criminal acts." Neb. Comp. Stat. § 9813 (1922) (citing Neb. Rev. Stat. § 8817 (1913)).

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s], **board-of-trade room[s]**, or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or purchase and sale, of any … grains, provisions, cotton or other commodity … wherein said proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board-of-trade**." Neb. Comp. Stat. §§ 28-955, 28-959 (1929).

**NEW HAMPSHIRE**

- Considered a form of "**[g]ambling**," "[n]o person or corporation shall keep, or cause to be kept, an office, store, or other place in which is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce… without any intention of receiving and paying for the property so bought, or of delivering the property so sold, or in which is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying, or offering to buy, such property, does not intend actually to receive the same if purchased, or deliver it if sold." N.H. Pub. L., ch. 384, § 23 (1925).

**NEW YORK**

- Outlawing bucket shops, which are defined to include places where a person "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale … of any … commodities … intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which such commodities … are dealt in, and **without intending a bona fide purchase or sale of the same**." N.Y. Penal Law § 390 (1909).

**NORTH CAROLINA**

- "The test of the validity of a contract for 'future' which this section requires is the 'intention not to actually deliver' the articles bought or sold for future delivery. No matter how explicit the words in any contract which may require a delivery, if in fact there is no intention to deliver, but the real understanding is that on the stipulated date the losing party shall pay to the other the difference between the market price and the contract price, this is a **gambling contract**." Ed.'s Note, N.C. Code Ann. § 2144 (1931).

**NORTH DAKOTA**

- Bucket shops, considered a "place for **gaming**," are "unlawful" where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile or agricultural products on margins, without any intention of future delivery." N.D. Comp. L. Ann. § 9699 (1913).

**OHIO**

- "[I]t shall be unlawful for any corporation, association, chamber of commerce, **board of trade**, copartnership or person to keep or cause to be kept within this state any bucket shop, office or other place wherein is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ohio Gen. Code § 6934a-1 (1902).
- It is unlawful for a person to use a building for a " 'bucket shop' or grain **gambling**." Ohio Gen. Code § 6934a-5 (1902).

**OKLAHOMA**

- "[A]ll contracts of sales for future delivery of cotton, grain, stocks or other commodities" that are "(1) made in accordance with the rules of any board of trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such board of trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton, exchange, grain exchange, board of trade, or similar institution organized under the laws of the State of Oklahoma or any other State shall be, and they are hereby declared to be valid

and enforceable in the courts of this State according to their terms." Okla. Comp. Stat. Ann. § 3883 (1921).

- Prohibiting bucket shops, which are "defined to be and mean any place of business wherein are made" "contract[s] of sale for the future delivery of cotton, grain, stocks or other commodities, which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange or similar institutions, upon which contracts of sale for future delivery are executed and dealt in **without any actual bonafide execution and the carrying out or discharge of such contracts upon the floor of such exchange, board of trade, or similar institution in accordance with the rules thereof**." Okla. Comp. Stat. Ann. §§ 3885-3888 (1921).

**OREGON**

- Outlawing when a person, "as broker," "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale … of any … commodities, intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities … are dealt in, and **without intending a bona fide purchase or sale of the same**." Ore. L., ch. 395, § 2 (1931).

**PENNSYLVANIA**

- Outlawing bucket shops, which are defined to include "an office, store, or other place, wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any … grains, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices, made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades, or transactions, are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Dig. Pa. Stat. L. § 2413 (1920) (citing Act of June 1, 1907).

- "All contracts, agreements, trades, or transactions of the nature described in section one of this act [on bucket shops] are hereby declared **gambling**, and criminal acts, and absolutely null and void." Dig. Pa. Stat. L. § 2418 (1920) (citing Act of June 1, 1907).

**RHODE ISLAND**

- Outlawing bucket-shopping, which includes "[t]he making of or offering to make any contract respecting the purchase or sale … of any … commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in, and **without a bona fide purchase or sale of the same**." R.I. Gen. L., ch. 406, § 1 (1923) (citing R.I. Gen. L., ch. 353 (1909)).

**SOUTH CAROLINA**

- "[A]ll contracts of sale for future delivery of cotton, grain, stocks, or other commodities, (1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of South Carolina, or any other State, shall be and they hereby are declared to be valid and enforceable in the Courts of this State, according to their terms." S.C. Acts, no. 711 § 2 (1928).

- Bucket shops are unlawful; "[a]ny contract of sale for future delivery of cotton, grain, stocks, or other commodities **where it is not the bona *fide* intention of parties that the things mentioned therein are to be delivered** but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona *fide* execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution, in accordance with the rules thereof**, shall be null and void and unenforceable in any Court of this State, and no action shall be maintainable thereon at the suit of any party." S.C. Acts, no. 711 §§ 3-4 (1928).

**SOUTH DAKOTA**

- Bucket shops, as a form of "**[g]ambling in [f]utures**," are unlawful where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile, mining or agricultural products or corporation stocks, on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without the state." S.D. Comp. L. § 3925 (1929).

**TENNESSEE**

- "[H]ereafter any sale, contract or agreement for the sale of ... grain, cotton or other produce, property, commodity, article or thing, for future delivery, where either of the contracting parties, buyer or seller, in dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, and where either of the said contracting parties have had no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and is hereby declared **gambling**." Act of March 30, 1883, 1883 Tenn. Pub. Acts 331.

**VERMONT**

- As a form of "**[g]ambling**," a bucket shop is unlawful where it is used for "the pretended buying or selling of ... petroleum, cotton, grain, provisions, pork or other produce ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Vt. Gen. L. § 7081 (1917).

**VIRGINIA**

- Outlawing "bucket-shopping," which includes "[t]he making of, or offering to make, any contract respecting the purchase or sale ... of any ... commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which said ... commodities are dealt in, and **without a bona fide purchase or sale of the same**." Va. Code Ann. §§ 4714-4715 (1924).

**WASHINGTON**

- Outlawing bucket shops, which are "defined to be shed[s], tent[s], tenement[s], booth[s], building[s], float[s] or vessel[s], or any part

thereof, wherein may be made contracts respecting the purchase or sale … of any commodities … wherein both parties, intend that such contract shall or may be terminated, closed and settled" **(1) "[u]pon the basis of the market prices quoted or made on any board of trade or exchange upon which such commodities** … **may be dealt in," (2) "[w]hen the market prices for such commodities … shall reach a certain figure in any such board of trade or exchange,' or (3) "[o]n the basis of the difference in the market prices at which said commodities … are, or purport to be, bought and sold."** Wash. Code § 8932 (1919).

**WEST VIRGINIA**

- "If any person shall carry on in this State what is commonly known as a bucket shop, or act as agent for any person, firm or corporation carrying on such business, or engage in transactions for the purchase or sale for others of grain, provisions, … or other property wherein the parties thereto or the broker intend that such transaction shall be settled according to the public market quotations on any board of trade or exchange, or intend that such transaction may be deemed terminated when such public market quotations shall reach a certain figure, or intend that such property shall be resold before or at the time fixed in such transaction for the delivery of such property and that the difference between the contract price and the market price thereof shall be paid or received **without the prior receipt or delivery of such property under the former sale**, he shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than two nor more than five years." W. Va. Code, ch. 61, art. 10, § 18 (1930).

**WISCONSIN**

- Outlawing bucket shops, which are "defined to be an office, store or other place wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grains, provisions or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such

contract, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Wis. Stat. §§ 348.175-348.178 (1929).

**WYOMING**

- It is "unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this state any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold** or wherein is conducted or permitted the pretended buying or selling of such property on margins." Wyo. Rev. Stat. Ann. § 32-924 (1931).