# 26-1835

## United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

Plaintiff-Appellant,

v.

ROBERT WILLIAMS, *et al.*,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of New York,
No. 1:25-cv-8846 (Torres, J.)

**AMICUS BRIEF OF U.S. COMMODITY FUTURES TRADING COMMISSION IN SUPPORT OF PLAINTIFF-APPELLANT**

TYLER S. BADGLEY
GENERAL COUNSEL
M. JORDAN MINOT
DEPUTY GENERAL COUNSEL
HENRY J. DICKMAN
SENIOR ASSISTANT GENERAL COUNSEL
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5433
jminot@cftc.gov

September 8, 2026

## TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICUS CURIAE ........ 1

INTRODUCTION ........ 2

BACKGROUND ........ 3

ARGUMENT ........ 10

I. Sports event contracts are subject to exclusive CFTC regulation ........ 10

A. The CEA preempts state regulation of swaps ........ 11

B. New York seeks to ban "swaps" ........ 21

II. The equities favor preliminary relief ........ 28

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

Cases

*American Agric. Movement v. Board of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ....................14, 18, 21

*CFTC v. Spagnuolo*,
No. 1:26-cv-4419 (S.D.N.Y.)....................7

*CFTC v. Van Dyke*,
No. 1:26-cv-3369 (S.D.N.Y.)....................7

*Cohn v. Brinson*,
73 So. 59 (Miss. 1916)....................3

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) ....................3

*Effex Capital, LLC v. National Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019).................... 11, 12

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020)....................14

*KalshiEX v. Assad*,
__ F.4th __, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) ....................*passim*

*KalshiEX LLC v. CFTC*,
2024 WL 4164694, at *12 (D.D.C. Sept. 12, 2024)....................23

*KalshiEX v. Flaherty*,
172 F.4th 220 (3d Cir. 2026).................... 11, 15, 21, 22

*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) .................... 20, 24

*Kalshiex LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ....................22

*Kansas v. Garcia*,
589 U.S. 191 (2020)....................19

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .......... 3, 11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 20

*Mohr v. Miesen*,
49 N.W. 862 (Minn. 1891) .......... 3

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 19

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010) .......... 11, 18

*New York v. Coinbase Financial Markets, Inc.*,
No. 451604/2026 (N.Y. Sup. Ct.) .......... 8

*New York v. Gemini Titan, LLC*,
No. 451603/2026 (N.Y. Sup. Ct.) .......... 8

*People v. KalshiEX LLC,*
No. 453272/2026 (N.Y. Sup. Ct.) .......... 9

*Puerto Rico v. Franklin California Tax-free Tr.*,
579 U.S. 115 (2016) .......... 15

*Rice v. Board of Trade of Chicago*,
331 U.S. 247 (1947) .......... 13

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 13

*United States v. Minnesota*,
__ F. Supp. 3d __, 2026 WL 2150211 (D. Minn. July 27, 2026) .......... 11, 12, 22, 25

*United States v. New York*,
No. 1:26-cv-3404 (S.D.N.Y. May 1, 2026) .......... 1

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 21

*United States v. Spagnuolo*,
No. 1:26-mj-02020 (S.D.N.Y.) .......... 7

*United States v. Van Dyke*,
No. 1:26-cr-156 (S.D.N.Y.) ....................7

*Utility Air Regul. Grp. v EPA*,
573 U.S. 302 (2014)....................26

Statutes

7 U.S.C. § 1a ....................*passim*

7 U.S.C. § 2 ....................*passim*

7 U.S.C. § 5 .................... 3, 18

7 U.S.C. § 7 ....................6, 20, 27

7 U.S.C. § 7a-2.................... 5, 16, 22, 27

7 U.S.C. § 7b-3 ....................27

7 U.S.C. § 8 ....................7

7 U.S.C. § 12a(9) ....................9

7 U.S.C. § 13....................27

7 U.S.C. § 13a-1 ....................27

7 U.S.C. § 13a-2 ....................12

7 U.S.C. § 16.................... 12, 16

Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 ....................4

Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376 (2010)....................4

Regulations

17 C.F.R. § 38.151 ....................18

17 C.F.R. § 40.2....................6

17 C.F.R. § 40.11 ....................25

73 Fed. Reg. 25,669 (May 7, 2008)....................6

91 Fed. Reg. 35,806 (June 12, 2026) ........ 1, 7, 16, 26

91 Fed. Reg. 37,873 (June 24, 2026) ........ 7

91 Fed. Reg. 40,102 (July 1, 2026) ........ 7

Legislative Materials

120 Cong. Rec. S 30458 (Sept. 9, 1974) ........ 13, 20

H.R. Rep. No. 93-1383 (1974) ........ 4, 14, 20

H.R. Rep. No. 106-711, pt. 2 (2000) ........ 17

S. Rep. No. 93-1131 (1974) ........ 4

Other Authorities

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. Bus. Rev. 1 (2019) ........ 17

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000) ........ 20

CFTC, Contracts & Products, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. ........ 5

CFTC, Designated Contract Market Products, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts? ........ 27

CFTC, *Order Directing Kalshi to Continue Exercising DCM Functions* (Aug. 11, 2026) ........ 9, 10, 28

CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26 ........ 7

CFTC, Release Number 9235-26, *CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey*, (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26. ........ 7, 8

CFTC, Release Number 9274-26, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30, 2026), https://www.cftc.gov/PressRoom/PressReleases/9274-26. ........ 7

*In re: Blockratize, Inc.*, *Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions* (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratizeorder010322/download. .............7

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 692-93 (1982)........................................................................................13, 14

Mike Mazzeo, *MLB wins Sports Event of the Year for a classic World Series*, Sports Business Journal (May 20, 2026), https://www.sportsbusinessjournal.com/Articles/2026/05/20/mlb-wins-sports-event-of-the-year-for-a-classic-world-series/ ..................................................................24

Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J. 223, 223 (2004) ..........................................................................23

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") submits this brief in support of Plaintiff-Appellant KalshiEX LLC ("Kalshi"). This appeal concerns the proper interpretation of the Commodity Exchange Act ("CEA"), which the CFTC exclusively administers.

The United States and the CFTC are currently litigating against nine States for infringing upon the Commission's exclusive jurisdiction by attempting to regulate the trading of event contracts on "prediction markets," which are CFTC-registered Designated Contract Markets ("DCMs"). One such action is against New York, where the federal government is seeking a preliminary injunction to prevent enforcement of state gambling laws as to transactions on DCMs. *See United States v. New York*, No. 1:26-cv-3404, Dkt. No. 34 (S.D.N.Y. May 1, 2026). The Commission is also actively engaged in significant rulemaking as to prediction markets, *see, e.g.*, 91 Fed. Reg. 35,806 (June 12, 2026), and the federal government is pursuing criminal and civil enforcement actions under the CEA for abuses involving such markets. The Commission therefore has a substantial interest in the resolution of this appeal.

## INTRODUCTION

This appeal concerns whether New York can prohibit a CFTC-registered national derivatives exchange from offering a class of derivatives called event contracts. The answer is no. As Kalshi correctly explains, New York's enforcement efforts are a direct assault on the regulatory jurisdiction of the CFTC and should be enjoined immediately. Under the Commodity Exchange Act, the event contracts New York seeks to ban are "swaps," and the CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate "transactions involving swaps" that are traded on derivatives exchanges, 7 U.S.C. § 2(a)(1)(A). State law that purports to regulate—let alone ban—trading on an exchange is therefore preempted.

In recent weeks, the stakes of this dispute have expanded well beyond sports event contracts or even the boundaries of New York. At 12:01 a.m. on July 31, New York sought a temporary restraining order that would prohibit Kalshi from offering *any* event contracts to *anyone* in the world. Although New York is not the first State to intrude on the Commission's jurisdiction over event contracts, its attempt to globally ban event contracts is unprecedented. If it succeeds, that means *one State* will be able to dictate nationwide derivatives policy. That is the polar opposite of the regulatory framework Congress created.

The Court should reverse and direct entry of a preliminary injunction.

## BACKGROUND

### I. Federal regulation of commodity derivatives markets

The CEA provides a comprehensive framework that governs transactions in U.S. commodity derivatives markets. A "derivative" is a financial instrument—such as a future, option, or swap—whose price is "derived from" the value of something else, such as an agricultural commodity, a financial variable, or other reference point. In general, market participants use derivatives to hedge risk and speculate on commodity price movements. *See Leist v. Simplot*, 638 F.2d 283, 287-88 (2d Cir. 1980).

Derivatives trading has always had its critics, particularly the States. Before Congress entered the field, States often failed to distinguish between futures trading and illegal "gambling" or "wagering." Illinois, for instance, declared that "the option to sell or buy at a future time any grain or commodity … shall be considered gambling contracts, and shall be void." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). Other state courts took a similar approach to futures contracts. *E.g.*, *Cohn v. Brinson*, 73 So. 59, 62 (Miss. 1916) (describing "the buying of cotton futures [as] a wager"); *Mohr v. Miesen*, 49 N.W. 862, 863 (Minn. 1891) (describing "betting upon the price of wheat, [as] against public policy, and not only void, but deserving of the severest censure").

Congress holds a different view. It has long recognized a "national public interest" in derivatives trading, which "provid[es] a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). In 1974, it created the CFTC and gave it "exclusive jurisdiction" over futures transactions

on registered exchanges. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (codified at 7 U.S.C. § 2(a)(1)(A)). That clause, leading proponents of the Act recognized, ensured futures regulation would be subject solely to Commission oversight—not state law. *See, e.g.*, H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"); S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

Congress has further expanded the preemptive reach of the CEA over the subsequent decades, particularly with respect to "swaps." A "swap" is a type of derivative that encompasses "any agreement, contract, or transaction … that provides for any … payment[] or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii), as well as any contract "that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv). In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "transactions involving swaps." Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. § 2(a)(1)(A)).

## II. Event contracts have long traded subject to CFTC oversight

"Event contracts" are CFTC-regulated "derivative contract[s] whose payoff is based on a specified event, occurrence, or value."[1] Typically, they are based on yes-no scenarios and provide for a fixed payout (usually $0 or $1) at the expiration of an event. For example, a trader might pay $0.60 for a "yes" position on whether the temperature in New York will exceed 90 degrees tomorrow; if it does, the trader gets a dollar, and if not, she loses her $0.60 investment. Event contracts trade on numerous CFTC-registered DCMs, whether they be relatively new entrants like Kalshi or longstanding ones like the Chicago Mercantile Exchange.

While event contracts have become increasingly popular with the American public, these contracts are not recent innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). Congress confirmed the Commission's jurisdiction over event contracts in Dodd-Frank, creating a "Special Rule" recognizing that "[e]vent contracts" are "swaps" and authorizing the Commission to prohibit event contracts that it deems contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C).

[1] CFTC, Contracts & Products, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

The Commission exercises its exclusive jurisdiction over event contracts in myriad ways. DCMs must register with the Commission and comply with the CEA's "core principles." *See* 7 U.S.C. § 7. Before a DCM can list an event contract for trading, it must self-certify to the CFTC that the contract complies with the CEA. 17 C.F.R. § 40.2. The Commission can suspend or revoke a DCM's designation for violations of the statute or regulations. 7 U.S.C. § 8(b).

The Commission's jurisdiction over event contracts also enables it to file enforcement actions for insider trading. *See, e.g.*, *CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.) (Google employee who used nonpublic information to trade event contracts related to Google's Year in Search list). The Justice Department is also bringing commodity-fraud criminal charges for insider trading of event contracts, which presupposes CEA coverage. *See United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.); *United States v. Spagnuolo*, No. 1:26-mj-02020 (S.D.N.Y.). In addition, the Commission has penalized persons who offer event contracts without registering as a DCM—indeed, the Commission fined Polymarket.com and ordered it

to wind down its operations in the U.S. for offering "swaps as defined by Section 1a(47) of the [CEA]" without obtaining CFTC registration.[2]

The Commission is also engaged in significant rulemaking concerning event contracts. In June, it proposed rules that deem certain event contracts presumptively against the public interest—such as contracts based on player injuries, officiating outcomes, or national-security events. *See* 91 Fed. Reg. 35,806, 35,834-37 (June 12, 2026). The CFTC and the SEC jointly sought comment on definitional and regulatory issues with respect to swaps. *See* 91 Fed. Reg. 37,873 (June 24, 2026). The CFTC also issued a Notice of Proposed Rulemaking concerning data-reporting requirements for certain event contracts. *See* 91 Fed. Reg. 40,102 (July 1, 2026). And it proposed rulemaking concerning affiliations between CFTC-regulated entities that would address issues concerning perceived and potential conflicts of interest.[3] Relatedly, the Commission has executed Memoranda of Understanding with professional sports leagues to promote market integrity in sports-related event contracts.[4] In short, the Commission is actively supervising the field of event contracts.

---

[2] *In re: Blockratize, Inc.*, *Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions* (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratizeorder010322/download.

[3] CFTC, Release Number 9274-26, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30, 2026), https://www.cftc.gov/PressRoom/PressReleases/9274-26.

[4] CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26, *CFTC and National Hockey League Sign MOU Related to Integrity*

## III. The district court denies Kalshi's motion for a preliminary injunction

Notwithstanding the Commission's comprehensive regulatory oversight, New York believes that it has authority to regulate event-contract derivatives. On October 24, 2025, the New York State Gaming Commission sent Kalshi a cease-and-desist letter directing it to immediately stop "advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform" because "offering event contracts based on sporting events 'within New York State' without a sports gaming license violate[s] New York law." JA106. Soon thereafter, New York escalated its efforts by filing enforcement actions against Coinbase and Gemini, seeking permanent injunctions prohibiting them from offering event contracts without a gambling license. *See New York v. Coinbase Financial Markets, Inc.*, No. 451604/2026 (N.Y. Sup. Ct.); *New York v. Gemini Titan, LLC*, No. 451603/2026 (N.Y. Sup. Ct.).

Seeing the writing on the wall, Kalshi moved for a preliminary injunction against enforcement of state gambling laws as to its sports-related event contracts. The district court denied the motion. JA22. The court assumed without deciding that sports event contracts are "swaps," JA11, but held that the Commission's "exclusive jurisdiction" over "transactions involving swaps" and the CEA's otherwise-comprehensive framework did not preempt state gambling law, JA12-19.

---

*in Professional Hockey*, (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

## IV. New York attempts to ban event contracts nationwide

After the district court denied relief, New York took an extraordinary step. At 12:01 a.m. on July 31, the Attorney General filed an enforcement action in state court and sought a temporary restraining order that would prohibit Kalshi from "operating an unlawful gambling business … within or from New York" by "offer[ing] contracts relating to sports, culture, elections, and other events."[5] *People v. KalshiEX LLC,* No. 453272/2026 (N.Y. Sup. Ct. July 31, 2026), Doc. No. 3 at 2. Because Kalshi is based in New York, the requested relief would preclude Kalshi from offering *any* event contracts *anywhere*. Kalshi's removal to federal court mooted the TRO motion, *id.* Doc. No. 74, but the State has offered no reason to doubt that it would promptly renew the motion if the case is remanded.

This effort by a single State to make itself the exclusive regulator of derivatives contracts is without modern precedent. The Commission accordingly exercised its statutory emergency authority and directed Kalshi to continue to operate its exchange in accordance with its normal practices and the CEA's Core Principles. *See* CFTC, *Order Directing Kalshi to Continue Exercising DCM Functions* (Aug. 11, 2026); *see* 7 U.S.C. § 12a(9) (Commission can "direct the registered entity, whenever it has reason to believe that an emergency exists, to take such action as in the Commission's judgment is necessary to maintain or restore orderly trading in or liquidation of any futures contract"). As the

[5] The State stipulated that it would not enforce against Kalshi through July 30, and it moved for a TRO just sixty seconds after that stipulation expired.

Commission explained, "the threat of the sudden, unpredictable shut down of a DCM poses an existential threat to the Commission's registrants, marketplaces, and regulatory jurisdiction—as well as to the individuals and entities that trade in the Commission's regulated marketplaces." *Order* at 5. Traders across the United States would lose the ability to hedge or gain exposure to a wide variety of events, including "whether the Federal Open Market Committee will move the Federal Funds Rate, when traffic in the Strait of Hormuz will return to normal levels, whether a crypto asset will reach a certain price, whether a State will experience a significant drought in a specific timeframe, and whether the United States will enter a recession in a specific quarter." *Id.* at 6. New York's actions would also cause artificial distortions of event-contract prices on other exchanges, and would subject Kalshi traders whose positions are suddenly liquidated to significant unwanted exposures. *Id.* at 6-8. These consequences underscore precisely why Congress vested exclusive regulatory authority in a single federal regulator: to prevent fragmented, conflicting, and destabilizing state-level interventions into national derivatives markets.

## ARGUMENT

### I. Sports event contracts are subject to exclusive CFTC regulation

Congress gave the Commission "exclusive jurisdiction" "with respect to … transactions involving swaps … traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). That necessarily means New York lacks jurisdiction to regulate swap transactions on a DCM—let alone ban them nationwide.

### A. The CEA preempts state regulation of swaps

Federal courts recognize three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (citation modified). All three forms of preemption are applicable here.

#### 1. Express preemption

**i.** The CEA expressly preempts state law by granting the Commission "exclusive jurisdiction" over "transactions involving swaps … traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). Every circuit to address the issue agrees that this language preempts state regulation of transactions on DCMs. *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("[C]ourts have held that [§] 2(a)(1) of the CEA preempts the application of state law."); *KalshiEX v. Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026) ("[A]s our sister circuits have held, the Act preempts state law purporting to regulate futures trading."); *Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (exclusive-jurisdiction clause preempts state law that "directly affect[s] trading on or the operation of a futures market"); *KalshiEX v. Assad*, __ F.4th __, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026) ("[T]he CEA expressly preempts state law regulating swaps 'traded or executed on' a DCM."). Rightly so. After all, if the Commission has "exclusive jurisdiction … with respect to" a transaction, other governmental authorities—including the States—necessarily lack "jurisdiction" to regulate that transaction. 7 U.S.C. § 2(a)(1)(A); *see United States v. Minnesota*, __ F. Supp.

3d __, 2026 WL 2150211, at *10 (D. Minn. July 27, 2026) (explaining the terms "exclusive" and "jurisdiction" "reflect congressional intent to give the CFTC the power over transactions in swaps that is independent from or not shared by other authorities").

The very next sentence in § 2(a)(1)(A) confirms this. It states that "[e]xcept as hereinabove provided," the CEA does not "supersede or limit the jurisdiction at any time conferred on … regulatory authorities under the laws of … any State" or "restrict" state authorities "from carrying out their duties and responsibilities." 7 U.S.C. § 2(a)(1)(A). "If the exclusive jurisdiction provision was not intended to have preemptive effect, the '[e]xcept as hereinabove provided' clause would be superfluous." *Assad*, 2026 WL 2543846, at *7; *see Effex*, 933 F.3d at 894 (preemption follows from "both the savings clause and the jurisdictional clause").

Other provisions of the CEA further reinforce the preemptive effect of the exclusive-jurisdiction clause. Section 13a-2(1) empowers a State to file suit to enjoin violations of the CEA or a Commission regulation. 7 U.S.C. § 13a-2(1). The natural implication is that States generally lack authority to apply their *own* laws to CEA-regulated transactions. And even when purporting to enforce the CEA, States cannot sue "a contract market," *id.* § 13a-2(1), doubling the inference that States cannot regulate trading on a DCM. Likewise, Section 16(e) provides for concurrent federal and state jurisdiction over certain *off-DCM* transactions. *Id.* § 16(e). That carveout does work only because the exclusive-jurisdiction clause preempts state law as to *on-DCM* transactions.

**ii.** The history behind the CFTC's creation leaves no doubt that Congress designed the exclusive-jurisdiction clause to preempt state law. Before the Commission existed, the Supreme Court held that the CEA did *not* preempt state law, for two reasons. First, there was no "declaration [in the CEA] by Congress that the system which it has adopted for the regulation of trading on contract markets is exclusive of state regulation." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 253 (1947). The Court drew a contrast to a companion case decided the same day, *id.*, which held that the United States Warehouse Act did preempt state law by granting the Secretary of Agriculture "*exclusive*" "power, *jurisdiction*, and authority" within a particular domain, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 224 (1947) (emphases added). Second, the Court also pointed out that Section 4c of the CEA expressly "prevent[s] supersedure and preserv[es] state control in [] areas where state and federal law overlap." *Rice*, 331 U.S. at 255.

Congress rectified both impediments when it created the Commission in 1974. First, Congress gave the Commission "exclusive jurisdiction" over futures trading—just like the Warehouse Act. 7 U.S.C. § 2(a)(1)(A). Second, it removed Section 4c "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). "These amendments established independent evidence of congressional intent to displace any state regulatory role," as "they wholly and unequivocally eliminated each of the bases the Supreme Court had relied on in *Rice v. Board of Trade* to hold that the CEA did not preempt state regulation of commodities trading." Kevin T.

Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 692-93 (1982).

"Those who deem legislative history a useful interpretive tool will find that the congressional history … supports this analysis." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 234 (2020). When the CFTC was created, "[t]he Act's proponents were concerned that the states, in light of [contemporaneous] circumstances, might step in to regulate the futures markets themselves. This, they feared, might have subjected the national futures trading apparatus to conflicting regulatory demands," and "a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric. Movement v. Board of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). So Congress designed the "exclusive grant of jurisdiction to the Commission" to "preempt the field insofar as futures regulation is concerned," such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Report).

In short, text, context, and history all agree that the exclusive-jurisdiction clause expressly preempts state law as applied to transactions on a DCM.

**iii.** The district court's basis for rejecting express preemption is, to say the least, unclear. It acknowledged that "Congress intended the CEA to preempt certain areas of derivative trading," including "swap transactions on DCMs." JA11. But the court held that the "scope" of that preemption could only "be determined by considering both

field and conflict preemption as applied to Kalshi's sports-event contracts," JA12, so it skipped ahead to those issues without resolving express preemption. That was error. If the exclusive-jurisdiction clause preempts anything, surely categorical state-law bans fit the bill.

In its unsettled discussion of express preemption, the district court also stated that "[t]he presumption against preemption … applies to this case" because "regulating gambling and lotteries is clearly a matter of predominantly state concern." JA10-11 (citation modified). That is flawed for several reasons. *First*, derivatives contracts are predominantly a matter of CFTC concern, not state concern. *Flaherty*, 172 F.4th at 230 (rejecting presumption against preemption because "the federal government has regulated the derivatives market for over a century"). *Second*, when a "statute contains an express pre-emption clause," as the CEA does, the court "do[es] not invoke any presumption against pre-emption but instead focus[es] on the plain wording of the clause." *Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016) (citation modified). *Third*, the exclusive-jurisdiction clause is either preemptive or it isn't—so if a presumption against preemption applies, *all* state laws (not just gambling laws) can apply to *any* derivatives contract (not just event contracts). As the district court itself acknowledged, that cannot be right. JA11.

The district court's textual arguments against preemption (raised in the context of field preemption) are unavailing, too. It cited the Special Rule, which gives the Commission authority to prohibit event contracts that involve "activity that is unlawful

under any Federal or State law" and that the Commission deems contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C). That language, the district court held, "reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." JA13. But the Special Rule does not allow States to determine whether *event contracts* are lawful; rather, it allows the Commission to prohibit event contracts when the *underlying event* violates state law (*e.g.*, murder). *See* 91 Fed. Reg. at 35,822 (addressing public-interest determinations where underlying activity violates state law). So nothing about the Special Rule invites state interference; to the contrary, it vests authority to prohibit certain event contracts with the Commission alone.

Next, the court relied on the "express prohibition of state regulation" in other parts of the CEA. JA14. It primarily pointed to § 16(e)(2), which provides that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" as applied to "an agreement, contract, or transaction that is *excluded* from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or *exempted* under section 6(c) of this title." 7 U.S.C. § 16(e)(2) (emphases added). Since "[n]either of these circumstances is presented in this action," the court concluded that state gambling law is not preempted. JA14.

That reasoning does not stand up. Were it true, the CEA would preempt state gambling laws *only* as to transactions over which the Commission exercises minimal regulatory oversight—"excluded" or "exempted" transactions—but *not* as to transactions subject to the Commission's full regulatory oversight. For example, if the

Commission exercised its statutory authority to "exempt" an event contract on a Giants-Jets game from CEA requirements, then § 16(e)(2) would straightforwardly preempt state gambling laws as to that contract. But according to the district court, because the Commission has *not* exempted the Giants-Jets contract from the CEA's requirements, States can enforce their gambling laws against it. That makes no sense.

There is a far more natural way to read the CEA's structure. Section 2(a)(1)'s "exclusive jurisdiction" provision preempts state law as to derivatives traded on a DCM, and § 16(e)(2) functions as a backstop: *even as to* derivatives that are largely beyond the CEA's purview, or where the CFTC expressly decides that applying its full regulatory regime is undesirable, state gambling law is *still* preempted. *See* H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (explaining that amendment "restate[d] … that the CEA supersedes and preempts other laws in the case of transactions conducted on a registered entity or subject to regulation by the CFTC" and "adds that in the case of excluded" or exempt transactions, "the CEA supersedes and preempts State gaming and bucket shop laws"); Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. Bus. Rev. 1, 6 (2019) ("Exclusive jurisdiction under section 2(a)(1)(A) is also preemptive jurisdiction; it has a much broader preemptive reach than gaming and bucket shop law-style preemption under section [16](e)(2)(B), which covers only excluded or exempt contracts over which the CFTC would [generally] have no jurisdiction."). So § 16(e)(2) confirms the preemptive effect of § 2(a)(1).

**iv.** Congress unmistakably designed the CEA's exclusive-jurisdiction clause to preclude States from regulating swap transactions on a DCM. New York's enforcement actions, which seek to prohibit swap transactions on DCMs, are squarely preempted.

**2. Conflict preemption**

Conflict preemption applies when (1) "it is impossible for a party to comply with both" federal and state law, or when (2) the challenged state law "is an obstacle to the achievement of federal objectives." *New York SMSA*, 612 F.3d at 104. Both apply here.

If DCM-hosted swaps are subject to state gambling laws, then compliance with both state and federal law is impossible. Federal law requires a DCM to provide "impartial access to its markets and services" to all its "members," and to provide "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). To the extent New York's enforcement effort would compel Kalshi to deprive New Yorkers of access to event contracts, that would necessarily require it to "discriminat[e]" against residents of the State. *Id.*

Of course, New York more recently has tried to prohibit Kalshi from offering event contracts nationwide, not just to New Yorkers. That, however, only exacerbates the conflict. The CEA's basic objective is to promote the "national public interest" in derivatives transactions and markets "through a system of effective self-regulation … under the oversight of *the Commission*." 7 U.S.C. § 5(a)-(b) (emphasis added). An effort by a *single State* to decide national derivatives policy is a direct affront to that objective. *See American Agric.*, 977 F.2d at 1157 (CEA obstacle-preempts "[s]tate laws specifically

directed towards the futures markets" or "[l]aws of general application" applied to "regulate the futures markets").

The district court downplayed the conflict on the ground that "the CEA leaves room for states to regulate tangential issues that may arise from trading swaps and other financial products on DCMs." JA17. New York's actions are not "tangential" to the operation of a derivatives market; they are existential. The court also pointed to the Special Rule as evidence that "Congress sought to prohibit the exact types of event contracts that Kalshi seeks to offer." JA18. But again, the Special Rule entrusts to *the CFTC* whether to prohibit an event contract. So the Special Rule only amplifies the conflict.

**3. Field preemption**

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018). "[L]ike all [forms of] preemption," field preemption "must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

Here, Congress gave the Commission "exclusive jurisdiction" over "swaps … traded or executed on a [DCM]," and it allowed state "regulatory authorities" to retain jurisdiction only "[e]xcept as hereinabove provided"—that is, *except* where the Commission has exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A). This "jurisdictional rule[]" establishes "that states may not regulate certain areas of conduct" and therefore is "of

the sort typically associated with 'field' preemption." Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 (2000). And taking a cue from the Supreme Court's *Rice* decision, Congress deleted language from the CEA that allowed the States to retain a measure of regulatory authority, which "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). In short, the "exclusive grant of jurisdiction" does what Congress expected it to do: "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35-36.

DCMs, moreover, are subject to extensive regulation under the CEA. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (describing the CEA as "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex"). They must, among other things, register with the Commission, 7 U.S.C. § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1). "These provisions regulate every aspect of" trading on a DCM, "leaving no room for state regulation." *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 964 (D. Ariz. 2026).

***

If the CEA does not preempt state gambling laws as to transactions on DCMs, that would be a massive sea change. Under that interpretation, States could regulate not just sports event contracts, but any type of swap—including basic interest-rate or currency swaps—as well as futures and options. That is the antithesis of the scheme Congress created; indeed, Congress created the CFTC in substantial part to prevent

state interference with derivatives markets. *American Agric.*, 977 F.2d at 1156. Whether on express, field, or conflict grounds, state gambling law is preempted as to on-DCM swap transactions.

### B. New York seeks to ban "swaps"

Although the district court did not address whether sports-related event contracts are swaps under the Act, this Court should hold that they are. The Third and Ninth Circuits have divided on that issue, and for the reasons explained below, the Court should follow the Third Circuit.

**1.** The definition of "swap" encompasses "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). As this Court has recognized, that definition is undeniably quite "broad[]." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Event contracts, including those related to sports, straightforwardly qualify as swaps. *See Flaherty*, 172 F.4th at 227-28 ("Kalshi's sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction"); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.).

For starters, event contracts make "payment … dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C.

§ 1a(47)(A)(ii). Consider an event contract over whether the Giants will defeat the Jets. "[P]ayment" under that contract is plainly "dependent on the occurrence … of an event"—namely, the Giants beating the Jets. *Id.* Likewise, a "yes" position on the Giants winning by more than 3.5 points is "dependent on … the extent of the occurrence of an event"—the extent of the Giants' victory. *Id.*

Sports events, moreover, are "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). As the Third Circuit explained, the result of a sporting event has the "potential" to affect "numerous … stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227-28. Of course, the financial, economic, or commercial consequences of an event may not always be felt "right away"—indeed, they may never actually occur—but an event contract nonetheless remains a swap so long as there is *potential* for commercial ramifications. *Kalshiex LLC v. Orgel*, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026); *see Minnesota*, 2026 WL 2150211, at *12 ("The occurrence of the event in question does not have to ultimately result in a financial, economic, or commercial consequence to meet the definition. It is enough that such consequences are foreseeable future possibilities.").

The statutory Special Rule bolsters this. It acknowledges that "[e]vent contracts" can be "swaps," and it contemplates that said "[e]vent contracts" can "involve," among other things, "gaming" and "other similar activity." 7 U.S.C. § 7a-2(c)(5)(C). And since "'gaming' includes the activity of playing games and playing games for stakes," "event

contracts related to … sporting events … implicate the gaming category." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *12 (D.D.C. Sept. 12, 2024). So the notion that the CFTC lacks jurisdiction over event contracts on "gam[es]" like sports runs headlong into the Special Rule.

None of this is to say that casino-style sports bets are swaps—they are not. Gambling wagers are typically conducted as bilateral agreements between a licensed casino (a "house") and its customer at prices ("lines") set by the house. Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J. 223, 223 (2004). Such wagers are not inherently tradeable and do not lend themselves to the exchange-trading requirement that Congress made applicable to swaps traded by retail participants. 7 U.S.C. § 2(e). By contrast, event contracts are traded on CFTC-registered national exchanges at market-set prices through the interaction of bids or offers placed on a central orderbook. And these contracts are centrally cleared by neutral, CFTC-registered clearinghouses. The substance of gambling wagers and event contracts is therefore materially and fundamentally different, so the CFTC's jurisdiction over event contracts in no way implies that it has jurisdiction over gambling wagers.

**2.** The Ninth Circuit recently held that sports-related event contracts do not satisfy the definition of swap in § 1a(47)(A)(ii). *Assad*, 2026 WL 2543846, at *8-16. That decision goes wrong on numerous fronts, and the Court should not follow it.

First, the Ninth Circuit doubted that a sports outcome like "whether the Dodgers win the World Series" is an "event." *Id.* at *9. Of course it is: Sports Business Journal

even called the Dodgers' victory the 2025 Sports Event of the Year.[6] The court also denied that "how many touchdowns Fernando Mendoza might throw in a game, or how many points BYU Football will win by" is an "event." *Assad*, 2026 WL 2543846, at *9. But contracts based on "the extent of the occurrence of an event" (like the margin of victory or number of touchdowns) are also swaps. 7 U.S.C. § 1a(47)(A)(ii); *see Johnson*, 832 F. Supp. 3d at 961-62 (explaining that the phrase "extent of the occurrence of an event or contingency" "reaches how an event unfolds, not just whether it happens").

Next, the court believed that the "substance" of sports event contracts "is sports gambling, regardless of whether Kalshi calls them swaps." *Assad*, 2026 WL 2543846, at *10. But "swap" is not just a label—it is a statutorily defined class of derivatives that retail investors are required to trade on a national exchange. 7 U.S.C. §§ 1a(47); 2(e). Sports event contracts fit the definition and, accordingly, are traded on CFTC-registered exchanges. Of course, a gambling wager and an event contract can both function as vehicles for staking money on the outcome of an event. But that does not make wagers and event contracts identical products with identical regulatory frameworks. For example, a person can stake money on gold prices by buying physical gold (property-law-regulated), a gold ETF (SEC-regulated) or a gold futures contract (CFTC-

[6] Mike Mazzeo, *MLB wins Sports Event of the Year for a classic World Series*, Sports Business Journal (May 20, 2026), https://www.sportsbusinessjournal.com/Articles/2026/05/20/mlb-wins-sports-event-of-the-year-for-a-classic-world-series/.

regulated). All these vehicles provide exposure to gold, but because their structure is materially different, the regulatory consequences differ. So too with event contracts.

More fundamentally, the Ninth Circuit never offered a coherent theory of what kinds of event contracts satisfy the definition of § 1a(47)(A)(ii), if sports event contracts are excluded. At one point, it suggested that event contracts must be based on "financial measures, indices, or instruments" like "the other subparts of the definition of 'swap.'" *Assad*, 2026 WL 2543846, at *12. But as the court acknowledged, the CEA also contemplates "emissions swap[s]" and "weather swap[s]," which "do not refer to a financial instrument or measure." *Id.* And if swaps had to refer to "financial instruments or measures," the subpart (ii) definition would inevitably be superfluous with subparts (i) and (iii), which cover the waterfront of finance-related contingencies. *Minnesota*, 2026 WL 2150211, at *13. Far better to read the statute as it is written: sports events are "associated with a potential financial, economic, or commercial consequence," and therefore, sports event contracts are swaps.

The Ninth Circuit also put significant weight on a CFTC regulation implementing the Special Rule, which purportedly "prohibits Kalshi from listing its sports event contracts on a DCM." *Assad*, 2026 WL 2543846, at *13; *see* 17 C.F.R. § 40.11. Even assuming that interpretation of § 40.11, the regulation would not exclude event contracts from the definition of "swap." And it certainly would not be grounds for *state gambling law* to enter the picture. Furthermore, the Commission has proposed revising the regulation to expressly clarify that sports event contracts are not

categorically prohibited but rather will be subject to public-interest review on a case-by-case basis. 91 Fed. Reg. at 35,818. So the durability of the Ninth Circuit's reasoning is shaky. *See Assad*, 2026 WL 2543846, at *19 (Lee, J., concurring) (acknowledging a "thorny statutory interpretation question" that "I do not think we need to resolve … *right now* because 17 C.F.R. § 40.11 bars gaming contracts" and "[w]hile CFTC has proposed revising that regulation, it remains in the books and controls the outcome of this appeal" (emphasis added)).

Finally, the Ninth Circuit held that the major-questions doctrine counseled against classifying sports event contracts as swaps. *Assad*, 2026 WL 2543846, at *14-15. But that doctrine is triggered "[w]hen an agency claims to discover in a long-extant statute an unheralded [regulatory] power." *Utility Air Regul. Grp. v EPA*, 573 U.S. 302, 324 (2014). The Commission has done no such thing: it has regulated event contracts for decades, and as the events underlying those contracts have evolved to include sports, the Commission has continued to exercise the same jurisdiction it always has. It is *New York*, not the Commission, that claims new authority.

**3.** Regardless, the Ninth Circuit did not address the fourth subpart of the swap definition: any contract "that is, or in the future becomes, commonly known to the trade as a swap" is a swap. 7 U.S.C. § 1a(47)(A)(iv). Event contracts independently qualify as swaps under this prong. For decades, the CFTC has held the position that event contracts are derivatives subject to its jurisdiction. *See* 91 Fed. Reg. at 35,813-17 (summarizing history). And market participants have self-certified thousands of sports-

related event contracts for trading and clearing as "swaps."[7] So sports event contracts are known to the trade as swaps—which makes them swaps under the CEA.

**4.** If event contracts (sports-related or otherwise) are not swaps subject to CFTC jurisdiction, that would leave a massive regulatory vacuum. Event contracts, for all their advantages, pose significant risks of manipulation, and the CEA provides a comprehensive framework for mitigating potential abuses. For one, event contracts must satisfy the CEA's core principles, and thus, only "contracts that are not readily susceptible to manipulation" can be listed. 7 U.S.C. § 7(d). The Commission's Special Rule power enables it to ban event contracts involving "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C). The Commission brings civil enforcement actions for illegal conduct with respect to swaps, such as insider trading, *id.* § 13a-1, and where appropriate, the Justice Department brings criminal actions for CEA violations, *id.* § 13. The Commission can also levy penalties for offering event contracts without registering as a DCM. *Id.* § 7b-3(a)(1).

None of this oversight would be possible if event contracts fall outside the CEA. Instead, 50 state-level gambling commissions would be left to oversee these national exchanges, ensure interstate market integrity, and bring enforcement cases based on

[7] *See* CFTC, Designated Contract Market Products, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?.

conduct that transcends state boundaries. Those are the core functions of a federal financial regulator, not a state gambling board.

## II. The equities favor preliminary relief

The harm in this case is not merely irreparable—it is existential. New York's enforcement action aims to prohibit a CFTC-registered exchange from offering an entire category of derivatives. If this effort succeeds, the Commission will not merely lack "exclusive jurisdiction" over event-contract derivatives on a DCM—it will have *no* jurisdiction over those transactions, as the State will have free rein to snuff them out.

Furthermore, given the global shutdown of event contracts that New York seeks to impose, the public interest in an injunction is exceptionally high. Kalshi sees billions of dollars in trading volume on thousands of event contracts every month, and if New York's enforcement gambit is permitted to go forward, this massive market will grind to a screeching halt. And to the extent that New York would forcibly unwind open contract positions that have not yet settled (*i.e.*, contracts where the underlying event has not yet occurred), that would "caus[e] additional, significant market disturbances" and "price volatility." CFTC, *Order Directing Kalshi to Continue Exercising DCM Functions* at 8 (Aug. 11, 2026). Specifically, the "contract-based expectation[s]" of Kalshi traders would be destroyed, forcing them to purchase or unwind positions on other contract markets in order to maintain existing exposure levels. *Id.* The Court should not tolerate that level of systemic disruption to national markets.

## CONCLUSION

New York seeks to massively short-circuit the Commission's jurisdiction and upend national derivatives markets. That effort is preempted by federal law. The Court should reverse and direct entry of a preliminary injunction.

Dated: September 8, 2026

Respectfully submitted,

*/s/ M. Jordan Minot*
M. Jordan Minot

TYLER S. BADGLEY
GENERAL COUNSEL
M. JORDAN MINOT
DEPUTY GENERAL COUNSEL
HENRY J. DICKMAN
SENIOR ASSISTANT GENERAL COUNSEL

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Tel. 202-418-5433
Fax. 202-418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov

*Attorneys for the Commodity Futures Trading Commission*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Local Rule 29.1(c) because it contains 6,959 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), which is less than one-half the maximum length authorized by the Court's Local Rules for a party's principal brief. *See* Local Rule 32.1(a)(4) (14,000-word limit for principal brief).

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Dated: September 8, 2026

*/s/ M. Jordan Minot*
M. Jordan Minot

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2026, I electronically filed the foregoing brief with the Clerk of the Court by using the ACMS system, and that the ACMS system will accomplish service on all parties represented by counsel who are registered users.

*/s/ M. Jordan Minot*
M. Jordan Minot