# 26-1835

## United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission,

*Defendants-Appellees*,

NEW YORK STATE GAMING COMMISSION,

*Defendant*.

*(caption continues inside front cover)*

On Appeal from the United States District Court for the Southern District of New York

## BRIEF FOR APPELLEES


BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
GRACE X. ZHOU
*Senior Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6160


Dated: October 30, 2026

(*caption continued from front cover*)

BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission, JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission, SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission, MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission, PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission, MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission, JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission,

*Defendants-Appellees.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iv

PRELIMINARY STATEMENT .......... 1

ISSUES PRESENTED .......... 4

STATEMENT OF THE CASE .......... 5

A. Legal Background .......... 5

1. New York's comprehensive regulation of gambling .......... 5

2. Federal regulation of derivatives trading .......... 10

3. The Commodity Futures Trading Commission's (CFTC) regulatory jurisdiction .......... 13

B. Factual Background .......... 17

1. Kalshi offers sports wagers in the guise of event contracts .......... 17

2. The Gaming Commission warns Kalshi to stop offering unlicensed sports betting in New York .......... 19

C. Procedural History .......... 20

STANDARD OF REVIEW .......... 24

SUMMARY OF ARGUMENT .......... 24

ARGUMENT .......... 29

POINT I

SPORTS WAGERS ARE NOT FINANCIAL INSTRUMENTS SUBJECT TO THE COMMODITY EXCHANGE ACT (CEA) .......... 30

**Page**

A. Kalshi's Sports-Event Contracts Do Not Satisfy the Statutory Definition of "Swap" .......... 30

1. Kalshi's contracts turn on the occurrence of outcomes, not events. .......... 33

2. Kalshi's contracts do not turn on events "associated with a potential financial, economic, or commercial consequence." .......... 35

3. Kalshi's position is inconsistent with the purposes of the CEA and would result in absurdities. .......... 41

B. Kalshi Is Wrong to Argue that States Lack Authority to Regulate Any Contracts Traded on a Designated Contract Market (DCM) .......... 46

POINT II

EVEN IF THE CEA APPLIED, IT WOULD NOT PREEMPT THE APPLICATION OF NEW YORK'S GAMING LAWS TO KALSHI .......... 48

A. The CEA Does Not Expressly Preempt State Gaming Laws .......... 51

1. Section 2(a)'s use of "exclusive jurisdiction" does not have express preemptive effect. .......... 51

2. At most, any express preemption under Section 2(a) is limited to state laws that directly regulate the licensing and operation of DCMs. .......... 55

3. Kalshi misplaces its reliance on pre-2010 legislative history and the CFTC's interpretation of its own authority. .......... 60

B. The CEA Does Not Impliedly Preempt State Gaming Laws. .......... 62

**Page**


1. New York's gaming laws are not field preempted. ......... 62

2. New York's gaming laws do not create an impermissible conflict with federal law. .......................... 66

C. Kalshi's Arguments in Favor of Preemption Present Numerous Doctrinal Problems. ............................................ 71

POINT III

THE REMAINING PRELIMINARY INJUNCTION FACTORS ALSO WEIGH HEAVILY AGAINST KALSHI ...................................................... 75

A. Kalshi Identifies No Irreparable Injury in the Absence of a Preliminary Injunction. .................................................. 75

B. The Balance of Equities and Public Interest Favor the Gaming Commission. ........................................................... 78

CONCLUSION ........................................................................ 82

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott v. Perez*,
585 U.S. 579 (2018) ........ 81

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) ........ 5, 43

*Alabama Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) (per curiam) ........ 71

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) ........ 49, 55

*American Agric. Movement, Inc. v. Board of Trade of City of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ........ 57, 60, 66

*Associates Against Outlier Fraud v. Huron Consulting Grp., Inc.*,
817 F.3d 433 (2d Cir. 2016) ........ 33

*Bailey v. United States*,
516 U.S. 137 (1995) ........ 34

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) ........ 74

*Bloomberg L.P. v. CFTC*,
949 F. Supp. 2d 91 (D.D.C. 2013) ........ 11

*Blue Lake Rancheria v. Kalshi, Inc.*,
No. 25-7504, 2026 WL 2728466 (9th Cir. Sept. 16, 2026) ........ 18

*Bond v. United States*,
572 U.S. 844 (2014) ........ 43-44, 71

*Booking v. General Star Mgmt. Co.*,
254 F.3d 414 (2d Cir. 2001) ........ 31

**Cases** **Page(s)**

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........ 60

*Chevron USA Inc. v. Plaquemines Parish*,
608 U.S. 1 (2026) ........ 38

*Chicago Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ........ 59

*Coinbase Fin. Mkts., Inc. v. Tong*,
No. 3:25-cv-2121, 2026 WL 2294602 (D. Conn. Aug. 10, 2026) ........ 50

*Coinbase Fin. Mkts., Inc. v. Nessel*,
No. 25-14092, 2026 WL 2295184
(E.D. Mich. Aug. 7, 2026) ........ 32, 41-42, 50, 60

*Commonwealth v. KalshiEX LLC*,
No. 2584-cv-2525, 2026 WL 188019
(Mass. Super. Ct. Jan. 20, 2026) ........ 50

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) ........ 49, 74

*Davis v. Michigan Dept. of Treasury*,
489 U.S. 803 (1989) ........ 33

*Dubin v. United States*,
599 U.S. 110 (2023) ........ 33

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ........ 41, 74

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021) ........ 47

*Figueroa v. Foster*,
864 F.3d 222 (2d Cir. 2017) ........ 66

*FTC v. Ken Roberts Co.*,
276 F3.d 583, 588 (D.C. Cir. 2001) ........ 52

**Cases** **Page(s)**

*Greater New Orleans Broad. Ass'n v. United States*,
527 U.S. 173 (1999) .......... 6, 63

*Hirschfeld v. Board of Elections*,
984 F.2d 35 (2d Cir. 1993) .......... 78

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) .......... 54

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) .......... 47

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) .......... 62

*International Paper Co. v. Ouellette*,
479 U.S. 481 (1987) .......... 58

*Investment Co. Inst. v. CFTC*,
720 F.3d 370 (D.C. Cir. 2013) .......... 10

*KalshiEX LLC v. Assad*,
190 F.4th 1098 (9th Cir. 2026) .......... passim

*KalshiEX LLC v. Bird*,
No. 2:26-cv-00109, 2026 WL 2691009
(S.D. Iowa Sept. 8, 2026) .......... 32, 50

*KalshiEX LLC v. Cafferelli*,
No. 3:25-cv-2016, 2026 WL 2294589
(D. Conn. Aug. 10, 2026) .......... 32, 34-35, 39, 50, 69

*KalshiEX LLC v. Cox*,
No. 2:26-cv-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026) .......... 50, 69

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 32, 45, 50, 69

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) .......... 32

**Cases** **Page(s)**

*KalshiEX, LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) .......................................... 32, 50

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ........................ 50, 61, 65-66, 69-70

*KalshiEX LLC v. Schuler*,
No. 26-3196, 2026 WL 2884087 (6th Cir. Sept. 25, 2026).......... passim

*Kansas v. Garcia*,
589 U.S. 191 (2020) ........................................................................ 62, 66

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ..................................................................... 59

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................................ 48, 61

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ................................................................ 48

*Marentette v. Abbott Labs., Inc.*,
886 F.3d 112 (2d Cir. 2018) ..................................................................... 69

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................... 81

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ............................................................................. 51

*Merck Sharp & Dohme Corp. v. Albrecht*,
587 U.S. 299 (2019) ............................................................................. 67

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ...................................................... 11, 13-14, 52

*Murphy v. NCAA*,
584 U.S. 453 (2018) .................................................................... 5, 49, 63

**Cases** **Page(s)**

*New York & Atlantic Railway Co. v. Surface Transportation Board*,
635 F.3d 66 (2d Cir. 2011) .......... 54

*New York Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .......... 24

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010) .......... 49-50

*New York State Firearms Ass'n v. James*,
157 F.4th 232 (2025) .......... 29

*New York State Telecomms. Ass'n v. James*,
101 F.4th 135 (2d Cir. 2024) .......... 67

*North Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nev. Gaming Control Bd.*,
815 F. Supp. 3d 1169 (D. Nev. 2025) .......... 32, 34

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) .......... 62

*QCX LLC v. Nessel*,
No. 1:26-cv-710, 2026 WL 1895958
(W.D. Mich. June 17, 2026) .......... 32, 50-51

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) .......... 59-60

*Resource Grp. Int'l Ltd. v. Chishti*,
91 F.4th 107 (2d Cir. 2024) .......... 24

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 54

*Saratoga Cnty. Chamber of Comm. v. Pataki*,
100 N.Y.2d 801 (2003) .......... 6

**Cases** **Page(s)**

*Siren Retail Corp. v. NLRB*,
190 F.4th 114 (2d Cir. 2026) .......... 46

*Slaney v. International Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) .......... 54

*St. Joseph's Hosp. Health Ctr. v. American Anesthesiology of Syracuse, P.C.*,
131 F.4th 102 (2d Cir. 2025) .......... 75

*Tom Doherty Assocs. v. Saban Ent., Inc.*,
60 F.3d 27 (2d Cir. 1995) .......... 77

*Transcontinental Gas Pipe Line Co. v. Pennsylvania Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) .......... 54

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) .......... 60

*United States v. Mangano*,
128 F.4th 442 (2d Cir. 2025) .......... 40

*United States v. Minnesota*,
No. 26-cv-2661, 2026 WL 2150211 (D. Minn. July 27, 2026) .......... 32, 50

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 11-12

*United States v. Wisconsin*,
No. 26-C-749, 2026 WL 2474512
(E.D. Wis. July 29, 2026) .......... 32, 50, 69

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 44

*White v. Cuomo*,
38 N.Y.3d 209 (2022) .......... 6

**Cases** **Page(s)**

*Whitman v. American Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 44

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) .......... 76

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 29

*Wisconsin Cent. Ltd. v. United States*,
585 U.S. 274 (2018) .......... 33

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 49, 67

**Constitution**

N.Y. Const. art. I, § 9 .......... 6

**Federal Laws**

Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998 (1922) .......... 10-11

Commodity Exchange Act, Pub. L. No. 74-675, 59 Stat. 1491 (1936) .......... 11

Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 .......... 13

Commodity Futures Modernization Act, Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000) .......... 11

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......... 12, 14

7 U.S.C.
§ 1 et seq .......... 1
§ 1a .......... 12, 24-25, 31-33, 35, 40-41, 45
§ 2 .......... 13-14, 45-46, 52, 55, 72
§ 5 .......... 30, 42

**Federal Laws** **Page(s)**

7 U.S.C.
§ 7a-2 .......... 13, 28, 43, 65, 70
§ 13a-2 .......... 64-65
§ 16 .......... 53
§ 27 .......... 53

15 U.S.C.
§ 78aa .......... 53
§ 78bb .......... 53, 73
§ 3001 .......... 5
§ 8301 et seq. .......... 12

18 U.S.C.
§ 1084 .......... 73
§ 1955 .......... 6, 73

30 U.S.C. § 1254 .......... 52

31 U.S.C.
§ 5361 .......... 74
§ 5362 .......... 6

49 U.S.C. § 10501 .......... 53

**State Laws**

N.Y. C.P.L.R.
7803 .......... 10, 75
7806 .......... 75

N.Y. Penal Law
§ 225.00 .......... 72
§ 225.05 .......... 7
§ 225.10 .......... 7

**State Laws** **Page(s)**

N.Y. Racing, Pari-Mutuel Wagering & Breeding Law
§ 100 et seq. .......... 7
§ 100 .......... 7-8
§ 104 .......... 7, 9
§ 116 .......... 10
§ 1305 .......... 9
§ 1317 .......... 9
§ 1318 .......... 9
§ 1362 .......... 8
§ 1367 .......... 7-9, 38, 70, 72
§ 1367-a .......... 7-9, 19, 68, 70

**Federal Administrative Sources**

17 C.F.R.
§ 38.151(b) .......... 68
§ 40.11(a) .......... 15, 28, 68, 70

75 Fed. Reg. 80572 (Dec. 22, 2010) .......... 68

89 Fed. Reg. 48968 (June 10, 2024) .......... 14-15, 62

91 Fed. Reg. 5386 (Feb. 6, 2026) .......... 15

91 Fed. Reg. 35806 (June 12, 2026) .......... 16

91 Fed. Reg. 65969 (Oct. 19, 2026) .......... 16, 45, 72

91 Fed. Reg. 66022 (Oct. 19, 2026) .......... 16

Order, *In re KalshiEX LLC's Notice Regarding Market Emergency Declaration*, CFTC (July 14, 2026), https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf .......... 77

**State Regulations** **Page(s)**

9 N.Y.C.R.R.
§ 5329.13 ........ 8
§ 5329.34 ........ 8
§ 5329.37 ........ 8
§ 5330.13 ........ 8
§ 5330.34 ........ 8
§ 5330.45 ........ 8

**Miscellaneous Authorities***

120 Cong. Rec. 30464 (1974) ........ 61

120 Cong. Rec. 35000 (1974) ........ 56

156 Cong. Rec. 13173 (2010) ........ 42

Alexander MacDougall, *Sports Gambling Is Everywhere. Is It Harming Young Adults?*, Times Union (Oct. 4, 2026), https://www.timesunion.com/capitol/article/sports-gambling-everywhere-harming-young-adults-22458511.php ........ 79

Cheryle Stepstone, *Kalshi Volume: Weekly Analytics & Market Share*, https://defirate.com/figures/volume-kalshi/2026-10-28T1030/#kalshi-records ........ 19

Comment Letter from A. Wilson, Ohio Att'y Gen., et al. to C. Kirkpatrick, Sec'y, CFTC (July 27, 2026), https://www.regulations.gov/comment/CFTC-2026-1189-0174 ........ 16

Commodity Futures Trading Commission, *Designated Contract Markets (DCM): Search Tool*, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?page=1 ........ 80

*All URLs last visited October 30, 2026.

**Miscellaneous Authorities** **Page(s)**

Commodity Futures Trading Commission, *Chairman & Commissioners*, https://www.cftc.gov/About/Commissioners/index.htm ..................... 15

Contessa Brewer, *DraftKings Acquires Predictions Platform Railbird*, CNBC (Oct. 21, 2025), https://www.cnbc.com/2025/10/21/draftkings-railbird-predictions-platform-acquisition.html ............................................ 81

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report* (updated Feb. 25, 2011)................................11-12

H.R. Rep. No. 87-967 (1961)...................................................................6

H.R. Rep. No. 93-1383 (1974)...............................................................66

Kaitlyn Radde, *Prediction Markets' Trading Volume Doubled Between May and July, Largely Driven by Sports*, Pew Research Ctr. (Sept. 23, 2026), https://www.pewresearch.org/short-reads/2026/09/23/prediction-markets-trading-volume-doubled-between-may-and-july-largely-driven-by-sports/................. 72

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)...................... 36

N.Y. State Gaming Commission, *Sports Wagering: Licensed Operators*, https://gaming.ny.gov/sports-wagering .............................. 9

*New Oxford American Dictionary* (2d ed. 2005) .................................... 35

Rena S. Miller, Cong. Rsch. Serv., R48451, Introduction to Derivatives and the Commodity Futures Trading Commission (Mar. 13, 2025)............................................................ 10

## PRELIMINARY STATEMENT

Plaintiff-appellant KalshiEX LLC operates a multibillion-dollar gambling business that it calls a "prediction market." In January 2025, Kalshi began offering sports wagers styled as "sports-event contracts" to customers in New York in violation of New York law. After the New York State Gaming Commission issued Kalshi a cease-and-desist letter, Kalshi filed this suit under 42 U.S.C. § 1983, asserting that the Gaming Commission lacks authority to regulate Kalshi's sports wagers because such wagers are supposedly "swaps" regulated exclusively by the federal Commodity Futures Trading Commission (CFTC). The U.S. District Court for the Southern District of New York (Torres, J.) disagreed and denied Kalshi's motion for a preliminary injunction.

This Court should affirm. The district court correctly concluded that Kalshi is unlikely to succeed on the merits of its preemption claim. To prevail, Kalshi must establish that all of its sports wagers are "swaps" governed by the Commodity Exchange Act (CEA), 7 U.S.C. § 1 et seq., and that the CEA clearly preempts the application of state gaming law to such wagers. Kalshi fails at both steps.

*First*, the sports wagers offered by Kalshi are not "swaps" as that term is defined in the CEA. As both the Sixth and Ninth Circuits have recognized, Kalshi's contracts do not turn on events "associated with" potential economic consequences, which is a necessary component of the CEA's definition of "swap." *See KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087, at *8 (6th Cir. Sept. 25, 2026); *KalshiEX LLC v. Assad*, 190 F.4th 1098, 1112 (9th Cir. 2026). At most, the occurrences at issue (e.g., the number of rebounds LeBron James has in a particular game or whether the Syracuse University men's basketball team wins a particular matchup) might have downstream financial consequences, but such consequences are far more attenuated than those required by the CEA.

*Second*, even if Kalshi could show that some or all of its sports wagers are "swaps," federal law does not preempt the application of state gaming law merely because some wagers might be separately subject to the CFTC's jurisdiction. Kalshi chiefly insists that the text of § 2(a)(1)(A) of the CEA, which gives the CFTC "exclusive jurisdiction" over certain swaps, expressly preempts state law. But § 2(a)(1)(A) lacks the textual hallmarks of a preemption provision intended to displace state law. The overall structure of the CEA further counsels against adopting Kalshi's expansive reading

of the CFTC's "exclusive jurisdiction," given the unique federalism concerns raised by the States' longstanding regulation of gaming. Nothing in the text, history, or purposes of the CEA suggests that Congress intended to make the CFTC a nationwide regulator of sports betting when it gave the agency authority to regulate swaps following the 2008 financial crisis.

Kalshi's arguments concerning implied preemption fare no better. The CEA contains several provisions that expressly preserve state law and recognize concurrent state enforcement authority over various derivatives. These provisions fatally undermine Kalshi's assertion that Congress intended to occupy the field of derivatives trading on CFTC-licensed markets. The CFTC's recent spate of regulatory actions does not rehabilitate Kalshi's position either. A federal agency cannot unilaterally create conflict preemption by directing private parties to ignore New York law based on the agency's erroneous view of its own jurisdiction.

*Finally*, the district court correctly found that the remaining preliminary injunction factors weigh in favor of denying Kalshi's motion. Kalshi principally claims that the New York Attorney General's pending enforcement action will imperil its business, but the Attorney General is not a defendant in this case, so these asserted harms do not justify an

injunction against officials of the Gaming Commission. Moreover, the district court did not abuse its discretion in concluding that the Gaming Commission's interest in enforcing New York gaming law heavily outweighs Kalshi's business concerns. As the preliminary injunction record amply establishes, the State and its residents are irreparably harmed every day that Kalshi continues to flout New York's carefully calibrated gaming laws.

## ISSUES PRESENTED

1. Whether Kalshi is unlikely to establish that its "sports-event contracts" are swaps within the meaning of the Commodity Exchange Act (CEA).

2. Even if some or all of Kalshi's sports-event contracts are considered swaps, whether Kalshi is unlikely to establish that the CEA preempts application of New York's sports gambling laws.

3. Whether the district court properly determined that the absence of irreparable harm to Kalshi, the balance of equities, and the public interest weigh decisively against granting preliminary injunctive relief.

## STATEMENT OF THE CASE

### A. Legal Background

This appeal presents the question of whether Congress intended to preempt States from exercising their historic power to regulate gambling whenever sports wagers are offered over a federally licensed contract market. Because this preemption question turns on the intersection of New York's gaming law and federal regulation of derivatives markets, we briefly describe the development of these distinct fields of law before turning to the facts and procedural history of this case.

#### 1. New York's comprehensive regulation of gambling

The regulation of gambling is a core state police power. *See Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905). Indeed, federal law has long recognized that "States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). Consistent with this "coherent federal policy," *Murphy v. NCAA*, 584 U.S. 453, 484 (2018), Congress has enacted a number of laws

that "defer to" and assist States in enforcing various gaming laws, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 187 (1999).[1]

Prior to the twentieth century, New York strictly prohibited gambling within its borders. *See Saratoga Cnty. Chamber of Comm. v. Pataki*, 100 N.Y.2d 801, 826-28 (2003) (Smith, J., concurring in part) (tracing history). The colonial government expressly banned gambling, and the prohibition was later reflected in the state constitution and state criminal laws for more than a century. *See id.* at 827; *White v. Cuomo*, 38 N.Y.3d 209, 218 (2022).

Beginning in 1939, New York voters amended the constitution to gradually "legalize various forms of lotteries and gambling," *White*, 38 N.Y.3d at 219, such as pari-mutuel betting on horse races, the state lottery, and casino gambling at limited locations, *see* N.Y. Const. art. I, § 9. The Legislature has since created a comprehensive regulatory regime to ensure

[1] *See, e.g.*, 18 U.S.C. § 1955(b)(1)(i) (Illegal Gambling Business Act) (prohibiting persons from conducting a gambling business in violation of the law of the state in which it is conducted); 31 U.S.C. § 5362(10)(A)-(B), (E) (Unlawful Internet Gambling Enforcement Act) (prohibiting interstate financial transactions relating to bets or wagers); H.R. Rep. No. 87-967, at 1 (1961) (noting that the Wire Act of 1961, 18 U.S.C. § 1084(a)-(b), was intended to "assist the various States and the District of Columbia in the enforcement of their laws pertaining to gambling").

responsible gambling. *See* N.Y. Racing, Pari-Mutuel Wagering & Breeding Law ("Racing Law"), § 100 et seq. Among other things, the Racing Law established the Gaming Commission, which is now the state agency responsible for enforcing New York's civil gambling laws.[2] *See id.* §§ 100, 104(1).

Sports betting beyond pari-mutuel wagering on horse racing was first legalized in New York in 2019. *See id.* §§ 1367 (in-person sports wagering), 1367-a (mobile sports wagering). The Racing Law defines "sports wagering" to include wagering on "sporting events" or "the individual performance statistics of athletes participating in a sporting event," such as "single-game bets," "parlays," "over-under bets," and "proposition bets." *Id.* § 1367(1)(x).

State law imposes numerous restrictions on sports wagering aimed at protecting the public. For example, the Racing Law prohibits sports wagering by anyone under twenty-one years of age, *id.* §§ 1367(1)(j),

---

[2] New York law also criminalizes the promotion of gambling. *See, e.g.*, N.Y. Penal Law §§ 225.05, 225.10. However, the Gaming Commission does not have criminal jurisdiction and must refer potential criminal matters to a law enforcement agency of competent jurisdiction. Racing Law § 104(12); *see also id.* § 1367(12)(a) (State Police to assist in investigating suspected criminal activity relating to "unusual wagering activity, match fixing, and other conduct that corrupts a wagering outcome of a sporting event").

(1)(r)(x), (2)(d), 1367-a(4)(a)(iii), and bars sports wagering operators from targeting advertisements to underage individuals, *see id.* § 1367-a(4)(e); 9 N.Y.C.R.R. §§ 5329.37(e), 5330.45. The Racing Law requires operators to post resources about compulsive gambling and to take affirmative steps to combat problem gambling. Racing Law §§ 1362(1)(c), 1367(13), 1367-a(4)(a)(x), (xiv), (xv); 9 N.Y.C.R.R. §§ 5329.34, 5330.34. Furthermore, the Racing Law requires mobile sports wagering operators to provide a self-exclusion program where individuals can set daily, weekly, and monthly gaming limits. Racing Law § 1367-a(4)(a)(xii).

The Racing Law also aims to protect the integrity of sports and to ensure that "all gaming activity conducted in this state" is "of the highest integrity, credibility and quality." *Id.* § 100. In particular, the law bans persons with insider information, such as athletes, coaches, and referees, from placing any sports bets. *See id.* §§ 1367(1)(r)(vii)-(viii), 1367-a(4)(d). The law also prohibits operators from offering betting on any sports event in which a New York college team participates. *Id.* §§ 1367(1)(s), 1367-a(4)(c). Finally, the law authorizes the Gaming Commission to prohibit or restrict any wagering that is contrary to public policy. *See id.* § 1367(11); 9 N.Y.C.R.R. §§ 5329.13(b)(2)(v), 5330.13.

All operators offering sports betting to customers in New York must be licensed by the Gaming Commission. Racing Law §§ 1367(2)(a), 1367-a(2)(a)-(b), 1367-a(4)(b). The Gaming Commission thoroughly vets licensees to ensure that they are fit to conduct gaming, *see id.* §§ 1317, 1318, and requires them to strictly comply with all state gaming laws and regulations as a condition of licensure, *see id.* § 1367-a(4)(a), (j). To date, the Gaming Commission has issued nine mobile sports wagering licenses[3] pursuant to a competitive bidding process prescribed by statute, *see id.* § 1367-a(7)(d). Licensed mobile sports wagering operators pay substantial state taxes on gross gaming revenue, which the State uses to fund problem gambling treatment and youth education. (*See* Joint Appendix (JA) 149 (reporting more than $1 billion in tax revenue in 2024).)

To ensure compliance with state gaming laws, the Gaming Commission is authorized to promulgate regulations, conduct audits and investigations, and impose civil penalties and fines for violations. Racing Law § 104(5)-(6), (9) (19); *see also id.* §§ 1305, 1367(16)(b). Before imposing

[3] *See* N.Y. State Gaming Commission, *Sports Wagering: Licensed Operators*. Full URLs for all internet sources appear in the table of authorities.

any penalties, the Gaming Commission must afford operators "a hearing or opportunity to be heard," *id.* § 116, and operators may seek judicial review of any adverse determination, *see* N.Y. C.P.L.R. 7803(3).

### 2. Federal regulation of derivatives trading

Derivatives are a type of financial instrument "deriving their value from underlying assets." *Investment Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013). The purpose of derivative contracts is usually to hedge against risk. For example, a "futures contract" is a type of derivative where a party agrees to "buy or sell a commodity or asset at a predetermined price at a future date," while an "option" is a type of derivative that gives a party "the option, but not the obligation" to do so. *See* Rena S. Miller, Cong. Rsch. Serv., R48451, *Introduction to Derivatives and the Commodity Futures Trading Commission* 3-4 (Mar. 13, 2025).

Federal regulation of derivatives trading began in the early twentieth century, when Congress enacted the Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998 (1922). That law made it generally unlawful to enter into a grain futures contract outside of a federally licensed "designated contract market" ("DCM"), *id.* § 4, 42 Stat. at 999-1000, and authorized the Secretary of Agriculture to supervise trading on DCMs to prevent price manipu-

lation and other abusive trading practices, *see id.* § 5, 42 Stat. at 1000-01. Congress later changed the name of the statute to the Commodity Exchange Act and expanded its coverage from grain futures to other commodities. *See* Commodity Exchange Act (CEA), Pub. L. No. 74-675, §§ 1-2, 59 Stat. 1491, 1491 (1936); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362-67 (1982) (tracing CEA's history).

This case centers on a particular derivative known as a "swap," which did not emerge until the 1980s. *See Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 97 (D.D.C. 2013). Unlike futures and options contracts, which "contemplate delivery of or performance related to a commodity at some future time," swaps are "pure financial instruments," *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (alteration and quotation marks omitted), that allow "two parties to agree to exchange payments to mitigate financial risk," *Schuler*, 2026 WL 2884087, at *2.

Prior to 2010, most swaps were traded "over-the-counter" (that is, directly between two counterparties) and were largely exempted from government regulation by the Commodity Futures Modernization Act, Pub. L. No. 106-554, § 105(b), 114 Stat. 2763A-365, 2763A-379 (2000). *See* Fin. Crisis Inquiry Comm'n (FCIS), *The Financial Crisis Inquiry Report:*

*Final Report* 46, 48 (updated Feb. 25, 2011). Without regulatory oversight, trading in swaps exploded and many experts blamed credit default swaps for precipitating the 2008 financial crisis. *See Phillips*, 155 F.4th at 113; FCIS, *supra*, at xxiv.

In response, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act to "improv[e] accountability and transparency in the financial system." Pub. L. No. 111-203, 124 Stat. 1376, 1376 (2010). As relevant here, the Dodd-Frank Act made several key amendments to the CEA.

*First*, Congress brought swaps under the CEA's regulatory framework, *see* 15 U.S.C. § 8301 et seq., and defined "swap" to include "any agreement, contract, or transaction" that, among other things, "provides for any purchase, sale, payment, or delivery" that is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii) (incorporated by 15 U.S.C. § 8301). The definitional provision enumerates nearly two dozen financial instruments as exemplar swaps. *See id.* § 1a(47)(A)(iii).

*Second*, Congress generally prohibited parties from entering into swap agreements outside of federally licensed DCMs. *See id.* § 2(e).

*Third*, Congress placed certain limits on the ability of DCMs to unilaterally list new contracts for trading. *See id.* § 7a-2(c)(1)-(2). Specifically, Congress added a Special Rule authorizing "review and approval of certain contracts," which permits federal regulators to prohibit the listing of "agreements, contracts, transactions, or swaps" in areas that are "contrary to the public interest," including those that involve "activity that is unlawful under any Federal or State law," "gaming," "war," and "terrorism." *Id.* § 7a-2(c)(5)(C)(i)-(ii).

### 3. The Commodity Futures Trading Commission's (CFTC) regulatory jurisdiction

The Commodity Futures Trading Commission is a federal agency created by Congress to oversee commodity futures trading. *See* 7 U.S.C. § 2. Congress gave the CFTC "exclusive jurisdiction" over particular financial derivatives, including options and futures traded or executed on a DCM, *see* Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (codified at 7 U.S.C. § 2(a)(1)(A)), in order to "consolidate federal regulation . . . in the Commission," *Merrill*

*Lynch*, 456 U.S. at 387, and to "separate [its] functions" from "those of the Securities and Exchange Commission [SEC] and other regulatory agencies," *id.* at 386. Following the 2008 financial crisis, the Dodd-Frank Act also added swaps to the CFTC's jurisdiction. *See* Pub. L. No. 111-203, § 722, 124 Stat. at 1672 (codified at 7 U.S.C. § 2(a)(1)(A)).

The CFTC's "exclusive jurisdiction" is expressly cabined by two "savings clauses" contained in § 2(a)(1)(A) of the CEA. The first clause states that "except as hereinabove provided [in § 2(a)(1)(A)], nothing in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the [SEC] and such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). The second clause provides: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

Until recently, the CFTC interpreted the limited scope of its jurisdiction to mean that it lacks the "statutory mandate" to exercise jurisdiction over the "rapidly evolving field" of gambling, which "is overseen by state regulators with particular expertise." 89 Fed. Reg.

48968, 48982-83 (June 10, 2024). In 2011, for example, the CFTC promulgated a regulation to bar DCMs from listing any event contract "that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). And in 2024, the agency issued a proposed rule that would have expressly defined "gaming" to include the "staking or risking . . . of something of value upon" the "outcome of a game in which one or more athletes compete," 89 Fed. Reg. at 48975, and further clarified that DCMs may not list gaming contracts because they are categorically contrary to the public interest, *see id.* at 48978.

Following a change in the presidential administration and the appointment of only a single commissioner to constitute the CFTC,[4] the agency abruptly changed its position on its interpretation of the CEA. In February 2026, the CFTC withdrew the 2024 proposed rule, asserting a need for reconsideration "in light of various forms of state regulatory actions and litigation concerning the Commission's exclusive jurisdiction over event contract derivatives." 91 Fed. Reg. 5386, 5387 (Feb. 6, 2026).

---

[4] *See* CFTC, *Chairman & Commissioners*.

Several months later, the CFTC issued a notice of proposed rulemaking seeking, for the first time, to preempt state gaming regulators' application of state gambling law to DCMs.[5] *See* 91 Fed. Reg. 35806, 35808 (June 12, 2026); *see also id.* at 35822.

While that rulemaking was ongoing, the CFTC bypassed notice and comment to issue an interim final rule distinguishing between sports bets offered by traditional sportsbooks (which the agency declared are not "swaps" subject to its jurisdiction) and "sports-event contracts" (which the CFTC maintains must be solely regulated by the CFTC). *See* 91 Fed. Reg. 65969, 65971, 65974, 65979 (Oct. 19, 2026). The CFTC also issued a new notice of proposed rulemaking seeking to define "swap" to expressly include sports-event contracts. *See* 91 Fed. Reg. 66022, 66029 (Oct. 19, 2026).

Finally, the CFTC has sued nearly a dozen States, including New York, asserting that the CEA preempts application of state gambling

---

[5] A bipartisan coalition of forty-four States submitted a comment explaining why the CFTC lacks statutory authority to promulgate this rule and identifying numerous additional flaws. *See* Comment Letter from A. Wilson, Ohio Att'y Gen., et al. to C. Kirkpatrick, Sec'y, CFTC (July 27, 2026). The CFTC has yet to publish the final rule.

laws to DCMs like Kalshi. *See, e.g.*, Compl. ¶ 10, *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), ECF 1.

## B. Factual Background

### 1. Kalshi offers sports wagers in the guise of event contracts

Kalshi is a DCM that claims to offer "events contracts related to an array of substantive areas," including sports. (JA105-106 (¶¶ 46-47).) The "sports-event contracts" Kalshi offers are functionally identical to sports wagers: Users buy "yes" or "no" positions (*see* JA99 (¶ 27)) on various sporting outcomes—for example, whether the Dallas Cowboys will beat the New York Jets in a particular game (*see* JA202-203)—and, at the end of the game, customers holding the "winning" position are paid out by Kalshi, while those holding the "losing" position receive nothing (*see* JA99-100 (¶ 29)).

Kalshi also offers sports wagering through "proposition" bets on individual players' performance metrics and "parlay" bets combining multiple outcomes. (*See* JA185.) Customers can, for instance, bet on whether a particular NBA player will achieve a certain number of "points, rebounds, assists, [or] three-pointers" in a given game. (JA259.) Kalshi also allows users to create custom, multileg parlays—for example, wagering

that the "San Francisco 49ers will win by more than 4.5 points, that the game's combined score will exceed 49.5 points, and that Brock Purdy will pass for over 200 yards." *Blue Lake Rancheria v. Kalshi, Inc.*, No. 25-7504, 2026 WL 2728466, at *5 (9th Cir. Sept. 16, 2026).

When Kalshi began offering sports-event contracts on its platform in January 2025 (JA105-106 (¶ 47)), it self-certified to the CFTC that such contracts are "swaps" governed by federal law (*see* JA326-329, 331). To the public, however, Kalshi touted its new offerings as sports betting. (*See* JA173 ("Bet on the NFL, Legal in 50 states.").) In September 2025, the CFTC issued a (now-rescinded) staff advisory cautioning DCMs to account for state regulatory and enforcement actions against the listing of "sports-related events contracts." (JA209-210.) The advisory directed DCMs to prepare "risk mitigation and contingency plans" and to warn customers that state enforcement actions could "result in termination" of these contracts. (JA210.)

Undeterred, Kalshi continued to list "sports-event contracts" on its platform—a decision that has proven to be remarkably lucrative. In 2025, Kalshi's projected annualized trading volume was $50 billion (JA191), with sports wagers comprising approximately ninety percent of its total trading

volume (*e.g.*, JA184-185, 194). By September 2026, Kalshi's *monthly* trading volume was over $60 billion.[6]

### 2. The Gaming Commission warns Kalshi to stop offering unlicensed sports betting in New York

Kalshi has not obtained a mobile sports wagering license from the Gaming Commission to offer sports wagering to customers in New York or agreed to abide by the State's comprehensive regulations governing sports betting. (*See* JA125-128.) Instead, Kalshi has aggressively targeted underage individuals (*see* JA255 (describing college ambassadors program)), offered bets on New York-based college sports teams (*see* JA290; *see also* JA286), and declined to implement statutorily mandated problem-gambling prevention plans, *see* Racing Law § 1367-a(4)(a)(xv)—all in apparent violation of New York law (see *supra* at 7-9).

Alarmed by the explosion of unregulated sports betting on Kalshi, the Gaming Commission issued the company a cease-and-desist letter in October 2025, demanding that Kalshi stop offering sports wagering in New York without a license. (JA125.) The letter identified numerous event

[6] *See* Cheryle Stepstone, *Kalshi Volume: Weekly Analytics & Market Share*.

contracts on Kalshi's platform that qualified as "sports wagering within the meaning of New York law." (JA127; *see* JA125-126.) And the Gaming Commission warned that it reserved the right to "levy and collect civil penalties and fines in connection with" Kalshi's sports wagering activity.[7] (JA128.)

## C. Procedural History

In October 2025, Kalshi filed this lawsuit in the U.S. District Court for the Southern District of New York against the Gaming Commission and eight Gaming Commission officials in their official capacities. (JA97-98.) The complaint asserted that the CEA preempts the Gaming Commission from regulating Kalshi's offering of sports wagering in New York. (JA92-94 (¶¶ 1-4), 109 (¶ 60).) Kalshi also moved for a preliminary injunc-

---

[7] In July 2026, the New York Attorney General brought a separate enforcement action to hold Kalshi accountable for violating various state and federal gambling laws. *See* Verified Pet. ¶ 12, *People v. KalshiEX LLC*, Index No. 453272/2026 (Sup. Ct. N.Y. Cnty. 2026), NYSCEF 1, *removed*, *People v. KalshiEX LLC*, No. 1:26-cv-6550 (S.D.N.Y.). Although Kalshi's brief repeatedly conflates the Attorney General and the Gaming Commission (*see* Opening Br. for KalshiEX LLC at 28-29, 52, 66), the two are separate state entities pursuing distinct enforcement actions, and the Attorney General is not a defendant in this case (*see* CA2 ECF 35, at 1; CA2 ECF 40, at 1).

tion barring the named defendants from enforcing state gaming law against Kalshi during the pendency of this litigation. (SDNY ECF 15, at 2.)

On July 7, 2026, the district court (Torres, J.) denied Kalshi's request for preliminary relief. (JA2; *see* JA23-24 (order amending decision); JA26-46 (amended decision).) The court assumed without deciding that Kalshi's sports-event contracts are swaps under the CEA (JA35) and concluded that Kalshi is nevertheless unlikely to succeed on the merits of its preemption challenge (JA32, 43). In so doing, the court squarely rejected Kalshi's arguments that the CEA expressly or impliedly preempts "New York's authority to regulate gambling where a DCM, like Kalshi offers sports-event contracts." (JA35; *see* JA32-43.)

With respect to express preemption (JA34-36), the district court acknowledged that the CEA's grant of "exclusive jurisdiction" to the CFTC preempts concurrent state regulation over some "areas of derivative trading." (JA35.) However, the court concluded that the statutory text does not clearly set forth "the scope of that preemption," and thus declined to hold that § 2(a)(1)(A) expressly preempts States from enforcing generally applicable gaming laws. (JA35-36.)

The district court further rejected Kalshi's argument that Congress intended to occupy the field of all trading that occurs on DCMs. (JA36-39.) The court found that multiple provisions of the CEA—for example, § 2(a)(1)(A)'s savings clauses and the Special Rule—embody "an affirmative intent to preserve state laws." (JA37 (quotation marks omitted).)

The district court found no conflict preemption for similar reasons. (JA39-43.) As the court explained, "nothing prevent[s] Kalshi from obtaining a license pursuant to New York law" and complying with the CEA. (JA40.) The court also found that application of state gaming laws is consistent with Congress's "objectives underpinning the CEA" because "the CEA leaves room for states to regulate tangential issues that may arise from trading swaps and other financial products on DCMs." (JA41).

The district court further held that the remaining preliminary injunction factors weigh decisively against the grant of preliminary relief. In particular, the court concluded that Kalshi's "largely monetary" harms are not irreparable (JA43-44 (quotation marks omitted), whereas the State has a substantial, sovereign interest "in regulating gaming in New York" (JA45). The district court therefore held that harms to the State and the

public interest "heavily outweigh" Kalshi's asserted interests in a preliminary injunction. (JA45.)

Kalshi appealed the district court's denial of preliminary relief (JA47), and moved for an injunction pending appeal (JA75; CA2 ECF 27). The district court denied Kalshi's motion, concluding that Kalshi had failed to point to "any unusual or compelling circumstances" justifying its requested relief (JA337-338), whereas defendants had "laid out significant harms associated with halting their efforts to enforce state gaming regulations" (JA339). This Court denied Kalshi's request for interim relief pending adjudication of its motion for an injunction pending appeal (CA2 ECF 32), and scheduled oral argument on the motion for November 3, 2026 (CA2 ECF 60).[8]

---

[8] After this Court denied Kalshi's request for interim relief, the Gaming Commission issued Kalshi investigatory subpoenas to ascertain the extent of Kalshi's violation of New York gaming law. *See* CA2 ECF 38.2, 38.3. On October 22, 2026, the Gaming Commission filed a state court special proceeding to enforce these subpoenas after months of noncompliance from Kalshi. *See* Verified Pet. ¶ 5, *Matter of New York State Gaming Comm'n v. Kalshi, Inc.*, Index No. 454547/2026 (Sup. Ct. N.Y. Cnty.), NYSCEF 1. On October 29, the state court signed the Commission's order to show cause and set a schedule for briefing and oral argument. *See* Order, *Matter of N.Y. State Gaming Comm'n v. Kalshi, Inc.*, Index No. 454547/2026 (Sup. Ct. N.Y. Cnty.), NYSCEF 22.

## STANDARD OF REVIEW

This Court reviews the district court's denial of a preliminary injunction for abuse of discretion. *See Resource Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024). An abuse occurs "when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quotation marks omitted).

## SUMMARY OF ARGUMENT

The Court should affirm the district court's denial of a preliminary injunction.

I. Kalshi is not entitled to a preliminary injunction because it has failed to make a clear showing that the sports-event contracts it offers are swaps governed by the CEA.

A. On appeal, Kalshi chiefly argues that its contracts are swaps because payment is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The contracts offered on Kalshi's platform fail to meet two aspects of this statutory definition.

*First*, Kalshi's contracts do not turn on the "occurrence, nonoccurrence, or the extent of the occurrence of *an event*." *Id.* (emphasis added). Instead, the contracts turn on the occurrence of outcomes, such as the number of home runs hit by a specific player or the number of corner kicks recorded in a particular game. No ordinary speaker would refer to these outcomes as events. "[B]ecause the statutory definition of swap uses both event and occurrence, these words should have independent meaning to avoid rendering one term superfluous." *Assad*, 190 F.4th at 1112.

*Second*, even if Kalshi's contracts involved events, those purported events are not "associated with . . . potential financial, economic, or commercial consequence[s]." 7 U.S.C. § 1a(47)(A)(ii). As the Sixth Circuit and Ninth Circuits have both held, the CEA is "best read as requiring that the event be one inherently associated with" such consequences, rather than one that has merely "potential downstream consequences." *Schuler*, 2026 WL 2884087, at *11 (quotation marks omitted); *see Assad*, 190 F.4th at 1115-16. While a rise in interest rates could be an event associated with inherent economic consequences, whether Jalen Brunson scores thirty or more points in a particular game is not.

Kalshi's contrary arguments are inconsistent with the purposes and structure of the CEA. Even more problematically, Kalshi's "overbroad swap definition would likely cover all sorts of commonplace gambling activity that does not currently occur on federally regulated exchanges" and has long been regulated under state law. *Schuler*, 2026 WL 2884087, at *14.

B. Kalshi also misses the mark in arguing that § 2(a)(1)(A) of the CEA applies to any contract traded on a DCM. That a contract is traded on a DCM is a necessary, but not sufficient, condition for application of this provision because the statute gives the CFTC "exclusive jurisdiction" only over certain enumerated transactions. *Assad*, 190 F.4th at 1111. If Kalshi cannot show that its contracts are what it self-certified to the CFTC—i.e., swaps—then its argument must fail.

II. Alternatively, even assuming that Kalshi's sports wagers are properly regarded as swaps, the district court correctly denied Kalshi's motion for a preliminary injunction because Kalshi failed to show that the CEA clearly preempts application of New York gaming law.

A. Kalshi is incorrect that § 2(a)(1)(A) of the CEA expressly preempts New York's sports gambling law merely because the CEA grants the CFTC "exclusive jurisdiction" over swaps traded on a DCM. Section 2(a) lacks

the textual hallmarks of an express preemption provision and, regardless, does not clearly indicate that the CEA displaces state gaming laws. The lack of congressional intent to preempt state law is especially clear because Congress granted the CFTC authority over swaps to address the root causes of the 2008 financial crisis, not to confer the CFTC sole authority to regulate sports gambling on DCMs.

B. Kalshi's arguments about field preemption are even further afield. For one thing, New York's gaming law is plainly aimed at the field of gambling regulation, *not* trading on DCMs. More fundamentally, the CEA's text and regulatory scheme expressly authorize concurrent state enforcement over at least *some* on-DCM trading, thus fatally undermining Kalshi's assertion that Congress intended to oust all state regulation that touches on this field.

Kalshi also fails to establish any irreconcilable conflict between state and federal law. Although Kalshi points to the CFTC's recent order directing Kalshi to ignore New York law, that order cannot give rise to conflict preemption when it is based entirely on an erroneous view of the CFTC's jurisdiction. Nor does New York's gaming law frustrate the CEA's purpose of consolidating futures regulation under the CFTC. Existing

federal law in fact prohibits sports betting on DCMs. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii); 17 C.F.R. § 40.11(a).

C. Kalshi's aggressive theory of preemption also raises a host of doctrinal problems. Among other things, Kalshi's reading of the CEA violates basic federalism principles and would impliedly repeal several federal antigambling laws.

III. The district court properly concluded that the remaining preliminary injunction factors also weigh strongly in favor of the Gaming Commission.

Although Kalshi claims that it faces a "Hobson's choice" between incurring monetary penalties for violating New York law or losing its DCM status if it complies, none of its asserted harms is irreparable. Any civil fines that could be imposed by the Gaming Commission against Kalshi could be reversed if Kalshi ultimately prevails in this litigation. And Kalshi's fear of CFTC sanction based on withdrawal of sport wagers from the New York market is entirely speculative given that Kalshi has already withdrawn from several other States because of adverse court decisions yet continues to operate with the CFTC's blessing.

By contrast, granting Kalshi's request for a preliminary injunction would substantially harm the State and its residents. An injunction would permit Kalshi to continue offering sports betting to underage New Yorkers and to disregard the State's robust gaming regulations.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain such relief, the moving party must typically establish that it is likely to succeed on the merits; that it would suffer irreparable harm absent preliminary relief; and that the balance of equities and public interest weigh in its favor. *See id.* at 20. A "more rigorous" standard applies, however, when "the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme." *New York State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2025) (quotation marks omitted). Under such circumstances, the Court may grant the requested relief only if the moving party demonstrates "a clear or substantial likelihood of success on the merits." *Id.* (quotation marks omitted).

Here, the district court correctly concluded that Kalshi's preemption claim fails this heightened likelihood-of-success standard. And the court

was equally correct in holding that the remaining equitable factors weigh decisively against barring the Gaming Commission from enforcing New York's gaming laws during the pendency of this litigation. Accordingly, this Court should affirm the district court's denial of Kalshi's request for a preliminary injunction.

## POINT I

### SPORTS WAGERS ARE NOT FINANCIAL INSTRUMENTS SUBJECT TO THE COMMODITY EXCHANGE ACT (CEA)

### A. Kalshi's Sports-Event Contracts Do Not Satisfy the Statutory Definition of "Swap"

The purpose of the CEA is to regulate transactions that "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). To that end, the statute sets forth an enumerated list of transactions that are subject to the CFTC's "exclusive jurisdiction", namely, "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery." *Id.* § 2(a)(1)(A). Kalshi's chief argument on this appeal is that its sports-event contracts are "transactions involving swaps." Opening Br. for KalshiEX LLC (Br.) 41-49.

Section 1a(47)(A) contains a six-part definition of the term "swap." Three of the parts list specific financial instruments (e.g., "a cross-currency rate swap"). 7 U.S.C. § 1a(47)(A)(iii)(V); *see id.* § 1a(47)(A)(i), (v). Two other parts cover any contract "that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv), or any contract "that is any combination or permutation" of other types of swaps defined in the statute, *id.* § 1a(47)(A)(vi). Kalshi primarily relies on the remaining part, which defines "swap" to include contracts that "provide[] for any purchase, sale, payment, or delivery" that is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[9] *Id.* § 1a(47)(A)(ii).

---

[9] Kalshi and the CFTC briefly suggest that "event contracts independently qualify as swaps" because they are "known to the trade as swaps" now that DCMs have self-certified such contracts as swaps. CFTC Amicus Br. 26-27 (citing 7 U.S.C. § 1a(47)(A)(iv)); *see* Br. 41, 45. Kalshi did not raise this argument below, and it is therefore waived. *See Booking v. General Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir. 2001).

In any event, the argument is wrong. The purpose of this definitional subpart was "to ensure that new forms of swaps were regulable as soon as they emerged, without requiring Congress to amend the Act." *See Schuler*, 2026 WL 2884087, at *13. It is implausible that this prophylactic provision was intended to allow regulated parties to transform any transaction into a swap merely by calling it one.

Kalshi's sports-related contracts are not swaps for two independent reasons. *First*, Kalshi's contracts do not depend on the "occurrence, nonoccurrence, or ... extent" of an "event or contingency." *See id.* § 1a(47)(A)(ii). Rather, the contracts turn on the subsidiary "outcomes" of sporting events, such as whether a team wins a particular game by more than a certain number of points. *Second*, even if the contracts did turn on events or contingencies, they are not ones "associated with" economic consequences within the meaning of the CEA. Kalshi's arguments to the contrary are inconsistent with the text, structure, and purposes of the CEA and, if accepted, would result in numerous absurdities.[10]

---

[10] The clear weight of authority from other courts has concluded that sports-event contracts are not "swaps" within the meaning of the CEA. *See, e.g.*, *Schuler*, 2026 WL 2884087, at *8-18; *Assad*, 190 F.4th at 1111-20; *KalshiEX LLC v. Cafferelli*, No. 3:25-cv-2016, 2026 WL 2294589, at *6-10 (D. Conn. Aug. 10, 2026); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1026-1032 (D. Nev. 2025); *North Am. Derivatives Exch. Inc. v. Nevada on Rel. of Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1179-1186 (D. Nev. 2025); *KalshiEX LLC v. Bird*, No. 2:26-cv-00109, 2026 WL 2691009, at *10-11 (S.D. Iowa Sept. 8, 2026); *Coinbase Fin. Mkts., Inc. v. Nessel*, No. 25-14092, 2026 WL 2295184, at *7-10 (E.D. Mich. Aug. 7, 2026); *United States v. Wisconsin*, No. 26-C-749, 2026 WL 2474512, at *9-11 (E.D. Wis. July 29, 2026); *QCX LLC v. Nessel*, No. 1:26-cv-710, 2026 WL 1895958, at *2-10 (W.D. Mich. June 17, 2026); *but see KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227-228 (3d Cir. 2026); *United States v. Minnesota*, No. 26-cv-2661, 2026 WL 2150211, at *12-13 (D. Minn. July 27, 2026); *KalshiEX, LLC v. Johnson*, 832 F. Supp. 3d 954, 961-63 (D. Ariz. 2026).

#### 1. Kalshi's contracts turn on the occurrence of outcomes, not events.

When interpreting a statute, courts do not read statutory phrases "in isolation" or based "on the broadest imaginable definitions of [their] component words." *See Dubin v. United States*, 599 U.S. 110, 120 (2023) (quotation marks omitted). Instead, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989). Thus, the Court must "attempt to give effect to the plain meaning of each word," *Associates Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016) (quotation marks omitted).

As noted above, the relevant definition of "swap" requires that payment be "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event." In such circumstances, courts typically "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (alteration and quotation marks omitted).

However, Kalshi errs in suggesting that dictionaries alone can resolve the interpretive question presented here. *See* Br. 62. Even though "definitions for both occurrence and event refer to a happening and are often referred to as synonyms, Congress chose different words for occurrence and event in the definition of a swap," and that choice must be given some meaning. *North Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1182 (D. Nev. 2025); *see also Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.")

The best way to understand the CEA's distinct uses of "occurrence" and "event" is to interpret the statute as being "concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event."[11] *KalshiEX LLC v. Cafferelli*, No. 3:25-

---

[11] While the Sixth Circuit was correct to read "occurrence" as qualifying whether an event "happened, did not happen, or only partially happened," *Schuler*, 2026 WL 2884087, at *9, that reading gives no independent meaning to the term "event." In other words, reading "occurrence" to modify "event" does not at all justify treating the "Giants winning the Super Bowl," *id.*, as an event, rather than treating the Super Bowl itself as the event.

cv-2016, 2026 WL 2294589, at *7 (D. Conn. Aug. 10, 2026). Such a reading is most consistent with common usage in the sports-wagering context. After all, people generally "do not refer to whether the Dodgers win the World Series, or how many touchdowns Fernando Mendoza might throw in a game, or how many points BYU Football will win by as an 'event.'" *Assad*, 190 F.4th at 1112. Similarly, the October 30 game between the Knicks and the Sixers might be an "event," but whether the Sixers score more than 112.5 points and whether Karl-Anthony Towns has more than eight rebounds are "outcomes" that could not reasonably be deemed to be "events." *See* Addendum 26-27.

**2. Kalshi's contracts do not turn on events "associated with a potential financial, economic, or commercial consequence."**

Even if Kalshi's sports-related contracts were construed to involve the occurrence of "events," they would still not be "swaps" within the meaning of the CEA, because any such events are not inherently "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). To "associate" means to "connect [something] with something else in one's mind," *The New Oxford American Dictionary* 95

(2d ed. 2005), when they are "closely related," *see Merriam-Webster's Collegiate Dictionary* 75 (11th ed. 2003).

Currency exchange rates, prices of natural resources, and the occurrence of natural disasters, for example, are "associated with" financial consequences that traders may wish to hedge against. The margin of victory of a particular college basketball game or whether an NBA player blocks two or more shots in a particular game has no direct economic consequences other than the wager itself. Such outcomes certainly have no impact on financial markets. And Kalshi has never even attempted to advance an explanation for how its custom multileg parlays of individual statistical propositions across different sports could plausibly have any direct economic consequences.

Both the Sixth and Ninth Circuits have interpreted the term "associated with" in the CEA to require a close causal showing. In *Schuler*, for example, the Sixth Circuit explained that, given the text, structure, and overall purposes of the CEA, "[t]he best reading of the statute thus requires that the qualifying event be inherently associated with a 'potential financial, economic, or commercial consequence,' such that it would be common understanding that hedging financial risk or

deriving pricing information for that event would be beneficial and would promote market stability." 2026 WL 2884087, at *11 (quoting *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025)). And, as the court further explained, "[a]n event will be inherently associated with a financial consequence if it itself has such a consequence without looking at externalities like potential downstream consequences." *Id.* (quotation marks omitted). The Ninth Circuit in *Assad* likewise noted that "reading 'associated with' narrowly is supported by the surrounding statutory language" because "the other subparts of the definition of 'swap' refer 'almost exclusively to financial measures, indices, or instruments.'" 190 F.4th at 1116 (quoting *Hendrick*, 817 F. Supp. at 1027).

Kalshi, on the other hand, offers no workable definition of "associated with." Instead, it argues that "to 'associate' with means 'to join or connect together,' or 'to bring together or into relationship in any of various intangible ways.'" Br. 42 (quoting *Merriam-Webster's Collegiate Dictionary*, *supra*). Under that definition, Kalshi suggests that the events at issue in its contracts "have financial consequences for sponsors that pay performance bonuses, advertisers with a financial stake in who performs well, television networks that benefit from high viewership, [and] local busi-

nesses that profit from team wins." *Id.* 43-44. But Kalshi fails to explain how the specific outcomes at issue in their contracts have any direct bearing on any of those financial consequences. If it is enough to merely hypothesize downstream economic consequences from the extent of a particular occurrence, then Kalshi's reading of the statute is so expansive that no possible bet related to any large industry could fail to be a swap. In other words, Kalshi's "definition is so broad that it is meaningless." *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 11 (2026) (quotation marks omitted).

Acknowledging this problem, Kalshi admits that a "DCM cannot list contracts involving events with potential financial consequences that are too attenuated, remote, or speculative to establish the requisite association," such as "the winner of a coin flip" or "the color of a Gatorade shower" (Br. 46), neither of which meets New York's statutory definition of "sports wagering" in any event, *see* Racing Law § 1367(1)(x). But Kalshi offers numerous contracts about outcomes that are at least as attenuated from any economic consequence. Having acknowledged that the term "associated with" requires a close causal connection, Kalshi offers no coherent distinction between the bets it claims would satisfy its

definition of "associated with" and those it does not.[12] Indeed, as the Sixth Circuit explained, "Kalshi's reading of the statute *would* encompass a Gatorade-shower contract because it is conceivable that if a yellow Gatorade shower were broadcast, sales for that flavor would increase. It is also conceivable that if sales of yellow Gatorade increased, athletes sponsored by Gatorade might incur financial benefits." *Schuler*, 2026 WL 2884087, at *11 (emphasis added).

Kalshi fares no better when suggesting that bettors use its platform to hedge commercial risk. *See* Br. 44-45. Even if that is true, such conduct would merely constitute bootstrapping gaming risk onto itself, not hedging inherent economic risk. As one court put it, "[w]hether both the Giants and Broncos happen to win on a given weekend may have no independent financial, economic, or commercial consequence at all, apart from its significance to participants in Kalshi's market and others who have wagered on that particular combination of outcomes." *Cafferelli*, 2026 WL 2294589,

---

[12] Similarly, Kalshi offers no workable definition of sports-event contracts that would fail to meet the definition of swap due to being "readily susceptible to manipulation." Br. 49 (quotation marks omitted). Indeed, sports leagues have complained about Kalshi's proposition wagers precisely because they are susceptible to manipulation. (*See, e.g.*, JA286-87.)

at *8. In other words, "sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed." *Assad*, 190 F.4th at 1114.

In any event, even if some unusual and discrete sports-event outcomes could hypothetically have "inherent" financial consequences (Br. 43-45), Kalshi fails to explain how that speculative possibility warrants its requested injunctive relief precluding the application of New York's gaming law to *all* of its sports related contracts. (*See* JA110-111.) Kalshi previously disclaimed that the proper interpretation of "swap" turns on any "factual question" about the financial consequences of particular sporting outcomes. (JA318.) Having done so, Kalshi cannot point to a slew of extra-record "facts" on appeal to justify its proposed reading. *See United States v. Mangano*, 128 F.4th 442, 466 (2d Cir. 2025) (party cannot raise argument on appeal that is contrary to previous concession).

Finally, Kalshi misses the mark in arguing (Br. 62) that a swap need not turn on any event associated with *inherent* financial consequence because the definition requires only that the underlying event be "associated with *potential* financial . . . consequence," 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). The term "'potential' is better understood as modifying

'consequence,' not 'associated with'—meaning the financial consequence need not actually come to fruition, but it still must be inherently associated with the event." *Schuler*, 2026 WL 2884087, at *11.

### 3. Kalshi's position is inconsistent with the purposes of the CEA and would result in absurdities.

In addition to failing as a textual matter, Kalshi's proposed definition of "swap" does not cohere with the CEA's overall structure and purposes. "[A] statute's meaning does not always turn solely on the broadest imaginable definitions of its component words." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (quotation marks omitted). Instead, "[l]inguistic and statutory context also matter." *Id.* Kalshi's reading of § 1a(47)(A)(ii) suffers from several fatal flaws.

*First*, Kalshi's expansive interpretations of "event" and "associated with" would sweep in virtually every plausible transaction, leaving the remaining parts of the CEA's definition of "swap" with no function. *See* 7 U.S.C. § 1a(47)(A)(i)-(vi). And Kalshi's boundless interpretations would make one part of the definition of "swap" broadly applicable across subject matters, in stark contrast to the remainder of the statute, which "refers almost exclusively to financial measures, indices, or instruments." *Coinbase*

*Fin. Mkts., Inc. v. Nessel*, No. 25-14092, 2026 WL 2295184, at *9 (E.D. Mich. Aug. 7, 2026) (quotation marks omitted); *see also Schuler*, 2026 WL 2884087, at *12-13.

*Second*, and relatedly, "Kalshi's reading would give the CFTC jurisdiction over event contracts that bear no relation to the goals Congress had in mind." *Schuler*, 2026 WL 2884087, at *14. The purpose of the CEA is to provide a regulatory framework for transactions that "are entered into regularly in interstate and international commerce" and affect "a national public interest" because they provide "a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). Sports bets do not share these features of traditional derivatives trades; rather, they are consumer transactions that people enter into primarily for personal entertainment purposes. Congress did not mention gaming in the CEA's definition of "swaps," and the legislative record nowhere evidences a discussion of legalizing sports bets as swaps. To the contrary, Congress added the Special Rule to ensure that gambling does not occur on CFTC-regulated DCMs. *See* 156 Cong. Rec. 13173 (2010) (colloquy between Sens. Feinstein and Lincoln explaining that sports-related event contracts should not be on DCMs because they

"would not serve any real commercial purpose" and "would be used solely for gambling").

Kalshi distorts the text and purpose of the Special Rule by insisting that it "expressly recognizes" event contracts involving gaming are swaps. *See* Br. 42. That is wrong, because the Special Rule is not limited to "swaps"; it also applies to "agreements, contracts, [and] transactions." 7 U.S.C. § 7a-2(c)(5)(C)(i). More fundamentally, the Special Rule allows the CFTC to prohibit trading in contracts that are "contrary to the public interest," including those that involve criminal activity, terrorism, assassination, war, or gaming. *Id.* Kalshi's contention (Br. 45) that such transactions are presumptively permitted unless and until expressly prohibited by the CFTC makes no sense as a textual or policy matter. And as the Ninth Circuit noted, "Kalshi's self-certification and listing of [sports-event] contracts is unlawful" under the Special Rule and the currently operative CFTC regulations. *Assad*, 190 F.4th at 1116.

*Third*, Kalshi's reading contravenes the settled principle that "Congress does not normally intrude upon the police power of the States." *See Bond v. United States*, 572 U.S. 844, 863 (2014). State gaming laws are a core exercise of the States' police powers. *See Ah Sin*, 198 U.S. at

505-06. Kalshi therefore errs in urging the Court to adopt a reading of "swap" that would "convert an astonishing amount of" state-regulated gambling into "a matter for federal enforcement," *Bond*, 572 U.S. at 863 (quotation marks omitted); *see also West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (applying major questions doctrine to claims of "[e]xtraordinary" regulatory authority). Kalshi's expansive reading of "swap" is particularly implausible given that "Congress has spoken on gambling repeatedly, deliberately, and specifically," *see Assad*, 190 F.4th at 1112, including in federal criminal statutes that expressly prohibit conduct that is unlawful under state gaming law. See *supra* at 6 n.1 (citing examples). Thus, had Congress intended to federalize some (or all) of sports betting, it would have done so expressly, not via a definitional provision of a commodities exchange law. *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

*Finally*, the necessary consequences of Kalshi's position are extreme insofar as its proposed statutory construction would "attach criminal penalties to a breathtaking amount of commonplace [gambling] activity." *Schuler*, 2026 WL 2884087, at *14 (quotation marks omitted). The CEA

makes it generally "unlawful for any person . . . to enter into a swap unless the swap is entered into on" a federally regulated DCM. 7 U.S.C. § 2(e). Thus, any sports bet that meets Kalshi's proposed definition of "swap" would have to take place on a DCM, a conclusion that "would likely encompass virtually every kind of wager that could exist, including classic casino games and charity raffles."[13] *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 233 (3d Cir. 2026) (Roth, J., dissenting).

In an effort to shield Kalshi from the consequences of its reading, the CFTC recently promulgated an interim final rule that purports to clarify that certain "casino-style gambling products" are not swaps. *See* 91 Fed. Reg. at 65969. The various distinctions between "casino-style" products and sports-related event contracts identified by the CFTC are completely atextual. *See, e.g.*, 91 Fed. Reg. at 65973-74. As the Ninth Circuit observed, for example, "[t]he CEA's definition of swap does not exclude a 'contract, agreement, or transaction' if the counterparty is a

---

[13] Kalshi's argument that "tradability" is a limiting principle on its definition of a swap misses the mark. *See* Br. 46-47. Nothing in the text of § 1a(47)(A) requires swaps to be tradeable. And, indeed, the CEA itself recognizes that eligible contract participants—largely financial institutions, 7 U.S.C. § 1a(18)—can enter into certain "swaps" outside of a DCM. *See id.* § 2(e).

casino or sportsbook." *Assad*, 190 F.4th at 1114. An agency's interpretation of a statute lacks persuasive force where, as here, it "misinterprets and misapplies the law." *Siren Retail Corp. v. NLRB*, 190 F.4th 114, 121 (2d Cir. 2026). The CFTC's analysis is therefore entitled to no weight by this Court and does not cure the absurdities inherent to Kalshi's statutory construction.

### B. Kalshi Is Wrong to Argue that States Lack Authority to Regulate Any Contracts Traded on a Designated Contract Market (DCM).

Kalshi's backup argument—that any contract traded on a DCM is subject to the CFTC's exclusive jurisdiction under the CEA—is simply wrong as a textual matter. According to Kalshi, "[t]he CEA broadly preempts all trading that occurs on a DCM" because the term "agreement" in § 2(a)(1)(A) covers *all* contracts traded on a DCM. Br. 40-41; *see also id.* at 61; Paradigm Operations LP Amicus Br. 19 ("[I]f it's traded on a CFTC-exchange, it's exempt from state regulation.").

But that is not what the CEA says. Section 2(a)(1)(A) applies "with respect to accounts, agreements . . . , and transactions involving swaps" and other enumerated transactions. 7 U.S.C. § 2(a)(1)(A). Contrary to Kalshi's assertion, the requirement that a traded instrument "involv[e]

swaps" applies equally to "agreements" as it does to "transactions," *id.*, because the last-antecedent rule has no application where, like here, "the modifying clause appears after an integrated list," *see Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 (2021). A contrary reading would drastically expand the CFTC's exclusive jurisdiction to cover *all* "agreements" and "accounts" traded on a DCM without any indication that Congress so intended. *See Schuler*, 2026 WL 2884087, at *16-17 (rejecting Kalshi's last-antecedent argument). Therefore, in order to invoke the CEA as a basis for preemption, Kalshi must affirmatively show that its sports-event contracts are "swaps" in accordance with its self-certification (*see* JA325-329, 331).

Kalshi also misses the mark in arguing that New York must instead challenge the CFTC's inaction with respect to Kalshi's contracts as a prerequisite to enforcing its sports gambling laws. *See* Br. 61. "[T]he party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013). More fundamentally, the Gaming Commission does not need permission from a federal agency to enforce state law, nor is it seeking to "attack[] the CFTC's action or inaction" in listing any

particular contract on a DCM. *See Assad*, 190 F.4th at 1109. In any event, federal courts—and not the CFTC—have the "duty" to "say what the law is"—here, by determining whether Kalshi's sports-event contracts are in fact swaps within the meaning of the CEA. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803*); see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024).

## POINT II

### EVEN IF THE CEA APPLIED, IT WOULD NOT PREEMPT THE APPLICATION OF NEW YORK'S GAMING LAWS TO KALSHI

Even if this Court were to conclude that some (or all) of Kalshi's "sports-event contracts" could qualify as "swaps" for purposes of the CEA, the Court must nevertheless affirm the denial of preliminary relief because Kalshi has failed to establish a clear likelihood that the CEA preempts the application of state gaming law to its conduct.

Where, as here, a party claims that federal law preempts a traditional area of state regulation (gaming), this Court must "start with the assumption" that state law is not superseded unless "that was the clear and

manifest purpose of Congress."[14] *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation marks omitted). This presumption applies with particular force when it comes to sports betting—a controversial, multibillion-dollar industry that "each State is free to" regulate. *See Murphy*, 584 U.S. at 486.

Although Kalshi and its amici spend the bulk of their briefs discussing the CEA's pre-2010 history (*see* Br. 8-15, 35-37, 50, 58; *see also* CFTC Amicus Br. 13-14; Paradigm Operations LP Amicus Br. 4-16), the derivatives at issue in this case—swaps—were not added to § 2(a)(1)(A) of the CEA until the Dodd-Frank Wall Street Reform Act of 2010. There is no indication whatsoever that Congress intended to create a federal sports betting industry on DCMs when it brought swaps under the CFTC's regulatory jurisdiction in 2010. *See New York SMSA Ltd. P'ship v. Town*

---

[14] Kalshi's attempts to avoid the presumption against preemption are wholly unavailing. *See* Br. 55. When "the text of a pre-emption clause is susceptible of more than one plausible reading," courts must "ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quotation marks omitted). Thus, even assuming that § 2(a)(1)(A) is an express preemption clause (and it is not, see *infra* at 51-55), the presumption against preemption applies because "the pre-emptive force of the text is ambiguous," *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025). See *infra* at 51-57.

*of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (per curiam) ("The key to the preemption inquiry is the intent of Congress.").

As explained above (at 11-12), Congress enacted the Dodd-Frank Act to address the root causes of the 2008 financial crisis, including the boom in unregulated, over-the-counter trading of credit default swaps. It is improbable that Congress would have intended—or even foreseen—that its inclusion of swaps in the CFTC's regulatory jurisdiction would empower the agency to legalize sports betting nationwide and strip States of their historic police powers to regulate such gambling. Indeed, "[a]t the time Dodd-Frank was enacted," sports betting was "largely prohibited" by federal law. *See Schuler*, 2026 WL 2884087, at *3.

Against this backdrop, Kalshi's arguments in favor of express and implied preemption must fail, as courts around the country have squarely held.[15]

---

[15] *See, e.g.*, *Schuler*, 2026 WL 2884087, at *16-27; *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 676-86 (D. Md. 2025); *Cafferelli*, 2026 WL 2294589, at *11-14; *Coinbase Fin. Mkts., Inc. v. Tong*, No. 3:25-cv-2121, 2026 WL 2294602, at *14-17 (D. Conn. Aug. 10, 2026); *KalshiEX LLC v. Cox*, No. 2:26-cv-151, 2026 WL 2241564, at *7-13 (D. Utah Aug. 4, 2026); *Bird*, 2026 WL 2691009, at *8-13; *Wisconsin*, 2026 WL 2474512, at *11-13; *Coinbase Fin. Mkts., Inc. v. Nessel*, 2026 WL 2295184, at *10-15; *QCX LLC*

*(continued on the next page)*

### A. The CEA Does Not Expressly Preempt State Gaming Laws.

Kalshi makes no attempt to engage with Congress's "purpose" in enacting the Dodd-Frank Act—the "ultimate touchstone" of the preemption inquiry, *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted). Instead, Kalshi insists that the text of the CEA, divorced from its statutory context, expressly preempts New York gaming law because § 2(a)(1)(A) confers on the CFTC "exclusive jurisdiction . . . with respect to . . . swaps . . . traded or executed on a [DCM]." *See* Br. 33 (quotation marks omitted). That argument is meritless.

#### 1. Section 2(a)'s use of "exclusive jurisdiction" does not have express preemptive effect.

As an initial matter, Kalshi is incorrect in asserting that, by granting the CFTC "exclusive jurisdiction" over swaps traded on a DCM, the CEA unambiguously superseded state law. *See* Br. 33. The text of § 2(a)(1)(A) demonstrates that "the provision's focus is on delineating responsibility among regulatory bodies . . . not on preempting state law." *Schuler*, 2026

---

*v. Nessel*, 2026 WL 1895958, at *9-13; *Commonwealth v. KalshiEX LLC*, No. 2584-cv-2525, 2026 WL 188019, at *4-8 (Mass. Super. Ct. Jan. 20, 2026); *but see Flaherty*, 172 F.4th at 228-31; *Minnesota*, 2026 WL 2150211, at *14-15; *Johnson*, 832 F. Supp. 3d at 963-66.

WL 2884087, at *21. In particular, the provision cross-references several CEA provisions that delineate the jurisdictional boundary between the CFTC and other federal regulators. *See* 7 U.S.C. § 2(a)(1)(A) (referencing, inter alia, § 2(a)(1)(C)(i), (C)(iii), and (D)(i)). Courts have therefore repeatedly recognized that the primary purpose of the "exclusive jurisdiction" provision was to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch*, 456 U.S. at 386; *see FTC v. Ken Roberts Co.*, 276 F3.d 583, 588 (D.C. Cir. 2001) (observing Congress's "aim" was to "'avoid unnecessary, overlapping and duplicative regulation,' especially as between the [SEC] and the new CFTC" (quoting 120 Cong. Rec. H34736 (Oct. 9, 1974)).

Because "exclusive jurisdiction" so often relates to the relationship between different regulators, federal statutes containing an "exclusive jurisdiction" provision commonly employ separate express preemption language when Congress intends to displace state law. For example, when Congress granted the Secretary of Interior "exclusive jurisdiction" over surface coal mining operations upon adopting a federal plan, 30 U.S.C. § 1254(a), it additionally specified that conflicting state laws are "preempted and superseded by the Federal program," *id.* § 1254(g). Simi-

lar provisions abound elsewhere. *See, e.g.*, 15 U.S.C. §§ 78aa(a), 78bb(a)(3) (conferring federal courts exclusive jurisdiction in § 78aa(a) while separately preempting state law in § 78bb(a)(3)); 49 U.S.C. § 10501(b) (specifying that the Surface Transportation Board's jurisdiction "is exclusive" *and* that the statutory remedies "preempt the remedies provided under . . . State law").

Importantly, the CEA itself contains several express preemption clauses that, unlike § 2(a), explicitly set forth the scope of displaced state regulation. Two of these provisions, for example, expressly preempt the application of state gaming law in limited circumstances. *See* 7 U.S.C. § 16(e)(2) (providing that CEA "shall supersede and preempt the application of" any state law that "regulates gaming or the operation of bucket shops" as to a discrete set of transactions); *id.* § 27(f)(b) (same, as to a specific category of hybrid instruments). And one provision specifically addresses swaps. *See id.* § 16(h) (declaring that swaps "may not be regulated as an insurance contract under the law of any State"). Congress's repeated choice to use traditional express preemption language in the CEA strongly suggests that it "did *not* expressly preempt state gaming law in

§ 2(a), because Congress knew how to draft an express preemption provision but chose not to." *Schuler*, 2026 WL 2884087, at *20 (emphasis added).

None of Kalshi's cited authorities (Br. 34) stands for the proposition that the words "exclusive jurisdiction" standing alone have talismanic power to preempt state law. In *New York & Atlantic Railway Co. v. Surface Transportation Board*, for example, the Court found express preemption only where the statute had explicitly stated that the agency's jurisdiction "is exclusive *and* preempts other law." 635 F.3d 66, 72 (2d Cir. 2011) (emphasis added). Similarly, in *Rice v. Santa Fe Elevator Corp.*, the Court concluded that the agency's "exclusive jurisdiction" superseded the application of state law based on the statute's "special and peculiar history," which unequivocally indicated Congress's preemptive intent. *See* 331 U.S. 218, 232-34 (1947).[16] These cases thus establish that Congress's grant of "exclusive jurisdiction" to an agency *can* preempt the application of state

[16] Kalshi's other cited authorities are wholly inapposite. Two of the cases dealt with the jurisdiction of the courts—not preemption of state law. *See Transcontinental Gas Pipe Line Co. v. Pennsylvania Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024); *Slaney v. International Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001). The remaining case did not address a statute with "exclusive jurisdiction" language at all. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154 (2016) (discussing 16 U.S.C. § 824).

law where Congress has clearly said so. They do not hold that the words "exclusive jurisdiction," alone, suffice to displace state law.

### 2. At most, any express preemption under Section 2(a) is limited to state laws that directly regulate the licensing and operation of DCMs.

Even if this Court were to conclude that § 2(a) has some express preemptive force, "it does not immediately end the inquiry." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). The Court must still ascertain "the substance and scope of Congress' displacement of state law." *Id.* As the district court correctly concluded (JA35-43), several features of the CEA's text and structure, including its two savings clauses, counsel against reading § 2(a) to displace all state laws that touch upon transactions that occur on DCMs, no matter how incidental such regulation is with respect to the matters within the CFTC's exclusive jurisdiction.

The first savings clause in § 2(a) expressly preserves the "jurisdiction" of state regulators as well their ability to "carry[ ] out their duties and responsibilities" under state law, "[e]xcept as hereinabove" limited by the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). The second clause declares (without reservation) that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of . . . any State." *Id.* The

meaning of these savings clauses is clear: "[J]urisdiction conferred on . . . State courts," and "regulatory authorities under the laws of . . . any State are retained." 120 Cong. Rec. 35000 (1974) (statement of Sen. Humphrey).

As the Sixth Circuit explained, the savings clauses in § 2(a) establish that "the CFTC's 'exclusive jurisdiction' was not meant to extend to every exercise of regulatory authority that might affect transactions on a DCM."[17] *See Schuler*, 2026 WL 2884087, at *21. Indeed, "the separation of 'jurisdiction' from other 'duties and responsibilities'" in the first savings clause means that the two are not coextensive. *Id.* Therefore, even if the CFTC's "exclusive jurisdiction" over swaps traded on DCMs displaces concurrent state "jurisdiction" over these instruments, state regulators nevertheless

[17] The Ninth Circuit erred in concluding otherwise based on its view that the CFTC's "exclusive jurisdiction" plainly and unambiguously displaces all state laws that touch upon swaps traded on a DCM. *See Assad*, 190 F.4th at 1110 (pointing to plain meaning of "exclusive"). For that reason, the court also declined to apply the presumption against preemption. *Id.* But, as explained (at 51-57), the plain meaning of "exclusive jurisdiction" is ambiguous, particularly when viewed in light of § 2(a)(1)(A)'s savings clauses and the CEA's other express preemption provisions. The Ninth Circuit failed to meaningfully grapple with these features and, instead, erroneously assumed that if § 2(a)(1)(A) has *some* preemptive effect, the scope of preemption must necessarily capture sports gambling laws. *See Assad*, 190 F.4th at 110.

remain free to perform *some* "duties and responsibilities" that touch on swaps. Otherwise, "there would have been no need to include a separate clause protecting agencies' ability to perform those 'duties and responsibilities.'" *Id.*

The Sixth Circuit's reading of § 2(a)(1)(A) makes sense when the statute is properly considered the statute as a whole. As Kalshi's brief confirms (*see* Br. 17-18), the CEA's regulatory scheme focuses on the licensing and operation of DCMs. The "jurisdiction" of the CFTC must therefore be construed as encompassing these matters. And the "exclusive" nature of this jurisdiction thus preempts at most the application of those state laws that encroach on that jurisdiction—i.e., laws that "directly regulate the licensure and operation of transactions on DCMs." *See Schuler*, 2026 WL 2884087, at *22; *cf. American Agric. Movement, Inc. v. Board of Trade of City of Chi.*, 977 F.2d 1147, 1155-56 (7th Cir. 1992) (interpreting § 2(a)(1)(A) to preempt only state laws that affect the "actual operation of the commodity futures markets"). State licensing of entities to operate gambling platforms is a different matter, involving gambling regulations that New York State, as a sovereign, is entitled to establish.

Kalshi misses the mark in pointing to § 2(a)'s savings clause and the CEA's other express preemption provisions as evidence supporting its expansive theory of preemption. *See* Br. 35, 38. The presence of these features generally *refutes* broad preemption, not the other way around. Indeed, the very presence of savings clauses "negates the inference that Congress left no room for state causes of action." *See International Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (quotation marks omitted).

In any event, the cited provisions do not remotely support Kalshi's asserted *scope* of preemption. For example, Kalshi points to language in § 2(a)(1)(A)'s first savings clause that preserves state regulatory authority "[e]xcept as hereinabove provided" and suggests that this phrase "reinforc[es] that state laws as to on-DCM transactions *are* superseded." Br. 35. But nothing about this language suggests that the scope of the CFTC's "exclusive jurisdiction" encompasses *all* on-DCM transactions or that the CFTC's jurisdiction should be broadly read to supersede any and all state law that these transactions run into.

The same flawed reasoning underlies Kalshi's arguments about § 16 of the CEA. According to Kalshi, both § 16(e)(1)(B)(i), which expressly *preserves* the application of state law to certain off-DCM transactions, and

§ 16(e)(2), which expressly *displaces* the application of state gaming law to certain transactions that the CEA also excludes from the CFTC's purview, imply that "Congress *did* intend preemption as to on-DCM transactions." *See* Br. 37; *see id.* at 36-38. But that does not follow. Section 16(e)(1)(B)(i) says nothing at all about which laws States are barred from applying to instruments traded on a DCM. Moreover, § 16(e)(2) simply exempts particular instruments from *both* federal and state regulation; it makes no distinction between on- versus off-exchange instruments.

Kalshi is also incorrect to argue (Br. 38-39) that courts have purportedly recognized that § 2(a)(1)(A) expressly supersedes even those state laws that only incidentally touch upon CFTC-licensed markets. For example, this Court's decision in *Leist v. Simplot* did not analyze preemption at all and instead addressed whether the CEA authorizes a private cause of action. *See* 638 F.2d 283, 322 (2d Cir. 1980); *see also Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (addressing jurisdictional boundary between CFTC and SEC). Kalshi's remaining cases in fact support the Gaming Commission's argument that § 2(a)(1)(A) at most preempts applications of state law that are directly "inconsistent with [the CEA's] provisions." *Rasmussen v. Thomson & McKinnon*

*Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam). *See also American Agric. Movement, Inc.*, 977 F.2d at 1155-56 (concluding that § 2(a)(1)(A) may at most give rise to conflict preemption); *cf. United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) (emphasizing that CEA does not preempt complementary state "antifraud statutes").

**3. Kalshi misplaces its reliance on pre-2010 legislative history and the CFTC's interpretation of its own authority.**

Kalshi also errs in relying extensively on legislative history in support of its express preemption argument. *See* Br. 8-17, 35-39. Although resort to history may be appropriate when the statutory text is ambiguous, *see Bostock v. Clayton County*, 590 U.S. 644, 656-57 (2020), any ambiguity here would counsel dispositively in favor of *preserving* the State's traditional authority over gambling. See *infra* at 70-71, 74.

The cited legislative materials do not support Kalshi's claim, in any event. Most predate the Dodd-Frank Act by decades and thus offer little insight into what Congress intended when it gave the CFTC jurisdiction to regulate swaps in 2010. More fundamentally, Kalshi's compilation of cherry-picked statements and a single law review article "only tells half the story." *Coinbase Fin. Mkts. v. Nessel*, 2026 WL 2295184, at *13; *see*

*also KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 684 n.5 (D. Md. 2025) (rejecting Kalshi's reliance on same statements and reports).

A fair account shows that, to the extent Congress sought to preempt state law, it was specifically concerned about laws that directly conflict with the federal scheme. *See, e.g.*, 120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis focusing on state laws "contrary to or inconsistent with Federal law"). Thus, when properly viewed as a whole, the statutory history is entirely consistent with reading the CEA to preempt at most state laws that directly impinge on the licensing and operation of DCMs as such, and not generally applicable sports betting laws that are nowhere mentioned in the statute's pre-2010 history.

Kalshi also misses the mark in urging this Court to "account for" the CFTC's own interpretation of its "exclusive jurisdiction." *See* Br. 39. The agency has "no special competence" in "the business of statutory interpretation." *Loper Bright Enters.*, 603 U.S. at 400. And here, "abdication in favor of the agency is *least* appropriate" because the dispute centers on "the scope of an agency's own power." *Id.* at 401. The Court should therefore be skeptical of—not deferential to—the CFTC's claims of expansive jurisdiction, especially given the agency's previous position that it lacks the

statutory mandate to regulate gaming, 89 Fed. Reg. at 48982-83. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987).

## B. The CEA Does Not Impliedly Preempt State Gaming Laws.

### 1. New York's gaming laws are not field preempted.

The doctrine of field preemption applies in "rare" circumstances when "Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quotation marks omitted). To identify the relevant field, this Court must "consider[ ] the target at which the state law aims." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015); *see Garcia*, 589 U.S. at 208.

Here, the state law at issue—the Racing Law—is aimed at ensuring appropriate regulation over a variety of gaming matters, including responsible gambling. To that end, Racing Law §§ 1367 and 1367-a set forth a comprehensive regulatory framework for sports wagering, including licensing requirements for gambling operators, self-exclusion mechanisms for bettors, and other measures to protect the public. See *supra* at 7-9. Such matters fall squarely within the State's longstanding authority to regulate gambling, and there is no indication that Congress intended

to oust States from this field. Indeed, federal law generally "defer[s] to, and even promote[s], differing gambling policies in different States." *Greater New Orleans Broad. Ass'n*, 527 U.S. at 187. See *supra* at 6. And the Supreme Court has expressly recognized (after Congress gave the CFTC "exclusive jurisdiction" over swaps) that "each State is free to act" concerning sports gambling. *Murphy*, 584 U.S. at 486.

Regardless, Kalshi is wrong even as to its own characterization of the relevant field: "trading on DCMs." *See* Br. 50. Contrary to Kalshi's contention, neither the CEA's text nor its structure suggests that Congress intended to categorically bar States from enforcing generally applicable state laws that in any way affect trading on DCMs.

*First*, Kalshi is simply mistaken that the CEA confers on the CFTC exclusive jurisdiction over all on-DCM trading. *See id.* 50-51. As the Ninth Circuit observed, Congress in fact "declined to grant exclusive jurisdiction to all on-DCM transactions, as illustrated by 'spot contracts,' which can be traded on DCMs but are not subject to the CFTC's exclusive jurisdiction under § 2(a)." *Assad*, 190 F.4th at 1111. Moreover, Kalshi's own rulebook "contemplates that state law will, in at least some instances, be properly applied to on-DCM trades" because Kalshi requires any lawsuits its users

file against the company to be "governed by New York law." *Schuler*, 2026 WL 2884087, at *22. These examples fatally undermine Kalshi's assertion that the CEA occupies the entire field of on-DCM trading.

*Second*, Kalshi (again) errs in relying on § 2(a)(1)(A)'s plain text. *See* Br. 50. As explained above (at 56-57), the best reading of the CFTC's "exclusive jurisdiction" provision is that, at most, it preempts *direct* state regulation of licensing and operation of DCMs as commodities exchanges. In other words, a State could not impose an additional requirement to act as a DCM that is not found in the CEA; licensure of a DCM is within the "exclusive jurisdiction" of the CFTC. The CEA, though, does not clearly and unambiguously displace the application of any state law that just so happens to touch upon a CFTC-licensed market.

*Third*, Kalshi's arguments about the CFTC's "comprehensive regulatory structure" fare no better. *See* Br. 51 (quotation marks omitted). Far from leaving States "no room" to supplement the CFTC's regulation of trading on DCMs, *id.* (quotation marks omitted), the CEA "expressly contemplates state involvement in its scheme." *See Schuler*, 2026 WL 2884087, at *24. For example, Congress authorized States to bring enforcement actions for certain violations of the CEA. *See* 7 U.S.C. § 13a-2(1).

And the statute also preserves the authority of state regulators to "proceed[] in State court on the basis of an alleged violation of" the State's "general civil or criminal antifraud" laws—including for violations arising out of on-DCM transactions. *See id.* § 13a-2(7). If Congress had intended to oust States from the field of regulating derivatives trading, it would not have affirmatively authorized States to exercise such concurrent enforcement authority. *Schuler*, 2026 WL 2884087, at *24.

Moreover, the CEA expressly incorporates state law, rendering field preemption particularly implausible. *See Martin*, 793 F. Supp. 3d at 680. Specifically, the Special Rule authorizes the CFTC to disallow event contracts that "involve . . . activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). The plain text thus "clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680. Indeed, the fact that the "Special Rule expressly contemplates the CFTC looking to state law to determine whether to prohibit certain contracts indicates that Congress envisioned a role for the states in this process." *Schuler*, 2026 WL 2884087, at *27.

*Finally*, Kalshi cites a single remark in a 1974 Conference Report that supposedly "eliminates any doubt about field preemption." *See* Br. 50. But that lone statement is wholly insufficient to establish that the CEA actually "preempt[s] the field." H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.). Preemption must be "grounded in the text and structure of the statute at issue." *Garcia*, 589 U.S. at 208 (quotation marks omitted). And here, the CEA's text expressly provides avenues for concurrent state regulation of derivative instruments. Thus, other courts carefully examining this history have squarely held that the CEA at most preempts only *some* state law, and not the entire field of derivatives trading. *American Agric. Movement, Inc.*, 977 F.2d at 1155-56; *see also Martin*, 793 F. Supp. 3d at 677 (rejecting Kalshi's reliance on same history).

**2. New York's gaming laws do not create an impermissible conflict with federal law.**

Conflict preemption exists where "it is impossible for a party to comply with both" federal and state law, or where the state law is "an obstacle to the achievement of federal objectives." *Figueroa v. Foster*, 864 F.3d 222, 228 (2d Cir. 2017) (quotation marks omitted). Neither theory of conflict preemption applies here.

***Impossibility preemption.*** Kalshi principally claims impossibility because the CFTC has instructed the company to disregard the New York Attorney General's pending enforcement action. *See* Br. 52. But the CFTC's extraordinary instruction to a regulated party to ignore state law cannot itself create a conflict. It is well settled that "a federal agency may preempt state law only when and if it is acting within the scope of its congressionally delegated authority." *New York State Telecomms. Ass'n v. James*, 101 F.4th 135, 155 (2d Cir. 2024) (quotation marks omitted). Preemption "cannot be the mere byproduct of self-made agency policy." *Id.* at 157 (quotation marks omitted); *see Wyeth*, 555 U.S. at 576 (same). In other words, Kalshi is wrong to argue that the CFTC can unilaterally manufacture conflict preemption by simply purporting to oust state authority. *See* Br. 52. The question remains whether the agency's actions are authorized by statute. *See Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019). For the reasons explained above, the CEA does not authorize the CFTC either to legalize sports-betting contracts or to displace States from regulating them.

Kalshi is equally incorrect to contend (Br. 53) that it is impossible to comply with New York's requirement to ensure "that authorized sports

bettors are physically located within the state," Racing Law § 1367-a(4)(a)(ii), and its federal obligation to provide "impartial access to its markets and services," 17 C.F.R. § 38.151(b). The Sixth Circuit rejected exactly the same argument in *Schuler*, 2026 WL 2884087, at *25-26. As the court explained, other DCMs have in fact "complied with both the federal impartial-access requirement and [similar] state sports-gaming laws by using geofencing." *Id.* at *26. Kalshi could do the same.[18]

In any event, Kalshi misapprehends the import of the federal impartial-access requirement. The stated purpose is to bar exchanges from using "discriminatory access requirements as a competitive tool against certain participants"—e.g., from discriminating against participants based on economic means. *See* 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010). Kalshi cites no authority—aside from the CFTC's argument in an amicus brief—to suggest that DCMs must operate in all fifty States or that any

---

[18] Tellingly, the CFTC has taken no action to date against Kalshi, even though the company has withdrawn from a number of States pursuant to court orders. *See* SDNY ECF 98-1 (Nevada); SDNY ECF 112-1 (Michigan); SDNY ECF 112-2 (Washington). Indeed, the CFTC's own regulation contemplates that DCMs may be able to list certain event contracts in some States but not others, depending on whether the underlying activity is permitted under state law. *See* 17 C.F.R. § 40.11(a)(1).

*geographical* restrictions are discriminatory. *See* Br. 53-54; *see also* CFTC Amicus Br. 18. Even the Third Circuit, which found that the CEA preempts state gaming law, did not endorse this novel reading, *see Flaherty*, 172 F.4th at 230-31, and court after court has rejected it, *see Schuler*, 2026 WL 2884087, at *26; *Assad*, 190 F.4th at 1120-21.[19]

***Obstacle preemption.*** This Court has declined to find a state law preempted on a theory of obstacle preemption unless "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quotation marks omitted). Here, Kalshi claims that allowing the New York Gaming Commission to regulate sports bets on Kalshi's platform would frustrate Congress's goal of consolidating all regulation of DCMs under the CFTC. *See* Br. 52. But that argument incorrectly presumes that Congress intended to displace even the application of *state gaming laws* to DCMs.

---

[19] *See also Martin*, 793 F. Supp. 3d at 686; *Cafferelli*, 2026 WL 2294589, at *13; *Cox*, 2026 WL 2241564, at *11-12; *Wisconsin*, 2026 WL 2474512, at *13.

Moreover, applying New York's gaming laws complements, rather than "subverts," the federal scheme. *See* Br. 52. Whereas "[t]he CEA and the CFTC's Core Principles seek to address the efficient functioning of derivatives and futures markets," *Martin*, 793 F. Supp. 3d at 686, New York's Racing Law is focused on ensuring that bettors and operators in New York engage in responsible gaming and adhere to state policy with respect to a variety of other matters. *See* Racing Law §§ 1367, 1367-a. The two regulatory regimes can readily operate in tandem because they address entirely different purposes. To the extent the CEA addresses gaming at all, the Special Rule and the CFTC's existing regulations work together to categorically *prohibit* the listing of gaming contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11(a).

There is likewise no merit to Kalshi's assertion that the Gaming Commission's enforcement of state gaming law would interfere with "Congress's chosen method of enforcement." *See* Br. 54 (quotation marks omitted). Kalshi contends that the Special Rule gives "the CFTC, and only the CFTC, authority to prohibit [gaming] contracts." *Id.* But the text of the Special Rule provides only that the CFTC "may determine" the listing of gaming contracts should be prohibited, 7 U.S.C. § 7a-2(c)(5)(C),

nowhere does it give the CFTC the *sole* discretion to do so, *see Schuler*, 2026 WL 2884087, at *27. Thus, as the Sixth Circuit recognized, enforcement of state gaming law and the CFTC's exercise of its authority under the Special Rule can readily coexist, with the Special Rule serving as "a backstop, supplying an additional review mechanism for" gaming contracts. *Schuler*, 2026 WL 2884087, at *27.

### C. Kalshi's Arguments in Favor of Preemption Present Numerous Doctrinal Problems.

This Court should also reject Kalshi's arguments in support of preemption because its reading of the CEA flouts basic federalism principles and contravenes multiple canons of interpretation.

*First,* construing the Dodd-Frank Act to give the CFTC exclusive authority to regulate sports gambling on DCMs would have "vast economic and political" consequences, *see Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (quotation marks omitted), and upend the "usual constitutional balance of federal and state powers" over gambling, *see Bond,* 572 U.S. at 858-59 (quotation marks omitted). Indeed, sports betting on DCMs is a multibillion-dollar industry that is roughly

"on par" with legal sportsbooks.[20] Following the Supreme Court's decision in *Murphy*, state officials, legislatures, and residents engaged in extensive debates about the industry's desirability and legality. As the Supreme Court envisioned, different States reached different conclusions about whether they wished to permit sports betting in their jurisdictions and how they wished to regulate such activity. Under the federalism canon and major questions doctrine, only an exceptionally clear statement of congressional intent can displace the distinct judgments made by different States in favor of a single federal approach.[21]

Nothing in the text, history, or purposes of the Dodd-Frank Act supplies this requisite clear statement. Although Congress authorized the CFTC to regulate swaps by adding the instrument to the CFTC's "exclusive jurisdiction," *see* 7 U.S.C. § 2(a)(1)(A), Congress did not enact an express

---

[20] *See* Kaitlyn Radde, *Prediction Markets' Trading Volume Doubled Between May and July, Largely Driven by Sports*, Pew Research Ctr. (Sept. 23, 2026).

[21] Although the CFTC has sought to disclaim any jurisdiction to regulate traditional sportsbooks, 91 Fed. Reg. at 65979, Kalshi's reading of the CEA would nevertheless transfer a large swath of existing state gambling authority to the CFTC because New York law has long defined gambling and sports wagering to include sports bets in any form. *See* Penal Law § 225.00; Racing Law § 1367(1)(x).

preemption provision to explicitly displace the application of state gaming law to such instruments. See *supra* at 51-55. This absence is striking given that Dodd-Frank explicitly superseded the application of state gaming laws to certain security-based swaps, which it added to the SEC's jurisdiction. *See* 15 U.S.C. § 78bb(a)(3). Thus, if Congress had sought to preempt the application of state gaming law to swaps regulated by the CFTC, it knew how to do so, and surely would have said so, expressly.

*Second*, Kalshi's reading of the CEA would also impliedly repeal several federal laws. For example, the Wire Act generally criminalizes the interstate transmission of bets or wagers on sporting events. *See* 18 U.S.C. § 1084(a). And the Illegal Gambling Business Act makes it unlawful to operate a "gambling business" in "violation of the law of the State . . . in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Under Kalshi's view, however, DCMs could offer sports betting to customers wherever they are—effectively nullifying these laws—so long as the sports bets are styled

as "swaps."[22] There is a strong presumption against such repeals by implication. *See Epic Sys. Corp.*, 584 U.S. at 510.

*Third*, the presumption against preemption counsels dispositively against reading the CFTC's "exclusive jurisdiction" over swaps in § 2(a)(1)(A), to displace the application of state gaming law. As explained (at 51-57), the preemptive scope of § 2(a) is, at best, ambiguous. Thus, under binding precedent, this Court must "resolve that ambiguity against preemption." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025); *see Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (applying presumption to ambiguous express preemption provision).

---

[22] Kalshi errs in suggesting that the Unlawful Internet Gambling Enforcement Act (UIGEA) exempts trading on DCMs from federal antigambling laws. *See* Br. 38. The UIGEA generally restricts use of the interstate financial system to facilitate bets or wagers, and Congress made clear that nothing in that law "alter[s]" or "limit[s]" other federal or state laws "regulating gambling within the United States." *See* 31 U.S.C. § 5361(b).

# POINT III

## The Remaining Preliminary Injunction Factors Also Weigh Heavily Against Kalshi

### A. Kalshi Identifies No Irreparable Injury in the Absence of a Preliminary Injunction.

To establish irreparable harm warranting preliminary relief, "the moving party must show an injury that is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr. v. American Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quotation marks omitted). The district correctly determined that none of Kalshi's asserted harms suffice, a holding that provides an alternative basis to affirm the denial of Kalshi's motion. (*See* JA43-44.)

To start, any civil penalties that the Gaming Commission may impose on Kalshi do not constitute irreparable harm because Kalshi can challenge and vacate such fines if it ultimately succeeds in this action. *See* C.P.L.R. 7803, 7806 (providing for judicial review and vacatur of unlawful agency determinations). Nor can Kalshi rely on penalties sought by the New York Attorney General in a separate enforcement action as support for a preliminary injunction against officials of the Gaming Commission. *See*

Br. 66. As defendants have repeatedly explained, the Attorney General and Gaming Commission are separate state entities. And, critically, the Attorney General is not a defendant in this case. The preliminary injunction Kalshi that seeks in this case could not direct the Attorney General to pause her separate civil enforcement proceedings. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (federal courts "may enjoin named defendants from taking specified unlawful actions," but cannot "purport to enjoin challenged laws themselves" (quotation marks omitted)).

Kalshi's self-serving assertions of fear that it may be sanctioned by the CFTC if it chooses to comply with New York law are likewise insufficient to warrant preliminary injunctive relief. *See* Br. 66-67. Kalshi could operate a DCM *and* comply with state licensing requirements for gambling operators; "it just refuses to do so and instead seeks a competitive advantage over its competitors," *Assad*, 190 F.4th at 1121.

Even if Kalshi were required to withdraw its sports wagers from the New York market, it has failed to establish that doing so would jeopardize its standing with the CFTC. Indeed, the CFTC has taken no action against Kalshi for withdrawing from other States (e.g., Michigan), even though

the agency issued an order directing Kalshi to continue operating there.[23] And even the CFTC's order concerning Kalshi's operations in New York threatens no penalties if Kalshi were to withdraw its sports wagers from the State. *See* CA2 ECF 39.1, at 3. To the extent Kalshi offered sports-event contracts before clearly establishing its legal ability to do so, any harms from the need to cease such conduct "is largely self-inflicted" and "severely undermines a claim for equitable relief." *See Assad*, 190 F.4th at 1122 (quotation marks omitted).

Finally, Kalshi's asserted monetary injuries and reputational harms in the absence of a preliminary injunction are likewise speculative and do not justify preliminary relief. The company has adduced no evidence suggesting that its claimed losses from exiting the New York market will threaten the "very viability of [its] business." *See Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). To the contrary, Kalshi continues to operate successfully despite being currently enjoined from offering its sports-event contracts in multiple States.

---

[23] *See* Order at 5, 7-9, *In re KalshiEX LLC's Notice Regarding Market Emergency Declaration*, CFTC (July 14, 2026).

Kalshi's asserted loss of goodwill is equally unavailing. Given that Kalshi has already been ordered to exit from multiple States, these reputational harms have already accrued. Moreover, Kalshi has been on notice of the Gaming Commission's position for more than a year, and has therefore had ample time to prepare itself, its partners, and its customers for potentially withdrawing from the New York market. Thus, any fallout from the company's refusal to do so is simply further evidence of Kalshi's "self-inflicted" harm. *See Hirschfeld v. Board of Elections*, 984 F.2d 35, 40 (2d Cir. 1993); *Assad*, 190 F.4th at 1122.

### B. The Balance of Equities and Public Interest Favor the Gaming Commission.

By contrast, an order enjoining the Gaming Commission from enforcing state gaming laws during the pendency of this litigation would result in significant harms to the State and its residents. (*See* JA44-45.)

*First*, a preliminary injunction would be particularly harmful to young New Yorkers, who are at high risk for gambling addiction. (*See* JA249.) For example, a recent study of New York college students reported that some students are so addicted to gambling that they have resorted

to using financial aid funds to support their gambling addiction.[24] With an injunction in place, Kalshi could continue offering sports betting illegally to eighteen-to-twenty-year-olds, and it would be free to operate without complying with any of the State's numerous requirements on gambling operators, including age-verification controls, advertising restrictions, and problem gambling measures. See *supra* at 7-9 (describing various requirements).

Adult consumers are likewise harmed by Kalshi's unregulated offering of sports gambling; indeed, several New York residents have already sued Kalshi for "enabl[ing] addictive gambling behavior" by "enticing them to gamble with 'free' money" and targeting them with advertisements by "a variety of influencers." *See* Consolidated Compl. ¶¶ 149, 152, *In re Kalshi Sports Prediction Mkt. Litig.*, No. 1:25-cv-8585 (S.D.N.Y. Apr. 7, 2026), ECF 47; *see also id.* ¶¶ 19, 24, 26-27, 36, 154. Kalshi chiefly insists that regulatory oversight is unnecessary because the company's voluntary measures are sufficient to protect consumers. Br. 68-69. That argument is meritless because Kalshi's measures fall short of the

---

[24] *See* Alexander MacDougall, *Sports Gambling Is Everywhere. Is It Harming Young Adults?*, Times Union (Oct. 4, 2026).

comprehensive protections set forth in state law, are unenforceable, and can be rescinded by Kalshi at any time.

*Second*, Kalshi's continued expansion of proposition-betting (often wagers on an individual player's performance) poses substantial risks to the integrity of sports in New York, especially college sports. (*See* JA258-260, 270-272, 278-284 (reporting recent player scandals and widespread industry concern).) Despite the fact that New York strictly prohibits gambling on any New York–based college sports teams, and the Gaming Commission does not allow proposition-betting on college players, Kalshi routinely lists such wagers and thereby flouts New York's policy choices designed to maintain integrity in sports.

*Third*, allowing Kalshi to offer sports gambling in violation of state law would embolden others to copy its unlawful playbook. Three DCMs have already followed Kalshi's lead in suing the Gaming Commission,[25] and the CFTC currently lists more than thirty active DCMs.[26] A preliminary injunction in favor of Kalshi could result in these DCMs flooding New

---

[25] *See North Am. Derivatives Exch., Inc. v. James*, No. 1:26-cv-4980 (S.D.N.Y.); *Ludlow Exch., LLC v. James,* No. 1:26-cv-6676 (S.D.N.Y.); *QCX LLC v. James,* No. 1:26-cv-8345 (S.D.N.Y.).

[26] *See* CFTC, *Designated Contract Markets (DCM): Search Tool*.

York with unlicensed and unregulated sports betting during the pendency of this litigation. A preliminary injunction could also incentivize licensed operators to switch to Kalshi's model, thus depriving the State of potentially more than a billion dollars in revenue for funding public education and gambling-addiction treatment.[27] (*See* JA149.)

*Finally*, a preliminary injunction would "clearly inflict[ ] irreparable harm" on the State's sovereign interests. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). A State is irreparably injured "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by the representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted). That injury is particularly acute here, given that New Yorkers have carefully chosen to legalize only limited forms of gambling, subject to a suite of stringent regulations. Kalshi's requested relief would allow it to ignore these vital protections and would empower other sports gambling operators to do the same by simply styling their wagers as "sports-event contracts."

---

[27] *See* Contessa Brewer, *DraftKings Acquires Predictions Platform Railbird*, CNBC (Oct. 21, 2025) (reporting that licensed operator DraftKings has acquired a DCM to launch its own prediction market).

## CONCLUSION

This Court should affirm the district court's denial of Kalshi's motion for a preliminary injunction.

Dated: New York, New York
October 30, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees

By: */s/ Grace X. Zhou*
GRACE X. ZHOU
Senior Assistant Solicitor General

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
GRACE X. ZHOU
*Senior Assistant Solicitor General*
*of Counsel*

28 Liberty Street
New York, New York 10005
(212) 416-6160

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Cynthia Yue, an employee in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 16,318 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1 as enlarged by court order.

*/s/ Cynthia Yue*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

McKinney's Penal Law § 225.00
Gambling offenses; definitions of terms ............................................................1

McKinney's Racing, Pari-Mutuel Wagering & Breeding Law § 1367
Sports wagering.......................................................................................................6

McKinney's Racing, Pari-Mutuel Wagering and Breeding Law § 1367-a
Mobile sports wagering ........................................................................... 18

Kalshi.com website:
New York Knicks vs Philadelphia 76ers Odds & Predictions (Oct. 30, 2026) ... 25

**McKinney's Penal Law § 225.00**
**Gambling offenses; definitions of terms**

The following definitions are applicable to this article:

1. "Contest of chance" means any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein.

2. "Gambling." A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

3. "Player" means a person who engages in any form of gambling solely as a contestant or bettor, without receiving or becoming entitled to receive any profit therefrom other than personal gambling winnings, and without otherwise rendering any material assistance to the establishment, conduct or operation of the particular gambling activity. A person who gambles at a social game of chance on equal terms with the other participants therein does not otherwise render material assistance to the establishment, conduct or operation thereof by performing, without fee or remuneration, acts directed toward the arrangement or facilitation of the game, such as inviting persons to play, permitting the use of premises therefor and supplying cards or other equipment used therein. A person who engages in "bookmaking", as defined in this section is not a "player."

4. "Advance gambling activity." A person "advances gambling activity" when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation. One advances gambling activity when, having substantial proprietary or other authoritative control over premises being used with his knowledge for purposes of gambling activity, he permits such to occur or continue or makes no effort to prevent its occurrence or continuation.

5. "Profit from gambling activity." A person "profits from gambling activity" when, other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity.

6. "Something of value" means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

7. "Gambling device" means any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine. Notwithstanding the foregoing, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices.

7-a. A "coin operated gambling device" means a gambling device which operates as a result of the insertion of something of value. A device designed, constructed or readily adaptable or convertible for such use is a coin operated gambling device notwithstanding the fact that it may require adjustment, manipulation or repair in order to operate as such. A machine which awards free or extended play is not a gambling device merely because such free or extended play may constitute something of value provided that the outcome depends upon the skill of the player and not in a material degree upon an element of chance.

8. "Slot machine" means a gambling device which, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such manner that, depending upon elements of chance, it may eject something of value. A device so constructed, or readily adaptable or convertible to such use, is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because, apart from its use or adaptability as such, it may also sell or deliver something of value on a basis other than chance. A machine which sells items of merchandise which are of equivalent value, is not a slot machine merely because such items differ from each other in composition, size, shape or color.

9. "Bookmaking" means advancing gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcomes of future contingent events.

10. "Lottery" means an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value provided, however, that in no event shall the provisions of this subdivision be construed to include a raffle as such term is defined in subdivision three-b of section one hundred eighty-six of the general municipal law.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

11. “Policy” or “the numbers game” means a form of lottery in which the winning chances or plays are not determined upon the basis of a drawing or other act on the part of persons conducting or connected with the scheme, but upon the basis of the outcome or outcomes of a future contingent event or events otherwise unrelated to the particular scheme.

12. “Unlawful” means not specifically authorized by law.

13. “Authorized gaming establishment” means any structure, structure and adjacent or attached structure, or grounds adjacent to a structure in which casino gaming, conducted pursuant to article thirteen of the racing, pari-mutuel wagering and breeding law, or Class III gaming, as authorized pursuant to a compact reached between the state of New York and a federally recognized Indian nation or tribe under the federal Indian Gaming Regulatory Act of 1988, is conducted and shall include all public and non-public areas of any such building, except for such areas of a building where either Class I or II gaming are conducted or any building or grounds known as a video gaming entertainment facility, including facilities where food and drink are served, as well as those areas not normally open to the public, such as where records related to video lottery gaming operations are kept, except shall not include the racetracks or such areas where such video lottery gaming operations or facilities do not take place or exist, such as racetrack areas or fairgrounds which are wholly unrelated to video lottery gaming operations, pursuant to section sixteen hundred seventeen-a and paragraph five of subdivision a of section sixteen hundred twelve of the tax law, as amended and implemented.

14. “Authorized gaming operator” means an enterprise or business entity authorized by state or federal law to operate casino or video lottery gaming.

15. “Casino gaming” means games authorized to be played pursuant to a license granted under article thirteen of the racing, pari-mutuel wagering and breeding law or by federally recognized Indian nations or tribes pursuant to a gaming compact reached in accordance with the federal Indian Gaming Regulatory Act of 1988, Pub. L. 100-497, 102 Stat. 2467, codified at 25 U.S.C. §§ 2701-21 and 18 U.S.C. §§ 1166-68.

16. “Cash equivalent” means a treasury check, a travelers check, wire transfer of funds, transfer check, money order, certified check, cashiers check, payroll check, a check drawn on the account of the authorized gaming operator payable to the patron or to the authorized gaming establishment, a promotional coupon, promotional chip, promotional cheque, promotional token, or a voucher recording cash drawn against a credit card or charge card.

17. “Cheques” or “chips” or “tokens” means nonmetal, metal or partly metal representatives of value, redeemable for cash or cash equivalent, and issued and sold by an authorized casino operator for use at an authorized gaming establishment. The value of such cheques or chips or tokens shall be considered

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

equivalent in value to the cash or cash equivalent exchanged for such cheques or chips or tokens upon purchase or redemption.

18. “Class I gaming” and “Class II gaming” means those forms of gaming that are not Class III gaming, as defined in subsection eight of section four of the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2703.

19. “Class III gaming” means those forms of gaming that are not Class I or Class II gaming, as defined in subsections six and seven of section four of the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2703 and those games enumerated in the Appendix of a gaming compact.

20. “Compact” or “gaming compact” means the agreement between a federally recognized Indian tribe and the state of New York regarding Class III gaming activities entered into pursuant to the federal Indian Gaming Regulatory Act, Pub. L. 100-497, 102 Stat. 2467, codified at 25 U.S.C. §§ 2701-21 and 18 U.S.C. §§ 1166-68 (1988 & Supp. II).

21. “Gaming equipment or device” means any machine or device which is specially designed or manufactured for use in the operation of any Class III or video lottery game.

22. “Gaming regulatory authority” means, with respect to any authorized gaming establishment on Indian lands, territory or reservation, the Indian nation or tribal gaming commission, its authorized officers, agents and representatives acting in their official capacities or such other agency of a nation or tribe as the nation or tribe may designate as the agency responsible for the regulation of Class III gaming, jointly with the state gaming agency, conducted pursuant to a gaming compact between the nation or tribe and the state of New York, or with respect to any casino gaming authorized pursuant to article thirteen of the racing, pari-mutuel wagering and breeding law or video lottery gaming conducted pursuant to section sixteen hundred seventeen-a and paragraph five of subdivision a of section sixteen hundred twelve of the tax law, as amended and implemented.

23. “Premises” includes any structure, parking lot, building, vehicle, watercraft, and any real property.

24. “Sell” means to sell, exchange, give or dispose of to another.

25. “State gaming agency” shall mean the New York state gaming commission, its authorized officials, agents, and representatives acting in their official capacities as the regulatory agency of the state which has responsibility for regulation with respect to video lottery gaming or casino gaming.

26. “Unfair gaming equipment” means loaded dice, marked cards, substituted cards or dice, or fixed roulette wheels or other gaming equipment which has been altered in a way that tends to deceive or tends to alter the elements of chance or normal

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

random selection which determine the result of the game or outcome, or the amount or frequency of the payment in a game.

27. "Unlawful gaming property" means:

(a) any device, not prescribed for use in casinio[1] gaming by its rules, which is capable of assisting a player:

(i) to calculate any probabilities material to the outcome of a contest of chance; or

(ii) to receive or transmit information material to the outcome of a contest of chance; or

(b) any object or article which, by virtue of its size, shape or any other quality, is capable of being used in casino gaming as an improper substitute for a genuine chip, cheque, token, betting coupon, debit instrument, voucher or other instrument or indicia of value; or

(c) any unfair gaming equipment.

28. "Video lottery gaming" has the meaning set forth in subdivision six of section sixteen hundred two of the tax law.

29. "Voucher" means an instrument of value generated by a video lottery terminal representing a monetary amount and/or play value owed to a customer at a specific video lottery terminal based on video lottery gaming winnings and/or amounts not wagered.

**Credits**

(L.1965, c. 1030. Amended L.1967, c. 791, § 31; L.1987, c. 632, §§ 1, 2; L.1994, c. 550, § 1; L.2011, c. 8, § 1, eff. March 25, 2011; L.2013, c. 174, § 3, eff. July 30, 2013; L.2013, c. 175, § 3, eff. July 30, 2013; L.2015, c. 59, pt. OO, § 2, eff. May 13, 2015.)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**McKinney's Racing, Pari-Mutuel Wagering and Breeding Law § 1367**
**Sports wagering**

1. As used in this section and in section thirteen hundred sixty-seven-a of this title:

(a) "Platform provider" means an entity selected by the commission to conduct mobile sports wagering pursuant to a competitive bidding process;

(b) "Authorized sports bettor" means an individual who is physically present in this state when placing a sports wager, who is not a prohibited sports bettor, and who participates in sports wagering offered by a casino or a mobile sports wagering licensee;

(c) "Casino" means a licensed gaming facility at which gambling is conducted pursuant to the provisions of this article;

(d) "Commission" means the New York state gaming commission established pursuant to section one hundred two of this chapter;

(e) "Collegiate sport or athletic event" means a sport or athletic event offered or sponsored by, or played in connection with a public or private institution that offers educational services beyond the secondary level;

(f) "Covered persons" includes: athletes; players; umpires; referees; officials; personnel associated with players, clubs, teams, leagues, and athletic associations; medical professionals, including athletic trainers, who provide services to athletes and players; and the family members of these persons;

(g) "High school sport or athletic event" means a sport or athletic event offered or sponsored by or played in connection with a public or private institution that offers education services at the secondary level;

(h) "In-play sports wager" means a sports wager placed on a sports event after the sports event has begun and before it ends;

(i) "Layoff bet" means a sports wager placed by a casino sports pool with another casino sports pool;

(j) "Minor" means any person under the age of twenty-one years;

(k) "Mobile sports wagering platform" or "platform" means the combination of hardware, software, and data networks used to manage, administer, or control sports wagering and any associated wagers accessible by any electronic means including mobile applications and internet websites accessed via a mobile device or computer;

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(l) “Mobile sports wagering operator” means a mobile sports wagering skin which has been licensed by the commission to operate a sports pool through a mobile sports wagering platform;

(m) “Mobile sports wagering licensee” means a platform provider and a mobile sports wagering operator licensed by the commission;

(n) “Operator” means a casino which has elected to operate a sports pool;

(o) “Professional sport or athletic event” means an event at which two or more persons participate in sports or athletic events and receive compensation in excess of actual expenses for their participation in such event;

(p) “Conduct potentially warranting further investigation” means any statement, action, or other communication intended to unlawfully influence, manipulate, or control a wagering outcome of a sporting contest or performance in a sporting contest in exchange for a benefit or to avoid financial or physical harm. “Conduct potentially warranting further investigation” may include, but not be limited to, statements, actions, and communications made to a covered person;

(q) “Professional sports stadium or arena” means a stadium, ballpark, or arena in which a professional sport or athletic event occurs;

(r) “Prohibited sports bettor” means:

(i) any officer or employee of the commission;

(ii) any principal or key employee of a casino, mobile sports wagering licensee, and its affiliates, except as may be permitted by the commission;

(iii) any casino gaming or non-gaming employee at the casino that employs such person and any gaming or non-gaming employee at the mobile sports wagering licensee that employs such person;

(iv) any contractor, subcontractor, or consultant, or officer or employee of a contractor, subcontractor, or consultant, of a casino or a mobile sports wagering licensee if such person is directly involved in the operation or observation of sports wagering, or the processing of sports wagering claims or payments;

(v) any person subject to a contract with the commission if such contract contains a provision prohibiting such person from participating in sports wagering;

(vi) any spouse, child, sibling or parent residing in the principal place of abode of any of the foregoing persons at the same casino or mobile sports wagering licensee where the foregoing person is prohibited from participating in sports wagering;

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(vii) any amateur or professional athlete if the sports wager is based on any sport or athletic event that the athlete participates in at such amateur or professional level;

(viii) any sports agent, owner or employee or independent contractor of a team, player and umpire union personnel, and employee referee, coach or official of a sports governing body, if the sports wager is based on any sport or athletic event overseen by the individual's sports governing body;

(ix) any individual placing a wager as an agent or proxy for another person known to be a prohibited sports bettor; or

(x) any minor.

(s) "Prohibited sports event" means a sport or athletic event in which any New York college team participates regardless of where the event takes place, or high school sport or athletic event. The following shall not be considered prohibited sports events: (i) a collegiate tournament, and (ii) a sports event within such tournament so long as no New York college team is participating in that particular sports event;

(t) "Sports event" means any professional sport or athletic event and any collegiate sport or athletic event, except a prohibited sports event;

(u) "Sports governing body" means the organization that prescribes final rules and enforces codes of conduct with respect to a sporting event and participants therein;

(v) "Sports pool" means the business of accepting wagers on any sports event by any system or method of wagering;

(w) "Sports wager" means cash or cash equivalent that is paid by an authorized sports bettor to a casino or a mobile sports wagering licensee to participate in sports wagering offered by such casino or mobile sports wagering licensee;

(x) "Sports wagering" means wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets;

(y) "Sports wagering gross revenue" means: (i) the amount equal to the total of all sports wagers not attributable to prohibited sports events that a mobile sports

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

wagering licensee collects from all sports bettors, less the total of all sums not attributable to prohibited sports events paid out as winnings to all sports bettors, however, that the total of all sums paid out as winnings to sports bettors shall not include the cash equivalent value of any merchandise or thing of value awarded as a prize;

(z) "Sports wagering lounge" means an area wherein a sports pool is operated at a casino for placement of in-person wagers;

(aa) "Unusual wagering activity" means abnormal wagering activity exhibited by patrons and deemed by the casino, the mobile sports wagering licensee, or commission pursuant to rules and regulations promulgated by the commission, as a potential indicator of suspicious activity. Abnormal wagering activity may include, but is not limited to, the size of a patron's wager or increased wagering volume on a particular event or wager type;

(bb) "Suspicious wagering activity" means unusual wagering activity that cannot be explained and is indicative of match fixing, the manipulation of an event, misuse of inside information, or other prohibited activity; and

(cc) "Independent integrity monitor" means an independent individual or entity approved by the commission to receive reports of unusual wagering activity from a casino, mobile sports wagering licensee, or commission for the purpose of assisting in identifying suspicious wagering activity.

2. (a) In addition to authorized gaming activities, a casino may operate a sports pool upon the approval of the commission and in accordance with the provisions of this section and applicable regulations promulgated pursuant to this article. The commission shall hear and decide promptly and in reasonable order all applications for a license to operate a sports pool, shall have the general responsibility for the implementation of this section and shall have all other duties specified in this section with regard to the operation of a sports pool. The license to operate a sports pool shall be in addition to any other license required to be issued to operate a casino. No license to operate a sports pool shall be issued by the commission to any entity unless it has established its financial stability, integrity and responsibility and its good character, honesty and integrity.

No later than five years after the date of the issuance of a license and every five years thereafter or within such lesser periods as the commission may direct, a licensee shall submit to the commission such documentation or information as the commission may by regulation require, to demonstrate to the satisfaction of the executive director of the commission that the licensee continues to meet the requirements of the law and regulations.

(b) A sports pool shall be operated in a sports wagering lounge located at a casino. The lounge shall conform to all requirements concerning square footage, design, equipment, security measures and related matters which the commission shall by

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

regulation prescribe. Provided, however, the commission may also approve additional locations for a sports pool within the casino, in areas that have been approved by the commission for the conduct of other gaming, to be operated in a manner and methodology as regulation shall prescribe.

(c) The operator of a sports pool shall establish or display the odds at which wagers may be placed on sports events.

(d) An operator shall accept wagers on sports events only from persons physically present in the sports wagering lounge, through mobile sports wagering offered pursuant to section thirteen hundred sixty-seven-a of this title, if such operator is also a mobile sports wagering licensee, or any additional locations for a sports pool within the casino, approved by the gaming commission. A person placing a wager shall be at least twenty-one years of age.

(e) An operator or mobile sports wagering licensee may also accept layoff bets as long as the authorized sports pool places such wagers with another authorized sports pool or pools in accordance with regulations of the commission. A sports pool that places a layoff bet shall inform the sports pool accepting the wager that the wager is being placed by a sports pool and shall disclose its identity.

(f) An operator or mobile sports wagering licensee may utilize global risk management pursuant to the approval of the commission.

(g) An operator or mobile sports wagering licensee shall not admit into the sports wagering lounge, or accept wagers from, any person whose name appears on the exclusion list.

(h) The holder of a license to operate a sports pool may contract with an entity to conduct that operation, in accordance with the regulations of the commission. That entity shall obtain a license as a casino vendor enterprise prior to the execution of any such contract, and such license shall be issued pursuant to the provisions of section one thousand three hundred twenty-seven of this article and in accordance with the regulations promulgated by the commission.

(i) If any provision of this article or its application to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of this article which can be given effect without the invalid provision or application, and to this end the provisions of this article are severable.

3. (a) All persons employed directly in wagering-related activities conducted within a sports wagering lounge shall be licensed as a casino key employee or registered as a gaming employee, as determined by the commission. All other employees who are working in the sports wagering lounge may be required to be registered, if appropriate, in accordance with regulations of the commission.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(b) Each operator of a sports pool shall designate one or more casino key employees who shall be responsible for the operation of the sports pool. At least one such casino key employee shall be on the premises whenever sports wagering is conducted.

4. Except as otherwise provided by this article, the commission shall have the authority to regulate sports pools and the conduct of sports wagering under this article to the same extent that the commission regulates other gaming. No casino or mobile sports wagering licensee shall be authorized to operate a sports pool unless it has produced information, documentation, and assurances concerning its financial background and resources, including cash reserves, that are sufficient to demonstrate that it has the financial stability, integrity, and responsibility to operate a sports pool. In developing rules and regulations applicable to sports wagering, the commission shall examine the regulations implemented in other states where sports wagering is conducted and shall, as far as practicable, adopt a similar regulatory framework. The commission shall promulgate regulations necessary to carry out the provisions of this section, including, but not limited to, regulations governing the:

(a) amount of cash reserves to be maintained by casinos and mobile sports wagering licensees to cover winning wagers;

(b) acceptance of wagers on a series of sports events;

(c) maximum wagers which may be accepted by a casino or mobile sports wagering licensee from any one patron on any one sports event;

(d) type of wagering tickets which may be used;

(e) method of issuing tickets;

(f) method of accounting to be used by casinos and mobile sports wagering licensees;

(g) types of records which shall be kept;

(h) use of credit and checks by authorized sports bettors;

(i) the process by which a casino may place a layoff bet;

(j) the use of global risk management;

(k) type of system for wagering; and

(l) protections for a person placing a wager.

5. Each casino and mobile sports wagering licensee shall adopt comprehensive house rules governing sports wagering transactions with its authorized sports bettors. The rules shall specify the amounts to be paid on winning wagers and the

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

effect of schedule changes. The house rules, together with any other information the commission deems appropriate, shall be conspicuously displayed in the sports wagering lounge and included in the terms and conditions of the account wagering system, and copies shall be made readily available to authorized sports bettors. Mobile sports wagering operators shall develop and prominently display procedures on the main page of such mobile sports wagering operator's platform for the filing of complaints by authorized sports bettors against such mobile sports wagering operator. An initial response shall be given by such mobile sports wagering operator to such bettor filing the complaint within forty-eight hours. A complete response shall be given by such mobile sports wagering operator to such bettor filing the complaint within ten business days. An authorized sports bettor may file a complaint alleging a violation of the provisions of this article with the commission.

6. (a) Each casino and mobile sports wagering operator that offers sports wagering shall annually submit a report to the commission no later than the twenty-eighth of February of each year, which shall include the following information:

(i) the total amount of sports wagers received from authorized sports bettors;

(ii) the total amount of prizes awarded to authorized sports bettors;

(iii) the total amount of sports wagering gross revenue received by the casino or mobile sports wagering operator;

(iv) the total amount of wagers received on each sports governing body's sporting events;

(v) the number of accounts held by authorized sports bettors;

(vi) the total number of new accounts established in the preceding year, as well as the total number of accounts permanently closed in the preceding year;

(vii) the total number of authorized sports bettors that requested to exclude themselves in a prior year who participated in sports wagering; and

(viii) any additional information that the commission deems necessary to carry out the provisions of this article.

(b) The commission shall annually publish a report based on the aggregate information provided by all casinos and mobile sports wagering operators pursuant to paragraph (a) of this subdivision, which shall be published on the commission's website no later than one hundred eighty days after the deadline for the submission of individual reports as specified in such paragraph (a).

7. For the privilege of conducting sports wagering in the state, casinos shall pay a tax equivalent to ten percent of their sports wagering gross gaming revenue, excluding sports wagering gross gaming revenue attributed to mobile sports wagering offered pursuant to section thirteen hundred sixty-seven-a of this title.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Platform providers shall pay a tax constituting a certain percentage of the sports wagering gross gaming revenue attributed to mobile sports wagering offered through such platform provider's platform pursuant to section thirteen hundred sixty-seven-a of this title; provided however, that such percentage shall be determined pursuant to a competitive bidding process conducted by the commission as outlined in subdivision seven of section thirteen hundred sixty-seven-a of this title; and provided further, that such percentage shall be no lower than twelve percent. When awarding a license pursuant to section thirteen hundred sixty-seven-a of this title, the commission may set graduated tax rates; provided however, that any such tax rates may not be lower than the minimum rate established in this subdivision.

8. Notwithstanding section thirteen hundred fifty-one of this article, mobile sports wagering gross gaming revenue and tax revenue shall be excluded from sports wagering gross gaming revenue and tax revenue. Mobile sports wagering tax revenue shall be separately maintained and returned to the state for deposit into the state lottery fund for education aid except as otherwise provided in this subdivision. Any interest and penalties imposed by the commission relating to those taxes, all penalties levied and collected by the commission, and the appropriate funds, cash or prizes forfeited from sports wagering shall be deposited into the state lottery fund for education. In fiscal year two thousand twenty-two, the commission shall pay into the commercial gaming fund one percent of the state tax imposed on mobile sports wagering by this section to be distributed for problem gambling education and treatment purposes pursuant to paragraph a of subdivision four of section ninety-seven-nnnn of the state finance law; provided however, that such amount shall be equal to six million dollars for each fiscal year through fiscal year two thousand twenty-six and twelve million dollars for each fiscal year thereafter, provided that this amount may only be expended pursuant to a plan approved by the director of the budget. In fiscal year two thousand twenty-two, the commission shall pay one percent of the state tax imposed on mobile sports wagering by this section to the general fund, a program to be administered by the office of children and family services for a statewide youth sports activities and education grant program for the purpose of providing annual awards to sports programs for underserved youth under the age of eighteen years; provided however, that such amount shall be equal to five million dollars for each fiscal year thereafter. The commission shall require at least monthly deposits by a platform provider of any payments pursuant to subdivision seven of this section, at such times, under such conditions, and in such depositories as shall be prescribed by the state comptroller. The deposits shall be deposited to the credit of the state commercial gaming revenue fund. The commission shall require a monthly report and reconciliation statement to be filed with it on or before the tenth day of each month, with respect to gross revenues and deposits received and made, respectively, during the preceding month.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

9. The commission may perform audits of the books and records of a casino or mobile sports wagering licensee pursuant to section one hundred four of this chapter.

10. Nothing in this section shall apply to interactive fantasy sports offered pursuant to article fourteen of this chapter. Nothing in this section authorizes any entity that conducts interactive fantasy sports offered pursuant to article fourteen of this chapter to conduct sports wagering unless it separately qualifies for, and obtains, authorization pursuant to this section.

11. A sports governing body may notify the commission that it desires to restrict, limit, or exclude wagering on its sporting events by providing notice in the form and manner as the commission may require. Upon receiving such notice, the commission shall review the request in good faith, seek input from the casinos or mobile sports wagering licensees on such a request, and if the commission deems it appropriate, promulgate regulations to restrict such sports wagering.

12. (a) When potential criminal activity is suspected by the commission, the commission shall designate the division of the state police to have primary responsibility for assisting the commission in conducting investigations into unusual wagering activity, match fixing, and other conduct that corrupts a wagering outcome of a sporting event or events.

(b) Casinos and mobile sports wagering licensees shall maintain records of sports wagering operations in accordance with regulations promulgated by the commission. These regulations shall, at a minimum, require a casino or mobile sports wagering operator to adopt procedures to obtain personally identifiable information from any individual who places any single wager in an amount of ten thousand dollars or greater or making a potential payout or actual payout of ten thousand dollars or greater on a winning wager.

(c) Casinos, mobile sports wagering licensees and sports governing bodies shall cooperate with the commission to ensure the timely, efficient, and accurate sharing of information.

(d) Casinos, mobile sports wagering licensees and sports governing bodies shall cooperate with investigations conducted by the commission or law enforcement agencies, including but not limited to providing or facilitating the provision of account-level wagering information and audio or video files relating to persons placing wagers; provided, however, that the casino and mobile sports wagering operator shall not be required to share any personally identifiable information of an authorized sports bettor with any sports governing body unless ordered to do so by the commission, a law enforcement agency or court of competent jurisdiction.

(e)(i) Casinos and mobile sports wagering licensees shall promptly report to the commission and any third party integrity monitoring provider approved by

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

the commission, as applicable and in accordance with rules and regulations established by the commission, any information relating to:

(1) criminal or disciplinary proceedings commenced against the casino or mobile sports wagering licensee in connection with its operations;

(2) unusual wagering activity or patterns that may indicate a concern with the integrity of a sporting event or events;

(3) any potential breach of the relevant sports governing body's internal rules and codes of conduct pertaining to sports wagering, as they have been provided by the sports governing body to the casino or the mobile sports wagering operator;

(4) any other conduct that corrupts a wagering outcome of a sporting event or events, including match fixing; and

(5) suspicious or illegal wagering activities, including use of funds derived from illegal activity, wagers to conceal or launder funds derived from illegal activity, using agents to place wagers, using confidential non-public information, and using false identification.

(ii) The commission may share information relating to conduct described in clauses two, three and four of subparagraph (i) of this paragraph with the relevant sports governing body.

(iii) The commission shall be authorized to share any information under this section with any law enforcement entity, team, sports governing body, or regulatory agency the commission deems appropriate. Such sharing of information may include, but is not limited to, account level wagering information and any audio or video files related to the investigation.

(iv) A casino or mobile sports wagering licensee may be required to share any personally identifiable information of an authorized sports bettor with a sports governing body only pursuant to an order to do so by the commission, a law enforcement agency or a court of competent jurisdiction.

(f) The confidentiality of information shared between a sports governing body and a casino or a mobile sports wagering operator shall be maintained pursuant to all applicable data privacy laws, unless disclosure is required by this section, the commission, other law, or court order. Furthermore, the information shared between a sports governing body, a casino, a mobile sports wagering operator or any other party pursuant to this act may not be used for business or marketing purposes by the recipient without the express written approval of the party that provides such information.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(g) The commission, by regulation, may authorize and promulgate any rules necessary to implement agreements with other states, or authorized agencies thereof to enable the sharing of information to facilitate integrity monitoring and the conduct of investigations into abnormal wagering activity, match fixing, and other conduct that corrupts a wagering outcome of a sporting event or events.

(h) In the event of the creation of an entity that maintains an inter-state database of sports wagering information for the purpose of integrity monitoring, the commission may share information and cooperate with such entity pursuant to regulations promulgated by the commission.

(i) Casinos and mobile sports wagering licensees shall adopt procedures to prevent persons from wagering on sports events who are prohibited from placing sports wagers. A casino or mobile sports wagering licensee shall not accept wagers from any person:

> (i) whose name appears on the exclusion list maintained by the commission and provided to the casino or mobile sports wagering licensee;
>
> (ii) whose name appears on any self-exclusion list maintained by the commission and provided to the casino or mobile sports wagering licensee;
>
> (iii) who is the operator, director, officer, owner, or employee of the casino or mobile sports wagering licensee or any spouse, child, sibling or parent living in the same principal place of abode as such individual;
>
> (iv) who has been identified as a prohibited sports bettor in a list provided by the sports governing body to the commission and casino or mobile sports wagering operator, that identifies the individual by such personally identifiable information as specified by rules and regulations promulgated by the commission; or
>
> (v) who is an agent or proxy for a prohibited sports bettor.

(j) The commission shall establish a method of communication, which may include, but is not limited to a website form, that allows any person to confidentially report information about conduct potentially warranting further investigation to the commission. The identity of any person reporting conduct potentially warranting further investigation to the commission shall remain confidential unless that person authorizes disclosure of his or her identity or until such time as the allegation of conduct potentially warranting further investigation is referred to law enforcement. The commission shall promulgate rules governing the investigation and resolution of a charge of any person purported to have engaged in conduct potentially warranting further investigation.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

13. The commission shall promulgate rules that require a casino or mobile sports wagering licensees to implement responsible gaming programs that include comprehensive employee trainings on responding to circumstances in which individuals present signs of a gambling addiction and requirements for casinos and mobile sports wagering licensees under section thirteen hundred sixty-seven-a of this title to assess, prevent, and address problem gaming by such casino's or mobile sports wagering licensee's users.

14. For purposes of wager determination, the commission shall provide a preference for the use of official league data unless the use of other objective wager determination criteria has been justified to the satisfaction of the commission.

15. The conduct of sports wagering in violation of this section is prohibited.

16. (a) In addition to any criminal penalties provided for under article two hundred twenty-five of the penal law, any person, firm, corporation, association, agent, or employee, who is not authorized to offer sports wagering under this section or section thirteen hundred sixty-seven-a of this title, and who knowingly offers or attempts to offer sports wagering or mobile sports wagering in New York shall be liable for a civil penalty of not more than one hundred thousand dollars for each violation, not to exceed five million dollars for violations arising out of the same transaction or occurrence, which shall accrue to the state and may be recovered in a civil action brought by the attorney general.

(b) Any person, firm, corporation, association, agent, or employee who knowingly violates any procedure implemented under this section, or section thirteen hundred sixty-seven-a of this title, shall be liable for a civil penalty as described in section one hundred sixteen of this chapter which shall accrue to the state and may be recovered in a civil action brought by the commission.

**Credits**

(Added L.2013, c. 174, § 2. Amended L.2020, c. 59, pt. X, § 1, eff. April 3, 2020; L.2021, c. 59, pt. Y, § 3, eff. April 19, 2021; L.2025, c. 59, pt. OO, § 1, eff. May 9, 2025.)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**McKinney's Racing, Pari-Mutuel Wagering and Breeding Law § 1367-a**
**Mobile sports wagering**

1. (a) Except as provided in this subdivision, the terms in this section shall have the same meanings as such terms are defined in subdivision one of section thirteen hundred sixty-seven of this title.

(b) "Mobile sports wagering operator" for purposes of this section, means a mobile sports wagering operator as defined by section thirteen hundred sixty-seven of this title.

2. (a) No entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission pursuant to this section.

(b) Licenses issued by the commission shall remain in effect for up to ten years. The commission shall establish a process for renewal.

(c) The commission shall publish a list of all casinos and mobile sports wagering licensees licensed to offer mobile sports wagering in New York state pursuant to this section on the commission's website for public use.

(d) All sports wagers through electronic communication placed in accordance with this section are considered placed or otherwise made when and where received by the mobile sports wagering licensee on such mobile sports wagering licensee's server or other equipment used to accept mobile sports wagering at a licensed gaming facility, regardless of the authorized sports bettor's physical location within the state at the time the sports wager is placed; and provided further that the intermediate routing of electronic data in connection with mobile sports wagering shall not determine the location or locations in which a wager is initiated, received or otherwise made.

3. As a condition of licensure the commission shall require that each platform provider authorized to conduct mobile sports wagering pay a one-time fee of twenty-five million dollars. Such fee shall be paid within thirty days of gaming commission approval prior to license issuance and deposited into the state lottery fund for education aid.

4. (a) As a condition of licensure, each mobile sports wagering operator shall implement the following measures:

(i) limit each authorized sports bettor to one active account on their platform, and prevent anyone they know, or should have known to be a prohibited sports bettor from maintaining accounts or participating in any sports wagering offered by such mobile sports wagering operator;

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(ii) adopt appropriate safeguards to ensure, to a reasonable degree of certainty, as defined by rules and regulations promulgated by the commission, that authorized sports bettors are physically located within the state when engaging in mobile sports wagering;

(iii) prohibit minors from participating in any sports wagering pursuant to rules and regulations promulgated by the commission;

(iv) when referencing the chances or likelihood of winning in advertisements or upon placement of a sports wager, make clear and conspicuous statements that are not inaccurate or misleading concerning the chances of winning and the number of winners;

(v) permit any authorized sports bettor to permanently close an account registered to such bettor, on any and all platforms supported by such mobile sports wagering operator, at any time and for any reason;

(vi) offer introductory procedures for authorized sports bettors, that shall be prominently displayed on the main page of such mobile sports wagering operator platform, that explain sports wagering;

(vii) implement measures to protect the privacy and online security of authorized sports bettors and their accounts;

(viii) offer all authorized sports bettors access to his or her account history and account details;

(ix) ensure authorized sports bettors' funds are protected upon deposit and segregated from the operating funds of such mobile sports wagering operator and otherwise protected from corporate insolvency, financial risk, or criminal or civil actions against such mobile sports wagering operator;

(x) list on each website, in a prominent place, information concerning assistance for compulsive play in New York state, including a toll-free number directing callers to reputable resources containing further information, which shall be free of charge;

(xi) ensure no sports wagering shall be based on a prohibited sports event;

(xii) permit account holders to establish self-exclusion gaming limits on a daily, weekly, and monthly basis that enable the account holder to identify the maximum amount of money an account holder may deposit during such period of time;

(xiii) when an account holder's lifetime deposits exceed two thousand five hundred dollars, the mobile sports wagering operator shall prevent any wagering until the patron immediately acknowledges that the account holder has met the deposit threshold and may elect to establish responsible gaming

limits or close the account, and the account holder has received disclosures from the mobile sports wagering operator concerning problem gambling resources. Once a patron has reached their lifetime deposit, such patron shall annually make the acknowledgement required by this paragraph;

(xiv) maintain a publicly accessible internet page dedicated to responsible play, a link to which must appear on the mobile sports wagering operator's website and in any mobile application or electronic platform on which a bettor may place wagers. The responsible play page shall include: a statement of the mobile sports wagering operator's policy and commitment to responsible gaming; information regarding, or links to information regarding, the risks associated with gambling and the potential signs of problem gaming; the availability of self-imposed responsible gaming limits; a link to a problem gaming webpage maintained by the office of addiction services and supports; and such other information or statements as the commission may require by rule; and

(xv) submit annually a problem gaming plan that was approved by the commission in consultation with the office of addiction services and supports that includes: the objectives of and timetables for implementing the plan; identification of the persons responsible for implementing and maintaining the plan; procedures for identifying users with suspected or known problem gaming behavior; procedures for providing information to users concerning problem gaming identification and resources; procedures to prevent gaming by minors and self-excluded persons; and such other problem gaming information as the commission may require by rule.

(b) No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York.

(c) Mobile sports wagering licensees shall not offer any sports wagering based on any prohibited sports event.

(d) Mobile sports wagering licensees shall not permit sports wagering by anyone they know, or should have known, to be a prohibited sports bettor.

(e) Advertisements for contests and prizes offered by a mobile sports wagering operator shall not target prohibited sports bettors, minors, or self-excluded persons.

(f) Mobile sports wagering operators shall develop and prominently display procedures on the main page of such mobile sports wagering operator's platform for the filing of a complaint by an authorized sports bettor against such mobile sports wagering operator. An initial response shall be given by such mobile sports wagering operator to such bettor filing the complaint within forty-eight hours. A complete response shall be given by such mobile sports wagering operator to such

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

bettor filing the complaint within ten business days. An authorized sports bettor may file a complaint alleging a violation of the provisions of this article with the commission.

(g) Mobile sports wagering licensees shall maintain records of all accounts belonging to authorized sports bettors and retain such records of all transactions in such accounts for the preceding five years; provided however that such records belonging to an authorized sports bettor shall be readily accessible and downloadable, without cost, by such authorized sports bettor.

(h) The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering shall be physically located in the licensed gaming facility and be limited to sports wagering related activities in accordance with regulations promulgated by the commission.

(i) All mobile sports wagering initiated in this state shall be deemed to take place at the licensed gaming facility where the server or other equipment used by a mobile sports wagering licensee to accept mobile sports wagering is located, regardless of the authorized sports bettor's physical location within this state.

(j) All mobile sports wagering shall be conducted in compliance with this section and section thirteen hundred sixty-seven of this title.

5. (a) Subject to regulations promulgated by the commission, a mobile sports wagering operator may allow for authorized bettors to sign up to create and fund accounts on its mobile sports wagering platform.

(b) Authorized sports bettors may deposit and withdraw funds to and from their account on a mobile sports wagering operator through electronically recognized payment methods, including but not limited to credit cards and debit cards, or via any other means approved by the commission; provided however, that in the case of credit card payments, each authorized sports bettor's account per operator shall be limited to a credit card spending amount of two thousand five hundred dollars per year; and provided further, that this limitation shall not apply to other payment methods or to debit cards. No operator shall be authorized to provide a line of credit to any authorized sports bettor.

6. The commission, in conjunction with the office of addiction services and supports, shall annually cause a report to be prepared and distributed to the governor and the legislature on the impact of mobile sports wagering on problem gamblers in New York, including, to the extent practicable, an analysis of demographics which are disproportionately impacted by the problem gambling. The costs associated with the preparation and distribution of the report shall be borne by mobile sports wagering licensees and the commission shall be authorized to assess a fee against mobile sports wagering licensees for these purposes. The commission, or in the case that an independent integrity monitor has been established, such independent integrity

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

monitor shall also report biannually to the governor and the legislature on the effectiveness of the statutory and regulatory controls in place to ensure the integrity of mobile sports wagering operations.

7. A platform provider may be licensed by the commission only after having been selected for potential licensure by the commission following a competitive bidding process in which the commission shall issue a request for applications no later than July first, two thousand twenty-one; provided however, that the deadline for submission of applications shall be no later than thirty days after the date upon which the commission issues such request for applications.

(a) The commission shall select platform providers based upon the criteria set forth in this section no later than one hundred fifty days, to the extent practicable, after the final application is received. The commission may disqualify applicants from licensure consideration if the applicant or the mobile sports wagering operator or operators included in their bid have not satisfied provision of required application information, fail to meet any platform provider and mobile sports wagering operator eligibility criteria established pursuant to the request for applications, or are deemed by the commission to have not satisfied the criteria pursuant to subdivision five of this section.

(a-1) The commission shall publish on its website the criteria that will be used to score applications based upon the criteria set forth in paragraph (c) of this subdivision; provided however, that such scoring methodology shall award additional points to an applicant that has entered into an agreement that includes revenue sharing related to such mobile sports wagering with compacted Native American tribe(s) or nation(s).

(b) The commission shall determine the form of application for bidders, which shall require, at a minimum, the following information:

(i) Different scenarios for the number of platform providers and number of mobile sports wagering operators licensed by the commission. For each scenario, this shall include estimates of mobile sports wagering gross gaming revenue and the bases for such estimates, the percentage of gross revenue from mobile sports wagering the applicant will pay to the state for the privilege of licensure if chosen, and the percentage of overall mobile sports wagering gross gaming revenue estimated to be generated;

(ii) The number of mobile sports wagering operators the applicant will host on its mobile sports wagering platform, if the applicant is licensed as a platform provider;

(iii) A description of how the applicant will use technology to ensure all bettors are physically within approved locations within the state, that any wager is accepted through equipment physically located at a licensed gaming facility and that necessary safeguards against abuses and addictions are in place;

(iv) The applicant and any associated operators such applicant proposes in its application possess the qualifications, capabilities and experience to provide a mobile sports wagering platform;

(v) A list of all jurisdictions where the applicant and parent company, and mobile sports wagering operator or operators and parent company or companies have been licensed or otherwise authorized by contract or otherwise to conduct sports wagering operations. This shall include the applicant and its mobile sports wagering operator or operators' experience in such other markets;

(vi) Player acquisition model, advertising and affiliate programs and marketing budget, including details on how the applicant and its mobile sports wagering operator or operators will convert customers from wagering through illegal channels to wagering legally in the state;

(vii) Timeframe to implement mobile sports wagering from award of license;

(viii) The applicant and mobile sports wagering operator or operators' capacity to bring authorized sports bettors into their mobile sports wagering platform; and

(ix) Integrity monitoring and reporting including any current affiliations related to integrity monitoring.

(c) In determining whether an applicant shall be eligible for a platform provider license, the commission shall evaluate how each applicant proposes to maximize sustainable, long-term revenue for the state by evaluating the following factors:

(i) A market analysis detailing the benefits of the applicant's bid as it relates to maximizing revenue to the state;

(ii) Estimates of mobile sports wagering gross gaming revenue generated by the applicant under different scenarios;

(iii) The percentage of mobile sports wagering gross gaming revenue to be paid to the state under different scenarios;

(iv) The potential market share of the mobile sports wagering operator or operators under different scenarios;

(v) Advertising and promotional plans of the mobile sports wagering operator or operators;

(vi) Past experience and expertise in the market of the applicant and any mobile sports wagering operator or operators which are part of such applicant's application;

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(vii) The applicant's capacity to rapidly and effectively bring authorized sports bettors into its platform;

(viii) A demonstration of how and to what degree the applicant fosters racial, ethnic, and gender diversity in its workforce;

(ix) Timeframe to implement mobile sports wagering from award of license;

(x) Any other factors that could impact the integrity, sustainability or safety of the mobile sports wagering system; and

(xi) Any other factors that could impact revenue to the state.

(d) The commission shall award a license to each of the two highest scoring platform providers that submit applications; provided however, that such awards shall require that both winning platform providers pay the same tax rate; and provided further, that the commission shall require that no less than four mobile sports wagering operators will be operating in the state. The commission may award additional licenses if it determines that such additional awards are in the best interests of the state; provided however, that any additional platform providers awarded licenses must also agree to pay the same tax rate as those platform providers that were initially awarded licenses by the commission. The award of any such license shall require each applicant to remit the highest percentage of gross gaming revenue from mobile sports wagering contained in an applicant's bid selected by the commission considered for licensure. A qualified applicant shall be afforded the ability to revise its bid in any such manner in order for such bid to meet the percentage of gross gaming revenue from mobile sports wagering as required by the commission for license award, provided that the bid does not incorporate any additional operators not already included in the bid; and provided however that it is not determined by the commission that the revised bid no longer meets all requirements and criteria established pursuant to this section and the request for applications. Any applicant that does not revise its bid to meet the percentage of gross gaming revenue from mobile sports wagering required by the commission for license award shall not be awarded a license.

**Credits**

(Added L.2021, c. 59, pt. Y, § 4, eff. April 19, 2021.)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Kalshi

Log in Sign up

Trending Elections Politics Sports Culture Crypto Commodities Climate Economics Mentions Finance Tech

NY Knicks vs PHI 76ers

Live chat

Begins in 6h 50m 43s · Oct 30, 7:30pm EDT

Stats

ADD25




$419,877 vol

1D 1W 1M ALL

Predict Live 189 Search Social

| | | | |
|---|---|---|---|
| NY Knicks | 52% ▲ 6 | Yes 54¢ | No 47¢ |
| PHI 76ers | 48% ▼ 6 | Yes 48¢ | No 54¢ |

## Spread and Total

NY Knicks win by over 1.5 points

< 1.5 1.5 2.5 3 >

53% ▲ 6 | Yes 53¢ | No 48¢

Over 226.5 points

< 5 224.5 226.5 228.5 23 >

51% ▼ 4 | Yes 51¢ | No 50¢

ADD26

## Team Totals

NY Knicks over 113.5 points

< 5 111.5 113.5 115.5 11 >

51% | Yes 53¢ | No 49¢

PHI 76ers over 112.5 points

< 5 110.5 112.5 114.5 11 >

53% | Yes 52¢ | No 50¢

Predict Live 189 Social

Player Assists

Player Rebounds

Search

VJ Edgecombe: 2+

2+ 4+ (

96%

Yes 98¢

Karl-Anthony Towns: 8+

8+ 10+ 1

87% ▲ 1

Yes 87¢

Mikal Bridges: 2+

2+ 4+ (

77%

Yes 79¢

No 24¢

Show more

Player Threes

Player Steals

Player Blocks

Double Double

ADD27

Predict

Live 189

Social

Points Leader

Pts + Reb + Ast

Steals + Blocks

## Market Rules

NY Knicks

Resolves Yes if New York wins the New York vs Philadelphia Pro Basketball game originally scheduled for Oct 30, 2026.

Outcome verified from the Governing League and ESPN.

If the game is postponed but begins within 48 hours of its originally scheduled start time, the market will remain open and resolve based on the official final result. If the game is cancelled or not started within 48 hours of its originally scheduled start, all markets will resolve to a fair price.

Kalshi is not affiliated, associated, authorized, endorsed by, or in any way officially connected with the Governing League. All trademarks, logos, and brand names are the property of their respective owners.

Note: this event is mutually exclusive.

View full rules Help center Report Insider Trading

Timeline and payout

Predict Live 189 Social

ADD28

After the outcome occurs

Projected payout
1 minute after closing

This market will close and expire after a winner is declared. Otherwise, it closes by Nov 1, 2026 at 6:30pm EST.

Series KXNBAGAME Event KXNBAGAME-26OCT30NYKPHI Market KXNBAGAME-26OCT30NYKPHI-NYK

Insider trading is prohibited

The following are prohibited from trading this contract:

- Current players, coaches, and staff of the league, association, or organization(s) governing the event. For college leagues/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current players/coaches/staff of the specific sport in <event> rather than the league/association as a whole (e.g., if the Division I Gonzaga Men's Basketball Team is playing in <event>, this prohibition will restrict trades by current players/coaches/staff on NCAA Basketball, rather than all current players/coaches/staff in any NCAA sport).
- Paid employees of the league and league participants
- Owners of teams and the league
- and household members and immediate family of all above
- Persons who are employed by any of the Source Agencies are not permitted to trade on the Contract.
- Persons who hold any material, non-public information on the Underlying are not permitted to trade on the Contract.

ADD29

## People are also trading

CHA Hornets vs WAS Wizards

CHI Bulls vs BOS Celtics

Predict Live 189 Social