# 26-1835

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

| | | |
|---|---|---|
| KALSHIEX LLC, | : | On Appeal from the |
| Plaintiff-Appellant, | : | United States District Court |
| | : | for the Southern District |
| v. | : | of New York |
| | : | |
| ROBERT WILLIAMS, ET AL., | : | District Court Case No. |
| Defendants-Appellees. | : | 1:25-cv-8846 |
| | : | Hon. Analisa Torres |
| | : | |

---

## BRIEF OF *AMICI CURIAE* OHIO, NEVADA, 35 OTHER STATES, THE DISTRICT OF COLUMBIA, AND THE NORTHERN MARIANA ISLANDS SUPPORTING APPELLEES

---

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
HStern@ag.nv.gov

D. ANDREW WILSON
Ohio Attorney General

MATHURA J. SRIDHARAN*
Ohio Solicitor General
**Counsel of Record*
GREGORY P. MATHEWS
Senior Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amici States*

*Additional Amici Curiae listed after signature block*

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... ii

STATEMENT OF *AMICI* INTEREST ..... 1

INTRODUCTION ..... 1

BACKGROUND ..... 4

I. States have traditionally regulated gambling, including sports betting. ..... 4

II. In 2010, Congress amended the Commodity Exchange Act in the wake of the financial crisis. ..... 6

III. Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide. ..... 9

IV. The CFTC abruptly changes its stance on its own authority ..... 12

SUMMARY OF ARGUMENT ..... 15

ARGUMENT ..... 17

I. When Congress makes major changes to the law, it does so clearly. ..... 18

A. Kalshi's position violates the federalism canon. ..... 19

B. Kalshi's position violates the major-questions doctrine ..... 22

II. Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens ..... 26

A. States are experienced in regulating sports betting and its many potential harms. ..... 26

B. Existing federal regulation is an insufficient substitute for the States' robust gaming regulations. ..... 32

III. The CFTC's reading of the federal statutes deserves no special weight. ..... 34

CONCLUSION ..... 36

ADDITIONAL *AMICI CURIAE* ..... 37

CERTIFICATE OF COMPLIANCE ..... 40

CERTIFICATE OF SERVICE ..... 41

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) .......... 4, 16, 20

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) .......... 35

*Bond v. United States*,
572 U.S. 844 (2014) .......... *passim*

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) .......... 22

*Coinbase Fin. Mkts., Inc. v. Tong*,
No. 26-2297 (2d Cir.) .......... 11

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) .......... 20

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 21

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*,
598 U.S. 339 (2023) .......... 18

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) .......... 20

*Inv. Co. Inst. v. CFTC*,
720 F.3d 370 (D.C. Cir. 2013) .......... 7

*KalshiEX, LLC v. Assad*,
___ F.4th ___, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) .......... 11

*KalshiEX, LLC v. Bird*,
No. 26-2874 (8th Cir.) .......... 11

*KalshiEX, LLC v. Cafferelli*,
No. 26-2239 (2d Cir.)........................................................................ 11

*KalshiEX, LLC v. Cox*,
No. 26-4100 (10th Cir.) .................................................................1, 11

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026)............................................................. 11

*KalshiEX, LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ....................................................22

*KalshiEX, LLC v. Martin*,
No. 25-1892 (4th Cir.) ....................................................................... 11

*KalshiEX, LLC v. Schuler*,
___ F.4th ___, 2026 WL 2884087 (6th Cir. Sept. 25, 2026)...... 2, 11, 17

*Kansas v. Garcia*,
589 U.S. 191 (2020)........................................................................... 17

*King v. Burwell*,
576 U.S. 473 (2015)........................................................ 16, 17, 24, 26

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) (Roberts, C.J., op.)............................................23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)................................................................ 17, 34, 35

*Massachusetts v. KalshiEX, LLC*,
No. SJC-13906 (Mass.)....................................................................... 12

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
456 U.S. 353 (1982)............................................................................. 7

*Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*,
70 Ohio St. 2d 95 (1982) ..................................................................... 4

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)...................................................................... *passim*

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 8

*United States v. Wisconsin*,
No. 26-2636 (7th Cir.) .......... 1, 15

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... *passim*

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 2, 15, 18

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 35

**Statutes, Regulations, and Constitutional Provisions**

17 C.F.R. §§38.100–.1200 .......... 32

17 C.F.R. §38.700 .......... 32

17 C.F.R. §38.750 .......... 32

17 C.F.R. §38.850 .......... 32

17 C.F.R. §40.11 .......... 12

54 Fed. Reg. 30694 (July 21, 1989) .......... 8

76 Fed. Reg. 44776 (July 27, 2011) .......... 12

77 Fed. Reg. 48208 (Aug. 13, 2012) .......... 12

89 Fed. Reg. 48968 (June 10, 2024) .......... 13, 32

91 Fed. Reg. 35806 (June 12, 2026) .......... 14

91 Fed. Reg. 65969 (Oct. 19, 2026) .......... 15

91 Fed. Reg. 66022 (Oct. 19, 2026) .......... 15

7 U.S.C. §1a .......... 9, 25

7 U.S.C. §2 ........ 8, 9, 22, 25
7 U.S.C. §7a-2 ........ 34
7 U.S.C. §16 ........ 22
Nev. Gaming Comm'n Reg. 22.010 ........ 27
Nev. Gaming Comm'n Reg. 22.060-.063 ........ 27
Nev. Gaming Comm'n Reg. 22.080 ........ 27
Nev. Gaming Comm'n Reg. 22.1205 ........ 28
Nev. Gaming Comm'n Reg. 22.121 ........ 28
Nev. Gaming Comm'n Reg. 5.170 ........ 27
Nev. Rev. Stat. §129.010 ........ 31
Nev. Rev. Stat. §463.0129 ........ 27
Nev. Rev. Stat. §463.170 ........ 27, 33
Nev. Rev. Stat. §463.350 ........ 31
Nev. Rev. Stat. §§463.362–.3668 ........ 27
Nev. Rev. Stat. §463.530 ........ 27
Nev. Rev. Stat. §463.5735 ........ 27
Nev. Rev. Stat. §465.092 ........ 27
Nev. Rev. Stat. §465.093 ........ 27
Nev. Rev. Stat. §465.094 ........ 27
Ohio Const. art. XV, §6 ........ 5
Ohio Rev. Code §3109.01 ........ 31
Ohio Rev. Code §3775.02 ........ 28

Ohio Rev. Code §3775.03 .......... 28

Ohio Rev. Code §3775.09 .......... 28

Ohio Rev. Code §3775.13 .......... 28

Ohio Rev. Code §3775.99 .......... 31

Pub. L. 111-203, 124 Stat. 1376 (2010) .......... 9

U.S. Const. amend. X .......... 19

U.S. Const. art. VI, cl. 2 .......... 17

**Other Authorities**

Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* (May 2025) .......... 5, 6

Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025) .......... 24

*CFTC Exercises Emergency Authority to Ensure Market Stability* (Aug. 11, 2026) .......... 15

CFTC Letter No. 25-36, Advisories (Sept. 30, 2025) .......... 13, 14

Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024) .......... 28

Cleveland Cavaliers. Tom Withers, *Cavs coach Bickerstaff says he received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024) .......... 31

Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025) .......... 11

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025) .......... 10

Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024) .......... 29

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011) .......... 8

George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65 (1996) .......... 4

Jennifer Carleton et al., The Gambling Law Review (Carl Rohsler ed. 2016) .......... 5

John C. Hull, *Options, Futures, and Other Derivatives* (8th ed. 2012) .......... 6, 7

John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025) .......... 24

Kaitlyn Radde, *Prediction markets' trading volume doubled between May and July, largely driven by sports*, Pew Research Center (Sept. 23, 2026) .......... 24

Kalshi Member Agreement (February 16, 2026) .......... 30

Kalshi Website, Sports .......... 10

Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024) .......... 30

Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024) .......... 29

Lia Nower et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies (2023) .......... 30

Matt Stone, *Risk of Gambling Addiction Up 30%* (Feb. 16, 2025) .......... 29

Michael S. Selig, *States Encroach on Prediction Markets*, Wall Street Journal (Feb 16, 2026) .......... 14

Nat'l Gambling Impact Study Comm'n, Final Report (June 1999) .......... 6, 28, 30

Ohio Attorney General, *Comment Letter on Prediction Markets; Public Interest Determinations*, CFTC-2026-1189 (July 27, 2026) .......... 14

*Ohio Gambling Survey 2022*, Ohio Casino Control Commission .......... 29

Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024) .......... 29

Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025) .......... 31

*U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025) .......... 31

## STATEMENT OF *AMICI* INTEREST

*Amici* consist of Ohio, Nevada, 35 other States, the District of Columbia, and the Northern Mariana Islands ("*amici* States"). They are interested in this case because Kalshi's aggressive theory of preemption threatens the States' longstanding ability to protect their citizens. *Amici* States submit this brief under Federal Rule of Appellate Procedure 29(a)(2).

One point before proceeding: cases pending in the Seventh and Tenth Circuits raise substantially the same issues as this one. *See United States v. Wisconsin*, No. 26-2636 (7th Cir.); *KalshiEX, LLC v. Cox*, No. 26-4100 (10th Cir.). *Amici* States submitted similar briefs raising the same arguments in those cases.

## INTRODUCTION

Hundreds of years ago, sailors aboard Columbus's ships played games of chance to pass the time. Ever since those explorers crossed the Atlantic, Americans have engaged in gambling. And all along, States have taken different regulatory approaches under their traditional police powers. In our constitutional system, federalism supplies the solution. As the Supreme Court put it less than a decade ago, "Americans have never been of one mind about gambling." *Murphy v. National Collegiate*

*Athletic Ass'n*, 584 U.S. 453, 458 (2018). So States remain "free to act" on the "controversial subject." *Id.* at 486. This case threatens the States' well-established powers.

When Congress makes major changes to the law, it does not keep them a secret. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Significant changes typically require a clear statement from Congress, and two clear-statement rules apply here: the federalism canon and the major-questions doctrine. Although this case can be resolved without applying these clear-statement rules, *see KalshiEX, LLC v. Schuler*, ___ F.4th ___, 2026 WL 2884087, *16 n.9 (6th Cir. Sept. 25, 2026), this basic principle dooms Kalshi's case.

Kalshi began offering online sports betting almost two years ago. This activity caught the States' attention. In some States, sports betting is illegal, while in others, it is allowed but comprehensively regulated. Kalshi argues that it may ignore these laws because of financial legislation Congress enacted in 2010, when sports betting was illegal in all but a few States. According to Kalshi, Congress—when responding to the 2008 financial crisis—quietly preempted States from regulating sports betting. As Kalshi would have it, this preemption was so subtle that

nobody noticed for years. But Congress would have spoken far more clearly if it wanted to strip the States of their historic powers.

*First*, Kalshi's position runs afoul of binding clear-statement rules. Under the federalism canon, Congress must speak clearly to shift this country's traditional balance of power. Similarly, under the major-questions doctrine, Congress must speak clearly to give a federal agency unprecedented authority over significant topics. Kalshi does not identify clear language that removed the States' traditional authority over sports betting or that gives the Commodity Futures Trading Commission ("CFTC") new power over a significant topic (sports betting). Kalshi instead strains to uncover preemptive intent buried within subsections of subsections of complex derivatives-related statutes.

*Second*, the negative ramifications of Kalshi's position are another sign that Kalshi is wrong. The States have considerable experience regulating gambling. The CFTC has no comparable expertise. That makes it unlikely that Congress would have delegated such broad power to the CFTC.

*Third*, the CFTC's current support of Kalshi's theory does not change the legal analysis. The CFTC has no special ability to interpret statutes

about its authority, and the Court should be skeptical of the CFTC's new position that exalts its own power.

## BACKGROUND

Kalshi's argument rests on the unrealistic premise that Congress, when responding to the 2008 financial crisis, quietly chose to make sweeping changes to gambling laws. To understand why that is so unlikely, it helps to review this country's regulatory history—of both gambling and derivatives markets.

### I. States have traditionally regulated gambling, including sports betting.

**A.** The regulation of gambling is "concededly within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Gambling regulation traces back to before the Founding. *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65, 66 (1996). In fact, "gambling was largely banned throughout the country" by the late 1800s. *Murphy*, 584 U.S. at 458.

But in the twentieth century, many States loosened gambling prohibitions. *Id.* at 458–59. For example, Ohio legalized charitable bingo and state-conducted lotteries in the 1970s. *See Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*, 70 Ohio St. 2d 95, 101 (1982). And about

fifteen years ago, Ohio voters approved a constitutional amendment allowing for casino gaming. *See* Ohio Const. art. XV, §6(C). Today, forty-eight States permit some form of gambling. *See* Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, at 12–13 (May 2025), perma.cc/J27S-WLSB.

**B.** Like other forms of gambling, sports betting was illegal throughout the States for much of this country's history. *See Murphy*, 584 U.S. at 458. That began to change in the mid-twentieth century. Nevada began permitting some sports betting in 1949. *See* Jennifer Carleton et al., The Gambling Law Review 147 (Carl Rohsler ed. 2016), perma.cc/3BSY-UYMZ. Over the next few decades, three other States legalized certain forms of sports betting. *See Murphy*, 584 U.S. at 462.

In the 1990s, Congress passed the Professional and Amateur Sports Protection Act, purporting to bar States from authorizing additional sports betting. *Id.* at 461. In 2018, however, the Supreme Court held that this barrier was unlawful. *Id.* at 458, 480. *Murphy* left the States "free to act" on the "controversial subject" of "sports gambling." *Id.* at 486.

Since *Murphy*, sports betting remains illegal in eleven States. *See* Am. Gaming Ass'n, *State of the States 2025*, at 12–13. But most have chosen legalization. Today, thirty-nine States and the District of Columbia permit some form of sports betting. *Id.*

**C.** Gambling, where legal, is highly regulated. States' "authorization of legalized gambling" over the years "has almost always been accompanied by the establishment of a corresponding regulatory regime and structure." Nat'l Gambling Impact Study Comm'n, Final Report, 3-1 (June 1999), perma.cc/UF4R-2UXH.

## II. In 2010, Congress amended the Commodity Exchange Act in the wake of the financial crisis.

**A.** State gambling regulation has long co-existed with federal regulation of derivatives markets. Parties come together on derivative markets to trade derivative contracts on "exchanges." John C. Hull, *Options, Futures, and Other Derivatives*, 2 (8th ed. 2012). A "derivative" is a financial contract whose value depends on, and usually derives from, another more basic asset such as the value of a stock or the price of hogs. *Id.* at 1. A "futures contract" is one type of derivative in which two parties agree "to buy or sell an asset at a certain time in the future for a certain price." *Id.* at 7.

Swaps are another type of derivative in which two parties agree to exchange cash flows in the future. *Id.* at 148; *see Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013). The "most common" swap is an interest-rate swap in which "a company agrees to pay cash flows equal to interest at a predetermined" rate over years and, in return, receives "interest at a floating rate" over the same timeframe. Hull, *Options, Futures, and Other Derivatives*, 148.

**B.** As early as 1921, Congress authorized regulation of certain derivatives in commodities markets. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360 (1982). In 1936, Congress enacted the Commodity Exchange Act to expand federal oversight to different commodities and increase regulation over futures contracts. *Id.* at 362. Among other things, the Act authorized federal officials "to fix limits on the amount of permissible speculative trading in a futures contract." *Id.* at 363.

In 1974, Congress created the CFTC and gave it "exclusive jurisdiction over commodity futures trading." *Id.* at 365–66, 386. But because lawmakers worried that some might overread the CFTC's jurisdiction, *id.* at 386–87, Congress included two saving clauses, which protect the States'

"regulatory authorities" and "the jurisdiction" of state courts. 7 U.S.C. §2(a)(1)(A).

**C.** Until 2010, the CFTC lacked authority to regulate swaps. *United States v. Phillips*, 155 F.4th 102, 112–13 (2d Cir. 2025). For many years, swaps were perceived as a narrow category of derivatives with little potential for mischief. In 1989, for instance, the CFTC issued guidance distinguishing unregulated "swap transactions" from regulated "futures contracts." *See* 54 Fed. Reg. 30694, 30694 (July 21, 1989). The Commission stressed that swaps were "predominantly" confined to "commercial and institutional participants." *Id.* at 30695. A swap typically involved parties acting "in conjunction with" their "line of business." *Id.* at 30697. The CFTC emphasized that unregulated swaps were not "marketed to the public." *Id.*

Without regulation, "[t]rading in swaps exploded in the early 2000s." *Phillips*, 155 F.4th at 113. Many blamed swaps for the 2008 financial crisis. *Id.* A congressionally authorized investigation found that credit-default swaps helped "fuel the housing bubble." Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the*

*National Commission on the Causes of the Financial and Economic Crisis in the United States* at xxiv (January 2011), perma.cc/C54L-RZVE.

In response, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, extending the CFTC's jurisdiction to include "swaps." Pub. L. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. §2(a)(1)(A). The Act defined "swap" to include "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A). The Act made it generally "unlawful for any person ... to enter into a swap unless the swap is entered into on" a CFTC-regulated contract market. 7 U.S.C. §2(e); *see also* 7 U.S.C. §1a(18). Thus, an ordinary consumer who wishes to trade in a "swap" must do so on a designated contract market.

## III. Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide.

Kalshi is a designated contract market that offers online "events contracts." Contracts traded on Kalshi identify a future circumstance and allow users to bet on whether it will happen. If users bet correctly, they

are paid out. By this format, Kalshi boasts that users may "[t]rade on anything" regardless of state law. X Post, @Kalshi, perma.cc/X9YC-EHE7.

Many "contracts" Kalshi lists are sports bets. *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025), perma.cc/CWK2-TZCV. Kalshi has said so. Take, for instance, this ad:




*Id.*

Kalshi's website solidifies the point, with an entire category dedicated to "sports" where users can make a variety of bets—ranging from who will win a game, to whether a team will cover a point spread, to how individual athletes will perform. *See generally* Kalshi Website, Sports, https://kalshi.com/sports/all-sports (last accessed Oct. 27, 2026). Kalshi

also offers parlays, which combine two or more wagers into a single bet. *See* Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R.

To support its claim that nationwide sports betting is now legal regardless of States' laws, Kalshi argues that events contracts about sports are "swaps" within the CFTC's exclusive jurisdiction. Kalshi Br.40–45. Kalshi is litigating this theory across the country.

Although the Third Circuit has ruled for Kalshi, two other circuits—the Ninth and the Sixth—have ruled against it. *Compare KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026) *with KalshiEX, LLC v. Assad*, ___ F.4th ___, 2026 WL 2543846 (9th Cir. Aug. 28, 2026); *KalshiEX, LLC v. Schuler*, ___ F.4th ___, 2026 WL 2884087 (6th Cir. Sept. 25, 2026). In addition to the two other similar cases pending at this Court, similar cases remain pending at the Fourth, Eighth, and Tenth Circuits, as well as the Massachusetts Supreme Judicial Court. *KalshiEX, LLC v. Cafferelli*, No. 26-2239 (2d Cir.); *Coinbase Fin. Mkts., Inc. v. Tong*, No. 26-2297 (2d Cir.); *KalshiEX, LLC v. Martin*, No. 25-1892 (4th Cir.); *KalshiEX, LLC v. Bird*, No. 26-2874 (8th Cir.); *KalshiEX, LLC v. Cox*, No.

26-4100 (10th Cir.); *Massachusetts v. KalshiEX, LLC*, No. SJC-13906 (Mass.).

## IV. The CFTC abruptly changes its stance on its own authority.

Shortly after its jurisdiction increased in 2010, the CFTC promulgated a rule prohibiting designated contract markets from listing any contract "that involves, relates to, or references … gaming." 17 C.F.R. §40.11(a)(1). The CFTC explained that this prohibition matched "Congress's intent to prevent gambling through the futures markets." 76 Fed. Reg. 44776, 44786 (July 27, 2011) (quotation omitted). The prohibition remains in effect.

In 2012, as part of a rule jointly promulgated with the SEC, the CFTC refused to read the term "swaps" in a way that would disrupt "customary business arrangements" that "historically have not been considered to involve swaps." 77 Fed. Reg. 48208, 48247 (Aug. 13, 2012). Swaps, the CFTC explained, "involve risk-shifting arrangements with financial entities." *Id.* at 48248. The CFTC did not understand "swaps" to include transactions or arrangements involving "personal or family activities" that ordinary "consumers" regularly engage in. *Id.* at 48247.

Two years ago, the CFTC proposed a rule that directly confronted the relationship between state-gambling regulation and federal-derivatives regulation. The CFTC acknowledged that "gambling is overseen by state regulators with particular expertise" and that federal-derivatives law is "not … aimed at protecting against gambling-specific risks and concerns." 89 Fed. Reg. 48968, 48982–83 (June 10, 2024). The CFTC further disclaimed having the "statutory mandate" or "specialized experience" necessary to exercise jurisdiction over the "rapidly evolving field" of gambling. *Id.* at 48983.

The CFTC remained consistent in September 2025, when it issued a staff advisory directed at platforms offering sports-related contracts. CFTC Letter No. 25-36, Advisories (Sept. 30, 2025), perma.cc/YLH6-4GUF. The advisory warned that the CFTC had never "taken any official action to approve" the listing of such contracts. *Id.* at 2 n.4. The advisory explained that the CFTC "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under" the Commodity Exchange Act. *Id.* Those offering sports-related events contracts, the advisory cautioned, must be prepared for

the possibility that state law will "result in termination" of such contracts. *Id.* at 2.

The CFTC recently changed its position. At the end of last year, while all four other Commission seats were vacant and without public input or comment, the new Chairman announced his view that all events contracts—including those about sports—are "swaps" within the CFTC's exclusive power. *See* Michael S. Selig, *States Encroach on Prediction Markets*, Wall Street Journal (Feb 16, 2026), https://web.archive.org/web/20260218182304/https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement021726.

The CFTC later issued a notice of proposed rulemaking attempting to preempt state law by allowing sports "event contracts" on designated contract markets. 91 Fed. Reg. 35806 (June 12, 2026). The CFTC argued that "[p]reemption of state law was necessary because, for decades, states had attempted to apply state gambling laws to derivatives trading." *Id.* at 35808 n.24; *see also id.* at 35822. The States pushed back, explaining in a *44-State-coalition* comment letter that the Commodity Exchange Act does not preempt state law. Ohio Attorney General, *Comment Letter on Prediction Markets; Public Interest Determinations*, CFTC-2026-1189

(July 27, 2026), perma.cc/GC7L-AFRW. The CFTC has yet to issue the final rule.

The CFTC recently took two more regulatory actions. First, it issued an interim final rule excluding some casino-style gambling from the definition of "swap." 91 Fed. Reg. 65969 (Oct. 19, 2026). And second, it proposed to redefine "swap" to explicitly include sports-related event contracts. 91 Fed. Reg. 66022 (Oct. 19, 2026). The comment periods for these rules remain open.

In addition to these regulatory actions, the CFTC has begun to sue States directly, arguing that its regulatory power preempts States' laws. *See CFTC Exercises Emergency Authority to Ensure Market Stability* (Aug. 11, 2026), perma.cc/3FSE-5DA7. One of those cases, which involves substantially the same issues as this one, is pending in the Seventh Circuit. *See United States v. Wisconsin*, No. 26-2636 (7th Cir.).

## SUMMARY OF ARGUMENT

**I.** When Congress intends major changes to federal law, it says so clearly. *Whitman*, 531 U.S. at 468. Kalshi's position violates this well-settled principle in two ways.

*First*, Kalshi's position violates the federalism canon. Courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond v. United States*, 572 U.S. 844, 857–59 (2014). The regulation of gambling falls within the States' traditional powers. *Ah Sin*, 198 U.S. at 505–06. The States have long regulated gambling, including sports betting. This Court should not upset this traditional balance.

*Second*, Kalshi's position violates the major-questions doctrine. The doctrine requires broad and novel claims of federal-agency authority over significant topics to flow from "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted). Sports betting is a matter of great political and economic significance. If Congress intended to give the CFTC broad power to make nationwide decisions about sports betting, it would have spoken far more clearly.

**II.** The negative ramifications of Kalshi's position are another sure sign it is wrong. States have considerable experience regulating gambling, including sports betting. The CFTC "has no expertise in crafting" policies to address sports betting. *See King v. Burwell*, 576 U.S. 473, 486

(2015). That makes it "especially unlikely that Congress would have delegated" this power in such an opaque manner. *See id.*

**III.** The CFTC's recent change of position does not change the analysis. This case turns on statutory interpretation, and the CFTC has "no special competence" to answer the statutory question about "the scope of" its own jurisdiction. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024).

## ARGUMENT

When Congress acts within its enumerated powers, it may preempt state law expressly or by implication. *See* U.S. Const. art. VI, cl. 2; *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). But preemption always turns on the text of federal law. *Garcia*, 589 U.S. at 202. And to give statutory text a "fair reading," courts must remain aware that "Congress legislates against the backdrop" of certain presumptions. *Bond v. United States*, 572 U.S. 844, 857 (2014) (quotation omitted).

Here, two presumptions—the federalism canon and major-questions doctrine—render Kalshi's position untenable. And although New York prevails even without these clear-statement rules, they confirm that the prediction market theories fail. *See KalshiEX, LLC v. Schuler*, ___ F.4th

___, 2026 WL 2884087, *16 n.9 (6th Cir. Sept. 25, 2026). And practical considerations reinforce the point.

## I. When Congress makes major changes to the law, it does so clearly.

Congress does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468. So when Congress seeks to change the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.*

This principle has several context-specific applications. For example, if Congress wishes to abrogate a government body's sovereign immunity, it "must use unmistakable language." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023). And "absent a clear statement from Congress," courts presume that federal statutes are inapplicable outside the United States. *Bond*, 572 U.S. at 857. These and other "clear-statement rules help courts act as faithful agents of the Constitution." *West Virginia v. EPA*, 597 U.S. 697, 736 (2022) (Gorsuch, J., concurring) (quotation omitted).

Two clear-statement rules apply here: the federalism canon and major-questions doctrine.

### A. Kalshi's position violates the federalism canon.

The Constitution gives the federal government "only limited powers; the States and the people retain the remainder." *Bond*, 572 U.S. at 854; *see* U.S. Const. amend. X. That setup leaves the States with considerable police powers that they exercise for the public good. *Bond*, 572 U.S. at 854. Congress legislates against this default ordering of sovereign authority. *Id.* at 857–58. Any statute that displaces a significant amount of state power constitutes a major change. *See id.* at 857. And Congress must speak clearly when making a major change. Absent a "clear statement," courts should not assume that Congress intends "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *Id.* at 858–59 (quotation omitted). This ensures that Congress "has in fact faced, and intended to bring into issue, the critical matters involved." *Id.* at 858 (quotation omitted).

The federalism canon applies with particular force to preemption. Preemption necessarily triggers the "sensitive relation" between federal and state authority. *Id.* (quotation omitted). Courts thus need "to be certain of Congress' intent before finding that federal law overrides the

usual constitutional balance of federal and state powers." *Id.* (quotation omitted). Courts should be "reluctant to find" preemption in an area "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

Given the many dangers of gambling, the regulation of gambling fits neatly "within the police powers of a state." *Ah Sin*, 198 U.S. at 505–06. It is no surprise that the States have a lengthy history of gambling regulation, including the regulation of sports betting. Federal law historically has "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

Applying the federalism canon, Kalshi's theory must fail unless Congress made a "clear statement" signaling that it intended "a significant change in the sensitive relation between" the federal and state governments as to gambling. *See Bond*, 572 U.S. at 858 (quotation omitted); *accord Ah Sin*, 198 U.S. at 505–06. Kalshi identifies no clear statement. Kalshi instead offers a roundabout theory under which Congress—many years ago, when sports betting was mostly illegal—supposedly made a subtle-but-drastic change to gambling laws by inserting the word "swap"

into a pre-existing regulatory scheme aimed at financial regulation. *See* Kalshi Br.40–45.

Kalshi's position is much like proposed readings that failed in past clear-statement cases. In 2000, the Supreme Court stopped a dramatic expansion of federal regulatory authority by refusing to read "drug"—in the context of the Food, Drug, and Cosmetic Act—to include tobacco. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). And in *Bond*, the Supreme Court refused to read "chemical weapon" in an "improbably broad" and "boundless" way that would have reached "purely local crimes" and "intrude[d] on the police power of the States." 572 U.S. at 860. This Court should likewise refuse to read "swaps"—a term describing particular financial instruments used to hedge against economic risk—in an improbably broad and boundless way. The Supreme Court certainly has not employed such a reading: just a few years after the Dodd-Frank Act, the Court concluded that States are "free to act" as they wish on the "controversial subject" of "sports gambling." *Murphy*, 584 U.S. at 486. That would make little sense if, as Kalshi posits, the CFTC controls all sports gambling so long as it is structured as an "events contract."

If the text clearly signals anything here, it is the *lack* of intent to preempt sports-betting regulations. The exclusive-jurisdiction provision on which Kalshi relies includes two saving clauses, both of which signal preservation of state authority. 7 U.S.C. §2(a)(1)(A). The statutory scheme also includes two express preemption clauses. 7 U.S.C. §16(e)(2), (h). One of those clauses preempts state laws about select forms of "gaming." §16(e)(2). But the "gaming" the clause covers does not extend to "sports-betting laws." *See KalshiEX, LLC v. Martin*, 793 F. Supp. 3d 667, 680–81 (D. Md. 2025). Congress's inclusion of a specific preemption provision tailored to other forms of gaming indicates a lack of preemptive intent as to sports betting. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

Kalshi invites the Court to read an express-preemption clause into federal law where none exists. Because this is an area of traditional state authority, the Court should reject that invitation.

### B. Kalshi's position violates the major-questions doctrine.

The major-questions doctrine teaches that courts—when reading statutes empowering federal agencies—should employ "common sense as to the manner in which Congress would have been likely to delegate" power.

*West Virginia*, 597 U.S. at 722–23 (alteration accepted, quotation omitted); *see also Learning Res., Inc. v. Trump*, 607 U.S. 229, 242–43 (2026) (Roberts, C.J., op.) (discussing the need for context, common sense, and skepticism when the federal government claims "broad, expansive power on an uncertain statutory basis"). "Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *West Virginia*, 597 U.S. at 723 (alteration accepted, quotation omitted).

The major-questions doctrine thus requires a clear statement whenever a federal agency claims broad and novel authority over matters of great economic and political significance. *See id.* at 721, 724. Courts should tread cautiously when an agency "claim[s] to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *Id.* at 724 (alterations accepted, quotation omitted). Said differently, a "lack of historical precedent," "coupled with" a broad claim of federal authority, makes for "a telling indication" of federal overreach. *Learning Res., Inc.*, 607 U.S. at 245–46 (Roberts, C.J., op.) (quotation omitted).

This case implicates the major-questions doctrine because sports betting is a politically and economically significant topic—on which "Americans have never been of one mind." *Murphy*, 584 U.S. at 458. Sports betting is a multi-billion-dollar industry involving millions of Americans. *See, e.g.*, John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT; Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp; *cf. also King v. Burwell*, 576 U.S. 473, 485 (2015). Kalshi alone reported sports betting of $58 billion in June and July 2026 during the FIFA World Cup. Kaitlyn Radde, *Prediction markets' trading volume doubled between May and July, largely driven by sports*, Pew Research Center (Sept. 23, 2026), perma.cc/3MDQ-JAEE.

Sports betting has been illegal under state law for much of this country's history and remains illegal in eleven States. States that allow it have made different decisions about what to allow. Kalshi's position would grant the CFTC incredible and unexpected power. *See* Kalshi Br.40–45.

An important consequence would follow: If sports bets qualify as swaps, then sports bets cannot be treated any other way. Under the federal definition, a swap is any type of "agreement, contract, or transaction" that satisfies certain conditions. §1a(47)(A). If an agreement satisfies those conditions, federal law makes it generally "unlawful for any person" to enter into such an agreement except on a CFTC-regulated market. §2(e). Kalshi is not simply arguing that sports betting *may* occur on designated contract markets. Kalshi is arguing that sports betting *must* occur on those markets. As Kalshi would have it, States authorizing sports betting via state-regulated processes—currently about forty States—are all facilitating illegal activity under federal law.

If Congress truly meant to give the CFTC so much power, it would have spoken clearly. Kalshi, again, points to no such clear statement. Instead, its attenuated theory of preemption relies on a contextless brand of textualism that is "colorable" at best. *See West Virginia*, 597 U.S. at 722. A merely colorable textual theory is not enough for such a major change. *Id.* at 722–23.

Kalshi argues that Congress preempted state gambling laws as part of its response to the 2008 financial crisis. But that makes no historical

sense. Nobody thought that sports gambling caused the financial crisis. Sports betting was mostly illegal at that time. *See Murphy*, 584 U.S. at 462. Congress was instead responding to much different problems involving financial instruments like credit-default swaps. Employing even an ounce of "common sense as to the manner in which Congress would have been likely to delegate" power, *see West Virginia*, 597 U.S. at 722–23 (alteration accepted, quotation omitted), Kalshi's argument crumbles. Congress did not sneak sports-gambling preemption into the Dodd-Frank Act.

## II. Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens.

Practical concerns make Kalshi's position even less likely. Congress is "especially unlikely" to delegate broad power to an agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. This Court should be "especially" reluctant to transfer authority over sports betting from experienced state regulators to an inexperienced federal commission. *Id.*

### A. States are experienced in regulating sports betting and its many potential harms.

**1.** States that allow sports betting comprehensively regulate that activity. For example, given the importance of gambling to Nevada's

overall economy, the State strictly regulates all gambling activities to ensure the public's continued "confidence and trust." Nev. Rev. Stat. §463.0129(1) (outlining Nevada's policy on gambling). A central part of Nevada's mission is ensuring that gaming proprietors are "controlled and assisted" to "protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." *Id.*

Nevada's regulatory scheme offers gamblers many levels of protection. Nevada employs a rigorous licensing process that ensures any gambling entity undergoes an in-depth investigation before receiving a license. *See* Nev. Rev. Stat. §§463.170, 463.530, 463.5735. This process ensures that gambling is free from organized crime and other criminal elements.

Nevada's regulatory scheme also offers a variety of more specific protections. For instance, Nevada requires those that conduct gaming operations to conspicuously post information about resources for problem gamblers. Nev. Gaming Comm'n Reg. 5.170(2). Nevada law also includes safeguards to protect against improper betting practices, including improper wagers on sports. *See, e.g.*, Nev. Rev. Stat. §§465.092–.094; Nev. Gaming Comm'n Regs. 22.010(14), 22.060–.063, 22.080(1); *cf. also* Nev. Rev. Stat. §§463.362–.3668. Nevada prohibits sports wagers by game

officials, owners, coaches, players, or other team staff. *See* Nev. Gaming Comm'n Reg. 22.1205(2). Further, Nevada requires that those facilitating sports betting report suspicious activity. Nev. Gaming Comm'n Reg. 22.121.

Consider also Ohio's approach to sports gambling. Like Nevada, Ohio prohibits companies from offering sports betting without a license. Ohio Rev. Code §3775.03(A). A company must therefore establish that it can responsibly facilitate gambling. Ohio Rev. Code §3775.09(A)–(B). Relatedly, Ohio facilitates an exclusion program whereby people worried about their sports gambling habits may place themselves on a voluntary exclusion list. *See* Ohio Rev. Code §3775.02(B)(11). Sports gaming proprietors are then required to "employ commercially reasonable methods to prevent any person who is participating in the sports gaming voluntary exclusion program from engaging in sports gaming." Ohio Rev. Code §3775.13(C)(1).

**2.** These and other regulations protect people and mitigate gambling risks. Gambling is entertaining for many but dangerous for some. Millions of Americans qualify as problematic gamblers. Nat'l Gambling Impact Study Comm'n, Final Report, 4-1; Charita M. Goshay, *Ohio offers*

*Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024), perma.cc/BQY6-YBC3. And research has linked gambling to other risks, including substance abuse and psychological distress. *See* Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024), perma.cc/XL7W-QS2L.

Some gamble to the point of financial ruin. *See* Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024), perma.cc/JG9G-P7QT. Others place gambling over the health of loved ones. *See* Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024), perma.cc/E4ZU-U3MN. Still others gamble to the point of suicide. *See* Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025), perma.cc/76KG-5ZGS.

These problems are on the rise. *See id.* A 2022 survey performed by the Ohio Casino Control Commission signaled that the prevalence of at-risk/problem gamblers in Ohio had nearly doubled in five years. *See Ohio Gambling Survey 2022*, Ohio Casino Control Commission,

perma.cc/4GG3-SGQE (slide five of PowerPoint). As another datapoint, calls to Ohio's gambling hotline were up 55% in 2023. Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024), https://tinyurl.com/mtjnna33.

Minors are particularly vulnerable, as online sports betting attracts a younger crowd. A recent New Jersey-based survey reflected that nearly one in five people surveyed between the ages of 18 and 24 was at high risk of a gambling problem. *See* Lia Nower et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies, at 34 (2023), perma.cc/V3KH-BPHC. And research reflects that those who start gambling at a young age run a higher risk of problematic gambling. *See* Nat'l Gambling Impact Study Comm'n, Final Report, 4-12.

Kalshi's position, if accepted, would effectively lower the gambling age in many States. According to Kalshi's membership agreement, the company's services are open to anyone of the age of majority in their State. Kalshi Member Agreement, at VI (February 16, 2026), https://kalshi.com/docs/kalshi-member-agreement.pdf. In most States,

the age of majority is eighteen. *See, e.g.*, Nev. Rev. Stat. §129.010; Ohio Rev. Code §3109.01. But many States have decided to limit gambling (or certain types of gambling) to those twenty-one or older. *E.g.*, Nev. Rev. Stat. §463.350; Ohio Rev. Code §3775.99(A). That discrepancy is no small matter. As just mentioned, those who begin gambling at a young age face a higher risk of long-term problems. That might be good for Kalshi, but it is bad for the States' citizens.

Unregulated sports betting also undermines the integrity of sporting events. The federal government recently indicted dozens of people, alleging unlawful betting on professional basketball games. *U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025), https://tinyurl.com/yux8k2nk. Last year, it took only a few pitches during baseball games to spark controversy over prop bets in Ohio. *See* Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025), perma.cc/CA26-SA28. And two years ago, gamblers even threatened a coach of the Cleveland Cavaliers. Tom Withers, *Cavs coach Bickerstaff says he received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024), perma.cc/4KR5-3F56.

### B. Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.

Federal regulation of the derivatives marketplace is not a cure-all when it comes to sports betting. The CFTC's present regulatory requirements—often called the "core principles"—are outlined within the federal code. *See* 17 C.F.R. §§38.100–.1200. They cover topics like dispute resolution, 17 C.F.R. §38.750, conflicts of interest, 17 C.F.R. §38.850, and disciplinary procedures, 17 C.F.R. §38.700.

Although Kalshi is regulated in this sense, these regulations are geared toward different concerns. In the CFTC's own words, its regulations "are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." 89 Fed. Reg. at 48983. It follows that federal regulations do not replace the States' regulatory schemes, which are specifically designed to combat problems associated with gambling. Moreover, relying on federal regulation alone forces a one-size-fits-all regime, eliminating the States' ability to experiment with other approaches.

Take Nevada, which has nearly one hundred years' experience in regulating gambling. Nevada has developed robust procedures for

determining the suitability of any person involved in the gaming industry. This suitability determination is a front-loaded process in which the person seeking approval bears the burden of showing the person is qualified to hold a license. Nev. Rev. Stat. §463.170(1). This burden entails satisfying the Nevada Gaming Commission that the person is a "person of good character, honesty and integrity"; that the person's "prior activities, criminal record ..., reputation, habits and associations do not pose a threat to the public interest of [Nevada] or to the effective regulation and control of gaming"; and that the person is "[i]n all other respects qualified to be licensed or found suitable consistently with the declared policy of [Nevada]." Nev. Rev. Stat. §463.170(2). This burden extends to the person showing "adequate business probity, competence and experience, in gaming" and that the financing for the operation is both adequate and from a suitable source. Nev. Rev. Stat. §463.170(3). In this way, Nevada screens out potentially predatory, bad actors from its system of legalized gambling.

The Commodity Exchange Act offers no comparator to Nevada's suitability procedures. Worse still, designated contract markets like Kalshi may list new types of events contracts on their exchanges without pre-

approval, simply by self-certifying to the CFTC that the new contract complies with federal law. *See* 7 U.S.C. §7a-2(c)(1). Such loose processes will allow individuals who would be unable to clear state-law hurdles to run de facto sportsbooks, immune from States' regulation.

The takeaway is simple. Under Kalshi's theory, various state-law safeguards would disappear. That, in turn, would create a sizeable hole in the States' ability to protect their citizens from predatory practices and other problematic behavior.

## III. The CFTC's reading of the federal statutes deserves no special weight.

In recent months under new leadership, the CFTC has joined in lockstep with Kalshi's arguments. But that does nothing to change the legal analysis here. The CFTC's new position on preemption deserves no special weight.

This case, like almost all preemption cases, turns on statutory interpretation. The preemption analysis depends on whether federal statutes about derivatives contain a clear statement removing States' traditional authority over sports betting. The CFTC has "no special competence" to answer that statutory question about "the scope of" its own jurisdiction. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024).

Rather, because the CFTC's new reading of federal statutes exalts its own authority, this is a situation where "abdication in favor of the agency is *least* appropriate." *See id.* at 401.

The CFTC's new position also does not carry any "particular power to persuade." *See id.* at 402 (quotation omitted). The position was prepared for purposes of litigation, without input from the public or the States. The position is inconsistent with the CFTC's past guidance, including guidance offered much closer in time to the enactment of the relevant statutory text. And the position does not arise from any special expertise as to sports betting. Considering these features, the CFTC's position is "inherently suspect." *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009).

*

One critical benefit of our constitutional structure is that the States act "as laboratories" of democracy, "devising solutions" to new and difficult problems. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quotation omitted). That flexibility is a particularly good thing here since "Americans have never been of one mind about gambling." *Murphy*, 584 U.S. at 458. States are in the best position to implement innovative regulatory schemes responsive to

particularized concerns that arise within their borders, thereby protecting the public and promoting confidence in the gaming industry. Nothing in federal law suggests, much less clearly states, that Congress has stripped the States of their traditional power over sports betting. This Court, it follows, should not do so.

## CONCLUSION

The Court should affirm.

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
HStern@ag.nv.gov

D. ANDREW WILSON
Ohio Attorney General

/s/ *Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
**Counsel of Record*
GREGORY P. MATHEWS
Senior Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amici States*

## ADDITIONAL *AMICI CURIAE*

STEVE MARSHALL
Attorney General
State of Alabama

CORI MILLS
Acting Attorney General
State of Alaska

KRISTIN K. MAYES
Attorney General
State of Arizona

TIM GRIFFIN
Attorney General
State of Arkansas

ROB BONTA
Attorney General
State of California

WILLIAM TONG
Attorney General
State of Connecticut

KATHLEEN JENNINGS
Attorney General
State of Delaware

BRIAN L. SCHWALB
Attorney General
District of Columbia

ANNE E. LOPEZ
Attorney General
State of Hawai'i

RAÚL R. LABRADOR
Attorney General
State of Idaho

KWAME RAOUL
Attorney General
State of Illinois

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

AARON M. FREY
Attorney General
State of Maine

ANTHONY G. BROWN
Attorney General
State of Maryland

ANDREA JOY CAMPBELL
Attorney General
State of Massachusetts

DANA NESSEL
Attorney General
State of Michigan

KEITH ELLISON
Attorney General
State of Minnesota

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

MICHAEL T. HILGERS
Attorney General
State of Nebraska

JENNIFER DAVENPORT
Attorney General
State of New Jersey

RAÚL TORREZ
Attorney General
State of New Mexico

JEFF JACKSON
Attorney General
State of North Carolina

EDWARD E. MANIBUSAN
Attorney General
Commonwealth of the
Northern Mariana Islands

DAN RAYFIELD
Attorney General
State of Oregon

DAVID W. SUNDAY, JR.
Attorney General
State of Pennsylvania

PETER F. NERONHA
Attorney General
State of Rhode Island

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

DEREK E. BROWN
Attorney General
State of Utah

CHARITY R. CLARK
Attorney General
State of Vermont

NICHOLAS W. BROWN
Attorney General
State of Washington

JOHN B. McCUSKEY
Attorney General
State of West Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for an *amicus* brief and contains 6,514 words. *See* Fed. R. App. P. 29(a)(5), 2nd Cir. R. 32.1(a)(4)(A).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2026, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN