# 26-1835-cv

## United States Court of Appeals
*for the*
## Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

– v. –

ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission, BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission, JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission, SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission, MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission, PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission, MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission, JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission,

*Defendants-Appellees,*

NEW YORK STATE GAMING COMMISSION,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF FOR *AMICUS CURIAE* GARY GENSLER IN SUPPORT OF DEFENDANTS-APPELLEES

AITAN D. GOELMAN
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
(202) 778-1800

VICTOR SUTHAMMANONT
KOSTELANETZ LLP
Seven World Trade Center
250 Greenwich Street, 34th Floor
New York, New York 10007
(212) 808-8100

*Attorneys for Amicus Curiae*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (397922)

# TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 3

ARGUMENT ........................................................................................ 10

I. The CEA's Text, History, Purpose, and Structure Demonstrate Sports-Betting Contracts Are Not Swaps ........................................ 10

A. Federal Derivatives Regulation Prior to Dodd-Frank .............. 10

B. Dodd-Frank Was Aimed at the Causes of the Financial Crisis, Not Sports Betting ........................................................ 14

C. Sports Bets Are Not Swaps ..................................................... 17

II. The Special Rule Does Not Imply That Sports Bets Fall Within the Swap Definition ........................................................................ 24

III. No One in Congress Called for Preempting State Gaming Laws, Nor Did Dodd-Frank Do So ............................................................ 28

IV. Kalshi's Interpretation of the Swap Definition as Covertly but Radically Altering Sports-Betting Regulation Defies Common Sense ................................................................................................ 30

CONCLUSION ................................................................................... 33

# TABLE OF AUTHORITIES

## CASES

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905) .............11

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316 (1997)........................................................................................18

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ....................................................30

*Chevron U.S.A. Inc. v. Plaquemines Par.*, 608 U.S. 1 (2026).................................18

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)........................30

*Inv. Co. Inst. v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013) ..........................................10

*KalshiEX LLC v. Assad*, 190 F.4th 1098 (9th Cir. 2026) ................................ 5, 7, 26

*KalshiEX LLC v. Cox*, No. 26-4100 (10th Cir. Sept. 8, 2026)..................................5

*KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087 (6th Cir. Sept. 25, 2026)........................................................................................ passim

*King v. Burwell*, 576 U.S. 473 (2015).....................................................................30

*Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026) ................................................30

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) ......................30

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982)........20

*Murphy v. NCAA*, 584 U.S. 453 (2018) ......................................................... 8, 9, 21

*Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80 (2020)...................................19

*United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025) .................................... 14, 15

*W. Flagler Assocs., Ltd. v. Haaland*, 144 S. Ct. 2671 (2024)...................................9

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).......................................9, 30

**STATUTES**

7 U.S.C. § 1a ..................... passim

7 U.S.C. § 2 ..................... passim

7 U.S.C. § 5 ..................... 12, 17

7 U.S.C. § 6 ..................... 12, 16, 29

7 U.S.C. § 7a-2 ..................... 7, 24, 25, 26

7 U.S.C. § 16 ..................... 7, 13, 29

7 U.S.C. § 27f ..................... 29

15 U.S.C. § 78bb ..................... 29

15 U.S.C. § 8302 ..................... 6

18 U.S.C. § 1084 ..................... 8

25 U.S.C. § 2710 ..................... 8

28 U.S.C. § 3702 ..................... 8

31 U.S.C. § 5362 ..................... 21

Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936) ..................... 11

Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, app. E, 114 Stat. 2763 ..................... 13, 14, 29

Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 ..................... 11, 12

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ..................... 6, 29

Futures Trading Practices Act of 1992, Pub. L. No. 102-546, 106 Stat. 3590 ..................... 12

Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998 (1922) ..................... 11

N.J. Stat. Ann. § 5:12A-11 ..................... 9

Nev. Rev. Stat. § 463.350 ....................................................................................9

Tex. Penal Code Ann. § 47.02 ...............................................................................9

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

17 C.F.R. § 40.11 ..............................................................................................27

Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669 (May 7, 2008) ...................................... 14, 23, 25

De Minimis Exception to the Swap Dealer Definition, 83 Fed. Reg. 56666 (Nov. 13, 2018) .............................................................................................22

Event Contracts, 89 Fed. Reg. 48968 (June 10, 2024) (proposed rule)..................32

Exemption for Certain Swap Agreements, 58 Fed. Reg. 5587 (Jan. 22, 1993).......12

Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant," 77 Fed. Reg. 30596 (May 23, 2012) ................23

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208 (Aug. 13, 2012)............................. 5, 18, 23

Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65969 (Oct. 19, 2026) .................................................. 6, 18, 22, 28

Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694 (July 21, 1989).........................................................................................................12

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011) .................................................................................................... 26, 27

## OTHER AUTHORITIES

156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) .......... 26

Bd. of Governors of the Fed. Rsrv. Sys. et al., *Joint Report on Retail Swaps* (Dec. 2001), https://perma.cc/MLA3-KJ39 .......... 14, 23

Br. of Appellee, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) .......... 20, 26

Carl Hulse, *Pentagon Prepares a Futures Market on Terror Attacks*, N.Y. Times (July 29, 2003), https://www.nytimes.com/2003/07/29/us/threats-responses-plans-criticisms-pentagon-prepares-futures-market-terror.html .. 24, 25

CFTC Off. of Inspector Gen., *Management and Performance Challenges Fiscal Year 2026* (Dec. 3, 2025), https://perma.cc/Q94S-Q6TM .......... 32

CFTC, *Comments for Proposed Rule 76 Fed. Reg. 29818*, https://comments.cftc.gov/PublicComments/CommentList.aspx?id=1032 .......... 23

Chicago Mercantile Exchange, *Chapter 13*, https://www.cmegroup.com/rulebook/CME/I/13.pdf .......... 24

CME Group, *Comment for Proposed Rule 75 Fed. Reg. 67282* (Jan. 3, 2011), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=26867&SearchText= .......... 27

*Derivative*, Black's Law Dictionary (12th ed. 2024) .......... 10

Eleanor Davis-Diver, *The House Always Wins, Even on House-less Kalshi*, Am. Prospect (Aug. 26, 2026), https://prospect.org/2026/08/26/house-always-wins-kalshi-prediction-markets/ .......... 22

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (Jan. 2011), https://perma.cc/B7VH-GTLV .......... 17

Letter from Timothy Geithner, Sec'y of the U.S. Treasury, to Senator Harry Reid (May 13, 2009), https://perma.cc/QUG5-HTD4 .......... 15

Milla Jovanovic, *US Sports Betting in 2025 Reaches Record Highs, Driven by New York and Illinois*, SportsHandle (Feb. 26, 2026), https://perma.cc/6JW7-D6X8 ......................................................................9, 22

S. Amend. 3739 to S. 3217, 111th Cong. (2010), 156 Cong. Rec. S2816 (daily ed. Apr. 29, 2010) ............................................................................24

Stephen Jewson et al., *Weather Derivative Valuation: The Meteorological, Statistical, Financial and Mathematical Foundations* (2005), https://perma.cc/KR7H-2UVB ..........................................................................13

*Testimony of CFTC Chairman Gary Gensler Before the H. Comm. on Fin. Servs.*, 111th Cong. (July 22, 2009), https://www.cftc.gov/PressRoom/SpeechesTestimony/gensler-7 ........................15

*Testimony of Chairman J. Christopher Giancarlo Before the S. Comm. on Appropriations, Subcomm. on Fin. Servs. & Gen. Gov't* (May 8, 2019), https://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo71 .............32

*Volume Race*, https://perma.cc/63VG-63M6 (last visited Oct. 28, 2026) ...............19

Written Testimony of Bill Miller, President & CEO, American Gaming Association (May 20, 2026), https://perma.cc/63HA-SSS9 ................................32

## INTERESTS OF AMICUS CURIAE

Gary Gensler served as Commodity Futures Trading Commission ("CFTC") Chairman (2009 to 2014), as Securities and Exchange Commission ("SEC") Chair (2021 to 2025), as Under Secretary and Assistant Secretary of the Treasury (1997 to 2001), and as Senior Advisor to Senator Paul Sarbanes. *Amicus* is currently Professor of the Practice of Global Economics and Management and Professor of the Practice of Finance at the Massachusetts Institute of Technology Sloan School of Management and co-hosts the *Power and Consequences* podcast.[1]

During his government service, *Amicus* worked with Congress twice in amending the Commodity Exchange Act ("CEA"), through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") and the Commodity Futures Modernization Act of 2000 ("CFMA"). He led the CFTC in adopting 67 rules, orders, and guidance implementing Dodd-Frank. He also was directly involved in, as SEC Chair, directing the completion of multiple security-based swaps rules and as Senior Advisor to Senator Sarbanes, assisting in drafting the Sarbanes-Oxley Act of 2002. At Treasury, he coordinated the response to the

[1] Other than *Amicus* and his counsel, no person authored this brief in whole or in part or contributed money to the preparation or submission of this brief. The parties have consented to the filing of this brief.

1998 collapse of hedge fund Long-Term Capital Management (with $1.3 trillion in derivatives exposures) and the drafting of the Gramm-Leach-Bliley Act ("GLBA") swaps provisions.

Prior to his public service, *Amicus* spent 18 years at the investment bank Goldman Sachs, during which he oversaw fixed income, currency, and derivatives trading in Japan and later worldwide Controller and Treasury functions, including accounting, funding, and risk management for the firm's derivatives desks.

*Amicus* submits this brief to provide statutory context for Dodd-Frank and the CFMA based on his involvement in their passage and implementation and to accurately describe the historical record of Executive Branch and congressional colleagues who worked on Dodd-Frank, in particular the late Senate Majority Leader Harry Reid of Nevada.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case boils down to the question of what, if anything, Congress did in Dodd-Frank with regard to sports betting. Kalshi's argument is that, by encompassing some event contracts within the statutory definition of swap, Congress also included sports-betting contracts within the swap definition and, as a result, the CEA operates to preempt state gaming laws.

The answer—from *Amicus* as someone who was there—is that Congress did nothing of the sort. When Congress amended the CEA through Dodd-Frank, it was addressing the causes of the 2008 financial crisis, not undoing federal policy against sports betting and displacing traditional state and tribal regulation. Congress did not include sports-betting contracts within the statutory definition of swap. Nor did it transfer jurisdiction over sports betting from the states to the CFTC.

To put the argument in the plainest real-world terms: Senate Majority Leader Harry Reid of Nevada would never have consented to legislation displacing an activity so critical to his state's economy and politics by permitting sports betting only under CFTC auspices. No one working on Dodd-Frank attempted to put a curve ball by the Senate Majority Leader to legalize a national sports-betting regime or preempt the Nevada Gaming Commission, a Commission Majority Leader Reid had chaired (1977–1981). He would not have allowed it. Nor did Congress do so.

*First*, the text, history, purpose, and structure of federal derivatives markets and laws show that sports-betting contracts are not swaps.

U.S. derivatives markets developed in the nineteenth century to enable farmers, ranchers, and merchants—and later parties with other commercial interests—to hedge price risk and discover prices. Fostering those functions has been at the heart of federal derivatives regulation for more than a century.

"Swaps," a new form of over-the-counter ("OTC") derivatives, developed in the 1980s to enable institutions to engage in customized bilateral hedging transactions. These agreements became known as swaps because counterparties often exchanged—or swapped—a series of cash flows or exposures.

In the wake of the then-unregulated OTC derivatives market's contribution to the 2008 financial crisis, Congress and the Obama administration focused on establishing a regulatory regime for swaps (including certain event contracts incorporated in the definition of swap) in Dodd-Frank.

In so doing, Congress did not include sports-betting contracts within the statutory definition of swap. Such contracts do not fit the CEA's purpose or the statutory language defining swap, which focus on hedging economic risk. Sports bets are not designed for and are very rarely, if ever, entered into for the purpose of hedging. As the Sixth and Ninth Circuits have concluded, reliance on downstream economic effects on sponsors, advertisers, television networks, and franchises

stretches "associated with a potential financial, economic, or commercial consequence" too broadly, beyond its statutory context.[2] *See KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087, at *12 (6th Cir. Sept. 25, 2026); *KalshiEX LLC v. Assad*, 190 F.4th 1098, 1114 (9th Cir. 2026).[3]

Moreover, if Kalshi and the CFTC were correct that Congress made sports bets swaps, then *all* off-exchange retail sports bets since October 2012[4]—in every state—have been illegal because persons other than "eligible contract participants" ("ECPs")[5] are prohibited from entering into off-exchange swaps under 7 U.S.C. § 2(e). The CFTC has attempted to address this dramatic implication through an interim final rule ("October 2026 IFR") without notice and comment, carving out of the swap definition sports bets not listed on a regulated exchange if entered into at a state or tribally regulated venue. That further definition, though, has no grounding

---

[2] The Tenth Circuit also denied Kalshi's application for an injunction pending appeal from the District of Utah's order denying Kalshi a preliminary injunction and granting summary judgment to Utah. Order at 1, *KalshiEX LLC v. Cox*, No. 26-4100, ECF No. 19 (10th Cir. Sept. 8, 2026).

[3] *Amicus* filed a brief in support of Ohio in the Sixth Circuit. *See Schuler*, 2026 WL 2884087, at *2, *14.

[4] October 2012 was the effective date of the CFTC and SEC joint rulemaking further defining swaps. *See* 77 Fed. Reg. 48208 (Aug. 13, 2012).

[5] An ECP is a financial, commercial, or governmental entity or an individual with more than $10 million of invested assets ($5 million if hedging). 7 U.S.C. § 1a(18).

in the statutory text, nor does the premise of the exclusion—that tradability is an inherent characteristic of a swap. Even if it did, the CFTC did not issue its further definition of swap jointly with the SEC as expressly required by Section 712(d) of Dodd-Frank.[6]

There was no mention of sports betting during the 54 times *Amicus* testified to Congress as CFTC Chairman, nor did anyone involved in drafting Dodd-Frank or in the extensive implementing rulemaking process speak of the CFTC as a national sports-betting regulator.

*Second*, contrary to Kalshi's contentions here, Dodd-Frank's "Special Rule," by text and design, does not define sports bets as swaps. *Contra* Opening Br. for KalshiEX LLC ("App. Br.") at 42, Dkt. No. 43.1. The Special Rule's purpose was to give the CFTC authority to prohibit "agreements, contracts, or transactions" that involve "gaming," unlawful activity, terrorism, war, or assassination from being listed on regulated markets.

The Ninth Circuit concluded from the Special Rule and its legislative history that "Congress did not want sports betting to be conducted on derivatives markets."

---

[6] *See* Dodd-Frank Act, Pub. L. No. 111-203, § 712(d)(1), 124 Stat. 1376, 1644 (2010) (codified at 15 U.S.C. § 8302(d)); Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65969, 65973 (Oct. 19, 2026), https://perma.cc/W28R-T5EZ.

*Assad*, 190 F.4th at 1118 (citation omitted). The rule expressly applies to "agreements, contracts, transactions, *or* swaps in excluded commodities," while its operative prohibition refers to "[n]o agreement, contract, or transaction" determined to be contrary to the public interest, without even using the term "swap." 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii) (emphasis added).

As the Sixth Circuit held, the fact that the CFTC may prohibit gaming-related event contracts does not mean that those contracts are swaps. *Schuler*, 2026 WL 2884087, at *15.

*Third*, Dodd-Frank did not preempt state gaming laws. Whatever preemptive effect the CEA may have with respect to state regulation of swaps and derivatives markets, Congress did not use it to displace state gaming laws governing sports betting.

Nobody involved in Dodd-Frank's passage called for preempting states or their gaming commissions' authorities over sports betting. Congress knew how to expressly preempt state law when it wished to do so. The CFMA expressly preempted state gaming laws for specified transactions, 7 U.S.C. § 16(e)(2), but Congress did not amend that limited provision in Dodd-Frank to cover sports betting.

*Fourth*, the argument that Congress made the CFTC the nation's sports-betting regulator defies logic and common sense.

Preempting state and tribal sports-betting authorities would have upended the federal, state, and tribal statutory schemes then governing sports betting. The Professional and Amateur Sports Protection Act ("PASPA") generally prohibited states in 2010 from authorizing sports betting other than as grandfathered for Nevada casinos and a few state lotteries. 28 U.S.C. § 3702. The Interstate Wire Act of 1961 ("Wire Act") imposed restrictions on interstate transmissions involving sports wagers. 18 U.S.C. § 1084(a). The Indian Gaming Regulatory Act of 1988 ("IGRA") established tribal gaming regulation and tribal-state compacts. 25 U.S.C. § 2710(d).

If sports bets were swaps, as discussed above, all off-exchange sports betting in casinos allowed under PASPA and IGRA would have been illegal under Section 2(e) since 2012.

Yet none of the sophisticated parties involved in *Murphy v. NCAA*, 584 U.S. 453 (2018), claimed Congress had gutted that architecture eight years earlier by handing nationwide sports-betting oversight to the CFTC—thereby permitting under CFTC authority the same activity that Congress had prohibited under PASPA. The Supreme Court decided *Murphy* with the understanding that states may regulate their own citizens on sports gambling: "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486.

Further, Congress and the CFTC (at least until the past year) did not behave as though Congress had made such a fundamental change. No one suggested that

casinos had to shut down their off-exchange sports-betting operations. Nor did the CFTC ask Congress for the staffing or appropriations to regulate sports-betting transactions after Dodd-Frank's passage or after *Murphy*.

Congress does not make fundamental changes in the balance of state and federal power in isolated snippets of text, particularly on unrelated subjects. As the Supreme Court has said, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Preempting state authority over sports betting—an over $165 billion per year industry—has major implications for states' power to protect their residents.[7] The Supreme Court in *Murphy* recognized that the legalization of sports gambling "requires an important policy choice," *Murphy*, 584 U.S. at 486, like Florida's allowing online sports betting under an IGRA gaming compact,[8] Texas's decision to prohibit sports bets,[9] and New Jersey's and Nevada's choices to set a minimum age of 21 for bettors.[10] Usurping this traditional discretion is not the kind of thing Congress hides in a

[7] *See* Milla Jovanovic, *US Sports Betting in 2025 Reaches Record Highs, Driven by New York and Illinois*, SportsHandle (Feb. 26, 2026), https://perma.cc/6JW7-D6X8.

[8] *See W. Flagler Assocs., Ltd. v. Haaland*, 144 S. Ct. 2671 (2024) (denying certiorari on challenge to compact).

[9] Tex. Penal Code Ann. § 47.02.

[10] *See* N.J. Stat. Ann. § 5:12A-11(e); Nev. Rev. Stat. § 463.350(1)(a).

subpart of a definition. If Dodd-Frank had preempted the states and tribes on sports betting, it would have been one of the biggest stories about Dodd-Frank at the time. But nobody ever mentioned it.

## ARGUMENT

### I. The CEA's Text, History, Purpose, and Structure Demonstrate Sports-Betting Contracts Are Not Swaps

To best understand the swap definition—text at the heart of this case—one must review the text, history, purpose, and structure of the CEA and the changes Congress made in response to the 2008 financial crisis. The history matters because Kalshi's argument would attribute to Congress a revolutionary change in sports-betting regulation that is nowhere apparent in the statute's purpose, surrounding provisions, or contemporaneous understanding.

#### A. Federal Derivatives Regulation Prior to Dodd-Frank

U.S. derivatives markets developed in the 1850s as a way for farmers to get price certainty for their potential future crops and to benefit from prices established in a central market, rather than relying on competition for their crops among local merchants.

A "derivative" is a financial contract that derives its value from a "secondary source such as an underlying bond, currency, or commodity" or an underlying price or index. *Derivative*, Black's Law Dictionary (12th ed. 2024); *Inv. Co. Inst. v. CFTC*,

720 F.3d 370, 372 (D.C. Cir. 2013). Well-functioning derivatives markets are essential for producers, merchants, and other end-users seeking to hedge future price risk and focus on what they do best—efficiently providing goods and services for the economy.

Hedging requires counterparties, often speculators hoping to profit from market risks that others want to hedge. As Justice Holmes explained, "[s]peculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905).

Fostering hedging and price discovery has been at the heart of federal derivatives regulation for more than a century. In 1922, Congress found commodity futures were "affected with a national public interest," because they were used as "a basis for determining . . . prices" and for "hedging . . . against possible loss through fluctuations in price." Grain Futures Act, Pub. L. No. 67-331, § 3, 42 Stat. 998, 999.

Those purposes carried into the CEA in 1936, Pub. L. No. 74-675, 49 Stat. 1491, and into Congress's creation of the CFTC in 1974, Pub. L. No. 93-463, 88 Stat. 1389. The CEA states that the transactions it covers are "affected with a national public interest by providing a means for managing and assuming price risks,

discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). These findings and purpose are core to understanding Congress's design for federal regulation of derivatives markets.

As amended in 1974, the CEA provided that all futures contracts were required to be entered into on a designated contract market ("DCM") and gave the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving such contracts, except for specified federal and state authorities. *See* Pub. L. No. 93-463, § 201, 88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)(A)); 7 U.S.C. § 6(a).

In the early 1980s, a new form of derivatives contract emerged as a way for institutions to engage in customized bilateral hedging transactions: swaps.[11] To address questions about swaps' legal status, the Futures Trading Practices Act of 1992 authorized the CFTC to exempt "any agreement, contract, or transaction" from the CEA's requirements. Pub. L. No. 102-546, § 502, 106 Stat. 3590, 3629. The CFTC then exempted certain customized off-exchange swaps between institutional investors. 58 Fed. Reg. 5587, 5594 (Jan. 22, 1993).

---

[11] *See* 54 Fed. Reg. 30694, 30695 (July 21, 1989) (describing swaps as "an agreement between two parties to exchange a series of cash flows").

In 2000, the CFMA statutorily excluded swap transactions in certain commodities between ECPs from CFTC regulation. *See* Pub. L. No. 106-554, app. E, §§ 103, 105(b), 114 Stat. 2763, 2763A-365, 2763A-377, 2763A-379. The CFMA also added a definition of "swap agreement" to the GLBA. *Id.* § 301, 114 Stat. 2763A-449 (adding GLBA § 206A). That amendment defined "swap agreement" to include, among other things, certain event contracts "associated with a potential financial, economic, or commercial consequence." *Id.* at 2763A-450. Congress included this language against a backdrop of the then-emerging market for OTC weather derivatives used to hedge weather-related commercial risks, including hurricanes.[12] Neither swap transactions nor swap agreements as defined in the CFMA were required to be inherently tradeable. In fact, they generally took the form of bespoke agreements between banks and institutional end-users.

In the CFMA, Congress preempted the application of state laws that "regulate[] gaming or the operation of bucket shops" for an enumerated list of transactions, including swaps in excluded commodities entered into by ECPs. *Id.* § 117 (codified at 7 U.S.C. § 16(e)(2) (amended again in Dodd-Frank)). Congress

[12] *See* Stephen Jewson et al., *Weather Derivative Valuation: The Meteorological, Statistical, Financial and Mathematical Foundations* 1 (2005), https://perma.cc/KR7H-2UVB.

did not exclude from CFTC jurisdiction or preempt state laws with respect to "retail" swap transactions. Instead, it directed the Federal Reserve, the Treasury, the CFTC, and the SEC to study "issues involving the offering of swap agreements to persons other than" ECPs, *id.* § 105(c), resulting in a 2001 Joint Report on Retail Swaps ("2001 Joint Report").[13] The 2001 Joint Report contained no suggestion that swaps be used for sports betting.

Subsequently, in 2008, the CFTC issued a "Concept Release on the Appropriate Regulatory Treatment of Event Contracts" ("2008 Concept Release") to address whether "financial agreements that may primarily function as information aggregation vehicles" were within the CFTC's jurisdiction. 73 Fed. Reg. 25669, 25670 (May 7, 2008). The word "swap" was nowhere to be found.

The CFTC recognized that most event contracts are not suited to the purposes of hedging and price discovery central to the CEA. The CFTC stated that event contracts "generally take the form of financial agreements linked to eventualities or measures that neither derive from, nor correlate with, market prices or broad economic or commercial measures." *Id.*

### B. Dodd-Frank Was Aimed at the Causes of the Financial Crisis, Not Sports Betting

---

[13] Bd. of Governors of the Fed. Rsrv. Sys. et al., *Joint Report on Retail Swaps* (Dec. 2001), https://perma.cc/MLA3-KJ39.

Unregulated swaps boomed in the early 2000s, contributing to the 2008 financial crisis. *See United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025).

In its aftermath, Congress and the Executive Branch pursued reforms that culminated in Dodd-Frank. A key administration focus was reversing many CFMA exemptive provisions and establishing a regulatory regime for swaps. In May 2009, Treasury Secretary Timothy Geithner sent Senate Majority Leader Harry Reid recommendations "to enable the government to regulate the OTC derivatives markets[,]" to promote efficiency and transparency, lower systemic risk, prevent manipulation and fraud, and prevent inappropriate marketing to unsophisticated parties.[14] As CFTC Chairman, *Amicus* repeatedly testified to Congress on the need for swaps markets reform, including clearing, exchange trading, transparency, dealer registration, and business-conduct rules. Off-exchange non-ECP swaps were to be prohibited.[15]

In response, Congress passed comprehensive reforms in Dodd-Frank. *Phillips*, 155 F.4th at 113. As amended, the CEA has a six-prong swap definition.

---

[14] *See* Letter from Timothy Geithner, Sec'y of the U.S. Treasury, to Senator Harry Reid (May 13, 2009), https://perma.cc/QUG5-HTD4.

[15] See, e.g., Testimony of CFTC Chairman Gary Gensler Before the H. Comm. on Fin. Servs., 111th Cong. (July 22, 2009), https://www.cftc.gov/PressRoom/SpeechesTestimony/gensler-7.

The third prong lists 22 types of agreements, contracts, or transactions commonly known as swaps—from interest rate swaps to commodity swaps. 7 U.S.C. § 1a(47)(A)(iii). As it had in GLBA, for legislative convenience, Congress also incorporated prongs for agreements not typically considered "swaps," i.e., (1) price-related options (a put, call, cap, floor, collar, or similar option), *id.* § 1a(47)(A)(i), and (2) a limited category of event contracts "associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). In context, these prongs cover only options and event contracts that function like the traditional swaps listed in the third prong by facilitating commercial hedging.

Moreover, Dodd-Frank did not define swaps as a subset of futures, which would have required *all* swaps to be "executed or consummated by or through" a DCM. *See* 7 U.S.C. § 6(a). Rather, Congress allowed ECPs to enter into customized bilateral swaps off-exchange, while prohibiting non-ECPs from doing so unless "entered into on" an exchange. *Id.* § 2(e).

Given the long history of bilateral swaps, which generally were not structured to be traded, these provisions used the words "entered into" rather than "traded"

when referring to swaps. For similar reasons, neither the statutory definition of swap nor of swap dealer includes the words "traded on." *See* 7 U.S.C. § 1a(47), (49).[16]

### C. Sports Bets Are Not Swaps

Kalshi treats the swap definition as if it includes sports-betting contracts, or at least those listed on a DCM. That interpretation, though, is inconsistent with the purpose of the CEA, the statutory and historical context of the swap definition, and the contemporaneous regulatory understanding of the relationship between sports bets, event contracts, and swaps.

As discussed, the CEA's purpose is to improve interstate commerce by facilitating hedging and price discovery. 7 U.S.C. § 5(a). Sports betting does not serve those purposes. Nor, at the time of Dodd-Frank, were sports bets "entered into regularly in interstate and international commerce[,]" *id.*

Sports betting was not part of the 2008 financial crisis or the response to it.[17] Nowhere in the Executive Branch's list of priorities, in *Amicus*'s 54 appearances before Congress, in any statement of a member of Congress, or in the text of Dodd-

---

[16] The swap dealer definition expressly uses "enters into swaps" instead of "traded." 7 U.S.C. § 1a(49)(A)(iii).

[17] *See* Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (Jan. 2011), https://perma.cc/B7VH-GTLV.

Frank was there any indication Congress sought to oust the states from sports-betting regulation.

Thus, when Congress used language for the CEA swap definition originally adopted in GLBA's 2000 definition of "swap agreement," it had no reason to think that language included sports bets. *See supra* Section I.B.

Indeed, the CFTC itself admitted as much in its October 2026 IFR. "[T]here is no indication that 'Congress intended to include [gambling products] in the swap . . . definition.' To the contrary, Congress has long recognized a distinction between gambling products and derivatives contracts." 91 Fed. Reg. at 65973 (second alteration in original) (footnotes omitted) (quoting 77 Fed. Reg. at 48246).

Each prong of Section 1a(47)(A) must be considered in relation to the other subparagraphs and the CEA's history and purpose. That context is crucial, as it limits the inclusion of event contracts to those that hedge risks in a manner similar to traditional swaps. The literalist reading of the event-contract category in subparagraph (ii) that Kalshi espouses, *e.g.*, App. Br. at 41–42, is so broad that it would cover the entire list of swaps in subparagraph (iii), making that key prong superfluous.

As the Supreme Court recently observed, "[t]o be sure, in a literalist sense, 'everything is related to everything else.'" *Chevron U.S.A. Inc. v. Plaquemines Par.*, 608 U.S. 1, 11 (2026) (quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham*

*Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring)). Likewise, many things can be associated with one another. "But, generally in statutory interpretation, 'it is the ordinary, not literalist, meaning that is the better one.'" *Id.* at 11–12 (quoting *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 93 (2020) (Thomas, J., concurring)).

Of the three purported limiting principles Kalshi proposes regarding "any contract involving speculation" from qualifying as a swap, App. Br. at 45–50, only one directly references the swap definition—that an event be "associated with" a potential financial, economic, or commercial consequence. The downstream economic effects on television networks and local businesses relied upon by Kalshi, App. Br. at 43–44, however, are at best only tenuously connected to hedges of commercial risks and stretch "associated with" too broadly beyond its statutory context. Cherry-picking examples like coin flips, Gatorade showers, and high-school theater attendance, as Kalshi does, App. Br. at 46, only highlights the lack of a clear delineation between those bets and the bets Kalshi allows. Congress, however, did not consider bets on outcomes of sporting events, how many points a player would score in a quarter, or sportsbook-style parlays to be swaps.[18] These contracts do not

[18] A parlay pays off on successfully predicting the outcomes of two or more events. Parlay bets represent over 55% of recent volume on reporting prediction

have hedgers meeting speculators to lay off risk. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357–58 (1982).

Kalshi conceded the point in a brief submitted to the D.C. Circuit only a few months before it began self-certifying sports-betting contracts. It stated that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'"[19]

Kalshi's second purported limit—that "tradability" is an inherent characteristic of a swap, App. Br. at 46–48—which the CFTC echoes in its October 2026 IFR, is simply incorrect. The CEA swap definition does not depend on whether the contract is tradeable, the venue in which it is entered into—on-exchange or off-exchange—or the counterparty. In fact, history demonstrates that swaps originally arose as bilateral customized contracts and Congress originally defined swap in the 2000 CFMA with reference to off-exchange transactions. *See supra* Sections I.A–B. The current statutory structure expressly provides that swaps may be entered into off-exchange (by ECPs) or executed on-exchange without reference to whether a contract is inherently tradeable. *See* 7 U.S.C. § 2(e). Simply put, the statutory

---

markets. *See* Volume Race, https://perma.cc/63VG-63M6 (last visited Oct. 28, 2026).

[19] Br. of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) ("Kalshi D.C. Cir. Br.").

definition of swap contains no requirement that swaps be inherently tradeable. *Id.* § 1a(47)(A).

Kalshi's third asserted limit—whether the contract is susceptible to manipulation, App. Br. at 49–50—appears nowhere in the text of the swap definition, Section 1a(47)(A), and rests instead on Kalshi's faulty premise that the definition of swap is limited by whether the contract is listed on a DCM.

As noted, Section 2(e) makes it "unlawful" for any person (other than an ECP) to enter into swaps off of a DCM. Most jarring, if Congress swept sports betting into the swap definition, then *all* off-exchange retail sports bets since October 2012 have been illegal. *Schuler,* 2026 WL 2884087, at *14–15. That is every sports wager placed in a casino, on an online sportsbook, or between two friends at a bar. This would include sports wagers in Nevada permitted by PASPA. *See Murphy*, 584 U.S. at 462. The October 2026 IFR (even if otherwise valid) cannot retroactively alter the consequences of Section 2(e) in 2012 if the CFTC's interpretation were correct that Congress included sports bets in the swap definition.

Kalshi further contends that the 2006 Unlawful Internet Gambling Enforcement Act ("UIGEA") indicates that Congress viewed on-DCM transactions as distinct from sports bets. App. Br. at 38 (citing 31 U.S.C. § 5362(1)(E)(ii)). Kalshi fails to note that Congress, however, also excluded "over the counter derivative instrument[s]" from the definition of "bet or wager." 31 U.S.C. § 5362(1)(E)(iii).

The reference to OTC derivatives in UIGEA completely undermines Kalshi's contention that Congress attempted to carve out on-DCM sports bets as compared to off-DCM sports bets. Moreover, if Kalshi's argument that sports bets are swaps were correct (it is not), then all sports bets would have been carved out of UIGEA's definition of "bet or wager" (on exchange or OTC) despite references to "contest of others, a sporting event, or a game subject to chance" in Section 5362(1)(A).

Further, Congress specifically provided that the "house," i.e., a party making markets in swaps—as a casino would if sports bets were considered swaps—may be regulated as a swap dealer.[20] *See* 7 U.S.C. § 1a(49)(A) (defining "swap dealer" as any person who, among other things, "makes a market in swaps"). Despite over $165 billion in sports-betting handle in 2025,[21] the CFTC has required no sportsbook, casino, or prediction-market maker to register as a swap dealer—even though their activity may exceed the $8 billion registration threshold. *See* 83 Fed. Reg. 56666 (Nov. 13, 2018).

---

[20] The October 2026 IFR attempts to distinguish casino sports bets from swaps, in part, because of the presence of a "house." *See* 91 Fed. Reg. at 65972–73. Nothing in the swap definition, though, excludes transactions in which the "house" is a market-maker. Moreover, Kalshi operates affiliated companies playing a market-maker role on its exchanges. *See* Eleanor Davis-Diver, *The House Always Wins, Even on House-less Kalshi*, Am. Prospect (Aug. 26, 2026), https://prospect.org/2026/08/26/house-always-wins-kalshi-prediction-markets/.

[21] *See supra* note 7.

The regulatory history also significantly undercuts Kalshi's broad reading. The 2001 Joint Report—based in part on market participant interviews—did not mention sports betting as a potential use of swaps.[22] When the CFTC examined event contracts in 2008, it considered whether they might be structured as options or futures with no mention of swaps. 2008 Concept Release, 73 Fed. Reg. at 25671. Most relevant, the CFTC's and SEC's congressionally mandated joint rulemakings further defining swaps and swap dealers made no mention of sports bets. None of the comments received contained the word "sport," "sports," or "gamble," suggested that swaps could be used for sports betting, or advocated to bring sports bets *within* the further definition of swap.[23] *See* 77 Fed. Reg. 30596 (May 23, 2012); 77 Fed. Reg. 48208 (Aug. 13, 2012).

Surely, if a sports wager were considered a swap at the time, someone would have sought clarification in the further definition—especially as such wagers, by operation of Dodd-Frank, would have been required to be placed only on DCMs or limited to ECPs. *See* 7 U.S.C. § 2(e). But no one did.

---

[22] *See supra* note 13.

[23] *See also* CFTC, *Comments for Proposed Rule 76 Fed. Reg. 29818*, https://comments.cftc.gov/PublicComments/CommentList.aspx?id=1032. The word "gaming" appears only in reference to "gaming" the system, not gambling or betting.

## II. The Special Rule Does Not Imply That Sports Bets Fall Within the Swap Definition

Another source of statutory context is the Special Rule authorizing the CFTC to prohibit listing "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of [certain commodities])" involving gaming, war, terrorism, assassination, and unlawful activity (explicitly including activities contrary to *state* law). 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC may forbid any event contract, swap or not, if it involves one of the statutory categories.[24]

The Special Rule provision originated in an amendment proposed by Senate Majority Leader Harry Reid, Senator Chris Dodd, and Senator Blanche Lincoln. S. Amend. 3739 to S. 3217, 111th Cong. (2010), 156 Cong. Rec. S2816 (daily ed. Apr. 29, 2010). A number of Senators wanted to ban certain agreements, contracts, or transactions, particularly those considered by the Defense Department's Defense Advanced Research Projects Agency ("DARPA") in 2003,[25] as well as certain types

---

[24] Further, DCMs can and do list contracts other than futures, options, and swaps, such as foreign-exchange transactions. *See, e.g.,* Chicago Mercantile Exchange, Chapter 13, https://www.cmegroup.com/rulebook/CME/I/13.pdf.

[25] DARPA proposed a Policy Analysis Market for event contracts based on Middle East political developments; opposition to markets for contracts involving assassination, terrorism, and war was swift. *See* Carl Hulse, *Pentagon Prepares a*

of event contracts addressed in the 2008 Concept Release, including those that are "the functional equivalent of gambling" and those "based on assassinations or terrorist activities."[26] 73 Fed. Reg. at 25673.

The text of the Special Rule makes clear that it applies to all "agreements, contracts, transactions, *or swaps* in excluded commodities," not merely "swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). Nor does it define "agreements, contracts, or transactions" involving the list of activities as "swaps." As the Sixth Circuit explained: "Event contracts may consist of 'agreements, contracts, transactions, *or* swaps.' So just because the CFTC may prohibit gaming-related event contracts does not mean Kalshi's sports-event contracts are *necessarily* swaps. They may be regulated instead because they are an 'agreement[],' 'contract[],' or 'transaction[]' that falls within the Special Rule's reach." *Schuler*, 2026 WL 2884087, at *15 (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)).

All of this contradicts Kalshi's assertion that "the CEA's Special Rule expressly recognizes" that sports-event contracts are swaps. App. Br. at 42. The

---

*Futures Market on Terror Attacks*, N.Y. Times (July 29, 2003), https://www.nytimes.com/2003/07/29/us/threats-responses-plans-criticisms-pentagon-prepares-futures-market-terror.html.

[26] *Amicus*, as CFTC Chairman at the time, provided technical assistance in drafting the Special Rule and recalls discussions with Senate Majority Leader Reid's office regarding the inclusion of "gaming" within the list of activities under the rule.

Special Rule does nothing of the sort. In fact, the title of the provision expressly distinguishes event contracts from swaps: "Special rule for review and approval of event contracts and swaps contracts." 7 U.S.C. § 7a-2(c)(5)(C). The structure of the provision also addresses event contracts, *id*. § 7a-2(c)(5)(C)(i), separately from swaps, *id*. § 7a-2(c)(5)(C)(iii).

As the Ninth Circuit noted, "[t]he classic example [of a gaming contract] is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." *Assad*, 190 F.4th at 1118 (quoting Kalshi D.C. Cir. Br. at 41).

The only known reference to sports betting in the Dodd-Frank legislative history shows that key members of Congress expected the CFTC to forbid all sports betting on exchanges it regulated. Senator Lincoln explained, in a colloquy with Senator Dianne Feinstein, 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010), that the provision was, in part, intended to "prevent gambling through futures markets[,]" including sports-event contracts that did not serve "any real commercial purpose."

While *Amicus* was Chairman, the bipartisan CFTC unanimously finalized Rule 40.11 in July 2011, prohibiting listing contracts involving gaming, along with the other activities enumerated in the Special Rule. 76 Fed. Reg. 44776, 44799 (July 27, 2011). The only public comment that discussed gaming merely requested that

the CFTC further define gaming so as to "avoid confusion" about the line between permissible speculation and "gaming-type activities."[27]

Importantly, Rule 40.11(a) prohibits listing "any" contract involving gaming, war, terrorism, assassination, or unlawful activity.[28] 17 C.F.R. § 40.11(a). The purpose of CFTC review of an event contract under Rule 40.11(c) is simply to determine whether a particular contract involves a prohibited category. *See* 76 Fed. Reg. at 44785. No contract-specific "public interest" determination is required because the CFTC already concluded in 2011 under its Special Rule authority that all event contracts within these categories are prohibited. Thus, if a contract involves gaming, terrorism, war, assassination, or unlawful acts, that is the end of the matter.

The express prohibition of "gaming" on CFTC-regulated exchanges is not evidence that Congress thought *sports-betting contracts* were swaps. Neither the text of the Special Rule nor the Senate colloquy concerning event contracts supports the conclusion that Congress was defining those contracts as swaps.

---

[27] *See* CME Group, Comment for Proposed Rule 75 Fed. Reg. 67282 at 6 (Jan. 3, 2011), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=26867&SearchText=.

[28] Even if the CFTC repealed Rule 40.11 to allow agreements, contracts, or transactions involving gaming on DCMs, it would not make sports wagers "swaps" under Section 1a(47)(A).

## III. No One in Congress Called for Preempting State Gaming Laws, Nor Did Dodd-Frank Do So

Kalshi contends that Congress preempted state laws regulating sports betting through the CEA. Nothing in Dodd-Frank, though, indicates Congress intended to preempt the states' traditional role in regulating sports betting within their borders. The Sixth Circuit, relying partly on Section 2(a)(1)(A)'s savings clauses preserving specified state authority and state-court jurisdiction, held that, even assuming the contracts are swaps, the CEA neither expressly nor impliedly preempts Ohio's or Tennessee's gaming laws. *Schuler*, 2026 WL 2884087, at *1.

Sports betting was not part of the 2008 financial crisis or the response to it. Nor were there any calls after the financial crisis from Congress, or anywhere else, to preempt the traditional state police powers over gaming, undermine PASPA, and establish nationwide sports betting solely under CFTC auspices. To the contrary, as discussed above in Section II, Congress gave the CFTC authority to ban DCMs from listing event contracts involving "gaming."

Just last month, the CFTC stated that "when Congress adopted the 'swap' definition, it did so against a background of other federal statutory provisions regulating sports gambling, and the Commission does not presume Congress to have impliedly repealed those provisions." 91 Fed. Reg. at 65973. If Congress did not do so by implication, it certainly did not do so expressly.

If it had wanted to do so, Congress knew how to preempt state gaming and bucket shop laws. Just ten years earlier in the CFMA, Congress had done so in the case of an enumerated list of certain financial agreements, contracts, or transactions excluded by select CFMA provisions or exempted by the CFTC under 7 U.S.C. § 6(c). *See* CFMA § 117, 114 Stat. 2763A-402 (codified at 7 U.S.C. § 16(e)(2)). This provision was specifically included in the CFMA to ensure states did not regulate specific financial instruments that were being excluded from CFTC jurisdiction. In passing Dodd-Frank, Congress did not add to this enumerated preemption list any reference to contracts involving sports or gaming.

Other aspects of Dodd-Frank and its implementation confirm that it did not make the CFTC the nation's sports-betting regulator. Congress did not address the overlap between state gaming regulation and federal swaps regulation—as it had in Dodd-Frank for insurance regulation. *See* 7 U.S.C. § 16(h). Though Dodd-Frank expressly amended the Securities Exchange Act of 1934 to preempt state regulation of security-based swaps, other than for hybrid instruments, it did nothing comparable for swaps in the CEA. *See* Dodd-Frank Act, Pub. L. No. 111-203, § 767, 124 Stat. at 1799 (amending 15 U.S.C. § 78bb(a)); 7 U.S.C. § 27f(b). The absence of any such provisions or discussion is especially telling.

Further, Kalshi's and the CFTC's arguments, in their briefs and the CFTC's recent rulemakings, would lead to the untenable result that private parties—just by

listing a sports-betting contract—could preempt state law. *Cf. Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

## IV. Kalshi's Interpretation of the Swap Definition as Covertly but Radically Altering Sports-Betting Regulation Defies Common Sense

The Supreme Court has long disapproved of taking obscure statutory language out of context and reading it as delegating massive executive power—what Justice Scalia referred to as hiding elephants in mouseholes. *Whitman*, 531 U.S. at 468; *accord Learning Res., Inc. v. Trump*, 607 U.S. 229, 242–43 (2026) (plurality opinion); *King v. Burwell*, 576 U.S. 473, 485–86 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see also MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994) (rejecting a theoretically possible interpretation of the word "modify" because it would upend the overall statutory scheme). This canon of interpretation is a memorable expression reflecting common sense about how Congress works. It is an antidote to the kind of literalism reflected in Kalshi's and the CFTC's arguments. Applying it recognizes that Congress was focused on regulating the derivatives markets that contributed to the crisis—not sports betting.

Common sense is recognizing sports bets for what they are—sports bets—not derivatives used to facilitate interstate commerce by providing a means for hedging or price discovery.

Common sense means recognizing that if sports-betting contracts were swaps, then sports bets between non-ECPs could be entered into only on CFTC-regulated exchanges under CEA Section 2(e), rendering illegal all off-exchange sports betting, including the in-casino betting then allowed under PASPA and IGRA, since 2012.

Common sense dictates the CFTC cannot through its October 2026 IFR override legislative text. Only Congress can establish a new federal system of sports-betting markets, immunized from state law—but it has not.

Common sense includes understanding that if Congress had given the CFTC exclusive jurisdiction over sports betting, it would have been a massive upending of the then-existing federal, state, and tribal statutory schemes governing sports betting, including PASPA, the Wire Act, IGRA, and UIGEA.

Common sense is wondering how in the real world Congress could have enacted a law that preempted Nevada gaming regulation and prohibited in-casino sports betting without then-Senate Majority Leader Harry Reid (and former Nevada Gaming Commission Chairman) noticing. Congress did no such thing. Senator Reid surely would have noticed and never would have approved.

Congress did not displace historical state police powers over sports betting through Dodd-Frank and give them to a small federal regulatory agency with no experience in gaming regulation. The CFTC, and *Amicus* as Chairman, did not think at the time it had become—nor did it seek appropriations to be—the nation's sports-

betting regulator. Nor did CFTC Chairman Giancarlo ask for such resources after the Supreme Court struck down PASPA's federal prohibition on sports betting in 2018.[29]

As late as 2024, the CFTC recognized that it is "not a gaming regulator" and lacks "the statutory mandate [and] specialized experience appropriate to oversee" gambling operations. 89 Fed. Reg. 48968, 48982–83 (June 10, 2024).

Today, there are more than 8,400 state and tribal gaming regulators.[30] By contrast, the CFTC employed only 556 full-time employees at the end of fiscal year 2025.[31]

The failure of Congress and the Executive Branch to take steps to appropriate funds as if the CFTC were the national sports-betting regulator is telling. The silence of the legislative and post-enactment regulatory records is telling. The failure of the sophisticated lawyers representing New Jersey and the NCAA in *Murphy,* as well as

---

[29] *See*, *e.g.*, Testimony of Chairman J. Christopher Giancarlo Before the S. Comm. on Appropriations, Subcomm. on Fin. Servs. & Gen. Gov't (May 8, 2019), https://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo71.

[30] Written Testimony of Bill Miller, President & CEO, American Gaming Association (May 20, 2026), https://perma.cc/63HA-SSS9.

[31] CFTC Off. of Inspector Gen., *Management and Performance Challenges Fiscal Year 2026* at 14 (Dec. 3, 2025), https://perma.cc/Q94S-Q6TM.

the Solicitor General, to perceive that Dodd-Frank may have gutted PASPA eight years earlier is telling.

If a particular meaning now attributed to a statute cannot be seen for nearly fifteen years, it is hard to conclude that it is the ordinary public meaning, much less what Congress intended.

## CONCLUSION

The district court's order should be affirmed.

November 6, 2026

Respectfully submitted,

/s/ *Victor Suthammanont*
Victor Suthammanont
Kostelanetz LLP
7 World Trade Center, 34th Floor
New York, NY 10007
(212) 808-8100
vsuthammanont@kostelanetz.com

Aitan D. Goelman
Ross M. Slaughter
Zuckerman Spaeder LLP
2100 L Street NW, Suite 400
Washington, DC 20037
(202) 778-1800
agoelman@zuckerman.com
rslaughter@zuckerman.com

*Counsel for Amicus Curiae Gary Gensler*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1 because it contains 6,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font using Microsoft Word.

November 6, 2026

/s/ *Victor Suthammanont*
Victor Suthammanont

*Counsel for Amicus Curiae Gary Gensler*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

November 6, 2026

/s/ *Victor Suthammanont*
Victor Suthammanont

*Counsel for Amicus Curiae Gary Gensler*