# 26-1835

## In the United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

ROBERT WILLIAMS, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Southern District of New York, No. 1:25-cv-8846 (Torres, J.)

**BRIEF OF AMICUS CURIAE AMERICAN GAMING ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLEES**

Kevin F. King
Matthew J. Glover
Scott J. Garfing
Sameer Aggarwal
Hassan Ahmad
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae American Gaming Association*

November 6, 2026

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1(a), undersigned counsel certifies that the American Gaming Association does not have a parent corporation and that no publicly held corporation owns ten percent or more of its stock.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......... i
TABLE OF AUTHORITIES .......... iii
INTEREST OF AMICUS CURIAE .......... 1
INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2
ARGUMENT .......... 5
I. Kalshi Offers Sports Bets .......... 5
II. Kalshi's Arguments Defy Settled Legal Principles and Common Sense. .......... 11
A. Kalshi's Sports Bets Are Not "Swaps." .......... 12
B. Kalshi's Preemption Arguments Fail. .......... 25
III. Kalshi's Vision Would Upend the Longstanding Framework Governing Sports Betting. .......... 33
CONCLUSION .......... 39
CERTIFICATE OF COMPLIANCE .......... 40
CERTIFICATE OF SERVICE .......... 41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) .......... 4

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) .......... 25

*Blue Lake Rancheria v. Kalshi, Inc.*,
191 F.4th 1071 (9th Cir. 2026) .......... 3, 5, 7

*Chevron USA, Inc. v. Plaquemines Parish*,
608 U.S. 1 (2026) .......... 17

*City of Chicago v. Fulton*,
592 U.S. 154 (2021) .......... 19

*Coinbase Fin. Mkts., Inc. v. Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026) .......... 15

*Dubin v. United States*,
599 U.S. 110 (2023) .......... 18

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 18

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) .......... 29

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 26

*KalshiEX, LLC v. Assad*,
190 F.4th 1098 (9th Cir. 2026) .......... 2, 5–8, 11, 12, 14,
.......... 17, 18, 21–25, 29–32

*KalshiEX LLC v. Bird*,
2026 WL 2691009 (S.D. Iowa Sep. 8, 2026) .......... 15, 21

*KalshiEX, LLC v. Cafferelli*,
__ F. Supp. 3d __, 2026 WL 2294589
(D. Conn. Aug. 10, 2026) .......... 13, 16

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 29, 31

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) .......... 20

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) .......... 28

*KalshiEX, LLC v. Schuler*,
__ F.4th __, 2026 WL 2884087 (6th Cir. Sep. 25, 2026) .......... 2, 5, 9,
.......... 11–14, 16, 17, 19, 22, 26–28, 30, 32, 33

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 25

*Madeira v. Affordable Hous. Found., Inc.*,
469 F.3d 219 (2d Cir. 2006) .......... 30

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) .......... 26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 27

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 3, 4, 20, 24, 29

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010) .......... 4, 25, 30

*Nevada v. KalshiEX, LLC*,
2026 WL 973804 (Nev. Dist. Ct. Mar. 20, 2026) .......... 21

*New York v. Dep't of Justice*,
951 F.3d 84 (2d Cir. 2020) .......... 4

*NFIB v. OSHA*,
595 U.S. 109 (2022) .......... 24

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) .......... 29

*Pulsifer v. United States*,
601 U.S. 124 (2024) .......... 18

*QCX, LLC v. Nessel*,
2026 WL 1895958 (W.D. Mich. June 17, 2026) .......... 16, 21

*Sackett v. EPA*,
598 U.S. 651 (2023) .......... 24

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014) .......... 4, 23

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 3

*Yates v. United States*,
574 U.S. 528 (2015) .......... 19

**Statutes**

7 U.S.C. § 1a .......... 12, 13, 18, 19, 21

7 U.S.C. § 2 .......... 22, 27, 28

7 U.S.C. § 7a-2 .......... 20, 28, 31

7 U.S.C. § 13 .......... 22, 28

7 U.S.C. § 16 .......... 27

15 U.S.C. § 3001 .......... 26

15 U.S.C. § 8302 .......... 22

18 U.S.C. § 1084 .......... 30

18 U.S.C. § 1955 .......... 30

31 U.S.C. § 5362 .......... 29

31 U.S.C. § 5363 .......... 29

38 U.S.C. § 1116 .......... 16

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......... 3, 18

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1332 .......... 35

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1362 .......... 36

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1363 .......... 37

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367 .......... 29, 35, 37

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367-a .......... 29

**Regulatory Materials**

17 C.F.R. § 38.151 .......... 33

17 C.F.R. § 40.11 .......... 25, 31

*Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024) .......... 38

*Further Definition of "Swap"—Inclusions*, 91 Fed. Reg. 66,022 (Oct. 19, 2026) .......... 25

*Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65,969 (Oct. 19, 2026) .......... 22

N.Y. Comp. Codes R. & Regs. tit. 9 § 5325.6 .......... 37

*Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806 (June 12, 2026) .......... 25

**Other Authorities**

AGA, *Commercial Gaming Revenue Hits $78.7 Billion in 2025, Driving Record $18.1 Billion in Gaming Taxes Nationwide* (Feb. 26, 2026) .......... 5

AGA, *State of Play Map* .......... 34

AGA, *State of the States 2026: The AGA Analysis of the Commercial Casino Industry* (May 2026) .......... 23, 34

AGA, *Teen-Twenty Sports Betting Tracker* .......... 36

Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025) .......... 7

Br. of Appellee, *KalshiEX LLC v. CFTC*, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) .......... 22

Br. of Appellees United States et al., *United States v. Wisconsin*, No. 26-2696 (7th Cir. Oct. 28, 2026) .......... 13

Br. of Former Sen. Christopher J. Dodd as Amicus Curiae, *Flaherty v. KalshiEX, LLC*, No. 26-299 (U.S. Oct. 8, 2026) .......... 20

CFTC Letter No. 25-36 (Sep. 30, 2025) .......... 23

Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sep. 17, 2025) .......... 6

Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026) .......... 9

Dustin Gouker, *Robinhood Cometh?*, Event Horizon (Sep. 2, 2026) .......... 7

Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025) .......... 6

Eric Ramsey, *Prediction Markets Pitch Hedging As Traders Pile Into Longshot Sports Combos*, Event Horizon (Oct. 22, 2026) .......... 10, 11, 15

Eric Ramsey & Dustin Gouker, *Parlays Propel Kalshi to Back-to-Back Volume Records to Open Football Season*, Event Horizon (Sep. 15, 2026) .......... 11

Joint Status Report, *Blue Lake Rancheria v. Kalshi, Inc.*, No. 3:25-cv-6162 (N.D. Cal. Oct. 14, 2026), Dkt. 101 .......... 32

Kalshi, *Signing Up as an Individual* (Mar. 10, 2026) .......... 36

Kalshi, *Trading Break* (Mar. 10, 2026) .......... 36

Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC, *Notification Regarding the Initial Listing of the "Will the fastest serve in <tennis match> be <above/below/exactly/at least/between><count><speed>?" Contract* (Jan. 16, 2026) .......... 8

Marshall Cohen, *Young Adults Under 21 Traded $5 Billion on Kalshi This Year, Amid Prediction Market Frenzy*, CNN Business (Aug. 28, 2026) .......... 36

Nancy Walecki, *It's Not Gambling, It's 'Girl Math'*, The Atlantic (Apr. 1, 2026) .......... 37

Nat'l Indian Gaming Comm'n, Bulletin 2009-3 (Mar. 9, 2009) .......... 32

## INTEREST OF AMICUS CURIAE[1]

The American Gaming Association (AGA) is a non-profit trade association whose members represent the full spectrum of the legal, regulated gaming industry—including commercial and tribal casino operators, suppliers, and sports betting operators. AGA's members participate in gaming markets throughout the United States, which generate $53 billion in annual tax revenue and support 1.8 million jobs. On behalf of its members, AGA works with law enforcement, elected officials, state agencies, and tribal leaders to combat illegal gambling and promote next-generation regulatory regimes.

AGA submits this brief to address the disruptive effects of Kalshi's unlicensed sports bets on longstanding state and tribal regulatory frameworks—including in New York, which permits sports wagering only by state-licensed entities and tribes, and in neighboring jurisdictions that regulate gaming on varying terms.

---

[1] Counsel for amicus certify that no party or party's counsel authored this brief in whole or in part and that no person other than amicus, its members, or its counsel funded the preparation or submission of this brief. All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, Congress and the States have worked together to establish a regulatory framework for gaming that elevates local policy choices and protects consumers. Licensed gaming operators, including AGA members, have built their businesses around this framework and partner with States to make it effective. That cooperative model has delivered enormous benefits: capital investments, jobs, tax revenues, and a safe and transparent marketplace where every operator plays by the same rules.

Kalshi's theory would eviscerate that longstanding regulatory structure. Seeking to avoid the compliance burdens of state laws, Kalshi masks its wagers as derivatives contracts governed exclusively by the Commodity Futures Trading Commission (CFTC or Commission) under the Commodity Exchange Act (CEA).

But "Kalshi has a gambling problem": its sports-event contracts are sports bets in every meaningful sense. *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1113 (9th Cir. 2026). They are "virtually indistinguishable from sports bets" that are available on traditional sportsbooks, like those operated by AGA's members. *KalshiEX, LLC v. Schuler*, __ F.4th __,

2026 WL 2884087, at *22 (6th Cir. Sep. 25, 2026). Indeed, when a customer places a sports bet on a prediction market, "[t]he only thing that changes is [the] vocabulary." *Blue Lake Rancheria v. Kalshi, Inc.*, 191 F.4th 1071, 1083 (9th Cir. 2026). Kalshi offers garden-variety sports bets, such as point spreads, proposition bets, and parlays, and its advertisements tout these transactions as "legal sports betting." Kalshi thus engages in precisely the type of unlicensed sports wagering that New York law prohibits.

The stakes extend well beyond New York. Within this Circuit, "the people of each State" have made different "policy choices … on the controversial issue of gambling." *Murphy v. NCAA*, 584 U.S. 453, 484 (2018). A ruling for Kalshi would override those legislative decisions in favor of a nationwide gaming scheme.

According to Kalshi, Congress eliminated States' power to regulate gaming within their borders when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010. There is no credible evidence that Congress intended Dodd-Frank to have that destabilizing effect. Congress, the Supreme Court has emphasized, "does not … hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S.

457, 468 (2001). A nationwide rule on the "controversial subject" of sports betting, *Murphy*, 584 U.S. at 486, undeniably qualifies as an elephant, yet Kalshi and the Commission rely on obscure derivatives provisions that say nothing about overriding state gaming laws. Those statutory mouseholes are particularly inadequate given that Congress must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,'" *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted), and that a "presumption against preemption" applies when Congress legislates in a field "where states have historically exercised their police powers," *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010).

Gaming regulation has long been such a field. *See Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905) ("gambling is ... within the police powers of a state"); *New York v. Dep't of Justice*, 951 F.3d 84, 113 (2d Cir. 2020) ("[T]here [is] no question that ... the States' police power allow[s] them to decide whether to permit sports gambling within their borders."). State-authorized gaming markets generated more than $165 billion in

sports-betting transactions in 2025 alone.[2] Nothing in the CEA supplies the clear statement required to strip the States of their authority, and the CFTC has neither the mandate nor the tools to replace them. The District Court's order denying Kalshi's preliminary injunction motion should be affirmed.

## ARGUMENT

### I. Kalshi Offers Sports Bets.

Kalshi attempts to obscure a simple reality: it offers sports bets. As courts across the country have observed, "[e]ach entry into a sports event contract materially resembles" a traditional sports bet—i.e., "an act of placing a bet or wager." *Blue Lake*, 191 F.4th at 1083 (cleaned up). These contracts are sports betting in "substance," and "*everyone*, including Kalshi, knows" it. *Assad*, 190 F.4th at 1113.

Kalshi has "market[ed] its sports event contracts … as 'legal sports betting'" and "advertised itself as 'the first app for legal sports betting in all 50 states.'" *Id.* at 1112-13; *see also Schuler*, 2026 WL 2884087, at *4. Although Kalshi employs sanitized terms like "trading" in its court

---

[2] *See* AGA, *Commercial Gaming Revenue Hits $78.7 Billion in 2025, Driving Record $18.1 Billion in Gaming Taxes Nationwide* (Feb. 26, 2026), https://perma.cc/67YZ-VMBN.

papers, *e.g.*, Opening Br. 22-25, its advertisements have repeatedly described its offerings as "sports betting," including in States like California and Utah where sports betting is prohibited:[3]







The data confirm what the marketing makes clear. In 2025, sports betting accounted for "[o]ver 90% of Kalshi's trades" and "95% of its revenue." *Assad*, 190 F.4th at 1106.

---

[3] Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sep. 17, 2025), https://perma.cc/8NJ4-HFUR; Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025), https://perma.cc/QEH6-YA3L.

Kalshi offers the same bets, on the same outcomes, as sportsbooks. A customer at a traditional sportsbook "can place a sports bet on the Las Vegas Raiders winning a game by over 7.5 points," while on Kalshi's prediction market "that same customer can buy an event contract based on the Las Vegas Raiders winning [the same] game by over 7.5 points," each with the same payout. *Id.* at 1113. The graphic below, published in a *New York Times* article regarding prediction markets' expansion into sports betting and cited in *Blue Lake*, 191 F.4th at 1079, illustrates the point.[4] The top image shows betting options for an NFL game on a state-licensed sportsbook; the bottom shows Kalshi's betting options for the same game. Both use the same format, offer bets on the same point spread, and offer bets on the same over-under for the number of points scored:[5]

---

[4] Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025), https://perma.cc/JZ9K-7HX8.

[5] Although Kalshi recently discontinued "American" pricing (e.g., "-106" in the Cowboys/Jets example), it explained that "[n]othing about the markets themselves has changed" and "[t]his change only affects how prices are shown on screen." Dustin Gouker, *Robinhood Cometh?*, Event Horizon (Sep. 2, 2026), https://perma.cc/6XHR-F432.




Kalshi also offers other bets that have long been standard sportsbook fare, including "prop[osition] bets," which are "bets based on outcomes within a game." *Assad*, 190 F.4th at 1106. For example, Kalshi offers bets on the speed of the fastest serve in tennis matches[6] and the number of corner kicks in soccer matches:[7]

---

[6] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC, Notification Regarding the Initial Listing of the "Will the fastest serve in <tennis match> be <above/below/exactly/at least/between><count><speed>?" Contract (Jan. 16, 2026), https://perma.cc/SGE5-NT5N.

[7] AGA's counsel took a screenshot of this page on the Kalshi mobile application on May 20, 2026.




*See Schuler*, 2026 WL 2884087, at *11, *13 (discussing corner kicks).

Kalshi likewise offers parlays, which combine several different wagers and pay off only if *all* listed outcomes occur, with the payout "depend[ing] on the performance of [multiple] sports team[s] or" "player[s]." *Id.* at *10. Kalshi does not restrict these parlays to a single game or even to matchups within a single sport or city. It has promoted parlays that depend on 30 different outcomes across multiple games,[8] as

[8] Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026), https://perma.cc/V34F-4WAU.

well as "centipede" parlays with hundreds of separate legs, including one that combined *453 separate wagers* into a single parlay bet.[9] For example, in May 2026 Kalshi offered the following 21-leg parlay that combined wagers on eleven different professional basketball, hockey, and baseball games played in eleven different cities:[10]







---

[9] Eric Ramsey, *Prediction Markets Pitch Hedging As Traders Pile Into Longshot Sports Combos*, Event Horizon (Oct. 22, 2026), https://perma.cc/M7G4-EWQK.

[10] AGA's counsel took a screenshot of this parlay on the Kalshi mobile application on May 12, 2026.

Kalshi "offers billions of dollars' worth" of these parlays "per month." *Schuler*, 2026 WL 2884087, at *15. Parlays represent two-thirds of Kalshi's volume, and 55% of the parlays transacted are longshots that involve 10 legs or more.[11]

Labels do not change substance. Whether described as "trades" or "event contracts," Kalshi's products allow users to stake money on sporting outcomes in pursuit of financial gain. "[P]lacing sports bets, even when called by another name, is still gambling." *Assad*, 190 F.4th at 1113.

## II. Kalshi's Arguments Defy Settled Legal Principles and Common Sense.

Kalshi's core argument fails for two independent reasons grounded in settled law. *First*, Kalshi's sports bets are not "swaps" under the CEA and Dodd-Frank. Kalshi's contrary arguments lack any limiting principle and would make the CFTC a national sports betting regulator without a clear mandate from Congress. *Second*, Kalshi cannot overcome the presumption against preemption, which applies here given the States' traditional role in regulating gaming.

---

[11] *See* Ramsey, *supra* note 9; Eric Ramsey & Dustin Gouker, *Parlays Propel Kalshi to Back-to-Back Volume Records to Open Football Season*, Event Horizon (Sep. 15, 2026), https://perma.cc/33QT-7GMV.

### A. Kalshi's Sports Bets Are Not "Swaps."

Kalshi asks this Court to hold that New York may not enforce its gambling laws against *any* of its sports bets—past, present, and future—embracing the CFTC's newfound view that "event contracts never violate state law when they are traded on a [designated contract market (DCM)]," Opening Br. 22, 39 (citation omitted). To obtain that extraordinary relief, Kalshi must show that *all* its wagers—trivial propositions and complex parlays alike—are "swaps" under the CEA. Kalshi cannot carry that heavy burden.

Starting with the text, Kalshi's arguments falter because a "swap" must be based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi reads that language as covering all sports outcomes because someone, somewhere, might experience downstream economic effects. But "event" does not mean the outcome of an event, and "associated with" requires a connection to economic consequences beyond the wager itself. *See Assad*, 190 F.4th at 1111-16; *Schuler*, 2026 WL 2884087, at *8, *11;

*KalshiEX, LLC v. Cafferelli*, __ F. Supp. 3d __, 2026 WL 2294589, at *7-10 (D. Conn. Aug. 10, 2026).[12]

Many of the sports bets Kalshi offers plainly lack the required association with potential financial, economic, or commercial consequences. Like traditional sportsbooks, Kalshi offers contracts on trivial in-game outcomes, such as the speed of the fastest serve in a tennis match and how many corner kicks will occur in a soccer match. And like sportsbooks, Kalshi often combines those propositions into parlays, sometimes comprising dozens or even hundreds of outcomes spanning point spreads, player performances, and games played in a hodgepodge of cities across the country or even the world. Those outcomes are not associated with independently existing economic consequences, setting them apart from grain futures and interest-rate swaps, where movements in the underlying asset or rate affect farmers, bankers, and businesses. *See Schuler*, 2026 WL 2884087, at *11.[13]

---

[12] It is insufficient for the wagers themselves to involve potential economic consequences because the CEA requires the underlying events—not the swap—to be "associated with" such consequences. 7 U.S.C. § 1a(47)(A)(ii).

[13] The CFTC has incorrectly asserted that parlays need not "entail economic consequences" because they are a "'combination or permutation of … any agreement, contract, or transaction' described in [7 U.S.C.

Kalshi fails to show that its wagers have the connection to economic consequences required under the CEA. "Kalshi's sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed." *Assad*, 190 F.4th at 1114. There is no genuine commodity or financial risk that turns on whether two football teams score a combined 47 or 48 points (the basis for the 47.5-point over/under bet shown on page 8). "[I]solated examples" of businesses placing wagers are "a far cry from establishing that sports-event contracts are" "associated with [potential] financial consequence[s]" as the CEA uses those terms, *Schuler*, 2026 WL 2884087, at *13, and do not show that sports wagers serve a risk-management or

§ 1a(47)(A)(i)-(v)]." Br. of Appellees United States at 55, *United States v. Wisconsin*, No. 26-2696 (7th Cir. Oct. 28, 2026) (quoting 7 U.S.C. § 1a(47)(A)(vi)). Subsection 1a(47)(A)(vi) applies only when the component parts individually qualify as "swaps," which is not the case here. Parlays also differ in kind from "combination[s]." A swap is an "agreement, contract, or transaction," 7 U.S.C. § 1a(47)(A)(ii), so a "combination" must consist of multiple contracts. But a parlay is a single contract that depends on the "event or contingency" of *every* leg winning, not several independent contracts. Indeed, the individual legs that make up a parlay do not "provid[e] for any purchase, sale, payment, or delivery" contingent on an event or occurrence, *id.*; rather, parlays pay out only if *all* legs hit. To illustrate: someone who combines two $10 coinflip bets on "heads" will break even if the coin comes up heads only once, but lose $20 on a parlay of those bets.

price-discovery function in commodity markets, *see KalshiEX LLC v. Bird*, 2026 WL 2691009, at *10 (S.D. Iowa Sep. 8, 2026).[14]

Kalshi's hedging argument is especially absurd regarding parlays, which account for two-thirds of Kalshi's volume, and which Kalshi does not even attempt to defend.[15] *No one* faces potential economic consequences based on whether dozens or hundreds of independent sports outcomes will *all* occur.

Take the 21-leg parlay on page 10, for example. Was there any person, team, league, sponsor, or other entity whose economic fortunes turned on whether De'Aaron Fox recorded 4 or more assists in a basketball game *and* the Anaheim Ducks beat the Las Vegas Golden Knights by more than 1.5 goals in a hockey game *and* the Kansas City Royals and the Chicago White Sox combined for more than 3.5 runs in a

---

[14] A district court recently held that a subset of sports-event contracts, regarding "who will win or lose a title game," likely qualifies as swaps. *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *5-8 (N.D. Ill. Oct. 2, 2026). That ruling is inapposite because it did not address the full range of Kalshi's sports wagers, including multi-leg parlays that make up the vast majority of Kalshi's volume, and likewise did not confront the weight of authority (including the decisions of the Sixth and Ninth Circuits) regarding the "swap" definition.

[15] *See* Ramsey, *supra* note 9.

baseball game *and* eighteen other outcomes occurred across eight other games in eight different cities? Of course not. The same is true for the "billions of dollars' worth" of parlays Kalshi offers "per month." *Schuler*, 2026 WL 2884087, at *15. Simply put, Kalshi's parlays lack any economic consequences "apart from [their] significance to participants … who have wagered on [each] particular combination." *Cafferelli*, 2026 WL 2294589, at *8; *see Schuler*, 2026 WL 2884087, at *13. This deficiency independently establishes that Kalshi is not likely to succeed on the merits.

Furthermore, Kalshi's argument contravenes the plain meaning of the phrase "associated with." In statutory and everyday usage alike, one thing is *associated with* another when the two tend to go together. *See Schuler*, 2026 WL 2884087, at *10 (the phrase "'associated with' can … require a close causal connection"). For example, Congress refers to diseases "having positive association with exposure to an herbicide agent" to describe diseases that tend to occur among persons exposed to such agents. 38 U.S.C. § 1116(a)(1)(B); *see also QCX, LLC v. Nessel*, 2026 WL 1895958, at *7 (W.D. Mich. June 17, 2026) ("Natural use of the phrase 'associated with' virtually never goes to the extreme [prediction

markets] prefe[r].”). Thus, in the CEA, Congress defined swaps to include only those contracts whose underlying events *tend to have* some potential financial, economic, or commercial consequence, “such that we can reasonably understand why contracts dependent on that event would be beneficial for hedging financial risk and deriving pricing information.” *Schuler*, 2026 WL 2884087, at *11. But on Kalshi’s reading, the “associated with” requirement is satisfied if an event could conceivably have a downstream consequence for a single person—even if the event generally does not have such consequences. That is like saying that drinking coffee is associated with winning the lottery just because someone once bought a winning Powerball ticket during their daily trip to the local bodega.

Kalshi’s interpretation would read “associated with” out of the statute. *See Assad*, 190 F.4th at 1116 (reading the CEA “so expansively as to include any conceivable downstream economic consequence” would “render the definition of swap so broad as to be meaningless”); *Chevron USA, Inc. v. Plaquemines Parish*, 608 U.S. 1, 11 (2026) (declining to interpret “relating to” so broadly “that it [would be] meaningless”). If Congress had intended the CEA to reach events with an attenuated

connection to economic consequences (or none at all), it would simply have omitted "associated with" altogether.

The statutory context further shows that Kalshi's sports bets are not "swaps." Kalshi urges the Court to read a handful of CEA provisions "in isolation" and to "adopt [the] broadest meaning" of those terms. *Assad*, 190 F.4th at 1112. But courts do not interpret statutory phrases "in isolation" or according to "the broadest imaginable definitions of [their] component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (citation omitted). They read statutes "by reviewing text in context," *Pulsifer v. United States*, 601 U.S. 124, 133 (2024), and in a manner that "fit[s] … all parts" of the statute "into a harmonious whole," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).

Every contextual indicator shows that Congress used "swap" to describe quintessential financial-market transactions. The statutory definition refers to "option[s] … for the purchase or sale" of "currencies, commodities, securities" and similar instruments, "interest rate swap[s]," instruments used to hedge "financial risk," and "foreign exchange swap[s]." 7 U.S.C. § 1a(47)(A); *see* Dodd-Frank Wall Street Reform and

Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Those traditional financial instruments bear no resemblance to a 453-leg sports parlay or a wager on the number of corner kicks in a soccer match.

Read in that context, an event contract has the requisite "financial, economic, or commercial consequence[s]" when the underlying event itself has effects akin to the financial transactions described elsewhere in § 1a(47)(A) and presents a bona fide need to hedge an independently existing risk. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (citation omitted)).

Kalshi's reading of § 1a(47)(A)(ii) would also swallow the separate, differently worded swap definitions in § 1a(47)(A). *See Schuler*, 2026 WL 2884087, at *13 ("Kalshi's approach would make all five other statutory subparts, as well as the 22 types of transactions expressly referenced in subpart (iii), unnecessary"); *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

History and experience point in the same direction. Congress designed Dodd-Frank to address "systemic risks in the financial sector that undermined U.S. financial stability" and "brin[g] risky financial products out of the shadows." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1028-29, 1031 (D. Nev. 2025). "Sports betting had nothing to do with th[ose] problem[s]." Br. of Former Sen. Christopher J. Dodd as Amicus Curiae, at 19, *Flaherty v. KalshiEX, LLC*, No. 26-299 (U.S. Oct. 8, 2026). Moreover, when the Supreme Court decided *Murphy* eight years later, the Court observed that "sports gambling" was legal only in Nevada and "three [other] States," 584 U.S. at 462—a statement that would have made no sense if Dodd-Frank had already authorized sports wagering nationwide.

To ensure that DCMs did not become gambling platforms, Dodd-Frank included a Special Rule authorizing the Commission to prohibit contracts involving "terrorism," "assassination," "war," "gaming," and other "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i).[16] The authority to disallow such contracts provides a

---

[16] Kalshi contends the Special Rule "expressly recognizes" that sports-event contracts are swaps. Opening Br. 42-43, 63. But because the Special Rule encompasses "agreements, contracts, transactions, *or*

"failsafe against attempts to" offer sports wagers on regulated exchanges, *QCX*, 2026 WL 1895958, at *7. In other words, by granting the Commission only the negative power to prohibit (rather than the affirmative power to authorize) gaming contracts, and "by lumping 'gaming' together with 'terrorism,' 'assassination,' 'war,' and other 'unlawful' conduct, Congress clearly viewed gaming contracts as a bad thing" to be avoided. *Bird*, 2026 WL 2691009, at *8.

Nor can Kalshi contend that its sports bets are "swaps" under the CEA's catchall definition for contracts "commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). Sports bets were "a new kind of contract" when Kalshi first self-certified them in 2025, *Assad*, 190 F.4th at 1106, and States quickly contested Kalshi's move. In many jurisdictions (including Michigan, Nevada, and Washington), States promptly obtained court orders enjoining Kalshi from offering unlicensed sports wagers. *See, e.g.*, *Nevada v. KalshiEX, LLC*, 2026 WL 973804 (Nev. Dist. Ct. Mar. 20, 2026). Kalshi cannot make its own products "known to the trade as" "swaps" by labeling them that way, particularly

---

swaps," 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added), the reference to "gaming" does not prove that Congress envisioned gaming swaps.

given the myriad court rulings that Kalshi's wagers are *not* swaps. That is especially true given Kalshi's representation to the D.C. Circuit that "Congress did not want sports betting to be conducted on derivatives markets." Br. of Appellee at 41, *KalshiEX LLC v. CFTC*, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024); *see Assad*, 190 F.4th at 1118.

Kalshi's reading "would also attach" severe "penalties to a breathtaking amount of commonplace gambling activity." *Schuler*, 2026 WL 2884087, at *14 (cleaned up). The CEA generally requires swaps to be executed on a federally regulated exchange, 7 U.S.C. § 2(e), and imposes stiff civil and criminal penalties for failing to comply with that rule, *see id.* §§ 13(a)(5), 13a-1(a), (d)(1). Thus, if sports bets are swaps, as Kalshi contends, the CEA would make a broad range of ordinary wagers unlawful—including parimutuel horse-racing wagers and "every sports wager placed … between two friends at a bar." *Schuler*, 2026 WL 2884087, at *14 (citations omitted). Courts have rightly rejected that boundless reading. *See Assad*, 190 F.4th at 1114-15.[17]

---

[17] The Commission's recent Interim Final Rule (IFR), which purports to "clarify" that certain state-regulated wagers are not "swaps," does not support Kalshi's position. *See Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65,969 (Oct. 19, 2026). Setting aside whether the IFR was issued using the correct procedures,

The major-questions doctrine confirms that the "swap" definition cannot bear the weight of Kalshi's interpretation. *See Assad*, 190 F.4th at 1119. Courts are "skeptic[al]" "[w]hen an agency claims to discover in a long-extant statute an unheralded power" over a matter of vast economic and political significance. *Utility Air*, 573 U.S. at 324. Yet Kalshi and the Commission now seek to recast the CEA, which was enacted in 1936, as a source of federal authority over the multibillion-dollar sports-betting industry.[18] That argument makes no sense given the unbroken, near-century of precedent on this issue: Not a single sports wager was traded on a CFTC-regulated exchange between 1936 and January 2025.[19] Nor can Dodd-Frank, enacted in 2010, "be read as a

---

*compare id.* at 65,970-71 & n.27, *with* 15 U.S.C. § 8302(d)(1)(A), the Commission irrationally treats sports bets as swaps when prediction markets offer them, but not when state-licensed casinos do so, *id.* at 65,975. That distinction has no basis in the statutory text. *See Assad*, 190 F.4th at 1114. And because the IFR does not cover parimutuel wagers (which are transacted multilaterally) or bets among friends, those wagers continue to present the section 2(e) problem noted in *Assad* and *Schuler*.

[18] AGA, *State of the States 2026: The AGA Analysis of the Commercial Casino Industry*, at 10 (May 2026), https://perma.cc/AS8X-CVFT.

[19] As recently as September 2025, the Commission explained that it "ha[d] not, to date, been requested to take or taken any official action to approve the listing of sports-related event contracts." CFTC Letter No. 25-36, at *2 n.4 (Sep. 30, 2025), https://www.cftc.gov/csl/25-36/download.

direct (or indirect) regulation of sports gambling," as "the CFTC is not a national gambling regulator," and "[n]o one suggested it was until over a decade after the law was passed." *Assad*, 190 F.4th at 1118.

Indeed, courts "require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (citation omitted). But under Kalshi's and the Commission's view, the congressional policy to "respect the policy choices of the people of each State on the controversial issue of gambling," *Murphy*, 584 U.S. at 484, was meaningless because the CEA had already legalized sports betting nationwide and transferred authority over it to the Commission. That is not a credible reading of the statute. Congress did not "take a wrecking ball to all sports gambling regulations built up over decades by federal, state, and tribal governments" through obscure clauses in Dodd-Frank's "swap" definition. *Assad*, 190 F.4th at 1120. The "lack of historical precedent" for the Commission's claimed authority, "coupled with the breadth of authority that the [agency] now claims," strongly indicates that its position "extends beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119-20 (2022) (citation omitted). Kalshi's

interpretation lacks the "clear congressional authorization" necessary to turn the CFTC into a national gambling regulator. *Assad*, 190 F.4th at 1118.[20]

### B. Kalshi's Preemption Arguments Fail.

Even if some of Kalshi's sports bets fit the CEA's "swap" definition, nothing in the statute would preclude New York from regulating them. The District Court correctly concluded that Kalshi failed to show that New York's gambling laws are expressly or impliedly preempted.

Because the States are independent sovereigns, this Court applies "a presumption against preemption with respect to areas where states have historically exercised their police powers." *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104. That presumption "applies with particular force when Congress has legislated in a field traditionally occupied by the States," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (citation omitted), such

[20] The Commission's pending rulemakings regarding sports bets cannot resolve the question presented here. *See Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806 (June 12, 2026); *Further Definition of "Swap"—Inclusions*, 91 Fed. Reg. 66,022 (Oct. 19, 2026). The meaning of the statutory "swap" definition is a question for courts, not the agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024). Even if the Commission could remove 17 C.F.R. § 40.11's independent bar on "gaming" contracts, it could not make sports bets "swaps."

as gaming. Indeed, "there is a long history of states regulating intrastate gambling, and a history of federal gambling regulations tying federal illegality to state law." *Schuler*, 2026 WL 2884087, at *19. Congress has separately declared that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). Kalshi must therefore show it was Congress's "clear and manifest purpose" in Dodd-Frank to transfer that responsibility to the Commission. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted); *see Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

Kalshi's theory would require the Court to infer a nationwide gambling code from provisions designed to govern derivatives markets. That is precisely the kind of extraordinary result that requires clear congressional language, not inferences from a general jurisdictional grant. Because the CEA says nothing about restricting States' authority to regulate sports wagering, the District Court correctly held that it does not authorize that result.

***Express Preemption***. Beyond the presumption, Kalshi's arguments fail given the CEA's text, structure, and history. The

statutory language Kalshi invokes—the CEA's conferral of "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A)—"would represent an unusual express preemption provision." *Schuler*, 2026 WL 2884087, at *19. The Supreme Court has explained that "[t]he purpose of the exclusive-jurisdiction provision … was to separate the functions of the Commission from those of the Securities and Exchange Commission and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982). Thus, "exclusive jurisdiction" identifies the governing federal agency, not the governing law in every field a DCM touches. *Schuler*, 2026 WL 2884087, at *21.

Section 16(e)(2) confirms that reading. It provides that the CEA "shall supersede and preempt" state gaming laws, but only "in the case of" transactions that are excluded from the CEA or exempted by the CFTC. 7 U.S.C. § 16(e)(2). That targeted language confirms that Congress did not silently preempt every state gaming law applicable to every product listed on a DCM. The statute's "in the case of" limitation preserves state authority outside the enumerated categories. Section 16(h), which provides that certain swaps "may not be regulated as an insurance contract under the law of any State," 7 U.S.C. § 16(h)(2),

supports the same conclusion. These provisions "provide 'strong evidence'" that Congress "did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps," JA14-15 (citation omitted), and that Congress "knew how to draft an express preemption provision" for gaming laws but "chose not to" in section 2(a)(1)(A), *Schuler*, 2026 WL 2884087, at *20.

***Field Preemption***. Field preemption is reserved for "rare cases" in which Congress has left no room for state law. *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). But the CEA leaves considerable room for state regulation. Congress expressly preserved certain "regulatory authorities … of any State" with respect to swaps traded on DCMs, 7 U.S.C. § 2(a)(1)(A), and authorized state officials to enforce "any general civil or criminal antifraud statute of such State," *id.* § 13a-2(7). The Special Rule similarly applies additional restrictions to contracts involving "activity that is unlawful under any … State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I); *see Schuler*, 2026 WL 2884087, at *27; *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025). Given these provisions, the "Swiss cheese-like field" that Congress created "cannot preempt state law because field preemption requires *complete* occupation on the part of the federal

government." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 238 (3d Cir. 2026) (Roth, J., dissenting).

In any event, field preemption turns on the state law's target, not a regulated party's description of its product. *See Oneok*, *Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). New York's laws target gambling, a field Congress "has explicitly not occupied." *Assad*, 190 F.4th at 1122. New York requires every entity that offers sports wagering in the State to obtain a license from the Gaming Commission, JA4 (citing N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 1367(2)(a), 1367-a(4)(b)), and "state laws of general applicability" are "generally not … preempted," even when they substantially affect a federally regulated activity, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992).

Congress's broader treatment of gaming confirms the point. It has consistently eschewed comprehensive gaming regulation in favor of targeted statutes that incorporate, rather than supersede, state law. *See Murphy*, 584 U.S. at 484. The Unlawful Internet Gambling Enforcement Act prohibits knowingly accepting payments for "unlawful internet gambling" but defines that term by reference to state law. 31 U.S.C. §§ 5362(10)(A), 5363. The Illegal Gambling Business Act likewise defines

an "illegal gambling business" as one that "is a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1). And the Wire Act allows specified transmissions involving wagering if (but only if) they are lawful in the relevant States. *Id.* § 1084(b). That reliance on state-law baselines is difficult to reconcile with Kalshi's theory that Congress implicitly vested a federal agency with exclusive authority over sports wagers whenever they are listed on a DCM. Congress has spoken on gambling "repeatedly, deliberately, and specifically," making it "difficult" to conclude that Congress overturned that longstanding state-centered framework through general language in "a Wall Street Reform Bill." *Assad*, 190 F.4th at 1112-13.

***Conflict Preemption***. Conflict preemption arises only where compliance with both laws is impossible or state law obstructs Congress's objectives, *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104 (citation omitted); "the mere fact of tension … is not enough," *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). Neither condition is present here. The Sixth and Ninth Circuits rejected both arguments, *Schuler*, 2026 WL 2884087, at *25-27; *Assad*, 190 F.4th at 1120-21, and the District Court correctly reached the same conclusion.

*First*, state gaming laws do not obstruct the CEA's objectives. The CEA regulates derivatives markets; it does not establish a federal policy favoring nationwide sports betting. Indeed, Congress has not regulated sports gambling "directly, or indirectly through the CFTC." *Assad*, 190 F.4th at 1118.

Far from conflicting with federal policy, New York's law complements it. *See* JA19. The Special Rule authorizes the Commission to prohibit contracts involving "gaming" or activity unlawful under state law, 7 U.S.C. § 7a-2(c)(5)(C)(i), and the Commission exercised that authority in 17 C.F.R. § 40.11(a). These provisions refute any suggestion that the CEA guarantees nationwide access to contracts that Congress singled out for disfavored treatment and that the Commission's own regulations have prohibited since 2011.

Kalshi's reliance on uniformity fails as well. Although a divided Third Circuit panel warned of a "patchwork of state regulations," *Flaherty*, 172 F.4th at 230, an abstract interest in uniform derivatives regulation cannot support a congressional objective of nationwide sports betting. And the CEA's "multiple savings clauses show that uniformity is far from a goal that the statute seeks to accomplish at all costs."

*Schuler*, 2026 WL 2884087, at *27. Licensed gaming operators have long offered multi-jurisdictional products—such as wide-area progressive slot systems that link machines across state lines to a communal jackpot—while complying with varying state and tribal laws.[21] Even if compliance is challenging, "expensive does not mean impossible." *Schuler*, 2026 WL 2884087, at *26 (cleaned up).

*Second*, compliance with New York law is not impossible. Licensed operators routinely use geolocation to confine wagering to jurisdictions where it is lawful, and Kalshi's refusal to do the same does not create a conflict. *Assad*, 190 F.4th at 1121; *see Schuler*, 2026 WL 2884087, at *26 ("[o]ther companies have also complied with … state sports-gaming laws by using geofencing"). Kalshi itself has done so elsewhere. *See* Joint Status Report at 5, *Blue Lake Rancheria v. Kalshi, Inc.*, No. 3:25-cv-6162 (N.D. Cal. Oct. 14, 2026), Dkt. 101. Kalshi's claim that New York's requirement that sports bettors be physically located in the State makes compliance "literally impossible," Opening Br. 53, cannot be squared with that experience. And, of course, "[t]here is nothing preventing Kalshi

---

[21] *See, e.g.*, Nat'l Indian Gaming Comm'n, Bulletin 2009-3, at 1-2 (Mar. 9, 2009), https://perma.cc/KCK6-M5AE.

from obtaining a license pursuant to New York law," as all sportsbooks operating in the state have done. JA16.

Kalshi's argument based on the impartial-access rule, 17 C.F.R. § 38.151(b), fares no better. That rule addresses discriminatory access criteria, such as standards based on net worth, not geographic availability, and it cannot require a DCM to offer products that are unlawful where its customers are located. *See Schuler*, 2026 WL 2884087, at *26.

## III. Kalshi's Vision Would Upend the Longstanding Framework Governing Sports Betting.

States have made different choices about whether and how to offer sports betting. Some States prohibit sports betting altogether, but 39 States (including all three in this Circuit) have adopted regulatory frameworks to permit sports betting.

Gaming operators, including many of AGA's members, have invested accordingly, building state-specific systems for licensing, geolocation, account controls, vendor relationships, and permissible bet offerings. And they work closely with state and tribal regulators to ensure that consumers can enjoy gaming as a safe, responsible form of entertainment.

States often require prospective gaming operators to apply—and pay a substantial fee—to state regulators for a license. After that process, which often involves extensive investigations, is complete, licensed operators must pay taxes; comply with state consumer-protection rules; and periodically renew their licenses. AGA's members have made substantial investments to satisfy these obligations, through advertising guidelines, gaming self-exclusion programs, and employee training standards. They have built their businesses on the expectation that States will continue to exercise their longstanding police power to oversee gaming.

In 2025, nationwide commercial gaming revenue reached $78.62 billion, including $16.89 billion from sports betting, and produced $17.86 billion in direct gaming tax revenue.[22] In Connecticut, New York, and Vermont, licensed gaming operators support nearly 100,000 jobs and generate $4.44 billion in gaming tax revenue annually.[23] These revenues

[22] *State of the States*, *supra* note 18, at 8-10.

[23] AGA, *State of Play Map*, https://perma.cc/J3PX-E6CF (captured Nov. 5, 2026).

support public programs, such as youth sports and public education. *See, e.g.*, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367(8).

There is a bargain at the heart of the state-based framework. Operators are licensed and investigated by the States in which they operate; their systems are audited; and their platforms are built to incorporate geolocation, identity verification, and reporting requirements. They provide States with revenue, investments, and compliance functions. The States, in return, provide a market in which all competitors are subject to the same standards. That level playing field has created settled expectations for regulators and operators alike.

Kalshi's legal theory would allow prediction markets to circumvent state restrictions on sports betting that protect minors, provide meaningful responsible-gaming safeguards, regulate advertising, and safeguard college sports.

***Age Limits.*** Like most states that permit sports betting, New York prohibits wagering by persons under 21. *See, e.g.*, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1332(1). Kalshi, though, offers sports bets to all

users 18 or older,[24] thus allowing even high schoolers to place bets, despite States' judgments that such wagers present unacceptable risks. As of November 2, 2026, young adults under 21 had wagered an estimated $9.5 billion on Kalshi alone.[25]

***Responsible Gaming.*** New York requires licensed operators to offer time limits, honor statewide self-exclusion lists, and maintain responsible-gaming programs designed to identify and address problematic wagering behavior. *See, e.g.*, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1362(7). These protections allow bettors to opt out across state-regulated systems.

Kalshi does not monitor for signs of problem gaming or contact users who exhibit signs of irresponsible use. Nor does Kalshi participate in state self-exclusion programs, instead noting that "it is ultimately [the user's] responsibility not to trade."[26]

---

[24] Kalshi, *Signing Up as an Individual* (Mar. 10, 2026), https://perma.cc/GA9G-8PRW.

[25] AGA, *Teen-Twenty Sports Betting Tracker*, https://perma.cc/YKE4-TQ3B; *see also* Marshall Cohen, *Young Adults Under 21 Traded $5 Billion on Kalshi This Year, Amid Prediction Market Frenzy*, CNN Business (Aug. 28, 2026), https://perma.cc/5X6Q-N4QY.

[26] *See* Kalshi, *Trading Break* (Mar. 10, 2026), https://perma.cc/4NZS-28FB.

***Advertising*.** States require licensed operators to include responsible-gaming messages and helpline information in advertising, to avoid advertising that appeals to minors, and to refrain from marketing to self-excluded patrons. *See, e.g.*, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1363; N.Y. Comp. Codes R. & Regs. tit. 9 § 5325.6.

Kalshi's advertising, however, blows past these limits. One depicted "a woman anxiously checking a Kalshi bet with her friends, with the caption, 'I was about to be unable to pay my rent, but I got two years of rent through Kalshi's prediction. It's amazing!'"[27] And none include responsible-gaming messages, nor is there any evidence that Kalshi prevents its advertisements from reaching minors and self-excluded individuals.

***College Sports*.** New York also prohibits wagers on sporting events involving New York-based college sports teams. *See* N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367(1)(s). Although licensed gaming operators abide by this restriction, prediction markets offer these types of bets—again undermining the judgments of New York policymakers.

---

[27] Nancy Walecki, *It's Not Gambling, It's 'Girl Math'*, The Atlantic (Apr. 1, 2026), https://perma.cc/7CCJ-FN7M.

* * *

Kalshi's approach would substantially weaken the core rules that States have used to govern sports betting. Instead, Kalshi would force the CFTC to serve as the Nation's sports-betting regulator even though the agency, by its own admission, "is not a gaming regulator" and lacks "the statutory mandate" and "specialized experience appropriate to oversee" the sports betting market. *Event Contracts*, 89 Fed. Reg. 48,968, 48,982-83 (June 10, 2024). This dramatic shift would result in fewer protections for consumers, reduced revenues for States, and a competitive imbalance for licensed gaming operators. There is no indication—let alone clear and manifest intent, *supra* at 25-26—that Congress designed federal commodities law to produce such upheaval.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

*/s/ Kevin F. King*
Kevin F. King
Matthew J. Glover
Scott J. Garfing
Sameer Aggarwal
Hassan Ahmad
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*
*American Gaming Association*

November 6, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 29.1(c) because this brief contains 6,995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Century Schoolbook font.

*/s/ Kevin F. King*
Kevin F. King

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2026, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

*/s/ Kevin F. King*
Kevin F. King