**No. 26-1835**

# In the United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

ROBERT WILLIAMS, *et al.*,

*Defendants-Appellees*,

On Appeal from the United States District Court
for the Southern District of New York
No. 1:25-cv-8846 (Hon. Analisa Torres)

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, ARIZONA INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, TRIBAL GAMING PROTECTION NETWORK, NATIONAL TRIBAL GAMING COMMISSIONERS & REGULATORS, NATIVE AMERICAN FINANCE OFFICERS ASSOCIATION, TRIBAL ALLIANCE OF SOVEREIGN INDIAN NATIONS, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 27 FEDERALLY RECOGNIZED INDIAN TRIBES IN SUPPORT OF DEFENDANTS-APPELLEES**

***(Counsel for Amici Curiae listed on inside of cover)***

*/s/ Joseph H. Webster*
JOSEPH H. WEBSTER
*Counsel of Record*
JENS W. CAMP
ALEXANDRA K. HOLDEN
HOBBS, STRAUS, DEAN & WALKER, LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
jcamp@hobbsstraus.com
aholden@hobbsstraus.com
*Attorneys for Tribal Amici*

SCOTT CROWELL
CROWELL LAW OFFICE
TRIBAL ADVOCACY GROUP PLLC
1487 W. State Route 89 A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net
*Attorney for Rincon Band of Luiseño Indians, Santa Ynez Band of Chumash Mission Indians, and Spokane Tribe of the Spokane Reservation*

MICHAEL HOENIG
YUHAAVIATAM OF SAN MANUEL NATION
422 1st Street SE
Washington, DC 20003
(909) 936-9684
michael.hoenig@sanmanuel-nsn.gov
*Attorney for Yuhaaviatam of San Manuel Nation and San Manuel Gaming & Hospitality Authority*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* disclose that they have no parent corporations and that no publicly held corporations hold 10% or more of stock in any of the *Amici Curiae*.

Dated: November 9, 2026

*/s/ Joseph H. Webster*
Joseph H. Webster

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

IDENTITY AND INTERESTS OF AMICI CURIAE .......... 1

INTRODUCTION .......... 6

ARGUMENT .......... 9

I. Congress Did Not Impliedly Repeal Key Provisions of IGRA .......... 9

A. IGRA's Structure .......... 9

B. Congress Did Not Repeal Key Provisions of IGRA When It Enacted the CEA's Definition of a "Swap" in 2010. .......... 12

C. Kalshi's Theory Does Not Meet the Standard for Implied Repeals. .......... 16

II. The Major Questions Doctrine Forecloses Kalshi's Theory .......... 24

CONCLUSION .......... 30

CERTIFICATE OF COMPLIANCE .......... 31

CERTIFICATE OF SERVICE .......... 32

# TABLE OF AUTHORITIES

**Cases**

*Blue Lake Rancheria v. Kalshi, Inc.*,

191 F.4th 1071 (9th Cir. Sept. 16, 2026) ............................................. passim

*Bryan v. Itasca Cnty., Minn.*,

426 U.S. 373 (1976)..........................................................................................24

*California v. Cabazon Band of Mission Indians*,

480 U.S. 202 (1987).......................................................................................9, 26

*CFTC v. Wisconsin*,

No. 2:26-cv-00749-WCG, 2026 WL 2474512 (E.D. Wis. July 29, 2026) ...14

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,

42 F.4th 1024 (9th Cir. 2022) .....................................................................7, 10

*Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*,

228 F.3d 82 (2d Cir. 2000) ...............................................................................24

*Epic Sys. Corp. v. Lewis*,

584 U.S. 497 (2018)..........................................................................................16

*FDA v. Brown & Williamson Tobacco Corp.*,

529 U.S. 120 (2000)...................................................................................... 25, 28

*Ho-Chunk Nation v. Kalshi Inc.*,

No. 3:25-cv-00698, 2026 WL 1284077 (W.D. Wis. May 11, 2026) ………..
..................................................................................... 7, 21, 24, 27

*KalshiEX, LLC v. Assad*,

190 F.4th 1098 (9th Cir. 2026) ........................................................... passim

*KalshiEX, LLC v. Cafferelli*,

No. 3:25-cv-02016, 2026 WL 2294589 (D. Conn. Aug. 10, 2026) ............ 14

*KalshiEX, LLC v. Flaherty*,

172 F.4th 220 (3d Cir. 2026) ........................................................................13

*KalshiEX, LLC v. Hendrick*,

817 F.Supp.3d 1014 (D. Nev. 2025) ..................................................... 18, 19

*KalshiEX LLC v. Schuler*,

No. 26-3196, 2026 WL 2884087 (6th Cir. Sept. 25, 2026) ....... 14, 16, 19, 27

*KalshiEX, LLC v. Schuler*,

No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026)........... 12, 14

*KalshiEX LLC v. Williams,*

No. 1:25-cv-8846, 2026 WL 1961872 (S.D.N.Y. July 7, 2026)...............6, 17

*KalshiEX LLC v. Williams,*

No. 1:25-cv-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026)...... 6, 20, 29

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,

523 U.S. 26 (1998)...........................................................................................22

*Michigan v. Bay Mills Indian Cmty.*,

572 U.S. 782 (2014)........................................................................................21

*Morton v. Mancari*,

417 U.S. 535 (1974)................................................................................ 24, 27

*Murphy v. Nat'l Collegiate Athletic Ass'n*,

584 U.S. 453 (2018)................................................................. 6, 26, 28, 29

*Pullen v. Morgenthau*,

73 F.2d 281 (2d Cir. 1934) ....................................................................16

*QCX LLC v. Nessel* (*Nessel I*),

No. 1:26-cv-710, 2026 WL 1166362 (W.D. Mich. Mar. 10, 2026).............18

*QCX LLC v. Nessel (Nessel II)*,

No. 1:26-cv-00710, 2026 WL 1895958 (W.D. Mich. June 17, 2026)………..
.............................................................................................. 19, 20, 23

*Santa Clara Pueblo v. Martinez*,

436 U.S. 49 (1978)...............................................................................21

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,

531 U.S. 159 (2001)..............................................................................26

*Util. Air Reg. Grp. v. EPA*,

573 U.S. 302 (2014)..............................................................................25

*W. Flagler Assocs., Ltd. v. Haaland,*

144 S. Ct. 2671 (2024)..........................................................................27

*W. Flagler Assocs., Ltd. v. Haaland*,

71 F.4th 1059 (D.C. Cir. 2023)...............................................................27

*West Virginia v. EPA*,

597 U.S. 697 (2022).................................................................. 25, 26, 27

**Statutes**

17 C.F.R. § 38.151(b) ...............................................................................5

17 C.F.R. § 40.11(a).................................................................................22

17 C.F.R. § 40.11(a)(1) ..................................................................... 8, 21, 22

18 U.S.C. § 1166(d) ....................15

18 U.S.C. § 1955(b)(1) ....................6

18 U.S.C. §§ 1953(b)–(c) ....................6

25 C.F.R. § 502.4(c) .................... 11, 14, 27

25 U.S.C. § 2701(5) .................... passim

25 U.S.C. § 2702 ....................10

25 U.S.C. § 2702(1) .................... 10, 27

25 U.S.C. § 2703(5) ....................4

25 U.S.C. § 2710(b)(2)(A) ....................11

25 U.S.C. § 2710(d)(1) .................... 7, 10, 15

25 U.S.C. § 2710(d)(2)(A) ....................11

31 U.S.C. § 5362(10) ....................6

7 U.S.C. § 16(e) ....................28

7 U.S.C. § 1a(47)(A) ....................8, 17

7 U.S.C. § 1a(47)(A)(ii) .................... 14, 17, 19

7 U.S.C. § 2(a)(1)(A) ....................8

7 U.S.C. § 2(e) ....................12

7 U.S.C. § 5 .................... 7, 12, 29

7 U.S.C. § 7a-2(c)(5)(C) ....................8

**Rules**

156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) .................... 8, 15, 21

Christopher Dodd, Comment on Proposed Rule on Prediction Markets; Public Interest Determinations (July 26, 2026) ....................22

Event Contracts, 89 Fed. Reg. 48968 (June 10, 2024) .................................... 23, 29

Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65969 (Oct. 19, 2026) ...........................................................13

Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66022 (Oct. 19, 2026)...13

Nat'l Indian Gaming Comm'n, *NIGC FY 2025 Gross Gaming Revenue Report* (July 21, 2026)..........................................................................................10

Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694 (July 21, 1989)..........................................................................................23

Proposed Rule on Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35806 (June 12, 2026)...................................................... 11, 21

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011)….. ...................................................................................... 8, 22, 24, 29

## IDENTITY AND INTERESTS OF AMICI CURIAE

*Amici curiae*[1] include the Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Arizona Indian Gaming Association ("AIGA"), California Nations Indian Gaming Association ("CNIGA"), Minnesota Indian Gaming Association ("MIGA"), Oklahoma Indian Gaming Association ("OIGA"), Washington Indian Gaming Association ("WIGA"), Tribal Gaming Protection Network ("TGPN"), National Tribal Gaming Commissioners & Regulators ("NTGCR"), Native American Finance Officers Association ("NAFOA"), Tribal Alliance of Sovereign Indian Nations ("TASIN"), San Manuel Gaming and Hospitality Authority ("SMGHA"), and 27 federally recognized Indian tribes ("Amici Tribes")[2] (collectively, "Tribal Amici").

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae* and their counsel, made any monetary contribution towards the preparation or submission of this brief.

[2] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Hannahville Indian Community; Iowa Tribe of Oklahoma; Jamestown S'Klallam Tribe; Lac Courte Oreilles Band of Lake Superior Chippewa Indians; Lytton Rancheria; Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Gun Lake Tribe); Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Oneida Nation; Pechanga Band of Indians; Pokagon Band of Potawatomi; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract); Spokane Tribe of the

The Tribal Amici have a shared interest in this case because of its potential to significantly impact their or their member tribes' rights regarding gaming on Indian lands, as well as tribal governmental revenue more generally.

IGA is an inter-tribal non-profit organization comprising 124 federally recognized Indian tribes that operate gaming enterprises throughout Indian Country. IGA's mission is to advance tribal economic, social, and political interests, and to preserve and promote tribal sovereignty, self-sufficiency, and economic development by advocating for tribally owned governmental gaming enterprises.

NCAI is the oldest and largest national organization composed of American Indian and Alaska Native tribal governments and their citizens. NCAI advises and educates the public, tribes, state governments, and the federal government on issues involving tribal sovereignty, self-government, treaty rights, and policies affecting tribes, including gaming issues.

USET SPF is a non-profit, inter-tribal organization advocating on behalf of 33 federally recognized tribes. USET SPF is dedicated to promoting, protecting, and advancing the inherent sovereign rights and authorities of tribes and works to

---

Spokane Reservation; Saint Regis Mohawk Tribe; Table Mountain Rancheria; Wilton Rancheria; Yavapai-Apache Nation; and Yuhaaviatam of San Manuel Nation.

educate federal, state, and local governments about the unique history and political status of tribes.

TGPN is a 501(c)(6) non-profit organization that was founded to provide regulatory outreach, services, and education for the tribal gaming industry. TGPN's goal is to protect tribal entities by strengthening relationships and providing knowledge to those working in the tribal gaming industry.

NAFOA is a national non-profit organization of tribal officers, controllers, treasurers, accountants, auditors, and financial advisors. NAFOA's mission is to foster development of financial and business expertise among tribal governments and their businesses by providing educational forums and resources, and by instilling finance and accounting best practices.

NTGCR is a national non-profit trade organization established to serve as a unified voice for tribal regulators and to promote consistent regulatory standards across Indian Country. NTGCR's mission is to empower tribal gaming regulators through education, collaboration, and regulatory enforcement enhancements.

TASIN is an intergovernmental association of federally recognized tribal governments throughout Southern California. TASIN's mission is to protect and promote the tribal sovereign government rights, the cultural identity, and the interests of federally recognized tribes located within the Federal Central Judicial District within the State of California.

SMGHA is a governmental instrumentality of Yuhaaviatam of San Manuel Nation created to independently carry out the investment in, and ownership and management of, gaming and hospitality businesses outside of the San Manuel Reservation.

AIGA, CNIGA, MIGA, OIGA, and WIGA are regional non-profit associations representing federally recognized Indian tribes within their respective regions on gaming-related matters. They advance tribal sovereignty and support their member tribes on Indian-gaming legislative, policy, legal, and educational matters.

The Amici Tribes are 27 federally recognized Indian tribes within the meaning of the Indian Gaming Regulatory Act ("IGRA"). *See* 25 U.S.C. § 2703(5). Each of the Amici Tribes is a separate and distinct tribal government with the sovereign authority to conduct and regulate gaming activities on its Indian lands. The Amici Tribes all have a direct and immediate interest in maintaining their sovereign rights over gaming on their Indian lands.

While the Tribal Amici concur with and support the arguments advanced by Defendants, the arguments advanced in this proposed amicus brief present additional grounds as to why the CEA does not exclusively govern KalshiEX, LLC's ("Kalshi") sports-event contracts. Kalshi's arguments in this case, if taken as true, would necessarily mean that the CEA preempts or impliedly repeals key provisions

of IGRA. *See* Appellant's Opening Br. 33–51, Dkt. No. 43.1. Such a holding would unquestionably impact tribes and the tribal gaming industry as a whole.

Additionally, by claiming that it must be able to offer sports betting nationwide, necessarily including on tribes' Indian lands in New York and across the country, *see id.* at 14–15 (quoting 17 C.F.R. § 38.151(b)), Kalshi sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands," *see* 25 U.S.C. § 2701(5).

Finally, this amicus brief is relevant to the disposition of the case because the Court's decision in this case directly impacts tribal sovereignty and, specifically, tribes' sovereign regulatory authority over gaming that occurs on their Indian lands, which is an important interest, as reflected by the congressional purposes of IGRA. Consequently, this amicus brief adds a valuable perspective for the Court not advanced by either party.

The Tribal Amici respectfully ask this Court to affirm the U.S. District Court for the Southern District of New York's decision denying Kalshi's motion for preliminary injunction.

Counsel for the Tribal Amici consulted with the parties to this appeal. Both parties consent to the filing of this brief.

## INTRODUCTION

Kalshi comes before this Court and asks it to wholly abandon the national policy of state and tribal regulation of sports betting and to turn decades of federal law on its head. The U.S. District Court for the Southern District of New York recognized this, aptly rejecting Kalshi's position in denying its motion for a preliminary injunction, and this Court should affirm. *See generally KalshiEX LLC v. Williams,* No. 1:25-cv-8846, 2026 WL 1961872 (S.D.N.Y. July 7, 2026), *as amended*, 2026 WL 2017466 (S.D.N.Y. July 13, 2026).

Where Congress has sought to regulate gaming, it has often done so with reference to state laws. *See, e.g.*, 18 U.S.C. §§ 1953(b)–(c), 1955(b)(1); 31 U.S.C. § 5362(10). Federal courts have likewise recognized that states regulate gaming pursuant to their inherent police powers. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 484 (2018) (recognizing federal policy that "respect[ed] the policy choices of the people of each State on the controversial issue of gambling"); *see also Williams*, 2026 WL 2017466, at *7 (declining to find that the CEA's grant of exclusive jurisdiction leaves no room for supplementary state legislation because "the power to regulate gambling is a traditional police power exercised by New York"). And, when enacting IGRA, Congress also relied upon state gaming laws, implementing a system of cooperative federalism in which tribes, states, and the federal government each play a role in the oversight of gaming. *Chicken Ranch*

*Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022). Critically, under this system, Congress expressly determined that "[c]lass III gaming activities shall be lawful on Indian lands *only if* such activities are … authorized by [tribal law,] … located in a State that permits such gaming[, and] … conducted in conformance with a Tribal-State compact." 25 U.S.C. § 2710(d)(1) (emphasis added). Yet Kalshi argues that, without so much as a whisper of legislative intent, Congress gave Designated Contract Markets ("DCMs") permission to engage in sports betting activity on tribes' Indian lands over such tribes' objections and granted the Commodity Futures Trading Commission ("CFTC") the unilateral authority to preempt any and all state and tribal gaming laws. Not so.

The Commodity Exchange Act ("CEA") does nothing to disturb IGRA's system of cooperative federalism. Since Congress enacted the CEA, tribal, federal, and state gaming regulation have co-existed harmoniously with federal derivatives market regulation. *See Ho-Chunk Nation v. Kalshi Inc.*, No. 3:25-cv-00698, 2026 WL 1284077, at *9–10 (W.D. Wis. May 11, 2026). Through the CEA, Congress merely sought to regulate derivatives "transactions … [that] provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information[,]" not gaming. 7 U.S.C. § 5(a); *see Blue Lake Rancheria v. Kalshi, Inc.*, 191 F.4th 1071, 1089 (9th Cir. Sept. 16, 2026) (explaining that the CEA and IGRA "address two different questions" and that the CEA "does not determine

whether [an event contract traded on a DCM], when offered on Indian lands, satisfies IGRA's separate requirements").

Congress intended to preserve this balance by, on the one hand, clarifying that the CFTC's jurisdiction extends to derivatives transactions with legitimate hedging functions, such as grain futures, and, on the other hand, preserving tribal and state regulation of gaming, including sports betting. *See* 7 U.S.C. §§ 1a(47)(A), 2(a)(1)(A), 7a-2(c)(5)(C). In 2010, in response to a major financial crisis driven by the trade of unregulated derivatives contracts, Congress enacted the Dodd-Frank Act. In an overt effort to prevent "gambling through supposed 'event contracts,'" including the listing of contracts "around sporting events such as the Super Bowl," the Act included the so-called "Special Rule," which prohibits contracts (like Kalshi's) that function as or facilitate gambling. *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statement of Sen. Lincoln); 7 U.S.C. § 7a-2(c)(5)(C). Pursuant to the Special Rule, and consistent with Congress's intent, the CFTC promulgated 17 C.F.R. Section 40.11(a)(1), prohibiting contracts involving "gaming." *See* Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011).

Yet now Kalshi has brazenly entered onto state and tribal lands across the nation to conduct unregulated gaming with its sports betting app. In doing so, Kalshi is siphoning away vital tribal and state governmental revenue to its owners' pockets.

Tribes have primary jurisdiction over their lands and the activities occurring thereon. Tribal jurisdiction extends to gaming, as the Supreme Court has long recognized. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–22 (1987); 25 U.S.C. § 2701(5).

Kalshi asks this Court to subvert this longstanding and comprehensive regulatory regime. The consequences of Kalshi's arguments would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent; radically transform the way gaming is regulated; undermine existing tribal-state gaming compacts and regulatory frameworks; allow Kalshi—not states or tribes—to regulate its own sports betting activity on state and tribal lands; permit Kalshi to siphon gaming revenues from tribal and state governments; and diminish tribal self-determination.

Accordingly, this Court should affirm the district court's decision to deny Kalshi's motion for a preliminary injunction.

## ARGUMENT

### I. Congress Did Not Impliedly Repeal Key Provisions of IGRA.

#### A. IGRA's Structure

When Congress adopted IGRA, it sought to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. §

2702(1). IGRA has been incredibly successful on that front.[3] Since IGRA's passage in 1988, tribes across the United States have lifted entire generations out of poverty through tribal gaming. Gaming revenue supports thousands of jobs in hundreds of communities, and provides critical funding to tribal, state, and local governments through revenue-sharing agreements, taxes, and economic stimulus. For tribes, gaming is not just a "commercial" endeavor but an existential one. *See Chicken Ranch Rancheria of Me-Wuk Indians*, 42 F.4th at 1032.

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribal government, is in a state that permits such gaming, and is conducted in accordance with a tribal-state compact. 25 U.S.C. § 2710(d)(1). These core provisions have remained unchanged since 1988.

Congress carefully crafted this comprehensive statutory regime to advance a clearly articulated policy to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments" and provide a statutory basis for regulation that protects players and preserves tribes' ability to be the primary beneficiaries of gaming on their lands. *Id.* § 2702. Thus, Congress made it

[3] *See, e.g.*, Nat'l Indian Gaming Comm'n, *NIGC FY 2025 Gross Gaming Revenue Report* 4 (July 21, 2026) (reporting $46.2 billion in total gross gaming revenue from Tribal gaming), available at https://www.nigc.gov/wp-content/uploads/2026/07/GGR25_071526.pdf.

abundantly clear that *tribes*—not private entities—must benefit from any gaming conducted on their Indian lands. *See id.* §§ 2710(b)(2)(A), (d)(2)(A).

In its recently published proposed rule, the CFTC acknowledged that "IGRA[] establishes a comprehensive federal framework for the regulation of gaming on Indian lands, … and that Tribal-State compacts under section 11(d) of the IGRA govern the conduct of Class III gaming." Proposed Rule on Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35806, 35858 (June 12, 2026). Despite this, the CFTC and the entities it regulates, including Kalshi, continue to draw a distinction without a difference between "event contracts traded as swaps or futures contracts" and class III gaming subject to IGRA. *Id.* at 35859. The plain truth is that Kalshi is offering and engaging in activity that is unequivocally class III gaming. 25 C.F.R. § 502.4(c) (defining class III gaming to include sports betting); *see Blue Lake*, 191 F.4th at 1083 ("In practice, what Kalshi labels 'sports event contracts' neatly track the activities described in IGRA and its implementing regulations…. Its sports event contracts are class III gaming."); *see also KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1113 (9th Cir. 2026) ("The substance of the sports event contracts offered on Kalshi's DCM is sports gambling, regardless of whether Kalshi calls them swaps.").

### B. Congress Did Not Repeal Key Provisions of IGRA When It Enacted the CEA's Definition of a "Swap" in 2010.

Kalshi argues that Congress's definition of a single term—"swaps"—within a statute whose entire purpose is to address the risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), preempts the field of what is unequivocally sports betting, and therefore effectively repealed core provisions of IGRA. *See* Appellant's Opening Br. 50–51, Dkt. No. 43.1. Under Kalshi's theory, Congress silently stripped away tribes' and states' longstanding authority over sports betting (and potentially other kinds of class III gaming) while allowing for-profit companies like Kalshi to run internet casinos pursuant to their own private oversight. *See* *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *6 n.6 (S.D. Ohio Mar. 9, 2026) ("finding that sports-event contracts are swaps, and thus must be traded on DCMs would have a seismic impact on Indian tribes' authority to regulate gaming on tribal land"). It did not. *Blue Lake*, 191 F.4th at 1076 (tribes "retain the exclusive authority to regulate class III gaming on their lands subject to IGRA's requirements.").

Kalshi's interpretation of the term "swaps" within the CEA is so broad that it necessarily consumes all sports betting (and potentially other kinds of gaming). And, with one inapplicable exception, the CEA prohibits off-market swaps. *See* 7 U.S.C. § 2(e). Consequently, if all sports betting contracts are swaps, "then all sports

betting must be done on a DCM" or risk violating federal law.[4] *Assad*, 190 F.4th at 1115 ("If the CEA's definition of swap is read broadly to encompass Kalshi's sports event contracts, … then it can also be read to encompass other sports bets such that anyone who places an off-DCM sports bet that fits within [the] definition of a swap would be violating the CEA."); *see also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 233 (3d Cir. 2026) (Roth, J., dissenting).

Kalshi's argument thus does double violence. On one hand, by permitting Kalshi to offer sports betting on Indian lands, its argument sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity

---

[4] The CFTC recently promulgated an interim final rule ("IFR") providing that "casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps…." Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65969, at 65971 (Oct. 19, 2026). At the same time, it used a Notice of Proposed Rulemaking proposing to amend the definition of "swaps" to include event contracts on sporting events. Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66022, at 66025 (Oct. 19, 2026). Though the CFTC correctly observed that sportsbook and casino wagering products are not swaps, it did so in a limited and self-serving manner that is not grounded in the statute it claims to implement. The IFR incorrectly states that the CEA empowers the CFTC to "further define" swaps to include such products. *See* 91 Fed. Reg. at 65971 (citing *Flaherty*, 172 F.4th at 228). The authority to "further define" a statutory term, however, is not the authority to change its meaning or broaden its scope beyond what Congress intended. Moreover, the Ninth Circuit rejected arguments that sportsbook betting and sports event contracts are different and ruled that the definition of "swap" for which Kalshi advocates is based on an overly broad reading of the CEA's definition of a swap, and this court should as well. *See Assad*, 190 F.4th at 1115 ("If we can only rely on the CFTC's regulation to exclude [bets on bingo games and ping pong matches] after the fact, then Congress's definition of swap would have to include all bets on [such games] under the CFTC's jurisdiction. We reject that overly broad reading.").

on Indian lands." 25 U.S.C. § 2701(5). On the other, it also prohibits tribes from offering the sports betting that IGRA plainly authorizes. *See* 25 C.F.R. § 502.4(c).

Moreover, if Kalshi's position is adopted, its reach would extend beyond sports betting to encompass other forms of gaming because it depends on embracing an interpretation of "swap" that "lacks a limiting principle." *Assad*, 190 F.4th at 1115; *see also KalshiEX, LLC v. Cafferelli*, No. 3:25-cv-02016, 2026 WL 2294589, at *8 (D. Conn. Aug. 10, 2026), *appeal filed*, No. 26-2239 (2d Cir. Aug. 11, 2026); *CFTC v. Wisconsin*, No. 2:26-cv-00749-WCG, 2026 WL 2474512, at *9–11 (E.D. Wis. July 29, 2026), *appeal filed*, No. 26-2636 (7th Cir. Aug. 7, 2026). Kalshi's alleged definition of "an event or contingency associated with a potential financial, economic, or commercial consequence" is so broad that it necessarily includes betting on other casino games. 7 U.S.C. § 1a(47)(A)(ii); *see also KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087, at *14 (6th Cir. Sept. 25, 2026) ("Kalshi's overbroad swap definition would likely cover all sorts of commonplace gambling activity that does not currently occur on federally regulated exchanges."). The irony of this result is that the gaming conducted pursuant to tribal-state gaming compacts or state law provides significantly more consumer protection than the type of unregulated sports betting offered by Kalshi, which generally allow users to engage in practically limitless betting with few, if any, guardrails. *See Schuler*, 2026 WL 657004, at *10 n.9, *aff'd*, No. 26-3196, 2026 WL 2884087 (6th Cir. Sept. 25, 2026).

Consequently, if the CEA governs Kalshi's sports betting contracts on Indian lands, then Congress must have intended to repeal key provisions of IGRA that expressly grant regulatory authority over such activity to tribes, states, and certain federal agencies. *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d). Congress also must have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereignty to conduct and regulate gaming activity that occurs on Indian lands. *See* 25 U.S.C. § 2701(5). No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA. This Court should therefore reject Kalshi's boundless theory and give effect to both the CEA and IGRA by excluding sports betting contracts such as Kalshi's from the CEA's definition of "swap." *Blue Lake*, 191 F.4th at 1089. Such an interpretation is more faithful to the CEA's statutory language and legislative intent:

> [I]t is our intent … [that the Special Rule] prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.

*See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statement of Sen. Lincoln, principal author of the Dodd-Frank Act).

### C. Kalshi's Theory Does Not Meet the Standard for Implied Repeals.

Kalshi's preemption argument must be rejected because it would manufacture an implied repeal of key provisions of IGRA where none exists. Kalshi cannot meet the heavy burden of proving that Congress intended to repeal key provisions of IGRA, because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend to Kalshi's sports bets or other forms of gaming.

Courts apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation modified). Congress's intent to repeal must be "clear and manifest." *Id.* (citation modified). "Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.'" *Id.* at 515 (citation modified). If that were Congress's intent, "it would have been stated in clearer terms if it were intended to have forceful preemptive effect." *Schuler*, 2026 WL 2884087, at *4; *see also Pullen v. Morgenthau*, 73 F.2d 281, 283 (2d Cir. 1934)("It is elementary that repeals by implication are not favored….").

The district court held correctly that the CEA neither expressly nor impliedly preempts the application of State law. *See Williams*, 2026 WL 1961872, at *5–9. Here, there is no "clear and manifest" congressional intent, and IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting.

*1. Sports betting contracts are not "swaps."*

The CEA defines "swap" as "any agreement, contract, or transaction … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's sports betting contracts simply do not fall under this definition.

First, Kalshi's sports betting contracts are not dependent on the *occurrence, nonoccurrence, or extent of the occurrence* of a sports event (i.e., whether the sports event occurs) but rather on the *outcome* of the sports event (or parts thereof) (i.e., which team wins). Other courts have held that sports bets are not swaps for precisely this reason. *See, e.g.*, *Assad*, 190 F.4th at 1107.

Second, courts nationwide have rejected a reading of the term "event" as used in 7 U.S.C. § 1a(47)(A)(ii) to mean (and therefore to allow DCMs to offer wagers on) "essentially anything that happens," because "[t]here would be no difference between *event* and *occurrence*, and the statute's other inclusive definitions of *swap* would serve little to no purpose as they would be subsumed by the all-encompassing

*event* clause." *QCX LLC v. Nessel* (*Nessel I*), No. 1:26-cv-710, 2026 WL 1166362, at *2 (W.D. Mich. Mar. 10, 2026). The Ninth Circuit has agreed, holding that the terms "event" and "occurrence" "should have independent meaning to avoid rendering one term superfluous," and "even conflating [the terms] we do not refer to whether the Dodgers win the World Series, or how many touchdowns Fernando Mendoza might throw in a game, [] as an 'event.'" *Assad*, 190 F.4th at 1112.

Third, there is no "financial, commercial, or economic consequence" associated with Kalshi's sports betting contracts. Aside from whether the purchaser wins or loses their bet, these contracts have no direct financial consequences for the purchaser. To constitute a swap, the underlying event itself must *inherently* have a financial or economic consequence. *Id.* at 1115 (affirming district court's holding that "the event or contingency must be inherently associated with a potential financial [or economic] consequence, not just that the event or contingency have some potential downstream financial consequence" (quoting *KalshiEX, LLC v. Hendrick*, 817 F.Supp.3d 1014, 1027–28 (D. Nev. 2025))). The Ninth Circuit held that "reading the statute so expansively as to include any conceivable downstream economic consequence would render the definition of swap so broad as to be meaningless," and "reading 'associated with' narrowly is supported by the surrounding statutory language." *Id.* at 1116; *see also Nessel I*, 2026 WL 1166362, at *3; *QCX LLC v. Nessel (Nessel II)*, No. 1:26-cv-00710, 2026 WL 1895958, at *3,

*6 (W.D. Mich. June 17, 2026). "[E]xternalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Hendrick*, 817 F.Supp.3d at 1028. Nor is the ability "to enable market actors to gauge likelihoods or probabilities more generally about economically nonsignificant events [… like] the probability that a broadcaster says a random word on air." *Schuler*, 2026 WL 2884087, at *16.

Without a limiting principle, "*[a]nything* can potentially have economic ramifications given enough attenuation and happenstance" so as to constitute a swap, which is clearly an absurd result contrary to Congress's intent. *Nessel II*, 2026 WL 1895958, at *3. As the Sixth Circuit recently observed, "If we were to adopt Kalshi's preferred approach, 'associate with' would effectively have no force." *Schuler*, 2026 WL 2884087, at *11–12. Accordingly, the court held:

> [W]e view "associate with" as requiring that the event be inherently associated with a financial consequence, such that it would be commonly understood that those kinds of contracts could be used to transfer financial risk or derive pricing information that could promote market stability….

*Id.* at *11–12 (relying on the principle of *noscitur a sociis* to find that a narrower reading of § 1a(47)(A)(ii) is more consistent with the broader context of the statute). In the CEA, Congress defined the term "swap" in a particular context. "If that context is ignored, the definition of the term 'swap' becomes so broad that it sweeps

in any agreement or transaction dependent on anything happening that could conceivably result in any degree of financial consequence for anyone[,] … intrud[ing] not only on the province of state gambling law but also on … family law (prenuptial agreements), among others." *Nessel II*, 2026 WL 1895958, at *6.

Kalshi's sports betting contracts do not satisfy the CEA's requirements and therefore do not qualify as swaps.

2. *Congress did not manifest clear intent to repeal key provisions of IGRA or to make the CFTC a gaming regulator.*

Congress did not repeal key aspects of IGRA and grant the CFTC the authority to regulate nationwide sports betting. *See Blue Lake*, 191 F.4th at 1089. The Ninth Circuit expressly recognized that "[Congress] did not say [] that the CEA displaces other federal statutes, much less IGRA's separate regulation of gambling on Indian lands—a subject on which Congress has spoken 'repeatedly, deliberately, and specifically.'" *Id.* (citation omitted)); *see also Williams*, 2026 WL 2017466, at *9 ("New York's gambling laws, which seek to regulate gaming in the state, complement rather than conflict with federal law."); *Assad*, 190 F.4th at 1120 ("[B]ecause Congress has spoken on the issue of gambling in other statutes (and did not impliedly repeal or amend those statutes through Dodd-Frank), there is no limiting principle to Kalshi's broad reading of the definition of swap and adopting that reading would assume that, by granting the CFTC regulatory authority over gaming nationwide, Congress 'hid an elephant in a mousehole.'"). Specifically, in

*Blue Lake*, the Ninth Circuit held that not only did sports-event contracts constitute class III gaming pursuant to IGRA when conducted on Indian lands, 191 F.4th at 1082, 1083, but that the CEA and any "exclusive jurisdiction" it grants to the CFTC does not displace IGRA's (or tribes') regulation thereof, *id.* at 1089. The Western District of Wisconsin held similarly, explaining:

> the CEA would [not] necessarily preempt IGRA, nor limit … tribal authority. On the contrary, '[a]lthough Congress has plenary authority over tribes,' the Supreme Court cautions against 'lightly assum[ing] that Congress in fact intends to undermine Indian self-government.' Neither are courts to find Congress repealed its own laws 'by implication,' nor abrogate tribal sovereign authority without expressly and unequivocally saying it is doing so.

*Ho-Chunk*, 2026 WL 1284077, at *10 (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978)).

Here, Congress expressed the opposite intent to what Kalshi's argument implies, and went out of its way to prevent event-contract markets from functioning as or facilitating gambling. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (colloquy between Sens. Feinstein and Lincoln).

The CFTC acted consistently with Congress's intent by promulgating its blanket prohibition of event contracts involving gaming.[5] 17 C.F.R. § 40.11(a)(1);

[5] The CFTC recently proposed a rule that would, among other things, eliminate its blanket prohibition on gaming-related contracts. *See generally* 91 Fed. Reg. 35806. But, as former Senator Christopher J. Dodd—a principal author of the Dodd-Frank

*Assad*, 190 F.4th at 1117 (17 C.F.R. § 40.11(a)'s "use of the phrase 'shall not' prohibits Kalshi from listing its sports event contracts on a DCM and 'creates an obligation impervious to judicial discretion.'" (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998))). When it originally promulgated this prohibition, the CFTC explained that its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" 76 Fed. Reg. at 44786 (citation modified). Thus, the CFTC recognized that the Special Rule reinforced Congress's existing policy *against* sports betting.[6]

---

Act—emphasized in his public comment:

> the proposed regulatory amendments contradict the language and intent of the Dodd-Frank Act and promote public policies opposing what Congress clearly intended.… The term "gaming" was included in the Special Rule to prevent things like sports wagering and other similar wagers through regulated "event contracts." "Gaming" is a legal term of art that Congress has used in statutes when regulating what is commonly known as "gambling."

Christopher Dodd, Comment on Proposed Rule on Prediction Markets; Public Interest Determinations (July 26, 2026), https://www.regulations.gov/comment/CFTC-2026-1189-0100.

[6] Under Kalshi's theory, prediction markets can simply call a sports wager a "swap"—regardless of its validity—and list it for trade on a DCM. According to Kalshi, CFTC inaction—despite banning "gaming" contracts via 17 C.F.R. § 40.11(a)(1)—is all that is required to bless illegal event contracts blatantly designed

Furthermore, Kalshi (a private company)—not Congress—claims that the CEA's definition of "swap" displaces tribal, state, and federal regulation of sports betting. The text and legislative history of the 2010 CEA amendments confirm that the CFTC was not established to regulate sports betting. And, until recently, the CFTC likewise did not assert such authority itself. *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (June 10, 2024) ("The [CFTC] is not a gaming regulator … and the [CFTC] does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources in this manner.").

This Court should reject Kalshi's efforts to expand the CFTC's jurisdiction to a vast new area of regulation.

---

for no other purpose than to enable gambling. But "[b]ecause the definition of swap cannot turn on whether the transaction occurred on a [DCM], the definition either produces the absurd result of forcing broad swaths of ordinary transactions onto [DCMs] through § 2(e), or it does not, and [their] preemption theory falls apart because excluding those other ordinary transactions excludes [Kalshi's] sports betting products as well." *Nessel II*, 2026 WL 1895958, at *8; *see also* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694, 30695 n.8 (July 21, 1989) ("The Commission and the courts have consistently recognized that the requirement that a futures contract be executed on a [DCM] is what makes the contract legal, not what makes it a futures contract." (citation modified)).

3. *The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to repeal portions of IGRA when it amended the CEA in 2010 (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes. *See, e.g.*, *Bryan v. Itasca Cnty., Minn.*, 426 U.S. 373, 392 (1976); *see also Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*, 228 F.3d 82, 92 (2d Cir. 2000); *Ho-Chunk Nation*, 2026 WL 1284077, at *7. Federal courts have consistently applied these canons for over a half-century to ensure that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance the United States' special relationship with tribes, without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974).

## II. The Major Questions Doctrine Forecloses Kalshi's Theory

When Congress amended the CEA in 2010 to add the new definition of "swap" and enact the Special Rule, federal law—the Professional and Amateur Sports Protection Act ("PASPA")—largely prohibited sports betting nationwide. The contemporaneous view of the CFTC was that those amendments were consistent with this policy. *See* 76 Fed. Reg. at 44786. Kalshi's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but also to reverse the federal policy that at the time prohibited sports betting—turning it instead into a nationwide authorization of such

betting under the jurisdiction of the CFTC. Whether Congress did so is a major question. *See Assad*, 190 F.4th at 1119.

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in cases where an agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation modified). In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization." *Id.* at 723 (citation modified). Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* (citation modified). "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' [courts] typically greet its announcement with a measure of skepticism. [They] expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)).

In effect, Kalshi's preemption argument would mean that, at a time when federal law broadly prohibited sports betting, the 2010 CEA amendments nullified both state and tribal gaming regulations, legalized sports betting nationwide, and

placed a multi-billion-dollar sports betting industry under the regulatory jurisdiction of the CFTC. This is unquestionably a "radical" and "fundamental" overhaul to both PASPA and IGRA, and certainly raises concerns of "economic and political significance," *see West Virginia*, 597 U.S. at 721, and thus "create[s] a major-questions problem," *see Assad*, 190 F.4th at 1119. This Court therefore has significant "reason to hesitate" and should require "clear congressional authorization" before even considering Kalshi's preemption argument. *West Virginia*, 597 U.S. at 723–24.

Here, gaming regulation, and even sports betting regulation specifically, has been understood to be within traditional state power, *see Murphy*, 584 U.S. at 474, 481–85 (2018), and Congress therefore must be clear when it "alter[s] the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001); *Assad*, 190 F. 4th at 1119. As the Supreme Court noted in *Murphy*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling." 584 U.S. at 484. And even when Congress chose to prohibit sports betting in PASPA, it did so *through* state regulation, rather than by directly regulating private actors. *See id.* at 484–85.

Similarly, courts have long recognized tribes' inherent sovereign authority to regulate gaming on their lands. *See Cabazon Band*, 480 U.S. at 207–14. IGRA

broadly advances tribes' "exclusive right to regulate [and offer] gaming activity" (including sports betting) on their Indian lands as a means of promoting tribal economic development and self-determination. *See* 25 U.S.C. §§ 2701(5), 2702(1); 25 C.F.R. § 502.4(c); *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1062–63 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024). And later-enacted statutes of general applicability—like the CEA—cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with tribes—such as IGRA—without a clear statement from Congress. *See, e.g.*, *Mancari*, 417 U.S. at 550.

Accordingly, because regulating gaming (including sports betting) has long been a traditional state and tribal power, Kalshi must show clear congressional language overturning federal policy. But they cannot, because no such language exists. *See, e.g.*, *Assad*, 190 F.4th at 1120. ("We are 'reluctant to read into ambiguous statutory text' a 'radical or fundamental change' to that longstanding statutory scheme. Congress did not take a wrecking ball to all sports gambling regulations built up over decades by federal, state, and tribal governments when it amended the CEA to add the definition of swap…." (quoting *West Virginia*, 597 U.S. at 723)); *see also Schuler*, 2026 WL 2884087, at *18–19; *Ho-Chunk Nation*, 2026 WL 1284077, at *9–10. Rather, the CEA *reinforces* the federal policy in favor of state gaming regulation by disclaiming preemption of state gaming laws. *See* 7

U.S.C. § 16(e). And nothing in the definition of "swap" indicates that Congress meant to overturn the entire field of sports betting regulation or Indian gaming.

Moreover, sports betting has a "unique place in American history and society," and therefore its own "political history." *Cf. Brown & Williamson*, 529 U.S. at 159–60. Given this social and political history, at the time of the 2010 CEA amendments, Congress had already "for better or for worse, … created a distinct regulatory scheme" for sports betting—namely, PASPA. *Cf. id.* at 160. The conflict between Kalshi's argument that the CEA's 2010 amendments authorized sports betting nationwide and the existence of PASPA's nationwide sports betting prohibition in 2010 therefore indicates that Congress could not have intended to regulate sports betting in the way that Kalshi now claims. "Given this history and the breadth of the authority" that Kalshi asserts the CFTC has, this Court should not defer to Kalshi's "expansive construction" of the CEA. *Cf. id.*

Further, the Supreme Court's elimination of PASPA as a barrier to sports betting in 2018—when it held PASPA unconstitutional—has no bearing on whether Congress's CEA amendments *in 2010* had the effect of obliterating PASPA (and IGRA) and the state laws on which it relied. *See Murphy*, 584 U.S. at 486. In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had *already* preempted all state gaming laws eight years earlier. *See id.* at 479–80. Rather, as the Supreme Court concluded, "[t]he legalization of sports

gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own*." *Id.* at 486 (emphasis added). In other words, Kalshi's deregulatory elephant was hidden in a statutory mousehole far too small for the Supreme Court to notice when deciding whether sports betting would be legal.

Ignoring history, context, and common sense, Kalshi presents an alternative reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5, governs nationwide sports betting, including that occurring on Indian lands. This position directly contradicts the position held by the CFTC for decades. *See* 76 Fed. Reg. at 44786 ; 89 Fed. Reg. at 48982–83. Kalshi therefore creates a world where Congress repealed the comprehensive regulatory scheme set forth in IGRA, similar structures set up by state law, and the federal policy requiring states to prohibit sports betting, as codified in PASPA. And Kalshi, incredibly, argues all of this happened without even a whisper of legislative intent.

Kalshi's position cannot withstand even the slightest scrutiny. As the Southern District of New York aptly stated: "Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps." *Williams*, 2026 WL 2017466, at *7.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court affirm the district court's decision to deny Kalshi's motion for preliminary injunction.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Joseph H. Webster*
JOSEPH H. WEBSTER
*Counsel of Record*
JENS W. CAMP
ALEXANDRA K. HOLDEN
HOBBS, STRAUS, DEAN & WALKER, LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
jcamp@hobbsstraus.com
aholden@hobbsstraus.com
*Attorneys for Tribal Amici*

SCOTT CROWELL
CROWELL LAW OFFICE
TRIBAL ADVOCACY GROUP PLLC
1487 W. State Route 89 A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Attorney for Rincon Band of Luiseño Indians, Santa Ynez Band of Chumash Mission Indians, and Spokane Tribe of the Spokane Reservation*

MICHAEL HOENIG
YUHAAVIATAM OF SAN MANUEL NATION
422 1st Street SE
Washington, DC 20003
(909) 936-9684
michael.hoenig@sanmanuel-nsn.gov

*Attorney for Yuhaaviatam of San Manuel Nation and San Manuel Gaming & Hospitality Authority*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume requirements of Local Rule 29.1 because it contains 6,906 words, excluding those items exempted by Federal Rule of Appellate Procedure 32(f), and is less than one-half of the 14,000-word limit for principal briefs as set by Local Rule 32.1(a)(4)(A).

The brief also complies with the type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: November 9, 2026

*/s/ Joseph H. Webster*
Joseph H. Webster

## CERTIFICATE OF SERVICE

I hereby certify that, on November 9, 2026, I electronically filed the foregoing Brief of *Tribal Amici Curiae* in Support of Defendant-Appellees and Affirmance with the United States Court of Appeals for the Second Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.

Dated: November 9, 2026

*/s/ Joseph H. Webster*
Joseph H. Webster